# ADMINISTRATIVE (AFBCMR) RECORDS

Wilma P. Webster, 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

Docket Number BC-2002-01487

**VOL 1 OF 3**

**(pgs 1-459)**

**PRIVACY ACT DATA OF 1974**

*****

**Under the Privacy Act of 1974, information reflected (including attachments) must be safeguarded. Disclosure of information is IAW AFI 33-119, AFI 33-127, AFI 33-129, AFI 33-332, AFI 33-219, and PL 93-579. For Official Use Only (FOUO)**

*****

# United States [illegible] of America

## DEPAR[illegible]NT OF THE AIR FORCE

Andrews AFB, Maryland, February 8, 2006

I HEREBY CERTIFY [illegible]m the official custodian of all Air Force records and material on file in the office of t[illegible] Force Board for Correction of Military Records, and that the papers attached hereto a[illegible]ntic copies of Air Force records and material contained in said files relative to the cas[illegible]LMA P. WEBSTER, 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, AFBCMR Case File Number BC-2002-01487.

MACK M. BURTON
Executive Director
Air Force Board for Correction
of Military Records

I HERE[illegible]TIFY that MACK M. BURTON, who signed the foregoing certificate, is the Executiv[illegible] of the Air Force Board for Correction of Military Records and OFFICIAL CUST[illegible]d that to his certification as such, full faith and credit are and ought to be given.

IN TESTIMONY WHEREOF, Michael W. Wynne, Secretary of the Air Force, have hereunto caused the seal of the Department of the Air Force to be affixed and my name to be subscribed by the Administrative Assistant to the Secretary of the Department, at the city of Arlington, State of Virginia.

this 15th day of February, 2006.

MICHAEL W. WYNNE
*Secretary of the Air Force.*

By ______________________________
*Administrative Assistant.*

# VOLUME I

# Table of Contents


| Page No. | Contents |
|---|---|
| i | AF Form 44, dated February 26, 2004 |
| ii | Table of Contents |
| 1 | AFBCMR Letter, dated February 4, 2003 |
| 2 | SAF/MRB Memorandum, dated February 4, 2003 |
| 3 | Record of Proceedings, dated February 4, 2003 |
| 13 | Exhibit A, DD Form 149, dated April 25, 2002, w/atchs |
| 170 | Exhibit B, Master Personnel Records - withheld |
| 171 | Exhibit C, AFMOA/SGZC, Letter, dated August 16, 2002, w/atchs |
| 1452 | Exhibit D, AFPC/DPAMF1, Letter, dated September 25, 2002 |
| 1454 | Exhibit E, SAF/MIBR, Letter, dated October 4, 2002 |
| 1455 | Exhibit F, Counsel, Letter, dated November 7, 2002 w/atchs |
| 1465 | Exhibit G, Record of Proceedings, dated February 4, 2003 |
| 1475 | Exhibit H, Counsel Letter, dated August 19, 2004, w/atchs |
| 1501 | Exhibit I, Minority Report, dated December 27, 2004 |
| 1502 | Letter, AFBCMR, dated December 28, 2004 |
| 1503 | Addendum to Record of Proceedings, dated December 28, 2004 |
| 1506 | SAF/MRB Memorandum, dated December 28, 2004 |

# EXHIBIT B
# MILITARY PERSONNEL RECORDS - WITHHELD

**DEPARTMENT OF THE AIR FORCE**
**WASHINGTON, DC**

Office of the Assistant Secretary

AFBCMR
1535 Command Drive
EE Wing, 3rd Floor
Andrews AFB, MD 20762-7002

FEB 4 2003

Major Wilma P. Webster, USAF, Retired
c/o Mr. James L. Stanton
Historic Library Plaza, Suite 1012
1823 Harney Street
Omaha, NE 68102

Dear Major Webster

Your application to the Air Force Board for Correction of Military Records, AFBCMR 02-01487, has been finalized.

The Board determined that the military records should be corrected as set forth in the attached copy of a Memorandum for the Chief of Staff, United States Air Force. The office responsible for making the correction will inform you when your records have been changed.

After correction, the records will be reviewed to determine if you are entitled to any monetary benefits as a result of the correction of records. This determination is made by the Defense Finance and Accounting Service (DFAS-DE), Denver, Colorado, and involves the assembly and careful checking of finance records. It may also be necessary for the DFAS-DE to communicate directly with you to obtain additional information to ensure the proper settlement of your claim. Because of the number and complexity of claims workload, you should expect some delay. We assure you, however, that every effort will be made to conclude this matter at the earliest practical date.

