CONTINUATION SHEET
DD FORM 149
WILMA P. WEBSTER, SSAN: 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

BLOCK 8: I request the following correction of error or injustice:

1. Void a finding and recommendation of a Medical Practice Review Board convened by the 24th Medical Group at Howard AFB, Panama, on 17-18 Feb 1999 which restricted Applicant from practicing Emergency Room medicine.
2. Void a determination by the Commander, 24th Medical Group, Howard AFB, Panama, on 24 Mar 1999, which restricted Applicant from practicing Emergency Room medicine and which further restricted Applicant from practicing medicine in Family Practice/Primary Care/Aerospace Medicine clinics without 100 per cent supervision for six months.
3. Direct the Office of the Surgeon General of the Air Force to rescind or correct its correspondence to the National Practitioner Data Bank to reverse the adverse information previously furnished by them to the National Practitioner Data Bank.
4. Grant or pay benefits, including monetary and other benefits, for the termination of various physician's incentive payments to Applicant from on or about 1 January 1999 to 1 December 2000.
5. Direct Air Force officials to remove and/or correct information from Applicant's official Air Force personnel files and records to comply with the decision of the AFBCMR on this application.

BLOCK 9: I believe the record to be in error or unjust in the following particulars:

OFFICIALS OF THE UNITED STATES AIR FORCE AND OTHER PERSONNEL OF THE AIR FORCE ACTED IN AN ARBITRARY AND CAPRICIOUS MANNER AND IN VIOLATION OF EXISTING LAW AND REGULATIONS BY LIMITING APPLICANT'S MEDICAL CREDENTIALS BY REMOVING HER FROM ANY PRACTICE IN EMERGENCY ROOM CARE AND IN LIMITING HER CLINICAL CARE CREDENTIALS BY REQUIRING 100 PER CENT MONITORING OF HER CLINICAL PRACTICE.

OFFICIALS OF THE UNITED STATES AIR FORCE AND OTHER PERSONNEL OF THE AIR FORCE ACTED IN AN ARBITRARY AND CAPRICIOUS MANNER, CONTRARY TO LAW, AND IN VIOLATION OF EXISTING LAW AND REGULATIONS BY NOT PERMITTING APPLICANT TO PRACTICE MEDICINE IN FAMILY PRACTICE/PRIMARY CARE/AEROSPACE MEDICINE AS RECOMMENDED BY A CREDENTIALS BOARD AND APPROVED BY APPLICANT'S COMMANDER AND BY TERMINATING THE VARIOUS PHYSICIAN'S INCENTIVE PAY TO APPLICANT FROM ON OR ABOUT 1 JANUARY 1999 TO 1 DECEMBER, 2000.

## BACKGROUND

On 17-18 February 1999, the 24th Medical Group at Howard Air Force Base, Panama, held a provider credentials hearing seeking revocation of Applicant's privilege to practice medicine at Howard Air Force Base. Applicant was a military physician with the rank of Major assigned to emergency room practice at the hospital operated by the 24th Medical Group of the United States Air Force. The letter of notification to Applicant of the convening of the credentials hearing and the reasons therefore is attached hereto as Attachment 1. The findings and recommendations of the three member panel is attached hereto as Attachment 2. After receiving an input from Major Burkett, Chief, Medical Staff, (Atch 3), the Commander of the 24th Medical Group, Colonel Terrence Jay O'Neil, concurred with the board's findings and recommendations except he extended her period of full supervision in Family Practice/Primary Care/Aerospace Medicine clinics from three months to six months. (Atch 4). Prior to Colonel O'Neil's decision, apparently a question had arisen as to transferring Applicant from Howard AFB and this matter was addressed by the Staff Judge Advocate of Headquarters 24th Wing in his letter of 25 February 1999, attached hereto. (Atch 5).

Applicant, through her then attorney, filed an appeal, dated April 6, 1999, to HQ USAF/SG. (Atch 6). By letter of 19 January 2000, the Air Force Surgeon General's office notified Applicant that it had reviewed her appeal and the record of the AF Medical Practice Review Board and found that the action taken by Howard AFB was appropriate and that they were notifying the National Practitioner Data Bank and the states where she held a medical license of this action. (Atch 7). Applicant's attorney filed a letter, dated January 27, 2000, disagreeing with and refuting this action. (Atch 8).

