The narrative states that there is a long-term functional impact because, whether this presentation was AIDP or an MS exacerbation, similar attacks in the future could occur and once again debilitate you.

3) On 4 August 1998 a narrative summary was completed from your neuropsychologic evaluation at Wilford Hall Medical Center, San Antonio, Texas conducted by Lt. Col. Brian Campbell that concluded that you have:

- Cognitive Disorder, not otherwise specified
- Personality change due to Multiple Sclerosis
- Antisocial, histrionic, and narcissistic personality traits

4) On 20 November 1998 from Lt Col Brian Campbell wrote a memorandum to Dr. Jack Saylor, MMB concerning your Social and Industrial Impairment Ratings. He stated that:

- "Her difficulties lead to marked military impairment and disqualify her for worldwide duty. I would rate her social and industrial impairment as severe. Although she may be employable, I doubt that she can continue with her practice of medicine safely and competently"

**B.** On 5 different occasions you have demonstrated labile emotional, behavioral, and personality traits in front of patients that have caused patients to lose confidence in your ability to treat them.

1) According to a patient complaint dated 11-12-97 Samantha Houston says that, "Dr. Webster was very, very forgetful and (I was) waiting in the emergency room from 3:30PM to 11:30pm"

2) A patient complaint submitted by Brian Denmark states that you gave him poor service and that "The provider was unwilling to listen to what I was saying." You "refused" to renew a prescription he had been taking for 10 years.

3) Another patient complaint dated 27 Oct 1997 by Kenneth R. Teel states that " Dr. Webster was absent minded"

4) A memorandum dated 7 February 1998 from patient SGT John Silbaugh says that during his appointment you began to cry. This made him nervous and when he asked you what was wrong you said, " I hate this job." He stated that you also said that the work you were doing could put you in jail.

5) A memo dated 6 May 1998 from patient Michelle Schroder describes an ER encounter. She complained of knee pain but says you told her that her XRAYS were fine and there was nothing wrong with her knee. She says she saw Orthopedics a few days later, told she had a torn meniscus and scheduled for arthroscopy. She says, "I was extremely disappointed with the service and care provided by Maj. Webster, especially when she told me nothing was wrong with my knee. I would not feel very confident if a life threatening emergency occurred while she was the attending Emergency Physician."

C. You have demonstrated poor insight and impulse control evidenced by emotional outbursts and inappropriate statements in public locations including contemplation of acts of violence against persons, and against an aeromedical evacuation aircraft.

1) On 29 January 1998 you responded in an angry, loud, and unprofessional manner when you were instructed that you had scheduled patients checking in and should not go out to eat for lunch. Dr. Edwin Burkett, Chief of Family Practice, dated 30 January 1998, notes the episode in a memorandum.

2) On 15 September 1998 you detailed to Aeromedical Evacuation Technician SRA Kristen Goode a dream you had where you "shot everyone" and this gave you an orgasmic feeling. On 16 September, in front of SRA Goode and several patients, and just prior to boarding the Air Evac mission you stated that " I just want to blow up the plane". SRA Goode dated 17 Sept 1998 documents these comments in a memorandum.

D. You have been noted to perform in a forgetful and unorganized manner on several occasions and to demonstrate poor judgement, including documented incidences of dispensing incorrect medication to patients.

1) You received a Letter of Counseling from Dr. James McCrary, Chief of Emergency Services, on 30 November 1997. He counseled you on excessive patient waiting times, forgetting about patients and having them wait too long before making a final disposition, having multiple patient complaints about you, and complaints about poor communication and instructions on your part by ER staff. He said, " I've seen a pattern of difficulty in handling the work-load in this Emergency Department when alone as sole MOD".

2) On 24 January 1998 you poorly handled a Code Blue according to a Memorandum for Record by Dr. Burkett dated 31 January 1998. It states that:

-You did not seem to grasp the importance of head position for ventilation of the patient and the patient was not being ventilated even though a technician was tying to bag him. You did not ask for assistance from another physician until you had made 3 unsuccessful intubation attempts.

- You neglected to order CPR on a pulseless patient.

- Thirdly, you had failed to order initial defibrillating shocks on a patient you knew to be in Ventricular Fibrillation until reminded by others.

3) On 3 February 1998 you received another Letter of Counseling from Dr. Teodoro Mendez, Chief of Primary Care Flight. He counseled you on the following:

- The outburst incident noted above in paragraph C.1.

-That on 2 February you left two scheduled patients unseen and took lunch for more than an hour. The same day you left another patient waiting after clinic hours on your request but you had left the building.

-On 3 February you again left for lunch for more than an hour while two patients with morning appointments waited unseen.

4) Based upon notes from Capt Ryan Shercliffe, Emergency Room Nurse, dated 19 May 98 you failed to follow appropriate triage procedure in the ER and took care of two stable pediatric appointments prior to seeing more acute patients. He states, "She did not realize what order the patients arrived, she had not looked over the charts to assess urgency."

5) On 26 May 1998, based on notes from Captain Shercliffe, you showed that you were unaware of the urgent transport policy for ambulance pick-ups on the East Bank. On the same

day you also refused an ambulance for a pregnant patient whose water had broke here at Howard, instead you chose to let her wait for a commercial taxi to take her downtown.

