*ward (page 58, Hearing Transcript). Major Burkett states in Exhibit 17 that when he arrived, Dr. Webster was in the process of trying to intubate the patient. He goes on to state that Major Webster was so intent on intubating the patient that she had forgotten about the need to defibrillate the patient. The records of the Code are attached hereto as Exhibit "B" and are incorporated by reference the same as if fully copied herein verbatim. They showed that the arrest began at 21:30, and that the patient was defibrillated the first time at 21:33. The patient was again defibrillated at 21:35 and 21:42, and the patient was not intubated until 21:47. Thereafter, no further defibrillations were accomplished until the Code was terminated at 21:59. This record does not square with the testimony of Major Burkett or his Memorandum for Record.*

*The testimony of Col. O'Neil further verified that Major Burkett's testimony and Memorandum for Record were in error. First, Col. O'Neil's time line is different from Major Burkett's (page 143, 144, Hearing Transcript). Further, it is apparent that when you compare his account to the Code Record, Col. O'Neil must have arrived latter than he remembered, and Major Burkett arrived after him. Finally Col. O'Neil testified that after the patient was intubated, the Code went smoothly (page 162, Hearing Transcript). Clearly, if Major Burkett had to remind Major Webster to shock the patient, then the Code was not going smoothly after the patient was intubated, and Col. O'Neil would have obviously noted it.*

*The last area of criticism was the stopping of CPR after it was initiated. While I am obviously not a physician, Dr. Matthews, a Board Member and the only physician on the Board who was Board Certified in Emergency Medicine, implied by his question at page 295 of the Hearing Transcript that it is appropriate to stop CPR at least to check the patient's real rhythm.*

*If the Board had been provided the Code Record, it is clear that the testimony of Major Burkett would have to have been questioned and, under cross-examination, the credibility of Major Burkett would clearly have been challenged. Further, the introduction of the x-rays ordered by Major Webster showing that Major Burkett possibly did not intubate the patient properly may have been given more credence by the Board and served as an explanation of why Major Burkett might have some animosity against Major Webster as a result of this Code.*

*During the Hearing, clearly, there was no evidence introduced to the Board regarding the medication administered during the Code, but the Board found Major Webster was even deficient in this area. The Code Records would have clearly changed this opinion.*

*Why the Board chose to accept Major Burkett's testimony, which was contradicted by both Col. O'Neil and Major Webster, cannot be answered via this Appeal. However,*

*there is no question that the Board Chairperson was biased in favor of Major Burkett. This bias was shown when the undersigned challenged whether Major Burkett properly intubated the patient based upon the fact that post mortem x-rays taken prior to the patient being moved following the Code showed that the endotracheal tube was not inserted properly (Exhibit 19). Specifically at page 81 of the Hearing Transcript, the Committee Chairperson, Major Richard Steffen stated:*

> *"Is there any point pertaining to her because he is not on trial for intubating the code.* ***We know that situation so I am sure Edwin intubated her just fine. Is there anything pertaining --"***

*At that point, the undersigned immediately challenged the Chairperson for cause but the challenge was denied by the Legal Advisor. It is Major Webster's position that this challenge should have been sustained and the failure to do so is one of the reasons the Board accepted Major Burkett's testimony without even questioning it. Further, contrary to the finding of the Board, it is Major Webster's position that the record shows that she conducted the Code properly. Her failure to be able to intubate the patient is not really criticized as every witness who was asked, acknowledged that she did the right thing by asking someone else to intubate the patent when she was unable to (pages 70, Hearing Transcript). Finally, instead of this Code being used to show Major Webster cannot operate under stress, the full record, which the Board was never provided, shows just the opposite.*

*Another point of error regarding the Board's handling of this Code involves Dr. Matthews. At the hearing, Exhibit 42 was introduced which was part of the file originally provided to Major Webster during this hearing. It implied that the Code in question was reviewed by 1 MDOS/CC, Langley AFB, Virginia. Major Matthews questioned this document and wanted to investigate it further. The Legal Advisor warned the Board that they should not review anything which was not in the record and not try and investigate any matter outside the confines of the Board. After the undersigned gave his closing argument relying on Exhibit 42, Major Matthews advised the undersigned that he had called Langley and determined that the Code in question had not actually been reviewed and that Exhibit 42, which was provided by the Government, could not be relied upon for determining the appropriateness of the Code. What other investigation was conducted by Major Matthews without the knowledge of Major Webster, her counsel, and the Legal Advisor is unknown, but one thing is clear – Major Matthews chose to disregard the instructions of the Legal Advisor and by doing so, Major Webster was subjected to secret evidence, a clear violation of her right to due process.*

*B.* ***Cat Bite:*** *The testimony of Ms. Linda Thomas is contained at pages 138-140 of the Hearing Transcript, and the testimony of Major Webster is contained at pages 281-283 of the Hearing Transcript. Ms. Thomas alleges that Major Webster gave her the*

*wrong antibiotic and Major Webster contends that she decided to change the medication without any prompting from Ms. Thomas. Ms. Thomas claims that Major Webster had to be reminded that Ms. Thomas needed a tetanus shot and then forgot the conversation a short time later and asked her when she had her last tetanus shot. Major Webster denies this. What is not included in Ms. Thomas' testimony or Major Webster's or in Exhibit 34 was that Major Webster ever prescribed the dosage for the rabies immunoglobin. While the Board was free to accept either parties' testimony as more creditable on the first two issues, they were not free to falsely assume that Major Webster prescribed the wrong dosage of the rabies immunoglobin. The Board is required to make their decisions based upon the evidence in the record and only that evidence. It is Major Webster's contention that this finding is only a further example of the bias of the Board against her.*

