MEMORANDUM

20 Dec 1999

FROM: Major William Haith
Emergency Services
Keesler Medical Center
Keesler AFB
Biloxi, MS

SUBJECT: Evaluation of Major Wilma Webster

1. As Emergency Physician at Keesler Medical Center Emergency Services, I have been tasked with evaluation of Major Wilma Webster in her role as an Emergency Physician.

2. I worked with Dr. Webster a second time on the evening of 10 Dec 99. Together we attended to eight patients.

3. Again, in the areas of: appropriate history, adequate physical exam, adequate differential diagnosis, and proper dispositions, I conclude Dr. Webster's performance as an Emergency Physician to be poor.

4. In the case of TC, vaginal bleeding in pregnancy, ectopic pregnancy was not included in the differential. In the case of SM, herpes zoster, a discussion of complications was not given. JW, abdominal pain, differential diagnosis was incomplete. For CB, the probability of pulmonary embolus was omitted. In the case of WF, cellulitis, physical exam findings were overlooked, and management plan poorly coordinated.

5. This evening of 10 Dec 99 was approximately the middle of Dr. Webster's evaluation at our Emergency Department, or ED. I reviewed her performance with her verbally at the end of her shift. I asked her perception of her weaknesses and strengths. I asked her prediction of her evaluation from the ED group. I urged her to write a list of goals to better demonstrate to us her capabilities. Lastly, I gently and supportively discussed my specific suggestions.

6. An Emergency Physician is a specialist trained to perform rapid patient evaluations. A differential diagnosis is immediately formed in order to identify life-threatening conditions. Concurrent aggressive decisions are made. Multi-tasking describes an ability to manage many cases at the same time.

7. Dr. Webster's functioning as an Emergency Physician, described in item 6 above, was poor and inadequate. A clinic setting may be more appropriate for her practice style.

William Haith

William L. Haith, Major, USAF MC
Emergency Physician

# CREDENTIALS EVALUATION OF HEALTH CARE PRACTITIONERS

OMB APPROVAL NO. 0701-1097
Expiration Date 30 Jun 88

*AUTHORITY: Title 10, U.S.C. Chapter 55 and Section 8067 and 8012.*
*PRINCIPAL PURPOSE(S): To evaluate each practitioner's formal education, training, clinical experience, and evidence of physical, moral and ethical capacities and to assist the Credentials Committee in making recommendations with regard to the practitioner's competence to treat certain conditions and perform certain medical procedures.*
*ROUTINE USE(S): Information may be released to government boards or agencies or professional societies or organizations if needed to license or monitor professional standards of health care practitioners. It may also be released to civilian medical institutions or organizations where the practitioner is applying for staff privileges during or after separating from the service.*
*DISCLOSURE IS VOLUNTARY: However, failure to provide information may result in the limitation or termination of clinical privileges.*

**I. TO BE COMPLETED BY PRACTITIONER**

1. NAME OF PRACTITIONER *(Last, First, Middle Initial)*: WEBSTER, WILMA P.

2. SSN: 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

**RELEASE OF LIABILITY**

I hereby release from liability all officials of the United States Air Force including all representatives of the hospital and its medical staff for their acts performed in good faith and without malice in connection with evaluating or action concerning my application and my credentials and qualifications. I hereby release from liability any and all individuals and organizations who in good faith and without malice, provide any and all information to officials of the United States Air Force, including medical facility officers, or to the authorized medical staff representatives, concerning my professional practice, competence, ethics, character and other qualifications for staff appointment and clinical privileges, and hereby consent to the release of any and all such information.

3. SIGNATURE: Wilma P. Webster

4. DATE: 01 DEC 99

**II. TO BE COMPLETED BY EVALUATOR**

5. NAME OF INSTITUTION WHERE THE ABOVE PRACTITIONER PRACTICED: KEESLER MEDICAL CENTER

6. DATES AT INSTITUTION — FROM: 1 DEC 99 — TO: 14 DEC 99

7. STATUS OF PRACTITIONER *(Staff, Resident, etc.)*:

8. SPECIALTY OR SPECIALTIES PRACTITIONER HAD PRIVILEGES IN AT THIS FACILITY: EMERGENCY ROOM PHYSICIAN

9. The following evaluation is based in demonstrated performance compared to that reasonably expected of a practitioner at his or her level of training, experience and background:

| PERFORMANCE *(Mark "x" in the appropriate block for each item listed)* | POOR | FAIR | GOOD | SUPERIOR | NOT OBSERVED |
|---|---|---|---|---|---|
| A. BASIC PROFESSIONAL KNOWLEDGE | X | | | | |
| B. PROFESSIONAL JUDGMENT | X | | | | |
| C. SENSE OF RESPONSIBILITY | | X | | | |
| D. ETHICAL CONDUCT | | | | | X |
| E. COMPETENCE AND SKILL | X | | | | |
| F. COOPERATIVENESS, ABILITY TO WORK WITH OTHERS | X | | | | |
| G. HISTORY AND PHYSICAL EXAM | X | | | | |
| H. RECORD KEEPING | | X | | | |
| I. CASE PRESENTATIONS | X | | | | |
| J. PATIENT MANAGEMENT | X | | | | |
| K. PRACTITIONER-PATIENT RELATIONS | | X | | | |
| L. ABILITY TO WRITE AND SPEAK ENGLISH | | | X | | |
| M. PARTICIPATION IN STAFF AND COMMITTEE ACTIVITIES | | | | | X |
| N. REGULARLY OBTAINED CONSULTATIONS WHEN NEEDED | | X | | | |

10. If the answer to any of the following questions is "YES" please give full details in the Remarks Section on reverse. If additional space is needed, continue on a separate sheet of paper and attach to this form. Be sure to identify item by number.

