agreeing with me. He still gave me a bad review. One of the attending physicians was very rude to me, and just wanted me to do the initial work-up on the patient, but not see the end result. When I asked him if I could at least find out what their end diagnosis was, he said he was there to evaluate me, not to teach me. That attitude had a strong psychological effect on me. He apparently resented having to work with me. I went to the break room to cool down for about a while after that. In the end they wrote scathing comments on me, much worse than I deserved. They did however all recommend I be permitted to work in the clinics.

## 4. 55th Medical Group, Offutt AFB, Bellevue, Nebraska

a. I arrived at Offutt AFB at the beginning of October, 1999 and from then until I left at the beginning of December, 2000, I was allowed only to do administrative tasks, and was never permitted to see any patients in any clinic, although I repeatedly voiced a desire to do so.

b. I worked first with TriCare, doing a lot of chart review, checking for military members who had chronic medical problems in order to determine who should be sent to an MEB. Then I went to the Quality (later changed to Performance) Improvement Office where I would look up things from the JCAHO manuals for the nurse-manager who was the head of that office. I wrote out some letters for her and edited a couple Operating Instructions (OI's). I also reviewed several videos used for hospital CME. Sometimes I just sat and stuffed envelopes.

c. I finally went to work for another nurse manager who did Information Management, and I designed materials for diabetic patient education. I also designed and wrote a handout about treatment for colds. All in all, the work was extremely boring and an obvious misuse of a trained physician working way below her capabilities.

## 5. Civilian Practice

a. Since being separated from the Air Force, all of the states where I have been certified to practice medicine have taken action to restrict my medical privileges in the same manner that the Air Force did. Because of that, I cannot practice medicine anywhere until I have all or some of the restrictions removed by the Air Force.

b. Even the American College of Emergency Physicians, which would otherwise allow me to have another try at the Oral Board Exam this next year, has told me I cannot take the exam unless I have at least one unrestricted license. Because of all the foregoing, I have opted to use the GI bill to take graduate level courses in Human Resources, and have done so for the last year. I have maintained an A-average at the Antelope Valley campus of Chapman University, without yet approaching the intense interest and the motivation that characterized my medical studies and career.

## 6. Finances

a. Although my motivation for studying medicine was not financial, I never expected to be in financial need as is the case now. My only income is the



135

approximately $1200 VA payment and the $600 from the GI bill which is spent on tuition, books, and gas to drive to the Palmdale campus. I could no longer make the $765.73 house payments, and when I tried to refinance the loan, I was told that I did not have enough income to qualify for refinancing, so I had to seek private loans to save my house.

b. Trying to live on almost nothing has led me to forego many things I would like to do, and deserve to be able to do after spending so much of my life working hard. I can no longer afford to spend money buying clothes, having my hair done at a beauty salon, my yard landscaped, eating at restaurants, paying for medical journals and medical societies, or traveling the world.

c. I have had to use up much of my savings, including cashing in my IRA's.

d. When Col. O'Neil took me away from clinical practice, he stopped the lump sum multi-year special pay (MSP) of $17,000 a year I had been receiving up till then, as well as incentive special pay (ISP), another lump-sum payment, so the monetary loss started to be felt immediately.

e. At my lawyer's suggestion I tried to apply for Social Security Disability Payments. The clerk asked me what my disability was and I told her the Air Force said I had multiple sclerosis with cognitive impairment. She answered by saying, "But what disability do *you say you have*?" I had to tell her I'm not disabled because I am not and the supposed MS was already disproved in my first two MEB's. "Then," she said, "you are not eligible for Social Security payments." That is when I realized I would have to live on a bare minimum.

Wilma P. Webster (signature)
Wilma P. Webster

**SIGNED AND SWORN BEFORE ME BY WILMA P. WEBSTER ON THIS 14th DAY OF March 2002**

Audrey M Strange (signature)
**NOTARY PUBLIC**

AUDREY M. STRANGE
COMM. #1281748
Notary Public-California
KERN COUNTY
My Comm. Exp. Nov. 20, 2004
ESI1



136

| | |
|---|---|
| NUMBER OF COMPLAINTS FROM PATIENTS: | 9 |
| NUMBER OF PATIENTS IN 8 MONTHS IN ER: | 1151 |
| PERCENTAGE: | .78% |

137
ATCH 14-TAB A

JULIAN **FABRY, PH.D.**
PSYCHOLOGIST
DODGE CENTER BUILDING
5002 DODGE SUITE 205
OMAHA, NE 68132
402-551-0330

April 19, 2000

Wilma Webster, M.D,
1703 Scarborough Drive 2G
Bellevue, NE 68123

Dear Dr. Webster,

This letter is being written to you at your request to report the results of the assessments administered to you in my office on February 28, March 25 and April 8 of this year. These results differ from those found by Dr. Margaret O'Connor, Ph.D., Director of Neuropsychology at Beth Israel Deaconess Medical Center in Boston, Massachusetts. Apparently you had been concerned about particular processing problems that were noted on the evaluation by Dr. O'Connor. After I had a conversation with her, you were administered the following assessments:

Verbal Fluency Test
Continuous Performance Task (2 Parts)
Tower of London Test (Adult Version)

Most of the assessments indicated that you were functioning within the normal range for a person of your age and educational level. Of the four assessments that were given to you only one, Part 1 of the Continuous Performance Task, yielded a score that was slightly outside the normal range. That was a test which required visual discrimination, which apparently was a problem area that was identified in a letter you had shown me from your ophthalmologist. That score may also have been affected by a need towards seeking accuracy over speed. On a similar appraisal that was more structured, Part 2 of the Continuous Performance Task, your performance was well within the normal range for a person of your age and educational level.

It is my professional opinion that you no longer have the physical and psychological problems (i.e. depression, stress, etc.) that perplexed you when you were assessed by Dr. O'Connor in January of 1999.

If you have any questions, please feel free to contact me at your convenience.

