**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS 55TH WING (ACC)
OFFUTT AIR FORCE BASE, NEBRASKA

13 September 2000

**VIA REGULAR MAIL**

Mr. James L. Stanton, Esq.
Stanton Law Office
1823 Harney Street, Suite 1012
Omaha, Nebraska 68102

Colonel Robert Rectenwald
55th Medical Group Commander
2501 Capehart Road
Offutt AFB, NE 68113-2160

Dear Mr. Stanton:

I am writing this letter in response to your letter of 31 August 2000 regarding Major Wilma Webster's status of training. While I realize that you are acting in your capacity as Major Webster's attorney in requesting information concerning Major Webster's training status, I must point out that there is no provision for Major Webster to be represented by counsel in her interactions with me or anyone else in her chain of command or supervision. For this reason, I am going to defer responding to your requests at this time.

It is obvious, of course, that I have not taken action to postpone her pending PEB as you have requested. Depending on the results the of the PEB, Major Webster's supervisors and I will then determine what the next course of action should be.

As an aside, I would like to point out that Major Webster has never requested credentialing of any type at Ehrling Bergquist. In fact, although she was provided with a newcomers credentialing package upon her arrival at Offutt in August 1999, she has never submitted anything for the 55th Medical Group Credentials committee to consider, with the exception of an Emergency Department credential request she submitted in preparation for a two-week evaluation of her ED skills in the Keesler AFB ED.

Sincerely,

ROBERT RECTENWALD II, Colonel, USAF, MC
Commander

155
AUH 22

**3.30. Credentials Function Procedures:**

3.30.1. The medical staff, through the credentials function, reviews provider requests for privileges and medical staff appointment, provider credentials, and performance data and recommends privileges and staff appointment to the MFC.

3.30.2. Credentials function members in the same discipline as the provider being evaluated should be present when the function acts on the credentials of such providers. This policy is not mandatory for actions on temporary or supervised privileges.

3.30.3. The function must not take action on a provider when less than a majority of the credentials function members eligible to vote are present.

3.30.4. When the function is considering awarding clinical privileges to a non-physician provider, the MFC will temporarily appoint at least one member from the same discipline to the function, if one is locally available.

3.30.5. When the committee is evaluating a member of the credentials function, the chairperson must excuse them from that portion of the meeting. Note his or her absence in the minutes of the meeting.

**3.31. Procedures and Requirements for Specific Types of Privileges:**

**3.31.1. Supervised Privileges:** Supervised privileges are granted to providers who do not meet the requirements for independent practice because they lack the necessary licensure, or certification. They may also be granted on the recommendation of the credentials function to newly accessed providers who do not have an adequate period of supervised clinical practice in their background. The procedures for awarding supervised privileges are the same as for regular privileges except that a clinical supervisor must be named at the time privileges are awarded and a supervision plan and schedule for periodic report on the provider's progress is outlined. The degree of supervision required is determined by the clinical supervisor and must be appropriate to the background, experience, and demonstrated skill of the supervised provider. Degrees of supervision are described in the glossary. All privileges awarded must be marked with a "2" indicating all are performed under supervision. Supervised privileges may be granted for up to 2 years or longer if necessary.

**3.31.2. Temporary Privileges.** Temporary privileges are awarded on an emergency basis to meet a pressing need in patient care when time constraints will not allow full credentials review. They are time limited to 5 days. Credentials requirements for temporary privileges are abbreviated to meet the urgent need for privileging. A copy of the provider's license must be obtained and verified. The credentials function then calls the facility where the provider has regular privileges and verifies with the chief of the medical staff, department chairperson, or other appropriate authority that the individual is a competent, fully qualified medical staff member in good standing, and that the proposed privileges are within the individual's current scope of practice and privileges. This is documented in the credentials file. The credentials function chairperson then recommends temporary privileges to the MFC who grants them. If the MFC is not available, the function chairperson may grant the privileges.

**3.31.3. Regular Privileges:** Regular privileges are granted to providers only after full verification and review of credentials. Regular privileges allow the provider to independently provide medical care within defined limits. They are based upon the individual's education, professional license, professional certifications, experience, competence, ability, health, and judgment. The MFC reviews the recommendation of the credentials function, and approves, denies, or modifies regular privileges. The MFC then notifies the provider of the decision, in writing, and the provider acknowledges receipt in



156
ATCH 23

privileging action may be based upon the results, then the peer doing the review must be a provider with the same background and experience as the provider under review.

**Privileges**—Permission to provide medical and other patient care services in the granting institution, within defined limits, based on the individual's education, professional license, certifications, experience, competence, ability, health, and judgment. Privileges define the limits of patient care services the provider may render. Privileges may be granted with or without an accompanying medical staff appointment.

**Privileging**—The process whereby the MFC or the MAJCOM/SG, upon recommendations from the MTF credentials function, grants to individual DoD health care providers the privileges and responsibilities for providing specified medical, dental, or nursing care with the MTF. Clinical privileges define the scope and limits of practice for individual practitioners.

**Professional medical staff**—Same as medical staff.

**Provider Activity File (PAF)**—A QA file containing provider-specific performance and productivity data. Is an extension of the PCF and contains active QA documents protected from disclosure by 10 U.S.C. 1102.

**Provider Credentials File (PCF)**—Contains all information regarding an individual privileged provider as outlined in paragraphs 3.17. through 3.17.6. and attachment 4, and all information related to adverse privileging actions. It is maintained in a secure manner. It is protected from disclosure by 10 U.S.C. 1102.

**QA Review of Malpractice Case**—A process whereby a standard of care determination is made in a medical malpractice case, and administrative, patient care, and other information is extracted from the case review for use in quality improvement activities within the MTF.

