As mentioned in item (6) above, some staff members gave favorable opinions of Major Webster. None of these testimonies were from peer emergency room physicians. As previously noted, an evaluation in the Keesler AFB medical center emergency room by six peer emergency room physicians unanimously rated Major Webster as incompetent in emergency medicine.

RECOMMENDATIONS: This office recommends denial of the applicant's request to expunge the records of this adverse privileging action. Revocation of Major Webster's emergency room privileges and supervision of her Family Practice privileges was authorized IAW AFI 44-119 and was done so appropriately at the discretion of the facility commander. This was supported by the AF/SG. However, if the decision is to grant the relief sought, the facility records should be corrected to remove all evidence of the revocation, and the adverse action records at AFMOA/SGZC destroyed. We need to emphasize, nevertheless, that, based on the findings of numerous peer providers, allowing this physician to go unreported for privilege action could have an adverse impact on patient welfare and safety wherever she practices.

Meghan R. Snide
MEGHAN R. SNIDE, Lt Col, USAF, NC
Chief, Risk Management Operations
Air Force Medical Operations Agency
Office of the Surgeon General

Attachment:
1. Copy of the Adverse Action File

175

To: MPRB 15 Jun 99

From: Lt Col Spatz

Subject: Privilege Action Appeal of Major Norma Webster

1. I have reviewed the privileging action and appeal from Maj (Dr.) Norma Webster, 24 MDG, Howard AFB, Panama. This review included the file used in the Credentials Hearing, all attachments, the verbatim transcript, MTF Commander's decision, and subsequent appeal from Maj Webster's attorney dated 6 Apr 99. Dr. Webster is board certified in Internal Medicine, has passed the written boards in Emergency Medicine but failed the oral boards twice. She was originally assigned to the ER at Howard, but was removed from that area initially and reassigned to Family Practice. She was subsequently returned to the ER for a very short period, and was then reassigned to the Health and Wellness Center. Her Emergency Medicine privileges have been revoked, and her Family Practice/Primary Care Privileges limited to supervised in this privileging action.

2. This is a very complex case, and the MTF has done a very thorough job of documenting the thought processes of the parties involved, especially Col O'Neil, MTF/CC. I further commend the Credentials Hearing Committee for their thorough approach to the case and clearly expressed deliberations.

3. Dr. Webster's complicating issues are covered very well in the deliberations of the Hearing Committee (Attch 1). They are:

   a. Cognitive disorder NOS, possibly due to multiple sclerosis. It is the opinion of several neuropsychologists, including one hired by Dr. Webster, that while she is of superior intelligence, this cognitive disorder makes it very difficult for her to handle multiple complex inputs in an effective and rapid fashion. This was considered an essential skill to practice as an emergency physician. Dr. Webster has had two Medical Evaluation Boards which were unable to give her a diagnosis of MS, and returned her to duty. She also carries the diagnosis of Guillain-Barre disease.

   b. Difficult personality with narcissistic and histrionic aspects, and poor organizational skills. While these are fairly common traits in physicians, most physicians demonstrate better impulse control than Dr. Webster in social settings. Her inappropriate behavior is amply demonstrated in the hearing and attachments. It has led to several letters of counseling for suboptimal patient-staff and staff-staff interactions, a referral OPR, command directed mental health evaluation, and patient complaints. This is a long-standing problem for her, and is reflected in AF 1562 peer reviews from her last three assignments. There are unsubstantiated allegations that patients would leave the ER if they saw she was on duty, but there are also several letters of recommendation submitted on her behalf from patients and hospital staff.

   c. Poor duty performance is accused in several instances. In one case, she was unable to intubate a patient during a Code Blue, and the patient died of a

pulmonary embolism. Nobody believes that the intubation affected the ultimate outcome. This case was reviewed for SOC at the 1 MDG at the request of ACC/SG, and they concurred SOC was met. Other concerns raised at the code were her poor airway control, questions regarding her use of medications, and inability to direct the code team while serving as code leader. Unfortunately, the documentation regarding this code was not available to the Credentials Hearing, but was subsequently discovered. In my review of these documents, ACLS protocols were generally followed. During the Credentials Hearing, Dr. Webster did not represent herself well when given a mock code scenario by an ACLS instructor serving on the board.

4. The final complicating factor is that nobody can point to a bad outcome attributable to Dr. Webster's medical practice. Even some of her critics provide comments that she is a good clinician. The Credentials Hearing Committee, Credentials Committee, and MTF/CC believed that she should be removed from patient care as a proactive measure, primarily based on her diagnosed cognitive deficit. Prior to receiving this diagnosis, she had been removed from patient care for administrative concerns but no privileging action was initiated. Dr. Webster has not been given an outside review of her care, nor was she provided with the opportunity to have her skills evaluated in another MTF.

