02 APR 1999

MEMORANDUM FOR WHOM IT MAY CONCERN

FROM: GUSTAVO A. HERRERA, MD

SUBJECT: Estrogen deficiency as probable origin of test results

1. In response to a request by Maj. Wilma Webster, I have started her on hormone replacement therapy with Premarin (estrogen).

2. She is aware of the danger of taking unopposed estrogen but maintains that she has a small, stable meningioma and has read that progesterone is known to serve as a growth factor for meningiomas.

3. I agree with her conclusion that the minor cognitive changes present on recent testing were probably related to estrogen deficiency. She went through menopause 7 years ago and has never taken hormonal replacement therapy.

GUSTAVO A. HERRERA, M.D.
Gyncologist, 24th Medical Group
Howard Air Force Base, Panama

STATE OF CALIFORNIA -- STATE AND CONSUMER SERVICES AGENCY GRAY DAVIS, Governor

State of California Department of Consumer Affairs

MEDICAL BOARD OF CALIFORNIA
1426 Howe Avenue, Suite 54
Sacramento, CA 95825-3236
1-800-633-2322
(916) 263-1647
www.medbd.ca.gov

April 5, 2000

AFMOA/SGOC
Molly J. Hall, Col, USAF, MC
Chief, Clinical Quality Management Division
110 Luke Avenue, Room 400
Bolling AFB, DC 20332-7050

RE: REQUEST FOR CERTIFIED DOCUMENTS - DISCIPLINARY ACTION

Dear Sirs:

The Medical Board of California is in receipt of information that your Board has taken disciplinary action against the following physician:

**WILMA PAULINE WEBSTER, M.D.**
**DOB: 7/6/41**
**SSN: 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**

This physician is licensed in the State of California and it is necessary for us to review any disciplinary action taken against her. Please provide **CERTIFIED** copies of the documents filed against this individual, including the Statement of Charges and Final Decision. Please verify the physician's date of birth, social security number, and last known address for the purpose of positive identification. If there are criminal actions against this individual, please provide the relevant documents or advise how and where they may be obtained.

Thank you for your cooperation in this matter.

Sincerely,

April Rohde

**APRIL ROHDE**
Staff Services Analyst
Enforcement Program

File No.: 16-2000-108250

236

237

6303

State of California Department of
Consumer Affairs

MEDICAL BOARD OF CALIFORNIA
1426 HOWE AVENUE, SUITE 54
SACRAMENTO, CA 95825-3236

PRESORTED
FIRST CLASS

SACRAMENTO
APR 05'00
CA

PB METER
7031367

0 27

U.S. POSTAGE

**PERSONAL AND CONFIDENTIAL**

AUNB 20332

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS UNITED STATES AIR FORCE**

26 April 2000

AFMOA/SGOC
110 Luke Avenue, Room 405
Bolling AFB, DC 20332-7050

Department of Consumer & Industry Services
Attn: Ms. Pamela Dixon

Dear Medical Board

This is in response to your request for information regarding an adverse privilege action taken by the Air Force on Dr. Wilma P. Webster. Dr Webster was assigned to the Emergency Room at the 24th Medical Group at Howard AFB, Panama. During her tenure there, members of the medical staff identified discrepancies in her ability to render care, believed to have been the result of a medical condition. This lead to a credentials committee review of the quality of care delivered by Dr. Webster, revocation of privileges, and full hearing and appeal. The final outcome supported the original decision of the commander to revoke clinical privileges. Documentation is attached as requested. If you need further information, please contact me at the above address or by telephone at (202)767-4140.

Sincerely

Kimberly J. Robinson
KIMBERLY J. ROBINSON, Maj, USAF, BSC
Chief, Professional Staff Action
Air Force Medical Operations Agency
Office of the Surgeon General

8 Attachments:
1. Notice of Proposed Revocation of Privileges, 3 Dec 98
2. Request for Hearing, 21 Dec 98
3. Notice of Privileges Hearing, 7 Jan 99
4. Findings & Recommendations of Clinical Privileges Hearing, 17-18 Feb 99
5. Commander's Action letter, 24 Mar 99
6. Provider's Appeal, 6 Apr 99
7. Clinical Review, 15 Jun 99
8. AFMOA/SGOC Final Action, 19 Jan 00

