**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS UNITED STATES AIR FORCE**

19 January 2000

AFMOA/SGOC
110 Luke Avenue, Room 405
Bolling AFB, DC 20332-7050

Major Wilma Webster, USAF, MC
1703 Scarborough Drive, Apt 2G
Bellevue, NE 68123

Dear Major Webster

This office has completed a review of your adverse action appeal regarding a revocation of Emergency Medicine privileges and restriction of Primary Care privileges taken at Howard AFB, Panama. The AF Medical Practice Review Board reviewed your appeal along with the case file and found that the action taken by Howard AFB was appropriate. The AF Surgeon General concurred and has directed that this adverse privilege action be reported to the National Practitioner Data Bank, and your state(s) of known licensure. This is the final action in your case. I urge you to retain this document for your records.

My point of contact is Lt Col Lewis who can be reached at the address above.

Sincerely

Paula A Lewis, Lt Col for
MOLLY J. HALL, Col, USAF, MC
Chief, Clinical Quality Management Division
Air Force Medical Operations Agency
Office of the Surgeon General

Attachment:
Adverse Action Report

cc:
55th MDG/CC
HQ ACC/SG

# DOCUMENTS CONCERNING HEARING PRIVILEGES APPEAL BY MAJOR WILMA WEBSTER

| | |
|---|---|
| TAB 1 | Reserved for record of HQ USAF/SG |
| TAB 2 | Provider's Appeal |
| TAB 3 | Medical Facility Commander's Decision |
| TAB 4 | There is no tab 4, Provider's statement of exceptions/corrections |
| TAB 5 | Hearing Committee Findings and Recommendations |
| TAB 6 | Hearing Transcript |
| TAB 7 | Letter of Notification of Hearing |
| TAB 8 | Medical Facility Commander Decision following Credentials Action |
| TAB 9 | Findings of Professional Review Committee (Credentials Function) |
| TAB 10 | DD Form 2499 |

# HEALTH CARE PROVIDER ACTION REPORT

**1. DATE OF REPORT** *(YYMMDD)*: 98-11-20

**REPORT CONTROL SYMBOL**

**2. TYPE OF REPORT** *(X one)*

- [ ] a. INITIAL
- [ ] b. CORRECTION OR ADDITION
- [ ] c. REVISION TO ACTION
- [ ] d. VOID PREVIOUS

**3. DATE OF ACTION** *(YYMMDD)*: 98-11-19

**4. EFFECTIVE DATE OF ACTION** *(YYMMDD)*:

**5. MEDICAL TREATMENT FACILITY (MTF)**

a. NAME AND ADDRESS *(Street, City, State, ZIP Code)*

24th Medical Group (ACC)
Unit 0530
APO AA 34001-5300

b. DMIS CODE

**6. PROVIDER INFORMATION**

a. NAME *(Last, First, Middle)*: WEBSTER, WILMA P

b. SSN: 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

c. DATE OF BIRTH *(YYMMDD)*: 41-07-06

d. NAME OF PROFESSIONAL SCHOOL ATTENDED: UNIVERSIDAD NACIONAL AUTONOMA DE MEXICO

- [ ] (1) UNITED STATES
- [X] (2) FOREIGN

e. DATE GRADUATED *(YYMMDD)*: 79-07-16

f. STATUS *(X one)*

- [ ] (1) Army
- [ ] (2) Navy
- [X] (3) Air Force
- [ ] (4) PHS
- [ ] (5) Civilian GS
- [ ] (6) Partnership Internal
- [ ] (7) Partnership External
- [ ] (8) Personal Services Contract
- [ ] (9) Non-Personal Services Contract

g. SOURCE OF ACCESSION *(X all that apply)*

(1) Military

- [ ] (a) Volunteer
- [ ] (b) Armed Forces Health Professional Scholarship Program
- [ ] (c) Uniformed Services University of Health Sciences
- [ ] (d) National Guard
- [ ] (e) Reserve
- [ ] (f) Other *(Specify)*

(2) Civilian

- [ ] (a) Civil Service
- [ ] (b) Contracted
- [ ] (c) Consultant
- [ ] (d) Foreign National *(Local hire)*
- [ ] (e) Other *(Specify)*

h. PAY GRADE: MAJ

i. FEDERAL DEA NUMBER *(if known)*:

j. LICENSING INFORMATION

| (1) State of License | (2) License Number | (1) State of License | (2) License Number |
|---|---|---|---|
| WISCONSIN | 26210 | MICHIGAN | 4301044199 |
| PENNSYLVANIA | MD032126-E | CALIFORNIA | CFE 42836 |

**7. TYPE OF PROVIDER AND SPECIALTY (FIELD OF LICENSURE)** *(X all that apply)*

a. PHYSICIAN DEGREE

- [X] M.D. (010)
- [ ] D.O. (020)

(1) Highest Level of Specialization

- [X] (a) Board Certified
- [ ] (b) Residency Completed
- [ ] (c) In Residency (015 / 025)
- [ ] (d) No Residency

(2) Primary Specialty

- [ ] (a) In Training
- [ ] (b) General Practice (GMO)
- [ ] (c) Anesthesiology
- [ ] (d) Aviation Medicine
- [ ] (e) Dermatology
- [ ] (f) Emergency Medicine
- [ ] (g) Family Practice
- [X] (h) Internal Medicine
  - [ ] (h.a) Gastroenterology
  - [ ] (h.b) Hematology-Oncology
- [ ] (h) Internal Medicine (Cont.)
  - [ ] (h.c) Infectious Disease
  - [ ] (h.d) Nephrology
  - [ ] (h.e) Pulmonary
  - [ ] (h.f) Rheumatology
  - [ ] (h.g) Tropical Medicine
  - [ ] (h.h) Allergy/Immunology
  - [ ] (h.i) Cardiology
  - [ ] (h.j) Endocrinology
- [ ] (i) Neurology
- [ ] (j) Obstetrics/Gynecology
- [ ] (k) Ophthalmology
- [ ] (l) Otorhinolaryngology
- [ ] (m) Orthopedics
- [ ] (n) Pathology
- [ ] (o) Pediatrics
- [ ] (p) Physical Medicine
- [ ] (q) Preventive Medicine
- [ ] (r) Psychiatry
- [ ] (s) Radiology
- [ ] (t) Surgery, General
  - [ ] (t.a) Cardio-Thoracic
  - [ ] (t.b) Colon-Rectal
  - [ ] (t.c) Neurosurgery
- [ ] (t) Surgery, General (Cont.)
  - [ ] (t.d) Oncology
  - [ ] (t.e) Pediatric
  - [ ] (t.f) Peripheral Vascular
  - [ ] (t.g) Plastic
- [ ] (u) Underseas Medicine
- [ ] (v) Urology
- [ ] (w) Intensivist
- [ ] (x) Neonatologist
- [ ] (y) Other *(Specify)*

