*the other overwhelming evidence, twisted to find a pattern of forgetfulness and disorganization. Even Major Webster's detractors were forced to admit that she rendered quality care. How can you do that and be forgetful and disorganized? Clearly, over an eight-month period of time, more examples of this supposed forgetfulness and disorganization would have to have been documented, but yet they were not.*

*5. **<u>Inappropriate Behavior/Impulse Control</u>**: There is no doubt that the statements referenced in this section of the Board's Findings and Recommendations were inappropriate. Major Webster admits to each of the incidents cited but does quarrel with what she said about the aerovac plane blowing up. She recalls stating that "I don't care if the plane blows-up" or words to that effect; not that "I am going to blow up the plane" or words to that effect. SrA Goode recalls the event differently, and the flight nurse recorded what SrA Goode said differently. However, Major Webster does not deny that whatever the words, it was inappropriate to speak them. The Board concludes that these outbursts were secondary to stress and contends that, therefore, Major Webster should be removed from a position of stress in the Emergency Room.*

*What the Board does not mention, although it is clearly in evidence (Exhibits 12 and 13), is what caused this stress. The first incident occurred on her first day of working in the Primary Care Clinic after she had just been removed from the Emergency Room due to her Carpal Tunnel Syndrome and the impact this medical condition had on her ability to intubate patients. Essentially, she told Major Burkett that she was going to lunch in a louder than normal voice. Major Burkett said she was not, and she returned to the Clinic without taking lunch. While Major Burkett may not have liked her response to his orders for her not to go to lunch, clearly her response was appropriate but for her raising her voice. Further, while she disagreed with Major Burkett's directive to return to the Primary Care Clinic without going to lunch, she nevertheless followed his directive to do so.*

*During the time that the other incidents occurred, there were several events which threatened Major Webster's career not only in the Air Force but also her profession as a physician:*

*a. Emergency Room Supervisor was directed by Squadron Commander to write memorandums on anything he felt was inappropriate action by Major Webster in the Emergency Room and was further directed to advise the Emergency Room Staff to advise him of same;*

*b. Removed from her position as an Emergency Room Physician due to her Commander's loss of confidence in her;*

*c. Given a Command Directed Mental Health Evaluation;*

*d. Given a Referral OPR;*

e. *Evaluated by Major LaMacchia as having cognitive deficits and possibly Multiple Sclerosis which made her unfit to practice as an Emergency Room Provider;*

f. *Directed to go to Wilford Hall USAF Medical Center for further evaluation and for possible MEB action;*

g. *Had all her privileges at Howard AFB revoked;*

h. *Suffered Guillain Barre Syndrome and was returned to Wilford Hall USAF Medical Center;*

i. *Was referred to PEB; and*

j. *Presented with a package of documents, many of which she had never seen, which were being used to justify the revocation of all of her privileges and further advised that this was an adverse credentialling action which, if accepted, would be reported to her state medical licensing boards.*

*Captain Gregory Fey in his testimony admitted that Major Webster was "stressed out" from all these events. He also testified that Major Webster felt that she was being railroaded by the Air Force and had no effective advocate for herself. He also stated that her rationale was logical and that she was never psychotic. And as noted in the Board's Findings and Recommendations, Captain Fey noted that she was never suicidal or homicidal. Finally, while he felt that her actions could not simply be explained by stress, he admitted that he had not treated many physicians in a similar situation and had never been in this situation himself. Further, he was unwilling or unable to advise the Board that Major Webster was unfit to practice medicine because he had never observed her medical practices and that was not his function in seeing her.*

*It is Major Webster's contention that placed under the enormous stress of all the above, she reacted badly, but these reactions were caused by her deep convictions that none of the actions were justified. It is also her position that all of these events, except for the event with Sgt. John D. Silbaugh on 7 February 1998, never occurred while she was treating patients. In fact, this one event occurred in the Primary Care Clinic, not in the Emergency Room. It is further significant to note that even after she was returned to the Emergency Room in mid-April 1998, she was never reported as making inappropriate comments to patients. Additionally, she made no such comments while performing her duties in the Health and Wellness Clinic. In other words, there is no showing that despite her tremendous frustration with the Air Force and how she was being treated, she ever voiced these concerns to her patients she was treating , other than the 7 February 1998 incident, or that they impacted in any way on the quality of care she provided. Again, the only evidence from her co-workers is that she is a quality physician who*

