22:15 S. I'd spoken to Dr. Olmos earlier & she'd requested I check fetal heart tones on this patient. Alert and oriented, complains of intermittent abdominal pain, much liquid from 'water broke'.
O. Alert & oriented, PERRL, conjunctivae pink, tongue moist, neck suppple, heart RRR, lungs clear. + left CVA tenderness, abdomen with enlarged uterus with intermittent contractions, bringing towel with fluid on it. No special smell. Non fetid. Ext with no cyanosis. FHT: 140 Discussed with Dr. Olmos. Send to Paitilla Hospital in POV.
A. Term pregancy in labor
P. Transport to Paitilla
P. After birth: regular exercise, increase fruits & veges

Instructions to patient: go directly to Paitilla Hospital, meet Dr. Olmos there.

---

Note from other hospital:

Admitted 25 APR 98 Delivery: 26 APR 98 Hospital: Paitilla

History of Present Illness: 28 YO patient, G1, 39 weeks pregnant, with history of spontaneous rupture of membranes 25 april 1998, approximately 11:00 p.m. PATIENT WITH HISTORY OF POSITIVE G.B.S., SENSIBLE TO KEFLIN. ADMITTED FOR IV ANTIBIOTICS AND MONITORING OF LABOR.

Past History and System Review: NEGATIVE

Prenatal Course: NORMAL

Physical Exam: WHEN EVALUATED, WITH IRREGULAR UTERINE ACTIVITY, CERVIX DILATED 5-6 CM, EFFACEMENT 70%, VERTEX PRESENTATION, STATION 2-3, PASSAGE OF CLEAR AMNIOTIC FLUID. FETAL MONITORING WITHOUT ABNORMALITIES.

Initial Diagnosis: TERM IUP
SPONTANEOUS RUPTURE OF MEMBRANES.
INITIAL LABOR

Laboratory: CBC, URINALYSIS NORMAL

Hospital course: GOOD UTERINE ACITVITY. THE PATIENT REQUESTED AN EPIDURAL BLOCKAGE THAT WAS GIVEN AT 6CM. ANTIBIOTIC THERAPY WAS STARTED AT ADMISSION WITH KEFLIN 1 GR IV Q6H. THE FETAL PRESENTATION STOOD AT -2-3 ALL THE TIME, AND IT DEVELOPED A CAPPUT. THE PATIENT REACHED 10 CM AND REMAINED WITH A FETAL PRESENTATION IN A STATION –2-3, 60 MINUTES AFTERWARDS. THE PATIENT WAS TAKEN TO THE OPERATING ROOM FOR A CESAREAN SECTION.

Type of delivery with indications: LOW SEGMENT TRANSVERSE CESAREAN SECTION. CLEAR AMNIOTIC FLUID, NORMAL ADNEXA, NORMAL PLACENTA, SHORT UMBILICAL CORD.

If C-Sec. Was done: Describe actions prior C-Section: FAILURE TO PROGRESS. PT WAS GIVEN IV PITOCIN AND HAD GOOD UTERINE ACTIVITY.

Final Diagnosis:
PUERPERIUM
TERM IUP
CORD DISTOCIA (SHORT UMBILICAL CORD)

Disposition:

RELEASED WITHOUT LIMITATIONS
EXCEPT FOR WEIGHT LIFTING.
INSTRUCTED ON HOW TO TAKE CARE OF

Medications: MOTRIN 800 MG PO TID.
KEFLEX 500 MG PO TID.

Follow Up:
1MAY 1998 FOR SUTURE REMOVAL

02 APR 1999

MEMORANDUM FOR WHOM IT MAY CONCERN

FROM: GUSTAVO A. HERRERA, MD

SUBJECT: Estrogen deficiency as probable origin of test results

1. In response to a request by Maj. Wilma Webster, I have started her on hormone replacement therapy with Premarin (estrogen).

2. She is aware of the danger of taking unopposed estrogen but maintains that she has a small, stable meningioma and has read that progesterone is known to serve as a growth factor for meningiomas.

3. I agree with her conclusion that the minor cognitive changes present on recent testing were probably related to estrogen deficiency. She went through menopause 7 years ago and has never taken hormonal replacement therapy.

GUSTAVO A. HERRERA, M.D.
Gyncologist, 24th Medical Group
Howard Air Force Base, Panama

**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

24 March 1999

MEMORANDUM FOR: Major Wilma P. Webster

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Credentials Function Proceeding in Re: Webster, Wilma P.

