voted to recommend revocation of Major Webster's privileges to practice in the emergency room and in the primary care clinic and that recommendation was followed up and approved by the Medical Group Commander. Under the AFI that regulates this hearing, AFI 44-119, Major Webster has the option of accepting that board's recommendation or choosing a hearing. In this case, Major Webster chose a hearing and that's why you are here today to determine whether not she can safely provide patient care.

Now today and probably the next day, we are going to be presenting to you evidence through witnesses and also through documents. And you are going to hear testimony of why Major Webster should not be a credentialed privileged provider to practice at the 24th Medical Group.

Now some of the evidence that you will hear will be the same as the credentials function heard back in November, but you will also hear some additional information. For example, you are going to hear or you will get to review the results of the Air Force Physical Examination Board that met last month at Randolph Air Force Base in Texas. The physical examination board consists of one doctor, one line officer and a personnel officer. Now when they reviewed her findings, they were looking at what the credentials board saw earlier which were evaluations that based Major Webster's performances on a--based on an MS diagnosis. They attributed her performance to that. The Physical Examination Board met last month and they found Major Webster fit for duty. Now you will get to review their findings or rather you will get to see what they saw at the medical evaluations, but your role, which I would like to emphasize to you, is not merely to determine whether Major Webster is fit for duty. Your role is to determine whether she can safely provide patient care. And as you will hear, those two things are different.

Now, among the witnesses you are going to hear from, you are going to hear from mental health providers at the 24th Medical Group. And specifically, you are going to hear from Captain Gregory Fey and from Major



396

Richard LaMacchia. Major LaMacchia will be able to tell you how he met with Major Webster on numerous occasions as part of a commander directed mental health evaluation.

CIVRC: I'm sorry, I generally don't like to object during the course of an opening statement, but as the Legal Advisor already knows, we have got some real objections to any testimony from Major LaMacchia or with regards to the physical findings. And, therefore, I think it would be inappropriate at this point in time to include those statements--to include that information in an opening statement that may or may not ever come before this board. So we object to that--any reference.

CC: It's noted.

AREC: We expect that you will hear testimony from mental health providers, Major LaMacchia, who can tell you of how when he evaluated Major Webster how she was forgetful on numerous occasions. He will also be able to tell you how he documented cognitive difficulties that she was having, as well as a personality disorder. You will also hear from Captain Fey, who like Major LaMacchia, met with Major Webster on numerous times. And he will be able to tell you of how she was forgetful with him. He will also be able to explain to you some of the medical evaluations that went on and how, based on an earlier review at this level, Major Webster's case was referred for evaluation at Wilford Hall Medical Center. And you will also be able to see the evaluations that came from Wilford Hall.

Now in addition to the mental health providers, you are going to hear from Major Edwin Burkett and from Colonel O'Neil. They were both eyewitnesses to a code blue at which Major Webster performed below the standard of care. This happened in January of last year. Both of those will be able to tell you that there were serious flaws in her ability, that she failed to follow proper ACLS protocol. And Doctor Webster not only failed to follow ACLS protocol, but she failed to intubate a patient after three attempts. This, you will hear from Colonel O'Neil, caused him to lose confidence in her ability as a provider in the emergency room.



397

Now, in addition to this code blue, you will also hear other incidents and events that led the medical staff to lose confidence in her ability. You are going to hear from Lieutenant Colonel Remington. He was the Medical Operations Squadron Commander. And he will tell you how Major Webster's inability to make swift decisions led him to give her a referral OPR. You will also hear, not only from those who supervise Major Webster, but also from those in the emergency room who worked with her directly. You will hear from Major McCrary, who is the chief of the emergency room, and also from Captain Shercliffe, who is the nurse manager of the emergency room. They will both be able to tell you that Major Webster had problems successfully handling the workload in the emergency room.

From Captain Shercliffe, he will tell you that Major Webster had difficulty managing the triage procedure and she would often see less critical patients before those who were more critical and in greater need of medical care. He will also tell you how Major Webster would become so involved in care for one patient that she forget about other patients.

