AREC: I am showing defense counsel a document which has been marked as Hearing Exhibit 10.

CIVRC: I have no objection to that exhibit. I have an objection to him testifying about that exhibit unless he has talked to this psychiatrist. This is hearsay. Him testifying about it when he has no personal knowledge is at least double hearsay and I don't think it is credible evidence before this board.

LA: Will the witness have any knowledge of that exhibit?

AREC: The witness has reviewed this exhibit so the witness knows what it is. I can't say--I don't know if the witness has personally spoken with--

(Recorders conferred.)

REC: This is a clinical neuropsychological report from Beth Israel Deaconess Medical Center that was done by Doctor Margaret O'Connor who is the Director of Neuropsychology there.

CC: When was this?

AREC: This was done January 11th, 1999.

CC: Okay.

Questions by assistant recorder:

Q. I am showing you what has been marked as Hearing Exhibit 10. Do you know what this is?

A. This--Major Webster got an independent medical evaluation. She didn't agree with the neuropsychological findings from Major Campbell. So she went for a neuropsychological evaluation and these are the--it's the report of that consult.

Q. I am showing Hearing Exhibit 10 to the board. Doctor Fey, based on your review of that, of Hearing Exhibit 10, the neuropsychological consult from Doctor O'Connor, how does it compare to the assessment of Major Webster that was made by Major Campbell?

A. Significantly--there are huge discrepancies. The performance level in this one was superior to the performance level that she had with Major Campbell. I can't account for the difference in the scores. You can read for yourself and compare the differences. Again, if you look at the summary and recommendations on the last two pages, they're basically self-explanatory, you know, the last paragraph especially. There were some similarities in that there was a verbal performance IQ discrepancy. Both of them found her to be in the superior to very superior range of intellect. Both of them found that she had some problems and the difference here is the first neuropsychological testing by Major Campbell felt these were problems and impairments. And this neuropsychological report doesn't call them impairments. This refers to them as relative deficits. What a relative deficit is, in other words, we all have our strengths and weaknesses at our realms of intelligence. What this doctor is saying is that her problems, as far as the cognitive speed is a relative deficit. In other words, it is below average. You would expect her to perform higher based on her intelligence quotient. She accounts for that and describes why that may be in the summary and you can read that.

AREC: I'm showing defense counsel a letter from Doctor Charles Poser which has been marked as Hearing Exhibit 11.

CIVRC: No objection to Doctor Poser's letter.

Questions from assistant recorder:

Q. Captain Fey, I am showing you a letter from Doctor Charles Poser which has been marked as Hearing Exhibit 11.

CC: Who is Posey?

AREC: Poser.

CIVRC: Poser. He is the preeminent expert in the field of multiple sclerosis.



617

CC: Okay.

CIVRC: And is referred to in the Air Force's evaluation referring on him and using him as a justification for the diagnosis which was wrongly given.

CC: So this is the eval for MS.

Questions by assistant recorder:

Q. Captain Fey, have you had a chance to review this letter from Doctor Poser?
A. Uh-huh, yes, I have.

Q. Okay, and how does this--what is your opinion of this assessment--

CIVRC: Well, wait. I am going to object to his giving an opinion of a neurological evaluation. He is a psychiatrist--you are a psychiatrist, Doctor?

WIT: That's right.

CIVRC: Okay, I am going to object to that. That is inappropriate. He has never talked to Doctor Poser or anything else.

CC: Okay, we will agree. We will review that ourselves.

AREC: I am handing Hearing Exhibit 11 to the board.

Questions by assistant recorder:

Q. Captain Fey, based on--

(Members reviewed Hearing Exhibit 11.)

CM (Maj Matthews): Can I ask a question? GBS Miller-Fischer, what is GBS again?

WIT: Guillain-Barre.

Questions by assistant recorder:



W 8

Q. Captain Fey, based on your meetings with Major Webster and your review of the evaluations of her, do you have an assessment of her ability to perform as a physician?
A. No.