Sincerely

RALPH J. PRETE
Chief Examiner
Air Force Board for Correction
of Military Records

Attachments:
1. Record of Proceedings
2. Copy of Directive

cc:
DFAS-DE

**DEPARTMENT OF THE AIR FORCE**
**WASHINGTON, DC**

Office of the Assistant Secretary

FEB 4 2003

AFBCMR 02-01487

MEMORANDUM FOR THE CHIEF OF STAFF

Having received and considered the recommendation of the Air Force Board for Correction of Military Records and under the authority of Section 1552, Title 10, United States Code (70A Stat 116), it is directed that:

The pertinent military records of the Department of the Air Force relating to WILMA P. WEBSTER, 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, be corrected to show that:

a. On 27 July 1998, she executed, and competent authority approved, a 1-year Additional Special Pay Contract, effective 28 July 1998.

b. On 27 July 1999, she executed, and competent authority approved, a 1-year Additional Special Pay Contract, effective 28 July 1999.

JOE G. LINEBERGER
Director
Air Force Review Boards Agency

RECORD OF PROCEEDINGS
AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

FEB 4 2003

IN THE MATTER OF:

WILMA P. WEBSTER

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

DOCKET NUMBER: 02-01487
INDEX CODE: 134.02
COUNSEL: Mr. James L. Stanton

HEARING DESIRED: YES

---

APPLICANT REQUESTS THAT:

1. The findings and recommendations of a Medical Practice Review Board (MPRB) restricting her from practicing Emergency Room (ER) medicine be removed from her records.

2. The determination of the 24th Medical Group commander restricting her from practicing medicine in the Family Practice/Primary Care/Aerospace Medicine clinics without 100 percent supervision for six months be removed from her records.

3. The adverse correspondence provided to the National Practitioner Data Bank (NPDB) by the Office of the Surgeon General of the Air Force (AF/SG) be rescinded, or in the alternative, the restriction be reduced to supervised practice in the ER and clinical settings.

4. She be granted physicians incentive pay and other benefits from 1 Jan 99 through 1 Dec 00.

---

APPLICANT CONTENDS THAT:

The findings and recommendations of the MPRB held at Howard AFB, Panama, and the subsequent actions by her commander and the AF/SG did not meet the criteria set forth in AFI 44-119. The basis for convening the MPRB was primarily ten patient complaints. Of the ten complaints the MPRB found that eight pertained to waiting times that did not appear to have resulted in any adverse outcomes. The two remaining complaints were a letter from an NCO about the applicant crying during his appointment, inappropriate comments she made about hospital officials, a dream she related about shooting hospital leadership, and having discussed her childhood sexual abuse with a technician in the front office. The MPRB concluded that because the applicant did not deny them, the incidents did occur. A physician agreed that while inappropriate, the outbursts were secondary to stress and concluded that she was neither suicidal nor homicidal. The MPRB concluded that these incidents were consistent with her inability to handle stressful situations in an appropriate manner and felt that she should limit her practice to settings which do not produce undue stress. The other incident involved a complaint about the applicant's treatment for a cat bite by a patient who contended that the applicant failed to render proper care by

failing to initiate a tetanus shot, delivering the wrong oral antibiotic, and prescription of an incorrect dosage of rabies immunoglobin. The MPRB found that the allegations were true and that they were corrected immediately and had no adverse effect upon the patient's care.

In another incident, the applicant prescribed a patient Tylenol but handed the patient a bottle of Benadryl instead. The MPRB concluded that the mistake did occur but noted that both medicines were elixir-type drugs in identical bottles with identical labels of the same color manufactured by the same manufacturer. The Pharmacist testified that this error was not uncommon and not isolated to the applicant. The Pharmacist also testified that the applicant was highly regarded for her pharmacological knowledge. The MPRB also noted that there were only two medication errors by the applicant since her arrival six months earlier and that she had seen well over 1,000 patients during that time.