Included in the notification to the states' licensure offices was a letter from an unidentified person (name and agency blacked out) presumably written by some person who was reviewing the file for the Air Force Surgeon General's Office. (Atch 9). In the summary of this letter, the writer concludes that "I firmly believe that Dr. Webster's cognitive deficits and personality are the essential problem. This physician does not belong in an Emergency Room where complex multi-taskings are a continuous risk. However, it is difficult to translate that information directly into a privilege revocation as outlined in AFI 44-119, para 4.5, describing "gross provider misconduct, professional incompetence, or negligence that is self-evident and poses a significant threat to patient safety or well-being". She has never been involved in a malpractice claim, and does not have any documented poor clinical outcomes. I also do not believe her deficits are remediable, as she has been in clinical practice for 14 years, demonstrates denial that she has any deficits affecting her practice, and is not an easy person to work with. Retraining will not be effective. This is not a unique case, and I have had providers similar to Dr. Webster in my supervision. I have always (my emphasis) handled these cases administratively, although privileging action was discussed. That is the mechanism I would have preferred in this case and the 24 MDGA has also taken action in that direction." The writer also correctly identified Applicant's case as "a very complex case". Indeed, that is Applicant's position precisely.

It is Applicant's position that Air Force officials were determined to remove her from practicing medicine in the Air Force and to separate her from the Air Force regardless of the consequences to her. To understand Applicant's position, it is necessary to know that Air Force officials at Howard Air Force Base initially initiated a Medical Evaluation Board on Applicant in December 1998 which recommended her case be sent to a Physical Evaluation Board (PEB). (Atch 10). After a full hearing, the PEB concluded that Applicant did not meet the criteria to be separated for medical reasons. (Atch 11). Shortly afterwards, Applicant's commander, Colonel O'Neil, initiated the proceedings before the Medical Practice Review Board indicated above. (Atch 1).

Following the action by the Medical Practice Review Board at Howard AFB, Applicant was transferred in August 1999 to the 55th Medical Group, Offutt AFB, Nebraska, (Atch 12) partly because Howard AFB was in the process of being closed as a base and, apparently also, because Air Force officials did not want to devote the time and effort necessary to monitor Applicant's work in the medical clinics as recommended by the Medical Practice Review Board and approved by Applicant's Commander (Atch 4).

After being stationed at Offutt AFB, Applicant was sent on temporary duty (TDY) at the end of November 1999 for two weeks to the medical facility at Kessler AFB, MS for observation of her Emergency Room (ER) capabilities. Following this TDY, the Commander of the Medical Facility from Kessler made a report to Applicant's new commander at Offutt AFB relating that all of the Air Force physicians at Kessler AFB who observed Applicant's actions while she was TDY recommended that she not be returned to duty in an Emergency Room but that she would be quite capable of performing medical duties in the less stressful medical clinics. (Atch 13). As indicated in her attached statement (Atch 14), Applicant apparently did not do well during this evaluation because after working in small, relatively low-volume emergency departments for 14 years (7 years in civilian practice and 7 years in the Air Force), followed by a year of administrative work with no patient care, she was suddenly sent for an evaluation in a large, busy ER at Kessler AFB where her evaluators were residency trained ER doctors who basically treated her like an intern and required her to report all of her findings to a staff physician and then obtaining his approval before she could continue her treatment – all of which combined to cause her to lose her self confidence and not perform at her best during this evaluation.

Notwithstanding these recommendations and the recommendations of the Medical Practice Review Board at Howard AFB and her Commander at Howard AFB, Applicant was never assigned to perform any medical physician duties while at Offutt AFB but rather was assigned to do administrative review of medical records and other duties in which she did not have any contact with medical patients as shown in Applicant's sworn statement attached hereto. (Atch 14).

Following the action of the Air Force Surgeon General's office in concurring with the Medical Practice Review Board, a MEB was convened by the Commander of the 55th

Medical Group to evaluate Applicant's fitness for duty in the Air Force. The MEB concluded that Applicant's case should be referred to an informal PEB. (Atch 15). The informal PEB concluded that Applicant was not fit for duty and recommended she be medically retired with a 30 per cent rating. (Atch 16). Although Applicant initially requested a hearing before the formal PEB, she later agreed to waive the hearing before the formal PEB and accept the recommendations of the informal PEB. (Atch 17). Applicant was subsequently medically retired from the Air Force effective 2 Dec 2000. (Atch 18).

## DISCUSSION AND ARGUMENTS

I. Applicant's allegations in her appeal to HQ USAF/SG (Atch 6) that the Medical Practice Review Board violated her rights to due process provided to her under the law and under the provisions of AFI 44-119 when (1) the Air Force failed to produce crucial medical records concerning the Code Blue at the hearing and which the Credentials Board based part of its opinion upon; (2) records were introduced at the hearing which had not been provided to Major Webster prior to the Credentials Hearing; (3) Command Influence was exerted upon at least one of the witnesses called to the hearing; (4) it failed to assure impartiality of its members; and (5) it went outside the hearing record to investigate the Code Blue without advising Major Webster that it had done so, are reiterated for the reasons set forth in Attachment 6 which is incorporated herein as though set forth verbatim.