6) ER notes on SF 558's dated 20 April 1998 at 1839 and 2220. You prescribed Tylenol elixir but actually handed out a bottle of Benadryl elixir from the MOD cabinet for patient Alexandria Ordaz (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)

**F.** You failed to initially acknowledge a known physical limitation, left wrist weakness, that prevented you from performing a successful intubation during the cardiac arrest referred to in paragraph D.2. You stated after the incident that your wrist was weak but later recanted the statement. Your conduct has caused the 24th Medical Group to lose confidence in your willingness to disclose any physical impairment that may limit your ability to safely conduct parts of your duties as an Emergency Room Physician or Primary Care Physician.

1) A 23 March 1998 Memorandum for Record by Lt.Col Addison, MDOS/CC, is titled "Events leading up to your removal from the ER". Paragraph 2 begins, " Following the Code Blue on 24 Jan98, you made an admission that you were not able to intubate the patient (a large male with a thick neck) due to lack of strength in your wrist. As you were already scheduled for surgery on this extremity, the decision was made to remove you based on risk factors and the fact that in the Emergency Room you could be the only provider placed in the same situation".

2) On 22 May 1998 another memorandum by Colonel Terrence O'Neil, and signed by you, is titled "Relief From Emergency room Duties Due to Performance". In paragraph 1 it says, " You stated during a Code Blue procedure in my presence that your wrist was too weak to successfully intubate a patient. You later told me that you had mis-spoken; that your wrist was really not the cause of the problem".

3) On 6 April 1998 a memo from Dr. Jose Rodriguez-Vazquez, SGH, documents your Airway Management Evaluation observed by him and Dr. Eric Ulloa, Primary Care Physician. This occurred after your recovery from Carpal Tunnel Surgery on your left wrist. They concluded that you took overall too much time to intubate a mannequin, had poor technique positioning the head and neck, poor technique with the laryngoscope, and several prolonged attempts. They suggested that you try live patient practice with the Nurse Anesthetist in the OR

4) On 14 April 1998 Major Michael Angeloro, Nurse Anesthetist sent an e-mail to Dr. Mendez. He had observed you performing two successful intubations of adult patients on the first attempts.

3. The hearing will be at **the Howard AFB Legal Office, Building 238, on 17 February 1998 starting at 0800.** You have the right to present evidence and call witnesses on your behalf, to cross-examine witnesses called by the committee, and to consult and be represented by legal counsel. It is your responsibility to arrange for the presence of any witnesses you desire. As a military provider a military legal counsel is available to you at your request. You may retain a civilian attorney at your own expense. The committee currently expects to call the these witnesses:

~~Lieutenant Colonel Kenneth Remington, USAF~~
~~Dr. Gregory Fey, Capt. USAF~~
Dr. Richard LaMacchia, Major USAF
~~Dr Teodoro Mendez~~
Dr. James McCrary, Major USAF

~~Dr. Edwin Burkett, Major USAF~~
Captain Ryan Shercliffe, USAF, NC
~~Senior Airman Kristen Goode, USAF~~

4. Failure to appear at the hearing will be construed as a waiver of those rights set out in AFI 44-119, chapter 4, paragraph 4.15. The Chairperson of the credentials hearing committee may change the time and place of the hearing upon your written request, if based on good cause.

EDWIN K. BURKETT, Maj USAF, MC
Chairperson, Credentials Function

1 Ind: Major Wilma P. Webster, USAF, MC 8 January, 1999

TO: Chairperson, Credentials Function (Major Burkett)

I acknowledge receipt of the Letter of Notification of Privileges Hearing, dated 7 January, 1999.

Date______
WILMA P. WEBSTER, Maj, USAF, MC

# FINDINGS AND RECOMMENDATIONS
# CLINICAL PRIVILEGES HEARING

Wilma Webster, Major, USAF, MC
*17-18 February 1999*

Consistent with the allegations outlined in the 7 January 1999 Letter of Notification (Exhibit 5), the panel has attempted to address all relevant matters which pertain to Dr. Webster's clinical proficiency, professional conduct, as well as matters affecting her mental and physical well-being. Accordingly, while we have strived to align our findings to conform to the specific allegations, we have nonetheless supplemented that material so as to more accurately reflect the evidence presented at the hearing.

To begin, we believe the notification letter contains five (5) general headings or global areas of concern (again, see Exhibit 5). Those allegations are: (1) patient complaints; (2) mental/physical limitations which amount to unacceptable impairment as a medical provider; (3) being forgetful/disorganized in clinical settings; (4) inappropriate actions/impulse control; (5) specific cases which allege Dr. Webster has failed to meet standard of care as an emergency room (ER) physician.

## 1. PATIENT COMPLAINTS:

FACTS: We have three sources of patient complaints. First, Exhibit 23 contains a total of *eight* written patient complaints lodged specifically against Dr. Webster from 14 October 1997 through 7 February 1998. Those complaints speak for themselves. Second, and consistent with her testimony at the hearing, is Linda L. Thomas' statement (Exhibit 34). She complained of the care she received (for a cat bite), after being examined by Dr. Webster at Howard AFB's ER on 12 January 1998. Lastly, Dr. Webster's PAF (Exhibit 54) contains a written complaint from Michelle Shroder who complains that she was not provided accurate medical care regarding a torn meniscus in her knee.

FINDINGS: The panel finds all ten (10) allegations did occur as stated.