*4. Forgetfulness and Disorganization in Medical Practice Setting: The Board under this category finds that the "relatively vague complaints" against Major Webster "to be true" and further finds that these relatively vague complaints are proof of a pattern of forgetfulness and disorganization. They cite as support for these findings the failure of Major Webster to deny that she is forgetful and Exhibits 23, 34, 46, 47, 48 and the Benadryl/Tylenol mix-up (Exhibit 22).*

*To see how far the Board was willing to stretch to make this finding, the Appellate Authority needs to only examine the testimony of Major Webster and these Exhibits, and then compare them to the testimony of Major Webster's co-workers who appeared and testified at the Hearing, some at great risk to their career. Contrary to the Board's assertion that Major Webster did not deny that she was forgetful, I would direct the Appellate Authority to page 281 of the Hearing Transcript where the undersigned specifically asks Major Webster whether she is forgetful in the Emergency Room and she replies: "No, not really."*

*Exhibit 22 contains the incident involving the giving of Benadryl instead of Tylenol. If this is an example of forgetfulness and disorganization, then the Board must feel that the numerous other Physicians throughout the Hospital who made this same error, by the Board's own admission in their Findings and Recommendations, are also forgetful and disorganized.*

*Exhibit 23 contains eight complaints. Only two of these complaints, one dated November 11 and the other dated November 12, 1997, allege Major Webster was forgetful without any specific examples of why the patients had that opinion.*

*Exhibit 34 concerns the cat bite incident more fully discussed in paragraph 3 above. If Ms. Thomas is believed over the testimony of Dr. Webster, then you might be able to use this as an example of forgetfulness. However, if you believe Ms. Thomas, Major Webster's forgetfulness must not have been too bad as she recognized the need for the change in the medication she had prescribed immediately upon Ms. Thomas asking her about same, and she was sure that Ms. Thomas got her tetanus shot and was told to go to Public Health.*

*Exhibits 46 and 47 concern the written memorandums of Captain Shercliffe who wrote them after the Squadron Commander advised him to keep a close watch on Major Webster and document anything he felt was of concern and after Captain Shercliffe was advised to tell his staff the same thing. It is significant that despite this intensive scrutiny, all that Captain Shercliffe and his staff could document is what is contained in these memorandums. Additionally, Captain Shercliffe could not remember how long before his first memorandum it was that he was told to keep an eye on Major Webster and report any items of concern. Please see pages 186-188, Hearing Transcripts.*

*With that background, the memorandums document a total of five incidents. The first incident concerns Major Webster's refusal to write up a dog bite report on a patient who had been seen earlier by another provider (page 177, Hearing Transcript). Whether this decision was right or wrong is not at issue; however it is clearly not an example of forgetfulness or disorganization.*

*The second item of concern relates to an ambulance run where Major Webster requested a strip on the patient. She apparently was unaware that they did not have that capability but when finally informed that they could not provide a strip, gave appropriate orders (page 178, Hearing Strip). Again, nothing to do with forgetfulness or disorganization.*

*The third item of concern regards the term patient who came into the Emergency Room after her water had broken. Major Webster requested that the Husband take her to the hospital downtown for delivery and he refused. Ultimately, they decided to take her downtown via a commercial taxi (page 178, Hearing Transcript). Captain Shercliffe testified that it was in Major Webster's medical discretion how the patient should be transported downtown. The Board felt that Major Webster's decision breached the standard of care. Whether their opinion is correct or not, however, is not the issue in this instance. Clearly, there is nothing in this incident to show that Major Webster was forgetful or disorganized. The only issue is whether she made the correct decision in transporting the patient via commercial taxi.*

*With regards as to whether Major Webster made the correct decision to have the patient transported via public taxi to the downtown hospital, the Board concluded that Major Webster's decision violated the standard of care with nothing more than the report of Captain Shercliffe. They had no records on the patient and asked no questions of Major Webster concerning this incident. None of the Board Members were specialists in OB/GYN. Attached hereto as Exhibit "C" is the record of the patient in question and the review by Gustavo A. Herrera, M.D., FACOG, OB/GYN Clinic, Howard AFB, Panama. The records document that Major Webster consulted with Dr. Olmos, OB/GYN, who concurred in Major Webster's decision to send the patient via POV. Dr. Herrera writes that in his opinion, Major Webster's decision was not a breach of the standard of care. It should be noted that nowhere in the notification letter to Major Webster was she advised that this case was considered to be an example of improper patient*

*care, and hence, the Appellate Authority should consider this additional evidence in Major Webster's favor. It should also be noted that Major Webster was denied the right to obtain actual copies of the medical records on the patient in question, and thus was forced to write what was in the medical records. Exhibit "C" is the typed version of what Major Webster recorded from the medical records of the patient in question.*

*The fourth item of concern is that she did not leave the Emergency Room until 1300 hours when she had to be back to work by 1800 hours the same day (page 178, Hearing Transcript). No one suggests that Major Webster simply forgot that her shift ended earlier or that she failed to take off earlier due to lack of organization. The truth is that her dedication to her patients attested to below by her co-workers is probably what kept her late.*

*The fifth item concerns Major Webster seeing two pediatric patients before other scheduled patients (pages 178-179, Hearing Transcript). This may be a result of disorganization, but Captain Shercliffe did not ever suggest that it was a result of forgetfulness. In fact in his entire testimony, while he did complain that comparatively Major Webster was not as organized as the other doctors or as predictable, he never once complained of any incidents of forgetfulness.*

*What was even more interesting, however, was his evaluation of Major Webster as an Emergency Room Provider. He explained that her approach was one like other Emergency Room Doctors who were trained in Internal Medicine, that is, slow and methodical. He also noted that her skills as a physician were comparable to the other Emergency Room Physicians, and he had confidence in her as a physician when working with her (pages 182-184, Hearing Transcript).*