*TO YOUR KNOWLEDGE HAS THE APPLICANT:*

| | YES | NO | | YES | NO |
|---|---|---|---|---|---|
| A. EVER HAD HIS OR HER LICENSE TO PRACTICE IN ANY JURISDICTION LIMITED, SUSPENDED OR REVOKED? | | X | G. EVER BEEN A DEFENDANT IN A FELONY CASE? | | X |
| B. EVER BEEN REFUSED MEMBERSHIP ON A MEDICAL STAFF? | | X | H. HAD ANY SIGNIFICANT MEDICAL OR MENTAL HEALTH PROBLEMS WHICH COULD AFFECT WORK PERFORMANCE? | | X |
| C. EVER HAD A REQUEST FOR SPECIFIC PRIVILEGES DENIED OR GRANTED WITH STATED LIMITATIONS? | | X | I. EVER BEEN A DEFENDANT OR THE SUBJECT OF A MALPRACTICE ACTION? | | X |
| D. EVER HAD PRIVILEGES AT ANY HOSPITAL SUSPENDED, LIMITED, OR REVOKED? | | X | IF "YES," WAS THE MATTER: | | |
| E. EVER HAD NARCOTIC REGISTRATION SUSPENDED OR REVOKED? | | X | (1) SETTLED PRIOR TO FINAL COURT ACTION? | | |
| | | | (2) JUDGMENT RENDERED BY COURT? | | |
| F. EVER BEEN ARRESTED OR TREATED FOR DRUG OR ALCOHOL ABUSE? | | X | (3) DEFENDANT FOUND LIABLE? | | |
| | | | (4) MATTER STILL PENDING? | | |

11. COMPLETE IF PRIVILEGE LIST REVIEWED

A. REVIEWED PRIVILEGE LIST FROM

☐ AIR FORCE RECRUITING PERSONNEL

☐ PRACTITIONER'S AIR FORCE CREDENTIALS FILE

☐ OTHER CIVILIAN *(Describe in "Remarks")*

B. UPON REVIEW OF THE PRIVILEGE LIST, DO YOU HAVE ANY RESERVATIONS ABOUT THE PRACTITIONER EXERCISING ALL PRIVILEGES LISTED?

☐ YES *(If yes, please explain in "Remarks")* ☐ NO

12. NUMBER OF YEARS YOU HAVE KNOWN THE APPLICANT

2 WEEKS

13. BEST TELEPHONE NUMBER TO CONTACT YOU

DSN 594-0500

14. REMARKS *(Please add any other information you think appropriate in evaluating this applicant)*

SEE ATTACHED STATEMENT

| 15. NAME AND TITLE OF EVALUATOR | 16. SIGNATURE | 17. DATE |
|---|---|---|
| DANIEL R. LANCE, CAPT, MC, USAF 44E3A | [signature] | 16 DEC 9 |



117

12 Dec 1999

MEMORANDUM FOR RECORD

SUBJ: Maj Wilma P Webster

INTRODUCTION

I have been asked to evaluate the above individual's ability to practice Emergency Medicine. This opinion is based upon observations I have made as Staff Physician in Emergency Services at Keesler Medical Center from 3 Dec 1999 to 11 Dec 1999, inclusive. I have no prior knowledge of this individual and I have been blinded as to details of her age, training, experience, credentials and professional history. I observed Dr Webster at work during two 10 hour shifts in Emergency Services and I was responsible for supervising her in eight cases. I have the charts of six of these patients available for review as of this writing. The other two were minor cases in which it was obvious from the triage nursing notes that no emergency medical condition existed.

CASE REPORTS

Patient 1 (LV, 20/4278, a 22 y/o female) sustained minor hand trauma and suspected she might be pregnant. Dr Webster examined her, elicited and documented bony tenderness over the dorsal third metacarpal, and ordered a (negative) urine pregnancy test. She then presented the case to me and proposed sending the patient home with a diagnosis of hand contusion.

I explained to Dr Webster that bony tenderness usually prompted radiographic evaluation to rule out fracture, as missed fracture is the largest category of malpractice claims against emergency physicians (in volume, not dollar amount.) She appeared to be completely unaware of this fact and not at all concerned by its significance. Radiographs demonstrated no fracture.

Patient 2 (CW, 30/6206) had been seen by Dr Webster 24 hours before with a different staff physician. This patient, a 23 y/o female, had initially presented with fever and abdominal pain. Workup had revealed a WBC count of 17,600 with left shift; urinalysis revealed pyuria. The patient had received intravenous fluids, antibiotics and analgesics and was asked to return by the staff physician for repeat evaluation in 24 hours.

Dr Webster examined this patient and recorded the following history: "Pt states much better but vomited x1 and still abdominal pain. Has used up 6 Tylenol #3, requests more." This was followed by an incomplete physical exam which, however, noted that the patient had tacky mucous membranes. Her complete presentation of the case to me was "I saw this lady yesterday with belly pain. She's fine today. Can I send her home?"

I then examined the patient and found that after her previous discharge she had continued to have fever to 101-102 F, rigorous chills and continued constant bilateral lower

quadrant pain radiating to the back which she rated at 8 on 1-10 scale, despite taking two Tylenol #3 every 4 hours. She had indeed only vomited once, but had been unable to take more than three cups of fluid by mouth in the 24 hours since discharge due to intense pain and nausea.

Upon exam the patient was awake and alert but ill appearing and uncomfortable with a fever of 101.8 F. Her abdomen was soft and nondistended but with moderate bilateral lower quadrant tenderness. Repeat urinalysis demonstrated continued pyuria.

I asked to perform a repeat set of laboratory studies, administer another round of intravenous fluids, antibiotics and narcotic pain medications and admit her to the hospital. She refused and was discharged against medical advice after risks of possibly fatal urosepsis were explained to her. She did agree to return again in 24 hours for a third evaluation.

Of concern in this case is that Dr Webster's history did not pick up on any of the four factors which indicated that this patient was not being adequately treated as an outpatient: continued fever, rigorous chills, inability to take oral fluids and continued severe pain despite narcotic prescription. In addition she did not attach any importance to the leukocytosis, though a level above 15,000 is generally recognized as supporting hospital admission.