Sincerely yours,

Julian Fabry, PhD

Julian Fabry, Ph.D.
Licensed Clinical Psychologist

138

ATCH 14, TAB C

# MEDICAL BOARD REPORT

*(This form is subject to the Privacy Act of 1974 - Use Blanket PAS - DD Form 2005)*

1. INSTALLATION AT WHI... CONVENED: 74th Medical Group, WPAFB, OH
2. DATE CONVENED: 12 Jul 00
3. NAME *(Last, First, Middle Initial)*: Webster, Wilma P.
4. GRADE: O-4
5. SSN: 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
6. COMPONENT: Active Duty
7. DEPT OR SERVICE: Air Force
8. ORGANIZATION: 55th MDOS, Offutt AFB, NE
9. SEX: F
10. DATE OF BIRTH *(Yr, Mo, day)*: 19410706
11. AGE: 59
12. SEPARATION/RETIREMENT DATE:
13. HOSPITAL INITIALLY ADMITTED: N/A
14. TRANSFERRED FROM: N/A
15. HOME ADDRESS: 1703 Scarborough Dr. 2G Bellevue, NE 68123

| 16. MILITARY OCCUPATIONAL SPECIALTIES – TITLE | CODE | 17. TOTAL YEARS MILITARY SERVICE – ACTIVE | INACTIVE |
|---|---|---|---|
| Emergency Physician | 44E3A | 8y 6m | 2y |

18. DATE ENTERED AD CURRENT TOUR: Aug 1992
19. AERO RATING:
20. ON FLYING STATUS ON ADMISSION: YES [ ] NO [X]
21. DATE RELIEVED FROM FLYING STATUS:

22. BY DIRECTION OF THE APPOINTING AUTHORITY, THE BOARD CONVENED TO CONSIDER THE CASE OF THE ABOVE NAMED MEMBER.

A. UNDER PROVISIONS OF THE FOLLOWING DIRECTIVES:
- [X] AFI 44-113 AND 48-123
- [ ] MANUAL FOR COURTS-MARTIAL
- [X] OTHER *(Specify)* AFI 36-3212

B. FOR THE PURPOSE OF:
- [X] CONTINUED ACTIVE DUTY
- [ ] EPTS DEFECTS
- [ ] SEPARATION/RETIREMENT
- [ ] OTHER *(Specify)*

## DIAGNOSIS AND FINDINGS

23. AFTER CONSIDERATION OF CLINICAL RECORDS, LABORATORY FINDINGS, AND PHYSICAL EXAMINATION, THE BOARD ESTABLISHES THE FOLLOWING DIAGNOSIS: *(List all diagnoses, in accordance with applicable directives, which contribute or may contribute to make the qualifications of the individual for worldwide duty questionable. Include any competency determinations. (DFAS-DE MANUAL 177-173).*

| A | B APPROXIMATE DATE OF ORIGIN | INCURRED WHILE ENTITLED TO BASIC PAY – YES C | NO D | EXISTED PRIOR TO SERVICE – YES E | NO F | PERMANENTLY AGGRAVATED BY SERVICE – YES G | NO H |
|---|---|---|---|---|---|---|---|
| Multiple sclerosis versus, less likely, recurrent Miller-Fisher variant of Guillain-Barre | 1992 | X | | | X | | N/A |
| AXIS I: Cognitive Disorder NOS<br>AXIS II: Prominent Cluster B personality features<br>AXIS III: Multiple sclerosis, glaucoma<br>AXIS IV: Occupational Problems<br>AXIS V: GAF = 85 | 1993 | X | | | X | | N/A |

Member did serve in Gulf War Theater of Operations from Nov 90 - Jun 91.

24. SANITY DETERMINATION *(To be completed for sanity board cases only.) (Manual for Courts-Martial)*

| | YES | NO |
|---|---|---|
| A. IS THIS A DISEASE OR DEFECT OF THE MIND AS DISTINGUISHED FROM A CHARACTER DEFECT? | | |
| B. DID THE ACCUSED, AT THE TIME OF THE ALLEGED OFFENSE AND AS A RESULT OF MENTAL DISEASE OR DEFECT, LACK SUBSTANTIAL CAPACITY TO APPRECIATE THE CRIMINALITY OF THIS CONDUCT? | | |
| C. DID THE ACCUSED, AT THE TIME OF THE ALLEGED OFFENSE AND AS A RESULT OF MENTAL DISEASE OR DEFECT, LACK SUBSTANTIAL CAPACITY TO CONFORM HIS/HER CONDUCT TO THE REQUIREMENTS OF THE LAW? | | |
| D. DID THE ACCUSED HAVE THE MENTAL CAPACITY TO FORM THE SPECIFIC INTENT OR REQUIRED STATE OF MIND? | | |

25. ACTION RECOMMENDED BY BOARD *(or directed by higher authority)*

Refer to the Informal Physical Evaluation Board

## BOARD MEMBERS

26.

| | TYPED NAME, GRADE, ARM OF SERVICE | SIGNATURE *(Place check after signature of psychiatrist)* | |
|---|---|---|---|
| PRESIDENT | DEAN A. BRICKER, LTC, USAF, MC | DBricker | |
| MEMBER | WILLIAM E. VENANZI, MAJ, USAF, MC | [signature] | |
| MEMBER | JEFFREY M. BISHOP, LTC, USAF, MC | Jeffrey M Bishop | X |

27. MINORITY REPORT ON REVERSE: [ ] YES [X] NO

## HOSPITAL COMMANDER OR DESIGNEE

28.
A. DATE REVIEWED: 17 Jul 00
B. BOARD RECOMMENDATION [1]: [X] APPROVED [ ] DISAPPROVED
C. TYPED NAME, GRADE, SERVICE: JAMES R. EBERT, Col, USAF, MC Chief of Medical Staff 74th Medical Group Wright-Patterson AFB OH
D. SIGNATURE: [signature]

29. I HAVE BEEN INFORMED OF THE FINDINGS AND RECOMMENDATIONS OF THE MEDICAL BOARD.
A. DATE: 21 JULY 2000
B. SIGNATURE OF SERVICE MEMBER: Wilma P. Webster
C. LETTER OF EXCEPTION ATTACHED: [X] YES [ ] NO [ ] N/A

[1] If, applicable indicate reason for disapproval on reverse.

AF FORM 618, 19951001 (EF-V2) PREVIOUS EDITION IS OBSOLETE.