**Regular Privileges**—Privileges which grant the holder permission to independently provide medical and other patient care services in the MTF within defined limits. They are based on the individual's education, professional license, experience, competence, ability, health, and judgment. Regular privileges must be renewed at least every 24 months.

**Revocation of Privileges**—An adverse privileging action which permanently removes all of a practitioner's clinical privileges. A revocation may only be imposed by a privileging authority after the opportunity for a hearing has been afforded the practitioner.

**Significantly Involved Health Care Worker**—A health care worker who has a significant involvement in a medical malpractice case. This may be a physician, ancillary healthcare professional, or nonprofessional medical technician or other health care worker. He or she may also be either military or civilian.

**Standard of Care**—Term referring to the accepted or correct actions of a provider, taken in order to arrive at a diagnosis, or implement treatment for a given disease, disorder, or patient problem, adjusted for the patient's presentation and other conditioning factors.

**Substandard Medical Practice or Care**—Medical care rendered to a patient which fails to meet the standard of care.

**Summary Action**—Speedy, unceremonious action.

**Supervision**—The process of reviewing, observing, and accepting responsibility for the health care



157
ATCH 24

services provided by health care providers. Levels of supervision are defined as:

a. Indirect. The supervisor performs retrospective record review of selected records. Criteria used for review relate to quality of care, quality of documentation, and the member not exceeding the authorized scope of care.

b. Direct. The supervisor is involved in the decision-making process. This may be further subdivided as follows:

   1. Verbal. The supervisor is contacted by phone or informal consultation before implementing or changing a regimen of care. The supervisor conducts face-to-face or telephone consultations and evaluations with the provider over patient care issues on a regular, reoccurring basis.

   2. Physically Present. The supervisor is physically present through all or a portion of care.

**Supervised Privileges**—Privileges granted to providers who have not obtained the necessary license or certification to practice independently or to newly accessed providers who do not have an adequate period of supervised clinical practice in their background. Supervised privileges require a supervisor be named at the time they are granted and may require monitoring as well as elements of indirect and direct supervision, depending on the ability of the supervised provider. A basic plan of supervision is outlined at the time privileges are granted which includes periodic reports to the credentials function. Supervised privileges may be granted for up to 2 years or longer if necessary.

**Suspension**—An adverse action which temporarily removes or restricts all or a portion of a privileged practitioner's clinical privileges pending investigation, reevaluation, rehabilitation, retraining, or more permanent action. A suspension should not exceed 6 months. Suspensions are not normally reportable to the NPDB.

**Temporary Medical Staff Appointment**—Appointment category for providers exercising temporary privileges on an emergency basis. These individuals generally do not have medical staff oversight responsibilities. Temporary appointments are granted in situations where time constraints will now allow a full credentials review. Use of temporary appointments should be relatively rare and then only to fulfill pressing patient care needs. Temporary medical staff appointment is required when providers practicing under temporary privileges will be admitting patients. Granting of temporary privileges should be relatively rare and then only to fulfill pressing patient care needs. Temporary privileges may be granted with or without a temporary appointment to the medical staff.

**Temporary privileges**—Privileges for independent practice which are granted on temporary basis (not to exceed 5 days) to providers who are brought in to meet an emergent patient care need. Temporary privileges are granted when time constraints will not allow a full credentials review. All temporary privileges must be time limited.

**Unprofessional Conduct**—Conduct which is beyond, or outside of, professional requirements for rendering patient care and which negatively effects, or has the potential for negatively effecting, the professional relationship or contract with the patient.

**Verification**—Confirmation of the authenticity of credentials documents through contact, either written or telephonic, with the issuing agency (the primary source). Verification must be documented.



158

# Policy on Medical Licensure

(Effective February 2002)

Throughout the certification process, applicants and candidates must hold a current and active license to practice medicine in at least one jurisdiction in the United States, its territories, or Canada, and in each jurisdiction in which they practice. All licenses held by the applicant must be valid, unrestricted, and unqualified.

For current year Emergency Medicine residency graduates who apply to the Board the year they graduate from residency and who submit an application and register to take the written certification examination that same year, the Board will require that they hold at least one license that is current, valid, unrestricted, and unqualified in the United States of America, its territories, or Canada. All licenses held by the applicant must be valid, unrestricted, and unqualified.

Evidence of licensure to practice medicine, displaying the expiration date(s), must be submitted with the application form.

A license to practice medicine is not "current, valid, unrestricted and unqualified" if, in any manner to any extent whatsoever, one or more of the following applies. The license is

1. revoked or suspended;
2. under probation;
3. conditioned, e.g., if the physician is required to practice under supervision or with modification, or to obtain continuing education;
4. limited, e.g., to specific practice settings;
5. institutional, temporary, or educational;
6. inactive as a result of an action taken by or a request made by a medical licensing board;
7. surrendered or not renewed in order to terminate or settle disciplinary proceedings.

If any license currently held by the candidate is restricted or qualified in any way, the applicant must provide full details of the restriction or qualification. The Board may, in its sole discretion, determine whether to investigate any questions relating to the applicant's licensure status. The Board reserves the right to approve or deny the application after review.