5. The basis of Dr. Webster's appeal, and my opinions are:

a. *The government failed to produce the Code Blue documentation at the Hearing.* This could not be found during the hearing, but was subsequently supplied to her. Although the impression of the committee was unfavorable to Dr. Webster on this issue, I believe that this is mostly neutralized by my review of the code documentation. There are no accusations that the information was deliberately withheld, but that it could not be found. It had been sequestered in the MDOS/CC office, and they underwent a change of command during this process.

b. *Records were introduced at the hearing without being provided to Dr. Webster beforehand.* There were no clinical records presented, and no new allegations raised at the hearing. Although not strictly in compliance with due process IAW AFI 44-119, I do not believe this had any impact on the deliberations of the committee or the commander. There are no accusations that the information was deliberately withheld, but that it was newly produced immediately prior to the hearing.

c. *Exerted command influence upon at least one of the witnesses.* One witness, Capt Li, stated that she felt pressured not to testify for Dr. Webster by Dr. Burkett/SGH. Dr. Li did testify on behalf of Dr. Webster, and I do not believe this had any impact.

d. *Failed to assure the impartiality of the Hearing Committee.* This is based on one statement by the Hearing Chairperson regarding the Code Blue, stating that he had confidence that Dr. Burkett had performed well during the Code. Dr. Burkett's performance was not in question, and was irrelevant to the case. Dr.

Webster's attorney felt that it was a demonstration of prejudgment against his client. Review of the entire proceedings supports my impression that this was an impartial panel.

e. *Went outside the hearing record to investigate the Code Blue without advising Dr. Webster.* One of the committee members called Langley to find out about the Code Blue review, and was unable to find out any information. This had no impact.

6. The appeal also states that Maj Webster's disorganization and cognitive deficit should be attributed to her not taking estrogen when she became menopausal. She has now started estrogen, and supplies a letter from a local gynecologist in support. There are no references cited, and no evidence submitted that her behavior or work habits have changed.

7. In summary, I do not support any of Dr. Webster's appeal as being sufficient to overturn the commander's decision. I firmly believe that Dr. Webster's cognitive deficits and personality are the essential problem. This physician does not belong in an Emergency Room where complex multi-taskings are a continuous risk. However, it is difficult to translate that information directly into a privilege revocation as outlined in AFI 44-119, para 4.5, describing "gross provider misconduct, professional incompetence, or negligence that is self-evident and poses a significant threat to patient safety or well-being." She has never been involved in a malpractice claim, and does not have any documented poor clinical outcomes. I also do not believe her deficits are remediable, as she has been in clinical practice for 14 years, demonstrates denial that she has any deficits affecting her practice, and is not an easy person to work with. Retraining will not be effective. This is not a unique case, and I have had providers similar to Dr. Webster in my supervision. I have always handled these cases administratively, although privileging action was discussed. That is the mechanism I would have preferred for this case, and the 24 MDG has also taken action in that direction. The MPRB's corporate memory will be very helpful in clarifying this case, and field guidance on this type of case should also be clarified in the revision of AFI 44-119.

MICHAEL W. SPATZ, Lt Col, USAF, MC
Family Practice Consultant
AFMOA/SGOC

Attch 1:
Findings and Recommendations of the Clinical Privileges Hearing

178

**MEMORANDUM**

**TO:** SGOC

**FROM:** JOSEPH L. BRAUN, MD

**SUBJECT:** Appeal of Adverse Action – Major Wilma Webster

**DATE:** July 19, 1999

Under the provisions of AFI 44-119 I have reviewed this file and Appeal of the adverse action taken against Major Webster. Major Webster had been serving as an Emergency Physician at Howard Air Force Base Panama Canal Zone. Her privileges have been revoked for both Emergency Medicine and Family Practice.

The adverse actions seem to originate from a number of different allegations. These included a number of patient complaints and an incident involving her emotional outburst while assigned to the Family Practice Clinic. Another incident cited involved a Cardiopulmonary resuscitation, which was unsuccessful due to indecisive action on Dr. Webster's part. This case is complicated by the fact that Dr. Webster has been evaluated and valued at multiple times for a cognitive disorder (NOS) possibly due to Multiple Sclerosis. Evidence was presented that it's very difficult for Dr. Webster to handle complex input in an effective and rapid fashion. Despite this Dr. Webster has had two medical evaluations in which the Board was unable to give her a diagnosis and therefore have returned her to duty. Dr. Webster also carries the diagnosis of Guillan Barre. Additionally Major Webster has been evacuated as having a difficult personality with narcissistic, histrionic tendencies and poor organizational skills.