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS UNITED STATES AIR FORCE**

26 April 2000

AFMOA/SGOC
110 Luke Avenue, Room 405
Bolling AFB, DC 20332-7050

Medical Board of California
Attn: Ms. April Rohde

Dear Medical Board

This is in response to your request for information regarding an adverse privilege action taken by the Air Force on Dr. Wilma P. Webster. Dr Webster was assigned to the Emergency Room at the 24th Medical Group at Howard AFB, Panama. During her tenure there, members of the medical staff identified discrepancies in her ability to render care, believed to have been the result of a medical condition. This lead to a credentials committee review of the quality of care delivered by Dr. Webster, revocation of privileges, and full hearing and appeal. The final outcome supported the original decision of the commander to revoke clinical privileges. Documentation is attached as requested. If you need further information, please contact me at the above address or by telephone at (202)767-4140.

Sincerely

Kimberly J Robinson

KIMBERLY J. ROBINSON, Maj, USAF, BSC
Chief, Professional Staff Action
Air Force Medical Operations Agency
Office of the Surgeon General

8 Attachments:
1. Notice of Proposed Revocation of Privileges, 3 Dec 98
2. Request for Hearing, 21 Dec 98
3. Notice of Privileges Hearing, 7 Jan 99
4. Findings & Recommendations of Clinical Privileges Hearing, 17-18 Feb 99
5. Commander's Action letter, 24 Mar 99
6. Provider's Appeal, 6 Apr 99
7. Clinical Review, 15 Jun 99
8. AFMOA/SGOC Final Action, 19 Jan 00

National Practitioner Data Bank
P.O. Box 10832
Chantilly, VA 20151

Voice: (800) 767-6732
FAX: (703) 802-4109
TDD: (703) 802-9395

Proc "New Case"

WEBSTER

## REPORT VERIFICATION

The following is a copy of a report which you recently submitted to the National Practitioner Data Bank (NPDB). Under the provisions of Public Law 99-6600 "The Health Care Quality Improvement Act of 1986", as amended, entities and individuals who submit information to the NPDB are legally responsible for the accuracy of such information. To ensure that the information which you have submitted is accurate and complete, it is strongly recommended that you review the content of the following report. Submit any corrections or additions to the NPDB as quickly as possible to preclude the possible legal consequences resulting from the disclosure of inaccurate information.

If the information contained in the following report is accurate and complete to the best of your knowledge, no further action is necessary. You may delete the report, retain the data in QPRAC, or print and file it in a secure place as record of your submission. Please ensure that QPRAC is in a secure place.

If the information in the enclosed report is inaccurate or incomplete, you must submit a CORRECTION to the NPDB as quickly as possible. If on review of the following report you conclude that the report was submitted erroneously (e.g., identifies the wrong practitioner; reported an incident which is not subject to the NPDB, etc.) you must VOID the report immediately.

Reports may be corrected or voided by choosing REPORTS | VOID or REPORTS | CORRECTION from the menu.

National Practitioner Data Bank
P.O. Box 10832
Chantilly, VA 20151

Voice: (800) 767-6732
FAX: (703) 802-4109
TDD: (703) 802-9395

Process Date: 01/18/2000


---

REPORT VERIFICATION

---

The following is a copy of a report which you recently submitted to the National Practitioner Data Bank (NPDB). Under the provisions of Public Law 99-6600 "The Health Care Quality Improvement Act of 1986", as amended, entities and individuals who submit information to the NPDB are legally responsible for the accuracy of such information. To ensure that the information which you have submitted is accurate and complete, it is strongly recommended that you review the content of the following report. Submit any corrections or additions to the NPDB as quickly as possible to preclude the possible legal consequences resulting from the disclosure of inaccurate information.

If the information contained in the following report is accurate and complete to the best of your knowledge, no further action is necessary. You may delete the report, retain the data in QPRAC, or print and file it in a secure place as record of your submission. Please ensure that QPRAC is in a secure place.

If the information in the enclosed report is inaccurate or incomplete, you must submit a CORRECTION to the NPDB as quickly as possible. If on review of the following report you conclude that the report was submitted erroneously (e.g., identifies the wrong practitioner; reported an incident which is not subject to the NPDB, etc.) you must VOID the report immediately.

Reports may be corrected or voided by choosing REPORTS | VOID or REPORTS | CORRECTION from the menu.