(3) Board Certification(s): INTERNAL MEDICINE

b. DENTIST

- [ ] DENTIST (030)

(1) Highest Level of Specialization

- [ ] (a) Board Certified
- [ ] (b) Residency Completed
- [ ] (c) In Residency (035)
- [ ] (d) No Residency

(2) Primary Specialty

- [ ] (a) General Dental Officer
- [ ] (b) Oral Surgeon
- [ ] (c) Other *(Specify)*

(3) Board Certification(s)

c. OTHER PROVIDERS

- [ ] OTHER PROVIDERS
- [ ] Audiologist (400)
- [ ] Clinical Dietician (200)
- [ ] Clinical Pharmacist (050)
- [ ] Clinical Psychologist (370)
- [ ] Clinical Social Worker (300)
- [ ] Nurse Anesthetist (110)
- [ ] Nurse Midwife (120)
- [ ] Nurse Practitioner (130)
- [ ] Occupational Therapist (410)
- [ ] Optometrist (636)
- [ ] Physical Therapist (430)
- [ ] Physician Assistant (642)
- [ ] Podiatrist (350)
- [ ] Speech Pathologist (450)
- [ ] Registered Nurse (100)
- [ ] Emergency Medical Technician
- [ ] Other *(Specify)*

**8. ACTION TAKEN**

| a. PRIVILEGING ACTION TAKEN/REASON CODE *(See Page 3, Item 14a)* | b. ACTIONS OTHER THAN PRIVILEGING (ADMINISTRATIVE) / REASON CODE *(See Page 3, Item 14b)* | c. LENGTH OF ACTION *(In months)* |
|---|---|---|
| 610.80 | | |
| 610.90 | | |
| | | |
| ☐ NONE | ☐ NONE | |

**d. LIST HOW AND WHY WHAT PRIVILEGES ARE AFFECTED BY THE ACTION:** Emergency Services privileges revoked. Family Practice, Primary Care Clinic privileges revoked.

WHY: 1. Member diagnosed with Multiple Sclerosis, progressive (610.80)

2. Cognitive Disorder (610.90) Expert neuropschologist says her ability to function as an Emergency or Primary Care Clinic provider is significantly impaired.

3. Testimony of Psychiatric Care Givers note member has no insight into her condition. Member denies that she could have MS and denies that she has any cognitive dysfunction.

**e. OTHER ACTIONS TAKEN** *(X all that apply)*

| | | | | |
|---|---|---|---|---|
| ☐ (1) Review | ☐ (2) Rehabilitation | ☐ (3) Retraining | ☐ (4) On-the-Job-Training | ☐ (5) Separated for Cause |
| ☐ (6) Fired / Terminated | ☐ (7) Separated | ☐ (8) Resigned | ☐ (9) Retired | ☐ (10) Other |

**9. CIVILIAN CONTRACTOR NAME**

**10. PROVIDER'S LAST KNOWN ADDRESS OR HOME OF RECORD** *(Street, City, State, and ZIP Code)*

PSC 1
BOX 3178
APO AA 34001

**11. MEDICAL TREATMENT FACILITY (MTF) POINT OF CONTACT**

a. NAME *(Last, First, Middle Initial)*: BURKETT, EDWIN K.

b. TELEPHONE *(Include Area Code)*: 313-284-3014

**12. REMARKS**

1703 Scarborough Drive Apr 26 [home]
Bellevue NE 68123

**13. OFFICE OF THE SURGEON GENERAL (OTSG) INDIVIDUAL SUBMITTING COMPLETED REPORT**

| a. NAME *(Last, First, Middle Initial)* | b. TITLE | c. TELEPHONE |
|---|---|---|
| | | |

| d. ADDRESS | e. SIGNATURE | f. DATE SIGNED *(YYMMDD)* |
|---|---|---|
| Office of the Surgeon General | | |

**INSTRUCTION**

(All other items are self-explanatory.)

**2b. Correction or Addition:** An administrative change intended to supersede or add information to the contents of a current version of a report.

**Revision to Action:** A new action which is related to and modifies a previously submitted adverse action.

**2c. Date of Action:** Enter the date of formal approval of the MTFs action as indicated by the OTSG.

**3. Effective Date of Action:** Enter the date on which the action became effective.

**4. Privileging Actions Taken / Reason:** This entry is equivalent to NPDB's Adverse Action Classification Code.

**14a.**

**14a. PRIVILEGING ACTIONS TAKEN / REASON CODES**

610 REVOCATION - CLINICAL PRIVILEGES
- 610.01 Alcoholism and Other Substance Abuse
- 610.02 Incompetence / Malpractice / Negligence
- 610.03 Narcotics Violations
- 610.04 Felony
- 610.05 Fraud
- 610.10 Unprofessional Conduct
- 610.20 Mental Disorder
- 610.30 Allowing Unlicensed Person to Practice
- 610.50 Disciplinary Action Taken in Another State
- 610.70 Violated Previous Action
- 610.80 Physical Impairment
- 610.90 Other

630 SUSPENSION - CLINICAL PRIVILEGES
- 630.01 Alcoholism and Other Substance Abuse
- 630.02 Incompetence / Malpractice / Negligence
- 630.03 Narcotics Violations
- 630.04 Felony
- 630.05 Fraud
- 630.10 Unprofessional Conduct
- 630.20 Mental Disorder
- 630.30 Allowing Unlicensed Person to Practice
- 630.50 Disciplinary Action Taken in Another State
- 630.70 Violated Previous Action
- 630.80 Physical Impairment
- 630.90 Other

635 VOLUNTARY SURRENDER OF ALL PRIVILEGES WHILE UNDER INVESTIGATION FOR INCOMPETENCE OR MISCONDUCT OR TO AVOID SUCH INVESTIGATION - CLINICAL PRIVILEGES
- 635.01 Alcoholism and Other Substance Abuse
- 635.02 Incompetence / Malpractice / Negligence
- 635.03 Narcotics Violations
- 635.04 Felony
- 635.05 Fraud
- 635.10 Unprofessional Conduct
- 635.20 Mental Disorder
- 635.30 Allowing Unlicensed Person to Practice
- 635.50 Disciplinary Action Taken in Another State
- 635.70 Violated Previous Action
- 635.80 Physical Impairment
- 635.90 Other