*cares for her patients and renders care well within the standard of care of an Emergency Room Physician.*

6. ***Neuropsychological Disorder:*** *The Board, in their Findings and Recommendations, found that Major Webster had "some form of cognitive deficit" and further concluded that "this deficit impaired her ability to make effective and rapid decisions, which are essential for an ER setting." The problem with this conclusion is that there is no evidence as detailed above that shows that Major Webster's "cognitive deficit" ever impaired her ability to make effective and rapid decisions in the ER.*

*The testimony and statements of her co-workers and even the Government's Witness were that she was a fine physician who rendered good care to her patients. Not one medical record was introduced by the Government to show inadequate care by Major Webster to any of her patients. Dr. Tall, Dr. Li, Dr. Copp, Dr. Efthimiadis, Dr. Luff, Dr. Ngo, Dr. McCrary, PA Marine, and Captain Shercliffe all either worked with Major Webster in the Emergency Room or reviewed charts of patients seen by Major Webster, and* ***not one*** *had any criticisms of her medical care of patients.*

*Major Burkett in his testimony beginning at page 255 of the Hearing Transcript admits that no decredentialling action of any kind was taken against Major Webster when she was removed from the ER and placed in the Health and Wellness Center in late May 1998. Hence, apparently at that point, the Hospital Commander and Major Webster's Supervisors had concluded that all the evidence used against her now in this hearing from October 1997 to May 1998 did not justify the conclusion that Major Webster was unfit to be a credentialled provider in any area of the hospital. This evidence only became a justification for decredentialling Major Webster after she was found to possibly have Multiple Sclerosis and to have "cognitive deficit." Major Burkett as much as admitted this when during an exchange between Major Matthews, Major Steffens and himself at pages 262-263 of the Hearing Transcript, he testified that the decredentialling was done because Major Webster had a health problem which was hindering her cognitive abilities.*

*Turning to Major Webster's cognitive deficit, it is important to appreciate that psychiatry and psychology are not exact scientific fields. Much of their conclusions are based on subjective analysis of testing and speaking with the patient. Their findings and conclusions must always be substantiated by concrete examples of the patient's actual behavior and performance. With this in mind, it is important to realize that none of the psychologists that examined Major Webster ever observed her practice of medicine in any setting, much less the Emergency Room. They were not privileged to hear the testimony of Major Webster's co-workers and others, who based on their observation of her treatment of her patients, the records of her treatment of her patients, the laboratory work she ordered on her patients, the prescriptions she ordered for her patients and the favorable results she obtained for her patients, concluded that Major Webster was a fine physician. If they had, the "relative cognitive deficit" described by Dr. O'Connor and the*

*"cognitive deficit" found by the Government's psychologists may well have been found to be of no significance in her practice of medicine in any setting.*

*Further, each of the Government Examiners to an extent were predisposed to find something wrong with Major Webster as Major Webster was referred to them as a result of a Command Directed Mental Evaluation. Each Government Pyschologist was also provided with letters from her commander which made wide sweeping allegations against her. However, when such allegations were put to the test under cross-examination in the Hearing, the overwhelming weight of the evidence proved that Dr. Webster's practice of medicine was equal to her other providers in the Emergency Room with the exception that she was a little slower seeing patients due to her approach, i.e., her training as an internist.*

*At the time of the Hearing, the PEB had already met and found that Major Webster had no medical problems and was fit for worldwide duty. Because of this, it was the position of Major Webster throughout the hearing that the Board was not permitted to reexamine the medical narratives on Major Webster to, in effect, reopen the PEB. It was and remains our legal position that the findings of the PEB were "res judicata" on the Board with regards to her medical and psychological fitness to practice medicine, and the Board's inquiry was limited to determining if Major Webster's medical practice was deficient as shown by the treatment she rendered to her patients. By taking the position that the Board could reexamine Major Webster's mental and physical competency to practice medicine, they again violated Major Webster's right to due process. In fact, their Findings and Recommendations are not based upon examples of Major Webster's poor medical practice, but rather are based on her cognitive deficit.*