1. Having fully reviewed the record of the subject hearing proceedings, including the AETC Form 1280 Code Blue Record which was noted as missing at the time of the hearing, I am approving the recommendations of the Credentials Hearing and am directing that (1) your Emergency Medicine privileges be rescinded, (2) your Family Practice/Primary Care / Aerospace Medicine privileges be continued in Category "2" with 100% chart review and full supervision for a period of six months. Furthermore, at the end of that period of observation and review, your privileging status will be re-evaluated.

2. You are advised of your right to appeal, according to AFI 44-119. My decision will remain in effect during appellate proceedings.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

1st Indorsement

25 MAR 99
DATE

TO: Chairperson, Credentials Function, 24th Medical Group

1. I acknowledge receipt of the above notification of the Commander's decision regarding he Credentials Hearing in RE: myself.

WILMA P. WEBSTER, Maj, USAF, MC

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AIR FORCE BASE, PANAMA

17 March 1999

MEMORANDUM FOR MAJOR WILMA P. WEBSTER

FROM: CC

SUBJECT: Transcript and Board's Recommendation in Provider Privileges Hearing

1. In accordance with AFI 44-119, paragraph 4.22.1, I am providing you with the transcript of the Provider Privileges Hearing and the Hearing Board's findings and recommendations.

2. AFI 44-119, paragraph 4.23, indicates that you have ten (10) duty days to respond/appeal to the Board's recommendations. You should address your response/appeal to me.

TERRENCE J. O'NEIL, Col, USAF, MC
Commander

I ACKNOWLEGE RECEIPT OF:

1. The Provider Privileges Hearing transcript, and
2. The findings and recommendations from the Provider Privileges Hearing.

WILMA P. WEBSTER, Major, USAF

18 MAR 99
DATE

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

22 March 1999

MEMORANDUM FOR: MAJOR WILMA P. WEBSTER

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Electronic Copy of Transcript of Board's Recommendation in Provider Privileges Hearing

1. I have obtained from 24WG/JA an electronic copy of the Hearing Proceedings. In order that you may have a version which is easier to read and transmit, I am giving this disk to you. It was given to me represented as an exact copy of the Hearing Proceedings which I gave you in hard-copy on 17 March 1999.

2. This is your copy, to keep and make copies as you see a need.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

I ACKNOWLEDGE RECEIPT OF:

A 3-1/2-inch diskette labeled "Record of Credentials Hearing Re Wilma P. Webster, Maj, USAF, MC Convene Under Air Force Instruction 44-119 Held At Howard AFB, Panama On 17-18 February 1999"

Wilma P. Webster
WILMA P. WEBSTER, Major, USAF

23 MAR 99
DATE

C:\AAMDGRP1\INVESTIG\WEBSTER\hearing\electron.doc

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH WING (ACC)**
**HOWARD AIR FORCE BASE, PANAMA**

23 March 1999

MEMORANDUM FOR 24 MDG/CC

FROM: 24 WG/JA

SUBJECT: Credentials Function Proceeding Regarding Maj Wilma P. Webster

We have reviewed your proposed 22 March 1999 memorandum to Maj Wilma P. Webster and find it legally sufficient. If you have any other questions or concerns, please feel free to contact me at 284-5354.

CYNTHIA C. VALDERREY, Capt, USAF
Assistant Staff Judge Advocate

I concur.

MATTHEW J. POLGAR, Lt Col, USAF
Staff Judge Advocate

Attachment:
Proposed Memorandum to Maj Wilma P. Webster, dated 22 March 1999

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

24 March 1999

MEMORANDUM FOR: RECORD

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Meeting With Major Wilma Webster

1. I met briefly with Major Webster in my office at 0710 this AM with the intent of serving her my decision letter regarding the Credentials Hearing.

2. In the course of the interview, she asked me if I had seen "the Code Sheet". I asked her which code sheet she was referring to. She responded that the record of the Code Blue, noted as missing during the Credentials Hearing, had been located by LtCol Remington.