Major McCrary will testify to you that Major Webster had the highest incidence of leaves without being seen while she worked in the emergency room. He will also tell you that there were numerous complaints about Major Webster from patients in the emergency room while she worked there. And, in fact, you will hear on one occasion when a patient who was supposed to receive Benadryl from Major Webster, she received Tylenol instead. And then that patient--that error rather--was not discovered until the patient's parents were at home and they called back to the emergency room to find out additional information.

In addition to these performances in the emergency room, you will hear on how numerous occasions Major Webster's personality displayed itself through inappropriate comments that have been made. Some of these comments were made in front of patients. You are going to hear from Ms. Linda Thomas who was a patient in the ER. And she will tell you how when she went to

the ER for a bite from a stray cat, how Major Webster was forgetful in front of her and how on that occasion too she almost gave her the wrong medication.

Now as far as the inappropriate comments, you are going to hear from two witnesses. You are going to hear from Senior Airman Kristen Goode and from Ms. Teddy Callender. Airman Goode is a aeromed evac technician. On a flight in which Major Webster was about to fly and there were other patients who were about to fly on the medevac flight, Major Webster, in a waiting room full of patients, made jokes about blowing up the plane. And you are going to hear this from Airman Goode. Airman Goode will also tell you how Major Webster made jokes about killing people.

What you are going to hear throughout this hearing is a pattern of poor performance, performance below the standard of care by Major Webster. You will hear of Major Webster's failure to perform during the code blue. You will hear of how forgetful she has been on numerous occasions. You will hear of patient complaints. You will hear of how she almost gave the wrong medication to patients on at least two occasions.

It is based on all of these facts taken together, her problems in performance, that we are asking you to completely revoke her privileges to practice in the medical career.

CC: Do you have any remarks?

CIVRC: Yes.

We are not talking about a slow leaking boat here. We are talking about an individual with worth. We are talking an individual who has practiced medicine without ever having had a lawsuit filed against her both in the civilian and military community. We are talking about an individual who has been dedicated to her patients and who has worked very hard.

When you hear the evidence, I really don't think there is going to be much of a choice for you to make except to give her credentials back. But I do want to talk to



354

you just a few minutes in opening about this evidence that is going to be coming forward.

You know there was one thing that I didn't hear the government say and it should probably sit in your minds very heavily too. They didn't say they had a patient-- they had any patient charts to show you, did they, that showed that she couldn't practice medicine appropriately? They didn't say that they had any patient incident reports where patients were injured or hurt or where they were misdiagnosed, did they? No, because there aren't any. Zero.

With regard to the code blue, what we believe the evidence is going to show is that Doctor Wilma Webster had carpal tunnel syndrome. The patient was difficult to intubate. He was a big man with a thick neck. She tried on three different occasions, backed off and said, "Somebody else try and intubate him." Now it seems to me that is what should be done. I think it's common knowledge and common experience that everyone can't always intubate a patient. Sometimes one doctor will have trouble and another one will just walk up and slip it in. So I want you to reserve your judgment on that until you hear all the facts about proper or improper intubation.

They go first; we go second. They have talked about people will come in and talk badly about Doctor Webster. We are going to present for you, if the government makes these witnesses available, Tech Sergeant Thomas Sonderegger who is the NCOIC of Patient Administration. And he is going to tell you about her thoroughness and how she does great follow-up on her patients and checks on records, always comes to them and asks, "Where is this? Where is that?"

You are going to hear from Doctor Marta Olmus, M.D. She is a civilian OB-GYN who reviewed and regularly saw the patients that Doctor Webster saw who said that she is a fine physician, has no problems, would allow herself to be treated or her family to be treated by Doctor Webster.



LPD

You are going to hear from a Captain Ann Li who worked with her in the emergency room who is going to tell you she is a great physician, she does a great job.

You are going to hear from Major Joan Marine who is a PA who is going to tell you that she has seen 70 of the patients that Doctor Webster has seen and always found the records to be complete; total, accurate, appropriate diagnosis, never had a problem and in fact has called on Doctor Webster for her advice from time to time too.