Q. Do you have any opinion regarding her cognitive ability to--what her cognitive ability is?
A. I'll comment on that. The purpose for me seeing Major Webster was not to do the evaluation. Therefore, when I saw her that was never my reason for seeing her. My reason for seeing her was basically to act as a medical liaison with the folks up at Wilford Hall to facilitate the process as asked by Colonel O'Neil. The purpose for seeing her was for a number of reasons. One was Colonel O'Neil was concerned on how she was doing, you know, under the stress. It is a very stressful situation to be taken out of your job, as you can imagine. And Major Webster--I sort of got to know her. She agreed to meet with me so that I could perform a neurological examination on her so at least we had a baseline down here so I could write the consult up for her to the neurologist, et cetera. Along with that, again, I had my concerns on how she was doing. She said, yes, she was under stress and she said that she thought she was managing adequately, doing things like exercise, her sleep wasn't impaired, her appetite wasn't impaired, she was taking care of herself by doing the best she could and sort of dealing with the situation. I offered that she come in and meet with me regularly. She declined that, feeling that wasn't necessary. And the other reasons why I saw her was based on some statements that she had made which probably some other folks will describe. But evidently a couple of incidents Major Webster had made some statements, inappropriate statements in the heat of the moment. While frustrated, she made statements to the commander's secretary saying--and I'll just go through some examples--that she wishes she could blow up this place, that if Major McCrary--that if she killed Major McCrary, that that would be very pleasurable to her. And she said the first thing about blowing up the place to--said it to the squadron commander. Made another statement to an airman regarding that it would give her a lot of pleasure--that she had a dream about killing Major McCrary and that it gave her a lot of pleasure



419

when she woke up from the dream. She also said that to the squadron commander, Lieutenant Colonel Addison left and Lieutenant Colonel Remington came in. She made a similar comment to Major McCrary--to Colonel Remington about Major McCrary. And then she also made a statement just before getting on a plane to go to the United States to go to Wilford Hall for her evaluation. She made a statement which, again, I didn't hear directly so it is hearsay. But she made a statement of a similar nature like, "I wouldn't--I wouldn't care if this plane blew up", in front of, I guess, a number of patients. So, you know, what happened is, you know, she would make these statements and then I would get a phone call. They were concerned that perhaps these statements, these homicidal statements, were serious and that she might be dangerous. And, you know, since suicide sometimes goes along with homicide, they were also concerned for her in that regard. I evaluated Major Webster on two or three occasions because of some of those statements. I don't think any of those statements were meant as homicidal intent or suicidal intent or anything like that. I think they were said out of frustration. I think they are inappropriate and I was concerned that she was making those statements. I was concerned that she couldn't inhibit a response like that. In other words, we--many of us have thoughts and when we are acutely frustrated we generally don't say things. And on numerous occasions she did and the commander was very concerned. I was asked to see her to evaluate her overall risk. I found her risk to act on any of those thoughts or fantasies was very low.

Q. And let me ask you, as far as her cognitive abilities, were you able to, I guess, form an opinion based on that, or not an opinion necessarily, but your impression of her cognitive ability? Were you able to develop that based on what you saw of her and the evaluation you received?

A. You know, I can answer that, but I am going to follow it up with something. I never formally tested her cognitively so all I can say is, on a number of occasions, she seemed somewhat forgetful. She would forget her hat in the clinic on numerous occasions. She left her car door open one time and came back. A



420

few minutes later my technician was out there wondering why someone's car door was open and she had left the car door open. Those were--that's really the only observations I can make--I would make a comment on, on her cognitive abilities.

AREC: The government has no further questions right now.

CC: I'll turn it over to you.

CIVRC: Obviously, I do.

**CROSS-EXAMINATION**

Questions by civilian respondent's counsel:

Q. Doctor Fey, we've never met, have we?
A. No, I don't think so.

Q. When was the first time that you met Dr. Webster?
A. It was in July. Well, no, met?

Q. I'll tell you what, when was the first time you evaluated her? Our records that I have show it wasn't until September.
A. No, it was in July. Let me just double-check this. (Referring to notes.) Yeah, July 22nd, 1998.