The more serious complaint was a "Code Blue" situation. The main complaints in this situation were her inadequate airway control, inability to properly follow Advanced Cardiac Life Support (ACLS) guidelines, CPR, and defibrillation. The patient died from cardiac arrest. The applicant was in charge of directing Code Blue on the patient with the assistance of Major B--- and Colonel O---. The MPRB found that there was a breach in the standard of care by the applicant and that her conduct did have a potential to adversely affect the quality of patient care. The MPRB noted, however, that it was difficult to objectively assess the situation because they were not provided certain support documents, notwithstanding their request that such documents be produced. Major B-- testified that the requested materials were not available but for some unexplained reasons, they reappeared after the MPRB hearing. The MRPB stated that it had to rely upon eyewitness testimony of Major B--- and Colonel O--- and concluded that the applicant was unable to successfully intubate the patient and failed to adequately follow ACLS protocol. The MPRB noted that she demonstrated a visible uneasiness when confronted with a hypothetical ACLS scenario and did appear to be in control of the situation. The MPRB concluded by stating that under nonstressful situations, she is capable of performing airway management and made the additional comment that there is a tremendous difference between real code and a controlled environment. Counsel states that even including the Code Blue, all of the complaints and allegations against the applicant were non-life threatening and did not affect any of the patients adversely. She saw 1,151 patients in the eight months that she practiced as an ER provider. There were only two medication complaints and nine complaints dealing with patient concerns with time waiting to be seen in the ER. The applicant should have been able to continue to practice ER medicine, or clinical medicine as recommended by the MPRB instead of never being permitted to treat any patients from the time of the board until her medical discharge.



4

The MPRB noted that it was alleged that the applicant suffered from Multiple Sclerosis (MS), neuropsychological deficits, and carpal tunnel syndrome. The MPRB noted that she faced a Medical Evaluation Board (MEB) and was returned to duty following a determination that she did not have a clinical diagnosis of MS. While stationed in Panama she was evaluated at Wilford Hall Medical Center by the Chairman of Neurology, whose findings were consistent with the diagnosis of MS. An independent neurologist evaluation at the Beth Israel Deaconess Medical Center determined that further clinical symptoms were necessary before a final conclusion was drawn and that her symptoms were more consistent with Guillan-Barre syndrome/Miller Fisher variant. The MPRB agreed that further clinical symptoms should occur before MS could be substantiated and limiting her practice as a physician based on physical disability could not be justified. However, that is exactly what happened despite the MPRB's recommendation. The Air Force had a duty to give her the opportunity to comply with the restrictions placed on her by the MPRB and her commander. She was never given the opportunity to practice as a physician in a clinical setting (except at Keesler AFB) and was not placed in a clinical setting at Howard AFB. Because Howard AFB was scheduled to close, she was reassigned to Offutt AFB. She was sent on temporary duty for two weeks to the medical facility at Keesler AFB for observation of her ER capabilities. The commander of the medical facility at Keesler AFB made a report to her commander at Offutt AFB that all the Air Force physicians at Keesler AFB who observed her actions recommended that she not be returned to duty in an ER but that she would be quite capable of performing medical duties in less stressful medical clinics. While assigned at Offutt AFB she was not assigned to a clinical setting as a physician but instead was relegated to duties of reviewing medical records and those of a file clerk. This arbitrary action totally destroyed her ability to practice as a physician and resulted in another MEB followed by a Physical Evaluation Board (PEB). This action demonstrated the Air Force's quest to remove her from practicing medicine and to ultimately remove her from the Air Force.

The Air Force conducted its hearings, made its recommendations and her commander added his approval with the slight modification of having her clinical practice 100 percent supervised for 6 months instead of the recommended 3 months. Her commander made the decision to go forward with her practicing in clinics instead of the ER. The MPRB noted that she possessed requisite knowledge to be a physician and the physicians who reviewed her ER capabilities agreed that she should be permitted to practice in a clinical setting. Notwithstanding these recommendations, she was never placed in a clinical setting. This not only humiliated her as a military physician but also took away her ability to demonstrate and improve her clinical abilities, but most importantly, took away her livelihood as a physician for the rest of her life. The applicant had the right to rely on the MPRB's recommendation and her commander's statement that she would be placed in a clinical setting. Had this happened she could have at least salvaged her medical career from a standpoint of rendering medical service in a non-emergency room setting both

while in the Air Force and as a civilian. The Air Force initiated a second MEB in July 2000 based again on its assertion that she had MS. The MEB recommended a PEB be conducted which eventually resulted in her medical disability retirement. The Air Force indicated that because of this condition, she should not be placed even in a clinical position. Neither the first PEB nor the MPRB concluded that she could not provide clinical care, therefore, any claim that her medical condition would prevent her from providing routine care was without any basis in fact.

In support of her request, applicant provided her counsel's brief, documentation associated with her clinical privileges hearing and appeals thereof, documentation associated with her MEB and PEB determinations, a copy of her permanent change-of-station orders, documentation associated with her medical skills evaluation at Keesler AFB, a personal statement, copies of clinical neuropsychological reports, a letter from her attorney and her commander's response, policy on medical licensure letter, her statement of military compensation; a copy of her Active Duty Service Commitment Counseling Statement, a Leave and Earnings Statement, and extracts for several Air Force instructions. Her complete submission, with attachments, is at Exhibit A.