II. SPECIFIC COMPLAINTS:

Applicant contends that the Findings and Recommendations of the Medical Practice Review Board at Howard AFB, Panama, and the subsequent actions by her Commander, Colonel O'Neil, and by the AF Surgeon General's Office, did not meet the criteria set forth in paragraph 4.5 of Air Force Instruction (AFI) 44-119 which states:

"4.5. Summary Action to Suspend Privileges: Summary action is speedy and unceremonious action to suspend a provider from performing all or a portion of his or her privileges. This action is taken in response to gross provider misconduct, professional

incompetence, or negligence that is self-evident and pose a significant threat to patient safety or well-being…" (Atch 19).

The basis for convening the Medical Practice Review Board by the 24th Medical Group Commander was primarily 10 patient complaints as set forth in attachment 1. The Medical Practice Review Board said in its findings that "the only theme in these complaints pertains to waiting times. This is always a concern but it does not appear to have resulted in any adverse outcomes. Accordingly, we are left with only two of the ten complaints which raise our concern." The Board then proceeds to identify the concerns as being a letter from a Sgt John D. Silbaugh about Dr. Webster crying during his appointment which was discussed along with other reported instances of Dr. Webster crying at inappropriate times and instances where she made inappropriate comments about hospital officials and related a dream about shooting hospital leadership and having discussed her childhood sexual abuse with a technician in the front office. (Atch 2). The Board concluded that these incidents did occur since Dr. Webster did not deny them and the Board said a Dr. Fey agreed that while inappropriate, the outbursts were secondary to stress. Dr. Fey also concluded that Dr. Webster was neither homicidal nor suicidal. The Board concluded that these incidents "are consistent with her inability to handle stressful situations in an appropriate manner. We feel Dr. Webster should limit her practice to settings which do not produce undue stress. (Atch 2, Page 5).

The other patient complaint was addressed under "SPECIFIC CASES" subparagraph b of the board's findings (Atch 2 Page 6) and involved a complaint about Applicant's treatment for a cat bite by a Mrs. Thomas who contended that Applicant failed to render proper care by (1) failure to initiate tetanus shot; (2) delivering wrong oral antibiotic and (3) incorrect dosage of rabies immunoglobin on prescription. The Board found that each of these allegations by Mrs. Thomas was true and that they were corrected immediately and had no adverse effect upon the patient's care and standard of care was met. (Atch 2, Page 6).

The last issue under SPECIFIC CASES, paragraph c, pertained to Dr. Webster having seen a patient on 20 April 1998 who she diagnosed as having gastroenteritis and prescribed Tylenol but handed the patient a bottle of Benadryl instead. The patient recognized the mistake when they arrived home and called the hospital wherein someone

instructed the patient to return to the hospital to obtain the correctly prescribed medication. The Board concluded that the mistake did occur but noted that both the Tylenol and Benadryl were elixir-type drugs in identical bottles (as demonstrated at the hearing) with identical labels and had the same color and both were made by the same manufacturer. The pharmacist (Capt Cusak) had testified that this exact error was not uncommon and not isolated to Dr. Webster. The Board noted that they had only been presented with two medication errors by Dr. Webster since her arrival in Panama (six months before) and since she had seen well over a thousand patients during this time, "we feel this is an acceptable medication error rate." The Board stated further on this matter "Additionally, we were impressed by Capt Cusak's (the pharmacist) testimony which indicated Dr. Webster is highly regarded for her pharmacological knowledge. Specifically, the chief pharmacist cited her currency on medications, proper administration, and choice of medications. (Atch 2, Page 7).

MY COMMENT: From the above, it is clear that the Medical Practice Review Board disposed of the individual complaints as being perhaps inappropriate in some cases but in no case was there any danger to any of the patients.