ANALYSIS: The only theme we see in these complaints pertains to waiting times. This is always a concern, but it does not appear to have resulted in any adverse outcomes. Accordingly, we are left with only two of the ten complaints which raise our concern. First, we find the letter by Sgt John D. Silbaugh to be troubling (Exhibit 23). Specifically, the inappropriate emotional outburst is inconsistent with that of a seasoned

physician. We will discuss this aspect later, however, under the heading "Inappropriate Actions." Secondly, the matter which pertains to Mrs. Linda L. Thomas is of concern and will be discussed in greater detail in Part 5 (specific cases), of this report.

## 2. MENTAL/PHYSICAL LIMITATIONS:

FACTS: It is alleged (Exhibit 5) that Dr. Webster suffers: (1) a progressive demyelinating disease (Multiple Sclerosis) for which it has impacted her cognitive/behavioral abilities, (2) neuropsychological deficits which impact her ability to function as a physician and (3) carpal tunnel syndrome which impacted her ability to perform a critical procedure.

a. Multiple Sclerosis: The evidence shows Dr. Webster has had some form of neurological dysfunction since 1973. While in the Air Force, Dr. Webster was initially worked-up for MS in 1992 at Travis AFB. Subsequently, she faced an MEB and was returned to duty following a determination that she did not have a clinical diagnosis of MS (Exhibit 9). Concerns about MS were again raised while stationed in Panama. Specifically, Dr. Webster was evaluated at Wilford Hall Medical Center (WHMC) by Lt Col (Dr.) Gary Gronseth, Chairman of Neurology. His findings (September 1998) were consistent with the diagnosis of MS. Although Dr. Gronseth finds Dr. Webster to be world-wide qualified from a neurological standpoint, he suggested further neuropsychological testing to determine her capabilities as a physician.

On 13 January 1999, Dr. Webster obtained an independent neurologic evaluation by Dr. Charles M. Poser of Beth Israel Deaconess Medical Center (Exhibit 11). In short, Dr. Poser was not convinced that Dr. Webster had MS because further clinical symptoms are necessary before final conclusions can be drawn. In his opinion, Dr. Poser felt that her symptoms are more consistent with recurrent Guillan-Barre syndrome/Miller Fisher variant.

ANALYSIS: We are confronted with a difficult task. On the one hand Air Force experts have concluded Dr. Webster likely has MS. However, Dr. Poser, one of the world's renowned experts in the field of MS, has questioned that diagnosis. We agree that further clinical symptoms should occur before MS can be substantiated. Given the intermittent nature of her symptoms at this time, we cannot justify limiting her practice as a physician based on physical disability. This is consistent with the findings of the formal PEB (Exhibit 6). Her current physical state, while not unfitting or compensable under the provisions of the Disability Evaluation System (DES), certainly might be judged "unsuitable" warranting administrative separation in the future (Exhibit 6).

b. Neuropsychological Disorder: Dr. Webster had three separate neuropsychological evaluations beginning June 1998 and ending January 1999. The initial evaluation by Dr. Ricardo De Obaldia, PhD (Exhibit 8) identified no major or severe deficits; however, it was noted that Dr. Webster had "some difficulties" in all four areas evaluated: fine motor, perceptual, cognitive, attention/concentration.

The second evaluation, performed by Dr. Brian R. Campbell (Exhibit 9), revealed several deficits in multiple areas of cognitive testing. Dr. Webster was also noted to have significant deficiencies with sensitive indices of cerebral function. Based on these findings, Dr. Campbell diagnosed Dr. Webster with Cognitive Disorder NOS and further questioned her ability to function as an ER or primary care physician.

In January 1999, Dr. Webster obtained an independent evaluation by Dr. Margaret O'Connor, PhD (Exhibit 10). Dr. Webster performed in superior range on tests of vocabulary, fund of verbal knowledge, arithmetic, attention span, and nonverbal problem-solving. Her speed of processing and memory for information fell into the average to low average range. "While these scores do not represent impairments per se, they should be seen as *relative* deficits given her superior IQ. ...[D]espite her considerable strengths and superior intelligence, her problems in the areas of memory and processing speed may intrude upon work performance, particularly in situations requiring a rapid response to complex types of information." Dr. O'Connor gave two solutions to the Dr. Webster's problems: (1) Re-organize and reduce work responsibilities and (2) Identify work that is engaging for her intellectually and emotionally, but is not time dependent.

ANALYSIS: Given three different evaluations, from three separate sources, we must conclude that Dr. Webster has some form of cognitive deficit. We believe that this deficit impairs her ability to make effective and rapid decisions, which are essential for an ER setting. Accordingly, we concur with Dr. O'Connor's recommendations (see above).

c. History of Carpal Tunnel Syndrome (CTS).

Dr. Webster had a history of CTS, prior to arriving to Howard AFB. She was followed by Orthopaedics at Howard AFB. Subsequently, she underwent Carpal Tunnel surgery in February, 1998. Based on the medical records, she has had a complete recovery of function.

ANALYSIS: Although this problem may have affected her performance during the Code Blue (see text below), we believe that this issue has been resolved.

## 3. <u>FORGETFULLNESS AND DISORGANIZATION IN MEDICAL PRACTICE SETTINGS</u>

FACTS: Dr. Webster was accused of being forgetful and disorganized on several occasions. These include patient complaints (exhibits 23 and 34), staff complaints (exhibits 46, 47, and 48), and the Benadryl/Tylenol mix-up (see below for details).