*The final example of forgetfulness is Exhibit 47 which is a Memorandum for Record dated May 20, 1998 and written by Major James E. McCrary, Chief, Emergency Services. This Memorandum includes the patient complaints already discussed above and the observations of Captain Shercliffe contained in his Memorandums discussed above. It also lists a 12 November 1997 Memorandum from Lt. Col. Robbins noting a one time non-compliance with standard documentation on downtown consults. It should be noted that Exhibit 53 contains a letter from Lt. Col. Robbins stating that after that one incident, Major Webster complied with the standard documentation on downtown consults. Hence, this clearly is not an example of forgetfulness or disorganization and could be construed as an example of the exact opposite.*

*Another item listed is Major McCrary's 30 November 1997 verbal counseling session. Significantly, Major McCrary testified that aftet that counseling, Major Webster improved (pages 202, 213, Hearing Transcript).*

*The final documented items in Major McCrary's Memorandum concerns Leaving Without Being Seen Statistics (LWOBS). Exhibits 26 and 27 were compiled by Major Webster from the Emergency Room Patient Records and show that contrary to what is written in the Memorandum,*

*Major Webster was not consistently the provider with the highest LWOBS statistics. In fact, Major McCrary acknowledged that the numbers on Exhibit 26 and 27 were approximately the same numbers he used to come up with a different result (page 197, Hearing Transcript). Major McCrary also noted that these statistics may or may not be significant (page 194, Hearing Transcript), and Dr. Theodoro Mendez, Major McCrary's supervisor, testified that LWOBS statistics cannot be used in the Emergency Room because you don't know if they occurred on a slow day or if they were the result of treating an Emergency (page 108,109, Hearing Transcript).*

*Despite this, the Air Force produced new statistics on LWOBS, Exhibits 49-52, over the objection of Major Webster's counsel (pages 198, 199, Hearing Transcript). AFI 44-119, paragraph 4.20, specifically prohibits the introduction of additional information not used in the original credentials function deliberations unless the provider is informed of the additional information prior to the hearing and is given reasonable time to review the information as well as access to the records upon which the additional information is based so that he/she can prepare to refute it. Consequently, this constitutes another example of where Major Webster was denied her rights to due process and the Air Force violated its own regulations.*

*In any event, these statistics do not denote forgetfulness. They might denote a lack of organization, but there is simply not enough evidence to validate these statistics as being an example of Major Webster's disorganization.*

*At this point, however, it is necessary to review the evidence not cited by the Board in their Findings and Recommendations. The first thing that needs to be pointed out is that Major McCrary acknowledged that he never observed Major Webster's clinical practice and had no criticism of her medical practice despite reviewing her patient charts (pages 191, 203, 204, Hearing Transcript). Further, the only time he felt it was necessary to counsel her on her performance in the Emergency Room was on 30 November 1997 (page 192, Hearing Transcript). Major McCrary had no criticism of her medical practice and based upon seeing patients who were previously seen by Major Webster and reviewing their charts, found no discrepancies in her treatment of the patients (page 203, Hearing Transcript). In fact, he volunteered that from what he had seen of Major Webster's medical practice, he thought it was good (pages 203, 204, Hearing Transcript). He also contradicted Dr. Mendez' testimony that Major Webster got 50% of the patient complaints in the Emergency Room (pages 206, 210, 211, Hearing Transcript). Additionally, he admitted that his Emergency Room was disorganized (page 210, Hearing Transcript). Clearly, this disorganization could have been part of what others perceived was Major Webster's problem instead of an Emergency Room wide problem.*

*Major McCrary did not state that Major Webster was forgetful. And finally, Major McCrary refused to voice any opinion on whether Major Webster should have her privileges removed, but did voice his opinion that he did not think it was right to go from a verbal counseling to a hearing to remove one's privileges (pages 207. 208, Hearing Transcript). His*

*bottom line was that while Major Webster's "care of patients is appropriate," she "just takes too long."*

*It is also necessary to point out that everyone of the Air Force's witnesses from Col. O'Neil down could not produce one chart that documented poor care on Dr. Webster's part (pages 79, 80,107, 159, 160, Hearing Transcript). In fact, every one of the Air Force witnesses acknowledged that as far as they knew, her medical skills were good.*

*The testimony of her co-workers and patients was even more glowing and are briefly summarized below for the convenience of the Appellate Reviewer:*

a. *Major Michael B. Angeloro, Nurse Anesthetist (pages 215-218, Hearing Transcript): Major Angelro testified that he tested Major Webster's skills in intubating a patient, that she successfully intubated two patients without any problems, and that he saw nothing that would cause him concern in her skills in intubating a patient. Remarkably, the Board used this as an example that Major Webster could operate in a nonstressful environment, but implied based upon her handling of the Code in question, that the results would be different in a stressful situation. This is remarkable because the evidence is uncontradicted that all physicians from time to time have difficulty intubating patients, and in this particular case, the evidence is uncontradicted that her failure to intubate the patient was due to a physical limitation (Carpal Tunnel Syndrome) which was treated successfully.*

b. *Major David Copp, General Surgeon (pages 218-220, Hearing Transcript): Major Copp worked with Major Webster in the Emergency Room when he was called by her for a surgical consult. He stated that from working with her in the Emergency Room and from seeing patients in his clinic who were seen by Dr. Webster in the Emergency Room, he found her skills comparable to the skills of the other Emergency Room Doctors and saw nothing that would give him any concern about her competency to practice medicine.*

c. *Captain Mark P. Westrick, Director Clinical Laboratory (pages 220-223, Hearing Transcript): Captain Westrick regularly reviewed Major Webster's orders for test and laboratory work and found them to be appropriate for the patients. He saw nothing in her laboratory work which caused him concern about her competency to practice medicine and felt that this was a good indicator to judge a physician's competency. He also knew Major Webster socially and noted that she had never made any inappropriate comments to him.*

d. *Doctor Byron Efthimiadis, Health Promoter Coordinator (pages 223-227): Dr. Efthimiadis is a pediatrician who had at least one experience with Major Webster*