Patient 3 (CP, 30/6168) was a 65 y/o female with known history of TIAs in the past who presented after three episodes of sudden "drop attack" type syncope associated with falls, despite treatment with Plavix. Dr Webster elicited a history of disorientation and "increased speech impairment". Her entire neurological exam consisted of "Oriented to year, month and place, not day. PERRL. Fundi poorly seen. Face symmetric, moves all 4 ext, follows commands." She ordered an incomplete workup consisting of C-spine films, CT scan of head, CBC, Chem-10 and urinalysis. She presented the patient to another staff physician who suggested Internal Medicine consultation.

This patient was signed out to me at shift change. Upon my exam I found a confused white female with persistent severe ataxia. I noted that Dr Webster had neither ordered cardiac enzymes nor a complete set of electrolytes; these were added. Upon discussion of the case with the admitting Internal Medicine resident, he asked me to tell the other staff physicians to call him directly as Dr Webster's presentations were far too disjointed and rambling to be of any use to him. His initial assumption was that Dr Webster was a medical student on rotation with us; he was shocked to learn she was a staff emergency physician.

Upon review of the chart before admission, I noted that Dr Webster had recorded a diagnosis of "severe atherosclerotic disease" – a phrase lifted straight from the CT scan reading given by our radiologist. Given this patient's incomplete history, the admitting diagnosis might be syncope, TIA or CVA, depending on one's interpretation of her symptoms, but "atherosclerotic disease" had little relevance to her presenting condition.

Most worrisome was that Dr Webster observed me completing the admission paperwork and stated to me "Oh, you decided to admit her? I thought she was going home." She neither inquired about the results of her workup nor asked why her condition warranted admission.

Patient 4 (BR, 30/1442) was a 28 y/o female with an ED visit 5 days ago for documented influenza A. She had been started on antiviral medication and had defervesced 2 days prior to her second presentation. She then presented again with complaint of low grade fever, wheezing and cough with production of scant sputum, all of less than 1 day duration. (Her initial illness consisted of rigors and myalgias with temperatures to 103 F, without chest symptoms.)

Dr Webster examined this patient and elicited a history of nonproductive cough and chest rattling, and documented an exam consisting of wheezing and rales in both lung bases. She obtained a chest Xray which she read as "wnl" and a room air Sa02 of 97%. She administered one nebulized albuterol treatment which eliminated the patient's wheezing. Dr Webster attributed this patient's symptoms to influenza and proposed sending her home with acetaminophen for antipyresis and analgesia.

Upon exam I found a young female in no distress with lungs showing only scattered bibasilar crackles. Review of her medical history revealed no history of bronchospasm. Review of her chest radiographs showed some questionable areas in the right middle and left lower lobes. (In fairness to Dr Webster, these areas did not represent definite infiltrates, and I do not have the dictated radiology report as of this writing.) The patient was discharged with prescriptions for azithromycin, albuterol and ibuprofen.

The following facts -- of which Dr Webster did not appear to be aware – are common knowledge amongst emergency physicians:

- Bronchospasm is not a common feature of primary influenza infection
- Bronchospasm in a patient without history of same, cough and rales would tend to indicate pneumonia
- Pneumonias, both viral and secondary bacterial, are the most common compliation of influenza A
- Up to 50% of community acquired pneumonias are preceded by a viral prodrome
- A significant proportion of pneumonias have no visible radiographic abnormality in the first 24 hours of the illness

While her management of this patient was mostly correct, I am concerned about Dr Webster's reluctance to consider more serious but less common causes of a patient's symptoms. One of the most important skills for the emergency physician is to simultaneously treat common problems while also recognizing and ruling out more serious disease as potential causes. Dr Webster appears to seize upon and treat the most obvious cause of a patient's symptoms; she appears surprisingly reluctant to consider the more rare but more serious causes which an emergency physician must rule out before disposing of a patient's case.

Patient 5 (DA, 20/1216) was an 18 y/o male who presented with a 2 day history of erythema and pain to the tip of his right index finger. On exam, Dr Webster noted no abscess or fluctuence, and proposed discharge with prescription for cephalexin.

Upon examination, the patient told me (while pointing to the pad of the index finger) "Doc, there's pus in there." Examination revealed that the patient was indeed correct: the pad was fluctuent, and frank pus was also expressible from a paronychia. (Dried pus was also visible on the nail bed.) Both lesions were incised, a drain was placed, and the patient was discharged with proscriptions for cephalexin, an oral narcotic, and orthopedic referral.

The deficiency in care here is obvious.

Patient 6 (TR, 20/0819) was a 65 y/o male with prior history of pancreatic surgery who presented with sudden onset of dull severe pain across his entire abdomen associated with distension, bloating and up to eight episodes of vomiting in approximately a six hour period. Bilious emesis was noted, but no melena or hematochezia. No diarrhea was noted and no fever was present. Initial exam revealed a diffuse, distended abdomen with "much" tenderness and rebound in all quadrants. Dr Webster ordered an appropriate series of radiographs (which showed three loops of bowel with air-fluid levels) and laboratory studies, which showed a leukocytosis (14,800) with left shift. Electrolytes revealed a serum sodium level of 131. Dr Webster placed a nasogastric tube which evacuated about 300cc of stomach contents and much air, after which the patient's exam improved.

Dr Webster presented the case to me at this time and stated that she was not sure whether the patient should be admitted to the surgical or medical service; perhaps, she felt, medicine would be more appropriate. (No diagnoses were mentioned during her presentation.) I examined the patient, confirmed the findings and formulated a working diagnosis of gastroenteritis vs. partial small bowel obstruction. While I felt that gastroenteritis was more likely, partial SBO was the potentially more lethal condition. Due to the equivocal surgical nature of the initial exam, the radiographs and the leukocytosis, consultation was made to the General Surgical service who concurred with this assessment and admitted the patient for serial exams and nasogastric decompression.