139

ATCH 15

08/15/00 08:04 FAX 210 565 4245 HQ AFPC DPPD 002

T2CW

| X | INFORMAL | FINDINGS AND RECOMMENDED DISPOSITION OF USAF PHYSICAL EVALUATION BOARD | DATE 10 Aug 00 |
|---|---|---|---|
| | FORMAL | | |

1. THE BOARD CONVENED AT Randolph AFB TX 78150-4708
2. A QUORUM WAS PRESENT AS INDICATED ON EXHIBIT A
3. EXHIBITS ATTACHED: A, B, PER ATTACHED ORDERS (EXHIBIT A)

| 4. MEMBER'S NAME (Last, First, Middle Initial) | 5. GRADE | 6. SSN | 7. YEARS OF SERVICE UNDER 10 USC 1208 | 8. COMPONENT |
|---|---|---|---|---|
| WEBSTER, WILMA P. | MAJ | 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 | 07 | REG AF; X USAFR; ANG |

9. FINDINGS CONCERNING INDIVIDUAL DEFECTS OR CONDITIONS

COLUMN A – Include degree of severity.

COLUMN C – Enter "YES" for in line of duty, "M" for intentional misconduct, "N" for Willful neglect, "A" for incurred during a period of unauthorized absence, or "NA".

COLUMNS B and D - Enter "YES", "NO", or "NA".

COLUMNS E and F - Self-explanatory.

| A. DIAGNOSIS | B. EXISTED WITHIN ENTITLED TO RE-CEIVE BASIC PAY | C. LINE OF DUTY (Applies Only If Item 9B is YES) | D. PROXIMATE RESULT OF PERFORMING MILITARY DUTY (Non-EAD USAFR and ANG only) | E. DISABILITY RATING | F. VA DIAGNOSTIC CODE |
|---|---|---|---|---|---|
| CATEGORY I - UNFITTING CONDITIONS WHICH ARE COMPENSABLE AND RATABLE: MULTIPLE SCLEROSIS, ASSOCIATED WITH SECONDARY COGNITIVE DEFICIT. | YES | YES | NA | 30 | 8018 |
| CATEGORY II - CONDITIONS THAT CAN BE UNFITTING BUT ARE NOT CURRENTLY COMPENSABLE OR RATABLE: NONE. | | | | | |
| CATEGORY III - CONDITIONS THAT ARE NOT SEPARATELY UNFITTING AND NOT COMPENSABLE OR RATABLE: PROMINENT CLUSTER B PERSONALITY TRAITS. | | | | | |

| 10. ADDITIONAL FINDINGS | YES | NO | NA |
|---|---|---|---|
| A. MEMBER IS UNFIT BECAUSE OF PHYSICAL DISABILITY | X | | |
| B. DISABILITY WAS INCURRED IN LINE OF DUTY IN TIME OF WAR OR NATIONAL EMERGENCY OR AFTER 14 SEPTEMBER 1978 | X | | |
| C. DISABILITY WAS THE DIRECT RESULT OF ARMED CONFLICT OR WAS CAUSED BY AN INSTRUMENTALITY OF WAR AND INCURRED IN LINE OF DUTY DURING A PERIOD OF WAR | | X | |
| D. DISABILITY WAS THE DIRECT RESULT OF A COMBAT RELATED INJURY | | X | |
| E. DEGREE OF IMPAIRMENT X IS MAY BE PERMANENT | | | |

11. COMPENSABLE PERCENTAGE: 30

12. RECOMMENDED DISPOSITION: PERMANENT RETIREMENT

13. OVERCOMES PRESUMPTION OF FITNESS: YES ___ NO X NA ___

14. SIGNATURE OF PEB PRESIDENT OR PEB REPRESENTATIVE

DAVID W. KLAUCK, Lt Col, USAF

SEPARATION/RETIREMENT DATE:

15. REMARKS

MAJOR WEBSTER'S MEDICAL CONDITION PREVENTS HER FROM PERFORMING DUTIES COMMENSURATE WITH HER OFFICE, GRADE, RANK OR RATING. IN THE OPINION OF THE IPEB, MEMBER'S CONDITION IS PRESENTLY STABLE, AND UNLIKELY TO SIGNIFICANTLY CHANGE IN THE NEXT SEVERAL YEARS. THE IPEB, THEREFORE, FINDS MEMBER UNFIT FOR FURTHER MILITARY SERVICE, AND RECOMMENDS SHE BE PERMANENTLY RETIRED WITH A 30% COMPENSABLE DISABILITY RATING IAW VASRD GUIDELINES.

AF Form 356, OCT 95 PREVIOUS EDITION IS OBSOLETE

140

Atch 16

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS AIR FORCE PERSONNEL CENTER
RANDOLPH AIR FORCE BASE, TEXAS

20 September, 2000

**MEMORANDUM FOR** PRESIDENT, FORMAL PHYSICAL EVALUATION BOARD

**FROM:** Major Wilma P. Webster
FPEB Evaluee

**SUBJECT:** Request to Waive Formal Physical Evaluation Board Hearing

1. I have received the findings and recommendations of the Informal Physical Evaluation Board.

2. Having received an explanation of these findings and recommendations by my counsel, I request that I now be permitted to waive my earlier election to demand a formal hearing, for the purposes of now concurring with the IPEB's recommendations and findings. I understand that if this waiver is approved, I have no further right to demand a formal hearing without substantial new evidence. The reason for my waiver is that I now feel it is in my best interest to agree with the findings and recommended disposition.

Wilma P. Webster
(Signature)

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
(Social Security Number)

1st Indorsement, USAF PEB/DPPDF, Lackland AFB, TX 78236

TO: FPEB Evaluee

APPROVED \ DISAPPROVED

JACKIE R. MARTIN, Colonel, USAF
President, Formal Physical Evaluation Board

141

ATCH 17

DEPARTMENT OF THE AIR FORCE
WASHINGTON

SPECIAL ORDER
NO. ACD-00060

23 OCT 00

V
MAJ WESTER, WILMA P.

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

OFFUTT AFB NE 68113

EFFECTIVE 01 DECEMBER 2000 YOU ARE RELIEVED FROM ACTIVE DUTY, ABOVE ORGANIZATION, AND STATION OF ASSIGNMENT. EFFECTIVE 02 DECEMBER 2000 YOU ARE PERMANENTLY DISABILITY RETIRED IN THE RETIRED PAY GRADE OF MAJ PER AFI 36-3212 WITH COMPENSABLE PERCENTAGE FOR PHYSICAL DISABILITY OF 30 PERCENT.