/sgk
February 3, 2002
f:\org_info\policies\candidate apps & reg\4.2-195 licensure.doc



159
ATCH 25

24 WG/FMFPM
BLDG 706
APO AA 34001

1 March 1998

6609 PVP048634

MAJ WILMA P WEBSTER
PSC 0001 BOX 03178
APO AA 34001

# PERSONAL STATEMENT OF MILITARY COMPENSATION

This statement is intended to outline the total value of your military pay, allowances and benefits. By making your compensation more "visible," this statement could be useful when applying for credit or loans (including home loans) from businesses or lending institutions. Another possible use of this summary is to help determine whether specific civilian employment offers would let you maintain the same standard of living you had while serving in the military. Start with the Total Direct Compensation on page 1, add the Federal Tax advantage from page 2, and then add any additional expense a civilian employer would expect you to pay for health and life insurance, retirement contributions, etc. This will tell you approximately what level of civilian salary you must earn in order to maintain a similar standard of living as that provided by your military take home pay. Each section of this statement contains an explanation. However, if you have any questions, please contact your local financial services office(FSO).

| SUMMARY: | | |
|---|---|---|
| | A. Basic Military Compensation as of February 1998 | $ 51,998.40 |
| | B. Special Pay and Bonuses | $ 53,199.92 |
| | C. Expense allowances | $ 9,918.60 |
| | TOTAL DIRECT COMPENSATION | $ 115,116.92 |
| | Added value of indirect compensation | $ 6,810.20 |
| | Added considerations/programs (Your estimate) | $ |
| | TOTAL COMPENSATION | $ |

The following information provides more details on the value of your personal compensation. Adding the indirect compensation and additional considerations to your direct compensation should provide a clearer picture of your total military compensation package.

## DIRECT COMPENSATION AS OF FEBRUARY 1998 (NOTE 1)

A. BASIC COMPENSATION. Describes the basic elements of compensation paid to all military members. It includes Basic Pay, the value of living quarters or Basic Allowance for Housing (BAH), and the value of meals furnished or Basic Allowance for Subsistence (BAS). Your basic compensation is:

| | Monthly | Annual |
|---|---|---|
| Basic Pay | $ 3,483.30 | $ 41,799.60 |
| BAH or housing valued at BAH rate..(See Note 2 on page 2) | $ 694.20 | $ 8,330.40 |
| BAS or meals valued at BAS rate..(See Note 2 page 2) | $ 155.70 | $ 1,868.40 |
| TOTAL BASIC COMPENSATION | $ 4,333.20 | $ 51,998.40 |

B. SPECIAL PAY AND BONUSES. Is in addition to Basic Compensation for people in certain skills and assignments. Your bonuses, special and incentive pays are:

| | Monthly | Annual |
|---|---|---|
| Special and Incentive Pays | $ 1,266.66 | $ 15,199.92 |
| Bonuses | $ | $ 38,000.00 |
| TOTAL SPECIAL PAY AND BONUSES | $ 1,266.66 | $ 53,199.92 |

C. EXPENSE ALLOWANCE. You may receive allowances to help compensate you for extra expenses you incur based on the location of your duty assignment. These include the overseas housing allowance (OHA), cost of living allowance (COLA) only payable in certain areas, family separation allowance (FSA), and clothing replacement allowance (CRA) (Note 1). Your total expense allowances are:

16

| | Monthly | Annual |
|---|---|---|
| TOTAL EXPENSE ALLOWANCES | $ 826.55 | $ 9,918.60 |

Exh 26

## INDIRECT COMPENSATION

Your direct compensation is supplemented by other programs. These have a cash value to you in terms of spendable income. They are an important part of your compensation and should be considered in adding up your real pay value.

A. MEDICAL CARE. As a active duty member, the Air Force provides you with comprehensive medical care. Family members may use military medical facilities or seek civilian medical care under the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS). Annual costs for CHAMPUS when used by family members is $150 deductible per person or $300 per family (E-4 and below: $50 per person or $100 per family); 20% cost share for outpatient care (CHAMPUS allowable) and $10.20 a day (or $25, whichever is greater) for inpatient care. The cost of a private plan for an individual that would provide similar comprehensive medical coverage is conservatively estimated at $237.00 x 12 months = $2,844.00 (yearly premium). The cost for family coverage is estimated at $494.00 x 12 months = $5,928.00 (yearly premium). Since both plans (CHAMPUS and civilian) often require a cost share and deductible, these are not taken into consideration. However, if the family member gets care in the military medical facility, there is no deductible or cost share other than the routine nominal subsistence charge. The new DOD-wide TRICARE health benefit has beenimplemented in certain regions across the U.S. If you live in one of the nine regions where TRICARE has already been implemented or will be implemented in 1997, your family will be able to select from the expanded TRICARE health benefits package. Although the military medical facility will continue to provide space-available care, as always, your family may (1) enroll in an HMO-like option (TRICARE Prime) with an assigned military or civilian primary care provider: (2) elect to continue with the standard CHAMPUS benefit,(with its associated cost-sharing)(TRICARE Standard): or (3) continue using the standard CHAMPUS-like benefit as in option 2, but elect to use one of the PRIME network providers and pay lower cost-shares (TRICARE Extra). Please consult the health benefits advisor at the nearest military medical facility for additional information on TRICARE implementation. The personal costs experienced by you or your family will vary depending on the TRICARE option you select.

Monthly Rate $ 237.00 Annual Rate $ 2,844.00

B. DEATH AND SURVIVOR PROGRAMS. If you die on active duty, your survivors are eligible for life insurance and other payments. You may buy life insurance in $10,000 increments up to $200,000 at a very low cost. Also, your dependents would receive a death gratuity payment of $6,000 and monthly Dependency and Indemnity Compensation (DIC) payments (non-taxable) of $850. An additional $215 will be paid for each dependent child. DIC is adjusted annually for inflation. Also see Survivor Benefit Plan on page 3 of this statement. You are currently paying premiums for $ 200,000 in life insurance coverage.