The revocation seems to be predicated on the two physical complaints, being coded as 610.80 and 6l0.90. However, there is evidence presented of poor duty performance at multiple times, including the inability to intubate a patient during the code blue. The final complicating factor is again that no one can come up with an adverse outcome that is attributable to Dr. Webster's clinical practice. The credentialing steering committee and MTF as well as LTC Spatz's evaluation seems to indicate that Dr. Webster is being removed as a proactive measure, primarily based on her diagnosis of Cognitive Deficit. I will examine the soundness of this basis for action also.

The time frames involving this case include a November 1998 Adhoc credental meeting. Results were to Dr. Webster are dated December 8th but presented on December 9th. There is documentation this delay was due to a concern about Dr. Webster's mental stability. A hearing was requested on December 21st. On January 7th notification of a privilege hearing was done. Subsequently such hearing was held on 17th and 18th .of February. On March 17th the hearing record was presented to Major Webster and on March 25th an Action dated the 24th of March was given to Major Webster with the decision of the hearing.

As a result of my evaluation on compliance with the appeals and proper procedures I reached the following concerns: There is discussion of the fact during the hearing of February 17 & 18 an AETC Form 1280 was missing which was subsequently found in a medical record search and was evaluated by the Commander. Furthermore I found the evaluation of medical record it appears that there are some discrepancies between the times on the code blue form 1280 and some of the rhythm strips. The other problem that I see is that there could possibly be a too long of a time period between the time a request was made for a hearing and the time notification was done for such a credentials hearing. The request was made on the 21st of December '98 and the notification was done on the 7th of January '99. There is a section in the regulations that states that this should be done within three days.

In summary, I believe that procedure has been followed for the most part with a high degree of accuracy and professionalism. Certain time limits which I mentioned may have been missed but as such probably would not be considered to be of such a measure that they would reach a level substantial enough to prevent the action from being approved.

There are a number of due process issues legitimately raised. However I do not believe them to be significantly problematic. I therefore feel that they do not cross the threshold on fairness and will not affect the outcome of the case.

Also after reviewing the testimony of Dr. Burkett, I do not believe the AETC Form 1280 would have proved up anything that was not already fully addressed at the hearing.

Furthermore I did not find any new clinical evidence that was presented at the hearing nor did I find any new issues or allegations being raised. While the hearing was not in full compliance with AFI 44-119 it is sufficiently so as to not raise any procedural problems.

More importantly I believe that the substantial issues of poor performance are most critical. We have a case here of a practitioner with proven inability to properly perform especially under pressure. I therefore believe that the Credentialing Committee action is fully warranted especially in view of the fact that the particular physical conditions, which are mentioned throughout the case, are not ones that which would be likely to be reversed.

This is respectfully submitted by:

Joseph L. Braun, MD JD
Lt. Colonel USAF Reserve
AFMOA/SGOC

To: MPRB 15 Jun 99

From [redacted]

Subject: Privilege Action Appeal of Major Norma Webster

1. I have reviewed the privileging action and appeal from Maj (Dr.) Norma Webster, 24 MDG, Howard AFB, Panama. This review included the file used in the Credentials Hearing, all attachments, the verbatim transcript, MTF Commander's decision, and subsequent appeal from Maj Webster's attorney dated 6 Apr 99. Dr. Webster is board certified in Internal Medicine, has passed the written boards in Emergency Medicine but failed the oral boards twice. She was originally assigned to the ER at Howard, but was removed from that area initially and reassigned to Family Practice. She was subsequently returned to the ER for a very short period, and was then reassigned to the Health and Wellness Center. Her Emergency Medicine privileges have been revoked, and her Family Practice/Primary Care Privileges limited to supervised in this privileging action.

2. This is a very complex case, and the MTF has done a very thorough job of documenting the thought processes of the parties involved, especially Col O'Neil, MTF/CC. I further commend the Credentials Hearing Committee for their thorough approach to the case and clearly expressed deliberations.

3. Dr. Webster's complicating issues are covered very well in the deliberations of the Hearing Committee (Attch 1). They are:

   a. Cognitive disorder NOS, possibly due to multiple sclerosis. It is the opinion of several neuropsychologists, including one hired by Dr. Webster, that while she is of superior intelligence, this cognitive disorder makes it very difficult for her to handle multiple complex inputs in an effective and rapid fashion. This was considered an essential skill to practice as an emergency physician. Dr. Webster has had two Medical Evaluation Boards which were unable to give her a diagnosis of MS, and returned her to duty. She also carries the diagnosis of Guillain-Barre disease.

   b. Difficult personality with narcissistic and histrionic aspects, and poor organizational skills. While these are fairly common traits in physicians, most physicians demonstrate better impulse control than Dr. Webster in social settings. Her inappropriate behavior is amply demonstrated in the hearing and attachments. It has led to several letters of counseling for suboptimal patient-staff and staff-staff interactions, a referral OPR, command directed mental health evaluation, and patient complaints. This is a long-standing problem for her, and is reflected in AF 1562 peer reviews from her last three assignments. There are unsubstantiated allegations that patients would leave the ER if they saw she was on duty, but there are also several letters of recommendation submitted on her behalf from patients and hospital staff.