National Practitioner Data Bank
P.O. Box 10832
Chantilly, VA 20151

Voice: (800) 767-6732
FAX: (703) 802-4109
TDD: (703) 802-9395

Process Date: 01/18/2000


## REPORT VERIFICATION

The following is a copy of a report which you recently submitted to the National Practitioner Data Bank (NPDB). Under the provisions of Public Law 99-6600 "The Health Care Quality Improvement Act of 1986", as amended, entities and individuals who submit information to the NPDB are legally responsible for the accuracy of such information. To ensure that the information which you have submitted is accurate and complete, it is strongly recommended that you review the content of the following report. Submit any corrections or additions to the NPDB as quickly as possible to preclude the possible legal consequences resulting from the disclosure of inaccurate information.

If the information contained in the following report is accurate and complete to the best of your knowledge, no further action is necessary. You may delete the report, retain the data in QPRAC, or print and file it in a secure place as record of your submission. Please ensure that QPRAC is in a secure place.

If the information in the enclosed report is inaccurate or incomplete, you must submit a CORRECTION to the NPDB as quickly as possible. If on review of the following report you conclude that the report was submitted erroneously (e.g., identifies the wrong practitioner; reported an incident which is not subject to the NPDB, etc.) you must VOID the report immediately.

Reports may be corrected or voided by choosing REPORTS | VOID or REPORTS | CORRECTION from the menu.

# FINDINGS AND RECOMMENDATIONS
# CLINICAL PRIVILEGES HEARING

Wilma Webster, Major, USAF, MC
*17-18 February 1999*

Consistent with the allegations outlined in the 7 January 1999 Letter of Notification (Exhibit 5), the panel has attempted to address all relevant matters which pertain to Dr. Webster's clinical proficiency, professional conduct, as well as matters affecting her mental and physical well-being. Accordingly, while we have strived to align our findings to conform to the specific allegations, we have nonetheless supplemented that material so as to more accurately reflect the evidence presented at the hearing.

To begin, we believe the notification letter contains five (5) general headings or global areas of concern (again, see Exhibit 5). Those allegations are: (1) patient complaints; (2) mental/physical limitations which amount to unacceptable impairment as a medical provider; (3) being forgetful/disorganized in clinical settings; (4) inappropriate actions/impulse control; (5) specific cases which allege Dr. Webster has failed to meet standard of care as an emergency room (ER) physician.

## 1. **PATIENT COMPLAINTS**:

FACTS: We have three sources of patient complaints. First, Exhibit 23 contains a total of *eight* written patient complaints lodged specifically against Dr. Webster from 14 October 1997 through 7 February 1998. Those complaints speak for themselves. Second, and consistent with her testimony at the hearing, is Linda L. Thomas' statement (Exhibit 34). She complained of the care she received (for a cat bite), after being examined by Dr. Webster at Howard AFB's ER on 12 January 1998. Lastly, Dr. Webster's PAF (Exhibit 54) contains a written complaint from Michelle Shroder who complains that she was not provided accurate medical care regarding a torn meniscus in her knee.

FINDINGS: The panel finds all ten (10) allegations did occur as stated.

ANALYSIS: The only theme we see in these complaints pertains to waiting times. This is always a concern, but it does not appear to have resulted in any adverse outcomes. Accordingly, we are left with only two of the ten complaints which raise our concern. First, we find the letter by Sgt John D. Silbaugh to be troubling (Exhibit 23). Specifically, the inappropriate emotional outburst is inconsistent with that of a seasoned

physician. We will discuss this aspect later, however, under the heading "Inappropriate Actions." Secondly, the matter which pertains to Mrs. Linda L. Thomas is of concern and will be discussed in greater detail in Part 5 (specific cases), of this report.

## 2. **MENTAL/PHYSICAL LIMITATIONS**:

FACTS: It is alleged (Exhibit 5) that Dr. Webster suffers: (1) a progressive demyelinating disease (Multiple Sclerosis) for which it has impacted her cognitive/behavioral abilities, (2) neuropsychological deficits which impact her ability to function as a physician and (3) carpal tunnel syndrome which impacted her ability to perform a critical procedure.

a. Multiple Sclerosis: The evidence shows Dr. Webster has had some form of neurological dysfunction since 1973. While in the Air Force, Dr. Webster was initially worked-up for MS in 1992 at Travis AFB. Subsequently, she faced an MEB and was returned to duty following a determination that she did not have a clinical diagnosis of MS (Exhibit 9). Concerns about MS were again raised while stationed in Panama. Specifically, Dr. Webster was evaluated at Wilford Hall Medical Center (WHMC) by Lt Col (Dr.) Gary Gronseth, Chairman of Neurology. His findings (September 1998) were consistent with the diagnosis of MS. Although Dr. Gronseth finds Dr. Webster to be world-wide qualified from a neurological standpoint, he suggested further neuropsychological testing to determine her capabilities as a physician.