640 REDUCTION IN PRIVILEGES - CLINICAL PRIVILEGES
- 640.01 Alcoholism and Other Substance Abuse
- 640.02 Incompetence / Malpractice / Negligence
- 640.03 Narcotics Violations
- 640.04 Felony
- 640.05 Fraud
- 640.10 Unprofessional Conduct
- 640.20 Mental Disorder
- 640.30 Allowing Unlicensed Person to Practice
- 640.50 Disciplinary Action Taken in Another State
- 640.70 Violated Previous Action
- 640.80 Physical Impairment
- 640.90 Other

645 OTHER RESTRICTION - CLINICAL PRIVILEGES
- 645.01 Alcoholism and Other Substance Abuse
- 645.02 Incompetence / Malpractice / Negligence
- 645.03 Narcotics Violations
- 645.04 Felony
- 645.05 Fraud
- 645.10 Unprofessional Conduct
- 645.20 Mental Disorder
- 645.30 Allowing Unlicensed Person to Practice
- 645.50 Disciplinary Action Taken in Another State
- 645.70 Violated Previous Action
- 645.80 Physical Impairment
- 645.90 Other

650 DENIAL (ORIGINAL OR SUBSEQUENT) - CLINICAL PRIVILEGES
- 650.01 Alcoholism and Other Substance Abuse
- 650.02 Incompetence / Malpractice / Negligence
- 650.03 Narcotics Violations
- 650.04 Felony
- 650.05 Fraud
- 650.10 Unprofessional Conduct
- 650.20 Mental Disorder
- 650.30 Allowing Unlicensed Person to Practice
- 650.50 Disciplinary Action Taken in Another State
- 650.70 Violated Previous Action
- 650.80 Physical Impairment
- 650.90 Other
- 650.90 Other

680 699 REVISION TO ACTION - CLINICAL PRIVILEGES
- 680.00 Reinstatement, Complete
- 681.00 Reinstatement,Conditional
- 689.00 Reinstatement, Denied
- 690.00 Partial Reinstatement of Privileges - Reduction of Previous Action
- 695.00 Extension of Previous Action
- 699.00 Reversal of Previous Action Due To Appeal or Review

**14b. ACTIONS OTHER THAN PRIVILEGING (ADMINISTRATIVE) / REASON CODES**
- 810.01 Alcoholism and Other Substance Abuse
- 810.02 Incompetence / Malpractice / Negligence
- 810.03 Narcotics Violations
- 810.04 Felony
- 810.05 Fraud
- 810.10 Unprofessional Conduct
- 810.20 Mental Disorder
- 810.30 Allowing Unlicensed Person to Practice
- 810.50 Disciplinary Action Taken in Another State
- 810.70 Violated Previous Action
- 810.80 Physical Impairment
- 810.90 Other

LAW OFFICES OF
**TERRENCE J. MARTIN, P.C.**
COLONNADE I
9901 IH 10 WEST, SUITE 430
SAN ANTONIO, TEXAS 78230
(210) 697-3400

TERRENCE J. MARTIN

TELECOPIER NO.
(210) 697-6386

*April 6, 1999*

***TO:*** *HQ USAF/SG through*
*HQ AFMOA/SGPC*
*ATTN: Major Lewis*
*110 Luke Ave., Room 405*
*Bolling AFB*
*Washington, D. C. 20332-7050*

***VIA FEDERAL EXPRESS AIRBILL NO. 809927369192***

***SUBJECT:*** *Appeal of Final Privileging Decision Regarding Wilma P. Webster, Major, USAF, MC*

***FROM:*** *Wilma P. Webster, Major, USAF, MC , by her attorney, Terrence J. Martin*

*1. In accordance with AFI 44-119, Paragraph 4.26, Major Wilma P. Webster, USAF, MC, hereby appeals the Final Privileging Decision of Terrence Jay O'Neil, Col., USAF, MC, rendered on 24 March 1999 and received by Major Webster on 25 March 1999. In that decision, Col. O'Neil agreed with the recommendations of the Credential's Board that Major Webster's Emergency Medicine privileges should be rescinded and her Family Practice/Primary Care/Aerospace Medicine privileges should be continued in Category "2" with 100% chart review and full supervision for a period of six months. It is the position of Major Webster that this decision is against the great weight and preponderance of the evidence contained in the transcript of the Credentials Hearing. It is further Major Webster's position that her rights to due process under the law and in accordance with AFI 44-119 were violated as (1) the Air Force failed to produce at the hearing crucial medical records concerning the Code Blue which was one of the matters which the Credentials Board based part of their opinion upon; (2) introduced records not provided to Major Webster prior to the Credentials Hearing; (3) exerted command influence upon at least one of the witnesses; (4) failed to assure the impartiality of the Hearing Committee and (5) went outside the hearing record to investigate the Code Blue without advising Major Webster of same.*

2. ***Complaints of Patients in General:*** *Major Wilma P. Webster started working in the Howard AFB Emergency Room in October, 1997. She was removed from her duties as an Emergency Physician on approximately January 29, 1998 due to her Carpal Tunnel Syndrome and placed in the Primary Care Unit (Page 65, Hearing Transcript). Following her recovery from her surgery to correct her Carpal Tunnel Syndrome, she returned to the Emergency Room in mid April 1997 and remained there until she was reassigned to the Health and Wellness Center on May 22, 1998. This was not a credentialling action. (See Exhibit 36).*

*During her time in the Emergency Room, Major Webster saw either 1102 patients (Exhibit 52) or 1151 patients (Exhibit 27). The evidence in this case shows that Major Webster had a total of arguably eight complaints during her time in the Emergency Room. See Exhibits 22 (not a patient complaint), 23, 34 and 54. This means that her total complaints equaled either .73 % or .69% of the total patients she saw. In other words, less than one percent of her patients registered complaints against her. There is no evidence as to the exact number of patients she saw in the Primary Care Clinic, but she only received three complaints during this period, two of which concerned waiting times and one concerned her crying (Exhibit 23). None of her complaints concerned an untoward outcome for her patients. Clearly a complaint rate of less than .75% cannot be considered evidence of poor practice or difficulties in working with patients.*