*Because of these beliefs and legal positions, Major Webster was not prepared to defend herself further on these issues. However, since the Hearing, Major Webster has consulted with Gustavo A. Herrera, M.D., Gynecologist, Howard AFB, Panama on the possible effects on her cognitive abilities of not taking hormonal replacement therapy. It was his opinion that the cognitive deficits noted by the psychologists who examined Major Webster were probably related to her estrogen deficiency. Please see Exhibit "D" which is attached hereto and incorporated by reference the same as if fully copied herein verbatim. Therefore, even if the Board was correct in finding that Major Webster had "cognitive deficits", a problem which did not result in improper care to Major Webster's patients, this problem apparently is easily resolved with the hormone replacement therapy, a treatment option not even considered by the psychologist who examined Major Webster or by the members of the Board.*

*7. __Conclusions:__ AFI 44-119, paragraph 4.18, states: " Privileges review is a function of professional peers. Personnel participating in the review* ***must be able to impartially review the case.*** *" AFI 44-119, paragraph 4.20 states: "Additional information, not used in the original credentials function deliberations on the case, may be presented at the hearing.* ***However, the provider must be informed of additional information prior to the hearing and must be afforded***

*reasonable time to review the information as well as access records upon which the additional information is based so that he/she may prepare to refute it."*

*The Air Force violated both of these provisions in the Hearing afforded Major Webster. The Air Force allowed, over the objection of Major Webster's counsel, the new Leaving Without Being Seen Statistics, and Major Matthews, contrary to the direction of the Board's Legal Advisor, conducted his own investigation of the Code Review without such information being provided to Major Webster. The Air Force also failed to provide Major Webster with an impartial hearing as the Chairperson was biased in favor of Major Burkett, the Government's chief accuser.*

*Besides the above, the Board itself was tainted by unlawful command influence upon witnesses and possibly potential witnesses in favor of Major Webster (Dr. Li). In addition, the Government withheld key records on the Code in question and, in fact, represented to the Board that such records were not available and could not be found when, in fact, such records were locked in the Command Section.*

*The above actions of the Government tainted the proceedings and violated Major Webster's right to due process. The impact of same on the Board's Findings and Recommendations can only be speculated upon here but may provide the reason why the Board reached findings and recommendations which were not supported by the evidence in this case.*

*What the evidence did show in this case, without any contrary evidence from the Government, was that Major Webster was a competent Emergency Room Physician. The evidence further showed that if she had cognitive deficit, Major Webster's cognitive deficit did not affect, in any way, the proper treatment of her patients.*

*The Board, itself, found that with regards to "patient complaints", the only theme in the few which were attributed to Major Webster was "to waiting times." With regards to medication errors, one of which Major Webster contends was not an error, the Board found that two medication errors was "an acceptable medication error rate." Further, the Board found that Major Webster's knowledge of pharmacology was impressive. Finally the Board admitted that Major Webster had " the requisite knowledge to be a physician" and had superior traits as a physician, i.e.," thoroughness, dedication to patients, medical knowledge, etc."*

*However, despite these findings, they still revoked her credentials to practice Emergency Room Medicine and limited her privileges to practice in Family Practice/Primary Care/Aerospace Medicine Clinic. These findings and recommendations were based: (1) upon her alleged forgetfulness and disorganization which is not documented in the evidence and is, in fact, contradicted by the evidence in this case; (2) her "cognitive deficit" without any examples of how this "cognitive deficit" ever manifested itself in the treatment of Major Webster's patients; (3) upon analysis of the Code Case (Exhibit "B"), Pregnancy Case (Exhibit "C") and the Cat Bite*

*Case which were flawed and contradicted by not only the evidence presented at the Hearing but by the records of the Code and the Pregnancy Case; and (4) upon her inappropriate statements made under the stress of the threat of having her privileges revoked and having her professional career destroyed. The Board's decision was arbitrary and capricious, and their flawed reasoning should not be allowed to stand in the face of the overwhelming evidence in favor of Major Webster retaining all of her privileges without any limitations.*

*Major Webster respectfully requests that the Appellate Authority reverse the findings of the Board and reinstate Major Webster's full credentials including her privileges to practice Emergency Medicine. In the alternative, Major Webster respectfully requests that the Appellate Authority rejects the Board's Findings and Recommendations and reconvene another Hearing as the initial Hearing violated both Air Force Regulations and Major Webster's right to due process.*

*Respectively Submitted,*

*TERRENCE J. MARTIN, P.C.*

*BY:* ______________________
*TERRENCE J. MARTIN*

*TJM/nlp*

*Enclosures: (Exhibits A, B, C and D)*

*cc: Major Wilma P. Webster, USAF, MC w/enclosures*
*cc: Col. Terrence J. O'Neil, USAF, MC w/enclosures*

240

EXHIBIT "A"

01 APR 99

MEMORANDUM FOR WHOM IT MAY CONCERN

FROM: ROBERT GRANVILLE, LTC MC USA, Chief, Orthopaedics

SUBJECT: CARE GIVEN TO MICHELLE SCHRODER

1. By request of Maj. Wilma Webster, I have evaluated the care that she documented was given to Michelle Schroder on 02 MAY 1998.