3. I stopped the interview, advising Major Webster that I wished to review that document prior to rendering a decision, since that was noted as an important document at the time of the Hearing. I requested that Maj Webster return Thursday AM at the same time, so we could talk following my review of the document.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

Document2



362

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

24 March 1999

MEMORANDUM FOR: RECORD

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Receipt of AETC Form 1280 and Associated Documents Regarding Code Blue

1. I acknowledge receipt of the AETC Form 1280; Cardiac / Respiratory Arrest Report, dated 24Jan98, a photocopy of the ECG from that arrest, the Cardiopulmonary Arrest Worksheet from the arrest (two pages), and an Emergency Care and Treatment printout also dated 24Jan98, totaling five pages.

2. I understand that these records were located in a search of medical document copies and have been turned over to me for my records by the Commander, 24MDG.

Wilma P. Webster
WILMA P. WEBSTER, Maj, USAF, MC

Attachments: Five pages; Record of Cardiac/Respiratory Arrest and Associated Documents

Document5

# CARDIAC/RESPIRATORY ARREST REPORT

*(This form is subject to the Privacy Act of 1974 - Use Blanket PAS, DD Form 2005)*

| LOCATION | ADMITTING DIAGNOSIS | DATE |
|---|---|---|
| Inpatient unit | Right Pleural effusion | 24 Jan 98 |

| TIME | INTERVENTIONS (Drugs/Doses, Procedures, IV's) |
|---|---|
| 2130 | BCLS initiated and 20 gauge IV inserted into R arm |
| 2133 | Defib. 300 J |
| 2135 | Defib 360 J. Epinephrine 1mg IVP |
| 2138 | Lidocaine 75mg IVP |
| 2140 | Epinephrine 1mg IVP |
| 2142 | Defib 360 J |
| 2143 | Epinephrine 1mg IVP |
| 2145 | Epinephrine 1mg IVP |
| 2146 | 20 gauge IV inserted into L arm |
| 2147 | Intubated by Dr. Burkett |
| 2149 | Mag 1gm IVP |
| 2151 | Asystole. Epinephrine 1mg IVP |
| 2155 | Atropine 2mg IVP. NG Tube inserted by Dr. Burkett |
| 2158 | Epinephrine 1mg IVP |
| 2158 | Bretylium 500mg IVP |
| 2159 | Code terminated. |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| TYPE OF ARREST | TIME OF ARREST |
|---|---|
| Cardiac | 2130 |
| **TIME BCLS STARTED** | **TIME ACLS STARTED** |
| 2130 | 2133 |
| **TIME INTUBATED** | **TUBE SIZE** |
| 2147 | |

NAME OF PROVIDER

Dr. Webster

NAMES OF PHYSICIANS RESPONDING

Dr. Webster
Dr. O'neil
Dr. Burkett

VITAL SIGNS

| TIME | BP | P | R |
|---|---|---|---|
| 2132 | Ø | Ø | minimal |
| 2133 | Ø | Ø | Ø |
| 2135 | Ø | Ø | Ø |
| 2142 | Ø | Ø | Ø |
| 2151 | Ø | Ø | Ø |
| 2154 | Ø | Ø | Ø |
| | | | |
| | | | |

ARTERIAL BLOOD GASES

| TIME | FIO$_2$ | pH | pO$_2$ | pCO$_2$ |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

ADDRESSOGRAPH

Hill, Wm. John

TIME CPR STOPPED: 2159

SIGNATURE OF PHYSICIAN

SIGNATURE OF NURSE

RESUSCITATION: ☐ SUCCESSFUL ☒ EXPIRED

IRATORY ARREST REPORT *(Continued)*













ORMATION

0. JUL 93 (REVERSE)

265

# CARDIOPULMONARY ARREST WORKSHEET

DATE / TIME OF ARREST: 2130

CPR INITIATED AT / BY: 2130

CODE BLUE ANNOUNCED @: 2130

TEAM MEMBERS RESPONDING

Director: Webster

Physicians: Webster, Oneil, Burket

Technicians: Bolten, Brook, Caesar

Nurses: Lester, Addison

Lab: Metzgar

X-Ray: yes

Other: PCC, EMT Ambulance

IV Fluids Started (Type/Time, Flow rate, Site/Catheter size):

#1: 2130 Right ARM 20g open wide

#2: 2146 Left ARM 20g open wide

#3:

Airway Management

Time: 2132 By: Brook

Bag Mask: Brook - O2 100%

Intubation: 2147 Dr Burkett

Bilateral Breath Sounds Verified by: Dr Burkett

| Vital Signs | Time 2132 | Time 2133 | Time 2135 | Time 2142 | Time 2151 | Time | Time | Time | Time |
|---|---|---|---|---|---|---|---|---|---|
| B/P | | | | | | | | | |
| Pulse | | No | No | No | NO | | | | |
| Resp. | Sparse | NO | NO | NO | NO | | | | |
| Defib. | ? 2146 | shock yes | shock yes | yes | | | | | |
| Ryhthm | ? v fib | ? V fib | | | st line | | | | |
| Energy | | | | | | | | | |

| Medications | Route | Time 2135 | Time 2138 | Time 2140 | Time 2143 | Time 2148 | Time 2149 | Time 2151 | Time 2155 |
|---|---|---|---|---|---|---|---|---|---|
| Epinephrine | | 1Ml | | 1ml | 1ml | 1ml | | 1ml | |
| Lidocaine | | | 75 | | | | | | |
| Bretylium | | | | | | | | | |
| Atropine | | | | | | | | | 2Ml |
| Other | | | | | | | Mag 1gr | | |

Other Treatment:

Foley Catheter @ ________ By: ________

X-Ray @ ________ Of: ________

Other: NG tube @ 2155 By: Dr. Burket

CODE TERMINATED AT: 2159.57

BY: Webster

REASON:

Transport to GACH @:

Attendents: TSgt Summers, MSgt Burns

WILMA P. WEBSTER, MAJ
EMERGENCY PHYSICIAN 44E3
24 MDOS, HAFB, ALABAMA

Signature of Recorder — 26 Jan 98 — Signature of Director: Wilma P. Webster — Date: 25 JAN 98

Remarks on reverse side of form.

HAFB FORM 0-180 May 91

366

# CARDIOPULMONARY ARREST WORKSHEET

DATE / TIME OF ARREST: ______________ CPR INITIATED AT / BY: ______________

CODE BLUE ANNOUNCED @: ______________

## TEAM MEMBERS RESPONDING

Director: ______________ Nurses: ______________

Physicians: ______________

Technicians: ______________

Lab: ______________

X-Ray: ______________

Other: ______________

IV Fluids Started (Type/Time, Flow rate, Site/Catheter size):

#1: ______________

#2: ______________

#3: ______________

## Airway Management

Time: ______________ By: ______________

Bag Mask: ______________

Intubation: ______________

Bilateral Breath Sounds Verified by: ______________

| Vital Signs | Time | Time | Time | Time | Time | Time | Time | Time | Time |
|---|---|---|---|---|---|---|---|---|---|
| B /P | | | | | | | | | |
| Pulse | | | | | | | | | |
| Resp. | | | | | | | | | |
| Defib. | | | | | | | | | |
| Ryhthm | | | | | | | | | |
| Energy | | | | | | | | | |

| Medications | Route 2157 | Time 2158 | Time 2159 | Time | Time | Time | Time | Time | Time |
|---|---|---|---|---|---|---|---|---|---|
| Epinephrine | IMI | r | | | | | | | |
| Lidocaine | | | | | | | | | |
| Bretylium | | 500 | | | | | | | |
| Atropine | | | | | | | | | |
| Other | | | total 8VF in 850 | | | | | | |

Other Treatment:

Foley Catheter @ ______________ By: ______________

X-Ray @ ______________ Of: ______________

Other: ______________ @ ______________ By: ______________

CODE TERMINATED AT: ______________

BY: ______________

REASON: ______________

Transport to GACH @: ______________

Attendents: ______________

WILMA P. WEBSTER, MAJ
EMERGENCY PHYSICIAN 44E3
24 MDOS, HAFB, PANAMA

[signature] Signature of Recorder | 21 Jan 98 Date | [signature] Signature of Director | 23 Jan 98 Date