You are going to hear from a Captain Steven Cusack who is a pharmacist who will tell you about how good she is, how she stays current on every medication. And with regards to the switch in medication, first of all, it wasn't Tylenol for Benadryl--it was--I mean, it wasn't Benadryl for Tylenol, it was Tylenol for Benadryl. And you are going to see, and the pharmacist is going to come in and show you that these are twin bottles. As a matter of fact, he is also going to tell you she is not the first who has made that mistake and she won't be the last. Fortunately, this type of drug is not going to have an adverse impact one way or the other. If the kid had a cold, the Benadryl would have treated the sniffles, the Tylenol was treating the general aches and pains.

You are going to hear from Captain Mark Westrick who is the director of the lab who routinely reviews the lab work that this lady orders on her patients and who will tell you that it is always appropriate.

You are going to hear from Captain Randy Langsten who is the head of Public Health who looked at the statement of this one witness that is going to come in here and tell you how forgetful Doctor Webster was and saw nothing unusual with regard to the cat bite. And he is in charge of the bite program and he will talk about the bite program a little bit as well.

You are going to hear from Major David Copp. He is a surgeon who routinely has been called down by Doctor Webster when she was in the emergency room and always found that the patients were properly worked up.

Occasionally he got called down a little bit early because some of the lab work hadn't come back yet, but generally he found that she was as good or better as other providers in the emergency room.

You are going to hear from Major Michael Angeloro, nurse anesthetist. The evidence is going to show that when Doctor Webster had her surgery, they wanted to make sure that she could intubate patients. They brought her to intubate a mannequin. They refused to give her a stylet and, on that basis, she had difficulty doing the intubation. She was then told that she had to go work with Dr. Angeloro--I'm sorry--Nurse Angeloro. She did two intubations, did them right the first time, using a stylet. He had no problem with her airway management, none. And he further said it's ridiculous not to let a physician use a stylet in the use of intubating a patient, but all of you know that.

You are also going to hear from her current boss who thinks she is great and would like to keep her. Finally--and also, who is a pediatrician who treated some of the patients, at least one of the patients that Doctor Webster saw and said this--she did a wonderful job, she caught a case of diabetes in a young infant.

You are finally going to hear from Captain Michael Tall who also worked with her in the ER. You know, one of the things that Doctor Tall brought out, and believe Doctor Li will, too, Doctor Webster was one of the first physicians in the ER who, when her shift over, she didn't say, "Okay, I'm done and walk out." She routinely stayed to finish up all the patients that she saw on her shift. And that is what is going to be the evidence from this chair.

With regards to patient complaints, I am going to suggest to you, lady and gentlemen--sorry, we don't have a lady any more--I'm going to suggest to you, gentlemen, that the evidence is going to show--

(Respondent's civilian counsel displayed chart.)

REC: For the record, the government has not seen that.

CIVRC: That's fine. The evidence is going to show that Doctor Webster saw 1,151 patients in her eight months in the ER. And she got nine complaints or less than a one percent complaint rate. You are also going to see that those complaints or most of complaints involved, "I had to wait too long", and I will tell you that the evidence is going to show that Doctor Wilma Webster is slow and thorough, and because of that, sometimes she doesn't see patients as fast as the Air Force would like her to see them. With regard to the leaving before being seen, there's going to be statistics introduced for you that are going to show what each provider's leaving without being seen shows, which, of themselves, doesn't mean a lot. But you can see in November 1997, Doctor Webster had the highest rate, 13, and that was her first month working in this ER by herself. But they ranged from one to four to one to six. Some months she is the highest. Some months she is in the middle. Some months she is lower. But you know, you can't look at these statistics in a vacuum, I don't think, because I don't believe that these statistics alone tell you the true worth. It seems to me that if you are going to use this leaving without being seen as one of the linchpins for taking this doctor's privileges away from her, then at least you ought to compare it to the number of patients being seen and figure out what the heck that ratio is. Well, we did that for you.

(Respondent's civilian counsel displayed chart.)

CIVRC: And the evidence is going to show, the first number on this chart is leaving without being seen. The second number are the patients that were seen, and the percentage that follows it is the percentage ratio between people who left without being seen to total patients including those who left without being seen. And when you do this, she is seeing a high number of patients. The range is .6 percent in October to 6.7 percent. She is only at six percent--she was .6 percent. She is the lowest. The next month, no question about it, she was at 4 percent. She was definitely the highest, but there were others as well that had problems, alright. In the next month, the



4103

range was from 1.1 percent to 2.5 percent. She was at 2 percent, the high was 2.5, the low was 1.1. In January, she was at .9 percent. The range was .3 to 8.3 percent.