Q. I assume you refer to those records in doing your testimony here today, correct?
A. Yes.

Q. So if I could see those just for a second?
A. Sure.

Q. Thank you. (Referred to witness' notes.) Because you saw her--I want to get a time line here.
A. Okay.

Q. I think that might be important for the board and maybe it is even important to put it up to get a proper perspective?
A. Alright.

Q. I don't think we are going to have a lot of disagreement, by the way, between you and I, but you never know. (Civilian defense counsel writing on tablet on easel.) Let's see, you first saw--your last name is spelled F-e-y, correct?
A. That's right.

Q. I'm just going to put treatment of Doctor Webster, okay. Are we marking--I'm not familiar with the marking of exhibits. Are we--

LA: Is that a demonstrative aid just to assist us?

CIVRC: Right, but something though I would like to put in evidence.

WIT: Okay, you know, I think "treatment" is not the right word--that I offered treatment to Major Webster.

Questions by civilian respondent's counsel:

Q. Would it be evals then?
A. Yeah, basically, you know.

CM (Maj Matthews): Patient interaction?

WIT: Huh?

CM (Maj Matthews): Interaction, patient interaction?

WIT: You could call it that. I really never did--I guess--in that Major Webster came to my office and vented my frustrations, I guess you could call it treatment in that response. I tried to give emotional support.

Questions by civilian respondent's counsel:

Q. With that explanation--
A. I never treated her with any medicine. I never did psychotherapy.

Q. Okay, so the first date of your examination again was what?
A. Was July 22nd, '98.

Q. What I'd like for you to do, Doctor, is tell us what had happened to Doctor Webster by July 22nd, 1998. Maybe I can help you a little bit.
A. Alright.

Q. Had she been removed from the emergency room?
A. Yes, in fact, I think she had been removed twice from the emergency room.

Q. Alright, so she had been removed twice from the ER. (Writing on tablet as he speaks.) Had she been also removed from the primary--she had her credentials pulled by the time you saw her, right?
A. I don't know if that is the proper language. I guess they were temporarily suspended.

Q. At any rate, can we at least agree--
A. Yeah, she was taken out of the ER on two occasions, taken out of primary care and put into the Health and Wellness Center.

Q. Can we at least agree that her credentials were in jeopardy?
A. Absolutely.

Q. Are you aware of the fact that she had been given a number of counseling letters before this time?
A. Yes. I never had those letters in my possession, but I was aware of them.

Q. Now are you aware that, when she came in to Howard, she was originally slotted to be the director of the emergency room, correct?
A. I'm not aware of that beyond what she told me, that she expected that she would be given that.

Q. All right, and then when she got here though, there was a competition between her and Doctor McCrary, correct?
A. I don't know if it was a competition. All I can say is that I understand Major McCrary was given it in lieu of Major Webster.

Q. At any rate, she was not selected to be the chief of ER?
A. Yeah, that's what I understand.

Q. Now with regards to inappropriate statements, had she made any inappropriate statements as of July 22nd, 1998, when you had seen her and she came in to vent?
A. No, she did not come in to vent on July 22nd of '98. The reason she came on July 22nd was because she wanted to know what the results of Major LaMacchia's evaluation. I told her it would be best for her to discuss that with Major LaMacchia. But she pressed me on it and I shared with her his general impressions. She asked me for a release of his evaluation to her. I said to go to him directly since it was his evaluation.

Q. Okay, so at that time she came to you, she hadn't been sent by anybody? You hadn't gotten any calls or anything like that about her?
A. I had gotten a call from the Medical Group Commander, Colonel O'Neil, from a July 14th, 1998, letter and Colonel O'Neil had contacted me and asked me to set up as liaison for her for the consults up in Wilford Hall. So that was one reason, when she came in, she agreed to allow me to do a neurological evaluation on her and shared with me some of the history and she did ventilate some of her frustration and anger in the process of explaining to me what had happened to her over the course of the last six months.