---

STATEMENT OF FACTS:

On 20 Jun 92, the applicant, a prior service Army Reserve officer, was appointed a major, Medical Corps, Reserve of the Air Force. She was voluntarily ordered to extended active duty on 28 Jul 92.

A credentials hearing was conducted to address matters that pertain to her clinical proficiency, professional conduct as well as matters affecting her mental and physical well-being. The hearing addressed patient complaints, mental/physical limitations mounting to an unacceptable impairment, forgetful/disorganization in the clinical setting, inappropriate actions, and allegations of substandard care in the ER setting. The applicant was represented by counsel and presented her own evidence and witnesses. The hearing committee unanimously concluded that she should not practice in an ER setting due to the concern that she does not adequately manage task-saturated events, family practice/primary care/aerospace medicine privileges should be allowed, she should be monitored with 100 percent chart review for no less than 3 months, and at the conclusion of the three-month period her privileges should be reevaluated. She appealed the decision to the AF/SG on the basis that the government failed to produce crucial medical records, the government introduced records not provided to the applicant prior to the hearing, the government exerted command influence upon at least one witness, the government failed to assure impartiality of the Hearing Committee, and the government went outside the hearing record to investigate an incident without advising the applicant. AF/SG completed a review of the adverse action and her appeal. AF/SG

agreed with the MPRB and directed this action be reported to the NPDB and States of known licensure.

While stationed at Offutt AFB, the Air Force offered her an additional reevaluation of her emergency room practice. She was sent to Keesler AFB for reevaluation. During this time six ER physicians provided direct evaluation of her ER practice. Their recommendations stated that it would not be prudent to leave the applicant alone in charge of an emergency department, that she was not a competent emergency physician, and most (but not all) evaluators believed that she could perform in a satisfactory manner in a controlled, slower clinical setting. They concluded that she has good clinical knowledge in most settings but all agreed that she couldn't handle the "multi-tasking" needed in the emergency medicine specialty.

An MEB was convened on 1 Dec 98 and referred her case to an Informal Physical Evaluation Board (IPEB) with a diagnosis of Gullian-Barre syndrome, MS, antisocial, histrionic, and narcissistic personality traits, cognitive disorder, and glaucoma. On 28 Jan 99, the IPEB recommended that she be returned to duty.

On 12 Jul 00, an MEB was convened and referred her case to an IPEB with a diagnosis of MS versus, less likely, recurrent Miller-Fisher variant of Gullian-Barre. On 10 Aug 00, the IPEB found her unfit for further military service based on a diagnosis of MS, associated with secondary cognitive deficit and recommended that she be permanently retired with a compensable percentage of 30 percent. The applicant disagreed with the findings and recommended disposition of the IPEB and requested a Formal PEB (FPEB). On 20 Sep 00, the applicant elected to waive her right to an FPEB and indicated that she concurred with the findings and recommended disposition of the IPEB. On 17 Oct 00, the Office of the Secretary of the Air Force directed that she be retired in the grade of major with a compensable rating of 30 percent. She was retired on 1 Dec 00. She served eight years, four months, and four days on active duty.

---

AIR FORCE EVALUATION:

AFMPA/SGZC reviewed applicant's request and recommends denial. SGZC states that it is important to note that she was provided a Credentialing package upon her arrival at Offutt AFB. She only applied for ER clinical privileges. She did not apply for Family Practice clinic privileges. Because she did not apply for Family Practice privileges, the facility did not have an opportunity to reevaluate her after a period of supervision in this clinical setting.

Regarding the applicant's allegation that her rights were violated for failure to produce crucial medical records used by the Credentials Hearing, SGCZ states that the medical documentation was missing for a period of time during the adverse