III. CODE BLUE MATTER:

The more serious complaint was a "Code Blue" situation discussed under "SPECIFIC CASES" subparagraph "a" of the Board's findings. (Atch 2, Pages 5 & 6). The main complaints against Dr. Webster in this situation were (1) inadequate airway control and (2) inability to properly follow ACLS (meaning Advanced Cardiac Life Support) guidelines, CPR and defibrillation. The patient died from cardiac arrest. Dr. Webster was in charge of directing the Code Blue on the patient and Dr (Major) Burkett and Dr. (Colonel) O'Neal arrived in the ER to assist in the Code Blue. The Board found that the allegations did occur, that there was a breach in the standard of care by Dr. Webster, and that the conduct did have a potential to adversely affect the quality of patient care. The Board noted, however, that it was very difficult to objectively assess the situation because the Board was not provided supporting documents, such as a code sheet, medical records, or nursing notes, notwithstanding the Board's specific request that

such documents be produced. Further, Dr. Burkett testified that the requested materials were not available but for some unexplained reasons, they magically reappeared after the Board hearing as shown by the statement in Colonel O'Neil's letter concurring with the Board's results. (Atch 4). (Note: The missing Code Sheet was included in Dr. Webster's appeal and is located at Tab B of Atch 6 to this application). The Board did go on to state that it had to rely upon the eyewitness testimony of Drs Burkett and O'Neil and concluded that Dr. Webster was unable to successfully intubate the patient and failed to adequately follow ACLS protocol. The Board further stated that it "was not as concerned that she couldn't intubate, but rather is more concerned that she was unable to control an airway. Given the autopsy results of massive pulmonary embolus, we are unable to determine what impact Dr. Webster's inability to maintain a proper airway had on Sgt. Hill's death." (Atch 2, page 6). The Board also noted that Dr. Webster "understood the general concepts of managing a cardiac arrest" but she did demonstrate a visible uneasiness when confronted with a hypothetical ACLS scenario and she did not appear to be in control of the situation. The Board concluded this matter by stating, "Consistent with the testimony of Major Angeloro, we find that under nonstressful situations, Dr. Webster is capable of performing airway management " and made the additional comment that "there is a tremendous difference between a real code and a controlled environment." (Atch 2, page 6).

MY COMMENTS: It is Applicant's position that even including the Code Blue (which the Board did not blame the death on her), all of the complaints and allegations against Dr. Webster were non-life threatening and did not affect any of the patients concerned adversely. When it is recognized that Applicant saw 1151 patients in the eight months that she practiced as an ER Provider at Howard AFB (Atch 14 and attachment "A" thereto), and that there were only two medication complaints (both non-life threatening) and 9 complaints dealing mostly with the patients concerned over the time they spent waiting to be seen in the ER, certainly, Applicant should have been able to continue to practice ER medicine, or at the very worse, clinical medicine as recommended by the Board instead of never being permitted to treat any patients from the time immediately before the Board met at Howard AFB in February 1999 until she was medically retired on 2 December 2000. There clearly was no authority or



22

justification for the actions of Air Force officials in not permitting Applicant to practice ER or clinical medicine during this period of time and these actions contributed directly in the permanent "taking" of Applicant's livelihood by not restoring at least her credentials to practice in medical clinical settings.

IV. MENTAL/PHYSICAL LIMITATIONS

The Medical Board addressed MENTAL/PHYSICAL LIMITATIONS in paragraph 2 of the Board's Findings and Recommendations. (Atch 2, page 2).

A. Under the paragraph labeled "FACTS", the board stated "It is alleged that Dr. Webster suffers: (1) a progressive demyelinating disease (Multiple Sclerosis) which has impacted her cognitive/behavioral abilities, (2) neuropsychological deficits which impact her ability to function as a physician and (3) carpal tunnel syndrome which impacted her ability to perform a critical procedure." The board then discussed that Dr. Webster had some form of neurological dysfunction since 1973 and was initially worked-up for MS (Multiple Sclerosis) in 1992 at Travis AFB where she faced an MEB and was returned to duty following a determination that she did not have a clinical diagnosis of MS. While stationed in Panama, she was evaluated at Wilford Hall Medical Center (WHMC) by LtCol (Dr.) Gary Gronseth, Chairman of Neurology whose findings in September 1998 were consistent with the diagnosis of MS. The Board also noted that on 13 January 1999, Dr. Webster obtained an independent neurologic evaluation by Dr. Charles M. Poser of Beth Israel Deaconess Medical Center (Atch 20) who was not convinced that Dr. Webster had MS because he believed further clinical symptoms were necessary before a final conclusion could be drawn and, in his opinion, her symptoms were more consistent with recurrent Guillan-Barre syndrome/Miller Fisher variant. COMMENT: As stated in Applicant's appeal (Atch 6, p 17, 2nd para), it "was and remains our legal position that the findings of the PEB were '*res judicata*' on the (Medical) Board with regards to her medical and psychological fitness to practice medicine, and the Board's inquiry was limited to determining if



23

Major Webster's medical practice was deficient as shown by the treatment she rendered to her patients."