ANALYSIS: We believe these relatively vague complaints to be true, as they were not denied by Dr. Webster in her testimony. We also believe, based on the information presented to us, that there is a pattern of forgetfulness and disorganization. Of the

EXHIBIT A PAGE 3 OF 13



41

various examples that were presented at the hearing, one case merits discussion. As noted by the testimony of Capt Ryan Shercliffe (also see Exhibit 46), a full-term pregnant patient presented to the ER with ruptured membranes. This patient was refused ambulance transfer. The patient was initially instructed to drive to a downtown hospital, an option that was totally unacceptable to the patient's husband. Ultimately, a commercial taxicab transported the patient to a local hospital. This is problematic because a patient with ruptured membranes should be transferred via ambulance to avoid risk to mother and child.

Although it is concerning for a physician to be disorganized and forgetful, we feel this is not a basis for complete revocation of clinical privileges. With the exception of the ambulance issue, we feel there has not been a breach in the standard of care. Accordingly, we find that in a more controlled, slower-paced environment, these characteristics would not be as problematic for either the provider or her patients.

## 4. INAPROPRIATE BEHAVIOR/ IMPULSE CONTROL

FACTS: Dr. Webster has been accused of multiple episodes of inappropriate behavior and impulse control. Although some of the following are taken from the notification letter, we have supplemented that material with relevant information received at the hearing:

a) A memorandum by Sgt John Silbaugh, dated 7 February 1998, details how Dr. Webster broke down and cried during his appointment (Exhibit 23).

b) A memorandum for record, written by Dr. Edwin Burkett, details an event that occurred on 29 January 1998, in which Dr. Webster had an outburst in the ER hallway (Exhibit 18).

c) A memorandum written by Mrs. Todolinde Callender, describes inappropriate behavior in a Customer Care University class in July 1998 (Exhibit 33).

d) Mrs. Callender's memorandum details an event in which she found Dr. Webster sobbing in the hallway.

e) Yet another instance cited by Mrs. Callender describes another encounter. While mentoring Dr. Webster, Mrs. Callender was present when Dr. Webster said, "these guys at the top [Howard's hospital leadership] are all jerks, and I feel like killing all of them."

f) A memorandum written by SrA Kristen Goode, reports that Dr. Webster described a dream in which she shoots everyone. After the shooting, she had an orgasmic feeling, followed by an orgasm (Exhibit 31).

g) The same memorandum also describes an episode on 16 September 1998. While waiting to be aerovaced to Wilford Hall Medical Center, Dr. Webster informed SrA Goode, "I just want to blow the plane up," followed by "...those new plastic bombs. that cannot be detected." (Exhibit 31). These statements were further investigated by the aerovac crew.

h) Dr. La Macchia's report (Exhibit 44) details Dr. Webster's actions on 28 May 1998, when she discussed details of her childhood sexual abuse with the technician at the front office.

FINDINGS: We find that these incidents did occur, as they were not denied by Dr. Webster. In fact, she attributed these outbursts to situational personal stress, as well as the pressure surrounding her professional career.

ANALYSIS: Dr. Fey agreed that while inappropriate, the outbursts were secondary to stress. Furthermore, he also concluded that during this time she was neither homicidal nor suicidal. These incidents are consistent with her inability to handle stressful situations in an appropriate manner. We feel Dr. Webster should limit her practice to settings which do not produce undue stress.

## 5. SPECIFIC CASES

a. Code Blue

FACTS: Army Sgt William Hill was admitted to Howard AFB for suspected pneumonia. During this hospitalization, he had a terminal event on 24 January 1998. Dr. Webster was called from the ER and directed the code of William Hill. Shortly after the patient's cardiac arrest, Dr. Edwin Burkett and Dr. (Colonel) Terrance O'Neal arrived to assist. During his testimony, Major Burkett expressed two concerns regarding Dr. Webster's management of the code: (1) inadequate airway control and (2) and inability to properly follow ACLS guidelines, CPR and defibrillation (Exhibit 17).

FINDINGS: The committee unanimously finds that these allegations did occur. The committee further finds the conduct did breach the standard of care for an ER provider and did have the potential to adversely affect the quality of patient care.

ANALYSIS: This aspect of the hearing was very difficult to objectively assess, given there were no supporting documents such as a code sheet, medical records, or nursing notes. While we specifically requested these materials, Dr. Burkett testified that these materials were not available. Accordingly, we've had to rely upon eyewitness testimony of those who were present. Based on the testimony of Drs. O'Neal and Burkett, direct witnesses to the code, Dr. Webster was unable to successfully intubate the patient and failed to adequately follow ACLS protocol.

We believe Dr. Burkett's recollection of events and note Dr. Webster's inability to adequately maintain an airway. While this may have been occasioned by Dr. Webster's "weak wrist"? or a patient with a "difficult airway," the bottom line is she failed to properly control the airway and had difficulty with ACLS protocol. The board is not as concerned that she couldn't intubate, but rather is more concerned that she was unable to control an airway. Given the autopsy results of massive pulmonary embolus, we are unable to determine what impact Dr. Webster's inability to maintain a proper airway had on Sgt Hill's death.