*in treating an Emergency Room Patient and who is Major Webster's supervisor in her current assignment at the Health and Wellness Center. Concerning the shared patient, he related that Major Webster called him from the Emergency Room for a consult on an infant she suspected had diabetes. When he arrived at the Emergency Room, the patient had been properly worked up by Major Webster. He found her diagnosis to be correct and found that in working with her, she was very competent. He also testified that Major Webster was performing excellently in her current job and that he wanted her back if the Board did not pull her credentials. He noted that Major Webster had not made any inappropriate remarks while she worked for him. He knew of nothing which would cause him to question Major Webster's competency to practice medicine.*

*e.* <u>*Captain Randall Langston, Commander of Public Health (pages 227-232)*</u>*: Captain Langston reviewed the complaint of Ms. Thomas and found nothing distressing about it with regards to Major Webster's handling of the cat bite. He also testified that he has worked with Major Webster since she was transferred to the Health and Wellness Center. He stated that Major Webster had never said anything inappropriate to him and that he would have no hesitancy in allowing Major Webster to treat either himself or his family.*

*f.* <u>*Captain Steven G. Cusack, Chief of Pharmacy (pages 232-239, Hearing Transcript)*</u>*: Captain Cusack regularly reviewed the prescriptions of Major Webster and was most impressed with her knowledge of pharmacology, her ability to stay current in the use of drugs, and her performance on his committee. He found her thorough. He was a patient of Major Webster and was impressed with her thoroughness and the concern she showed about him. He saw nothing in his observations to given him concern about her competency to practice medicine and would allow her to treat himself and his family. He further felt that a physician's prescription use was one of the better ways to evaluate a physician's competency.*

*g.* <u>*Captain Ann Li, Primary Care Physician (pages 239-245, Hearing Transcript)*</u>*: Captain Li worked with Major Webster for eight months in the Emergency Room. Prior to her becoming licensed, Dr. Webster was supervising her. Captain Li found Major Webster to be an excellent physician who was very thorough and meticulous in her treatment of patients. In her opinion, Major Webster's rate of seeing patients was about the same rate as Captain Li's. She never had any concerns about her judgment and sought her advice on consults. She also sought treatment from Major Webster. She knew of nothing that would justify pulling Major Webster's credentials in the Emergency Room or anywhere else and voiced the opinion that she was a very good doctor.*

*Captain Li also testified that she felt threatened by Major Burkett. She had a conversation with him in which it was her distinct impression that if she testified out of the norm in the Hearing, her application for Flight Medicine would be disapproved.*

*h.* *<u>TSgt Thomas Sonderegger, NCOIC Patient Administration (pages 245-248, Hearing Transcript)</u>: TSgt Sonderegger submitted a written statement in support of Major Webster (Exhibit 30) as well as testifying before the Board. He found Major Webster a very honest and thorough person who gave him everything he needed to process her recent PEB. He further noted that in her practice of medicine, she frequently came to his section to follow up on laboratory and other test results and x-rays on patients. He also noted how she would call her patients to advise of the results. Major Webster never said anything inappropriate to him, and he never observed anything which caused him to question her competency in practicing medicine. He would allow Major Webster to treat him and his family.*

*i.* *<u>Captain Michael Tall, Emergency Room Physician, (pages 249-254, Hearing Transcript)</u>: Captain Tall worked with Major Webster in the Emergency Room but did not recall having treated a patient with her. He has however seen patients previously seen by Major Webster and their records always reflected a proper diagnostic work up and proper care. He believes that she is competent to practice medicine in the Emergency Room and would have no objection to her being reinstated as an Emergency Room Physician at Howard AFB. If she was sent to a busier Emergency Room, again he would not have a problem with her medical skills, but he felt that because of her thoroughness, you might get more patient complaints because the waiting times might go up. Captain Tall was particularly appreciative that Major Webster would stay after her shift to see patients who she began treating on her shift rather than passing them on to the next shift. Captain Tall stated that he would have no problem in having Major Webster treat him or a member of his family.*

*j.* *<u>Major Joan Marine, Physician Assistant (pages 284-286, Hearing Transcript)</u>: Major Marine has seen over 70 patients seen previously by Major Webster. She has also called Major Webster for consults. She trusts Major Webster's medical judgment and has never seen anything which caused her to question Major Webster's competency. Captain Marine would allow Major Webster to treat both her and her family. Major Webster never said anything inappropriate to her.*

*k.* *<u>Captain Mark A. Luff, Family Practice Physician, (Exhibit 28)</u>: Captain Luff worked with Major Webster in the Emergency Room. He was unable to be present for the hearing but he submitted a letter supporting her. He noted that she had a caring patient attitude and unlike other providers, always stayed after*