Of concern here is Dr Webster's inability to formulate an appropriate differential diagnosis and disposition. When faced with two possible diagnoses, one dangerous and one benign, the emergency physician is obliged to rule out the dangerous diagnosis or admit the patient to someone who can do so. While a general surgeon can easily manage gastroenteritis, asking an internist to manage a small bowel obstruction is an invitation to disaster.

ASSESSMENT

I find Dr Webster to have serious deficits in her clinical skills. No one specific area of deficiency is notable; rather, it appears that her general medical knowledge base is seriously deficient.

Of particular concern is that of the six non-trivial cases which Dr Webster managed under my supervision, her management of all six violated the prevailing standard of care in some form or other. Some breaches were more serious than others, but all six cases fell short of the standard.

Dr Webster's history taking skills are inadequate; she does not investigate a patient's chief complaint in sufficient detail to be able to formulate a working diagnosis. In addition, she appears incapable of performing a comprehensive and systematic review of symptoms. Still more worrisome is that when she does elicit a historical fact suggestive of a serious illness, she tends to discount it or ignore it entirely.

Her physical examination skills are also inadequate. Given the small number of cases which I observed, I cannot determine if this is due to ignorance or inattention. However, I found one conversation between Dr Webster and another staff physician to be particularly concerning: the case of a patient with suspected TIAs and cranial nerve findings was being discussed. Dr Webster stated (in my presence) that she had not done an examination of the cranial nerves; that she did not know how to do so and that it did not concern her since she had not found examination of the cranial nerves to be clinically useful in her practice.

With her profound deficiencies in history taking and physical examination skills, it is not surprising that this individual has significant difficulty in formulating a differential diagnosis. What does surprise me is that Dr Webster does not even seem to try. Her presentations jump directly from the physical exam to her recommendations for management – without any mention of the diagnosis in between. Her charts reflect the most broad and hesitant of diagnoses, usually expressed in non-medical terms. Since the entirety of medical school training is focused around the formulation of diagnoses, I find this facet of her practice style bizarre.

Finally – and not surprisingly – I find her interactions with other professionals inadequate. I have already referred to the problems she has with presenting cases to consultants in a coherent manner. She is hesitant, passive and indecisive when dealing with our nursing and technician staff, forcing them to repeatedly question her as to what they need to do for her patients.

RECOMMENDATIONS

I am extremely reluctant to make the following recommendations, as I have no desire to see another physician's career impacted negatively. I am well aware that the practice of medicine is an art, not an exact science. However, I feel strongly that this individual is unable to practice Emergency Medicine in accordance with generally accepted standards

of care. She should not be allowed to practice Emergency Medicine in an unsupervised setting.

Given the serious and broad nature of her defects, I cannot think of a supervisory arrangement that would allow her to safely practice Emergency Medicine in a supervised setting. The supervisory practitioner would have to repeat so much of the history and physical examination on even minor patients as to make her services useless. Also, based on my interactions with her, I do not believe she would accept such a supervised practice arrangement.

I feel compelled to point out that my observations are based on a very small number of cases; my observations should be combined with others before any final decision is made in her case.

DANIEL R. LANCE
Captain, MC, USAF
Staff Physician
Emergency Services
81st Medical Group
Keesler AFB, MS

(1)

# PATIENT LOG

| | PATIENT | DIAGNOSIS | DISPOSITION | PROCEDURES | ER PHYSICIAN |
|---|---|---|---|---|---|
| 02 DEC 99 | W 4534 | Syncope (?) | admit FM | | ~~Dr. Haith~~ |
| | D 0908 | dysmenorrhea | home | | Dr. Lance |
| | D 9103 | assault Mult contusions | home Naval Home | | Dr. Burian |
| | W 3928 | Left upper arm pain | home | | Dr. Haith |
| | K 5638 | Diabetic with weakness H/o MI | ? admit | | Dr. Burian |
| | W 6206 | pyelonephritis | home | surg consult | Dr. Haith |
| | J 5600 | URI c laryngitis | home | | Dr. Haith |
| | G 5910 | Ingestion weed killer | home | | Dr Burian |
| 03 DEC | + 8227 | URI - lower abd pain | home | | Dr. Alagarsami |
| | B 5217 | anisocoria | to opthalmology | | Dr. Alagarsami |
| | A 1829 | chest pain in Cardiac Transplant pt | admitted FM | | Dr. Burian |
| | W 6206 | F/U pyelo | H/o pyelo | | Dr. Lance |
| | B 8548 | Strep pharyngitis | quarters | | Dr Alagarsamy |
| | S 4422 | pharyngotonsillitis | home | | Dr. Lance |
| | F 9621 | Mild dehydration | home | | Dr. Lance |
| | H 8548 | HA | home | | Dr. Lance |
| | B 2959 | situational anxiety | home | | Dr. Burian |
| | C 9793 | facial numbness H/o TIA | home | | Dr. Alagarsami |
| | V 4278 | Contusion (L) hand | home | | Dr. Lance |
| | | | | | |
| 04 DEC 99 | F 5884 | GI bleed ? Mallory-Weiss tear | admit | | Dr. Alagarsamy |
| | + 4817 | UTI | home | | Dr. Walters |
| | P 9559 | viral syndrome | quarters | | Dr. Burian |
| | W 8782 | gastroenteritis | home | | Dr. Burian |
| | S 2693 | unstable angina | admit | | Dr. Walters |
| | H 7488 | abscess thumb | home | F&D Digital block | Dr. Walters |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# PATIENT LOG