HIGHEST GRADE HELD ON ACTIVE DUTY: MAJ RESERVE GRADE: MAJ

DATE OF BIRTH: 06 JUL 41

| | YEARS | MONTHS | DAYS |
|---|---|---|---|
| SERVICE FOR BASIC PAY: | 11 | 04 | 22 |
| ACTIVE SERVICE FOR RETIREMENT: | 08 | 10 | 23 |
| SERVICE PER 10 U.S.C. 1405: | NA | NA | NA |

SERVICE PER 10 U.S.C. 12733: 09.20

TO PROCEED TO HOME OF SELECTION, PCS. TDN. 5713500 321 5781.0* 525725
(*INSERT M, J, L, R, D, K, H, I, T, G, OR Y).
NONTEMPORARY STORAGE: 5713500 321 5788.0N 525725.
CIC: 4 5 148 0080 525725. TAC: F17E.

DISABILITY RECEIVED IN LINE OF DUTY AS A DIRECT RESULT OF ARMED CONFLICT OR CAUSED BY AN INSTRUMENTALITY OF WAR AND INCURRED IN LINE OF DUTY DURING A PERIOD OF WAR: NO

ON 24 SEPT 1975 HAD SERVICE AFFILIATION AS DEFINED IN 26 U.S.C. 104: NO

DISABILITY WAS THE DIRECT RESULT OF A COMBAT RELATED INJURY AS DEFINED IN 26 U.S.C. 104: NO

REMARKS: 10 U.S.C. 1201

BY ORDER OF THE SECRETARY OF THE AIR FORCE

OFFICIAL

LARRY N. VAN BUREN, COLONEL, USAF
CHIEF, USAF PHYSICAL DISABILITY DIVISION
DIRECTORATE OF PERS PROG MGT

SERVICING MPF/DPMAR
55 MSS
OFFUTT AFB NE (ACC)
68113-4035 ACD-00060

DIST: DPSAMR - 1 CY; SERVICING MPF - 2 CYS

142
ATCH 18

# Chapter 4

# ADVERSE ACTIONS

## *Section 4A—Investigating, Holding in Abeyance, Denying, Suspending, Limiting, or Revoking Clinical Privileges*

**4.1. General.** The provisions of this section should not be construed as requiring the chief of the medical staff to place in abeyance, suspend, or take other privileging actions in order to carry out evaluations of medical services. Temporary moratorium on some medical services while evaluating those services for systemic problems may be appropriate to determine problem causes. This action may be taken without abeyance or suspension of privileges. In the event a particular provider's care is determined to be the cause of poor outcomes, abeyance or suspension actions may or may not be appropriate, depending on the extent of the problems, the provider's culpability and effort to correct them, and the remedial action required. However, such findings should be included in the PAF.

**4.1.1. Appropriate Use of Privileging Actions.** Privileging action must be taken when appropriate, regardless of the provider's contract or other duty status within the MTF. Severing the employment relationship in lieu of taking a privileging action that is indicated is not appropriate.

**4.2. Identity of Persons Providing Information.** The Air Force will make all reasonable efforts to protect the identity of persons who give information that could lead to a clinical privilege action.

**4.3. Allegations Involving Separated Providers.** Allegations of substandard performance or misconduct within the past 12 months must be investigated. Immediately advise HQ MAJCOM/SG of such cases. HQ MAJCOM/SG will coordinate with HQ AFMOA/SGPC. The responsibility for investigating these situations will remain with the MTF with assistance as necessary by the MAJCOM/SG. The MTF will notify the provider of the charges and will give the provider the opportunity to provide information in his or her defense. If the MTF has closed, HQ MAJCOM/SG assumes these responsibilities.

**4.4. Actions Involving the Medical Facility Commander:** When information arises on a privileged MFC's conduct or condition which may bear on his or her suitability for professional practice, the MFC's commanding line officer should notify and consult with HQ MAJCOM/SG who then assumes responsibility for privileging actions. All other issues are managed by the commanding line officer.

**4.5. Summary Action to Suspend Privileges:** Summary action is speedy and unceremonious action taken to suspend a provider from performing all or a portion of his or her privileges. This action is taken in response to gross provider misconduct, professional incompetence, or negligence that is self-evident and poses a significant threat to patient safety or well-being. When a provider's conduct or condition requires that summary action be taken to protect the health or safety of any patient, employee, or other person in the MTF, the credentials function chairperson or higher authority may immediately suspend all, or any portion of, the clinical privileges of the provider.

**4.6. Routine Action to Investigate, Hold in Abeyance, Suspend, Limit, or Revoke Privileges.** When the credentials function receives information on a provider's conduct or condition, and summary action is not deemed necessary, the function chairperson should determine the proper action to take. When the action is an abeyance or suspension, an inquiry should take place.



143

ATC A 19

**4.7. Use of Abeyance:** An abeyance is not an adverse clinical privilege action. Abeyance is used when an evaluation appears warranted, but information is insufficient to suspend privileges or the potential hazard to patients or patient care is not well understood. It is imposed for the purpose of conducting an internal or external peer review or other inquiry. It is valid for 14 calendar days. The MFC may grant a single extension of up to 14 more calendar days. Then, if the abeyance period is not closed, the action automatically becomes a suspension of privileges. Abeyance which is not resolved when a provider ends his or her relationship with the MTF will automatically become a suspension. Abeyance actions which become suspensions must then be immediately reported as outlined in paragraph 4.10.

**4.8. Use of Suspension:** Suspension is used to control a provider's practice while an investigation is completed or while reevaluation, rehabilitation, or retraining is completed. It is a temporary measure. Suspension should be used as an initial action when misconduct, professional incompetence, or negligence is clear-cut, and poses a threat to patient safety or well-being. A suspension should not exceed six months. A request to extend the suspension beyond six months must be sent to HQ MAJCOM/SG for approval.

**4.9. Withdrawal of Permission to Engage in Off Duty Employment:** The MFC must withdraw any permission for the provider to engage in off-duty employment until the issue is resolved. The MFC must also notify those civilian medical treatment facilities where the provider is practicing of the summary suspension action. Generally, the MFC must remove permission for off duty employment if a provider is being investigated for any item listed in attachment 14, or if an adverse privileging action of any kind seems likely.