C. FEDERAL TAX ADVANTAGE. This represents the amount of additional Federal tax you would have to pay if your housing (BAH), and meals (BAS) were taxed. Your tax advantage is based on

SINGLE 0 DEPN(S) Monthly Rate $ 330.51 Annual Rate $ 3,966.20

INDIRECT COMPENSATION (A + C).................... Monthly Rate $ 567.51 Annual Rate $ 6,810.20

Note 1: Pay items on your February 1998 LES, marital status and dependents taken from your personnel records. Annual rates for OHA, COLA, and enlisted BAS are for 365 days, not 12 times the February rate.

Note 2: If BAH or BAS was not in effect in February 1998, we assumed you received quarters or meals worth about as much as BAH or BAS. If you received partial BAH, we assumed that the partial BAH and value of quarters together roughly equal full BAH.

## RETIREMENT SYSTEM

One of the most attractive incentives of a military career is the retirement system which provides a monthly retirement income and security for those who serve a minimum of twenty years (Note: Retired pay stops upon the death of the retiree (See Survivor Benefit Plan)). Currently there are three retirement plans in effect--Final Basic Pay, High-3, and Military Retirement Reform Act (MRRA). Below is a description of each. Additional information on the military retirement system is available on the Internet at http://www.afpc.af.mil.dppry/.

| Plan | Eligible (Note 1) | Pay Formula (Note 2) | Cost-of-Living Adjustment (COLA) |
|---|---|---|---|
| Final Basic Pay | Entered service prior to Sept 8, 1980 | 2.5% times the years of service times basic pay | Full inflation protection: COLA based on Consumer Price Index (CPI) |
| High-3 | Entered service between Sept 8, 1980 and July 31, 1986 | 2.5% times the years of service times the average of the highest three years of basic pay | Full inflation protection; COLA based on Consumer Price Index (CPI) |
| MRRA | Entered service after July 31, 1986 | 2.5% times the years of service minus one percentage point for each year less than 30 years times the average of the highest 3 years of basic pay. At age 62, retired pay is increased to 2.5% times years of service times the avg. of the highest 3 years of basic pay | Partial inflation protection: COLA based on Consumer Price Index (CPI) minus 1 percent. At age 62, retired pay is adjusted to reflect full COLA since retirement. Partial COLA continues after age 62 |

Note 1: Date "entered service" means the date the person is enlisted; inducted, or appointed. This includes cadets at the Service Academies, students enrolled in a reserve component as part of the Services' senior ROTC programs or ROTC financial assistance programs, students in the Uniformed Services University of the Health Sciences, participants in the Armed Forces Health Professions Scholarship program, officer candidates attending Officer Training School, and persons in the Delayed Entry Program.

Note 2: The maximum multiplier is 75 percent times basic pay. Additional information on the dates used to determine your retired pay is available

161

Circle appropriate Copy Designator: COPY 1 - HQ AFPC/DPSRIT; COPY 2 - UNIT PERSONNEL REC GROUP (UPRG); COPY 3 - MEMBER

# OFFICER/AIRMAN ACTIVE DUTY SERVICE COMMITMENT (ADSC) COUNSELING STATEMENT

*(See reverse for instructions)*

## PRIVACY ACT STATEMENT

*AUTHORITY: 10 U.S.C. 8013 and Executive Order 9397, Secretary of the Air Force: powers and duties: delegation by.*
*PRINCIPAL PURPOSE: Documents ADSC counseling. To make you aware of the ADSCs you will or have incurred as a result of training or education.*
*ROUTINE USE: None.*
*DISCLOSURE IS VOLUNTARY: Failure to provide the SSN would make it difficult to identify you and your records when the ADSC Counseling Statement is processed and filed. Do not complete this form for officers of the medical services receiving DoD-sponsored basic education (AFI 36-2107, table 1.3), and health related education and training (AFI 36-2107, table 1.10). (See SECTION III OF INSTRUCTION ON REVERSE).*

## I. ACTIVE DUTY SERVICE COMMITMENT(S)

According to AFI 36-2107:

A. Table 1.11, Rule 4, you ☐ will incur ☒ incurred an ADSC of 30 Sep 2000 for Incentive Spec Pay, ADSCD-RSN-FOR Code 47

B. Table 1.11, Rule 7, you ☐ will incur ☒ incurred an ADSC of 30 Sep 2000 for Morb Pay, ADSCD-RSN-FOR Code 48

YOU MUST COMPLETE SECTION II OF THIS FORM NO LATER THAN 7 CALENDAR DAYS FROM RECEIPT OF ASSIGNMENT, TRAINING OR EDUCATION NOTIFICATION. IF YOU ARE UNWILLING TO SIGN SECTION II, THE CHIEF, MPF WILL SIGN SECTION II AND INCLUDE A STATEMENT EXPLAINING WHY SECTION II WAS NOT COMPLETED.