   c. Poor duty performance is accused in several instances. In one case, she was unable to intubate a patient during a Code Blue, and the patient died of a

123

pulmonary embolism. Nobody believes that the intubation affected the ultimate outcome. This case was reviewed for SOC at the 1 MDG at the request of ACC/SG, and they concurred SOC was met. Other concerns raised at the code were her poor airway control, questions regarding her use of medications, and inability to direct the code team while serving as code leader. Unfortunately, the documentation regarding this code was not available to the Credentials Hearing, but was subsequently discovered. In my review of these documents, ACLS protocols were generally followed. During the Credentials Hearing, Dr. Webster did not represent herself well when given a mock code scenario by an ACLS instructor serving on the board.

4. The final complicating factor is that nobody can point to a bad outcome attributable to Dr. Webster's medical practice. Even some of her critics provide comments that she is a good clinician. The Credentials Hearing Committee, Credentials Committee, and MTF/CC believed that she should be removed from patient care as a proactive measure, primarily based on her diagnosed cognitive deficit. Prior to receiving this diagnosis, she had been removed from patient care for administrative concerns but no privileging action was initiated. Dr. Webster has not been given an outside review of her care, nor was she provided with the opportunity to have her skills evaluated in another MTF.

5. The basis of Dr. Webster's appeal, and my opinions are:

a. *The government failed to produce the Code Blue documentation at the Hearing.* This could not be found during the hearing, but was subsequently supplied to her. Although the impression of the committee was unfavorable to Dr. Webster on this issue, I believe that this is mostly neutralized by my review of the code documentation. There are no accusations that the information was deliberately withheld, but that it could not be found. It had been sequestered in the MDOS/CC office, and they underwent a change of command during this process.

b. *Records were introduced at the hearing without being provided to Dr. Webster beforehand.* There were no clinical records presented, and no new allegations raised at the hearing. Although not strictly in compliance with due process IAW AFI 44-119, I do not believe this had any impact on the deliberations of the committee or the commander. There are no accusations that the information was deliberately withheld, but that it was newly produced immediately prior to the hearing.

c. *Exerted command influence upon at least one of the witnesses.* One witness, Capt Li, stated that she felt pressured not to testify for Dr. Webster by Dr. Burkett/SGH. Dr. Li did testify on behalf of Dr. Webster, and I do not believe this had any impact.

d. *Failed to assure the impartiality of the Hearing Committee.* This is based on one statement by the Hearing Chairperson regarding the Code Blue, stating that he had confidence that Dr. Burkett had performed well during the Code. Dr. Burkett's performance was not in question, and was irrelevant to the case. Dr.

Webster's attorney felt that it was a demonstration of prejudgment against his client. Review of the entire proceedings supports my impression that this was an impartial panel.

e. *Went outside the hearing record to investigate the Code Blue without advising Dr. Webster.* One of the committee members called Langley to find out about the Code Blue review, and was unable to find out any information. This had no impact.

6. The appeal also states that Maj Webster's disorganization and cognitive deficit should be attributed to her not taking estrogen when she became menopausal. She has now started estrogen, and supplies a letter from a local gynecologist in support. There are no references cited, and no evidence submitted that her behavior or work habits have changed.

7. In summary, I do not support any of Dr. Webster's appeal as being sufficient to overturn the commander's decision. I firmly believe that Dr. Webster's cognitive deficits and personality are the essential problem. This physician does not belong in an Emergency Room where complex multi-taskings are a continuous risk. However, it is difficult to translate that information directly into a privilege revocation as outlined in AFI 44-119, para 4.5, describing "gross provider misconduct, professional incompetence, or negligence that is self-evident and poses a significant threat to patient safety or well-being." She has never been involved in a malpractice claim, and does not have any documented poor clinical outcomes. I also do not believe her deficits are remediable, as she has been in clinical practice for 14 years, demonstrates denial that she has any deficits affecting her practice, and is not an easy person to work with. Retraining will not be effective. This is not a unique case, and I have had providers similar to Dr. Webster in my supervision. I have always handled these cases administratively, although privileging action was discussed. That is the mechanism I would have preferred for this case, and the 24 MDG has also taken action in that direction. The MPRB's corporate memory will be very helpful in clarifying this case, and field guidance on this type of case should also be clarified in the revision of AFI 44-119.