On 13 January 1999, Dr. Webster obtained an independent neurologic evaluation by Dr. Charles M. Poser of Beth Israel Deaconess Medical Center (Exhibit 11). In short, Dr. Poser was not convinced that Dr. Webster had MS because further clinical symptoms are necessary before final conclusions can be drawn. In his opinion, Dr. Poser felt that her symptoms are more consistent with recurrent Guillan-Barre syndrome/Miller Fisher variant.

ANALYSIS: We are confronted with a difficult task. On the one hand Air Force experts have concluded Dr. Webster likely has MS. However, Dr. Poser, one of the world's renowned experts in the field of MS, has questioned that diagnosis. We agree that further clinical symptoms should occur before MS can be substantiated. Given the intermittent nature of her symptoms at this time, we cannot justify limiting her practice as a physician based on physical disability. This is consistent with the findings of the formal PEB (Exhibit 6). Her current physical state, while not unfitting or compensable under the provisions of the Disability Evaluation System (DES), certainly might be judged "unsuitable" warranting administrative separation in the future (Exhibit 6).

b. Neuropsychological Disorder: Dr. Webster had three separate neuropsychological evaluations beginning June 1998 and ending January 1999. The initial evaluation by Dr. Ricardo De Obaldia, PhD (Exhibit 8) identified no major or severe deficits; however, it was noted that Dr. Webster had "some difficulties" in all four areas evaluated: fine motor, perceptual, cognitive, attention/concentration.

The second evaluation, performed by Dr. Brian R. Campbell (Exhibit 9), revealed several deficits in multiple areas of cognitive testing. Dr. Webster was also noted to have significant deficiencies with sensitive indices of cerebral function. Based on these findings, Dr. Campbell diagnosed Dr. Webster with Cognitive Disorder NOS and further questioned her ability to function as an ER or primary care physician.

In January 1999, Dr. Webster obtained an independent evaluation by Dr. Margaret O'Connor, PhD (Exhibit 10). Dr. Webster performed in superior range on tests of vocabulary, fund of verbal knowledge, arithmetic, attention span, and nonverbal problem-solving. Her speed of processing and memory for information fell into the average to low average range. "While these scores do not represent impairments per se, they should be seen as *relative* deficits given her superior IQ. ...[D]espite her considerable strengths and superior intelligence, her problems in the areas of memory and processing speed may intrude upon work performance, particularly in situations requiring a rapid response to complex types of information." Dr. O'Connor gave two solutions to the Dr. Webster's problems: (1) Re-organize and reduce work responsibilities and (2) Identify work that is engaging for her intellectually and emotionally, but is not time dependent.

ANALYSIS: Given three different evaluations, from three separate sources, we must conclude that Dr. Webster has some form of cognitive deficit. We believe that this deficit impairs her ability to make effective and rapid decisions, which are essential for an ER setting. Accordingly, we concur with Dr. O'Connor's recommendations (see above).

c. History of Carpal Tunnel Syndrome (CTS).

Dr. Webster had a history of CTS, prior to arriving to Howard AFB. She was followed by Orthopaedics at Howard AFB. Subsequently, she underwent Carpal Tunnel surgery in February, 1998. Based on the medical records, she has had a complete recovery of function.

ANALYSIS: Although this problem may have affected her performance during the Code Blue (see text below), we believe that this issue has been resolved.

## 3. FORGETFULLNESS AND DISORGANIZATION IN MEDICAL PRACTICE SETTINGS

FACTS: Dr. Webster was accused of being forgetful and disorganized on several occasions. These include patient complaints (exhibits 23 and 34), staff complaints (exhibits 46, 47, and 48), and the Benadryl/Tylenol mix-up (see below for details).