*In addition to the above, Dr. Webster was never given an opportunity to respond to the majority of these complaints and was not even aware of most of them until they were presented to her as a result of this credentialling action. Hence, she was denied the opportunity at the time to refute same. One of these complaints is included in Exhibit 54, the complaint of Mrs. Schroder. This complaint was not raised at the Board Hearing and was overlooked by Major Webster and her counsel in the review of the many documents submitted to her. However, after the hearing and as a result of it being mentioned in the Board's Findings and Recommendations, Major Webster submitted the complaint to Lt. Col. Granville, Chief, Orthopaedic Surgery. He found nothing wrong in the way Major Webster treated Mrs. Shroder and his written confirmation of this is attached as Exhibit "A" to this Appeal which is hereby incorporated by reference the same as if fully copied herein verbatim. One can only question how many of the other complaints cited by the Board would have been found to be inaccurate or unjustified if Major Webster had been timely provided these complaints and had a chance to investigate them at the time they were made.*

3. ***Specific Cases Addressed by the Credentials Board:*** *The Board, in their report, addressed three specific cases involving Major Webster's treatment of patients. Their analysis of the Tylenol/ Benadryl issue was fair and based upon the evidence. They acknowledged the testimony of Captain Cusak and found that while an error occurred, it was properly handled by Major Webster and, in fact, was a common error which several doctors throughout the Hospital had made due to the almost identical appearance of the bottles holding the drugs in question (page 233-234, Hearing Transcript). Their use of this incident as an example of Major Webster's*

*forgetfulness and disorganization, however, is contrary to the evidence in this case and will be addressed further in this appeal. The Board's interpretation of the other two specific cases is simply erroneous and contrary to the evidence contained in the record and the records withheld from the Board for their consideration. What follows is an examination of the evidence regarding both of these cases:*

*A.* ***Code Blue:*** *The Board found that the allegations contained in Major Edwin K. Burkett's Memorandum for Record dated 31 January 1998 (Exhibit 17) and his testimony before the Board beginning at page 55 of the hearing transcript restating the "facts" set forth in his Memorandum for Record to be accurate and proof that Major Webster's handling of the Code breached the standard of care. The Board also used this Code as examples of (1) Major Webster being unable to handle the stress of working as an Emergency Room Physician and (2) her cognitive dysfunction affecting her patient care.*

*This analysis is faulty because (1) the Board was not provided the AETC Form 1280 Code Blue Record; (2) the Board either disregarded or failed to remember the testimony of both Col. O'Neil and Major Webster; and/or (3) was prejudiced in favor of Major Burkett. The hearing transcript of the testimony of Dr. Burkett at page 59 and page 71 reflects that the records of the Code have simply vanished and no one knows where they are. In truth and in fact, the records were locked in the Command Section at all times.*

*Major Burkett's first criticism was that Major Webster did not maintain an adequate airway on the patient until he arrived and repositioned the patient's head (page 60, Hearing Transcript). However, Col. O'Neil testified that he arrived prior to Major Burkett, that the patient was being bagged, that he charged himself with the responsibility of insuring there was bilateral breath sounds throughout the Code, and that there were bilateral breath sounds the entire time he was present. (See pages 143 and 163 of the Hearing Transcript.) Major Webster was hazy on the details of the Code as she had not seen the records of the Code since the incident happened, just as Col. O'Neil was (see page 163 of the Hearing Transcript); but she did not recall that the patient had a problem with his airway (see page 295 of the Hearing Transcript). Obviously, if Col. O'Neil is hearing bilateral breath sounds throughout the Code and he arrived prior to Major Burkett, Major Burkett is wrong about the inadequate airway control. This is also true if the patient was showing signs of breathing on his own as testified by Major Webster.*

*Another criticism of Major Burkett was that Major Webster failed to defibrillate the patient in a timely manner and needed prompting from him even after he intubated the patient. Unfortunately, the Board was not given the opportunity to read the Code Sheet for if they had, there would had to have been raised serious questions regarding Major Burkett's criticisms. Major Burkett testified that he was advised of the Code while he was at home, and that it takes him four to five minutes to get from his home to the*

*ward (page 58, Hearing Transcript). Major Burkett states in Exhibit 17 that when he arrived, Dr. Webster was in the process of trying to intubate the patient. He goes on to state that Major Webster was so intent on intubating the patient that she had forgotten about the need to defibrillate the patient. The records of the Code are attached hereto as Exhibit "B" and are incorporated by reference the same as if fully copied herein verbatim. They showed that the arrest began at 21:30, and that the patient was defibrillated the first time at 21:33. The patient was again defibrillated at 21:35 and 21:42, and the patient was not intubated until 21:47. Thereafter, no further defibrillations were accomplished until the Code was terminated at 21:59. This record does not square with the testimony of Major Burkett or his Memorandum for Record.*

*The testimony of Col. O'Neil further verified that Major Burkett's testimony and Memorandum for Record were in error. First, Col. O'Neil's time line is different from Major Burkett's (page 143, 144, Hearing Transcript). Further, it is apparent that when you compare his account to the Code Record, Col. O'Neil must have arrived latter than he remembered, and Major Burkett arrived after him. Finally Col. O'Neil testified that after the patient was intubated, the Code went smoothly (page 162, Hearing Transcript). Clearly, if Major Burkett had to remind Major Webster to shock the patient, then the Code was not going smoothly after the patient was intubated, and Col. O'Neil would have obviously noted it.*

*The last area of criticism was the stopping of CPR after it was initiated. While I am obviously not a physician, Dr. Matthews, a Board Member and the only physician on the Board who was Board Certified in Emergency Medicine, implied by his question at page 295 of the Hearing Transcript that it is appropriate to stop CPR at least to check the patient's real rhythm.*

*If the Board had been provided the Code Record, it is clear that the testimony of Major Burkett would have to have been questioned and, under cross-examination, the credibility of Major Burkett would clearly have been challenged. Further, the introduction of the x-rays ordered by Major Webster showing that Major Burkett possibly did not intubate the patient properly may have been given more credence by the Board and served as an explanation of why Major Burkett might have some animosity against Major Webster as a result of this Code.*

*During the Hearing, clearly, there was no evidence introduced to the Board regarding the medication administered during the Code, but the Board found Major Webster was even deficient in this area. The Code Records would have clearly changed this opinion.*

*Why the Board chose to accept Major Burkett's testimony, which was contradicted by both Col. O'Neil and Major Webster, cannot be answered via this Appeal. However,*

*there is no question that the Board Chairperson was biased in favor of Major Burkett. This bias was shown when the undersigned challenged whether Major Burkett properly intubated the patient based upon the fact that post mortem x-rays taken prior to the patient being moved following the Code showed that the endotracheal tube was not inserted properly (Exhibit 19). Specifically at page 81 of the Héaring Transcript, the Committee Chairperson, Major Richard Steffen stated:*