2. Mrs. Schroder had a degenerative tear of her right lateral meniscus, a non-emergent orthopaedic condition. Maj. Webster's documented treatment met the standard of care for this condition.

ROBERT GRANVILLE, LTC, MC, USA
Chief, Orthopaedic Surgery

EXHIBIT "B"

...24 MED GP HOWARD AFB PM | LOG NUMBER: 980124-00

Date/Time: 24 Jan 199802130
to Hospital: OTHER
ory Obtained From: OTHER RELATION

3rd Party Payer: NO
Time Seen: 2130
Category: EMERGENCY

Jdr: PSC 4 BOX 613 APO, AA 34004
Chief Complaint: CARDIAC/RESPIRATORY ARREST

Phone: 280-6414
Sex: MALE Age: 30

**VITAL SIGNS**

Time ___
BP-SY ___
BP-DI ___
Pulse ___
Resp ___
Temp ___
WT-Ped ___

Orders Inits Time

**Medications**

Tetanus:
Allergies:
NO ALLERGIES DOCUMEN

2130
S. 'Code' called in ward at approx 2130 after a patient fell back in bed apparently unconscious with heavy breathing. When I arrived on scene patient was already receiving CPR. I put my hand in his right groin to feel the pulse though I felt faint pulses in addition to the CPR induced pulses. At that point Ann Brook pointed out that the patient breathing on his own. At that point we stopped CPR and observed the patient's respirations even while the monitor seemed to indicate V fib. However it also decreased and he became cyanotic again. CPR was resumed and I ordered defibrillate x 3 at escalating doses, epi 1mg x 3 and 1 gram of Mg Sulfate. I attempted but was unable to intubate. pt was intubated by Dr. Burkett. Potassium 7c mgs given IVP. 2 mgs atropine given after pt became straight line. pt was declared deceased at 21:57. A post mortem CXR was taken and showed notable cardiomegaly and intubation in the R mainstem bronchus.

**ASSESSMENT/DIAGNOSIS**

Cardiopulmonary Arrest

**DISPOSITION**

__Home __Full Duty
__Quarters
__24hrs __48hrs __72hrs

Modified Duty Until:
Day:___ Mon:___ Yr:___

Referred to:

__Emergency __Today
__72 hours __Routine

Admitted to:

Others:

Condition Upon Release:
__Improved __Unchanged
✓ Deteriorated
Release Time:

Signature of Provider/Stamp: [signature] MD

Instructions to Patient:

I HAVE RECEIVED AND UNDERSTAND MY DISCHARGE INSTRUCTIONS ___

20/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 HILL, WILLIAM A11
26 Apr 1967 MALE W:285-4617 H:280-6414

344

Pers[redacted]l Data - Privacy Act o:

CARE & TREATMENT - 24 MED GP HOWARD AFB PM ! LOG NUMBER: 980124-0004-

: Date/Time: 24 Jan 1998@2130 ! 3rd Party Payer: NO
to Hospital: OTHER ! Time Seen: 2130
ory Obtained From: OTHER RELATION ! Category: EMERGENCY

ddr: PSC 4 BOX 613 APO, AA 34004 ! Phone: 280-6414
Chief Complaint: CARDIAC/RESPIRATORY ARREST ! Sex: MALE Age: 30

| VITAL SIGNS | | | |
|---|---|---|---|
| Time | | | |
| BP-SY | | | |
| BP-DI | | | |
| Pulse | | | |
| Resp | | | |
| Temp | | | |
| WT-Ped | | | |

| Orders | Inits | Time |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Medications

Tetanus:
Allergies:
NO ALLERGIES DOCUMENTED

2130
S. Code called in ward at approx 2130
after a patient fell back in bed [illegible]
[illegible] unconscious [illegible]
When I arrived on scene patient was
already receiving CPR. [illegible]
on his right [illegible] to feel the [illegible],
[illegible] felt faint [illegible]
to the CPR [illegible] pulse. [illegible]
[illegible] posted [illegible]
breathing on his own. At that point we
stopped CPR and assessed [illegible]
respirations [illegible]
[illegible] to indicate V fib. [illegible]
[illegible] and he [illegible]
was resumed and I [illegible]
3 at escalating doses [illegible]
and [illegible] update. I attempted
but was unable to intubate. Pt was
intubated by Dr. [illegible] Kett. [illegible]
[illegible]
after pt became [illegible]
Pt was declared deceased at 2157. A
post mortem CXR was taken and [illegible]
[illegible]
[illegible] Watchins.