Remarks: Use reverse side of form

HAFB FORM 0-120 May 91

367

Pers[redacted]l Data - Privacy Act of

CARE & TREATMENT - 24 MED GP HOWARD AFB PM | LOG NUMBER: 980124-0004

Date/Time: 24 Jan 1998@2130
to Hospital: OTHER
ory Obtained From: OTHER RELATION

3rd Party Payer: NO
Time Seen: 2130
Category: EMERGENCY

Adr: PSC 4 BOX 613 APO, AA 34004
Chief Complaint: CARDIAC/RESPIRATORY ARREST

Phone: 280-6414
Sex: MALE Age: 30

| VITAL SIGNS | | | |
|---|---|---|---|
| Time | | | |
| BP--SY | | | |
| BP--DI | | | |
| Pulse | | | |
| Resp | | | |
| Temp | | | |
| WT-Ped | | | |

| Orders | Inits | Time |
|---|---|---|
| | | |

Medications

Tetanus:
Allergies:
NO ALLERGIES DOCUMENTED

2130
S. Code called in ward at approx 2130 after a patient fell back in bed [illegible] unconscious with [illegible]. When I arrived on scene patient was already receiving CPR. I put [illegible] on his right [illegible] to feel the [illegible] [illegible] felt faint pulses [illegible] to the CPR [illegible] pulses. [illegible] [illegible] but that [illegible] breathing on his own. At that point we stopped CPR and observed [illegible] respirations even while [illegible] to indicate [illegible]. [illegible] and [illegible] was resumed and [illegible] 3 at escalating doses, epi 1mg [illegible] and 1 gram of [illegible] sulfate. I attempted but was unable to intubate. It was intubated by Dr. Puckett. [illegible] after [illegible] became [illegible]. It was declared deceased at 21:57. A post mortem CXR was taken and [illegible] probable cardiomegaly [illegible] [illegible] Watchers.

ASSESSMENT/DIAGNOSIS
Cardiopulmonary arrest

====== DISPOSITION ======
__Home __Full Duty
__Quarters
__24hrs __48hrs __72hrs

Modified Duty Until:
Day:____ Mon:____ Yr:____

Referred to:

__Emergency __Today
__72 hours __Routine

Admitted to:

Others:

Condition Upon Release:
__Improved __Unchanged
✓ Deteriorated
Release Time:

Signature of Provider/Stamp: [signature] MD

Instructions to Patient:

HAVE RECEIVED AND UNDERSTAND MY DISCHARGE INSTRUCTIONS ____________

20/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 HILL,WILLIAM A11
26 Apr 1967 MALE W:285-4617 H:280-6414

268

**DEPARTMENT OF THE AIR FORCE**
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

25 March 1999

MEMORANDUM FOR: RECORD

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Meeting With Maj Webster

1. I met at 0710 today with Maj Webster in my office to deliver my determination as regards the Credentials Hearing.

2. She read the findings, stated that they were "too harsh" and stated that she thought I enjoyed the process of taking her credentials away. She also stated that the copy I had given her of the AETC Form 1280 and the four associated pages were "inadequate because the whole right side is illegible" and demanded another copy.

3. I informed her that I did not enjoy the process, at all, but that it was my responsibility to do what I felt needed to assure that health care was delivered safely at this institution. I told her that I would attempt to get her a fresh photocopy of the documents by COB today.

4. The signed original of the notification to Dr. Webster was sent to Ms. DeLeon in Credentials for inclusion in her Credentials Folder.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

C:\AAMDGRP1\INVESTIG\WEBSTER\FINDINGS\25mar99.doc

# FINDINGS AND RECOMMENDATIONS CLINICAL PRIVILEGES HEARING

Wilma Webster, Major, USAF, MC
*17-18 February 1999*

Consistent with the allegations outlined in the 7 January 1999 Letter of Notification (Exhibit 5), the panel has attempted to address all relevant matters which pertain to Dr. Webster's clinical proficiency, professional conduct, as well as matters affecting her mental and physical well-being. Accordingly, while we have strived to align our findings to conform to the specific allegations, we have nonetheless supplemented that material so as to more accurately reflect the evidence presented at the hearing.

To begin, we believe the notification letter contains five (5) general headings or global areas of concern (again, see Exhibit 5). Those allegations are: (1) patient complaints; (2) mental/physical limitations which amount to unacceptable impairment as a medical provider; (3) being forgetful/disorganized in clinical settings; (4) inappropriate actions/impulse control; (5) specific cases which allege Dr. Webster has failed to meet standard of care as an emergency room (ER) physician.