CC: I think we get the gist of it.

CIVRC: Okay, so I don't think these statistics by themselves show anything or prove anything about the competency of a physician.

Gentleman, together, we are going to take a journey today and tomorrow through the evidence. And you are going to have to make a decision here. Now one decision you are not going to have to make, and that is because that decision has already been made for you. The physical evaluation board found this lady physically fit, no mental defects, worldwide qualified. So consequently, when you are looking at this information, you are going to have to keep that in your mind, and you are going to have to sit there and say, "Okay, what evidence do we have that this doctor's performance fell below the standard of care at any time?" Now falling below the standard of care does not equate to--doesn't mean that she has to be the best doctor in the world. It just means that she has to meet the standard. I think it will show that Doctor Webster does more than meet the standard, but I will suggest to you that there is really no evidence that she falls below the standard of care when you look at this evidence. Thank you.

AREC: The government would like to call Captain Fey.

CIVRC: We have an objection to calling Captain Fey.

LA: What would the objection be?

CIVRC: Again, this goes--and while we are here, I'm going to talk about all the issues that were previously brought before the board. Dr. Fey and Major LaMacchia have never observed this doctor's care of any patients. Their sole purpose was to render care and their records have been submitted as part of the PEB evaluation with

regards to whether not Doctor Webster is physically fit for duty.

That decision has already been rendered by the Physical Evaluation Board in this case. And therefore, it is not in this province of this board to go back and rejudge that evidence and use it in anyway for the credentialing.

In other words, what I believe this board is here to hear is evidence of her failure to meet the standard of care because when it comes right down to it, unless a person is physically or mentally disabled, this is really the only basis that any of you all would want your credentials taken away from you. If, because of negligence, if because of carelessness, if because of just not staying current, your practice falls below the standard of care, that's one thing but the only purpose to have Doctor Fey here, to have Doctor LaMacchia, to put in the evidence of the neuropsych evals, et cetera, is to try and dredge up things that were already considered by the physical evaluation board, rejected by them and this member was found to be physically fit, both mentally and physically. And, therefore, that's our objection.

AREC: If I may answer to that?

LA: Please do.

AREC: The government's intention in calling both doctors, Doctor Fey and Doctor LaMacchia, is not to assess Major Webster's physical fitness. We are calling her--we are calling these two witnesses to attest to Major Webster's overall state of mind and how that relates to her ability to safely provide patient care. We feel that their testimony will be relevant to you and will also give you insight into her ability to practice, her personality and what difficulties and problems that she has had. And that is information for you which will be relevant regardless of what findings the PEB has made.

(Legal Advisor and Chairperson conferred.)

CC: I think your point is very relevant. I think we will allow that. You'll have the opportunity to cross-examine these people.

CIVRC: I understand.

CC: I think, from our standpoint, I think we need to know as much as we can. We have no idea where we're going or where this has been.

I did have one question. Were those evaluations made available to this board that met when they pulled your credentials initially in November?

CIVRC: Yes, they were.

CC: Okay, I think we need to hear it, too.

CIVRC: My objection is noted for the record.

CC: Okay. Let's take a five-minute break and then we will start with witnesses, okay?

AREC: Okay, sir.

(The hearing recessed from 1055 hours to 1100 hours, 17 February 1999.)

**CAPTAIN GREGORY FEY**

was called as a witness by the government, was sworn and testified as follows:

**DIRECT EXAMINATION**

Questions by assistant recorder:

Q. Would you state your name and rank for the record?
A. Captain Gregory Fey.

Q. And where are you assigned?
A. I'm the chief of the Howard Mental Health Clinic, 24th Squadron, SGOHP.

Q. How long have you been in that position?



406

A. Since July of '97.

Q. I'm showing you what has been marked as Hearing Exhibit 7. Do you recognize it?
A. Yeah.

Q. Can you tell us what it is?
A. It's a CV.

Q. Is it your CV?
A. Yeah.

Q. Is it current and up-to-date?
A. Uh--yes, in fact, I updated it in October of '98.

Q. Does it accurately reflect your education and training?
A. Uh-huh.

CIVRC: For the record, this was not provided to us prior to this, nor is it listed in anything that was sent to us for it. I'm not going to object to a CV because I don't think it is important, but if are any substantial documents have not been provided to us beforehand, as is required, then I'm going to raise an objection in the future. Thank you.