Q. All right, but what I am trying to figure out, Doctor, is, when she came to you, it wasn't a result of any inappropriate statements she had made before that, as far as your records reflect?
A. That was not the purpose for her seeing me. That may have been the purpose of her seeing Doctor LaMacchia. You would have to ask Doctor LaMacchia that.

Q. But I am talking about you now, Doctor.
A. No, the reason for seeing me on the 22nd of July was not for inappropriate statements.

Q. So no bad comments. When was the first time that you were told, at least documented in the records, that she had made inappropriate comments?
A. That was on--that was in August.

Q. Can we get the exact date?



424

A. When you say inappropriate comments, are we talking about the comments to the secretary regarding--

Q. I'm talking about any comments which people reported to you and said, you know, "This is bad. This lady may have gone around the bend. You need to maybe talk to her."

A. Again, I won't comment on any statements made prior to the 22nd of July of '98. Again, I think you will have to ask Doctor LaMacchia that. But the first time that I heard of--the first time I was asked to evaluate her for a comment that had to do with anything with homicidality or suicidality was after the first time that I saw her on July 22nd of '98.

Q. And when was that?

A. That wasn't until August--uh--(referring to records). The 10th of August of '98, I was called by Lieutenant Colonel Addison, the squadron commander. She basically told me about what the secretary--what her secretary had told her about "blowing this place up". I said that--

Q. Is that reflected, that statement "blowing this place up", in your notes? I'm just curious.

A. Yeah, that is a telephone consult. (Counsel reviewed witness' notes.) That was my quotation. That wasn't her quotation. That was Lieutenant Colonel Addison's description of what she said.

Q. So she said she would "like to blow this place up" or words to that effect?

A. Yeah, something--I say exactly here, I say, "something in the line of 'blow this place up'." That was the 10th of August.

Q. Now, something happened between July 22nd and August 10th, 1998, didn't it?

A. That's right, that's reflected in this note here.

Q. Referral ER, right--OPR?

A. A referral OPR.

Q. We used to call them OER's.

CM (Maj Matthews): What is that?

CIVRC: OPR's are officer performance reports.

CM (Maj Matthews): What is the referral?

WIT: Again, I'm not an administrative guru. My understanding is that it is basically a very bad thing to get. It is potentially career damaging. If you get two straight, you could be kicked out or not allowed to be--

CM (Maj Matthews): So the OPR was a referral?

WIT: In other words, you know, on OPR's you get 5's and 4's. If you get really, really low...

Questions by civilian respondent's counsel:

Q. I believe you talked to Doctor Webster about this statement and you determined that there was very little likelihood that this was any more than voicing frustration. She had no real intent to blow up Howard Air Force Base?

A. That's right. (Referring to notes.) And, again, my comments were that it was a ventilation out of frustration. I offered to--for her to come in and ventilate to me instead of ventilating to the commander--the commander's secretary. Again, she didn't think it was necessary.

Q. Okay, we'll get into that a little bit more, too, Doctor. When is the next time you see her?

A. The--

Q. For any reason?

A. Yeah, at that point, I also--so she declined. (Referring to notes.) Uh--then I believe she went on air evac, if I have things right, on September 16th. But I also have something on August 13th. She basically walked into the clinic to give me further information, including complaints made against her in the past and her responses. She discussed her work-up, believed that she was being railroaded and provided a logical explanation for why she felt that way.

Q. Okay, so on August 13th, she came in on her own volition to tell you why she felt she was being railroaded and you, as a psychologist, without--psychiatrist--without making opinion one way or the other as to the validity of her assessment, at least found it to be a logical, reasonable one?
A. Yeah, I mean, she was not an illogical woman.

Q. She is not an illogical woman?
A. That's a blanket statement. But, at that time, you know, the mental status exam showed that she was logical.

Q. (Writing on tablet on easel.) I want to get this down right because I don't want anybody to accuse me of putting words in your mouth. Lawyers frequently do that, and I don't want to do that here before this board. Would it be correct to say, "felt railroaded"?
A. Yes.

Q. "And gave reasonable explanation for conclusion"?
A. Well, you know, logical doesn't imply that the explanation is reasonable.