7

privileging action and was found just prior to the hearing. AF/SG did not consider this information as a basis for the action taken upon her privileges. Regarding her allegation that there was undue command influence upon at least one witness, SGCZ states that the witness stated she felt pressured not to testify for the applicant, she did testify on her behalf and the testimony did not have any negative impact on the applicant. Regarding her allegation that the medical treatment facility failed to assure impartiality of the hearing committee, SGCZ states that this allegation is based on one statement from a hearing member who stated he had confidence in Major B---'s performance during the code blue incident, Major B---'s performance was not in question and this is irrelevant to this case. Regarding her allegation that one member of the medical treatment facility went outside the Hearing record to investigate a peer review at a different medical facility, SGCZ states that one committee member telephoned Langley AFB to inquire about the results of a peer review on the code blue involving the applicant. No information was provided to the member and giving her the benefit of the doubt, was not considered as a factor in the final decision by AF/SG. Regarding her allegation that she does not have a higher patient complaint rate than her peers, SGCZ states that this allegation cannot be validated since patient complaint rates were submitted by the medical treatment facility. The patient complaints submitted on her behalf demonstrated labile emotional and behavioral issues. Regarding her allegation that she did not have opportunity to respond to the patient complaints and there is no documentation of poor patient outcomes, SGCZ states that there is general agreement that she posses good medical knowledge. Her diagnosed cognitive deficits have impacted her ability to manage a fast-paced, multi-tasked emergency room environment. Once this problem was recognized the facility took action to prevent any medical mishaps. Regarding her allegation that other physicians supported her medical care, SGCZ states that some physicians provided supportive statements; however, none of the statements was from her peer emergency room physicians, the specialty where she was felt to be deficient. Regarding her allegation that the medical facility produced new evidence without providing the evidence to her, SGCZ sates that there is no reference to this information, it was not considered as a factor by the Hearing Committee or the MPRB and had no impact on the final outcome. The SGZC evaluation, with attachments, is at Exhibit C.

AFPC/DPAMF1 reviewed applicant's request and recommends denial. DPAMF1 states that revocation of the applicant's ER privileges was authorized in accordance with AFI 44-9119 and was done so appropriately as the discretion of the medical facility commander and supported by AF/SG. Title 37, Chapter 5 of the United States Code states that an officer in not eligible for incentive special pay unless the Secretary concerned has determined that such officer is qualified in the medical profession. The Secretary of the Air Force delegated authority to approve and disapprove physician special pays on 22 Jun 98. AFI 41-9109, Special Pay for Health Professionals, states that a Medical Corps officer is entitled to incentive pay if the individual is fully qualified in

a medical specialty and practicing in that specialty. Based on the determination of the Air Force MPRB and the AF/SG, she was not eligible to receive physician incentive pays.

The DPAMF1 evaluation, with attachments, is at Exhibit D.

---

APPLICANT'S REVIEW OF AIR FORCE EVALUATION:

Counsel responded and states that the MPRB did not recommend that the applicant's medical privileges be "revoked" but only that she should be monitored with 100 percent chart review for no less than 3 months and then reevaluated at the conclusion of that period. This, in fact did not occur. It was her commander who expanded the MPRB's recommendation to "rescind" her emergency medicine privileges and to direct that her clinical privileges "be continued in Category 2 with 100 percent chart review and full supervision for a period of 6 months." While the physicians at the ER at Keesler AFB did not think she should be left alone and in charge of an emergency department, counsel points out that this should not preclude her from being able to prove herself in the future by being an assistant ER provider in a civilian hospital. The significance of the fact that most, but not all of the ER evaluators believed that she could perform in a satisfactory manner in a controlled slower clinic setting seems to have been lost in the review. Nobody in authority in the Air Force has given the applicant the benefit of these positive statements and counsel contend that these statements are very significant in evaluating her abilities to perform medical duties in a clinical setting.

SGCZ states that when she was given a credentialing package, she only applied for ER clinical privileges claiming that it was her responsibility to apply for credentialing and that credentialing is not awarded until application is made for them. This may be the routine under normal circumstances but not under the applicant's circumstances. The Air Force had the duty to take the steps necessary to insure that she was reevaluated in both the ER and clinical settings regardless of where she was assigned. The statement of her commander clearly shows that it was the responsibility of the Air Force, not the applicant, to assure that both her clinical privilege status be reevaluated. In the Staff Judge Advocate's memorandum to her commander, he recommended against reassigning her because he believed it would give the appearance of reprisal against her because of the adverse hearing outcome. He further recommended such action be coordinated with the major command and that her gaining unit officials be notified of her situation. From the time the applicant arrived at Offutt AFB she was only allowed to do administrative tasks and was never permitted to see any patients in any clinic despite her repeated voicing her desire to do so. The Air Force was at fault for not assigning her to clinical duties and in failing to follow through with reevaluating her performance of clinical duties.