B. Under the paragraph labeled "ANALYSIS" the Board stated, "We are confronted with a difficult task. On the one hand, Air Force experts have concluded Dr. Webster likely has MS. However, Dr. Poser, one of the world's renowned experts in the field of MS, has questioned that diagnosis. We agree that further clinical symptoms should occur before MS can be substantiated. Given the intermittent nature of her symptoms at this time, we cannot justify limiting her practice as a physician based on physical disability."(my emphasis). (Atch 2).

C. MY COMMENTS:

a. As noted immediately above, the Board determined that it "cannot justify limiting her (Applicant's) practice as a physician based on physical disability" but, in fact, that is exactly what happened despite the Board's recommendations (Atch 2) and her commander's (Col O'Neil) approval of these recommendations with the slight modifications indicated above. (Atch 4). Because of the Board's recommendations and Col O'Neil's approval, the Air Force had a duty to give her the opportunity to comply with the restrictions placed on her by the Board and Col O'Neil. Dr. Webster was never given this opportunity (except for the ER evaluation at Kessler) to practice as a physician in a clinical setting and was not placed in a clinical setting at Howard AFB following the Board hearing. Further, because Howard AFB was scheduled to be closed, Dr. Webster was reassigned to Offutt AFB, Nebraska, in August, 1999. While at Offutt AFB, Dr. Webster was also not assigned to a clinical setting as a physician but instead was relegated to merely reviewing medical records or performing the duties of a file clerk. (See Dr. Webster's statement, Atch 14, page 8, Para 4b). This arbitrary action by Air Force officials totally destroyed Dr. Webster's ability to practice as a physician and resulted in the Air Force again initiating an MEB followed by a PEB in July 2000 to

remove her from the Air Force. This action by Air Force officials demonstrated their quest to remove her from practicing as a medical physician and to ultimately remove her from the Air Force. Admittedly, the Air Force believed it was necessary to convene a credentials hearing on Applicant in February, 1999 and this Board issued its Findings and Recommendations (Atch 2) and her Commander, Col O'Neil, added his approval with the slight modification of having her clinical practice be 100 per cent supervised for six months instead of the recommended three months. (Atch 4) This having been said, the Air Force conducted its hearing, made its recommendations and her Commander made the decision to go forward with Dr. Webster practicing in clinics instead of in the ER. The Board even stated in its "RECOMMENDATIONS" that "It is clear Dr. Webster possesses the requisite knowledge to be a physician. She does, however, display several disturbing qualities which make her presence in the military (specifically, in a military ER with possible war-time taskings), a potential disruption. Despite some superior traits as a physician (my emphasis) (thoroughness, dedication to patients, medical knowledge, etc.), she appears to have certain identifiable interpersonal deficiencies." (Atch 2, page 7). Indeed, even all the doctors at Kessler AFB who reviewed her ER capabilities, said she should be permitted to practice in a clinical setting. (Atch 13). Notwithstanding these recommendations and Dr. O'Neil's specific statement that she would be permitted to practice in a clinical setting, Dr. Webster was never placed in a clinical setting as a practicing physician from the time of the Board hearing in February, 1999, until her separation from the Air Force with a disability retirement in December, 2000. This conscious action to prevent Dr. Webster from having any physical contact with any patients (except while at Kessler AFB for the ER evaluation) not only humiliated her as a military physician and took away her ability to demonstrate and improve her

clinical abilities as a physician but, most importantly, took away her livelihood as a physician both in the military and for the rest of her life as a civilian. If Dr. Webster had "certain identifiable interpersonal deficiencies" as stated by the Board (Atch 2, Page 7), clearly an astute supervisor should have been able to help her overcome these "deficiencies" without the necessity of her being removed totally from a clinical setting.

b. It is obvious that no effort was made to place her in a clinical setting. Sometime after she was assigned to Offutt AFB, Dr. Webster engaged me to assist her in the MEB and PEB matters and during the course of these matters, I wrote the Commander at the Regional Hospital inquiring why Dr. Webster was not performing the duties of a military physician in the Air Force and what actions he was taking to train and monitor Dr. Webster according to the limitations placed on her by Col O'Neil, which would lead to a re-evaluation of her privileging status. (Atch 21). The Commander's reply which included the comments, "I must point out that there is no provision for Major Webster to be represented by counsel in her interactions with me or anyone else in her chain of command or supervision. For this reason, I am going to defer responding to your requests at this time." illustrates the general Air Force attitude exhibited toward Dr. Webster during this entire matter. (Atch 22).