During the board's questioning of Dr. Webster, it was noted she understood the general concepts of managing a cardiac arrest. She did, however, demonstrate a visible uneasiness when confronted a hypothetical ACLS scenario. She did not appear to be in control of the situation. Specifically, she exhibited hesitation during a period which required timely and accurate interaction with the questioner. While the board is well aware that the stress surrounding the hearing environment, coupled with lack of direct patient contact over the past year, may have contributed to this outward appearance, we believe a physician with 14 years of emergency room experience should have handled simple ACLS algorithms in a more systematic manner.

Consistent with the testimony of Major Angeloro, we find that under nonstressful situations, Dr. Webster is capable of performing airway management. Again, there is a tremendous difference between a real code and a controlled environment.

b. Cat Bite

FACTS: Dr. Webster saw Mrs. Linda Thomas for evaluation of a cat bite on 12 January 1998. Mrs. Thomas contended that during this encounter, Dr. Webster failed to render proper care: (1) failure to initiate tetanus shot; (2) delivering wrong oral antibiotic and (3) incorrect dosage of rabies immunoglobin on prescription.

FINDINGS: We find that while each of the allegations are true, they were corrected immediately and had no adverse effect upon the patient's care and standard of care was met.

ANALYSIS: Dr. Webster's testimony provided us with sufficient information to determine that each of the complaints were addressed immediately and appropriately. At no time was the patient in danger. Addressing each of these aspects separately, it first should be noted that Dr. Webster self-identified the antibiotic discrepancy. Secondly, Dr. Webster concurred with the patient's need for a tetanus immunization. Lastly, while it may be unclear whether Dr. Webster wrote the prescription for rabies immunoglobin, it is not a surprise that she may have miscalculated the dose, given that the rabies vaccine is rarely prescribed. It should be noted, however, that Dr. Webster took the appropriate action and sent the patient to Public Health. Given the proper follow-up, any possible errors can and were corrected.

c. Tylenol/Benadryl Issue

FACTS: Dr. Webster saw Alexandria Ordaz on 20 April 1998 and diagnosed the patient with gastroenteritis with associated aches and pains. Dr. Webster prescribed Tylenol, yet handed the patient a bottle of Benadryl. Once at home, the parents notified the hospital that they were given the wrong medication and they were instructed to return to the clinic for the correct medication.

FINDINGS: We find this incident to have occurred and that its occurrence did not meet standard of care.

ANALYSIS: Dr. Webster immediately noted the error, she did not attempt to hide the facts, and ultimately corrected the situation. The elixir-type drugs were in identical bottles (as demonstrated at the hearing), with identical labels, and had the same color. Furthermore, both medications are from the same manufacturer. As noted by the pharmacist (Capt Cusak), this exact error is not uncommon and not isolated to Dr. Webster. Ultimately, the hospital decided to purchase Tylenol through a different manufacturer to avoid similar episodes. The reality of this situation is that the panel has been provided only two medication errors for this provider since her arrival to Panama. Since we know she has seen well over a thousand patients, we feel this is an acceptable medication error rate.

Additionally, we were impressed by Capt Cusak's testimony which indicated Dr. Webster is highly regarded for her pharmacological knowledge. Specifically, the chief pharmacist cited her currency on medications, proper administration, and choice of medications.

## RECOMMENDATIONS

In accordance with AFI 44-119, para 4.22, and after thorough review of all the exhibits and testimony, the committee unanimously recommends the following for Dr. Webster: (1) She should not practice in an ER setting (this is primarily due to our concern that she does not adequately handle task-saturated events), (2) Family Practice/Primary Care/Aerospace Medicine privileges should be allowed, (3) In any or all of those settings, she should be monitored with 100% chart review for no less than three months and, (4) at the conclusion of that three month period her privileges should be reevaluated.

It is clear Dr. Webster possesses the requisite knowledge to be a physician. She does, however, display several disturbing qualities which make her presence in the military (specifically, a military ER with possible war-time taskings), a potential disruption. Despite some superior traits as a physician (thoroughness, dedication to patients, medical knowledge, etc.), she appears to have certain identifiable interpersonal deficiencies.

While these undesirable personality traits have yet to result in an untoward patient outcome, we can easily see where those who review this case may not want her to

practice in *any* military setting. Accordingly, while we don't believe the evidence against Dr. Webster rises to a level which would warrant revocation of her privileges, we acknowledge she may not "fit in" to the unique demands and needs of the United States Air Force. In short, if after a sufficient period of review this physician is unable to meet the expectations of the military, consideration for administrative separation should be given.

Richard T. Steffen
RICHARD T. STEFFEN, Major, USAF, MC
Chairperson

20 Feb 99
DATE

Andrew L. Matthews
ANDREW L. MATTHEWS, Major, USAF, MC
TDY from Langley AFB

20 Feb 99
DATE

Florin C. Georgescu
FLORIN C. GEORGESCU, Capt, USAF, MC

20 FEB 99
DATE

EXHIBIT A page 8 of 13



46

DEPARTMENT OF THE AIR FORCE
24TH MEDICAL OPERATIONS SQUADRON (ACC)
HOWARD AFB, PANAMA

22 February, 1999

**MEMO FOR 24TH MDG/CC (Col O'Neil)**

**FROM 24th MDG/SGH (Dr. Edwin K. Burkett)**

**SUBJECT: Privilege Hearing Recommendations**

1. On 22 February I was given the recommendations report from the hearing committee concerning the privileges of Major Wilma Webster. The committee decided that her privileges as an Emergency room provider should remain revoked because they agreed that she has proven cognitive deficits that are magnified under stress and that she cannot handle task-saturated events. They further decided that her privileges in Family Practice/Primary Care/Aerospace Medicine should be reinstated under a 100% chart review for no less than 3 months and then have her privileges reevaluated. The committee also commented that Major Webster has some disturbing qualities and undesirable personality traits that cause concern with her practicing medicine in any military setting. Following are my further comments and recommendations.