*her shift to finish up her patients.*

l. *SrA Stacey L. Lindgren, Emergency Room Technician (Exhibit 29): SrA Lindgren submitted a letter in support of Major Webster whom she had worked with in the Emergency Room. She voiced the opinion that Major Webster was an "exceptional doctor" who inspired her to strive a little harder and become knowledgeable. She further noted that Major Webster was dedicated to her patients.*

m. *Captain Phyllis F. Jones, Nurse Manager (Exhibit 61): Captain Jones worked with Major Webster for two months in the Emergency Room. She was very laudatory of Major Webster both with regards to her patient care and her interactions with the staff. She concluded her letter by stating "As a registered nurse, I never felt a need to question or doubt her management, treatment or care she administered to her patients."*

n. *Lt.Col. Santa Ngo, Pediatrician (Exhibit 62): Lt. Col. Ngo was a member of the original Credentials Committee who voted to revoke Major Webster's privileges. However, she submitted a letter of support for Major Webster Lt. Col. Ngo noted that she worked with Major Webster in the Emergency Room when called for consultations. She noted that Major Webster had genuine concern for her patients and provided good medical care. She also commented that Major Webster stays current on her medical journals and accepts recommendations on current pediatric care.*

o. *SrA Jodi L. McMasters, Medical Service Journeyman (Exhibit 63): SrA McMasters is a patient of Major Webster and noted that she was very caring and willing to listen to her concerns.*

p. *Mr. John S. Best, SFC, USA (Retired) (Exhibit 64): Mr. Best is a patient of Major Webster. His letter thanks Major Webster for the prompt, courteous and professional medical care that Major Webster provided his family and himself.*

*It is Major Webster's contention that when all the above evidence is considered, the overwhelming weight of the evidence is that she is a competent Emergency Room Physician. If Major Webster was so forgetful and disorganized, isn't it only logical to conclude that the Air Force would have been able to present one patient record which shows this? If Major Webster was so forgetful and disorganized, is it logical that she would have the support of so many of her colleagues even at the risk of possible retaliation from their Commander? If Major Webster was so forgetful and disorganized, isn't it logical to expect that this would show up on her prescriptions, in her laboratory work or with patient follow up? Yet no such evidence exists. The only evidence consists of relatively few vague complaints which the Board, apparently ignoring*

*the other overwhelming evidence, twisted to find a pattern of forgetfulness and disorganization. Even Major Webster's detractors were forced to admit that she rendered quality care. How can you do that and be forgetful and disorganized? Clearly, over an eight-month period of time, more examples of this supposed forgetfulness and disorganization would have to have been documented, but yet they were not.*

*5. **Inappropriate Behavior/Impulse Control**: There is no doubt that the statements referenced in this section of the Board's Findings and Recommendations were inappropriate. Major Webster admits to each of the incidents cited but does quarrel with what she said about the aerovac plane blowing up. She recalls stating that "I don't care if the plane blows-up" or words to that effect; not that "I am going to blow up the plane" or words to that effect. SrA Goode recalls the event differently, and the flight nurse recorded what SrA Goode said differently. However, Major Webster does not deny that whatever the words, it was inappropriate to speak them. The Board concludes that these outbursts were secondary to stress and contends that, therefore, Major Webster should be removed from a position of stress in the Emergency Room.*

*What the Board does not mention, although it is clearly in evidence (Exhibits 12 and 13), is what caused this stress. The first incident occurred on her first day of working in the Primary Care Clinic after she had just been removed from the Emergency Room due to her Carpal Tunnel Syndrome and the impact this medical condition had on her ability to intubate patients. Essentially, she told Major Burkett that she was going to lunch in a louder than normal voice. Major Burkett said she was not, and she returned to the Clinic without taking lunch. While Major Burkett may not have liked her response to his orders for her not to go to lunch, clearly her response was appropriate but for her raising her voice. Further, while she disagreed with Major Burkett's directive to return to the Primary Care Clinic without going to lunch, she nevertheless followed his directive to do so.*

*During the time that the other incidents occurred, there were several events which threatened Major Webster's career not only in the Air Force but also her profession as a physician:*

*a. Emergency Room Supervisor was directed by Squadron Commander to write memorandums on anything he felt was inappropriate action by Major Webster in the Emergency Room and was further directed to advise the Emergency Room Staff to advise him of same;*

*b. Removed from her position as an Emergency Room Physician due to her Commander's loss of confidence in her;*

*c. Given a Command Directed Mental Health Evaluation;*

*d. Given a Referral OPR;*

e. *Evaluated by Major LaMacchia as having cognitive deficits and possibly Multiple Sclerosis which made her unfit to practice as an Emergency Room Provider;*

f. *Directed to go to Wilford Hall USAF Medical Center for further evaluation and for possible MEB action;*

g. *Had all her privileges at Howard AFB revoked;*

h. *Suffered Guillain Barre Syndrome and was returned to Wilford Hall USAF Medical Center;*

i. *Was referred to PEB; and*

j. *Presented with a package of documents, many of which she had never seen, which were being used to justify the revocation of all of her privileges and further advised that this was an adverse credentialling action which, if accepted, would be reported to her state medical licensing boards.*

*Captain Gregory Fey in his testimony admitted that Major Webster was "stressed out" from all these events. He also testified that Major Webster felt that she was being railroaded by the Air Force and had no effective advocate for herself. He also stated that her rationale was logical and that she was never psychotic. And as noted in the Board's Findings and Recommendations, Captain Fey noted that she was never suicidal or homicidal. Finally, while he felt that her actions could not simply be explained by stress, he admitted that he had not treated many physicians in a similar situation and had never been in this situation himself. Further, he was unwilling or unable to advise the Board that Major Webster was unfit to practice medicine because he had never observed her medical practices and that was not his function in seeing her.*

*It is Major Webster's contention that placed under the enormous stress of all the above, she reacted badly, but these reactions were caused by her deep convictions that none of the actions were justified. It is also her position that all of these events, except for the event with Sgt. John D. Silbaugh on 7 February 1998, never occurred while she was treating patients. In fact, this one event occurred in the Primary Care Clinic, not in the Emergency Room. It is further significant to note that even after she was returned to the Emergency Room in mid-April 1998, she was never reported as making inappropriate comments to patients. Additionally, she made no such comments while performing her duties in the Health and Wellness Clinic. In other words, there is no showing that despite her tremendous frustration with the Air Force and how she was being treated, she ever voiced these concerns to her patients she was treating , other than the 7 February 1998 incident, or that they impacted in any way on the quality of care she provided. Again, the only evidence from her co-workers is that she is a quality physician who*