| | PATIENT | DIAGNOSIS | DISPOSITION | PROCEDURES | ER PHYSICIAN |
|---|---|---|---|---|---|
| 05DEC99 | S0754 | Influenza A | home | | Dr. Walters |
| | M2845 | Musculoskeletal Back Pain ? Sciatica | home | | Dr. Walters |
| | H7488 | [illegible] abscess @ thumb | home | | Dr. Alagarsamy |
| | A4510 | Abd pain ? cause | home | pelvic exam | Dr. Alagarsamy |
| | N3895 | Viral Syndrome | home | | Dr. Alagarsamy |
| | P7497 | Fever ? cause | home | | Dr. Walters |
| | W8782 | flu AGE | TEL consult | | Dr Burian |
| 6DEC99 | B3819 | Abd pain ? cause | home | | Dr. Walters |
| | W8782 | flu AGE | TEL consult | | Dr. Burian |
| | C6077 | Exacerb. COPD | home | | Dr Rosenquist |
| | M9659 | Subconj. hemorrhage | home | slit lamp exam | Dr Rosenquist |
| | R0667 | Viral Syndrome | quarters home | | Dr. Rosenquist |
| | | | | | |
| 07DEC99 | B9515 | Fever ? cause | home | | Dr. Hall |
| | M9370 | Fever + ear infxd. | home | | Dr. Hall |
| | B0716 | Viral Syndrome | home | | Dr. Hall |
| | C2032 | exudative tonsillitis | home | | Dr. Hall |
| | S5399 | AGE | signed off to Dr Stefano | | Dr DeStefano |
| | | | | | |
| 09DEC99 | D8093 | Musculoskeletal Low Back Pain | home | | Dr. Burian |
| | B0635 | Cellulitis | admit IM | | Dr. Burian |
| | Q1039 | Viral Syndrome | home | | Dr. Burian |
| | M1463 | Viral syndrome/pharyngitis | home | | Dr. Lance |
| | P6980 | prob hyperventilation syndrome | home | | Dr. Haith |
| | M8155 | Exacerbation COPD | home | | Dr. Haith |
| | L8677 | fever c rash ? ques | admit peds | | Dr. Haith |
| | B2730 | fever & neck pain | home | | Dr. Haith |
| | L1673 | [illegible] numbness chest pain ? | admit IM | | Dr. Walters |
| | W6904 | Viral Syndrome | home | | Dr. Walters |

C

# PATIENT LOG

| | PATIENT | DIAGNOSIS | DISPOSITION | PROCEDURES | ER PHYSICIAN |
|---|---|---|---|---|---|
| 10 DEC 99 | P 6980 | s/p hyperventilation syndrome | TELEPHONE CONSULT | | Dr. Haith |
| | P 5547 | transient visual scotoma | home | | Dr. Alagarsamy |
| | B 8004 | Viral URI + RAD | home | | Dr Burian |
| | S 8347 | URI | home | | Dr. Burian |
| | S 8640 | Low Back pain | home | | Dr. Burian |
| | B 3018 | Viral Syndrome | home | | Dr Haith |
| | V 1081 | laceration | home | | Dr. Haith |
| | C 1778 | 1st trimester pg c bleeding | to L&D | pelvic exam | Dr. Haith |
| | M 5466 | Herpes zoster | home | | Dr. Haith |
| | W 1163 | 3rd trimester pg c abd pain | to L&D | pelvic exam | Dr. Haith |
| | S 5814 | contusion (L) arm/wrist | home | | Dr Haith |
| | B 5791 | Epigastric pain | | | Dr. Haith |
| | F 4700 | Cellulitis (R) forearm | home | | Dr. Haith |
| 1 DEC 99 | M 3375 | Dressing Surg Wound | admit FM | | Dr. Alagarsamy |
| | P 6168 | TIA syncope | | | Dr Alagarsamy |
| | P 6889 | Bronchitis vs atyp pneumonia | home | | Dr Alagarsamy |
| | H 7810 | Abd pain | home | | Dr Alagarsamy |
| | C 5647 | (R) foot pain | home | | Dr Alagarsamy |
| | R 1442 | pneumonia | home | | Dr Lance |
| | N 3895 | Fx base middle phalanx | home | | Dr. Burian |
| | W 1271 | acute OM + tonsillitis | home | | Dr. Burian |
| | A 1216 | paronychia + felon | home | | Dr Lance |
| | D 6227 | pneumonitis (L) lung | home | | Dr. Burian |
| | F 4706 | r/o cellulitis arm | home | | Dr. Burian |
| | R 0819 | SBO | ADMIT | | Dr Lance |
| | T 5110 | depression OD suicide attempt | transfer psych [illegible] | | Dr Lance |
| | | | | | Dr. Lance |
| | | | | | |
| | | | | | |
| | | | | | |

171

# PATIENT LOG

DEC 99

| PATIENT | DIAGNOSIS | DISPOSITION | PROCEDURES | ER PHYSICIAN |
|---|---|---|---|---|
| | | home | | Dr Alagarsamy |
| K8267 | Muscle Tremor | home | | Dr Alagarsamy |
| G9039 | Dyspnea | home | | Dr Alagarsamy |
| B4822 | Viral Syndrome | home | | Dr Alagarsamy |
| M9373 | Viral Syndrome | home | | Dr Collins |
| L9900 | Pneumonitis | home | | Dr Alagarsamy |
| W2135 | [illegible] cause | home | pericardiocentesis | Dr Rosenquist |
| F3718 | Code | morgue | | |
| | | | | Dr Collins |
| B8231 | Dyspnea on exertion | home | | Dr Rosenquist |
| M0055 | Costochondritis | home | | Dr Rosenquist |
| C2805 | Sialolithiasis | home | | Dr. Collins |
| R4182 | labial ulceration H. herpes | home | | Dr. Alagarsamy |
| H2970 | viral tonsillitis | home | | Dr Alagarsamy |
| W3681 | atypical CP [illegible] | home | | Dr. Collins |
| P2899 | pain behind (L) ear ? cause | home | | Dr Rosenquist |
| B6984 | Blood soaked bandage | home | | Dr Alagarsamy |
| B3153 | Laceration lip | home | | Dr Collins |
| E0771 | Viral syndrome in diabetic | home | | Dr Rosenquist |
| L2998 | Knee effusion | home | | |