**4.10. Immediate Notification to HQ AFMOA/SGPC:** The MFC must send a DD Form 2499, **Health Care Provider Action Report** (RCS: DD-HA(AR)1611 to HQ AFMOA/SGPC and HQ MAJCOM/SG within 3 duty days to report any suspension, denial, limitation, or revocation action taken with a provider's clinical privileges. Copies of supporting documentation identifying the issues that gave rise to the action, the actual action taken, and provider notification of rights and responsibilities under this AFI must accompany the 2499. HQ AFMOA/SGPC will review all suspension actions and determine which must be reported immediately to the NPDB.

**4.11. Notification of the Provider:** The credentials function chairperson, after consultation with the SJA or MLC, should give written notice within 3 duty days to the provider of any abeyance or suspension. They must specify the deficiencies, and the scope and duration of the action (Attachments 7 & 8). If the provider is a member of a contract group, give a copy of the notification letter, and any subsequent correspondence, to the contract group. Notify the contracting officer in these cases of substandard performance and consult on further actions to manage these situations. The credentials function chairperson will inquire into the matter, or assign someone to inquire, in order to decide what action should follow.

**4.12. Inquiry Procedures:** An inquiry may be conducted with or without an accompanying privilege action. MFCs will evaluate allegations of misconduct including, but not limited to, those acts listed in attachment 14. MFCs will refer allegations of criminal misconduct to the local Office of Special Investigations (OSI) detachment. If more information or background on the provider's conduct is necessary, one or more officers may be appointed by the MFC to conduct a further inquiry. After completing the inquiry, the investigating officer sends a report through the credentials function chairperson to the credentials function. The report should organize those factual findings of the inquiry and may include the investigat-

Beth Israel Deaconess Medical Center

Harvard Medical School

Department of Neurology
Senior Neurologist

Charles M. Poser, MD, FRCP, FRCPG

Visiting Professor of Neurology

Beth Israel Deaconess Medical Center
330 Brookline Avenue • Boston, MA 02215 USA
617 667-2063 • Fax 617 667-5216
Internet: cposer@bidmc.harvard.edu

January 15, 1999

Dr. Wilma Webster
PSC # 1 Box 3178
APO AA 34001

Dear Dr. Webster:

You were seen at your request on January 13, 1999. You had already provided me with a fairly detailed recital of your past medical history and current complaints.

I noted the following particularly relevant data: a congenital spina bifida occulta associated with a "fleshy brown growth in the middle of the back" were discovered in ? The first episode of neurological problems occurred in 1974, characterized by bilateral,lower facial weakness, loss of taste, vertigo and garbled speech. This apparently resolved spontaneoulsy after a month. The second episode occurred in 1992 while you were under the stress of intensive Air Force training and suffered from lack of sleep. The only symptom seems to have been a recurrence of the previously experienced double vision.

In October 1997 you developed a Guillain-Barre syndrome for which you were admitted to Wilford Hall Medical Center. You gave me a copy of the discharge summary for that admission. This diagnosis was well documented and I fully agree with it. I note that you were found to be areflexic except for weak LUE reflexes. Bilateral Babinksi signs were elicited. NCV studies confirmed the diagnosis. There was an elevation of CSF protein, normal CSF IgG content but 4 oligoclonal bands were found. T2 weighted MR images of the head revealed several periventricular areas of increased signal intensity.

My own neurological examination revealed the following abnormalities: Reflexes were active and equal in the arms, KJs were 1+ bilaterally, AJs could not be elicited; there were bilateral Babinski signs. I had the opportunity to examine the MRIs and noted the abnormalities as stated.

You told me that you had "never" had ankle jerks and that the Babinski signs had been present for as far as you could remember.

It is clear that the spina bifida, and more importantly what may have been some degree of meningomyelocele, may have caused the absence of ankle jerks and the bilateral Babinski signs. I believe

Beth Israel Deaconess Medical Center, Boston, is a major teaching hospital of Harvard Medical School.
A founding member of CareGroup,℠ an organized system of quality healthcare serving the individual, family, and community.

145

ATCH 20

that the 1974 episode represents a Miller Fisher syndrome (a variant of the Guillain-Barre syndrome) rather than the first bout of multiple sclerosis (MS): bilateral facial weakness would be an extraordinarily rare event in MS. The second episode, diplopia, occurring under stress probably represents a recurrence of the previously experienced diplopia in 1974. Finally, the 1997 diagnosis of Guillain-Barre syndrome is completely accurate and amply documented.

Oligoclonal bands are found in many conditions, including the GBS. The MRI changes, while they do appear quite similar to what is often seen, but is not diagnostic in MS are also found in many other illnesses, including post-infectious conditions such as the GBS. There are a number of cases in the literature where a GBS has actually occurred in a patient with well documentd MS: in every such instance that I am aware of, there was a concurrent exacerbation of the MS symptoms; you did not have that in 1997.

In summary, I am not convinced that you have MS. The diagnosis of MS remains, and will continue to be, a clinical one, which cannot be based only on the MRI and/or the presence of CSF oligoclonal bands, in the absence of clinical neurological signs and symptoms compatible with MS. I find that the clinical history is much more in accord with recurrent GBS/Miller Fischer variant, with only the 1992 bout of diplopia as suggestive of MS. That is, in my opinion, simply not sufficient to sustain the diagnosis of MS.

Very sincerely,

Charles M. Poser

Charles M. Poser

Beth Israel Deaconess Medical Center

Department of Neurology
Division of Behavioral Neurology

East Campus
330 Brookline Avenue
Boston, Massachusetts 02215 USA
617 667-8000

West Campus
One Deaconess Road
Boston, Massachusetts 02215 USA
617 632-7000

*Affiliated with the Comprehensive Epilepsy Center*

http://www.bih.harvard.edu/behavneuro

*Director*
Albert M. Galaburda, M.D.

*Neurology*
Albert M. Galaburda, M.D.
Michael P. Alexander, M.D.
Alvaro Pascual-Leone, M.D., Ph.D.
Dawn Pearson, M.D.
Daniel Press, M.D.
Thomas Sandson, M.D.
Bruce A. Yankner, M.D., Ph.D.

*Neuropsychiatry*
Bernard Vaccaro, M.D.
Shirlene Sampson, M.D.
Antonio Bullon, M.D.