## II. ACKNOWLEDGMENT AND AGREEMENT *(Officer/Airman receiving ADSC counseling completes this section)*

☐ I certify I have been counseled on the ADSC(s) described in Section I and was given the opportunity to review and read AFI 36-2107. I hereby acknowledge and agree to the following:

a. (OFFICER/AIRMAN) To accept and serve the ADSC(s) stated in Section I.
b. (AIRMAN ONLY) I understand the ADSC(s) will extend beyond my retirement eligibility date and I will be required to serve this commitment prior to retirement.
c. (OFFICER ONLY) To accept and serve the ADSC(s) associated with withdrawal or elimination from education or training described in Section I (AFI 36-2107, Table 1.8).
d. (OFFICER/AIRMAN) I have not received any ADSC information other than contained herein. No promises have been made to me, implied or otherwise, concerning the possibility or probability of retirement or separation prior to serving my ADSC.
e. (OFFICER/AIRMAN) Once I have signed this statement, I cannot apply for retirement or separation except as authorized in AFIs 36-3202, 3207 or 3208 until the ADSC(s) associated with the event(s) described here have been entered into my official personnel records.
f. (OFFICER/AIRMAN) That only the Secretary of the Air Force or his designee may excuse me from my obligation to serve on active duty for the period specified in this agreement.
g. (OFFICER ONLY) As a condition of receiving advanced education as defined in Title 10, U.S.C. Section 2005;
(1) That if I fail to complete the specified educational requirements, I will serve on active duty for the specified period.
(2) That if I am voluntarily retired or separated, or if I am involuntarily separated because of misconduct, prior to completing the ADSC, I understand and agree that the Secretary of the Air Force or his designated representative may direct reimbursement. The amount to be reimbursed will be a percentage of the cost of the education. The percentage will equal the period not served to the ADSC in Section I.
(3) I understand that discharge in bankruptcy under Title 11, U.S.C., if less than five years after the last day of the specified period of active duty, will not release me from my obligation to reimburse the United States as provided in this agreement.

☐ DECLINATION STATEMENT: I desire to decline the ADSC in Section I. (OFFICERS) I understand I must submit an application for retirement or separation within 7 calendar days following receipt of this notification. I understand that if I am ineligible to apply for retirement or separation or if I fail to apply for retirement or separation within 7 calendar days, I will incur the ADSC associated with the event. (AIRMAN) I understand I may submit an application for retirement or separation within 7 calendar days following receipt of this notification, or if I have insufficient obligated service for the ADSC I may decline to obtain retainability. I understand that if I am ineligible to apply for retirement or separation and possess the obligated service for the ADSC, I will incur the ADSC associated with the event.

| TYPED OR PRINTED NAME OF MEMBER *(Last, First, Middle Initial)* | SSN | GRADE |
|---|---|---|
| WEBSTER, WILMA P. | 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 | MAJOR |
| DATE: 30 Dec 96 | SIGNATURE: Wilma P. Webster | |

## III. I HAVE ENSURED THAT THE ABOVE NAMED OFFICER/AIRMAN HAS BEEN COUNSELED AS INDICATED

| TYPED OR PRINTED NAME OF OFFICIAL WHO CONDUCTED COUNSELING *(Last, First, Middle Initial)* | GRADE |
|---|---|
| ROBERTS, ALLISON J. | MSgt |
| DATE: 30 Dec 96 | SIGNATURE: Allison J. Roberts |

REMARKS

## IV. FOR OFFICIAL USE ONLY *(To be completed by official who conducted ADSC counseling)*

| A. PROJECTED ADSCD | B. ACTUAL ADSCD *(Verified from the ADSCD RIP)* |
|---|---|
| | |

162

AF FORM 63, FEB 96 (EF-V1) (PERFORM PRO) REPLACES AF FORM 63, APR 89 AND AF FORM 161, APR 91, WHICH ARE OBSOLETE.

ATCH 27

DEPARTMENT OF THE AIR FORCE
55 WG/FMFP
106 PEACEKEEPER DR STE 2N3
OFFUTT AFB NE 68113-3299
---------------------
0 9 0005157 LES

55 MED OPERATE MDOS ADSN 4020
WILMA P WEBSTER
1703 SCARBOROUGH DR
BELLEVUE NE 68123-3482

## DEFENSE FINANCE AND ACCOUNTING SERVICE MILITARY LEAVE AND EARNINGS STATEMENT

| ID | NAME (LAST, FIRST, MI) | SOC. SEC. NO. | GRADE | PAY DATE | YRS SVC | ETS | BRANCH | ADSN/DSSN | PERIOD COVERED |
|---|---|---|---|---|---|---|---|---|---|
| | WEBSTER WILMA P | 572543446 | 04 | 890710 | 11 | 010731 | AF | 4020 | 1-31 JUL 00 |

| | ENTITLEMENTS TYPE | AMOUNT | DEDUCTIONS TYPE | AMOUNT | ALLOTMENTS TYPE | AMOUNT |
|---|---|---|---|---|---|---|
| A | BASE PAY | 4252.50 | FEDERAL TAXES | 1135.88 | | |
| B | BAS | 158.83 | FICA-SOC SECURITY | 263.66 | | |
| C | BAH | 752.00 | FICA-MEDICARE | 61.66 | | |
| D | BRD CRT PHYS/DENT | 291.66 | SGLI FOR 200,000 | 16.00 | | |
| E | VSP PHYS | 916.66 | MID-MONTH-PAY | 2516.23 | | |
| F | ADVANCE DEBT | 150.00 | | | | |
| G | | | | | | |
| H | | | | | | |
| I | | | | | | |
| J | | | | | | |
| K | | | | | | |
| L | | | | | | |
| M | | | | | | |
| N | | | | | | |
| O | | | | | | |
| TOTAL | | 6521.65 | | 3993.43 | | |

| SUMMARY | |
|---|---|
| +AMT FWD | .00 |
| +TOT ENT | 6,521.65 |
| -TOT DED | 3,993.43 |
| -TOT ALMT | .00 |
| =NET AMT | 2,528.22 |
| -CR FWD | .00 |
| =EOM PAY | 2,528.22 |

| LEAVE | BF BAL | ERND | USED | CR BAL | ETS BAL | LV LOST | LV PAID | USE/LOSE |
|---|---|---|---|---|---|---|---|---|
| | 12.5 | 25.0 | 18 | 19.5 | 49.5 | .0 | .0 | .0 |