[redacted]

Attch 1:
Findings and Recommendations of the Clinical Privileges Hearing

**DEPARTMENT OF THE AIR FORCE**
USAF JUDICIARY AREA DEFENSE COUNSEL
PATRICK AIR FORCE BASE FLORIDA 32925-3238

21 December 98

MEMORANDUM FOR 24 MDG/CC

FROM: AFLSA/ADC
1201 Edward H. White II St., Ste. N-110
Patrick AFB, Florida 32925

SUBJECT: Request for Hearing

1. My client acknowledged receipt of the notice of proposed revocation of privileges dated 3 December 98 on 9 December 98. By and through counsel and in accordance with the rights enumerated in Chapter 4 of Air Force Instruction 44-119, dated 1 October 1995, Major Wilma Webster hereby respectfully requests a hearing to review the proposed action.

2. I can be contacted at DSN 854-4423 and the fax number is DSN 854-4425.

SCOTT E. HARDING, Capt, USAF
Area Defense Counsel

WILMA P.WEBSTER, MAJ USAF MC

134

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

3 December 1998

MEMORANDUM FOR: Major Wilma P. Webster

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Notice of Proposed Revocation of Privileges

1. The Credentials Function of the 24th Medical Group has recommended to me to revoke your clinical privileges as Emergency Physician and Primary Care Physician. I have considered their recommendation and have decided to act as they recommend.

2. The reasons for this action by me are as follows:

a. While in the Emergency Room and in Primary Care Clinic your labile emotional state caused several patients to lose confidence in your ability to treat them.

b. You performed in a forgetful and disorganized manner on several occasions and there were documented incidents of you dispensing incorrect medication to patients.

c. In a witnessed cardiac arrest response you stated you were physically incapable of performing an endotracheal intubation due to left wrist weakness. Although the weakness was transient, and attributed to carpal tunnel syndrome at the time, you subsequently stated to me that you had mis-represented the incident and that your left wrist was not, in fact, weak. This conflict of claimed facts over a critical and basic part of your expected duties led me to lose confidence in your insight and truthfulness regarding your capabilities.

d. You had one acute episode of disabling weakness attributed to an immunologically-mediated neurological condition. Although transient, the incident described in "c" above leads me to question whether you would fully and truthfully disclose a more limited episode in the future which impinged on your ability to safely conduct essential parts of your duties as an Emergency Room Physician or Primary Care Physician.

e. You have undergone a full Neurology and Neuropsychiatry evaluation, with some parts of that evaluation repeated at three different institutions. The result of that evaluation has revealed that you have a chronic, progressive de-myelinating neurologic disease with significant cognitive and behavioral damage. You have demonstrated fluctuating neurological status over the past year, and the expert opinion of the medical team which has evaluated you leads me to believe that you will suffer from temporally- and physiologically-varying future involvement of motor strength, cognition, and judgement. Additionally, that medical team has determined that you demonstrate neither acceptance of nor insight into that disease process, and this may lead you to deny or ignore impairment which would interfere with your safely accomplishing critical tasks involved in your primary clinical duties. This could seriously endanger patient safety in either your Emergency Medicine or Primary Care Medicine duties.

f. You have on two occasions made statements in a public setting, witnessed by several persons, that indicate you have thought about or contemplated acts of violence against persons in the Hospital, and against an aeromedical evacuation aircraft. Regardless of whether you meant to carry out the actions implied by these statements, the nature of your making them and the setting you made them in create grave doubts about your judgement, insight, and impulse control in the clinical settings of the Emergency Room and Primary Care Clinic, where you may be under intense pressure and liable to great frustration in dealing with patients and illness situations.

3. You are advised that you have the right, upon request, to have a credentials hearing committee review this action. To have this hearing, you must make a written request to me within 30 days from the date you receive this notification. If you fail to ask within that time, or if you fail to appear at a hearing so requested, you waive your rights to the hearing. If you waive your rights to a hearing, you may still exercise your right to appeal this decision to HQ AFMOA/SGPC.

4. Depending on the outcome of this action, HQ AFMOA/SGPC may report the matter to appropriate professional regulatory agencies. I strongly recommend that you consult AFI 44-119, chapter 4, for information on the specific procedures involved with this action and your rights.

5. You are required to acknowledge receipt by signature below. Your acknowledgement of receipt does not constitute your acceptance of the action, only that you have received notification of the proposed action. You are entitled to a copy of this notification.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

1st Indorsement: Major Wilma P. Webster, USAF, MC

TO: 24MDG/CC (Col O'Neil)
Chairperson, Credentials Function

I acknowledge receipt.