ANALYSIS: We believe these relatively vague complaints to be true, as they were not denied by Dr. Webster in her testimony. We also believe, based on the information presented to us, that there is a pattern of forgetfulness and disorganization. Of the



245

various examples that were presented at the hearing, one case merits discussion. As noted by the testimony of Capt Ryan Shercliffe (also see Exhibit 46), a full-term pregnant patient presented to the ER with ruptured membranes. This patient was refused ambulance transfer. The patient was initially instructed to drive to a downtown hospital, an option that was totally unacceptable to the patient's husband. Ultimately, a commercial taxicab transported the patient to a local hospital. This is problematic because a patient with ruptured membranes should be transferred via ambulance to avoid risk to mother and child.

Although it is concerning for a physician to be disorganized and forgetful, we feel this is not a basis for complete revocation of clinical privileges. With the exception of the ambulance issue, we feel there has not been a breach in the standard of care. Accordingly, we find that in a more controlled, slower-paced environment, these characteristics would not be as problematic for either the provider or her patients.

## 4. <u>INAPROPRIATE BEHAVIOR/ IMPULSE CONTROL</u>

FACTS: Dr. Webster has been accused of multiple episodes of inappropriate behavior and impulse control. Although some of the following are taken from the notification letter, we have supplemented that material with relevant information received at the hearing:

a) A memorandum by Sgt John Silbaugh, dated 7 February 1998, details how Dr. Webster broke down and cried during his appointment (Exhibit 23).

b) A memorandum for record, written by Dr. Edwin Burkett, details an event that occurred on 29 January 1998, in which Dr. Webster had an outburst in the ER hallway (Exhibit 18).

c) A memorandum written by Mrs. Todolinde Callender, describes inappropriate behavior in a Customer Care University class in July 1998 (Exhibit 33).

d) Mrs. Callender's memorandum details an event in which she found Dr. Webster sobbing in the hallway.

e) Yet another instance cited by Mrs. Callender describes another encounter. While mentoring Dr. Webster, Mrs. Callender was present when Dr. Webster said, "these guys at the top [Howard's hospital leadership] are all jerks, and I feel like killing all of them."

f) A memorandum written by SrA Kristen Goode, reports that Dr. Webster described a dream in which she shoots everyone. After the shooting, she had an orgasmic feeling, followed by an orgasm (Exhibit 31).

g) The same memorandum also describes an episode on 16 September 1998. While waiting to be aerovaced to Wilford Hall Medical Center, Dr. Webster informed SrA Goode, "I just want to blow the plane up," followed by "...those new plastic bombs that cannot be detected." (Exhibit 31). These statements were further investigated by the aerovac crew.

h) Dr. La Macchia's report (Exhibit 44) details Dr. Webster's actions on 28 May 1998, when she discussed details of her childhood sexual abuse with the technician at the front office.

FINDINGS: We find that these incidents did occur, as they were not denied by Dr. Webster. In fact, she attributed these outbursts to situational personal stress, as well as the pressure surrounding her professional career.

ANALYSIS: Dr. Fey agreed that while inappropriate, the outbursts were secondary to stress. Furthermore, he also concluded that during this time she was neither homicidal nor suicidal. These incidents are consistent with her inability to handle stressful situations in an appropriate manner. We feel Dr. Webster should limit her practice to settings which do not produce undue stress.

## 5. SPECIFIC CASES

a. Code Blue

FACTS: Army Sgt William Hill was admitted to Howard AFB for suspected pneumonia. During this hospitalization, he had a terminal event on 24 January 1998. Dr. Webster was called from the ER and directed the code of William Hill. Shortly after the patient's cardiac arrest, Dr. Edwin Burkett and Dr. (Colonel) Terrance O'Neal arrived to assist. During his testimony, Major Burkett expressed two concerns regarding Dr. Webster's management of the code: (1) inadequate airway control and (2) and inability to properly follow ACLS guidelines, CPR and defibrillation (Exhibit 17).

FINDINGS: The committee unanimously finds that these allegations did occur. The committee further finds the conduct did breach the standard of care for an ER provider and did have the potential to adversely affect the quality of patient care.

ANALYSIS: This aspect of the hearing was very difficult to objectively assess, given there were no supporting documents such as a code sheet, medical records, or nursing notes. While we specifically requested these materials, Dr. Burkett testified that these materials were not available. Accordingly, we've had to rely upon eyewitness testimony of those who were present. Based on the testimony of Drs. O'Neal and Burkett, direct witnesses to the code, Dr. Webster was unable to successfully intubate the patient and failed to adequately follow ACLS protocol.