> *"Is there any point pertaining to her because he is not on trial for intubating the code.* ***We know that situation so I am sure Edwin intubated her just fine. Is there anything pertaining --"***

*At that point, the undersigned immediately challenged the Chairperson for cause but the challenge was denied by the Legal Advisor. It is Major Webster's position that this challenge should have been sustained and the failure to do so is one of the reasons the Board accepted Major Burkett's testimony without even questioning it. Further, contrary to the finding of the Board, it is Major Webster's position that the record shows that she conducted the Code properly. Her failure to be able to intubate the patient is not really criticized as every witness who was asked, acknowledged that she did the right thing by asking someone else to intubate the patent when she was unable to (pages 70, Hearing Transcript). Finally, instead of this Code being used to show Major Webster cannot operate under stress, the full record, which the Board was never provided, shows just the opposite.*

*Another point of error regarding the Board's handling of this Code involves Dr. Matthews. At the hearing, Exhibit 42 was introduced which was part of the file originally provided to Major Webster during this hearing. It implied that the Code in question was reviewed by 1 MDOS/CC, Langley AFB, Virginia. Major Matthews questioned this document and wanted to investigate it further. The Legal Advisor warned the Board that they should not review anything which was not in the record and not try and investigate any matter outside the confines of the Board. After the undersigned gave his closing argument relying on Exhibit 42, Major Matthews advised the undersigned that he had called Langley and determined that the Code in question had not actually been reviewed and that Exhibit 42, which was provided by the Government, could not be relied upon for determining the appropriateness of the Code. What other investigation was conducted by Major Matthews without the knowledge of Major Webster, her counsel, and the Legal Advisor is unknown, but one thing is clear – Major Matthews chose to disregard the instructions of the Legal Advisor and by doing so, Major Webster was subjected to secret evidence, a clear violation of her right to due process.*

*B.* ***Cat Bite:*** *The testimony of Ms. Linda Thomas is contained at pages 138-140 of the Hearing Transcript, and the testimony of Major Webster is contained at pages 281-283 of the Hearing Transcript. Ms. Thomas alleges that Major Webster gave her the*

*wrong antibiotic and Major Webster contends that she decided to change the medication without any prompting from Ms. Thomas. Ms. Thomas claims that Major Webster had to be reminded that Ms. Thomas needed a tetanus shot and then forgot the conversation a short time later and asked her when she had her last tetanus shot. Major Webster denies this. What is not included in Ms. Thomas' testimony or Major Webster's or in Exhibit 34 was that Major Webster ever prescribed the dosage for the rabies immunoglobin. While the Board was free to accept either parties' testimony as more creditable on the first two issues, they were not free to falsely assume that Major Webster prescribed the wrong dosage of the rabies immunoglobin. The Board is required to make their decisions based upon the evidence in the record and only that evidence. It is Major Webster's contention that this finding is only a further example of the bias of the Board against her.*

*4. **Forgetfulness and Disorganization in Medical Practice Setting:** The Board under this category finds that the "relatively vague complaints" against Major Webster "to be true" and further finds that these relatively vague complaints are proof of a pattern of forgetfulness and disorganization. They cite as support for these findings the failure of Major Webster to deny that she is forgetful and Exhibits 23, 34, 46, 47, 48 and the Benadryl/Tylenol mix-up (Exhibit 22).*

*To see how far the Board was willing to stretch to make this finding, the Appellate Authority needs to only examine the testimony of Major Webster and these Exhibits, and then compare them to the testimony of Major Webster's co-workers who appeared and testified at the Hearing, some at great risk to their career. Contrary to the Board's assertion that Major Webster did not deny that she was forgetful, I would direct the Appellate Authority to page 281 of the Hearing Transcript where the undersigned specifically asks Major Webster whether she is forgetful in the Emergency Room and she replies: "No, not really."*

*Exhibit 22 contains the incident involving the giving of Benadryl instead of Tylenol. If this is an example of forgetfulness and disorganization, then the Board must feel that the numerous other Physicians throughout the Hospital who made this same error, by the Board's own admission in their Findings and Recommendations, are also forgetful and disorganized.*

*Exhibit 23 contains eight complaints. Only two of these complaints, one dated November 11 and the other dated November 12, 1997, allege Major Webster was forgetful without any specific examples of why the patients had that opinion.*

*Exhibit 34 concerns the cat bite incident more fully discussed in paragraph 3 above. If Ms. Thomas is believed over the testimony of Dr. Webster, then you might be able to use this as an example of forgetfulness. However, if you believe Ms. Thomas, Major Webster's forgetfulness must not have been too bad as she recognized the need for the change in the medication she had prescribed immediately upon Ms. Thomas asking her about same, and she was sure that Ms. Thomas got her tetanus shot and was told to go to Public Health.*

*Exhibits 46 and 47 concern the written memorandums of Captain Shercliffe who wrote them after the Squadron Commander advised him to keep a close watch on Major Webster and document anything he felt was of concern and after Captain Shercliffe was advised to tell his staff the same thing. It is significant that despite this intensive scrutiny, all that Captain Shercliffe and his staff could document is what is contained in these memorandums. Additionally, Captain Shercliffe could not remember how long before his first memorandum it was that he was told to keep an eye on Major Webster and report any items of concern. Please see pages 186-188, Hearing Transcripts.*

*With that background, the memorandums document a total of five incidents. The first incident concerns Major Webster's refusal to write up a dog bite report on a patient who had been seen earlier by another provider (page 177, Hearing Transcript). Whether this decision was right or wrong is not at issue; however it is clearly not an example of forgetfulness or disorganization.*

*The second item of concern relates to an ambulance run where Major Webster requested a strip on the patient. She apparently was unaware that they did not have that capability but when finally informed that they could not provide a strip, gave appropriate orders (page 178, Hearing Strip). Again, nothing to do with forgetfulness or disorganization.*

*The third item of concern regards the term patient who came into the Emergency Room after her water had broken. Major Webster requested that the Husband take her to the hospital downtown for delivery and he refused. Ultimately, they decided to take her downtown via a commercial taxi (page 178, Hearing Transcript). Captain Shercliffe testified that it was in Major Webster's medical discretion how the patient should be transported downtown. The Board felt that Major Webster's decision breached the standard of care. Whether their opinion is correct or not, however, is not the issue in this instance. Clearly, there is nothing in this incident to show that Major Webster was forgetful or disorganized. The only issue is whether she made the correct decision in transporting the patient via commercial taxi.*