ASSESSMENT/DIAGNOSIS
Cardiopulmonary
arrest

====== DISPOSITION =====
__Home __Full Duty
__Quarters
__24hrs __48hrs __72hrs

Modified Duty Until:
Day:____ Mon:____ Yr:____

Referred to:

__Emergency __Today
__72 hours __Routine

Admitted to:

Others:

Condition Upon Release:
__Improved __Unchanged
✓ Deteriorated
Release Time:

Signature of Provider/Stamp:
[signature] MD

Instructions to Patient:

I HAVE RECEIVED AND UNDERSTAND MY DISCHARGE INSTRUCTIONS ____

20/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 HILL,WILLIAM A11
26 Apr 1967 MALE W:285-4617 H:280-6414

# CARDIAC/RESPIRATORY ARREST REPORT

*(This form is subject to the Privacy Act of 1974 - Use Blanket PAS, DD Form 2005)*

| LOCATION | ADMITTING DIAGNOSIS | DATE |
|---|---|---|
| Inpatient unit | Right Pleural effusion | 24 Jun 98 |

| TIME | INTERVENTIONS (Drugs/Doses, Procedures, IV's) |
|---|---|
| 2130 | BCLS initiated and 20 gauge IV inserted into R arm |
| 2133 | Defib. 300 J |
| 2135 | Defib 360 J. Epinephrine 1mg IVP |
| 2138 | Lidocaine 75mg IVP |
| 2142 | Epinephrine 1mg IVP |
| 2142 | Defib 360 J |
| 2143 | Epinephrine 1mg IVP |
| 2145 | Epinephrine 1mg IVP |
| 2146 | 20 gauge IV inserted into L arm |
| 2147 | Intubated by Dr. Burkett |
| 2149 | Mg 1gm IVP |
| 2151 | Asystole. Epinephrine 1mg IVP |
| 2155 | Atropine 2mg IVP. NG Tube inserted by Dr. Burkett |
| 2158 | Epinephrine 1mg IVP |
| 2158 | Bretylium 500mg IVP |
| 2159 | Code terminated |

| TYPE OF ARREST | TIME OF ARREST |
|---|---|
| Cardiac | 2130 |
| **TIME BCLS STARTED** | **TIME ACLS STARTED** |
| 2130 | 2133 |
| **TIME INTUBATED** | **TUBE SIZE** |
| 2147 | |

**NAME OF PROVIDER**
Dr. Webster

**NAMES OF PHYSICIANS RESPONDING**
Dr. Webster
Dr. O'Neil
Dr. Burkett

**VITAL SIGNS**

| TIME | BP | P | R |
|---|---|---|---|
| 2132 | Ø | Ø | minimal |
| 2133 | Ø | Ø | Ø |
| 2135 | Ø | Ø | Ø |
| 2142 | Ø | Ø | Ø |
| 2151 | Ø | Ø | Ø |
| 2154 | Ø | Ø | Ø |

**ARTERIAL BLOOD GASES**

| TIME | FIO2 | pH | pO2 | pCO2 |
|---|---|---|---|---|
| | | | | |

**ADDRESSOGRAPH**
Hill, William John

**TIME CPR STOPPED**
2159

**SIGNATURE OF PHYSICIAN**

**SIGNATURE OF NURSE**

**RESUSCITATION**
☐ SUCCESSFUL ☒ EXPIRED

AETC FORM 1280, JUL 93 REPLACES ATC FORM 1280, APR 85, WHICH IS OBSOLETE

246

RATORY ARREST REPORT (Continued)




ORMATION

'80. JUL 93 (REVERSE)