## 1. PATIENT COMPLAINTS:

FACTS: We have three sources of patient complaints. First, Exhibit 23 contains a total of *eight* written patient complaints lodged specifically against Dr. Webster from 14 October 1997 through 7 February 1998. Those complaints speak for themselves. Second, and consistent with her testimony at the hearing, is Linda L. Thomas' statement (Exhibit 34). She complained of the care she received (for a cat bite), after being examined by Dr. Webster at Howard AFB's ER on 12 January 1998. Lastly, Dr. Webster's PAF (Exhibit 54) contains a written complaint from Michelle Shroder who complains that she was not provided accurate medical care regarding a torn meniscus in her knee.

FINDINGS: The panel finds all ten (10) allegations did occur as stated.

ANALYSIS: The only theme we see in these complaints pertains to waiting times. This is always a concern, but it does not appear to have resulted in any adverse outcomes. Accordingly, we are left with only two of the ten complaints which raise our concern. First, we find the letter by Sgt John D. Silbaugh to be troubling (Exhibit 23). Specifically, the inappropriate emotional outburst is inconsistent with that of a seasoned

-/L Σ

physician. We will discuss this aspect later, however, under the heading "Inappropriate Actions." Secondly, the matter which pertains to Mrs. Linda L. Thomas is of concern and will be discussed in greater detail in Part 5 (specific cases), of this report.

## 2. MENTAL/PHYSICAL LIMITATIONS:

FACTS: It is alleged (Exhibit 5) that Dr. Webster suffers: (1) a progressive demyelinating disease (Multiple Sclerosis) for which it has impacted her cognitive/behavioral abilities, (2) neuropsychological deficits which impact her ability to function as a physician and (3) carpal tunnel syndrome which impacted her ability to perform a critical procedure.

a. Multiple Sclerosis: The evidence shows Dr. Webster has had some form of neurological dysfunction since 1973. While in the Air Force, Dr. Webster was initially worked-up for MS in 1992 at Travis AFB. Subsequently, she faced an MEB and was returned to duty following a determination that she did not have a clinical diagnosis of MS (Exhibit 9). Concerns about MS were again raised while stationed in Panama. Specifically, Dr. Webster was evaluated at Wilford Hall Medical Center (WHMC) by Lt Col (Dr.) Gary Gronseth, Chairman of Neurology. His findings (September 1998) were consistent with the diagnosis of MS. Although Dr. Gronseth finds Dr. Webster to be world-wide qualified from a neurological standpoint, he suggested further neuropsychological testing to determine her capabilities as a physician.

On 13 January 1999, Dr. Webster obtained an independent neurologic evaluation by Dr. Charles M. Poser of Beth Israel Deaconess Medical Center (Exhibit 11). In short, Dr. Poser was not convinced that Dr. Webster had MS because further clinical symptoms are necessary before final conclusions can be drawn. In his opinion, Dr. Poser felt that her symptoms are more consistent with recurrent Guillan-Barre syndrome/Miller Fisher variant.

ANALYSIS: We are confronted with a difficult task. On the one hand Air Force experts have concluded Dr. Webster likely has MS. However, Dr. Poser, one of the world's renowned experts in the field of MS, has questioned that diagnosis. We agree that further clinical symptoms should occur before MS can be substantiated. Given the intermittent nature of her symptoms at this time, we cannot justify limiting her practice as a physician based on physical disability. This is consistent with the findings of the formal PEB (Exhibit 6). Her current physical state, while not unfitting or compensable under the provisions of the Disability Evaluation System (DES), certainly might be judged "unsuitable" warranting administrative separation in the future (Exhibit 6).

b. Neuropsychological Disorder: Dr. Webster had three separate neuropsychological evaluations beginning June 1998 and ending January 1999. The initial evaluation by Dr. Ricardo De Obaldia, PhD (Exhibit 8) identified no major or severe deficits; however, it was noted that Dr. Webster had "some difficulties" in all four areas evaluated: fine motor, perceptual, cognitive, attention/concentration.



271

The second evaluation, performed by Dr. Brian R. Campbell (Exhibit 9), revealed several deficits in multiple areas of cognitive testing. Dr. Webster was also noted to have significant deficiencies with sensitive indices of cerebral function. Based on these findings, Dr. Campbell diagnosed Dr. Webster with Cognitive Disorder NOS and further questioned her ability to function as an ER or primary care physician.