AREC: I will provide Hearing Exhibit 7 to the board.

CC: Thank you.

Questions by assistant recorder:

Q. Captain Fey, do you know a Major Webster?
A. Yes.

Q. How do you know her?
A. Well, inevitably, I know her, of course, as a colleague. That's where I knew her from first. Major Webster would occasionally call an emergency case that she had seen since or she had follow-up for. Since then, I also knew her as someone I have evaluated and provided some support for or at least offered support during a very stressful period of time.

Q. Was that in a mental health capacity that you saw her?

A. Yeah.

Q. Are you familiar with Major Webster's referral to your clinic for a mental health evaluation?

A. Yeah. Are you talking about the command directed evaluation?

Q. Yes.

A. Yes, I am. The--initially, it was brought up to Doctor Rodgers and myself from the squadron commander which was Lieutenant Colonel Addison, at the time, and also Colonel O'Neil. Anytime you have a command directed evaluation, you have to get the okay from a mental health provider before proceeding with it. It sort of prevents inappropriate evaluations. Doctor Rodgers and I both agreed the evaluation was appropriate considering what was said about some of the difficulties that she'd had. Doctor Rodgers and I felt that it was probably best for Doctor LaMacchia to be the one to be doing the command directed evaluation since he hadn't had any--he didn't have as much association with Major Webster and if Major Webster wanted treatment, it would be better for her to have that in the Howard Mental Health Clinic. It's sort of optimal if you have the treating person as a different person than the one who is doing the command directed evaluation. There is a little bit less conflict of interest.

Q. Are you familiar with the evaluation made by Major LaMacchia?

A. Yes.

Q. Based on that evaluation, what did you do?

A. The results of that evaluation dealt--the evaluation pretty much included interviews with Major Webster. He also referred her for neuropsychological testing which a downtown neuropsychologist did, Doctor De Obaldia. And he formulated the data, believed that she had some cognitive problems. He also felt that she had some personality problems. He also noted and the neuropsychologist noted the history of multiple sclerosis, at least the history of her going through a medical evaluation board. They were aware that diagnosis was not substantiated. Those results were

forwarded to the squadron commander, as commander directed evaluation results are forwarded. At that point, it was felt that since she had some demonstrated problems on this neuropsychological testing and we didn't have a neurologist here, the decision was made to get an MRI and to have her sent to some place CONUS for a neurology evaluation and also a repeat of the neuropsychological testing because this neuropsychological testing was done by a--the guy spoke English but evidently Major Webster had done some of the testing in Spanish and we felt that may have--could have contributed to some of the deficits. We wanted to make sure that the deficits weren't due to a language problem--not a language problem, a language barrier.

Q. Language barrier?
A. Uh-huh.

AREC: I am showing defense counsel what has been marked as Hearing Exhibit 8.

CIVRC: I have two objections. The first objection is the same one I have had through this witness and too, as I have stated, that these issues have already been decided by an Air Force board and therefore are really not fit for consideration by this board. My second objection is that this document is highlighted, underlined, starred and I believe that's inappropriate and constitutes a comment on the evidence. I realize we are not under the rules of evidence, but nevertheless, I don't believe it is appropriate to have such a document go in without it being a clean copy.

AREC: As far as the highlighting and the underlining, at least, I know that is, I guess, the condition which we received the documents in. As far as the highlighting--

LA: What is it? What are we talking about?

AREC: This is a referral for civilian care that was basically a neuropsychological report from Doctor Obaldia that we received from Major Webster's--I think it was part of her mental health report, I believe. Excuse me just a moment.



409

(Recorders conferred.)

(Legal advisor and chairperson conferred.)

CC: We are going to go ahead and just allow this.

AREC: Okay.

CC: Your concerns are noted. Again, being doctors, we will take this information for what it's worth.