Q. Logical?
A. Yeah, see people all carry their belief systems. Some of them--let me give an example. Someone may have an extremely irrational religious belief, however, go down a set of cognitive thoughts that are logical within their value system. I thought everything she said was logical in terms of what she believed.

Q. Okay, in other words, you didn't hear anything like, "I hear a voice from God that tells me--
A. No, absolutely not.

Q. Nothing like that?
A. Nothing psychotic.

Q. When is the next time you see her?
A. (Referring to notes.) The next time was on the 14th of September, one month later.



4(?)7

Q. Now let me ask you something. With regards to--I hate it when that happens. Start to ask a question and you forget what you were going to ask. That's all right, we'll just go on. September 14th, 1998. Now, by that time, she had been air evac'd, right?
A. No, I believe the air evac was coming up in two days.

Q. Oh, two days?
A. Yeah.

Q. Okay, tell me what occasioned her visit this time?
A. Now I cannot remember if this visit was planned. Most of Major Webster's visits were as walk-ins. She would come in. I would try to fit her in and I would see her on the spot. This one--

Q. By the way, Doctor, that is not unusual for colleagues in a hospital, is it?
A. Uh--it depends. (Referring to notes.) It is not unusual for a colleague to call me about a case. In fact, I encourage them to do that. However, there are some boundaries in treatment relationships and usually it's best to schedule an appointment. Actually, let me correct what I said first. This appointment was scheduled.

Q. Okay, it was scheduled?
A. Yeah, Major Webster and I had scheduled this appointment basically to see her just prior to her air evac. She had agreed to come in and allow me to see how she was doing.

Q. I guess I am a little bit confused, and maybe the board is. When you initially saw her, she said she didn't want to be seen by you for venting, but yet, we see either her coming in on her own volition or you scheduling her for appointments?
A. Yeah, this--this was more out of practical considerations. Mostly I wanted to meet and touch base prior to her being launched off to Wilford Hall, make sure we had everything in check.

Q. And the purpose of this visit?
A. Again, the purpose of this visit, I believe there was probably a phone call or something in the interim and

we agreed that she would come in just prior to air evac to make sure everything was set logistically.

Q. When you say a phone call or something in the interim, something initiated by Doctor Webster, right?
A. It's likely that I recommended it. Again, you know, Major Webster had requested not to be seen again. Even though, and, you know, this is--I wasn't in Major Webster's head. I didn't understand necessarily why she would sort of walk in on occasion. But I didn't mind it either. I wanted to help her. But I think this one was scheduled at my request.

Q. Okay, and she came in. She agreed to do that, right?
A. Uh-huh.

Q. So that all I am trying to point out is that this visit wasn't prompted by any call from SGH or anybody else, correct?
A. Right.

Q. Okay, and again, what was discussed during this visit?
A. A host of things. (Referring to notes.) I think she had had a lot of frustrating events. She was still having problems sort of adjusting to what was going on. you know, some of the things were the anger and the frustration, wanting to get back to the emergency department, feeling railroaded, feeling that she didn't have a significant advocate in the people that would be making the decision regarding her credentialing. Then she talked about some of the complaints that were made against her and how a lot of them were invalid, how on a number of occasions she actually was very thorough with her work-ups and sometimes that's the reason why her work-ups went a little bit longer. She also provided me with some supporting statements for her. You know, she gave me some letters of support from other people, some accounts for some of her accomplishments. And I was always interested in that, you know, because I think it was important for her to recognize her strengths.

Q. Was she rational during that visit?
A. Uh--her mood was upset and angry. I would say she was mostly rational, yeah.

Q. (Writing on tablet on easel.) And would it be correct or not to say that she was highly upset, she was greatly--I'm trying to--the word I hear a lot today and I know you all don't use it, but she was--would it be correct to say she was just stressed out, in a layman's term?
A. Uh--yeah, I suppose someone could say that. I mean...

Q. Well, I don't know, I sometimes have psychiatrists who say, "I never use that term. That is TV stuff."
A. Actually, I think it is a good--I like it. I can totally relate to it.