Her commander noted that he had reviewed the record of the MPRB hearing, including the AETC Form 1280 Code Blue Record, which was noted as missing at the time of the hearing. This corroborates the applicant's allegation that the MPRB did not have the opportunity to review this crucial document which would have been to her benefit because it shows that even though she was unable to intubate the patient, the patient was intubated by Major B---. This documentation also refutes testimony of Major B--- where he related that the applicant failed to defibrillate the patient in a timely manner. The facts are that the procedures were done but the MPRB did not review this documentation before it made its report.

During the hearing, her attorney challenged Major B---'s testimony concerning the Code Blue and the challenge was not allowed by the Chairman of the Board. His statement clearly showed that the Chairman was biased in Major B---'s favor which is crucial to understanding that not only was Major B--- a key witness against the applicant but on his own initiative he prepared a letter to the commander recommending what action should be taken and also recommending that her monitoring and reevaluation not be accomplished at Howard AFB.

It should be noted that prior to her evaluation at Keesler AFB her ER experiences were at relatively small ER facilities, which by their very nature would limit the extent of her capabilities. Keesler AFB, however, was home to the Air Force's second largest emergency services department with an annual patient volume of 30,000 to 35,000 visits per year. The fact that most but not all of the Keesler AFB physicians states that she could perform in a satisfactory manner in a controlled, slower clinic setting and felt that she had good clinical knowledge in most settings should be given strong consideration in restoring unlimited primacy care privileges.

Counsel's statement is at Exhibit F.

---

<u>THE BOARD CONCLUDES THAT</u>:

1. The applicant has exhausted all remedies provided by existing law or regulations.

2. The application was timely filed.

3. Insufficient relevant evidence has been presented to demonstrate the existence of error or injustice that would warrant full relief of the applicant's requests. We note that the credentials hearing committee, after deliberation on all the facts of her case, recommended that she should not practice in an ER setting and that she should be allowed clinical privileges with 100 percent chart review and reevaluation after a period of time. Her commander concurred with that recommendation. The MPRB reviewed the facts of her case and made their recommendation to the AF/SG. After review of all the facts of her case and

consideration of her appeal, the AF/SG subsequently concurred with the recommendations of the MPRB. The applicant contends that the actions taken to revoke her ER privileges and limit her to clinical duties were arbitrary, capricious, and were in violation of laws and policy; and requests that those findings and determination be removed from her records. After a thorough review of the evidence of record, it is our opinion that the actions taken to affect revocation of her ER privileges and restrict her to clinical practices were taken appropriately and in accordance with established directives. Evidence has not been presented which would lead us to believe that her commander abused his discretionary authority in this matter or that the actions taken against the applicant were based on anything other than her own performance. Upon her application for ER clinical privileges, she was reevaluated in an ER setting and it was further confirmed and recommended that she should not be placed in an ER department and she be limited to duties in a clinical setting. We note the applicant's requests that the adverse correspondence provided to the MPRB be rescinded, or in the alternative amended. However, we carefully reviewed the data contained in the Adverse Action Report provided to the MPRB and are not persuaded that the data therein is factually incorrect or that the report was improperly submitted. Therefore, we agree with the Air Force offices of primary responsibility regarding these matters, and adopt their rationale as basis for our conclusion that she has not been the victim of an error or injustice.

4. Sufficient relevant evidence has been presented warranting approval of the applicant's request to receive Additional Special Pay (ASP) for the years 1998 and 1999. A review of her pay records reflects that she remained eligible for, and continued to receive payments on her Incentive Special Pay, Multi-year Special Pay, Board Certification Pay, and Variable Special Pay contracts. Based on our review of the evidence of record, it is our opinion that although her ER privileges were revoked, the MPRB had determined that she was qualified to perform in a clinical setting. While we believe that it was at her commander's discretion to relegate her to other duties, we note that based on the findings of the MPRB, the applicant could have practiced in a clinical setting and therefore was entitled to the Additional Special Pay. Accordingly, we recommend that her records be corrected to the extent indicated below.

5. The applicant's case is adequately documented and it has not been shown that a personal appearance with or without counsel will materially add to our understanding of the issues involved. Therefore, the request for a hearing is not favorably considered.

---



11

<u>THE BOARD RECOMMENDS THAT:</u>

The pertinent military records of the Department of the Air Force relating to APPLICANT be corrected to show that:

a. On 27 July 1998, she executed, and competent authority approved, a 1-year Additional Special Pay Contract, effective 28 July 1998.

b. On 27 July 1999, she executed, and competent authority approved, a 1-year Additional Special Pay Contract, effective 28 July 1999.