c. It is also important to note that both the Medical Board at Howard AFB and Applicant's then Commander, Colonel O'Neil, made positive statements that Dr. Webster should perform clinical duties, albeit under 100 per cent supervision for either three months (Board's recommendation) or six months (Col O'Neil's determination) but this did not occur. Dr. Webster was never placed in any medical clinic either at Howard AFB hospital or at her new assignment at the 55th Hospital at Offutt AFB. What would supervision have entailed? Air Force Instruction (AFI) 44-119 addresses supervised privileges for

military physicians at paragraph 3.31.1 (Atch 23) and in its glossary of terms at pages 65-66. (Atch 24). From the explanation in the glossary, there are two levels of supervision, namely, indirect and direct. (Atch 24, Page 66). "Indirect" means the supervisor performs retrospective record review of selected records with the criteria used for review being related to quality of care, quality of documentation, and the member not exceeding the authorized scope of care. "Direct" means the supervisor is involved in the decision-making process through either "verbal" consultation by phone or informal consultations before implementing or changing a regimen of care and the supervisor conducts face-to-face or telephone consultation and evaluations with the provider over patient care issues on a regular, reoccurring basis. The other "direct" method is "physically present" meaning the supervisor is physically present through all or a portion of care. (Atch 24, Page 66). As stated previously, the Medical Board stated there was to be "100% chart review for no less than three months and, (4) at the conclusion of that three month period her privileges should be reevaluated." Atch 2. Also, Applicant's commander, Col O'Neil, stated, in his action letter that "(2) your Family Practice/Primary Care/Aerospace Medicine privileges be continued in Category "2" with 100% chart review and full supervision for a period of six months. Furthermore, at the end of that period of observation and review, your privileging status will be re-evaluated." (Atch 4). What exactly the "full supervision" was intended to mean is somewhat uncertain in view of the different definitions in AFI 44-119 but it most likely meant "Direct" supervision as that term is defined on page 66 of AFI 44-119. (Atch 24). But as shown above, this "direct supervision" could have entailed "verbal consultation" by telephone or in person or a requirement that the supervisor be "physically present " (present" 100% of the time.) Even if Col O'Neil meant that other military physicians would "supervise" Dr. Webster in her daily work and



27

review all of her chart entries on her patients, it is obvious that Col O'Neil did not see any problem with this solution either as to Applicant's abilities or the Air Force's capability to supervise her for this relatively short period of time. A shortage of staff to conduct supervision could not have been a problem for Col O'Neil because he would have known that Howard AFB was about to be closed down as shown by the letter from the Staff Judge Advocate prior to Col O'Neil's determination. (Atch 5) Thus, it was not seen as any problem by the Board to place Applicant on 100 per cent chart review for three months nor for Col O'Neil to place her on 100 % chart review and full supervision in clinical settings for six months. Why then was this never carried out? It is our contention that Dr. Webster had a right to rely on the Board's recommendation and her commander, Col O'Neil's statement that she would be placed in a clinical setting with 100 per cent supervision for six months and that her military career and her subsequent civilian career as a physician were irreparably damaged and harmed because of the failure of the Air Force to carry out this supervision and subsequent re-evaluation of her privileging status. Had this occurred, Dr. Webster could at least have salvaged her medical career from a standpoint of rendering medical service in a non-emergency room setting both while she was still in the Air Force and also as a civilian physician. Instead, because the Air Force denied her this right, she was left in limbo regarding her non-emergency room abilities. It is our contention that the failure of the Air Force officials to ensure that Dr. Webster performed clinical duties (even under supervision) amounted to a major breech of the Air Force's duty to her as recommended by the Medical Board and approved by Col O'Neil.

d. As stated above, the Air Force initiated a MEB after Dr. Webster's appeal of the Medical Board's recommendation and Col O'Neil's determination was denied by Air Force Surgeon General's Office. The Air Force's reason for initiating their second MEB in July 2000 was

based on its assertion that Dr. Webster had multiple sclerosis. (Atch 15). The MEB recommended a PEB be conducted which eventually resulted in Dr. Webster being granted a medical disability retirement. (Atch 18). The Air Force indicated that because of this condition, Dr. Webster should not be placed even in a clinical position. What about this medical condition? This was discussed by the Medical Board in arriving at its findings and recommendation in February, 1999 based on the PEB decision in January 1999 which retained Dr. Webster and determined that she did not have MS and released her for return to duty. On the one hand, the Air Force, through its first PEB finding, said that Applicant did not have MS and should be returned to duty. But, in actuality, this did not occur because within a very short time, Applicant's commander convened a medical board to review her ability to provide not only ER care but also the basic clinical care. Thus, neither the first PEB (conducted in 1998) nor the Medical Practice Review Board concluded that she could not provided clinical care. Therefore, any claim that her medical condition would prevent her from providing routine clinical care was without any basis in fact.