**Recommendation #1:** I fully concur with the decision about revocation of her Emergency physician privileges

Comment: In light of Major Webster's cognitive deficits and memory deficits I am not convinced that she can give appropriate and safe care to patients in Primary Care setting. I mainly question whether she can assimilate and manage the information for patients with multiple medical problems and multiple medications. However, this cannot be determined without monitoring and evaluation by long term chart review. Because of the lack of confidence in her at this MTF and the possibility that such a review may not appear to be impartially accomplished at the 24th MDG I do not feel this M&E should be done here.

**Recommendation #2:** While Major Webster remains at the 24th Medical Group she should continue without privileges in Primary Care. Upon her PCS the gaining MTF should institute the Monitoring and Evaluation process if they choose to grant her Primary Care privileges.

**Recommendation #3:** According to AFI 44-119 paragraph 3.17.3 I recommend that the hearing committee report, the DD Form 2499, and the transcript of the hearing be placed in Section III of her Provider Credentials File. Additionally, the supporting documents that have been consolidated into a single file be cross-referenced as part of this same section of the PCF.

Edwin K. Burkett

Edwin K. Burkett, MD
Maj USAF, MC
24th MDG, Chief, Medical Staff

Global Power For America

ATCH 3(1)

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

24 March 1999

MEMORANDUM FOR: Major Wilma P. Webster

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Credentials Function Proceeding in Re: Webster, Wilma P.

1. Having fully reviewed the record of the subject hearing proceedings, including the AETC Form 1280 Code Blue Record which was noted as missing at the time of the hearing, I am approving the recommendations of the Credentials Hearing and am directing that (1) your Emergency Medicine privileges be rescinded, (2) your Family Practice/Primary Care / Aerospace Medicine privileges be continued in Category "2" with 100% chart review and full supervision for a period of six months. Furthermore, at the end of that period of observation and review, your privileging status will be re-evaluated.

2. You are advised of your right to appeal, according to AFI 44-119. My decision will remain in effect during appellate proceedings.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

1st Indorsement

25 MAR 99
DATE

TO: Chairperson, Credentials Function, 24th Medical Group

1. I acknowledge receipt of the above notification of the Commander's decision regarding he Credentials Hearing in RE: myself.

Wilma P. Webster

WILMA P. WEBSTER, Maj, USAF, MC

EXHIBIT A page 9 of 13

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH WING (ACC)
HOWARD AIR FORCE BASE, PANAMA

25 February 1999

MEMORANDUM FOR 24 MDOS/CC

FROM: JA

SUBJECT: Recommended Action Regarding Major Wilma Webster

1. On 17-18 Feb 99, the 24th Medical Group held a provider credentials hearing seeking revocation of Major Wilma Webster's privilege to practice medicine at Howard Air Force Base. On 20 Feb 99, the Hearing Board unanimously recommended that Major Webster's practice as a physician be limited. You have expressed an interest in PCSing Major Webster expeditiously based upon the Hearing Board's recommendations. We do not recommend PCSing Major Webster in the near future and offer the following guidance.

2. BACKGROUND:

a. On 17-18 Feb 99, the 24th Medical Group held a provider credentials hearing seeking to completely revoke Major Webster's ability to practice medicine at the 24th Wing. On 20 Feb 99, the Hearing Board issued the following findings and recommendations: 1) that Major Webster not practice in an ER setting; 2) that Major Webster should be allowed privileges to practice in Family Practice/Primary Care/Aerospace Medicine; 3) that in any or all of these practice settings, Major Webster should be monitored with 100% chart review for no less than three months; and 4) that Major Webster's privileges be reevaluated at the end of that three month period.

b. You have indicated that the 24th Medical Group has concerns about its ability to fully comply with the Hearing Board's decision. Given the small size of the 24th Medical Group, it will be difficult to provide the level of chart review recommended by the Hearing Board. Additionally, the small size of the 24th Medical Group makes thorough chart review difficult without involving those persons who were actively involved in supporting the action to revoke Major Webster's privileges. Such involvement by interested parties could potentially lead Major Webster to allege the chart review process is unfair. As a result, you have expressed an interest in PCSing Major Webster expeditiously.