*cares for her patients and renders care well within the standard of care of an Emergency Room Physician.*

*6. __Neuropsychological Disorder:__ The Board, in their Findings and Recommendations, found that Major Webster had "some form of cognitive deficit" and further concluded that "this deficit impaired her ability to make effective and rapid decisions, which are essential for an ER setting." The problem with this conclusion is that there is no evidence as detailed above that shows that Major Webster's "cognitive deficit" ever impaired her ability to make effective and rapid decisions in the ER.*

*The testimony and statements of her co-workers and even the Government's Witness were that she was a fine physician who rendered good care to her patients. Not one medical record was introduced by the Government to show inadequate care by Major Webster to any of her patients. Dr. Tall, Dr. Li, Dr. Copp, Dr. Efthimiadis, Dr. Luff, Dr. Ngo, Dr. McCrary, PA Marine, and Captain Shercliffe all either worked with Major Webster in the Emergency Room or reviewed charts of patients seen by Major Webster, and **not one** had any criticisms of her medical care of patients.*

*Major Burkett in his testimony beginning at page 255 of the Hearing Transcript admits that no decredentialling action of any kind was taken against Major Webster when she was removed from the ER and placed in the Health and Wellness Center in late May 1998. Hence, apparently at that point, the Hospital Commander and Major Webster's Supervisors had concluded that all the evidence used against her now in this hearing from October 1997 to May 1998 did not justify the conclusion that Major Webster was unfit to be a credentialled provider in any area of the hospital. This evidence only became a justification for decredentialling Major Webster after she was found to possibly have Multiple Sclerosis and to have "cognitive deficit." Major Burkett as much as admitted this when during an exchange between Major Matthews, Major Steffens and himself at pages 262-263 of the Hearing Transcript, he testified that the decredentialling was done because Major Webster had a health problem which was hindering her cognitive abilities.*

*Turning to Major Webster's cognitive deficit, it is important to appreciate that psychiatry and psychology are not exact scientific fields. Much of their conclusions are based on subjective analysis of testing and speaking with the patient. Their findings and conclusions must always be substantiated by concrete examples of the patient's actual behavior and performance. With this in mind, it is important to realize that none of the psychologists that examined Major Webster ever observed her practice of medicine in any setting, much less the Emergency Room. They were not privileged to hear the testimony of Major Webster's co-workers and others, who based on their observation of her treatment of her patients, the records of her treatment of her patients, the laboratory work she ordered on her patients, the prescriptions she ordered for her patients and the favorable results she obtained for her patients, concluded that Major Webster was a fine physician. If they had, the "relative cognitive deficit" described by Dr. O'Connor and the*

*"cognitive deficit" found by the Government's psychologists may well have been found to be of no significance in her practice of medicine in any setting.*

*Further, each of the Government Examiners to an extent were predisposed to find something wrong with Major Webster as Major Webster was referred to them as a result of a Command Directed Mental Evaluation. Each Government Pyschologist was also provided with letters from her commander which made wide sweeping allegations against her. However, when such allegations were put to the test under cross-examination in the Hearing, the overwhelming weight of the evidence proved that Dr. Webster's practice of medicine was equal to her other providers in the Emergency Room with the exception that she was a little slower seeing patients due to her approach, i.e., her training as an internist.*

*At the time of the Hearing, the PEB had already met and found that Major Webster had no medical problems and was fit for worldwide duty. Because of this, it was the position of Major Webster throughout the hearing that the Board was not permitted to reexamine the medical narratives on Major Webster to, in effect, reopen the PEB. It was and remains our legal position that the findings of the PEB were "res judicata" on the Board with regards to her medical and psychological fitness to practice medicine, and the Board's inquiry was limited to determining if Major Webster's medical practice was deficient as shown by the treatment she rendered to her patients. By taking the position that the Board could reexamine Major Webster's mental and physical competency to practice medicine, they again violated Major Webster's right to due process. In fact, their Findings and Recommendations are not based upon examples of Major Webster's poor medical practice, but rather are based on her cognitive deficit.*

*Because of these beliefs and legal positions, Major Webster was not prepared to defend herself further on these issues. However, since the Hearing, Major Webster has consulted with Gustavo A. Herrera, M.D., Gynecologist, Howard AFB, Panama on the possible effects on her cognitive abilities of not taking hormonal replacement therapy. It was his opinion that the cognitive deficits noted by the psychologists who examined Major Webster were probably related to her estrogen deficiency. Please see Exhibit "D" which is attached hereto and incorporated by reference the same as if fully copied herein verbatim. Therefore, even if the Board was correct in finding that Major Webster had "cognitive deficits", a problem which did not result in improper care to Major Webster's patients, this problem apparently is easily resolved with the hormone replacement therapy, a treatment option not even considered by the psychologist who examined Major Webster or by the members of the Board.*

*7. __Conclusions:__ AFI 44-119, paragraph 4.18, states: " Privileges review is a function of professional peers. Personnel participating in the review **must be able to impartially review the case.**" AFI 44-119, paragraph 4.20 states: "Additional information, not used in the original credentials function deliberations on the case, may be presented at the hearing. **However, the provider must be informed of additional information prior to the hearing and must be afforded***

***reasonable time to review the information as well as access records upon which the additional information is based so that he/she may prepare to refute it."***