13 DEC 99

127

# APPLICANT'S STATEMENT

**Wilma P. Webster, being duly sworn, deposes and states:**

## 1. ALLEGATIONS AGAINST ME

a. **Patient complaints: (There were complaints that I was slower than the other doctors, but doctors that train in internal medicine tend to be more thorough, and slower):** The US Air Force stated that eight patients turned in complaints about me at the hospital. Out of the many patients I saw in that time period, eight complaints is not that many, and the majority of complaints were about waiting times. As shown by a copy of a slide I used at the Board hearing at Howard AFB, I saw and treated 1151 patients in the ER for the previous 8 months and received only those written complaints. (Please see attachment "A" to this statement). While it does appear to be true that I sometimes took longer to see patients than some of the other doctors, that is typical of many who trained in Internal Medicine. We tend to be more thorough than other physicians, and this takes longer. Still, I was not that much slower. As an example, in November, 1998, I saw 300 patients while McCrary saw 242, Tall 268, Luff 297 and Ulloa 312. The Air Force listed two other complaints which I will describe below under "b" and "c", and when they are analyzed it is apparent that neither one of them was a valid complaint.

b. **Air Force blames me for someone else's medication error, and calls my change of mind about which of two good antibiotics to use, a medication error:** Linda L.Thomas complained that she had been given the wrong dosage of rabies medication, however she told me she could keep the cat under observation for 10 days. Because of that, I agreed to put off the rabies vaccine and immunoglobin till the cat developed symptoms. I cleansed the wound, put her on antibiotics and had her follow up with Public Health and also with a primary care physician. If somebody gave her the wrong dose of rabies vaccine, I was not the one. She also said I erred when I chose the medication and then discovered the error and changed it. The truth is that at first I thought of giving her tetracycline as prophylaxis, but later decided I'd rather give a more expensive drug, Augmentin. Both of these medications would have been good treatment for her problem, but Augmentin is currently more popular.

c. **The Air Force called this an error, but the orthopedic surgeon wrote that I followed standard of care:** Michele Shroder complained that I did not take proper care of the torn meniscus in her knee, but she had already been treated by the orthopedic surgeon, (Dr. Robert Granville) for that problem. She was not satisfied with the medication given and wanted me to give her narcotics. I offered other medication, but don't believe in giving narcotics for chronic problems. She wasn't satisfied. Dr. Granville later reviewed what I had done and wrote a letter stating that the treatment I gave met the standard of care.

d. **Air Force calls crying softly an emotional outburst:** Work was being piled on me even though I was new, not trained as a Family Practice doctor, and didn't know where all the supplies were. The computer I was supposed to use had a virus and wouldn't work. In addition, by order of Dr. Burkett, I was not even allowed to go eat on the first day of the job. A day or so later, a patient (John D. Silbaugh) asked me how I was, and feeling completely miserable and under attack, tears began rolling faster and faster down my face. This is the emotional outburst the Air Force referred to.

e. **Air Force 'experts' say I have multiple sclerosis, (but the renowned world expert disagrees).** Multiple times the Air Force has tried to prove I have MS, and each time, when I have proven that I don't have it, they persevere, because they want to prove that their 'experts' know what they're doing. My MRI is abnormal and looks like the MRIs of people with MS, but as the foremost renowned expert, Dr. Charles Poser points out, this can be caused by many different things, not just MS. Among these, to name just a few, are Guillain-Barré syndrome, exposure to carbon monoxide or other toxins, and encephalitis. Air Force physicians acted as if they thought I was hiding symptoms. They would suggest that any ache or pain I had was caused by MS. As an example, they at first thought the tingling and weakness in my left hand was from MS till the x-ray showed I had an extra bone in the carpal tunnel. Begrudgingly they admitted it was a simple carpal tunnel syndrome, and it was later cured with carpal tunnel release surgery. When the corns on my right 5th toe made me limp, they would point at the limp and say it was proof of MS, but when the podiatrist shaved the corns off, the limp was cured.

f. **Forgetfulness and disorganization in medical practice settings:** When trying to get by with inadequate sleep, I would not function at my best, and probably was seen as 'forgetful'. An example of this is when I volunteered to write the 'Scope of Care' for the whole medical group, a document that was needed for the JCAHO visit. I wrote the preliminary part that Dr. Robbins had told me about, but when Lt. Col. Addison came on board, she ordered me to do a tremendous amount more, and she gave me very few days to do it in. I knew it was too much for me to do, but she insisted it had to be done, and by a certain date. I still had a busy work schedule to do, and the only way I could do it, was to stay up very late at night to write everything she wanted. I did everything I was supposed to do, but I know my work in the ER suffered because I was chronically low on sleep. In the end, she said that I'd done an excellent job with what I wrote for JCAHO, but she turned around and sent me for a mental health evaluation soon thereafter. In the 'Findings and Recommendations Clinical Privileges Hearing,' panel members, when writing about forgetfulness and disorganization, mentioned an example of a pregnant woman I had refused to send in an ambulance to a downtown hospital. They didn't mention, however, that I had discussed the case with the obstetrician on call, and gotten her agreement, and this was well documented in the record.

g. **Problems in memory and processing speed (<u>Not so</u>, the problem is with visual focus)** The tests done by Dr. Margaret O'Conner were visual based tests, done on a computer. I wear trifocals and have extreme nearsightedness plus conjunctivitis sicca (extremely dry eyes). It's not my mental processing that was slow for those tests, but my ability to focus on the numbers on the computer screen. Dr. Fabry, a Nebraska psychologist, after consulting with Dr. O'Conner did other tests with less visual input, and he said and documented that I was completely normal for someone of my age and training. (Please see attachment "B" to this statement).

h. **Inappropriate behavior/impulse control:** In the first case that they mentioned (Silbaugh), I was seeing a patient in the midst of all the nasty politics and ill treatment. The patient said, "How are you?" and I did start crying softly because they had made me so miserable. In a second case Dr. Burkett was refusing to let me go eat, and I said emphatically, but not terribly loudly, that I WAS going to go eat. In the end, I didn't go eat and all I had that day was a pop tart and a sandwich someone gave me. How can I be expected to work efficiently without any food?