*Neuropsychology*
Margaret O'Connor, Ph.D.
Peter J. Hayashi, Ph.D.
Dara S. Manoach, Ph.D.
Roberta Tsukahara, Ph.D.
Joan E. Sweeney
Cornelia Brenninkmeyer

*Neurorehabilitation*
Michael P. Alexander, M.D.
Dawn Pearson, M.D.

*Social Work*
Lissa R. Kapust, L.I.C.S.W.
Gina Bowers, L.I.C.S.W.
Barbara Gustin, M.S.W.
Rebecca Stiles, L.I.C.S.W.

*Division Administrator*
Betsey Powers-Sinclair

*Staff*
Erin Bradley
Jean Dooley
Susan Labb
Gjergj Lazri
Mickey Lentz
Lorna Reid
Julianna Sokolowski

*Research Laboratory*
Albert M. Galaburda, M.D.
Dorothy Holinger, Ph.D.
Glenn Rosen, Ph.D.
Gordon Sherman, Ph.D.
Antis Zalkalns

*Laboratory for Magnetic Brain Stimulation*
Alvaro Pascual-Leone, M.D., Ph.D.

*Behavioral Neurology Unit*
Beth Israel Deaconess Medical Center
East Campus
330 Brookline Ave.
Boston, MA 02215
Fax (617) 667-7981

# CLINICAL NEUROPSYCHOLOGY REPORT

| | |
|---|---|
| Patient Name: | Wilma Webster |
| Date of Birth: | 7/6/41 |
| Date of Exam: | 1/11/99 |
| Age: | 57 |
| Handedness: | Right |
| Education: | 21 years |
| Occupation: | Physician |
| Medications: | Timoptic |

REASON FOR REFERRAL: Dr. Webster is a 57 year-old, right-handed physician referred for neuropsychological evaluation of her cognitive status in light of allegations by work colleagues that she has been forgetful and that she has demonstrated cognitive changes that have undermined her work performance. Current test findings will be compared with previous neuropsychological evaluations.

History of Current Symptoms: The following history was obtained from a review of several neuropsychological evaluations, a memorandum from Colonel O'Neil, and from an interview with Dr. Webster, who appeared to be a reliable historian. Dr. Webster reports that she encountered a number of job-related difficulties over the last year or so during which time she was stationed in Panama. She presented a recent memorandum that she received from her commander, Colonel O'Neil. Colonel O'Neil recommended that Dr. Webster's clinical privileges be revoked. In this memo he listed a number of work-related difficulties including emotional lability, forgetfulness, and disorganization. He cited a specific episode when she failed to respond to a medical situation in a competent manner. He also cited an episode when she had made verbal statements of a violent nature. With regard to the incident of hostile verbalization, she notes that when she was boarding a plane to go for a neuropsychological evaluation, she communicated her dissatisfaction to a woman who asked her how she was. She states that she said that if the plane were to "blow up" she would be glad because then she would not have to undergo the evaluation. She states that she immediately retracted the statement and apologized profusely.

-CONFIDENTIAL-

Beth Israel Deaconess Medical Center, Boston, is a major teaching hospital of Harvard Medical School.
A founding member of CareGroup,[SM] an organized system of quality healthcare serving the individual, family, and community.

With regard to her work performance, she states that she had been a candidate to be director of the military emergency department at Howard Air Force Base but that a male counterpart had been appointed to this position. She wrote a letter to her commander, Colonel O'Neil, to express her disappointment. Around that time and for a year or so prior, she had been having weakness in her left hand related to carpal tunnel syndrome. Because of this weakness she was unable to perform an intubation during a code in the hospital. She requested that another physician perform the procedure. According to her, the patient died and post-mortem x-rays revealed that the tube had been incorrectly placed. Because of her weakness she was transferred to primary care medicine. She states that she did not enjoy this work and that she was treated poorly. She subsequently underwent surgery for carpal tunnel syndrome and regained the strength in her left arm. She petitioned to return to the emergency room. She was required to undergo a simulated exercise focused on intubation prior to her return. She states that she was not provided with the necessary equipment during this exercise and that she failed the exam; she was instructed to receive further training on the procedure with an anesthesiologist. She ultimately was transferred back to the emergency department. However, according to her, she was again removed from her duties there due to the fact that her commander "lost faith in her competence". A neuropsychological evaluation was requested at that time.

Initial testing was conducted by Dr. Ricardo DeObaldia in 1998. Test findings indicated low average performance on measures of fine motor coordination, perception, reading, and memory. Her abilities in these areas were incorrectly described as "impaired" even when raw data indicated that her performance had fallen in the low average range.

Follow up examination by Dr. Brian Campbell occurred in October of 1998. Dr. Campbell reported that Dr. Webster had obtained a Verbal IQ of 136 and a Performance IQ of 122. Her performance on tests of language fell in the high average to superior range. Digit span was average (63rd %ile). Performance on measures of distractibility and mental flexibility fell in the average to high average range. Regarding her memory, sentence memory fell in the high average range whereas memory for paragraph length material was average. Memory for a word list that exceeded her attention span limitations (i.e., the CVLT) fell in the average range (24th %ile). Performance on the CVMT was low average (14th %ile). Performance on tests of problem-solving was average. Motor dexterity across a variety of tasks fell in the average range. In contrast with the above, there was evidence of mildly impaired performance on tasks of processing speed and reaction time. Personality assessment revealed that she did not perform in the depressed range on self-report measures such as the Beck Depression Inventory. On the MMPI she demonstrated an elevation on scale 4 consistent with a tendency not to conform to social norms. It is noteworthy that elevation on scale 4 is sometimes seen in highly educated individuals.

Dr. Campbell attributed Dr. Webster's test performance to MS based on her neuropsychological deficits as well as previous medical evidence of periventricular white matter changes, positive oligoclonal bands, and elevated IgG index and neurologic symptoms. Dr. Webster disputes this

diagnosis and requested another medical opinion regarding her neuropsychological and neurological status at BIDMC.