| FED TAXES | WAGE PERIOD | WAGE YTD | M/S | EX | ADD'L TAX | TAX YTD |
|---|---|---|---|---|---|---|
| | 5460.82 | 37853.14 | S | 01 | .00 | 7835.66 |

| FICA TAXES | WAGE PERIOD | SOC WAGE YTD | SOC TAX YTD | MED WAGE YTD | MED TAX YTD |
|---|---|---|---|---|---|
| | 4252.50 | 28494.90 | 1766.66 | 28494.90 | 413.20 |

| STATE TAXES | ST | WAGE PERIOD | WAGE YTD | M/S | EX | TAX YTD |
|---|---|---|---|---|---|---|
| | NE | 5460.82 | 37853.14 | N | 01 | .00 |

| PAY DATA | BAQ TYPE | BAQ DEPN | VHA ZIP | RENT AMT | SHARE | STAT | JFTR | DEPNS | 2D JFTR | BAS TYPE | CHARITY YTD | TPC | PACIDN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SINGLE | | 68113 | .00 | 1 | R | | 0 | | | .00 | | |

REMARKS: YTD ENTITLE 44378.95 YTD DEDUCT 10127.52

-FOR GENERAL INFORMATION ABOUT PAY AND ALLOWANCES VISIT THE DFAS WEBSITE, "WWW.DFAS.MIL".
-MISSED TAX DAY? THE IRS IS AVAILABLE TO ASSIST IF YOU NEED TO FILE A LATE RETURN. THEIR TOLL-FREE NUMBER IS 1-800-829-1040, OR VISIT THEIR WEBSITE AT "WWW.IRS.GOV".
-THE RECRUITING SERVICE IS LOOKING FOR VOLUNTEERS. VISIT "WWW.RS.AF.MIL/RTR.HTM" FOR DETAILED INFORMATION ON RECRUITING DUTY AND ELIGIBILITY CRITERIA FOR SRA THRU MSGT.

TOTAL INDEBTEDNESS $150.00(203)
INDEBTEDNESS DUE US $150.00(193)
RATE CHG BASIC PAY 000701(183)
BAH BASED ON W/O DEP, ZIP 68113
BANK PENNSYLVANIA STATE EMPLOYEE
ACCT # 0572543446

163

AR 28

## Sec. 302. - Special pay: medical officers of the armed forces

**(a)** Variable, Additional, and Board Certification Special Pay. -

**(1)**

An officer who is an officer of the Medical Corps of the Army or the Navy or an officer of the Air Force designated as a medical officer and who is on active duty under a call or order to active duty for a period of not less than one year is entitled to special pay in accordance with this subsection.

**(2)**

An officer described in paragraph (1) who is serving in a pay grade below pay grade O-7 is entitled to variable special pay at the following rates:

**(A)**

$1,200 per year, if the officer is undergoing medical internship training.

**(B)**

$5,000 per year, if the officer has less than six years of creditable service and is not undergoing medical internship training.

**(C)**

$12,000 per year, if the officer has at least six but less than eight years of creditable service.

**(D)**

$11,500 per year, if the officer has at least eight but less than ten years of creditable service.

165

(E)

$11,000 per year, if the officer has at least ten but less than twelve years of creditable service.

(F)

$10,000 per year, if the officer has at least twelve but less than fourteen years of creditable service.

(G)

$9,000 per year, if the officer has at least fourteen but less than eighteen years of creditable service.

(H)

$8,000 per year, if the officer has at least eighteen but less than twenty-two years of creditable service.

(I)

$7,000 per year, if the officer has twenty-two or more years of creditable service.

(3)

An officer described in paragraph (1) who is serving in a pay grade above pay grade O-6 is entitled to variable special pay at the rate of $7,000 per year.

(4)

Subject to subsection (c), an officer entitled to variable special pay under paragraph (2) or (3) is entitled to additional special pay of $15,000 for any twelve-month period during which the officer is not undergoing medical internship or initial residency training.

(5)

An officer who is entitled to variable special pay under paragraph (2) or (3) and who is board certified is entitled to additional special pay at the following rates:

(A)

$2,500 per year, if the officer has less than ten years of creditable service.

(B)

$3,500 per year, if the officer has at least ten but less than twelve years of creditable service.

166

**(C)**

$4,000 per year, if the officer has at least twelve but less than fourteen years of creditable service.

**(D)**

$5,000 per year, if the officer has at least fourteen but less than eighteen years of creditable service.

**(E)**

$6,000 per year, if the officer has eighteen or more years of creditable service.

**(b)** Incentive Special Pay. -

**(1)**

Subject to subsection (c) and paragraph (2) and under regulations prescribed under section 303a(a) of this title, an officer who is entitled to variable special pay under subsection (a)(2) may be paid incentive special pay for any twelve-month period during which the officer is not undergoing medical internship or initial residency training. No payment to an officer under this subsection may exceed $16,000 for any twelve-month period beginning in fiscal year 1990, $22,000 for any twelve-month period beginning in fiscal year 1991, $29,000 for any twelve-month period beginning in fiscal year 1992, and $36,000 for any twelve-month period beginning after fiscal year 1992.

**(2)**

An officer is not eligible for incentive special pay under paragraph (1) unless the Secretary concerned has determined that such officer is qualified in the medical profession.

**(c)** Active-Duty Agreement. -

**(1)**

An officer may not be paid additional special pay under subsection (a)(4) or incentive special pay under subsection (b) for any twelve-month period unless the officer first executes a written agreement under which the officer agrees to remain on active duty for a period of not less than one year beginning on the date the officer accepts the award of such special pay.