09 DEC

WILMA P. WEBSTER, Maj, USAF, MC

**DEPARTMENT OF THE AIR FORCE**
**24TH MEDICAL OPERATIONS SQUADRON (ACC)**
**HOWARD AFB, PANAMA**

**7 January, 1999**

**MEMORANDUM FOR Wilma Webster, Major USAF, MC:**

**FROM: 24th MDG/SGH (Major Edwin K. Burkett)**

**SUBJECT: Notification of Privileges Hearing**

1. The credentials hearing committee will conduct a hearing that may adversely affect your clinical privileges. Depending on the final outcome, HQ AFMOA/SGPC may report the matter to appropriate civilian regulatory agencies. I refer you to AFI 44-119, chapter 4 for discussion of your rights and responsibilities in this matter. Information on what specific matters are reported to civilian regulatory agencies may be found in the same regulation, chapter 4 and 6.

2. Allegations being investigated are:

A. That you suffer from a chronic, progressive demyelinating disease (Multiple Sclerosis) with significant cognitive and behavioral damage that makes you unable to safely conduct patient care. Also that you lack acceptance or insight into the disease and this compounds your risk to quality patient care. The bases for these allegations are as follows:

1) You underwent a Command Directed Psychologic Evaluation dated 14 July 1998 at the 24th Medical Group, Panama conducted by Major Richard La Macchia which concluded that you:

-Had consistently poor motor skills performance, particularly under pressure.

- Possible aspects of a Cognitive Disorder evidenced by neurospychologic deficits consistent with diffuse brain dysfunction

-Functional impairment that would prevent you from performing at or above the standard of care required for an ER physician

- Lack of awareness of any of your deficits

2) According to a discharge summary dated 18 October 1998 you were admitted to a Turkish Hospital for an acute disabling weakness attributed to an immunologically mediated mechanism. Dr. Emil Goldenberg and Dr. Hayim Babur stated that you had:

- Acute Guillain-Barre

- This led to your admission and Neurology workup at Wilford Hall Medical Center

3) On 4 August 1998 a narrative summary was completed from your neuropsychologic evaluation at Wilford Hall Medical Center, San Antonio, Texas conducted by Lt. Col. Brian Campbell that concluded that you have:

- Cognitive Disorder, not otherwise specified

- Personality change due to Multiple Sclerosis

- Antisocial, histrionic, and narcissistic personality traits

4) On 7 November 1998 a narrative summary was completed from your Neurology evaluation at Wilford Hall Medical Center (WHMC), San Antonio, Texas was by Dr. Richard Popwell and Dr. Gary Gronseth and you were diagnosed as having:

- Laboratory supported, clinically-definite Multiple Sclerosis (MS)
- Had an acute inflammatory demyelinating polyneuropathy (AIDP)

The narrative states that there is a long-term functional impact because, whether this presentation was AIDP or an MS exacerbation, similar attacks in the future could occur and once again debilitate you.

5) On 20 November 1998 from Lt. Col Brian Campbell wrote a memorandum to Dr. Jack Saylor, MMB concerning your Social and Industrial Impairment Ratings. He stated that:

- "Her difficulties lead to marked military impairment and disqualify her for worldwide duty. I would rate her social and industrial impairment as severe. Although she may be employable, I doubt that she can continue with her practice of medicine safely and competently"

**B**. On 5 different occasions you have demonstrated labile emotional, behavioral, and personality traits in front of patients that have caused patients to lose confidence in your ability to treat them.

1) According to a patient complaint dated 11-12-97 Samantha Houston says that, "Dr. Webster was very, very forgetful and (I was) waiting in the emergency room from 3:30PM to 11:30pm."

2) A patient complaint submitted by Brian Denmark states that you gave him poor service and that "The provider was unwilling to listen to what I was saying." You "refused" to renew a prescription he had been taking for 10 years.

3) Another patient complaint dated 27 Oct 1997 by Kenneth R. Teel states that " Dr. Webster was absent minded"

4) A memorandum dated 7 February 1998 from patient SGT John Silbaugh says that during his appointment you began to cry. This made him nervous and when he asked you what was wrong you said, " I hate this job." He stated that you also said that the work you were doing could put you in jail.

5) A memo dated 6 May 1998 from patient Michelle Schroder describes an ER encounter. She complained of knee pain but says you told her that her XRAYS were fine and there was nothing wrong with her knee. She says she saw Orthopedics a few days later and was told she had a torn meniscus, and was scheduled for arthroscopic surgery. She says, "I was extremely disappointed with the service and care provided by Maj. Webster, especially when she told me nothing was wrong with my knee. I would not feel very confident if a life threatening emergency occurred while she was the attending Emergency Physician."

C. You have demonstrated poor insight and impulse control evidenced by emotional outbursts and inappropriate statements in public locations including contemplation of acts of violence against persons, and against an aeromedical evacuation aircraft.

1) On 29 January 1998 you responded in an angry, loud, and unprofessional manner when you were instructed that you had scheduled patients checking in and should not go out to eat for

lunch. Dr. Edwin Burkett, Chief of Family Practice, dated 30 January 1998, notes the episode in a memorandum.