We believe Dr. Burkett's recollection of events and note Dr. Webster's inability to adequately maintain an airway. While this may have been occasioned by Dr. Webster's "weak wrist"? or a patient with a "difficult airway," the bottom line is she failed to properly control the airway and had difficulty with ACLS protocol. The board is not as concerned that she couldn't intubate, but rather is more concerned that she was unable to control an airway. Given the autopsy results of massive pulmonary embolus, we are unable to determine what impact Dr. Webster's inability to maintain a proper airway had on Sgt Hill's death.

During the board's questioning of Dr. Webster, it was noted she understood the general concepts of managing a cardiac arrest. She did, however, demonstrate a visible uneasiness when confronted a hypothetical ACLS scenario. She did not appear to be in control of the situation. Specifically, she exhibited hesitation during a period which required timely and accurate interaction with the questioner. While the board is well aware that the stress surrounding the hearing environment, coupled with lack of direct patient contact over the past year, may have contributed to this outward appearance, we believe a physician with 14 years of emergency room experience should have handled simple ACLS algorithms in a more systematic manner.

Consistent with the testimony of Major Angeloro, we find that under nonstressful situations, Dr. Webster is capable of performing airway management. Again, there is a tremendous difference between a real code and a controlled environment.

b. Cat Bite

FACTS: Dr. Webster saw Mrs. Linda Thomas for evaluation of a cat bite on 12 January 1998. Mrs. Thomas contended that during this encounter, Dr. Webster failed to render proper care: (1) failure to initiate tetanus shot; (2) delivering wrong oral antibiotic and (3) incorrect dosage of rabies immunoglobin on prescription.

FINDINGS: We find that while each of the allegations are true, they were corrected immediately and had no adverse effect upon the patient's care and standard of care was met.

ANALYSIS: Dr. Webster's testimony provided us with sufficient information to determine that each of the complaints were addressed immediately and appropriately. At no time was the patient in danger. Addressing each of these aspects separately, it first should be noted that Dr. Webster self-identified the antibiotic discrepancy. Secondly, Dr. Webster concurred with the patient's need for a tetanus immunization. Lastly, while it may be unclear whether Dr. Webster wrote the prescription for rabies immunoglobin, it is not a surprise that she may have miscalculated the dose, given that the rabies vaccine is rarely prescribed. It should be noted, however, that Dr. Webster took the appropriate action and sent the patient to Public Health. Given the proper follow-up, any possible errors can and were corrected.

c. Tylenol/Benadryl Issue

FACTS: Dr. Webster saw Alexandria Ordaz on 20 April 1998 and diagnosed the patient with gastroenteritis with associated aches and pains. Dr. Webster prescribed Tylenol, yet handed the patient a bottle of Benadryl. Once at home, the parents notified the hospital that they were given the wrong medication and they were instructed to return to the clinic for the correct medication.

FINDINGS: We find this incident to have occurred and that its occurrence did not meet standard of care.

ANALYSIS: Dr. Webster immediately noted the error, she did not attempt to hide the facts, and ultimately corrected the situation. The elixir-type drugs were in identical bottles (as demonstrated at the hearing), with identical labels, and had the same color. Furthermore, both medications are from the same manufacturer. As noted by the pharmacist (Capt Cusak), this exact error is not uncommon and not isolated to Dr. Webster. Ultimately, the hospital decided to purchase Tylenol through a different manufacturer to avoid similar episodes. The reality of this situation is that the panel has been provided only two medication errors for this provider since her arrival to Panama. Since we know she has seen well over a thousand patients, we feel this is an acceptable medication error rate.

Additionally, we were impressed by Capt Cusak's testimony which indicated Dr. Webster is highly regarded for her pharmacological knowledge. Specifically, the chief pharmacist cited her currency on medications, proper administration, and choice of medications.

## RECOMMENDATIONS

In accordance with AFI 44-119, para 4.22, and after thorough review of all the exhibits and testimony, the committee unanimously recommends the following for Dr. Webster: (1) She should not practice in an ER setting (this is primarily due to our concern that she does not adequately handle task-saturated events), (2) Family Practice/Primary Care/Aerospace Medicine privileges should be allowed, (3) In any or all of those settings, she should be monitored with 100% chart review for no less than three months and, (4) at the conclusion of that three month period her privileges should be reevaluated.