*With regards as to whether Major Webster made the correct decision to have the patient transported via public taxi to the downtown hospital, the Board concluded that Major Webster's decision violated the standard of care with nothing more than the report of Captain Shercliffe. They had no records on the patient and asked no questions of Major Webster concerning this incident. None of the Board Members were specialists in OB/GYN. Attached hereto as Exhibit "C" is the record of the patient in question and the review by Gustavo A. Herrera, M.D., FACOG, OB/GYN Clinic, Howard AFB, Panama. The records document that Major Webster consulted with Dr. Olmos, OB/GYN, who concurred in Major Webster's decision to send the patient via POV. Dr. Herrera writes that in his opinion, Major Webster's decision was not a breach of the standard of care. It should be noted that nowhere in the notification letter to Major Webster was she advised that this case was considered to be an example of improper patient*

*care, and hence, the Appellate Authority should consider this additional evidence in Major Webster's favor. It should also be noted that Major Webster was denied the right to obtain actual copies of the medical records on the patient in question, and thus was forced to write what was in the medical records. Exhibit "C" is the typed version of what Major Webster recorded from the medical records of the patient in question.*

*The fourth item of concern is that she did not leave the Emergency Room until 1300 hours when she had to be back to work by 1800 hours the same day (page 178, Hearing Transcript). No one suggests that Major Webster simply forgot that her shift ended earlier or that she failed to take off earlier due to lack of organization. The truth is that her dedication to her patients attested to below by her co-workers is probably what kept her late.*

*The fifth item concerns Major Webster seeing two pediatric patients before other scheduled patients (pages 178-179, Hearing Transcript). This may be a result of disorganization, but Captain Shercliffe did not ever suggest that it was a result of forgetfulness. In fact in his entire testimony, while he did complain that comparatively Major Webster was not as organized as the other doctors or as predictable, he never once complained of any incidents of forgetfulness.*

*What was even more interesting, however, was his evaluation of Major Webster as an Emergency Room Provider. He explained that her approach was one like other Emergency Room Doctors who were trained in Internal Medicine, that is, slow and methodical. He also noted that her skills as a physician were comparable to the other Emergency Room Physicians, and he had confidence in her as a physician when working with her (pages 182-184, Hearing Transcript).*

*The final example of forgetfulness is Exhibit 47 which is a Memorandum for Record dated May 20, 1998 and written by Major James E. McCrary, Chief, Emergency Services. This Memorandum includes the patient complaints already discussed above and the observations of Captain Shercliffe contained in his Memorandums discussed above. It also lists a 12 November 1997 Memorandum from Lt. Col. Robbins noting a one time non-compliance with standard documentation on downtown consults. It should be noted that Exhibit 53 contains a letter from Lt. Col. Robbins stating that after that one incident, Major Webster complied with the standard documentation on downtown consults. Hence, this clearly is not an example of forgetfulness or disorganization and could be construed as an example of the exact opposite.*

*Another item listed is Major McCrary's 30 November 1997 verbal counseling session. Significantly, Major McCrary testified that aftet that counseling, Major Webster improved (pages 202, 213, Hearing Transcript).*

*The final documented items in Major McCrary's Memorandum concerns Leaving Without Being Seen Statistics (LWOBS). Exhibits 26 and 27 were compiled by Major Webster from the Emergency Room Patient Records and show that contrary to what is written in the Memorandum,*

*Major Webster was not consistently the provider with the highest LWOBS statistics. In fact, Major McCrary acknowledged that the numbers on Exhibit 26 and 27 were approximately the same numbers he used to come up with a different result (page 197, Hearing Transcript). Major McCrary also noted that these statistics may or may not be significant (page 194, Hearing Transcript), and Dr. Theodoro Mendez, Major McCrary's supervisor, testified that LWOBS statistics cannot be used in the Emergency Room because you don't know if they occurred on a slow day or if they were the result of treating an Emergency (page 108,109, Hearing Transcript).*

*Despite this, the Air Force produced new statistics on LWOBS, Exhibits 49-52, over the objection of Major Webster's counsel (pages 198, 199, Hearing Transcript). AFI 44-119, paragraph 4.20, specifically prohibits the introduction of additional information not used in the original credentials function deliberations unless the provider is informed of the additional information prior to the hearing and is given reasonable time to review the information as well as access to the records upon which the additional information is based so that he/she can prepare to refute it. Consequently, this constitutes another example of where Major Webster was denied her rights to due process and the Air Force violated its own regulations.*

*In any event, these statistics do not denote forgetfulness. They might denote a lack of organization, but there is simply not enough evidence to validate these statistics as being an example of Major Webster's disorganization.*

*At this point, however, it is necessary to review the evidence not cited by the Board in their Findings and Recommendations. The first thing that needs to be pointed out is that Major McCrary acknowledged that he never observed Major Webster's clinical practice and had no criticism of her medical practice despite reviewing her patient charts (pages 191, 203, 204, Hearing Transcript). Further, the only time he felt it was necessary to counsel her on her performance in the Emergency Room was on 30 November 1997 (page 192, Hearing Transcript). Major McCrary had no criticism of her medical practice and based upon seeing patients who were previously seen by Major Webster and reviewing their charts, found no discrepancies in her treatment of the patients (page 203, Hearing Transcript). In fact, he volunteered that from what he had seen of Major Webster's medical practice, he thought it was good (pages 203, 204, Hearing Transcript). He also contradicted Dr. Mendez' testimony that Major Webster got 50% of the patient complaints in the Emergency Room (pages 206, 210, 211, Hearing Transcript). Additionally, he admitted that his Emergency Room was disorganized (page 210, Hearing Transcript). Clearly, this disorganization could have been part of what others perceived was Major Webster's problem instead of an Emergency Room wide problem.*

*Major McCrary did not state that Major Webster was forgetful. And finally, Major McCrary refused to voice any opinion on whether Major Webster should have her privileges removed, but did voice his opinion that he did not think it was right to go from a verbal counseling to a hearing to remove one's privileges (pages 207. 208, Hearing Transcript). His*

*bottom line was that while Major Webster's "care of patients is appropriate," she "just takes too long."*

*It is also necessary to point out that everyone of the Air Force's witnesses from Col. O'Neil down could not produce one chart that documented poor care on Dr. Webster's part (pages 79, 80,107, 159, 160, Hearing Transcript). In fact, every one of the Air Force witnesses acknowledged that as far as they knew, her medical skills were good.*