# CARDIOPULMONARY ARREST WORKSHEET

DATE / TIME OF ARREST: 2130 CPR INITIATED AT / BY: 2130

CODE BLUE ANNOUNCED @: 2130

TEAM MEMBERS RESPONDING

Director: Webster
Physicians: Webster, Oneil, Burket
Technicians: Bolton, Brook, Caesar

Nurses: Lester, Addison
Lab: Metzgar
X-Ray: Yes
Other: ECC, Ambulance

IV Fluids Started (Type/Time, Flow rate, Site/Catheter size):

#1: 2130 Right ARM 20g open wide
#2: 2146 Left ARM 20g open wide
#3:

Airway Management

Time: 2132 By: Brook
Bag Mask: Brook - O2 100%
Intubation: 2143 Dr Burkett
Bilateral Breath Sounds Verified by: Dr Burkett

| Vital Signs | Time 2132 | Time 2133 | Time 2135 | Time 2142 | Time 2151 | Time | Time | Time | Time |
|---|---|---|---|---|---|---|---|---|---|
| B/P | | | | | | | | | |
| Pulse | | No | No | No | NO | | | | |
| Resp. | Sparse | NO | NO | NO | NO | | | | |
| Defib. | ? | Yes | Yes | Yes | | | | | |
| Rhythm | ? v fib | ? v fib | | | flatline | | | | |
| Energy | | | | | | | | | |

| Medications | Route | Time 2135 | Time 2138 | Time 2140 | Time 2143 | Time 2148 | Time 2149 | Time 2151 | Time 2155 |
|---|---|---|---|---|---|---|---|---|---|
| Epinephrine | | 1ml | | 1ml | 1ml | 1ml | | 1ml | |
| Lidocaine | | | 75 | | | | | | |
| Bretylium | | | | | | | | | |
| Atropine | | | | | | | | | |
| Other | | | | | | | Mag 1gm | | 2ml |

Other Treatment:

Foley Catheter @ ______ By: ______
X-Ray @ ______ Of: ______
Other: NG Tube @ 2155 By: Dr. Burket

CODE TERMINATED AT: 2159 - 57
BY: Webster
REASON:

Transport to GACH @:
Attendants: SSgt [illegible], MSgt [illegible]

WILMA R WEBSTER, MAJ
EMERGENCY PHYSICIAN 44MD
24 MDOS, HAFB, [illegible]

Signature of Recorder 25 Jan 98 Signature of Director 25 Jan 98 Date

Remr... see reverse side of form.

HAFB FORM 0-180 May 91

# CARDIOPULMONARY ARREST WORKSHEET

DATE / TIME OF ARREST: ______________ CPR INITIATED AT / BY: ______________

CODE BLUE ANNOUNCED @: ______________

TEAM MEMBERS RESPONDING

Director: ______________ Nurses: ______________

Physicians: ______________

Technicians: ______________ Lab: ______________

X-Ray: ______________

Other: ______________

IV Fluids Started (Type/Time, Flow rate, Site/Catheter size):

#1: ______________

#2: ______________

#3: ______________

Airway Management

Time: ______________ By: ______________

Bag Mask: ______________

Intubation: ______________

Bilateral Breath Sounds Verified by: ______________

| Vital Signs | Time | Time | Time | Time | Time | Time | Time | Time | Time |
|---|---|---|---|---|---|---|---|---|---|
| B /P | | | | | | | | | |
| Pulse | | | | | | | | | |
| Resp. | | | | | | | | | |
| Defib. | | | | | | | | | |
| Rhythm | | | | | | | | | |
| Energy | | | | | | | | | |

| Medications | Route 2157 | Time 2158 | Time 2159 | Time | Time | Time | Time | Time | Time |
|---|---|---|---|---|---|---|---|---|---|
| Epinephrine | 1mg | r | | | | | | | |
| Lidocaine | | | | | | | | | |
| Bretylium | | 500 | | | | | | | |
| Atropine | | | | | | | | | |
| Other | | | ipig1 2 VF in 850 | | | | | | |

Other Treatment:

Foley Catheter @ ______________ By: ______________

X-Ray @ ______________ Of: ______________

Other: ______________ @ ______________ By: ______________

CODE TERMINATED AT: ______________

BY: ______________

REASON: ______________

Transport to GACH @: ______________

Attendants: ______________

WILMA P. WEBSTER, MAJ
EMERGENCY PHYSICIAN 4423
24 MDOS, HAFB PANAMA

[signature] 21 Jan 98 [signature] 25 Jan 98

Signature of Recorder — Date — Director — Date

Remarks: Use reverse side of form

HAFB FORM 0-100 Nov 91

49

Place: Inpatient Unit
Diagnosis: Right pleural effusion
21:30 BCLS initiated sith 20 gauge IV
21:33 Defib 300J
21:35 Defib 360J epinephrine 1 mg IVP
21:38 Lidocaine 75 mgs IVP
21:40 epi 1 mg IVP
21:42 Defib 360J
21:43 Epi 1 mg IVP
21:45 Epi 1 mg IVP
21:46 20 gauge IV put into left arm
21:47 Intubated by Dr. Burkett
21:49 Mag 1 gm IVP
21:51 Aystole Epi 1 mg IVP
21:55 Atropine 2 mgs IVP ng tube by Burkett
21:57 Eppinephrine 1 mg IVP
21:58 Bretylium 500 mgs IVP
21:59 Code Terminated

Hill, Wm. John Time CPR stopped: 21:59

Date: 24 JAN 98
Type of Arrest: Cardiac
Time of arrest: 21:30
BCLS started 21:30
ACLS started 21:33
Time intubated 21:47

Names of Physicians responding
Dr. Webster
Dr. O'Neil
Dr. Burkett

Vital Signs

| | BP | P | Resp |
|---|---|---|---|
| 21:32 | 0 | 0 | 0 |
| | 0 | 0 | 0 |
| | 0 | 0 | 0 |
| | 0 | 0 | 0 |

21:30
S. Code called on ward at approx 21:30 after patient fell back in bed apparently unconscious with "heavy breathing." When I arrived on scene patient was already received CPR. I put my hand on his right groin to feel the pulses. I thought I felt faint pulses in addition to the CPR induced pulses. At that point Amn Brook pointed out that the patient was breathing on his own. At that point we stopped CPR and observed the patient's respirations even while the monitor seemed to indicate V fib. However the breathing decreased and he became cyanotic so CPR was renewed and I ordered defibrillation x 3 escalating doses , epi 1 mg q 3 ' and 1 gram of mg sulfate. I attempted but was unable to intubate. Pt Was intubated by Dr. Burkett. Bretylium 500 mgs was given IVP. 2 mgs atropine given after pt became st. line. Pt was declared deceased at 21:59. A post mortem CXR was taken and showed probable cardiomegaly & intubation of the right mainstem bronchus.

Wilma P. Webster, MAJ

Dx Cardiopulmonary Arrest
Hill, William
20/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 Male 30 y/o

Place: Inpatient Unit
Diagnosis: Right pleural effusion
21:30 BCLS initiated sith 20 gauge IV
21:33 Defib 300J
21:35 Defib 360J epinephrine 1 mg IVP
21:38 Lidocaine 75 mgs IVP
21:40 epi 1 mg IVP
21:42 Defib 360J
21:43 Epi 1 mg IVP
21:45 Epi 1 mg IVP
21:46 20 gauge IV put into left arm
21:47 Intubated by Dr. Burkett
21:49 Mag 1 gm IVP
21:51 Aystole Epi 1 mg IVP
21:55 Atropine 2 mgs IVP ng tube by Burkett
21:57 Eppinephrine 1 mg IVP
21:58 Bretylium 500 mgs IVP
21:59 Code Terminated

Hill, Wm. John Time CPR stopped: 21:59

Date: 24 JAN 98
Type of Arrest: Cardiac
Time of arrest: 21:30
BCLS started 21:30
ACLS started 21:33
Time intubated 21:47

Names of Physicians responding
Dr. Webster
Dr. O'Neil
Dr. Burkett

Vital Signs

| | BP | P | Resp |
|---|---|---|---|
| 21:32 | 0 | 0 | 0 |
| | 0 | 0 | 0 |
| | 0 | 0 | 0 |
| | 0 | 0 | 0 |

EXHIBIT "C"

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

DATE: 6 April, 1999

MEMORANDUM FOR : To whom it may concern

FROM: Dr. Gustavo Herrera

SUBJECT: Obstetrical management.

In general, a pregnant patient at term, not in active labor, stable, with normal fetal heart tones, not bleeding, with ruptured membranes and clear liquid can be safely advised to go to the maternity with her husband in a private vehicle.

GUSTAVO A. HERRERA, MD. FACOG.
OB/GYN CLINIC
HOWARD AFB, PN

Global Power For America