In January 1999, Dr. Webster obtained an independent evaluation by Dr. Margaret O'Connor, PhD (Exhibit 10). Dr. Webster performed in superior range on tests of vocabulary, fund of verbal knowledge, arithmetic, attention span, and nonverbal problem-solving. Her speed of processing and memory for information fell into the average to low average range. "While these scores do not represent impairments per se, they should be seen as *relative* deficits given her superior IQ. ...[D]espite her considerable strengths and superior intelligence, her problems in the areas of memory and processing speed may intrude upon work performance, particularly in situations requiring a rapid response to complex types of information." Dr. O'Connor gave two solutions to the Dr. Webster's problems: (1) Re-organize and reduce work responsibilities and (2) Identify work that is engaging for her intellectually and emotionally, but is not time dependent.

ANALYSIS: Given three different evaluations, from three separate sources, we must conclude that Dr. Webster has some form of cognitive deficit. We believe that this deficit impairs her ability to make effective and rapid decisions, which are essential for an ER setting. Accordingly, we concur with Dr. O'Connor's recommendations (see above).

c. History of Carpal Tunnel Syndrome (CTS).

Dr. Webster had a history of CTS, prior to arriving to Howard AFB. She was followed by Orthopaedics at Howard AFB. Subsequently, she underwent Carpal Tunnel surgery in February, 1998. Based on the medical records, she has had a complete recovery of function.

ANALYSIS: Although this problem may have affected her performance during the Code Blue (see text below), we believe that this issue has been resolved.

## 3. <u>FORGETFULLNESS AND DISORGANIZATION IN MEDICAL PRACTICE SETTINGS</u>

FACTS: Dr. Webster was accused of being forgetful and disorganized on several occasions. These include patient complaints (exhibits 23 and 34), staff complaints (exhibits 46, 47, and 48), and the Benadryl/Tylenol mix-up (see below for details).

ANALYSIS: We believe these relatively vague complaints to be true, as they were not denied by Dr. Webster in her testimony. We also believe, based on the information presented to us, that there is a pattern of forgetfulness and disorganization. Of the

various examples that were presented at the hearing, one case merits discussion. As noted by the testimony of Capt Ryan Shercliffe (also see Exhibit 46), a full-term pregnant patient presented to the ER with ruptured membranes. This patient was refused ambulance transfer. The patient was initially instructed to drive to a downtown hospital, an option that was totally unacceptable to the patient's husband. Ultimately, a commercial taxicab transported the patient to a local hospital. This is problematic because a patient with ruptured membranes should be transferred via ambulance to avoid risk to mother and child.

Although it is concerning for a physician to be disorganized and forgetful, we feel this is not a basis for complete revocation of clinical privileges. With the exception of the ambulance issue, we feel there has not been a breach in the standard of care. Accordingly, we find that in a more controlled, slower-paced environment, these characteristics would not be as problematic for either the provider or her patients.

## 4. <u>INAPROPRIATE BEHAVIOR/ IMPULSE CONTROL</u>

FACTS: Dr. Webster has been accused of multiple episodes of inappropriate behavior and impulse control. Although some of the following are taken from the notification letter, we have supplemented that material with relevant information received at the hearing:

a) A memorandum by Sgt John Silbaugh, dated 7 February 1998, details how Dr. Webster broke down and cried during his appointment (Exhibit 23).

b) A memorandum for record, written by Dr. Edwin Burkett, details an event that occurred on 29 January 1998, in which Dr. Webster had an outburst in the ER hallway (Exhibit 18).

c) A memorandum written by Mrs. Todolinde Callender, describes inappropriate behavior in a Customer Care University class in July 1998 (Exhibit 33).

d) Mrs. Callender's memorandum details an event in which she found Dr. Webster sobbing in the hallway.

e) Yet another instance cited by Mrs. Callender describes another encounter. While mentoring Dr. Webster, Mrs. Callender was present when Dr. Webster said, "these guys at the top [Howard's hospital leadership] are all jerks, and I feel like killing all of them."

f) A memorandum written by SrA Kristen Goode, reports that Dr. Webster described a dream in which she shoots everyone. After the shooting, she had an orgasmic feeling, followed by an orgasm (Exhibit 31).

g) The same memorandum also describes an episode on 16 September 1998. While waiting to be aerovaced to Wilford Hall Medical Center, Dr. Webster informed SrA Goode, "I just want to blow the plane up," followed by "...those new plastic bombs that cannot be detected." (Exhibit 31). These statements were further investigated by the aerovac crew.

h) Dr. La Macchia's report (Exhibit 44) details Dr. Webster's actions on 28 May 1998, when she discussed details of her childhood sexual abuse with the technician at the front office.