Questions by assistant recorder:

Q. I'm showing you what has been marked as Hearing Exhibit 8. Do you recognize that?
A. Uh-huh. This is the report from Doctor Obaldia to Doctor LaMacchia based on the neuropsychological testing.

LA: Excuse me, just for clarification, is this the document you were concerned with, with the language barrier?

CIVRC: Yes.

LA: So Exhibit 8 is--

WIT: Correct. Yes, this is the test from the Panamanian neuropsychologist. Major Webster elected to proceed with some of the testing in Spanish and this showed some deficits that sort of triggered further evaluation and referral to the United States for more definitive testing.

AREC: I'm providing Hearing Exhibit 8 to the board.

Questions by assistant recorder:

Q. Captain Fey, you said that Major Webster was referred for further evaluation to the U.S. What do you know about that further evaluation?
A. Uh--she had--uh--well, she had three things. One was a repeat neuropsychological testing and that was done by Major Campbell. He is a neuropsychologist at Wilford Hall. Another was a neurological exam and that was



410

Major Gronseth. Actually, I'm not sure if he is a major or lieutenant colonel at this point. And I believe she also had the MRI up there at Wilford Hall. So I wrote this consult. They wanted me to write the consult based on some medical things so that was my--that was what I was tasked with.

AREC: I'm showing defense counsel what has been marked as Hearing Exhibit 9.

CIVRC: To save time for the record so I don't have to keep objecting to all of this, I want it noted for the record and approved by the chairman that we have a standing objection to any of the introduction of the medical condition of Doctor Webster based upon the fact that that has already been ruled on by an Air Force board and she has been found to be physically fit for duty and that just a review of this information might prejudice the board.

Questions by assistant recorder:

Q. Captain Fey, I am showing you a document which has been marked as Hearing Exhibit 9. Can you tell us what this is?

A. This is Major Campbell's--Major Brian Campbell's consult. These are the results of his study including the tests that were administered and his analysis of those tests, his conclusions.

CC: That's the repeat neuropsych?

WIT: Uh-huh, this is the one by an active duty neuropsychologist. I believe he is a major. Actually attached to this, I notice--did you want to attach this second part here? Also attached to this is an initial profile based on the original findings and also the results of the neurology consultation which was done by Dr. Gronseth who is the Chairman of Neurology at Wilford Hall.

Questions by assistant recorder:

Q. Are you familiar with the consultation that was done at Wilford?

A. Yeah.

Q. Have you had a chance to read and review it?
A. Yes, I have.

Q. Based on your review, what were your impressions of the findings made at Wilford Hall?
A. Well, I think probably the best--

CIVRC: Your Honor--Mr. Chairman, I am going to object to the testimony. I understand this is not subject to the strict rules of evidence and hearsay can come in, but we are now talking about hearsay upon hearsay.

LA: His interpretation of the results?

CIVRC: His interpretation of results of a doctor that he has never seen or talked to. The report speaks for itself.

LA: I think so.

Questions by legal advisor:

Q. Did you speak to Campbell or Doctor Gronseth yourself?

A. Yeah, I spoke to both of them.

Q. At the conclusion of the report?
A. Uh--upon the referral, basically to get the information to them that they needed.

Q. Did you discuss, after the report was made, for clarification, did you have any substantive discussion with them?
A. Yeah, they summarized their findings.

LA: Why don't we talk about that, what the findings were and his understanding.

Questions by assistant recorder:

Q. Based on your discussion--I'm handing Hearing Exhibit 9 to the board. Based on your discussions that you had with Doctor Campbell after their evaluation, what were your impressions based on that discussion?