Q. See, I told you we wouldn't have a lot of disagreements. When is the next date you see her?
A. (Referring to notes.) Let's see. You know, at that point, we agreed to meet. I would call her after she came back. As soon as she came back, she came in with the results.

Q. Did you get a call--again, I want to make sure this is--
A. Okay, here is a--

Q. --an accurate chronology.
A. Yeah.

Q. Did you get a call from the air evac people about her on the day of her air evacuation?
A. Uh--let's see. (Referring to notes.) Yes, I did.

Q. Okay, and again, that was September 16th?
A. That was the 17th.

Q. The 17th, okay, good, we finally got the date right. That was the day she was being air evac'd. And what did that call--what did the caller relate to you? Have you got that recorded in your notes some place?
A. I was called by the group commander and the report from Senior Airman Goode was that she had stated she was angry, that she would blow up the whole place.

Q. That she would blow up the whole place, that is what your notes reflect?



430

A. Yeah, and again, you have to understand, this is hearsay upon hearsay upon hearsay. This is my report of Colonel O'Neil's statement from Senior Airman Goode who heard Major Webster.

Q. That's right. I'll tell you what, we will put it down right now as you have got it in your report because we are going to get a chance to hear from Airman Goode.
A. Yeah, and you know, Airman Goode, I believe, called me and said--I can't remember what she made reference to prior to the air evac. My--I am not concerned and I never have been concerned for Major Webster going on a homicidal killing spree. And she was--

Q. I'm sure everybody in the room is thankful for that.
A. She is, you know, she is claiming that she says it out of frustration. I say, "Look, don't do it. It gets you in trouble every time you do it." She continued to make inappropriate statements. So, you know, I was not concerned even though the group commander, who didn't know her as well, was very concerned by the statements. I tried to explain to him that her risk factors, if you look at the combination of risk factors, they are rather low.

Q. Again, what did you write there?
A. (Referring to notes.) I wrote two paragraphs.

Q. About the statement? "I'm going to blow up the airplane"?

A. "Report from Senior Airman Goode was that the patient had stated she was angry and that she could blow up the whole place".

Q. She could blow up the whole place?
A. Uh-huh.

CM (Maj Matthews): Did Airman Goode tell you why she was angry when she said that?

WIT: Say again?

CM (Maj Matthews): Did the airman tell you why she was angry?

WIT: Oh, yeah, well, the whole--the inappropriate nature of this comment, the stressing matter, was not only that she made the comment in the first place, okay. But see, I was comfortable with the fact that she wasn't a homicidal risk at that time. I mean, she could have made that statement. I know that I would see her. She would say basically it was ventilation, she was not plotting. I don't think she has the capabilities--she doesn't have any expertise on how to operate a bomb. So, all right, I tend to blow off statements like that after I have done the evaluation. What I was concerned about and what I commented on, was the inappropriate nature of the comment in reference to the fact there were, and I can't say how many people, but somewhere approaching twelve--actually in front of twelve other patients who were going on the airplane. Basically you have another person on the airplane that you are going on saying that they wish the plane would blow up. That is very upsetting to the patients and that was part of my concern. So my concern was not over the fact that she was a homicidal threat. My concern was over that she would say something like that in front of the patients.

CM (Maj Matthews): What prompted that statement?

CC: Did you comment on why that was prompted, that statement?

WIT: I think that Major Webster was extremely frustrated about having to go for another medical evaluation when the past MEB had been overturned, the diagnosis hadn't been substantiated and thought she was being railroaded and so she was very resentful about the whole process of having to go up there. And I think, and again, this is conjecture. I was not in her head. But I think the--sort of the rationale for saying that was she wished the plane would blow up was because she really didn't want to have to go up there and go through this process, not that she was planning on actually doing it.

Questions by civilian respondent's counsel:

Q. And that, I guess, was really the point I wanted to bring out. Thank you for bringing it out for me. When was the next time you had any discussion with her?
A. (Referring to notes.) The 30th of September, '98.