---

The following members of the Board considered Docket Number 02-01487 in Executive Session on 18 Dec 02, under the provisions of AFI 36-2603:

Mr. Thomas S. Markiewicz, Vice Chair
Mr. Billy C. Baxter, Member
Mr. Grover L. Dunn, Member

All members voted to correct the records, as recommended. The following documentary evidence was considered:

Exhibit A. DD Form 149, dated 25 Apr 02, w/atchs.
Exhibit B. Applicant's Master Personnel Records.
Exhibit C. Letter, AFMOA/SGZC, dated 16 Aug 02, w/atchs.
Exhibit D. Letter, AFPC/DPAMF1, dated 25 Sep 02, w/atchs.
Exhibit E. Letter, SAF/MRBR, dated 4 Oct 02.
Exhibit F. Letter, Counsel, dated 7 Nov 02.

THOMAS S. MARKIEWICZ
Vice Chair

MAY 1 2002

D/A.. / AFBCMR / 2002 ... NPRC

# APPLICATION FOR CORRECTION OF MILITARY RECORD UNDER THE PROVISIONS OF TITLE 10, U.S. CODE, SECTION 1552

*(Please read instructions on reverse side BEFORE completing application.)*

*Form Approved*
*OMB No. 0704-0003*
*Expires Sep 30, 2003*

The public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports (0704-0003), 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302. Respondents should be aware that notwithstanding any other provision of law, no person shall be subject to any penalty for failing to comply with a collection of information if it does not display a currently valid OMB control number.

PLEASE DO NOT RETURN YOUR COMPLETED FORM TO THE ABOVE ADDRESS. RETURN COMPLETED FORM TO THE APPROPRIATE ADDRESS ON THE BACK OF THIS PAGE.

## PRIVACY ACT STATEMENT

**AUTHORITY:** Title 10 US Code 1552, EO 9397.

**PRINCIPAL PURPOSE:** To initiate an application for correction of military record. The form is used by Board members for review of pertinent information in making a determination of relief through correction of a military record.

**ROUTINE USE(S):** None.

**DISCLOSURE:** Voluntary; however, failure to provide identifying information may impede processing of this application. The request for Social Security number is strictly to assure proper identification of the individual and appropriate records.

SCANNED

**1. APPLICANT DATA**

a. BRANCH OF SERVICE *(X one)*: [ ] ARMY [ ] NAVY [X] AIR FORCE [ ] MARINE CORPS [ ] COAST GUARD

b. NAME *(Last, First, Middle Initial) (Please print)*: Webster, Wilma P.

c. PRESENT PAY GRADE: Major(Ret)

d. SERVICE NUMBER *(If applicable)*: 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

e. SSN: 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

2. TYPE OF DISCHARGE *(If by court-martial, state type of court)*: Honorable

3. PRESENT STATUS, IF ANY, WITH RESPECT TO THE ARMED SERVICES *(Active duty, Retired, Reserve, etc.)*: Medically Retired

4. DATE OF DISCHARGE OR RELEASE FROM ACTIVE DUTY *(YYYYMMDD)*: 1 Dec 2000

5. ORGANIZATION AT TIME OF ALLEGED ERROR IN RECORD: 24th Med Group, Howard AFB, Panama and 55th MDOS, Offutt AFB, NE

6. I DESIRE TO APPEAR BEFORE THE BOARD IN WASHINGTON, D.C. *(No expense to the Government) (X one)*: [XX] YES [ ] NO

7. COUNSEL *(If any)*

a. NAME *(Last, First, Middle Initial)*: Stanton, James L

b. ADDRESS *(Street, Apartment Number, City, State and ZIP Code)*:
Historic Library Plaza, Suite 1012
1823 Harney Street
Omaha, NE 68102

8. I REQUEST THE FOLLOWING CORRECTION OF ERROR OR INJUSTICE:

PLEASE SEE CONTINUATION SHEET.

9. I BELIEVE THE RECORD TO BE IN ERROR OR UNJUST IN THE FOLLOWING PARTICULARS:

PLEASE SEE CONTINUATION SHEET.

10. IN SUPPORT OF THIS APPLICATION I SUBMIT AS EVIDENCE THE FOLLOWING: *(If Veterans Administration records are pertinent to your case, give Regional Office location and Claim Number.)*

PLEASE SEE CONTINUATION SHEET.

11. ALLEGED ERROR OR INJUSTICE

a. DATE OF DISCOVERY *(YYYYMMDD)*: 26 Jan 2000

b. IF MORE THAN THREE YEARS SINCE THE ALLEGED ERROR OR INJUSTICE WAS DISCOVERED, STATE WHY THE BOARD SHOULD FIND IT IN THE INTEREST OF JUSTICE TO CONSIDER THIS APPLICATION.