<u>SUMMARY</u>

1.Applicant strongly asserts that none of the action taken by the Medical Board or Colonel O'Neil or the Air Force Surgeon General's Office was warranted under the circumstances. None of her actions were life threatening to any patient in the ER. Even the Code Blue matter did not justify having her ER medical privileges revoked. The testimony of her co-workers and patients at the Medical Board, as summarized on pages 10 – 13 of Atch 6, clearly showed that the actions taken by the Medical Board and Colonel O'Neil were not warranted. Indeed, there was testimony from Major James E. McCrary, Chief, Emergency Services at Howard AFB, that after verbal counseling, Major Webster's actions improved (Atch 6, p 8, last para) and further testimony from Major McCrary that, although he voiced no opinion about whether Dr. Webster's privileges should be

removed, he did voice his opinion that he did not think it was right to go from a verbal counseling to a hearing to remove one's privileges. (Atch 6, p 9, last para). Further, the unidentified writer of the memorandum to the Surgeon General (Atch 9) correctly identified the problem and also correctly suggested the proper solution, that is, administrative action only and not action on her medical credentials. As stated earlier in this application, the writer correctly recognized that "it is difficult to translate that information (Applicant's cognitive deficits and personality) directly into a privilege revocation as outlined in AFI 44-119, para 4.5 describing "gross provider misconduct, professional incompetence or negligence that is self-evident and poses a significant threat to patient safety and well-being." It is unfortunate for Applicant that the writer of Atch 9 did not enter into the decision making process before Applicant's case was already at Air Force Headquarters level.

2. Although the Air Force probably was justified in some manner in initiating a MEB and conducting a formal PEB on Applicant in late 1998 and early 1999, and again in 2000, the result was clearly the only result that ever should have been taken against Applicant. Had the Air Force PEB in 1999 arrived at the decision which the PEB made in 2000, (medical retirement), then Dr. Webster would not be in the predicament she is in at present. By revoking her ER practice and limiting her clinical practice (without offering her an opportunity to have those credentials restored), the Air Force unjustifiably affected Dr. Webster's life and livelihood for the rest of her life. As shown by the American Board of Emergency Medicine's Policy on Medical Licensure (Atch 25), Dr. Webster is precluded from ever practicing Emergency Medicine while any of her licenses are "revoked or suspended" or "limited, e.g., to specific practice settings" which is the present status of her medical licenses. It is Applicant's contention that nothing she ever did justified or warranted revoking her ER privileges and there certainly was not any basis for limiting her non-ER clinical privileges in any manner.

3. What should be the remedy to Applicant for the actions of the Air Force officials. First, the AFBCMR should make a finding favorable to Applicant that

removes the restriction that she can not practice emergency room (ER) medicine and should not practice medicine in a clinical setting without 100 per cent supervision. If the restriction on her practice of emergency room (ER) can not be restored completely at this time, we urge the AFBCMR to at least restore her privileges and place a limitation on her ER practice similar to the "full supervision for a period of six months" that was imposed on her by the Medical Board by her Commander, Col O'Neil. This would be extremely beneficial to her at this time in helping her to transition into civilian medical practice because she could approach a future employer with her credentials partially restored with a limitation that she be supervised for a definite period of time. This would leave the final decision on her future ER practice with civilian physicians who would be in the best position to determine her present ability to perform as an ER qualified physician.

4. Because she was not seeing patients, the Air Force stopped paying Dr. Webster all of the bonuses she was receiving as an Air Force military physician. Prior to this action in March, 1998, Dr. Webster was receiving Special and Incentive Pays of $1,266.66 per month and an annual bonus of $38,000.00 as shown by the attached "Personal Statement of Military Compensation" dated 1 March 1988. (Atch 26). Without knowing the exact amount she received earlier, it appears from an AF Form 63, dated 30 Dec 96, she incurred an ADSC of 30 Sep 2000 for receiving Incentive Special Pay and MORB pay. (Atch 27). She did continue to receive Variable Special Pay (VSP) of about $916.66 per month and Board Certified Pay of about $291.66 per month pay until she was separated from the Air Force as shown by her Leave and Earnings Statement (LES) for July, 2000. (Atch 28). To our knowledge, the bonus of $38,000 shown in Atch 26 included an Additional Special Pay (ASP) amounting to about $17,000 per year which was stopped by Colonel O'Neil in late 1998 or early 1999 and from then until she left the Air Force due to her disability retirement on 1 December, 2000, she did not receive this pay resulting in very significant monetary losses to her. It is estimated that Applicant lost at least $17,000.00 per year for 2 years for lost

ASP and an unknown amount for lost MORB and other bonuses for a total loss to Dr. Webster well in excess of $34,000.00.