3. ANALYSIS: In order to accurately explain the rationale behind our recommendation not to PCS Major Webster at the current time, a clear understanding of the appeal process is necessary. AFI 44-119, *Medical Service Clinical Quality Management*, Chapter 4, describes the appeal process. A summary of the AFI requirements are as follows:

a. The hearing transcr and the Hearing Board's findings an commendations must be completed and provided to Major Webster thirty (30) calendar days after the hearing concludes (20 Mar 99) (AFI 44-119, paragraph 4.22.1).

b. Major Webster then has ten (10) duty days to respond/appeal to the Board's recommendations. She can request additional time to respond (AFI 44-119, paragraph 4.23). 24 MDG/CC has the discretion to grant additional time. It may be advisable to grant Major Webster additional time if she so requests, since Major Webster's counsel is located in the United States.

c. 24 MDG/CC then has ten (10) calendar days from the time he receives Major Webster's response to make his final decision (AFI 44-119, paragraph 4.24). If 24 MDG/CC does nothing within fifteen (15) days after he receives Major Webster's response, his silence is deemed a denial of the Hearing Board's decision. We strongly recommended against a denial by silence. If 24 MDG/CC disagrees with the Hearing Board's recommendation, he should state the reasons why in writing.

d. 24 MDG/CC must notify Major Webster in writing of his final decision within three (3) calendar days of the date his decision becomes final (AFI 44-119, paragraph 4.24). This notification letter must state what 24 MDG/CC's final decision is and notify Major Webster of her right to appeal his final decision. Specific guidance on the notification letter is located in Attachment 13 of AFI 44-119. The hearing transcript, Major Webster's response, and 24 MDG/CC's final decision is then forwarded to HQ ACC/SG. If Major Webster appeals 24 MDG/CC's final decision, the appeal process to the Air Force Surgeon General could take about 90 days from the final decision date.

4. RECCOMENDATION:

a. While we understand the reasons behind the 24th Medical Group's desire to PCS Major Webster, we recommend against PCSing her before the Air Force Surgeon General makes a final decision on the privileging action. Based on our interpretation of AFI 44-119, as well as consultation with Major William Boyce (the Medical Law Consultant (MLC) at Keesler AFB), we recommend retaining Major Webster in the Health and Wellness Center (HAWC) or utilizing her to perform other administrative duties within the 24th Medical Group. Although the AFI does not specifically prohibit PCSing Major Webster, doing so could give the appearance that the 24th Medical Group is acting against her in reprisal for an adverse hearing outcome, and is denying her due process before a final decision has been rendered. However, if you decide to PCS Major Webster before final action is taken, we recommend such action be coordinated with HQ ACC/SG. In addition, we recommend notifying Major Webster's gaining unit of the present privileging action.

b. If 24 MDG/CC does not want to retain Major Webster in the HAWC, he may assign her other administrative duties in the hospital or allow her to return to providing patient care with chart review in accordance with the Board's recommendation.

5. RECOMMENDATION: We recommend against PCSing Major Webster before the Air Force Surgeon General makes a final decision. If 24 MDG/CC accepts the recommendation of the Board, he is not required to immediately place Major Webster in a setting where she would provide patient care. At his discretion, he may keep her in the HAWC until a final decision has been reached.

6. Capt Cynthia Valderrey and Capt Reggie Harris are my action officers regarding this matter. Please call them at 284-5354 if you have any questions or require additional information.

Matthew J Polgar

MATTHEW J. POLGAR, Lt Col, USAF
Staff Judge Advocate

Attachments:
Board Findings and Recommendations, 20 Feb 1999

cc:
24 MDG/CC



51

LAW OFFICES OF
TERRENCE J. MARTIN, P.C.
COLONNADE I
9901 IH 10 WEST, SUITE 430
SAN ANTONIO, TEXAS 78230
(210) 697-3400

TERRENCE J. MARTIN

TELECOPIER NO.
(210) 697-6386

*April 6, 1999*

*TO:* *HQ USAF/SG through*
*HQ AFMOA/SGPC*
*ATTN: Major Lewis*
*110 Luke Ave., Room 405*
*Bolling AFB*
*Washington, D. C. 20332-7050*

***VIA FEDERAL EXPRESS AIRBILL NO. 809927369192***

*SUBJECT:* *Appeal of Final Privileging Decision Regarding Wilma P. Webster, Major, USAF, MC*

*FROM:* *Wilma P. Webster, Major, USAF, MC , by her attorney, Terrence J. Martin*

*1. In accordance with AFI 44-119, Paragraph 4.26, Major Wilma P. Webster, USAF, MC, hereby appeals the Final Privileging Decision of Terrence Jay O'Neil, Col., USAF, MC, rendered on 24 March 1999 and received by Major Webster on 25 March 1999. In that decision, Col. O'Neil agreed with the recommendations of the Credential's Board that Major Webster's Emergency Medicine privileges should be rescinded and her Family Practice/Primary Care/Aerospace Medicine privileges should be continued in Category "2" with 100% chart review and full supervision for a period of six months. It is the position of Major Webster that this decision is against the great weight and preponderance of the evidence contained in the transcript of the Credentials Hearing. It is further Major Webster's position that her rights to due process under the law and in accordance with AFI 44-119 were violated as (1) the Air Force failed to produce at the hearing crucial medical records concerning the Code Blue which was one of the matters which the Credentials Board based part of their opinion upon; (2) introduced records not provided to Major Webster prior to the Credentials Hearing; (3) exerted command influence upon at least one of the witnesses; (4) failed to assure the impartiality of the Hearing Committee and (5) went outside the hearing record to investigate the Code Blue without advising Major Webster of same.*