*The Air Force violated both of these provisions in the Hearing afforded Major Webster. The Air Force allowed, over the objection of Major Webster's counsel, the new Leaving Without Being Seen Statistics, and Major Matthews, contrary to the direction of the Board's Legal Advisor, conducted his own investigation of the Code Review without such information being provided to Major Webster. The Air Force also failed to provide Major Webster with an impartial hearing as the Chairperson was biased in favor of Major Burkett, the Government's chief accuser.*

*Besides the above, the Board itself was tainted by unlawful command influence upon witnesses and possibly potential witnesses in favor of Major Webster (Dr. Li). In addition, the Government withheld key records on the Code in question and, in fact, represented to the Board that such records were not available and could not be found when, in fact, such records were locked in the Command Section.*

*The above actions of the Government tainted the proceedings and violated Major Webster's right to due process. The impact of same on the Board's Findings and Recommendations can only be speculated upon here but may provide the reason why the Board reached findings and recommendations which were not supported by the evidence in this case.*

*What the evidence did show in this case, without any contrary evidence from the Government, was that Major Webster was a competent Emergency Room Physician. The evidence further showed that if she had cognitive deficit, Major Webster's cognitive deficit did not affect, in any way, the proper treatment of her patients.*

*The Board, itself, found that with regards to "patient complaints", the only theme in the few which were attributed to Major Webster was "to waiting times." With regards to medication errors, one of which Major Webster contends was not an error, the Board found that two medication errors was "an acceptable medication error rate." Further, the Board found that Major Webster's knowledge of pharmacology was impressive. Finally the Board admitted that Major Webster had " the requisite knowledge to be a physician" and had superior traits as a physician, i.e.," thoroughness, dedication to patients, medical knowledge, etc."*

*However, despite these findings, they still revoked her credentials to practice Emergency Room Medicine and limited her privileges to practice in Family Practice/Primary Care/Aerospace Medicine Clinic. These findings and recommendations were based: (1) upon her alleged forgetfulness and disorganization which is not documented in the evidence and is, in fact, contradicted by the evidence in this case; (2) her "cognitive deficit" without any examples of how this "cognitive deficit" ever manifested itself in the treatment of Major Webster's patients; (3) upon analysis of the Code Case (Exhibit "B"), Pregnancy Case (Exhibit "C") and the Cat Bite*

*Case which were flawed and contradicted by not only the evidence presented at the Hearing but by the records of the Code and the Pregnancy Case; and (4) upon her inappropriate statements made under the stress of the threat of having her privileges revoked and having her professional career destroyed. The Board's decision was arbitrary and capricious, and their flawed reasoning should not be allowed to stand in the face of the overwhelming evidence in favor of Major Webster retaining all of her privileges without any limitations.*

*Major Webster respectfully requests that the Appellate Authority reverse the findings of the Board and reinstate Major Webster's full credentials including her privileges to practice Emergency Medicine. In the alternative, Major Webster respectfully requests that the Appellate Authority rejects the Board's Findings and Recommendations and reconvene another Hearing as the initial Hearing violated both Air Force Regulations and Major Webster's right to due process.*

*Respectively Submitted,*

*TERRENCE J. MARTIN, P.C.*

*BY:* ______________________
*TERRENCE J. MARTIN*

*TJM/nlp*

*Enclosures: (Exhibits A, B, C and D)*

*cc: Major Wilma P. Webster, USAF, MC w/enclosures*
*cc: Col. Terrence J. O'Neil, USAF, MC w/enclosures*

01 APR 99

MEMORANDUM FOR WHOM IT MAY CONCERN

FROM: ROBERT GRANVILLE, LTC MC USA, Chief, Orthopaedics

SUBJECT: CARE GIVEN TO MICHELLE SCHRODER

1. By request of Maj. Wilma Webster, I have evaluated the care that she documented was given to Michelle Schroder on 02 MAY 1998.

2. Mrs. Schroder had a degenerative tear of her right lateral meniscus, a non-emergent orthopaedic condition. Maj. Webster's documented treatment met the standard of care for this condition.

ROBERT GRANVILLE, LTC, MC, USA
Chief, Orthopaedic Surgery

A 71

... HED OF HOWARD HFL M | LOG NUMBER: 980124-00

Date/Time: 24 Jan 19982130 | 3rd Party Payer: NO
to Hospital: OTHER | Time Seen: 2130
ory Obtained From: OTHER RELATION | Category: EMERGENCY
Adr: PSC 4 BOX 613 APO, AA 34004 | Phone: 280-6414
Chief Complaint: CARDIAC/RESPIRATORY ARREST | Sex: MALE Age: 30

VITAL SIGNS
Time
BP-SY
BP-DI
Pulse
Resp
Temp
WT-Ped
Orders Inits Time

Medications

Tetanus:
Allergies:
NO ALLERGIES DOCUMEN

2130
S. 'Code' called in ward at approx 2150 after a patient fell back in bed appa-ly unconscious with heavy breathing. When I arrived on scene patient was already receiving CPR. I put my ha[nd] on his right groin to feel the pulse ... I felt faint pulses in addi[tion] to the CPR induced pulses. At that po[int] ... pointed out that the patient [was] breathing on his own. At that point we stopped CPR and observed the patient's respirations even while the monitor seemed to indicate V fib. However, the b... decreased and he became cyanotic ag[ain] ... was resumed and I ordered defibrillati[on] x 3 at escalating doses, epi 1mg x 3 and 1 gram of Mg Sulfate. I attempted but was unable to intubate. pt was intubated by Dr. Burkett. Pr... mg given IVP. 2 mg ... after pt became straight line. pt was declared deceased at 21:57. A post mortem CXR was taken and sho... notable cardiomegaly and intubation [in] the (R) mainstem bronchus.