i. **I'm accused of discussing details of my childhood sexual abuse with a psychology technician:** I didn't discuss it in great detail, I think I just told the psychology technician that I'd forgotten to tell Dr. LaMachia that I'd been repeatedly fondled by my psychologist uncle when I was a child. Do these psychology professionals really want me to feel it is something I should feel guilty about and hide? I think that's an unhealthy attitude on their part, and I don't think Sigmund Freud would agree with them

j. **It appears to me that they purposely 'lost' the code sheet, so they could change the facts in the case.** The 'code sheet' where I had documented the treatment during the code of a year before, disappeared during the time I was undergoing the credentials hearing, and supposedly credible witnesses testified that I had not attempted to defibrillate the patient. I did not remember the code well, since it had happened a year previously and I have been at many codes, especially in my civilian career. I thought I had defibrillated the patient, but I didn't think they could possibly be lying. After all, Maj. Burkett is always publicizing the fact that he is a born-again Christian, and you get the feeling he thinks he's better than everybody else. Even his computer screen-saver proclaims "Jesus saves!" How could he be lying? I tried to figure out why I could conceivably have not defibrillated this patient. I remembered that I had strongly considered the possibility of a pulmonary embolus, and thought perhaps that I was so fixated on that possibility that I had concentrated on intubation and ventilation instead of shocking him. Then, after the hearing was over and they had taken away my privileges, somehow the code sheet was miraculously found in the office of the chief administrator, and it showed I had indeed attempted defibrillation on the patient and had given appropriate drugs. It also showed that Maj. Burkett and Col. O'Neil had taken longer to get to the code than they had calculated, and we had already attempted defibrillation several times when they got there. I believe this 'loss of the code sheet' was all planned and they wanted to keep the code

sheet out of the hearing so they could attack me with more success. In addition, Col. O'Neil himself testified that he arrived before Maj. Burkett and that he was always watching the patient's breathing status, and at no time were there any problems with the ventilation of the patient. So how could the Board accept Maj. Burkett's testimony that I was unable to maintain an adequate airway at the same time they are accepting Col. O'Neil's testimony that there was no problem with breathing?

## 2. POLITICS AT HOWARD AFB, PANAMA

a. **Two majors vying for same position:** Having held this position before at Yokota AFB, Japan, I saw this as my chance to be director of the ER again and improve on what I'd done before. On approximately August 10, 1997, I phoned the chief of medical staff, Lt.Col.Robbins, before going PCS to Howard, and he said that I would be the ER director when I got to Howard. I was looking forward to that, but took a month off en route, and when I finally got there on October 5, 1997, Major McCrary had been there for a month and he wanted to be the ER director too. He was much less qualified than I, not being board certified in anything. On October 6, I began inprocessing and arranging to pick up my car and get an apartment. I started work on October 13th, and worked 8 to 11 hours a day for that first week. On November 4th, 1997 they asked me for my curriculum vitae (CV) so they could make a decision on who would be director. I didn't have all my household goods and files, but I quickly put one together from memory and turned it in.

*b.* **Addison biased in favor of McCrary:** Lt. Col. Addison was commander of the Medical Operations Squadron, and seemed to dote on Maj. McCrary. She would beam with pride whenever he was speaking, and was much harsher with me. Maj. McCrary later told me that one day she ordered him to write a letter listing all the complaints he could possibly think of about me. That list was later used to begin the process of removing me from the ER.

c. **Voting for ER director:** Dr. Mendez, a civilian physician was the Chief of both Family Practice and the ER. He was of Puerto Rican origin, but lived in Panama and had years working for the American military. He, Lt. Col. Addison and Lt. Col. Robbins got together and voted on who would be ER director. I was told on November 16, 1997 that they decided Maj. McCrary was the one to be director of the ER, which disappointed me tremendously, especially since he was less qualified than I, not being board certified in anything. Lt. Col. Robbins told me that he voted for me, but the other two voted for McCrary, so he got the job. On November 20, to assuage me, I was told I'd be Assistant Director of the ER, but McCrary complained that he'd not agreed on that.

d. **Carpal tunnel syndrome:** During this time, I was also waiting for surgery for carpal tunnel syndrome in my left wrist, which had been diagnosed in Japan, and was doubtless caused by all the typing of the paperwork needed for my job as director of the Yokota ER. An x-ray showed what looked like extra bones in my

left wrist, but apparently was just arthritic calcifications. I finally had surgery on it on February 13, 1998 and quickly regained strength in my wrist.

e. **The 'code' and Burkett puts the tube in wrong:** During a night shift 'code' on approximately January 26, 1998, called because a 30-year-old male had lost consciousness in the hospital ward, I ran to the ward from the ER, and was in charge of the 'code'. I did CPR and attempted to defibrillate the patient, but to no avail. Dr. Burkett, who had recently been made chief of the Primary Care clinic, arrived late as did Lt. Col. Addison, and the hospital commander, Col. O'Neil because they'd come from their homes. I tried to intubate the patient, who had a thick neck, and was difficult to intubate, but I couldn't. I asked Dr. Burkett to intubate him and he did. I told the other doctors that my wrist had felt "incredibly weak". They all left after the code was over, and anxious to find out why this young patient had died, and considering a pulmonary embolus or a tumor, I asked for a post mortem x-ray. The x-ray showed that Dr. Burkett had put the tube in too far, down into the right mainstem bronchus. I wrote up the note on that code, and at the bottom stated. "X-ray shows ET tube in right mainstem bronchus." Thinking over this case, I believe he was so angry because this case will probably go to court, and my note about the tube will make it look like he caused the death. However, the pulmonary embolus began earlier, and that would not have made a difference. If this patient could have been saved, it would have been by giving heparin when he first got to the hospital either earlier that day or the day before. Dr. 'Pat' was the admitting physician, but Burkett may have been involved too, in which case they have guilty complexes and were looking for a scapegoat (me).