Regarding the diagnosis of MS, Dr. Webster relates the following history as pertinent. In 1974 she had a two week episode of double vision and shortly afterwards experienced facial paralysis on one side of her face followed by paralysis on the other side. The latter symptoms lasted for approximately one month. She states that she had an episode of vertigo around that time. In 1991 she chewed on something hard and had a sudden pain on the left side of her jaw. The pain radiated to her head. She was sent to a neurologist who ordered an MRI that was suggestive of periventricular white matter disease. In 1992 she experienced a recurrence of double vision shortly after she entered the Air Force. She had to complete her initial training with one eye closed and was sent to her first base in Japan to complete further work up. When in Japan an internal medicine physician diagnosed her with MS and she was sent for a Medical Evaluation Board. It was decided that she could not be diagnosed with MS but that she had phoria. She states that laboratory tests have never been definitive for MS. In retrospect, she wonders whether some of her MS-like symptoms were due to psychogenic factors. In this regard, she notes that her step-mother had MS.

Past Medical History: Other significant medical events include the following. In October 1997, while on tour in Turkey, she developed diarrhea and a bad cold followed by quadraplegia. She was hospitalized in a Turkish hospital for five days and was given IgG for a presumptive diagnosis of Guillan Barre syndrome. She was then transferred to an American military hospital.

Personal History: Social history reveals that she was born in Pasadena, California the oldest of four children. She was raised and educated in Pasadena and Redondo Beach, CA. She states that she did well socially and academically. She acquired developmental milestones at normal times and was precocious in terms of her reading. She was able to read at age four. However, reports from elementary school teachers indicate attention and memory problems. Despite these problems, she scored in the top one percent of all US high school students in the National Merit Scholarship Test. She attended UCLA for her undergraduate work. She struggled during her first two years and lost her scholarship but after taking some time off from school she successfully returned to school and did well academically. She had a particular talent for learning languages and did well in Spanish, French, Persian and Arabic. While at UCLA she was the social chairman of the International Students' Association. She met her husband at UCLA at which time he was a cafeteria worker. They moved to Mexico in 1965. They had two children and also raised two other children of whom her husband was the biological father. She states that she was occasionally beaten by her husband. She left him in 1972 and entered medical school in 1973 at UNAM. She was the president of her medical school class. She subsequently returned to the United States (1979) where she passed the medical exam for foreign graduates. She took a residency position in Michigan. She entered the Army Reserves in 1989 and served in Saudi Arabia during Desert Storm (1/17/91-6/12/91). She worked in internal medicine and emergency medicine. After Desert Storm she decided to go in the Air Force

because there were no overseas assignments in the Army. She left the Army in 1992 at which time she entered the Air Force.

Family History: Both parents are deceased. Her father died at 69 after a CVA and within the context of pneumonia. She had a close and supportive relationship with her father. She also described a warm relationship with her father's second wife who was a woman disabled by MS. Her mother died in her 70's. She believes that her mother suffered from paranoid schizophrenia. She also suffered from diabetes and a fractured hip. A younger sister, who lives in Florida, is described as emotionally unstable. A younger brother suffered from behavior problems during early school and has had an erratic work history. Apparently he is doing well now. Another brother also had psychological problems after a bitter divorce.

Behavioral Observations: On examination, she was alert and oriented x 3 and was able to convey her thoughts in a clear and coherent manner. There was no evidence of delusions or hallucinations. She displayed a full range of affect. Motivation for testing was normal; to this extent, current test findings are considered valid.

EVALUATION PROCEDURES AND TESTS ADMINISTERED:
Review of Records; Clinical Interview; General Intellectual Assessment: Wechsler Adult Intelligence Scale-III; Attention Battery: Utah Criteria; Digit Span; F-A-S Test; The Stroop Interference Test; Calcap; Trail-Making Tests; Memory Battery: Rey Auditory Verbal Learning Test; Rey Osterreith Complex Figure; Warrington Recognition Memory Test; Language Battery: Boston Naming Test; Visuospatial/Perceptual Battery: Visual Cancellation Tests; Benton Facial Recognition Test; Affective: Beck Depression Inventory; MMPI-2.

TEST FINDINGS:
1. General Intellectual Ability: Performance on tests of general cognitive abilities was variable with superior performance on tasks measuring fund of information (>95th %ile), vocabulary (95th %ile), nonverbal problem solving (95th %ile), attention span (91st %ile), working memory (95th %ile) and verbal concept formation (99th %ile). She demonstrated relative difficulties though clearly average performance on tasks of processing speed (50th %ile). There was a marked discrepancy between verbal (VIQ=133) and nonverbal intelligence (PIQ=114). These scores are commensurate with previous testing from 1998 and indicate superior intelligence.

2. Attention: Brief attention span was high average to superior for auditorily presented information. Performance on verbal and nonverbal fluency measures, which are often seen as indices of processing speed and sustained attention, fell in the low average range. There was no evidence of sensitivity to interference on the Stroop paradigm (T=50). Set maintenance and set shifting abilities were normal on the Trail Making (A&B) and Wisconsin Card Sorting Tests. Simple reaction time was high average (81st %ile) on the Calcap test whereas choice reaction time fell in the low average range (19th-47th %ile).

3. Learning/Memory: There was evidence of a "span effect" on the RAVLT, a 15-item word list where recall reached 7/15 after one presentation and was 9/15 after five presentations. Her learning over trials on this test was below expectations. Following a 30-minute delay interval she recalled 6/15 words (16th %ile) and recognized 12/15 with no false-positive errors. On the Warrington Recognition Memory Test recognition of words was flawless (50/50) whereas recognition of faces was average (40/50; 50th %ile). Recall of the Rey Osterreith Figure was below expectations (Immediate recall=12/36; 12th %ile) even though she had copied this figure in an organized and accurate manner.

4. Language: Spontaneous speech was fluent, articulate and prosodic with no evidence of word finding difficulties or paraphasic errors. Praxis was normal for limb and buccofacial commands. Comprehension of simple and complex commands and complex ideational material was intact. Repetition of short and long, high and low frequency, phrases was adequate. Confrontation naming was high average (BNT=58/60). Finger gnosis was intact.

5. Visual Perceptual/Constructions: Basic perceptual abilities were intact. There was no evidence of hemispatial neglect on double simultaneous stimulation. Scanning was normal and systematic on a Letter Cancellation Test. Facial discrimination was average on the Benton Facial Recognition Test (59th %ile). Copy of the Rey Osterreith figure was well organized and accurate Solution of block design problems from the WAIS-III was superior; there was no evidence of broken configuration or failure to appreciate gestalt.