**(2)**

167

Under regulations prescribed by the Secretary of Defense under section 303a(a) of this title, the Secretary of the military department concerned may terminate at any time an officer's entitlement to the special pay authorized by subsection (a)(4) or (b)(1). If such entitlement is terminated, the officer concerned is entitled to be paid such special pay only for the part of the period of active duty that he served, and he may be required to refund any amount in excess of that entitlement.

**(d)** Regulations. -

Regulations prescribed by the Secretary of Defense under section 303a(a) of this title shall include standards for determining -

**(1)**

whether an officer is undergoing medical internship or initial residency training for purposes of subsections (a)(2)(A), (a)(2)(B), (a)(4), and (b)(1); and

**(2)**

whether an officer is board certified for purposes of subsection (a)(5).

**(e)** Frequency of Payments. -

Special pay payable to an officer under paragraphs (2), (3), and (5) of subsection (a) shall be paid monthly. Special pay payable to an officer under subsection (a)(4) or (b)(1) shall be paid annually at the beginning of the twelve-month period for which the officer is entitled to such payment.

**(f)** Refund for Period of Unserved Obligated Service. -

An officer who voluntarily terminates service on active duty before the end of the period for which a payment was made to such officer under subsection (a)(4) or (b)(1) shall refund to the United States an amount which bears the same ratio to the amount paid to such officer as the unserved part of such period bears to the total period for which the payment was made.

**(g)** Determination of Creditable Service. -

For purposes of this section, creditable service of an officer is computed by adding -

**(1)**

148

all periods which the officer spent in medical internship or residency training during which the officer was not on active duty; and

**(2)**

all periods of active service in the Medical Corps of the Army or Navy, as an officer of the Air Force designated as a medical officer, or as a medical officer of the Public Health Service.

**(h)** Reserve Medical Officers Special Pay. -

**(1)**

A reserve medical officer described in paragraph (2) is entitled to special pay at the rate of $450 a month for each month of active duty, including active duty in the form of annual training, active duty for training, and active duty for special work.

**(2)**

A reserve medical officer referred to in paragraph (1) is a reserve officer who -

**(A)**

is an officer of the Medical Corps of the Army or the Navy or an officer of the Air Force designated as a medical officer; and

**(B)**

is on active duty under a call or order to active duty for a period of less than one year.

**(i)** Effect of Discharge in Bankruptcy. -

A discharge in bankruptcy under title 11 that is entered less than 5 years after the termination of an agreement under this section does not discharge the person signing such agreement from a debt arising under such agreement or under subsection (c)(2) or (f). This paragraph applies to any case commenced under title 11 after September 30, 1985.

Prev | Next

© copyright about us send email

169

# EXHIBIT B
# MILITARY PERSONNEL RECORDS - WITHHELD

WEBSTER WILMA P
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 USAF RET MAJ
0201487 BCMR CASE01

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS UNITED STATES AIR FORCE**
**WASHINGTON DC**

## ADVISORY OPINION <u>RECOMMENDING DENIAL</u>

MEMORANDUM FOR AFBCMR

AUG 16 2002

FROM: AFMOA/SGZC
110 Luke Avenue, Room 405
Bolling AFB, DC 20332-7050

SUBJECT: Application for Correction of Military Records, Wilma Webster 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

REQUESTED ACTION: Applicant requests that the privileging action restricting her Emergency Room and Family practice privileges be voided. Applicant further requests the Air Force Office of the Surgeon General rescind or correct its correspondence to the National Practitioner Data Bank to reverse the adverse privileging information.

BASIS FOR REQUEST: The applicant alleges the following:

(1) Provider rights as outlined in Air Force Instruction 44-119 were violated for failure to produce crucial medical records, which were used by the Credentials Hearing in their decision-making.
(2) There was undue Command influence upon at least one witness.
(3) The medical treatment facility failed to assure impartiality of the Hearing Committee.
(4) One member of the medical treatment facility went outside the Hearing record to investigate a peer review being completed at a different facility for this case.
(5) Major Webster states she did not have a higher patient complaint rate than her peers.
(6) Major Webster alleges she did not have an opportunity to respond to the patient complaints. Medical facility had no documentation of poor patient outcomes.
(7) Other physicians supported her medical care, contrary to the Hearing Committee findings.
(8) Medical facility produced new evidence (Leaving Without Being Seen) statistics for the Hearing without providing this evidence to Major Webster.
(9) Several staff testimonies were supportive of Major Webster's performance.

BACKGROUND: Major Wilma Webster is an Emergency Room physician who was stationed at Howard Air Force Base, Panama. She graduated from Universidad Nacional Autonoma De Mexico in 1979. Major Webster is board certified in Internal Medicine; she has passed the written boards in Emergency Medicine, but has failed the oral boards twice. Major Webster initially practiced emergency medicine at Howard AFB, then was moved to the Family Practice clinic, and finally the Health and Wellness Center. Major Webster was medically discharged from active duty on 1 December 2000 with a 30% disability rating for Multiple Sclerosis associated with cognitive deficits. Major Webster waived her right to appeal the Physical Evaluation Board's decision.

C 171

FACTS: A credentials hearing was conducted 17-18 February 1999 to address all relevant matters, which pertain to Major Webster's clinical proficiency, professional conduct, as well as matters affecting her mental and physical well being. The hearing addressed five areas of concern, 1) patient complaints, 2) mental/physical limitations mounting to an unacceptable impairment, 3) forgetfulness/disorganization in the clinical setting, 4) inappropriate actions, and 5) allegations of substandard care in the emergency room setting.