2) On 15 September 1998 you detailed to Aeromedical Evacuation Technician SRA Kristen Goode a dream you had where you "shot everyone" and this gave you an orgasmic feeling. On 16 September, in front of SRA Goode and several patients, and just prior to boarding the Air Evac mission you stated that " I just want to blow up the plane." SRA Goode dated 17 Sept 1998 documents these comments in a memorandum.

**D**. You have been noted to perform in a forgetful and unorganized manner on several occasions and to demonstrate poor judgement, including documented incidences of dispensing incorrect medication to patients.

1) You received a Letter of Counseling from Dr. James McCrary, Chief of Emergency Services, on 30 November 1997. He counseled you on excessive patient waiting times, forgetting about patients and having them wait too long before making a final disposition, having multiple patient complaints about you, and complaints about poor communication and instructions on your part by ER staff. He said, " I've seen a pattern of difficulty in handling the work-load in this Emergency Department when alone as sole MOD".

2) On 24 January 1998 you inefficiently handled a Code Blue according to a Memorandum for Record by Dr. Burkett dated 31 January 1998. It states that:

-You did not seem to grasp the importance of head position for ventilation of the patient and the patient was not being ventilated even though a technician was tying to bag him. You did not ask for assistance from another physician until you had made 3 unsuccessful intubation attempts.

- You neglected to order CPR on a pulseless patient.

- Thirdly, you had failed to order initial defibrillating shocks on a patient you knew to be in Ventricular Fibrillation until reminded by others.

3) On 3 February 1998 you received another Letter of Counseling from Dr. Teodoro Mendez, Chief of Primary Care Flight. He counseled you on the following:

- The outburst incident noted above in paragraph C.1.

-That on 2 February you left two scheduled patients unseen and took lunch for more than an hour. The same day you left another patient waiting after clinic hours on your request but you had left the building.

-On 3 February you again left for lunch for more than an hour while two patients with morning appointments waited unseen.

4) Based upon notes from Capt Ryan Shercliffe, Emergency Room Nurse, dated 19 May 98 you failed to follow appropriate triage procedure in the ER and took care of two stable pediatric appointments prior to seeing more acute patients. He states, "She did not realize what order the patients arrived, she had not looked over the charts to assess urgency."

5) On 26 May 1998, based on notes from Captain Shercliffe, you showed that you were unaware of the urgent transport policy for ambulance pick-ups on the East Bank. On the same day you also refused an ambulance for a pregnant patient whose water had broke here at Howard, instead you chose to let her wait for a commercial taxi to take her downtown.

6) ER notes on SF 558's dated 20 April 1998 at 1839 and 2220. You prescribed Tylenol elixir but actually handed out a bottle of Benadryl elixir from the MOD cabinet for patient Alexandria Ordaz.

F. You failed to initially acknowledge a known physical limitation, left wrist weakness, that prevented you from performing a successful intubation during the cardiac arrest referred to in paragraph D.2. You stated after the incident that your wrist was weak but later recanted the statement. Your conduct has caused the 24th Medical Group to lose confidence in your willingness to disclose any physical impairment that may limit your ability to safely conduct parts of your duties as an Emergency Room Physician or Primary Care Physician.

1) A 23 March 1998 Memorandum for Record by Lt.Col Addison, MDOS/CC, is titled "Events leading up to your removal from the ER". Paragraph 2 begins, " Following the Code Blue on 24 Jan98, you made an admission that you were not able to intubate the patient (a large male with a thick neck) due to lack of strength in your wrist. As you were already scheduled for surgery on this extremity, the decision was made to remove you based on risk factors and the fact that in the Emergency Room you could be the only provider placed in the same situation".

2) On 22 May 1998 another memorandum by Colonel Terrence O'Neil, and signed by you, is titled "Relief From Emergency room Duties Due to Performance". In paragraph 1 it says, " You stated during a Code Blue procedure in my presence that your wrist was too weak to successfully intubate a patient. You later told me that you had mis-spoken; that your wrist was really not the cause of the problem".

3) On 6 April 1998 a memo from Dr. Jose Rodriguez-Vazquez, SGH, documents your Airway Management Evaluation observed by him and Dr. Eric Ulloa, Primary Care Physician. This occurred after your recovery from Carpal Tunnel Surgery on your left wrist. They concluded that you took overall too much time to intubate a mannequin, had poor technique positioning the head and neck, poor technique with the laryngoscope, and several prolonged attempts. They suggested that you try live patient practice with the Nurse Anesthetist in the Operating Room.