It is clear Dr. Webster possesses the requisite knowledge to be a physician. She does, however, display several disturbing qualities which make her presence in the military (specifically, a military ER with possible war-time taskings), a potential disruption. Despite some superior traits as a physician (thoroughness, dedication to patients, medical knowledge, etc.), she appears to have certain identifiable interpersonal deficiencies.

While these undesirable personality traits have yet to result in an untoward patient outcome, we can easily see where those who review this case may not want her to

practice in *any* military setting. Accordingly, while we don't believe the evidence against Dr. Webster rises to a level which would warrant revocation of her privileges, we acknowledge she may not "fit in" to the unique demands and needs of the United States Air Force. In short, if after a sufficient period of review this physician is unable to meet the expectations of the military, consideration for administrative separation should be given.

RICHARD T. STEFFEN, Major, USAF, MC
Chairperson

20 Feb 99
DATE

ANDREW L. MATTHEWS, Major, USAF, MC
TDY from Langley AFB

20 Feb 99
DATE

FLORIN C. GEORGESCU, Capt, USAF, MC

20 FEB 99
DATE



250

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH WING (ACC)**
**HOWARD AIR FORCE BASE, PANAMA**

25 February 1999

MEMORANDUM FOR 24 MDOS/CC

FROM: JA

SUBJECT: Recommended Action Regarding Major Wilma Webster

1. On 17-18 Feb 99, the 24th Medical Group held a provider credentials hearing seeking revocation of Major Wilma Webster's privilege to practice medicine at Howard Air Force Base. On 20 Feb 99, the Hearing Board unanimously recommended that Major Webster's practice as a physician be limited. You have expressed an interest in PCSing Major Webster expeditiously based upon the Hearing Board's recommendations. We do not recommend PCSing Major Webster in the near future and offer the following guidance.

2. <u>BACKGROUND</u>:

a. On 17-18 Feb 99, the 24th Medical Group held a provider credentials hearing seeking to completely revoke Major Webster's ability to practice medicine at the 24th Wing. On 20 Feb 99, the Hearing Board issued the following findings and recommendations: 1) that Major Webster not practice in an ER setting; 2) that Major Webster should be allowed privileges to practice in Family Practice/Primary Care/Aerospace Medicine; 3) that in any or all of these practice settings, Major Webster should be monitored with 100% chart review for no less than three months; and 4) that Major Webster's privileges be reevaluated at the end of that three month period.

b. You have indicated that the 24th Medical Group has concerns about its ability to fully comply with the Hearing Board's decision. Given the small size of the 24th Medical Group, it will be difficult to provide the level of chart review recommended by the Hearing Board. Additionally, the small size of the 24th Medical Group makes thorough chart review difficult without involving those persons who were actively involved in supporting the action to revoke Major Webster's privileges. Such involvement by interested parties could potentially lead Major Webster to allege the chart review process is unfair. As a result, you have expressed an interest in PCSing Major Webster expeditiously.

3. <u>ANALYSIS</u>: In order to accurately explain the rationale behind our recommendation not to PCS Major Webster at the current time, a clear understanding of the appeal process is necessary. AFI 44-119, *Medical Service Clinical Quality Management*, Chapter 4, describes the appeal process. A summary of the AFI requirements are as follows:

a. The hearing transcript and the Hearing Board's findings and recommendations must be completed and provided to Major Webster thirty (30) calendar days after the hearing concludes (20 Mar 99) (AFI 44-119, paragraph 4.22.1).

b. Major Webster then has ten (10) duty days to respond/appeal to the Board's recommendations. She can request additional time to respond (AFI 44-119, paragraph 4.23). 24 MDG/CC has the discretion to grant additional time. It may be advisable to grant Major Webster additional time if she so requests, since Major Webster's counsel is located in the United States.

c. 24 MDG/CC then has ten (10) calendar days from the time he receives Major Webster's response to make his final decision (AFI 44-119, paragraph 4.24). If 24 MDG/CC does nothing within fifteen (15) days after he receives Major Webster's response, his silence is deemed a denial of the Hearing Board's decision. We strongly recommended against a denial by silence. If 24 MDG/CC disagrees with the Hearing Board's recommendation, he should state the reasons why in writing.

d. 24 MDG/CC must notify Major Webster in writing of his final decision within three (3) calendar days of the date his decision becomes final (AFI 44-119, paragraph 4.24). This notification letter must state what 24 MDG/CC's final decision is and notify Major Webster of her right to appeal his final decision. Specific guidance on the notification letter is located in Attachment 13 of AFI 44-119. The hearing transcript, Major Webster's response, and 24 MDG/CC's final decision is then forwarded to HQ ACC/SG. If Major Webster appeals 24 MDG/CC's final decision, the appeal process to the Air Force Surgeon General could take about 90 days from the final decision date.