*The testimony of her co-workers and patients was even more glowing and are briefly summarized below for the convenience of the Appellate Reviewer:*

a. *Major Michael B. Angeloro, Nurse Anesthetist (pages 215-218, Hearing Transcript): Major Angelro testified that he tested Major Webster's skills in intubating a patient, that she successfully intubated two patients without any problems, and that he saw nothing that would cause him concern in her skills in intubating a patient. Remarkably, the Board used this as an example that Major Webster could operate in a nonstressful environment, but implied based upon her handling of the Code in question, that the results would be different in a stressful situation. This is remarkable because the evidence is uncontradicted that all physicians from time to time have difficulty intubating patients, and in this particular case, the evidence is uncontradicted that her failure to intubate the patient was due to a physical limitation (Carpal Tunnel Syndrome) which was treated successfully.*

b. *Major David Copp, General Surgeon (pages 218-220, Hearing Transcript): Major Copp worked with Major Webster in the Emergency Room when he was called by her for a surgical consult. He stated that from working with her in the Emergency Room and from seeing patients in his clinic who were seen by Dr. Webster in the Emergency Room, he found her skills comparable to the skills of the other Emergency Room Doctors and saw nothing that would give him any concern about her competency to practice medicine.*

c. *Captain Mark P. Westrick, Director Clinical Laboratory (pages 220-223, Hearing Transcript): Captain Westrick regularly reviewed Major Webster's orders for test and laboratory work and found them to be appropriate for the patients. He saw nothing in her laboratory work which caused him concern about her competency to practice medicine and felt that this was a good indicator to judge a physician's competency. He also knew Major Webster socially and noted that she had never made any inappropriate comments to him.*

d. *Doctor Byron Efthimiadis, Health Promoter Coordinator (pages 223-227): Dr. Efthimiadis is a pediatrician who had at least one experience with Major Webster*

*in treating an Emergency Room Patient and who is Major Webster's supervisor in her current assignment at the Health and Wellness Center. Concerning the shared patient, he related that Major Webster called him from the Emergency Room for a consult on an infant she suspected had diabetes. When he arrived at the Emergency Room, the patient had been properly worked up by Major Webster. He found her diagnosis to be correct and found that in working with her, she was very competent. He also testified that Major Webster was performing excellently in her current job and that he wanted her back if the Board did not pull her credentials. He noted that Major Webster had not made any inappropriate remarks while she worked for him. He knew of nothing which would cause him to question Major Webster's competency to practice medicine.*

e. *Captain Randall Langston, Commander of Public Health (pages 227-232): Captain Langston reviewed the complaint of Ms. Thomas and found nothing distressing about it with regards to Major Webster's handling of the cat bite. He also testified that he has worked with Major Webster since she was transferred to the Health and Wellness Center. He stated that Major Webster had never said anything inappropriate to him and that he would have no hesitancy in allowing Major Webster to treat either himself or his family.*

f. *Captain Steven G. Cusack, Chief of Pharmacy (pages 232-239, Hearing Transcript): Captain Cusack regularly reviewed the prescriptions of Major Webster and was most impressed with her knowledge of pharmacology, her ability to stay current in the use of drugs, and her performance on his committee. He found her thorough. He was a patient of Major Webster and was impressed with her thoroughness and the concern she showed about him. He saw nothing in his observations to given him concern about her competency to practice medicine and would allow her to treat himself and his family. He further felt that a physician's prescription use was one of the better ways to evaluate a physician's competency.*

g. *Captain Ann Li, Primary Care Physician (pages 239-245, Hearing Transcript): Captain Li worked with Major Webster for eight months in the Emergency Room. Prior to her becoming licensed, Dr. Webster was supervising her. Captain Li found Major Webster to be an excellent physician who was very thorough and meticulous in her treatment of patients. In her opinion, Major Webster's rate of seeing patients was about the same rate as Captain Li's. She never had any concerns about her judgment and sought her advice on consults. She also sought treatment from Major Webster. She knew of nothing that would justify pulling Major Webster's credentials in the Emergency Room or anywhere else and voiced the opinion that she was a very good doctor.*

*Captain Li also testified that she felt threatened by Major Burkett. She had a conversation with him in which it was her distinct impression that if she testified out of the norm in the Hearing, her application for Flight Medicine would be disapproved.*

h. *TSgt Thomas Sonderegger, NCOIC Patient Administration (pages 245-248, Hearing Transcript): TSgt Sonderegger submitted a written statement in support of Major Webster (Exhibit 30) as well as testifying before the Board. He found Major Webster a very honest and thorough person who gave him everything he needed to process her recent PEB. He further noted that in her practice of medicine, she frequently came to his section to follow up on laboratory and other test results and x-rays on patients. He also noted how she would call her patients to advise of the results. Major Webster never said anything inappropriate to him, and he never observed anything which caused him to question her competency in practicing medicine. He would allow Major Webster to treat him and his family.*

i. *Captain Michael Tall, Emergency Room Physician, (pages 249-254, Hearing Transcript): Captain Tall worked with Major Webster in the Emergency Room but did not recall having treated a patient with her. He has however seen patients previously seen by Major Webster and their records always reflected a proper diagnostic work up and proper care. He believes that she is competent to practice medicine in the Emergency Room and would have no objection to her being reinstated as an Emergency Room Physician at Howard AFB. If she was sent to a busier Emergency Room, again he would not have a problem with her medical skills, but he felt that because of her thoroughness, you might get more patient complaints because the waiting times might go up. Captain Tall was particularly appreciative that Major Webster would stay after her shift to see patients who she began treating on her shift rather than passing them on to the next shift. Captain Tall stated that he would have no problem in having Major Webster treat him or a member of his family.*

j. *Major Joan Marine, Physician Assistant (pages 284-286, Hearing Transcript): Major Marine has seen over 70 patients seen previously by Major Webster. She has also called Major Webster for consults. She trusts Major Webster's medical judgment and has never seen anything which caused her to question Major Webster's competency. Captain Marine would allow Major Webster to treat both her and her family. Major Webster never said anything inappropriate to her.*

k. *Captain Mark A. Luff, Family Practice Physician, (Exhibit 28): Captain Luff worked with Major Webster in the Emergency Room. He was unable to be present for the hearing but he submitted a letter supporting her. He noted that she had a caring patient attitude and unlike other providers, always stayed after*