FINDINGS: We find that these incidents did occur, as they were not denied by Dr. Webster. In fact, she attributed these outbursts to situational personal stress, as well as the pressure surrounding her professional career.

ANALYSIS: Dr. Fey agreed that while inappropriate, the outbursts were secondary to stress. Furthermore, he also concluded that during this time she was neither homicidal nor suicidal. These incidents are consistent with her inability to handle stressful situations in an appropriate manner. We feel Dr. Webster should limit her practice to settings which do not produce undue stress.

## 5. <u>SPECIFIC CASES</u>

a. Code Blue

FACTS: Army Sgt William Hill was admitted to Howard AFB for suspected pneumonia. During this hospitalization, he had a terminal event on 24 January 1998. Dr. Webster was called from the ER and directed the code of William Hill. Shortly after the patient's cardiac arrest, Dr. Edwin Burkett and Dr. (Colonel) Terrance O'Neal arrived to assist. During his testimony, Major Burkett expressed two concerns regarding Dr. Webster's management of the code: (1) inadequate airway control and (2) and inability to properly follow ACLS guidelines, CPR and defibrillation (Exhibit 17).

FINDINGS: The committee unanimously finds that these allegations did occur. The committee further finds the conduct did breach the standard of care for an ER provider and did have the potential to adversely affect the quality of patient care.

ANALYSIS: This aspect of the hearing was very difficult to objectively assess, given there were no supporting documents such as a code sheet, medical records, or nursing notes. While we specifically requested these materials, Dr. Burkett testified that these materials were not available. Accordingly, we've had to rely upon eyewitness testimony of those who were present. Based on the testimony of Drs. O'Neal and Burkett, direct witnesses to the code, Dr. Webster was unable to successfully intubate the patient and failed to adequately follow ACLS protocol.

We believe Dr. Burkett's recollection of events and note Dr. Webster's inability to adequately maintain an airway. While this may have been occasioned by Dr. Webster's "weak wrist"? or a patient with a "difficult airway," the bottom line is she failed to properly control the airway and had difficulty with ACLS protocol. The board is not as concerned that she couldn't intubate, but rather is more concerned that she was unable to control an airway. Given the autopsy results of massive pulmonary embolus, we are unable to determine what impact Dr. Webster's inability to maintain a proper airway had on Sgt Hill's death.

During the board's questioning of Dr. Webster, it was noted she understood the general concepts of managing a cardiac arrest. She did, however, demonstrate a visible uneasiness when confronted a hypothetical ACLS scenario. She did not appear to be in control of the situation. Specifically, she exhibited hesitation during a period which required timely and accurate interaction with the questioner. While the board is well aware that the stress surrounding the hearing environment, coupled with lack of direct patient contact over the past year, may have contributed to this outward appearance, we believe a physician with 14 years of emergency room experience should have handled simple ACLS algorithms in a more systematic manner.

Consistent with the testimony of Major Angeloro, we find that under nonstressful situations, Dr. Webster is capable of performing airway management. Again, there is a tremendous difference between a real code and a controlled environment.

b. Cat Bite

FACTS: Dr. Webster saw Mrs. Linda Thomas for evaluation of a cat bite on 12 January 1998. Mrs. Thomas contended that during this encounter, Dr. Webster failed to render proper care: (1) failure to initiate tetanus shot; (2) delivering wrong oral antibiotic and (3) incorrect dosage of rabies immunoglobin on prescription.

FINDINGS: We find that while each of the allegations are true, they were corrected immediately and had no adverse effect upon the patient's care and standard of care was met.

ANALYSIS: Dr. Webster's testimony provided us with sufficient information to determine that each of the complaints were addressed immediately and appropriately. At no time was the patient in danger. Addressing each of these aspects separately, it first should be noted that Dr. Webster self-identified the antibiotic discrepancy. Secondly, Dr. Webster concurred with the patient's need for a tetanus immunization. Lastly, while it may be unclear whether Dr. Webster wrote the prescription for rabies immunoglobin, it is not a surprise that she may have miscalculated the dose, given that the rabies vaccine is rarely prescribed. It should be noted, however, that Dr. Webster took the appropriate action and sent the patient to Public Health. Given the proper follow-up, any possible errors can and were corrected.