4/12

A. Well, let me tell you what his impressions were as he communicated them to me. And, again, I understand the comment about hearsay so that is the limit of how I can speak for the neuropsychologist that actually did the examination. His impression was that she did have significant cognitive deficits in realms of attention, concentration, speed of cognitive processing, visual greater than verbal memory problems and he also felt that she had problems with novel tasks, given a lot of distractions. In other words, what I am saying is, if you have--if you are performing tasks and you have to keep track of numerous pieces of data, if you throw a new piece of data in, she had some problems integrating that and coming up with a new solution. Those were his impressions. What his diagnosis that he gave her was cognitive disorder. Uh--now, the cognitive disorder, not always specified, is the diagnosis at first. When she then had the neurology consultation, the diagnosis was probable MS. What Doctor Gronseth looked at was basically a history of symptoms. He looked at past lab findings. He looked at--sort of put everything together and what he said was that he believed there was a 65 percent chance that she had MS. So, in other words, he could not say, you know--that was his level of probability, okay. His conclusions were largely based on lab-related evidence rather than clinically-related evidence. Based on the fact that a neurologist said that she had a 65 percent chance of having MS, at that point, it would be reasonable to subscribe the cognitive findings to a multiple sclerosis diagnosis. And so that was the ultimate finding from Major Campbell, cognitive disorder due to multiple sclerosis. He also made the diagnosis--you can see his summary. It's very succinct and clear--the last two paragraphs and the diagnosis, personality change due to MS, mentioning some things like emotional outbursts and some social inappropriateness. It was reasonable to make a--to subscribe the personality changes and the multiple--the cognitive findings as caused by the multiple sclerosis. However, he also realized that it may have been caused by other things if the multiple sclerosis diagnosis didn't stand up. That was the impression that I got from Doctor Gronseth and Major Campbell.



43

Q. Is it possible that, even without the multiple sclerosis diagnosis, that those cognitive difficulties that you mentioned were still present?
A. Yeah, I mean, having cognitive findings, in itself, you don't necessarily need to have an MS diagnosis. Numerous things can cause--

CIVRC: I'm sorry. I've got to object to this testimony again. The board--the Air Force board--the Physical Evaluation Board has ruled that this woman does not have any mental or physical conditions. It is not within the scope of this board to make a judgment on that issue. Those issues have already been resolved and yet that is exactly what the government is attempting to do, collaterally attack the finding of the Air Force Physical Violation Board. This is going far beyond anything here.

CC: Well, I mean, a PEB, in and of itself, determines if you are world-wide qualified. You can be world-wide qualified and have problems. What we are trying to assess is information to know if some of these things that were brought up in the initial statements about inappropriateness and that, if any of this applies. So we need to hear a bunch of information so we are going to allow it. I understand your objections and I agree, but we need to hear some of this information.

Questions by assistant recorder:

Q. Captain Fey, were you finished?
A. Yeah. You know, I really think Major Campbell's neuropsychological evaluation is sufficient in and of itself to explain. I mean, he basically explains the particulars on what her strengths were. She is--she functions in the very superior range as far as intellectual quotient and yet she had problems in specific areas that are hard to explain. He was also looking at Doctor Obaldia's report and also past IQ testing from, I believe, '93 when she went through the first medical evaluation board. Evidently some very similar findings were found back then. He also makes note of in there of some of the problems--

CIVRC: At this point in time, I am going to object. He keeps referring to, "he makes note in his summaries". The testimony was supposed to be based upon what he was told by these physicians.

WIT: Well actually, the--when Major Campbell talked to me, he basically--I spent two conversations, phone conversations and they lasted a half-hour each. And I know that because we were cut off. That's the limit of DSN time. We were cut off at the end of the conversation and he sort of explained to me the reasoning and rationale and we went through the findings.

Questions by assistant recorder:

Q. Captain Fey, let me ask you, are you familiar with any other neurological--or I guess were there medical or psychological evaluations that were performed on Major Webster?

A. Yes. She had a lumbar puncture. She had some lab work. Nothing as--you know, metal screens, RPR, et cetera, anything to rule out other things that might cause a cognitive disorder. Nothing was found. An LP was also done and, unfortunately, the blood work hadn't been completed so the results of that--you really couldn't get the things that you need like an IgG index and some of the things that you would require as far as laboratory to support a diagnosis for MS. You need corresponding blood work with the lumbar puncture.

Q. Captain Fey, how did Doctor Campbell's evaluation of Major Webster compare to what you knew of her for the times when you had met with her?

A. Can you be more specific on that?

Q. I guess, what they found, did that appear consist with what you had seen of her?

A. Uh--the behavioral observations, yes. I never tested her cognitive status so on that one, I couldn't compare. As far as behavioral observations that include things like forgetfulness and sort of maybe social inappropriateness, I would say, yes. But I couldn't call it further than that.



415