Q. Was that a result of a scheduled visit, a drop-in, or did somebody direct her to come see you?
A. When we had departed, basically, it was understood by both of us that we were going to be meeting again because basically I wrote the consult and they were coming back to me. She knew that and she walked into the clinic and she told me about the work-up. I reviewed her medical records and she showed me the work-up.

Q. So again, that wasn't the result of the commander calling you or anything else? It was an agreed upon--
A. That's right.

Q. I'm just going to put "agreed appointment" right now. (Writing on tablet on easel.)
A. She also--she told me about the--we reviewed the MRI findings. She didn't agree with the--some of the findings. Also, as part of this, evidently she was supposed to get a blood draw after her lumbar puncture. She ended up getting sidetracked and didn't get the blood drawn so part of it was now, I was calling up Doctor Gronseth to see if we could get a blood draw now after the fact. I don't think that data was ever--we never really got the data.

Q. Do you know whether or not--
A. I think that LP--

Q. --the blood was drawn?
A. I can't say for sure. I think what Gronseth felt was that it probably wouldn't be valid, but it couldn't hurt to draw it and I believe I communicated that to her.

CM (Maj Matthews): Can I clarify? So she went up there to have an MEB, I mean, this reevaluation and an LP was done and told to get her blood drawn?

WIT: She--yeah--she--



433

CM (Maj Matthews): Did she get it drawn?

WIT: She had the LP. It was a very painful LP. Towards, I think, the day--the same day she was leaving or the day prior to her leaving, she came back to Gronseth. They discussed some of the findings, et cetera, his impression. He said, "Look, go down to the lab. Get your blood drawn. It has to be done." And I think she ended up going to check into her flight and never made it to the lab to get the blood drawn.

Questions by civilian respondent's counsel:

Q. Because she didn't want to miss her flight, right, Doctor?
A. I don't know what the reason for that was. I put sidetracked. The other thing was that she clarified the statements that she had made. She basically said--she told me that she said, "if the plane blew up with me on it, I wouldn't care about it." She saw it as an inappropriate statement. Recognized it as an inappropriate statement. Minimized it by saying she was blowing off steam. She told me about dreams with homicidal content that she had had. She says, "I would not kill anybody. I would like to prove them wrong by showing that I can perform capably as a physician." And denied any suicidality.

Q. And that's another point that I want to bring up. You testified at some point--but I haven't heard it yet from your notes--maybe we are coming to it, that she talked to the commander's secretary and told her that she wanted to shoot Major McCrary. Where is that in your notes?
A. That is--that's likely not in my notes. (Referring to notes.)

Q. That's not in your notes.
A. Again, I would get that comment from the people who had heard the comment. You know, when I hear a comment, someone says to me on the phone, they say to me, "Hey, this guy says that he wants to kill himself." And the commander is calling me. I can almost be assured that that is not exactly what the person said. I can't tell

you how many patients I have seen that have said something that is construed as suicidal intent or homicidal intent and you get differing accounts--everybody has got a differing account of what was actually said. The important thing is what the person was thinking, what was in the person's head as far as the evaluation.

Q. So with regard to these other statements about shooting people, did you ever ask Wilma about that?
A. Oh, yeah.

Q. And did she admit to saying that she was threatening to kill these people or did she say that she was relating to them--
A. Blowing up--

Q. --a dream?
A. Blowing up--

Q. I'm talking about the shooting thing now.
A. No, I--as far as I understood, the communication to the squadron commander was not a dream. The communication to Airman Goode was a dream.

Q. Now, did she also tell you that, as a result, at the end of this dream, she is carried away and taken to jail and that she realizes that is not the appropriate--that was not the appropriate thing to do? Do you recall that at all?
A. No, she didn't tell me that that was the end of the dream.

Q. Does that conclude your records or is there something else?
A. (Referring to notes.) What date, September 30th?

Q. Yeah.
A. No, that's not--

Q. I just put down here under September 30th, she explains her statements. (Writing on tablet on easel.)
A. Yeah.

Q. That would be correct, okay, good.