12. APPLICANT MUST SIGN IN ITEM 16. IF THE RECORD IN QUESTION IS THAT OF A DECEASED OR INCOMPETENT PERSON, LEGAL PROOF OF DEATH OR INCOMPETENCY MUST ACCOMPANY APPLICATION. IF APPLICATION IS SIGNED BY OTHER THAN APPLICANT, INDICATE RELATIONSHIP OR STATUS BY MARKING APPROPRIATE BOX. Not Applicable

[ ] SPOUSE [ ] WIDOW [ ] WIDOWER [ ] NEXT OF KIN [ ] LEGAL REPRESENTATIVE [ ] OTHER *(Specify)*

13. I MAKE THE FOREGOING STATEMENTS, AS PART OF MY CLAIM, WITH FULL KNOWLEDGE OF THE PENALTIES INVOLVED FOR WILLFULLY MAKING A FALSE STATEMENT OR CLAIM. *(U.S. Code, Title 18, Sec. 287, 1001, provides that an individual shall be fined under this title or imprisoned not more than 5 years, or both.)*

14.a. COMPLETE CURRENT ADDRESS, INCLUDING ZIP CODE *(Applicant should forward notification of all changes of address.)*:
Wilma P. Webster
3031 Ontario Ct.
Rosamond, CA 93560-7602

b. TELEPHONE NUMBER *(Include Area Code)*: (661) 256-2298

DOCUMENT NUMBER *(Do not write in this space.)*: 0201487

15. DATE SIGNED *(YYYYMMDD)*: 25 April 2002

16. SIGNATURE *(Applicant must sign here.)*: Wilma P. Webster

DD FORM 149, SEP 2000 PREVIOUS EDITION IS OBSOLETE.

13

## INSTRUCTIONS

*(All data should be typed or printed)*

1. For detailed information see: Air Force Instruction 36-2603; Army Regulation 15-185; Coast Guard, Code of Federal Regulations; Title 33, Part 52; or Navy, Code of Federal Regulations; Title 32, Part 723.
2. Submit only original of this form.
3. Complete all items. If the question is not applicable, mark "None."
4. If space is insufficient, use "Remarks" or attach additional sheet.
5. Various veterans and service organizations furnish counsel without charge. These organizations prefer that arrangements for representation be made through local posts or chapters.
6. List all attachments and enclosures.
7. ITEMS 6 AND 7. Personal appearance of you and your witnesses or representation by counsel is not required to ensure full and impartial consideration of applications. Appearances and representations are permitted, at no expense to the Government, when a hearing is authorized.
8. ITEM 8. State the specific correction of record desired.
9. ITEM 9. In order to justify correction of a military record, it is necessary for you to show to the satisfaction of the Board, or it must otherwise satisfactorily appear, that the alleged entry or omission in the record was in error or unjust. Evidence may include affidavits or signed testimony of witnesses, executed under oath, and a brief of arguments supporting application. All evidence not already included in your record must be submitted by you. The responsibility for securing new evidence rests with you.
10. ITEM 11. 10 U.S.C. 1552b provides that no correction may be made unless request is made within three years after the discovery of the error or injustice, but that the Board may excuse failure to file within three years after discovery if it finds it to be in the interest of justice.

## MAIL COMPLETED APPLICATIONS TO APPROPRIATE ADDRESS BELOW

### ARMY

**(For Active Duty Personnel)**
Army Board for the Correction of Military Records
1941 Jefferson Davis Highway, 2nd Floor
Arlington, VA 22202-4508

**(For Other than Active Duty Personnel)**
Army Review Boards Agency
Support Division, St. Louis
ATTN: SFMR-RBR-SL
9700 Page Avenue
St. Louis, MO 63132-5200

### COAST GUARD

Chairman
Board for Correction of Military Records (C-60)
Department of Transportation
400 7th St., SW
Washington, DC 20590

### NAVY AND MARINE CORPS

Board for Correction of Naval Records
2 Navy Annex
Washington, DC 20370-5100

### AIR FORCE

Board for Correction of Air Force Records
SAF/MIB
550-C Street West, Suite 40
Randolph AFB, TX 78150-4742

17. REMARKS *(Applicant has exhausted all administrative channels in seeking this correction and has been counseled by a representative of his/her servicing military personnel office. (Applicable only to active duty and reserve personnel.))*

PLEASE SEE CONTINUATION SHEET.