5. While Applicant has suffered severe financial losses because of the actions of Air Force officials, even more importantly, she has been deprived of her livelihood capabilities because she has not been able to utilize her physician skills since she has separated from the Air Force and she will not be able to remove any of the restrictions placed on her by the various state medical licensing Boards until the restrictions placed on her by Air Force officials have been removed. Had the Air Force, as a minimum, removed the restriction on her being able to practice medicine in clinics such as family practice, primary care, and other non-emergency room clinics, she could have re-entered civilian life as a practicing physician in all but emergency room facilities. While Applicant strongly believes that Air Force officials were not justified in restricting her from practicing emergency room medicine, she is even more adamant about the fact that there was absolutely no justification for restricting her from practicing unfettered in non-ER clinics. But having done this, it was totally wrong for the Air Force not to make every effort to place her in a clinical setting for six months so that this restriction could be removed. Even the majority of the doctors at Kessler AFB who evaluated her ER abilities, indorsed Applicant's intelligence and ability to function well in a clinical setting as shown by Atch 13. This was almost one year before she was processed through a PEB. To have made the decision to place her in a supervised setting in the clinics for six months without following through on letting her have the opportunity to show that at least this part of her practice is excellent, was totally inexcusable, arbitrary and capricious, and was contrary to the law and Air Force regulations.

## CONCLUSION

For the reasons set forth above, Applicant re-iterates that the action taken against her was unjust and in error and requests you (1) void the action taken by the Medical Practice Review Board in February 1999, (2) void the determination made by the

Commander, 24th Medical Group, Howard AFB, Panama, on 24 March 1999, (3) direct the Office of the Surgeon General of the Air Force to rescind its notification to the National Practitioner Data Bank, or, in the alternative, at least reduce the restriction to supervised practice in the ER and clinical settings, (4) direct the Air Force to pay Applicant for all physician's bonuses that were withheld from her from 1 January 1999 to 1 December, 2000, (5)correct Applicant's official Air Force records to comply with the decision of the AFBCMR, and (6) grant any and all other appropriate relief to Applicant.

Respectfully submitted,

JAMES L STANTON
Counsel for Applicant

**DEPARTMENT OF THE AIR FORCE**
**24TH MEDICAL OPERATIONS SQUADRON (ACC)**
**HOWARD AFB, PANAMA**

**7 January, 1999**

**MEMORANDUM FOR Wilma Webster, Major USAF, MC:**

**FROM: 24th MDG/SGH (Major Edwin K. Burkett)**

**SUBJECT: Notification of Privileges Hearing**

1. The credentials hearing committee will conduct a hearing that may adversely affect your clinical privileges. Depending on the final outcome, HQ AFMOA/SGPC may report the matter to appropriate civilian regulatory agencies. I refer you to AFI 44-119, chapter 4 for discussion of your rights and responsibilities in this matter. Information on what specific matters are reported to civilian regulatory agencies may be found in the same regulation, chapter 4 and 6.

2. Allegations being investigated are:

A. That you have been diagnosed with a chronic, progressive demyelinating disease (Multiple Sclerosis) with significant cognitive and behavioral damage that makes you unfit to safely conduct patient care. Also that you lack acceptance or insight into the disease and this compounds your risk to quality patient care. The bases for these allegations are as follows:

1) You underwent a Command Directed Psychologic Evaluation dated 14 July 1998 at the 24th Medical Group, Panama conducted by Major Richard La Macchia which concluded that you:

- Had consistently poor motor skills performance, particularly under pressure.
- Possible aspects of a Cognitive Disorder evidenced by neurospychologic deficits consistent with diffuse brain dysfunction
- Functional impairment that would prevent you from performing at or above the standard of care required for an ER physician
- Lack of awareness of any of your deficits

2) According to a discharge summary dated 18 October 1998 you were admitted to a Turkish Hospital for an acute disabling weakness attributed to an immunologically mediated mechanism. Dr. Emil Goldenberg and Dr. Hayim Babur stated that you had:

- Acute Guillain-Barre
- This led to your admission and Neurology workup at Wilford Hall Medical Center

3) On 7 November 1998 a narrative summary was completed from your Neurology evaluation at Wilford Hall Medical Center (WHMC), San Antonio, Texas was by Dr. Richard Popwell and Dr. Gary Gronseth and you were diagnosed as having:

- Laboratory supported, clinically-definite Multiple Sclerosis (MS)
- Had an acute inflammatory demyelinating polyneuropathy (AIDP)