ATCH 1 57

2. ***Complaints of Patients in General:*** *Major Wilma P. Webster started working in the Howard AFB Emergency Room in October, 1997. She was removed from her duties as an Emergency Physician on approximately January 29, 1998 due to her Carpal Tunnel Syndrome and placed in the Primary Care Unit (Page 65, Hearing Transcript). Following her recovery from her surgery to correct her Carpal Tunnel Syndrome, she returned to the Emergency Room in mid April 1997 and remained there until she was reassigned to the Health and Wellness Center on May 22, 1998. This was not a credentialling action. (See Exhibit 36).*

*During her time in the Emergency Room, Major Webster saw either 1102 patients (Exhibit 52) or 1151 patients (Exhibit 27). The evidence in this case shows that Major Webster had a total of arguably eight complaints during her time in the Emergency Room. See Exhibits 22 (not a patient complaint), 23, 34 and 54. This means that her total complaints equaled either .73 % or .69% of the total patients she saw. In other words, less than one percent of her patients registered complaints against her. There is no evidence as to the exact number of patients she saw in the Primary Care Clinic, but she only received three complaints during this period, two of which concerned waiting times and one concerned her crying (Exhibit 23). None of her complaints concerned an untoward outcome for her patients. Clearly a complaint rate of less than .75% cannot be considered evidence of poor practice or difficulties in working with patients.*

*In addition to the above, Dr. Webster was never given an opportunity to respond to the majority of these complaints and was not even aware of most of them until they were presented to her as a result of this credentialling action. Hence, she was denied the opportunity at the time to refute same. One of these complaints is included in Exhibit 54, the complaint of Mrs. Schroder. This complaint was not raised at the Board Hearing and was overlooked by Major Webster and her counsel in the review of the many documents submitted to her. However, after the hearing and as a result of it being mentioned in the Board's Findings and Recommendations, Major Webster submitted the complaint to Lt. Col. Granville, Chief, Orthopaedic Surgery. He found nothing wrong in the way Major Webster treated Mrs. Shroder and his written confirmation of this is attached as Exhibit "A" to this Appeal which is hereby incorporated by reference the same as if fully copied herein verbatim. One can only question how many of the other complaints cited by the Board would have been found to be inaccurate or unjustified if Major Webster had been timely provided these complaints and had a chance to investigate them at the time they were made.*

3. ***Specific Cases Addressed by the Credentials Board:*** *The Board, in their report, addressed three specific cases involving Major Webster's treatment of patients. Their analysis of the Tylenol/ Benadryl issue was fair and based upon the evidence. They acknowledged the testimony of Captain Cusak and found that while an error occurred, it was properly handled by Major Webster and, in fact, was a common error which several doctors throughout the Hospital had made due to the almost identical appearance of the bottles holding the drugs in question (page 233-234, Hearing Transcript). Their use of this incident as an example of Major Webster's*

*forgetfulness and disorganization, however, is contrary to the evidence in this case and will be addressed further in this appeal. The Board's interpretation of the other two specific cases is simply erroneous and contrary to the evidence contained in the record and the records withheld from the Board for their consideration. What follows is an examination of the evidence regarding both of these cases:*

*A.* ***Code Blue:*** *The Board found that the allegations contained in Major Edwin K. Burkett's Memorandum for Record dated 31 January 1998 (Exhibit 17) and his testimony before the Board beginning at page 55 of the hearing transcript restating the "facts" set forth in his Memorandum for Record to be accurate and proof that Major Webster's handling of the Code breached the standard of care. The Board also used this Code as examples of (1) Major Webster being unable to handle the stress of working as an Emergency Room Physician and (2) her cognitive dysfunction affecting her patient care.*

*This analysis is faulty because (1) the Board was not provided the AETC Form 1280 Code Blue Record; (2) the Board either disregarded or failed to remember the testimony of both Col. O'Neil and Major Webster; and/or (3) was prejudiced in favor of Major Burkett. The hearing transcript of the testimony of Dr. Burkett at page 59 and page 71 reflects that the records of the Code have simply vanished and no one knows where they are. In truth and in fact, the records were locked in the Command Section at all times.*

*Major Burkett's first criticism was that Major Webster did not maintain an adequate airway on the patient until he arrived and repositioned the patient's head (page 60, Hearing Transcript). However, Col. O'Neil testified that he arrived prior to Major Burkett, that the patient was being bagged, that he charged himself with the responsibility of insuring there was bilateral breath sounds throughout the Code, and that there were bilateral breath sounds the entire time he was present. (See pages 143 and 163 of the Hearing Transcript.) Major Webster was hazy on the details of the Code as she had not seen the records of the Code since the incident happened, just as Col. O'Neil was (see page 163 of the Hearing Transcript); but she did not recall that the patient had a problem with his airway (see page 295 of the Hearing Transcript). Obviously, if Col. O'Neil is hearing bilateral breath sounds throughout the Code and he arrived prior to Major Burkett, Major Burkett is wrong about the inadequate airway control. This is also true if the patient was showing signs of breathing on his own as testified by Major Webster.*

*Another criticism of Major Burkett was that Major Webster failed to defibrillate the patient in a timely manner and needed prompting from him even after he intubated the patient. Unfortunately, the Board was not given the opportunity to read the Code Sheet for if they had, there would had to have been raised serious questions regarding Major Burkett's criticisms. Major Burkett testified that he was advised of the Code while he was at home, and that it takes him four to five minutes to get from his home to the*