ASSESSMENT/DIAGNOSIS
Cardiopulmonary arrest

DISPOSITION
__Home __Full Duty
__Quarters
__24hrs __48hrs __72hrs

Modified Duty Until:
Day:____ Mon:____ Yr:____

Referred to:

__Emergency __Today
__72 hours __Routine

Admitted to:

Others:

Condition Upon Release:
__Improved __Unchanged
✓ Deteriorated
Release Time:

Signature of Provider/Stamp: [signature] MD

Instructions to Patient:

I HAVE RECEIVED AND UNDERSTAND MY DISCHARGE INSTRUCTIONS ____________

20/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 HILL,WILLIAM
26 Apr 1967 MALE
A11
W:285-4617
H:280-6414

72

Pers[illegible]l Data - Privacy Act o[illegible]

CARE & TREATMENT - 24 MED GP HOWARD AFB PM | LOG NUMBER: 980124-0004-

Date/Time: 24 Jan 1998@2130
to Hospital: OTHER
[illegible]ry Obtained From: OTHER RELATION

3rd Party Payer: NO
Time Seen: 2130
Category: EMERGENCY

[illegible]dr: PSC 4 BOX 613 APO, AA 34004
Chief Complaint: CARDIAC/RESPIRATORY ARREST

Phone: 280-6414
Sex: MALE Age: 30

VITAL SIGNS

| | | | |
|---|---|---|---|
| Time | | | |
| BP-SY | | | |
| BP-DI | | | |
| Pulse | | | |
| Resp | | | |
| Temp | | | |
| WT-Ped | | | |

Medications

Tetanus:
Allergies:
NO ALLERGIES DOCUMENTE[illegible]

| Orders | Inits | Time |
|---|---|---|
| | | |

2130

S Code called in ward at approx 2130 after a patient fell back in bed [illegible] unconscious [illegible]. When I arrived on scene patient was already receiving CPR. [illegible] right [illegible] to feel the [illegible] [illegible] felt faint [illegible] to the CPR [illegible] patient [illegible] breathing on his own. At that point we stopped CPR and [illegible] respirations [illegible]. [illegible] and [illegible] CPR was resumed and I [illegible] 3 at escalating [illegible] and [illegible] but was unable to [illegible]. [illegible] [illegible] [illegible] it was [illegible] [illegible] [illegible].

ASSESSMENT/DIAGNOSIS
Cardiopulmonary arrest

===== DISPOSITION =====
__Home __Full Duty
__Quarters
__24hrs __48hrs __72hrs

Modified Duty Until:
Day:_____ Mon:_____ Yr:_____

Referred to:

__Emergency __Today
__72 hours __Routine

Admitted to:

Others:

Condition Upon Release:
__Improved __Unchanged
✓ Deteriorated
Release Time:

Signature of Provider/Stamp: [signature] MAJ

Instructions to Patient:

I HAVE RECEIVED AND UNDERSTAND MY DISCHARGE INSTRUCTIONS

29/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 HILL,WILLIAM
26 Apr 1967 MALE
A11
U1285-4617
H:280-6414

73

# CARDIAC/RESPIRATORY ARREST REPORT

(This form is subject to the Privacy Act of 1974 - Use Blanket PAS, DD Form 2005)

| LOCATION | ADMITTING DIAGNOSIS | DATE |
|---|---|---|
| Inpatient unit | Right Pleural effusion | 24 Jan 98 |

| TIME | INTERVENTIONS (Drugs/Doses, Procedures, IV's) |
|---|---|
| 2130 | BCLS initiated and 20 gauge IV inserted into R arm |
| 2133 | Defib. 300 J |
| 2135 | Defib 360 J. Epinephrine 1mg IVP |
| 2138 | Lidocaine 75mg IVP |
| 2140 | Epinephrine 1mg IVP |
| 2142 | Defib 360 J |
| 2143 | Epinephrine 1mg IVP |
| 2145 | Epinephrine 1mg IVP |
| 2146 | 20 gauge IV inserted into L arm |
| 2147 | Intubated by Dr. Burkett |
| 2149 | Mg 1gm IVP |
| 2151 | Asystole. Epinephrine 1mg IVP |
| 2155 | Atropine 2mg IVP. NG Tube inserted by Dr. Burkett |
| 2158 | Epinephrine 1mg IVP |
| 2158 | Bretylium 500mg IVP |
| 2159 | Code terminated |

| TYPE OF ARREST | TIME OF ARREST |
|---|---|
| Cardiac | 2130 |
| **TIME BCLS STARTED** | **TIME ACLS STARTED** |
| 2130 | 2133 |
| **TIME INTUBATED** | **TUBE SIZE** |
| 2147 | |

NAME OF PROVIDER: Dr. Webster

NAMES OF PHYSICIANS RESPONDING:
Dr. Webster
Dr. O'Neil
Dr. Burkett

VITAL SIGNS

| TIME | BP | P | R |
|---|---|---|---|
| 2132 | Ø | Ø | minimal |
| 2133 | Ø | Ø | Ø |
| 2135 | Ø | Ø | Ø |
| 2142 | Ø | Ø | Ø |
| 2151 | Ø | Ø | Ø |
| 2154 | Ø | Ø | Ø |

ARTERIAL BLOOD GASES

| TIME | FIO2 | pH | pO2 | pCO2 |
|---|---|---|---|---|
| | | | | |

ADDRESSOGRAPH: Hill, Wm. John

TIME CPR STOPPED: 2159

SIGNATURE OF PHYSICIAN:

SIGNATURE OF NURSE:

RESUSCITATION: ☐ SUCCESSFUL ☒ EXPIRED

AETC FORM 1280, JUL 93 REPLACES ATC FORM 1280, APR 85 WHICH IS OBSOLETE

74