f. **The autopsy:** Dr. Burkett criticized the way I managed the code; they seemed especially upset that I'd asked for the x-ray. I went to the autopsy and found the patient had died of a massive pulmonary embolus (clot in the lung). The next day or so I got a call telling me I would begin working in Primary Care under Dr. Burkett himself, and not in the ER. I was new there and not used to doing family practice. They piled a lot of patients on me and I got behind. The computer had a virus and slowed me up more, and I didn't know where the equipment and forms were. I didn't get a chance to eat lunch until 1 PM, and then Dr. Burkett stopped me from going to lunch, telling me I had to see patients. I demanded to go eat lunch but he would not let me go. The next day or so I was feeling miserable working there and cried softly in front of a patient.

g. **They gave me an unreasonable intubation test:** I had surgery on my wrist and regained strength in it. During the time in Primary Care, I took the PALS (Pediatric Advanced Life Support) course and passed it on February 4-5, 1998. I intubated several mannequins successfully during this course. Still they would not let me go back to the ER. They told me I had to take a special intubation test. I was given an appointment, but when I went to take it at the appointed time with Dr. Lopez and Dr. Rodriguez, they did not have all the proper equipment. The stylette was missing. They told me I should be able to intubate without a stylette (normally there is always a stylette available.) I



132

finally intubated two mannequins without a stylette, but they told me I took too long so they flunked me. Then I was told to train in Anesthesia. The anesthesiologist had me intubate two of his surgical patients. I had no difficulties. He recommended I go back to the ER, and several days later they let me go back to the ER.

h. **Base commander's wife brings in a friend for special treatment, but is disappointed** In the morning of May 19, 1998, Capt. Shercliff had reiterated to me that patients with chronic problems would be sent upstairs to be seen in Primary Care. This is something that Maj. McCrary had told me before, and I had promised him I'd comply with this. Later on that same day, I was seeing two patients in the ER, one being a child who had fallen down and had a laceration to the scalp. When I felt inside the wound, I felt a "crack" which was probably just the periostium, but I was worried about a possible skull fracture even though he was normal neurologically. I ordered a skull x-ray and was waiting for the results before suturing. The other patient was a man with abdominal pain and a history of diverticulitis. Then Mrs. Trebone, the base commander's wife, came in with a friend who complained of exacerbation of chronic back pain, and who refused the medications I suggested for her pain. I got the impression that she wanted to be treated with narcotics, which I didn't feel was appropriate, so instead I sent her to Primary Care as I would have done with any other similar patient. Later on she returned saying that she had received treatment upstairs and then had gotten worse. While she was in the ER this second time, she was visited by Lt. Col. Addison and Col. O'Neil. I called Dr. Pat and arranged for her to be admitted to the hospital for pain control.

i. **Eye drops caused decreased vision but Howard optometrists were unaware of this side effect leading to my bothering the hospital commander:** We had no ophthalmologist at Yokota, but the optometrists would refill my prescriptions. The base had opted to discontinue the eye drops I was using for probable glaucoma, so they changed me to new ones. I thought I experienced loss of vision with these and complained to both optometrists, who denied the possibility the drops could cause that symptom. When I found out that decreased vision was listed as a side effect on the package insert, I went to complain to the commander. He said he'd get back to me on that but he never did. I was quite upset about this and even complained to him too loudly at a social function, getting his animosity.

j. **My inappropriate words on the way to my Mental Health evaluation** When the girl who was directing airplane passengers asked me how I was, I said "Not very good because I don't want to go on the flight. In fact if that airplane were to blow up right now, I'd be relieved 'cause I wouldn't have to get on it." This statement was blown completely out of proportion and they said I wanted to blow up the plane, or that I wanted to blow myself up with the plane. Not true. I'm just glad that there was



133

some documentation (patient evacuation tag) showing my version was more correct than theirs was.

k. **Guillain-Barré Syndrome as complication of the flu in Turkey October 1998.** I caught a bad case of flu when on leave on a tour of Turkey, and then over several days I became almost completely paralyzed and even had some difficulty breathing. I was taken by ambulance to The American Hospital of Istanbul, where I was diagnosed as Guillain-Barré Syndrome (GBS), and kept for about ten days. With my son's advice, I worked very hard at rehabilitation exercises and started getting better quickly. Then they aerovacked me to Wilford Hall Medical Center in Texas. The military doctors there disputed the Turkish diagnosis and were arguing that I was getting better too fast for GBS, and they thought it was MS.

l. **2nd MEB in January, 1999:** I even saw the world expert on MS, Dr. Charles Poser who wrote the original landmark article on the disease, and he thought I didn't have MS, but instead the Miller-Fischer variant of Guillain-Barré. Again the MEB decided that I didn't have MS. I was sent back to duty, but Col. O'Neil was not happy with their decision.

m. **Privileges hearing February 17-18, 1999:** Col. O'Neil couldn't accept the decision of the MEB, and soon I was forced to undergo a privileges hearing, which in my opinion was totally unjustified. I had seen 1151 patients while at Howard AFB and had only 8 written complaints, none of which were life threatening and most of which only dealt with waiting times. Many people testified in my favor, but Col. O'Neil practically pleaded at the hearing for them to take away my privileges, and although they didn't completely take them away, I wasn't permitted to see patients again and the report to the Physicians' Data Bank has kept me from practicing medicine.

## 3. Evaluation at Keesler AFB, Mississippi, an unfair biased evaluation

a. After working in small overseas Air Force ER's, followed by a year of Air Force imposed office work I was sent to Keesler AFB to be evaluated on how well I worked in an ER. That was a real ER, not like the ones I'd been working in overseas. It was filled with Board Certified Emergency Physicians, who are generally known to be biased against those of us who are practice trained. I was told I had to report and review everything with the attending physician I was assigned to. Thus, they were treating me like a lowly intern, and naturally I started acted like one. We were supposed to sign up for patients on a large white board in the front of the ER. When I wanted to sign up for a patient I would often find that someone else had scrambled to get his or her name listed ahead of me for all the patients. So I'd sit in the break room for a while. Once one of the attending physicians decided to review a chest x-ray with me because he said I'd missed pneumonia. I insisted that it was normal, and eventually he admitted that he wasn't real good at reading x-rays. Then the official reading came back