6. Sensorimotor Examination: Motor dexterity was intact on the Grooved Pegboard Procedure.

7. Affective/Personality: There was no evidence of depression a self-report inventory (BDI-II=4). Her MMPI-2 profile was not valid due to an extremely elevated K (defensiveness) scale; hence, the clinical subscales could not be interpreted.

SUMMARY AND RECOMMENDATIONS: Dr. Webster was referred for neuropsychological evaluation in order to obtain a second opinion regarding her cognitive status relevant to her competence to practice medicine. Previous reports have indicated evidence of attention and memory problems that were attributed to MS. She disputes the diagnosis of MS but reports indicate that laboratory testing has been positive.

Current test findings indicate that she is of superior intellectual abilities. She performs in the superior range on tests of vocabulary, fund of verbal knowledge, arithmetic, attention span, and nonverbal problem-solving. Performance on tasks of frontal executive abilities was intact. In contrast with the above, speed of processing and memory for information that exceeded attention span limitations fell in the average to low average range. While these scores do not represent impairments per se, they should be seen as *relative* deficits given her superior IQ. In comparison to previous neuropsychological reports, it is noteworthy that her scores on tests of reaction time ranged from low average (19th %ile) to high average (81st %ile) during the current evaluation. It

may be that her improved performance on these tests was due to the fact that she was less anxious within the context of the current testing environment. Otherwise, her scores were roughly equivalent to those obtained during previous evaluations.

Dr. Webster's relative deficits on measures of processing speed and supraspan learning are consistent with a broad array of neurological, psychiatric, and developmental problems. While MS in the differential, there is nothing definitive in the neuropsychological data that supports this diagnosis. In fact, there is evidence that she was prone to disorganization and unusual behaviors extending back to childhood years. It may be that her current neuropsychological profile is based on developmental factors rather than more recent neurological demise.

The pragmatic implications of current test findings are as follows. Dr. Webster's conceptual reasoning abilities are wholly intact. She is able to think in a flexible manner and is able to engage in nonverbal deductive thinking without a problem. Her fund of knowledge for many types of information is superior. Basic perceptual abilities are intact. Despite her considerable strengths and superior intelligence, her problems in the areas of memory and processing speed may intrude upon work performance, particularly in situations requiring a rapid response to complex types of information. There are two solutions to this problem. Her work responsibilities may be reorganized and reduced so that she may complete her assignments effectively. The other solution is for her to identify work that is engaging for her intellectually and emotionally but that is not time-dependent.

Findings will be discussed with Dr. Webster and will be sent to Dr. Poser for his review, as per her request.

Please contact me if there are questions regarding this evaluation.

Margaret O'Connor, Ph.D.
Director of Neuropsychology

cc:Dr. Charles Poser, Dept. of Neurology, BIDMC
Terry Martin Esq., FAX 210-697-6386
Terry Martin Esq., 9901 IH 10-West, Suite 430, San Antonio, Texas, 78230
BNU File
MOC File

STANTON LAW OFFICE
HISTORIC LIBRARY PLAZA
SUITE 1012
1823 HARNEY STREET
OMAHA, NEBRASKA 68102

(402) 345-0848
FAX (402) 444-1701

ADMITTED IN IOWA AND NEBRASKA

JAMES L STANTON
ATTORNEY AT LAW

August 31, 2000
**HAND DELIVER**

Colonel Robert Rectenwald, Commander
U.S.A.F. Ehrling Bergquist Hospital
Offutt AFB, NE 68113

Re: Status of Monitoring and Re-evaluation of Credentials:
Major Wilma P. Webster, 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

Dear Colonel Rectenwald:

Major Wilma P. Webster, of your command, has engaged me to assist her in reviewing the manner in which her medical credentials have been limited and in restoration of her credentials.

The recommendations of the Clinical Privileges Hearing held in February 1999 at Howard AFB were:

(1) She should not practice in an ER setting (this is primarily due to our concern that she does not adequately handle task-saturated events);
(2) Family Practice/Primary Care/Aerospace Medicine privileges should be allowed;
(3) In any or all of those settings, she should be monitored with a 100% chart review for no less than three months; and,
(4) at the conclusion of that three month period, her privileges should be reevaluated. (See Atch 1).

Her commander, Colonel Terrence Jay O'Neil, approved these recommendations and informed Major Webster by letter of 24 March 1999, that he was directing that: "(1) your Emergency Medicine privileges be rescinded; (2) your Family Practice/Primary Care/Aerospace Medicine privileges be continued in Category "2" with 100% chart review and full supervision for a period of six months. Furthermore, at the end of that period of observation and review, your privileging status will be re-evaluated." (See Atch 2).

As you may know, Major Webster appealed this action but was notified by AFMOA/SGOC by letter of 19 January 2000 that "The AF Medical Practice Review Board reviewed your appeal along with the case file and found that the action taken by Howard AFB was appropriate." (See Atch 3).

The purpose of this letter is not to rehash the conclusions of the Clinical Privileges Board or Colonel O'Neil's action but rather to request you to inform me, what, if any, action your command took to implement the

153

ATCH 21

actions which Colonel O'Neil directed in his letter, (Atch 2), and what is the status of any training and monitoring of Major Webster in a "Family Practice/Primary Care/Aerospace Medicine" setting leading to a re-evaluation of her privileging status as directed by Colonel O'Neil.

As you know, a PEB is presently scheduled for Major Webster during the week of 11 September 2000. If the PEB determines that she should be medically retired, then it appears that she could be separated from active duty before her privileging status is re-evaluated. If she does not have an opportunity to have her privileges restored before she leaves active duty, it will be extremely difficult for her to accomplish restoration of any or all of her privileges as a civilian physician. Therefore, I am requesting that:

1. You advise me immediately what action has been taken to train and monitor Major Webster in a clinical practice at E.B. Hospital.

2. You advise me immediately of any re-evaluation of her privileging status which has been taken or is pending.

3. If any of this action has not been taken, then please take action to postpone her pending PEB until the training and re-evaluation has been accomplished.

I would appreciate your response at the earliest possible time.

Very truly yours,

James L Stanton

Encls:
1. Recommendations of Clinical Hearing Board;
2. Ltr, Col O'Neil, dated 24 March 1999;
3. Ltr, AFMOA/SGOC, dated 19 Jan 2000.

Cy to: Major Wilma P. Webster