The hearing reviewed all the evidence and testimony. Major Webster was represented by legal counsel and presented her own evidence and witnesses. The hearing committee unanimously made the following conclusions: 1) Major Webster should not practice in an emergency room setting due to the concern that she does not adequately manage task-saturated events, 2) family practice/primary care/ aerospace medicine privileges should be allowed, 3) in any or all of these settings, she should be monitored with 100% chart review for no less than three months, and 4) at the conclusion of the three-month supervision, her privileges should be reevaluated.

Major Webster appealed this decision to the Air Force Office of the Surgeon General. The basis of her appeal included: 1) the government failed to produce crucial medical records concerning an incident which substandard care was alleged, 2) the government introduced records not provided to Major Webster prior to the hearing, 3) exerted Command influence upon at least one of the witnesses; 4) failed to assure the impartiality of the Hearing Committee, and 5) went outside the hearing record to investigate an incident without advising Major Webster of the same.

The Office of the Surgeon General completed a review of the adverse action including Major Webster's appeal. The basis for the adverse privileging action was a medical impairment with cognitive disorder that affects her ability to manage multiple complex tasks. The Air Force Medical Practice Review Board (AFMPRB) concurred that Major Webster demonstrated disorganization, difficulty managing patient care in a high-pace, multi-task environment, and inappropriate behaviors. The AFMPRB determined her medical impairment was an unacceptable risk in the emergency room environment and recommended the Air Force Surgeon General (AF/SG) revoke Major Webster's emergency room privileges and provide 100% supervision for her Family Practice privileges. The AF/SG agreed with AFMPRB and directed this action be reported to the National Practitioner Data Bank and States of known licensure.

Due to the closure of Howard AFB and the downsizing of the staff, Major Webster was reassigned to Offutt AFB. The Air Force offered Major Webster an additional reevaluation of her emergency room practice. Offutt AFB approved temporary supervised emergency room privileges and Major Webster was sent to Keesler AFB medical center for reevaluation. This approval was strictly for the purpose of the reevaluation. During this time six emergency room physicians provided direct evaluation of Major Webster's emergency room practice. Each physician provided a written evaluation of Major Webster's ability to practice emergency room medicine. The following recommendations were made following this reevaluation:

(1) It would not be prudent to leave Major Webster alone and in charge of an Emergency department.
(2) Major Webster is not a competent Emergency physician.
(3) Most (but not all) evaluators believe that Major Webster could perform in a satisfactory manner in a controlled, slower clinic setting. They concluded that Major Webster has good clinical knowledge in most settings, but all agreed that Major Webster couldn't handle the "multi-tasking" needed in the Emergency Medicine specialty.

It is important to note that Major Webster was provided a Credentialing package upon her arrival to Offutt AFB. Major Webster only applied for emergency room clinical privileges. She did not apply for Family Practice clinic privileges. (Obtaining privileges is the responsibility of the physician; they are not awarded unless and until application is made for them.) Because she did not apply for Family Practice privileges, the facility did not have an opportunity to reevaluate Major Webster after a period of supervision in this clinical setting.

DISCUSSION: The following information addresses the applicant's allegations and basis for her BCMR request.

(1) *Provider rights as outlined in Air Force Instruction 44-119 were violated for failure to produce crucial medical records, which were used by the Credentials Hearing in their decision-making.*

Medical documentation specific to an incident involving a code blue situation was missing for a period of time during the adverse privileging action. This documentation was found just prior to the hearing. This allegation is unsubstantiated since the AF/SG did not consider this information as a basis for the action taken upon her privileges.

(2) *There was undue Command influence upon at least one witness.*

One witness, Captain Li stated she felt pressured not to testify for Major Webster. Captain Li did testify on behalf of Major Webster. This did not have any negative impact for Major Webster.

(3) *The medical treatment facility failed to assure impartiality of the Hearing Committee.*

This is unsubstantiated. Major Webster based this allegation on one statement from a Hearing member who stated he had confidence in Major Burkett's performance during the code blue incident. Major Burkett's performance was not in question and this is irrelevant to this case.

(4) *One member of the medical treatment facility went outside the Hearing record to investigate a peer review being completed at a different medical facility.*

One of the committee members telephoned Langely AFB to inquire about the results of a peer review on the code blue incident involving Major Webster. No information was provided to this committee member. Additionally, this incident was not substantiated and therefore, giving her the benefit of the doubt, was not considered as a factor in the final decision by the AF/SG.

(5) *Major Webster alleges she does not have a higher patient complaint rate than her peers.*

This office cannot validate this allegation since patient complaint rates were submitted by the medical treatment facility. The patient complaints submitted on behalf of Major Webster demonstrated labile emotional and behavioral issues.

(6) *Major Webster alleges she did not have opportunity to respond to the patient complaints and the facility has no documentation of poor patient outcomes.*

There is general agreement amongst those physicians that have evaluated Major Webster's practice that she possesses good medical knowledge. Unfortunately her diagnosed cognitive deficits have impacted her ability to manage the fast paced, multi-tasked emergency room environment. Once this problem was recognized the facility took action to prevent any medical mishaps.

(7) *Other physicians supported her medical care, contrary to the Hearing Committee findings.*

Some physicians provided supportive statements. Significantly, however, none of the statements was from her peers, emergency room physicians, and this was the specialty where she was felt to be deficient.

(8) *Medical facility produced new evidence (Leaving Without Being Seen) statistics for the Hearing without providing this evidence to Major Webster.*

According to the Findings and Recommendations of the Clinical Privileges Hearing dated 20 February 1999, there is no reference given to this information. This, too, was not considered as a factor by the Hearing Committee nor the AFMPRB and had no impact on the final outcome.

(9) *Several staff testimonies were supportive of Major Webster's performance.*