3. The hearing will be at **the Howard AFB Legal Office, Building 238, on 17 February 1998 starting at 0800.** You have the right to present evidence and call witnesses on your behalf, to cross-examine witnesses called by the committee, and to consult and be represented by legal counsel. It is your responsibility to arrange for the presence of any witnesses you desire. As a military provider a military legal counsel is available to you at your request. You may retain a civilian attorney at your own expense. The committee currently expects to call the these witnesses:

Lieutenant Colonel Kenneth Remington, USAF, 24MDOS/CC, DSN: 284-6988
Dr. Gregory Fey, Capt. USAF, 24MDOS/SGOHP, DSN 284-6410
Dr. Richard LaMacchia, Major USAF, 24MDOS/SGOHP, DSN 288-4971
Dr. Teodoro Mendez, 24 MDOS/SGOPL, DSN 284-3014
Dr. James McCrary, Major USAF, 24MDOS/SGOPE DSN 284-3636
Dr. Edwin Burkett, Major USAF, 24MDOS/SGOPL DSN 284-3014
Captain Ryan Shercliffe, USAF, NC, 24MDOS/SGOPE DSN 284-3636
Senior Airman Kristen Goode, USAF, 24MDSS/SGST DSN 284-6324

4. Failure to appear at the hearing will be construed as a waiver of those rights set out in AFI 44-119, chapter 4, paragraph 4.15. The Chairperson of the credentials hearing committee may change the time and place of the hearing upon your written request, if based on good cause.

EDWIN K. BURKETT, Maj USAF, MC
Chairperson, Credentials Function

1st Ind: Major Wilma P. Webster, USAF, MC 8 January 1999

TO: Chairperson, Credentials Function (Major Burkett)

I acknowledge receipt of the Letter of Notification of Privileges Hearing, dated 7 January, 1999.

Date 08 JAN 99

WILMA P. WEBSTER, Maj, USAF, MC

 Copy

# DEPARTMENT OF THE AIR FORCE
## 24TH MEDICAL OPERATIONS SQUADRON (ACC)
## HOWARD AFB, PANAMA

**8 January, 1999**

**MEMORANDUM FOR Wilma Webster, Major USAF, MC:**

**FROM: 24th MDG/SGH (Major Edwin K. Burkett)**

**SUBJECT: Documents Supporting Allegations for Privilege Notification**

1. I have given Major Wilma Webster a copy of all of the documents that I used to prepare the letter notifying her of her Privilege Hearing. The documents are in a sealed manila envelope. If there is anything missing it is not intentional and will be provided upon request.

Edwin K. Burkett

EDWIN K. BURKETT
Maj USAF, MC
24MDG Associate SGH

1st Ind: Major Webster

I acknowledge receipt of the envelope.

Wilma P. Webster date 17 JAN 99
WILMA P. WEBSTER

***Webster, Wilma – Internal Medicine Physician.*** **Issue:** Appeal of revocation of ER privileges and restriction of Family Practice Privileges at Howard AFB, Panama. (ACC). Case summary at attachment 4. **Discussion:** The basis of the adverse action was a medical impairment, a diagnosed cognitive disorder that impairs the provider's ability to safely render patient care. There was evidence of inappropriate behavior, inability to manage multiple complex tasks, and a specific patient care episode alleging difficulty intubating a patient and directing team members in the ER during a code. This latter allegation was not substantiated. The provider's appeal addressed the fact that there are no bad outcomes related to her provision of care. The board members determined that the MTF appropriately restricted the practice of this physician, and that a facility does not have to wait until something bad happens to take an adverse action. This individual has met 2 Medical Evaluation Boards, which determined that the medical condition was not boardable. The physician desires to remain on active duty, and prefers the Emergency Room Setting to others. The hearing committee and the clinical review of the appeal were in agreement that the ER setting is an unacceptably high-risk environment to patients for this individual and the board concurs with the MFC decision to revoke ER privileges. The provider was reassigned to Offutt AFB in NE. She is working in the health and wellness center until the appeal is resolved.
**R/A:** Board voted 4/0 to concur with the MFC decision to revoke clinical privileges.
**F: Closed.**

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

12 April 1999

MEMORANDUM FOR: ACC/SG (Brigadier General Schafer)

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Response by Counsel for Major Webster to Credentials Hearing Recommendations

1. Mr. Terrence Martin, counsel for Major Webster, responded in her behalf citing his reasons why his client wishes to appeal my acceptance of the recommendations of the Credentials Hearing. IAW AFI 44-119 I am conveying the complete documentation folder on the matter to you for further appeal consideration.

2. In the meantime, Maj. Webster continues to work in the Health and Wellness Center at Howard AFB. Due to closure DEROS's of provider personnel and the need for full focus on the Joint Commission Survey and Health Services inspection, this facility currently lacks the needed personnel to implement a 100% full supervision program required by the Credentials Hearing.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander


**Global Power For America**