4. <u>RECCOMENDATION</u>:

a. While we understand the reasons behind the 24th Medical Group's desire to PCS Major Webster, we recommend against PCSing her before the Air Force Surgeon General makes a final decision on the privileging action. Based on our interpretation of AFI 44-119, as well as consultation with Major William Boyce (the Medical Law Consultant (MLC) at Keesler AFB), we recommend retaining Major Webster in the Health and Wellness Center (HAWC) or utilizing her to perform other administrative duties within the 24th Medical Group. Although the AFI does not specifically prohibit PCSing Major Webster, doing so could give the appearance that the 24th Medical Group is acting against her in reprisal for an adverse hearing outcome, and is denying her due process before a final decision has been rendered. However, if you decide to PCS Major Webster before final action is taken, we recommend such action be coordinated with HQ ACC/SG. In addition, we recommend notifying Major Webster's gaining unit of the present privileging action.

b. If 24 MDG/CC does not want to retain Major Webster in the HAWC, he may assign her other administrative duties in the hospital or allow her to return to providing patient care with chart review in accordance with the Board's recommendation.

5. RECOMMENDATION: We recommend against PCSing Major Webster before the Air Force Surgeon General makes a final decision. If 24 MDG/CC accepts the recommendation of the Board, he is not required to immediately place Major Webster in a setting where she would provide patient care. At his discretion, he may keep her in the HAWC until a final decision has been reached.

6. Capt Cynthia Valderrey and Capt Reggie Harris are my action officers regarding this matter. Please call them at 284-5354 if you have any questions or require additional information.

Matthew J Polgar

MATTHEW J. POLGAR, Lt Col, USAF
Staff Judge Advocate

Attachments:
Board Findings and Recommendations, 20 Feb 1999

cc:
24 MDG/CC

253

DEPARTMENT OF THE AIR FORCE
24TH MEDICAL OPERATIONS SQUADRON (ACC)
HOWARD AFB, PANAMA

**MEMO FOR 24TH MDG/CC (Col O'Neil)** **22 February, 1999**

**FROM 24th MDG/SGH (Dr. Edwin K. Burkett)**

**SUBJECT: Privilege Hearing Recommendations**

1. On 22 February I was given the recommendations report from the hearing committee concernin the privileges of Major Wilma Webster. The committee decided that her privileges as an Emergency room provider should remain revoked because they agreed that she has proven cognitive deficits that ar magnified under stress and that she cannot handle task-saturated events. They further decided that her privileges in Family Practice/Primary Care/Aerospace Medicine should be reinstated under a 100% char review for no less than 3 months and then have her privileges reevaluated. The committee also commented that Major Webster has some disturbing qualities and undesirable personality traits that cause concern with her practicing medicine in any military setting. Following are my further comments and recommendations.

**Recommendation #1:** I fully concur with the decision about revocation of her Emergency physician privileges

Comment: In light of Major Webster's cognitive deficits and memory deficits I am not convinced that she can give appropriate and safe care to patients in Primary Care setting. I mainly question whether she can assimilate and manage the information for patients with multiple medical problems and multiple medications. However, this cannot be determined without monitoring and evaluation by long term chart review. Because of the lack of confidence in her at this MTF and the possibility that such a review may not appear to be impartially accomplished at the 24th MDG I do not feel this M&E should be done here.

**Recommendation #2:** While Major Webster remains at the 24th Medical Group she should continue without privileges in Primary Care. Upon her PCS the gaining MTF should institute the Monitoring and Evaluation process if they choose to grant her Primary Care privileges.

**Recommendation #3:** According to AFI 44-119 paragraph 3.17.3 I recommend that the hearing committee report, the DD Form 2499, and the transcript of the hearing be placed in Section III of her Provider Credentials File. Additionally, the supporting documents that have been consolidated into a single file be cross-referenced as part of this same section of the PCF.

Edwin K. Burkett

Edwin K. Burkett, MD
Maj USAF, MC
24th MDG, Chief, Medical Staff

Global Power For America

254