*her shift to finish up her patients.*

l. *SrA Stacey L. Lindgren, Emergency Room Technician (Exhibit 29): SrA Lindgren submitted a letter in support of Major Webster whom she had worked with in the Emergency Room. She voiced the opinion that Major Webster was an "exceptional doctor" who inspired her to strive a little harder and become knowledgeable. She further noted that Major Webster was dedicated to her patients.*

m. *Captain Phyllis F. Jones, Nurse Manager (Exhibit 61): Captain Jones worked with Major Webster for two months in the Emergency Room. She was very laudatory of Major Webster both with regards to her patient care and her interactions with the staff. She concluded her letter by stating "As a registered nurse, I never felt a need to question or doubt her management, treatment or care she administered to her patients."*

n. *Lt.Col. Santa Ngo, Pediatrician (Exhibit 62): Lt. Col. Ngo was a member of the original Credentials Committee who voted to revoke Major Webster's privileges. However, she submitted a letter of support for Major Webster Lt. Col. Ngo noted that she worked with Major Webster in the Emergency Room when called for consultations. She noted that Major Webster had genuine concern for her patients and provided good medical care. She also commented that Major Webster stays current on her medical journals and accepts recommendations on current pediatric care.*

o. *SrA Jodi L. McMasters, Medical Service Journeyman (Exhibit 63): SrA McMasters is a patient of Major Webster and noted that she was very caring and willing to listen to her concerns.*

p. *Mr. John S. Best, SFC, USA (Retired) (Exhibit 64): Mr. Best is a patient of Major Webster. His letter thanks Major Webster for the prompt, courteous and professional medical care that Major Webster provided his family and himself.*

*It is Major Webster's contention that when all the above evidence is considered, the overwhelming weight of the evidence is that she is a competent Emergency Room Physician. If Major Webster was so forgetful and disorganized, isn't it only logical to conclude that the Air Force would have been able to present one patient record which shows this? If Major Webster was so forgetful and disorganized, is it logical that she would have the support of so many of her colleagues even at the risk of possible retaliation from their Commander? If Major Webster was so forgetful and disorganized, isn't it logical to expect that this would show up on her prescriptions, in her laboratory work or with patient follow up? Yet no such evidence exists. The only evidence consists of relatively few vague complaints which the Board, apparently ignoring*

*the other overwhelming evidence, twisted to find a pattern of forgetfulness and disorganization. Even Major Webster's detractors were forced to admit that she rendered quality care. How can you do that and be forgetful and disorganized? Clearly, over an eight-month period of time, more examples of this supposed forgetfulness and disorganization would have to have been documented, but yet they were not.*

*5. **<u>Inappropriate Behavior/Impulse Control</u>**: There is no doubt that the statements referenced in this section of the Board's Findings and Recommendations were inappropriate. Major Webster admits to each of the incidents cited but does quarrel with what she said about the aerovac plane blowing up. She recalls stating that "I don't care if the plane blows-up" or words to that effect; not that "I am going to blow up the plane" or words to that effect. SrA Goode recalls the event differently, and the flight nurse recorded what SrA Goode said differently. However, Major Webster does not deny that whatever the words, it was inappropriate to speak them. The Board concludes that these outbursts were secondary to stress and contends that, therefore, Major Webster should be removed from a position of stress in the Emergency Room.*

*What the Board does not mention, although it is clearly in evidence (Exhibits 12 and 13), is what caused this stress. The first incident occurred on her first day of working in the Primary Care Clinic after she had just been removed from the Emergency Room due to her Carpal Tunnel Syndrome and the impact this medical condition had on her ability to intubate patients. Essentially, she told Major Burkett that she was going to lunch in a louder than normal voice. Major Burkett said she was not, and she returned to the Clinic without taking lunch. While Major Burkett may not have liked her response to his orders for her not to go to lunch, clearly her response was appropriate but for her raising her voice. Further, while she disagreed with Major Burkett's directive to return to the Primary Care Clinic without going to lunch, she nevertheless followed his directive to do so.*

*During the time that the other incidents occurred, there were several events which threatened Major Webster's career not only in the Air Force but also her profession as a physician:*

*a. Emergency Room Supervisor was directed by Squadron Commander to write memorandums on anything he felt was inappropriate action by Major Webster in the Emergency Room and was further directed to advise the Emergency Room Staff to advise him of same;*

*b. Removed from her position as an Emergency Room Physician due to her Commander's loss of confidence in her;*

*c. Given a Command Directed Mental Health Evaluation;*

*d. Given a Referral OPR;*

293

e. *Evaluated by Major LaMacchia as having cognitive deficits and possibly Multiple Sclerosis which made her unfit to practice as an Emergency Room Provider;*

f. *Directed to go to Wilford Hall USAF Medical Center for further evaluation and for possible MEB action;*

g. *Had all her privileges at Howard AFB revoked;*

h. *Suffered Guillain Barre Syndrome and was returned to Wilford Hall USAF Medical Center;*

i. *Was referred to PEB; and*

j. *Presented with a package of documents, many of which she had never seen, which were being used to justify the revocation of all of her privileges and further advised that this was an adverse credentialling action which, if accepted, would be reported to her state medical licensing boards.*

*Captain Gregory Fey in his testimony admitted that Major Webster was "stressed out" from all these events. He also testified that Major Webster felt that she was being railroaded by the Air Force and had no effective advocate for herself. He also stated that her rationale was logical and that she was never psychotic. And as noted in the Board's Findings and Recommendations, Captain Fey noted that she was never suicidal or homicidal. Finally, while he felt that her actions could not simply be explained by stress, he admitted that he had not treated many physicians in a similar situation and had never been in this situation himself. Further, he was unwilling or unable to advise the Board that Major Webster was unfit to practice medicine because he had never observed her medical practices and that was not his function in seeing her.*

*It is Major Webster's contention that placed under the enormous stress of all the above, she reacted badly, but these reactions were caused by her deep convictions that none of the actions were justified. It is also her position that all of these events, except for the event with Sgt. John D. Silbaugh on 7 February 1998, never occurred while she was treating patients. In fact, this one event occurred in the Primary Care Clinic, not in the Emergency Room. It is further significant to note that even after she was returned to the Emergency Room in mid-April 1998, she was never reported as making inappropriate comments to patients. Additionally, she made no such comments while performing her duties in the Health and Wellness Clinic. In other words, there is no showing that despite her tremendous frustration with the Air Force and how she was being treated, she ever voiced these concerns to her patients she was treating , other than the 7 February 1998 incident, or that they impacted in any way on the quality of care she provided. Again, the only evidence from her co-workers is that she is a quality physician who*