A. The 8th of December, she--basically she came in and she wanted me to review an article. But, again, I was concerned and wanted to see how she was doing.

CC: At this point, having gone through a long process, is there anything else that you really want us to emphasize right here?

CIVRC: Yes, I do. I do want to get this. I apologize. I realize it is going to take time, but there is a reason to my madness.

CC: Okay.

Questions by civilian respondent's counsel:

Q. When is the next one?
A. The--this was in December '98, the 8th of December. She walked into the clinic.

Q. When in December?
A. The 8th of December of '98.

Q. (Writing on tablet on easel.) This was a walk-in?
A. Yeah.

Q. What was the purpose?
A. (Referring to notes.) And, again, you know, she wanted me to review an article she had written on alcohol. I gave some comments. And then I said, "Hey, I wanted to see how you were doing." She basically gave me an update on she had had Guillain-Barre diagnosed and had had quite a series of events. I asked her whether or not she had had any further suicidal or homicidal thoughts. She said, "Even though I felt that way in the past, I would never have acted on that." Said she had been sleeping and eating well. I also said--I said, "Hey, you know, if you want to see anybody regularly or me regularly, you can do that." She says, "I feel worse when I see you or Doctor LaMacchia", however, she could see one of the social workers instead. I understood that she felt that I was part of the whole railroading system since I had written the consult and that was one reason she was uncomfortable seeing me.



436

Q. And, Doctor, I guess that is one of the things I really want to ask you about. Look at all the things that happened to this lady. Would you agree with me--I'm sure you have seen patients before whose careers are threatened?

A. Oh, yeah.

Q. And those--I'm sure those people get extremely stressed as a result of that?

A. Yeah, I would expect anybody would where their career is threatened.

Q. And all I am trying to ask you is, as a psychiatrist, it is not abnormal for people who are stressed out like this with their life and their license on the line, the medical license and the medical right to practice, that some people will overreact and say things they shouldn't without thinking because they are just mad and they are frustrated and they feel like the system is out to get them, right?

A. Could you just repeat that more succinctly?

Q. Sure, I'll be happy to. I'm sure you have treated patients--first of all, you have already told me that you have treated patients before--

A. Right.

Q. --who have been in a situation where their career is on the line. Have you ever treated physicians whose license or credentials are at stake?

A. Uh-huh. (Affirmative)

Q. And in those situations, have you also had occasion where those people, because of the stress of the moment and the burden that they felt they were carrying, made inappropriate statements which they later recanted and said they wished they had never said them?

A. Yes--no. In other words, I have never had someone, as a physician, and again, I've had the luxury of not having to be in this situation with this many physicians. But the number of comments over the history of time and the regular feedback, I thought it was inappropriate and I don't think they are explainable based on the stress. Yes, they are due to

stress. However, most people are able to inhibit that response.

CIVRC: Do I just stay in numbers as far as exhibits go or not? I at least want them marked for identification. (Referring to the writing he did on tablet on easel.)

LA: We are up to 12 at this point.

CIVRC: Okay, we'll make this 13.

LA: No, this will be 12.

CIVRC: This will be 12, I'm sorry. (Marked first page of writing.)

LA: Why don't you just say it's a two-page exhibit?

CIVRC: That's all right, 12 and 13. (Marked both pages on tablet on easel.)

Questions by civilian respondent's counsel:

Q. Now, Doctor, we've had you on the stand a lot here, but it is my understanding you have no opinion to render to this board whether or not Doctor Webster is capable of continuing to practice medicine in accordance with standard of care?

A. My opinion is that that is not my decision. I was--when you come to an MEB or a PEB, that wasn't the purpose of my evaluation ever and that's the whole reason for the board.

Q. Let me ask you something else, Doctor. If a person looked at a couple of neuropsych evals that are in before this board and then you looked at one done by Doctor O'Connor--by the way, do you know who Doctor O'Connor is? Do you know anything about her?

A. From what I understand, just from reading the tab, it looks like she is the head of Neuropsychology at Beth Israel Deaconess.

Q. What is Beth Israel Deaconess, in case somebody doesn't know?

A. It's a hospital in Boston, Massachusetts.

Q. It's the adjunct of Harvard University, isn't it?
A. Uh--yeah.

CIVRC: I'll go ahead and mark her curriculum vitae as 14.

AREC: The government has no objections. However, we will note, for the record, this is the first time we have seen this curriculum vitae.

CIVRC: And I would note, for the record, that unlike the government, I am under no obligation to provide the government with anything before this hearing.

Questions by civilian respondent's counsel:

Q. Now her results were markedly different than the results of the neuropsychs at both Wilford Hall and even here, right?
A. Yeah, as I said before, she performed better on this testing.

Q. Let's see, could there be a reason for that difference?
A. Absolutely.

Q. Could that reason be that she no longer felt like she was fighting the blue-suiters and in their hands and, therefore, could be more relaxed and less anxious?
A. Uh--that would be one reason.

Q. So when you were talking about the difference in that report, you weren't criticizing Doctor O'Connor's report or calling it into question as not being valid, were you?
A. I think both of these reports are excellent. Major Campbell's report is about as detailed as you can get of an analysis of the situation from the data that he had at that time. This woman had different data. We don't know which data each of them had. So they may draw different conclusions based on what data they had. Furthermore, there may be differences in the performance based on two factors, I figure. One has to do with practice. When you take neuropsych testing repeatedly, you tend to get a little better at it. She had three within the last six months. The second,

probably more likely, is the fact that she was probably less anxious with this neuropsych testing than the prior one.

Q. And by the way, when we start talking about the neurological evaluation, do you know anything about Doctor Poser?
A. Yeah, I do. I've never met him.

Q. Tell us what you know about Doctor Poser.
A. You know, just from what I learned going through neurology rotations and studying for the boards in psychiatry and neurology, Poser criteria is basically one set of diagnostic criteria you can use for multiple sclerosis.

Q. One of the preeminent authorities in the field?
A. Yeah, I would say, yeah.

(Civilian respondent's counsel provided document to recorder.)

AREC: No objection.

CIVRC: I am going to put the curriculum vitae of Doctor Poser in as 15.

Questions by civilian respondent's counsel:

Q. By the way, as you noticed, the Air Force physicians who saw her, relied upon Doctor Poser's criteria to reach their conclusion, didn't they?
A. From what I understand, the--Doctor Gronseth used, as one factor, used Poser's criteria basically. And that's the thing with MS, it is a very diffuse sort of thing. It is sort of like any criteria for an illness. It is not a broken leg. You can't look at it. you basically have criteria.

CIVRC: Thank you very much. I don't have any further questions.

CC: Thank you, Doctor Fey.

(The witness left the hearing room.)

CC: We'll go to 1:00 and then take a break about a half hour or forty-five minutes.

REC: Just to clarify, are we going to take an hour recess?

CC: We will take forty-five minutes at 1:00 o'clock.

AREC: The government will call Major Burkett.

CC: Okay.

**MAJOR EDWIN K. BURKETT**

was called as a witness by the government, was sworn and testified as follows:

**DIRECT EXAMINATION**

Questions by assistant recorder:

Q. Would you please state your name and rank for the record?
A. Edwin Keith Burkett, Major, United States Air Force.

Q. Where are you assigned, Major Burkett?
A. I am assigned to the 24th Med Group, Howard Air Base in Panama.

Q. How long have you been assigned to Panama?
A. Since August of '96.

Q. What are your duty titles here or what is your duty title here?
A. Currently, I am the chief of the medical staff. I am also a family practice physician.

Q. As chief of the medical staff, what duties do you have related to that job?
A. The main thing that the chief of medical staff is involved in is the quality of care, provider privileging actions, credentials function, quality assurance reviews of medical records.

AREC: I'm showing defense counsel what has been marked as Hearing Exhibit 16. It is an Air Force Form 2662.

CIVDC: Again, we have no objection, although it was not provided to us prior as required by the regs.

Questions by assistant recorder:

Q. Major Burkett, I am showing you what has been marked as Hearing Exhibit 16, a curriculum vitae. Do you recognize it?
A. I sure do.

Q. Can you tell the board what it is?
A. A curriculum vitae is the list of my positions and titles and job descriptions, so to speak, as well as my list of educational background and other types of experience in the medical field.

Q. And it is current and up to date?
A. That does not include my current position as SGH. I was just appointed January 25th and that was up to date as of October '98, I believe.

Q. Now, Major Burkett, do you know Major Wilma Webster?
A. Yes, I do.

Q. And how do you know her?
A. She was on--she is on the staff of the medical facility. She worked in the emergency room when she first arrived and she also worked in the primary clinic where I work.

Q. What involvement did you have with the special credentials function that met in November of last year?
A. I was the chairman of that credentials function.

Q. Okay, and what was the final disposition of that credentials function? What did they decide finally?
A. The decision was to revoke all the privileges for Major Wilma Webster in the area of emergency medicine and also in family practice primary care medicine.

Q. Now, Major Burkett, have you had an opportunity to personally observe Major Webster giving patient care?

A. I have.

Q. Can you tell us when that happened?
A. In the meantime, I was working next to her in the family practice clinic after she moved from the ER to the family practice clinic. Then I observed her working with a few patients as well as discussed some patients with her.

Q. Let me direct your attention to January 24th, 1998. On that day, did you see Major Webster in the course of patient care on that day?
A. Yes, that was a special situation where I was called in to assist with a Code Blue and Major Webster was the MOD or medical officer of the day and she was directing the Code Blue.

Q. Can you tell us how you came to observe this Code Blue and what you saw?
A. Okay, when I--as part of our procedures, they call in providers who are available and I was available and I came in at the call from the emergency room to the inpatient medical ward. And as I came into the room, Major Webster was at the head of the bed with the patient and the code team was assembled with the crash cart available. And so the first things I observed were that the patient apparently had ventricular fibrillation on the monitor and I asked if that was the rhythm that she was seeing and she agreed. And I observed that the patient appeared, you know, to not be breathing or have a pulse at the time as well. And--uh...

Q. Major Webster was there. Who else was there at the time when you arrived?
A. Okay, when I arrived, as far as names, I can remember a few people specifically. There was, I think, I believe Captain--Lieutenant Lester was the nurse and also Lieutenant Colonel Addison arrived just before I did. She was called in from home as well. The other technician was--uh--was Doug Brooks--Brook, I believe was there. The other ones, I don't remember who all was there.

Q. Were there any other physicians besides yourself?

A. Doctor O'Neil arrived also from--called in from home.

CM (Maj Matthews): What time of day was it?

WIT: It was night-time.

CM (Maj Matthews): How long had the code been going on before you arrived?

WIT: I don't recall exactly the time, the amount of time. But it takes me about four minutes to get in from my home, four to five minutes to get from home to the ward.

Questions by assistant recorder:

Q. When you arrived at the code that night, what was Major Webster doing?
A. At that--when I arrived, Major Webster was attempting or she had the equipment available to do an intubation of the patient. And she was preparing to intubate when I arrived.

Q. Did she perform the intubation?
A. No, she was unsuccessful.

Q. And what happened after--how many times did--did you see how many times she attempted--
A. Yes.

Q. --intubation?
A. If I--the other thing I noticed when I arrived was that CPR wasn't being done at the time and I asked about that and why that wasn't being done and the thing was they said they thought the patient was breathing. So I came around to the front of the bed to the head of the bed where Major Webster was and I observed her. You know, she initially missed the first intubation and then she did--made two other attempts and also was unsuccessful.

Q. You said when you came in you asked about the CPR?
A. Right.

Q. Why did you do that?



L144

A. Well, because if a patient is in ventricular fibrillation and doesn't have--you assume they don't have a pulse and if they don't have a pulse then they need to have CPR or cardiopulmonary resuscitation which includes chest compressions and otherwise they aren't circulating any blood and that is an essential part of successful resuscitation.

CC: Was there any CPR done, to your knowledge, until you arrived?

WIT: I believe they had started CPR. When I asked was CPR being done, they said, "No, we stopped".

CC: Did they stop to intubate? Was that the reason it was stopped?

WIT: Well, they told me they stopped. She said they stopped because they thought the patient was breathing and wanted to see if the patient was breathing. So I said, "Well, how long did you"--I don't know if I asked that question, but I said, "Well, you need to do CPR".

CM (Maj Matthews): Is there a code sheet we can reference to while he is discussing this?

CIVRC: We have requested this many times. It has not been provided to us yet.

AREC: We do not--well, I'll let Major Webster--Major Burkett rather--

Questions by assistant recorder:

Q. Do you know where the code sheet is?
A. I wish I did. I do not. I do not. It is not even in the record. It was in the record when the case was--this was a case that was reviewed and it was in the record then and now it is not in the record.

Q. Major Burkett, you stated at some point you suggested CPR needed to be started.
A. Right.



445

Q. Can you tell us what else that you did related to the code?

A. Well, the other--the other--there were three things that I noticed or that came up that I thought were particularly lacking in this code and the one thing was that no CPR at the time. They had started it, but they stopped it. But it still needed to be continued. Two is that the patient wasn't getting any air at the time I arrived. And the third one was that apparently no ventricular--no defibrillation had been done at the time that I arrived. So we are four minutes into a patient in ventricular fibrillation and these things were lacking. So when I came in, I said--I asked about the CPR. I suggested that CPR was resumed. I came up to see how she was doing with the airway and what I noticed was this was a big man and his neck was thick and he was in the bed and in a bed without much of a back board. And the technician was doing--had an ambu bag bagging with oxygen attached, but there was no--no chest movement. There was no air movement that I could see. And I went up and I helped and I repositioned the head and when I did that then air--I could see the chest rise and fall and air was--the patient was now being ventilated. So she attempted intubations again after that, still unsuccessful. But it was significant because, you know, head position is one of the most important things in ventilating a patient and it wasn't being done right. You can bag on the face all you want, but if the head position isn't correct, then there is no air going in. It wasn't until I helped reposition the head that that occurred. Then, after she made her attempts, she asked, you know, someone else to do the intubation. She asked me and I'm standing right there, so she asked me to do that and I went ahead and made the intubation attempt and it was successful.

Q. Now you mentioned the importance of the head position. On a Code Blue like this, who is responsible for maintaining the proper head position?

A. Well, the code director is responsible for making sure these things are done. He or she doesn't have to do it themselves. They just have to make sure it is done. So the technician doing the bagging with the oxygen

isn't responsible for that, per se. The code director needs to recognize that that's the wrong head position.

Q. Was Major Webster the code director for this code?
A. She was.

CM (Maj Matthews): When she relieved the laryngoscope to you, did she mention the reason why she couldn't intubate? Just difficulty visualizing or were there some medical problems or--

WIT: No, at that time, she just said, "He is very difficult to intubate. I can't see the cords and he has a thick neck", which he did.

Questions by assistant recorder:

Q. Major Burkett, you mentioned you had some concerns about the patient being in fibrillation and the use of shock. Could you explain your concerns about that?
A. Right, the patient was in ventricular fibrillation and Lieutenant Colonel Addison who was also our--at that time, our chief nurse, as well as the Medical Operations Squadron Commander, said, "Has this patient been shocked yet?" And the answer to that was, no, also. Of course, in a patient with ventricular fibrillation, the treatment for that is defibrillating shocks. And that is the only way to convert the rhythm back to a rhythm that the patient can live with. At that time, it had not been done yet.

Q. This patient, do you remember what was the result of this Code Blue? What happened to the patient?
A. Well, the patient died.

Q. Do you know what was the cause of the death?
A. It was my understanding, from reports later, it was a massive pulmonary embolus which is a clot to the lungs.

Q. Do you know what factor did the positioning of the chest tube play in the--or the intubation in the patient have in his death? What factor did that play?
A. Do you mean the position of the intubation tube, did that have any factor in the patient's death?

Q. Yes.
A. None, none. When I intubated the patient, I was controlling the tube and I auscultated both sides of the lung fields to make sure there was air going in with the bagging and both sides of the lungs were being aerated or ventilated.

CM (Capt Georgescu): I think the question, if you don't mind me asking, is the failure of intubating the patient in a more--in a faster way, what would the consequences of that have been in the patient's death?

WIT: I don't think that was so much a factor as much as the head position because you don't have to intubate a patient to control their airways. In order for the patient in a code to have oxygen, intubation is a good way to protect the airway in a long-term, but it is not essential, and there are other ways to--head position is number one. You can use other alternative forms of airway control, oral pharyngeal airway or nasal pharyngeal airway or just have someone else hold the head in the proper position to get the proper ventilation. So my impression of Major Webster's direction of that, she was so intent on intubating that she was oblivious or forgetting other types of things to do that needed to be done for this patient.

AREC: I am showing defense counsel Hearing Exhibit--what has been documented in an MFR, Memorandum for Record, which has been marked as Hearing Exhibit 17.

Questions by assistant recorder:

Q. Major Burkett, I am showing you an MFR which has been marked as Hearing Exhibit 17.
A. Correct.

Q. Do you recognize this exhibit?
A. Yes, I do.

Q. Can you tell us what that is?
A. This is the memo for record that I wrote after that date. I wrote it on the 31st of January, but it is regarding the code on the 24th of January, and I was outlining those three deficiencies that I noted, airway



418

management ventilation, CPR and defibrillation. I wrote this to the SGH and to the MDOS Squadron Commander as information.

Q. Can you explain to the board, why did you write this MFR?

A. Because I felt that the care of that code was not adequate for someone I assumed was a well-trained ER physician when I came in. That was really my first major interaction with her, and I came in there expecting, you know, someone who really knew what they were doing and was in control. And I felt that she wasn't in control of that situation. So I wrote that as a memo suggesting that she retake ACLS soon and brush up on her skills in that particular expertise or that particular important tasking.

CC: I don't know if this is an appropriate place, but what is her training in? I don't know if I should ask you or ask her directly. Internal medicine, ER? I don't know what your--is that directed to him?

LA: Do you have the PCF available?

AREC: Yes, we have the PCF.

REC: If you would like, if this is an appropriate time, we can mark both the PAF and the credentials file.

LA: Why don't we use them as demonstratives for right now. He can quote from them and then later the whole panel will look at them.

CIVRC: We will stipulate the doctor is board certified in internal medicine.

Questions by assistant recorder:

Q. Major Burkett, I am showing Major Webster's Provider Activity File and also her Provider Credential File regarding the question that was asked you by Major Steffen.

A. Uh-huh. (Reviewed files.)

CM: And her ACLS, at the time, was up to date?

WIT: I believe it was. (Reviewing files.) I believe she should still be current.

CM: We can look for ourselves.

WIT: Her ACLS doesn't expire until June '99.

CM: Okay.

WIT: But she is board certified in internal medicine and she worked in the emergency room.

AREC: I am handing Hearing Exhibit 17 to the board.

CIVRC: Seventeen is the credentials file?

CM: No, a memorandum for record.

CIVRC: Oh, okay.

AREC: We haven't marked these two yet. (Referring to files.)

CIVRC: Thank you.

Questions by assistant recorder:

Q. Major Burkett, I want to ask you a question about another area, this time regarding Major Webster's time in the primary care clinic. What type of interaction did you have with Major Webster in the primary care clinic?

A. Major Webster came to work in the primary care family practice clinic, and I was, at the time, the chief of family practice. So under the direction of Doctor Mendez, who was the flight chief, she came to work from the ER area element to the family practice element. She happened to be in the office right next to me as well. So when she came up to work there, I was responsible for telling her about how we would see patients and I made out her schedule as well and was available to help her and work with her in that setting.

Q. Do you remember when this was, roughly what time?



450

A. It was right--it was after that code so that was about the 29th of January or something like that was her first day.

Q. What type of patients was Major Webster seeing at the time when she was in primary care?

A. Well, initially, because she said she hadn't worked in a clinic setting much, she was--she worked in the ER for many years, we gave her--I gave her a schedule that was 30 minute acute appointments and also seeing sick call in the morning. So we start sick call at 7:00 and those we would see on a first come first served and whatever doctor got to those at the time, we would see as many as we could. Then appointments would start at 9:00 and she had 30 minute slots for acute walk-in patients at the time. I don't remember how long after that, but mainly she was seeing mostly physical exams as well.

Q. How much time for lunch did Major Webster have when she worked in the primary care clinic?

A. Well, everyone in the family practice primary care clinic was allotted lunch from noon to 1:00, that is, those are when there were no scheduled patients.

Q. Did you explain that to her when she began there?

A. I believe so.

Q. Can you recall an incident where Major Webster disagreed with you about the lunch schedule?

A. Well, the first day she came to work, that was where we had a time of trouble with lunch. And what happened was she got behind in her patients that morning, her first day in the clinic. And I told her, you know, lunch was from 12:00 to 1:00, but apparently she had patients flowing over into that time. And so what happened there was, I believe the NCOIC approached me somewhere around 12:15 and said she was, you know, wanted to go to lunch. I said, well, you know, "She has appointments at 1:00 so she can get lunch when she is able but scheduled patients need to be seen as soon as possible when they arrive for their appointment." So I believe I had to leave the clinic for something. Then when I was coming back, I came up to the clinic and I was informed that she had gone to lunch and it

was now like 1:05 and she had a patient waiting. So I went downstairs and I saw her on her way through the emergency room and I stopped her to ask her, you know, to inform her that she had patients waiting and asked her what she was going to do. She said she was on her way out to lunch. I said, "Well, you can't go out to lunch because it will take too long and you already have a patient waiting. So--and you can't have patients waiting for an hour while you go to lunch. There has to be some way for you to have lunch here." In fact, at that point, I offered her my lunch. She was very upset and she got--she got a little loud in the ER hallway and there were people around and she said, "No, I am going to lunch. I deserve to have lunch." And I said, "Well, you can have lunch, you just can't go out for lunch."

Q. When you say she was loud, how loud was she?
A. Well, I would say--I can't answer that. I don't know how loud she was.

Q. Did she yell?
A. Yeah, she yelled and, if I was down at the other end of the hallway, I imagine I could have heard her. But there were people--

CM: The patients were definitely aware--

WIT: There were patients--

CM: --of the situation?

WIT: --in the ER hallway. There was a person in another office who was right behind her and he looked up when this was going on and she was very--you know--she was--her physical demeanor was very angry, tightening up her fists and she slammed the locker. She had a locker down there and she slammed that shut. And basically I thought that it was, not so much that she was upset about not going to lunch, which was fine, but the manner in which she responded was unprofessional, I thought, and very antagonistic and loud and demonstrative.

Questions by assistant recorder:



452

Q. When you stopped her--when you saw she was going to lunch and you talked to her, how did you stop her? How did you approach her?
A. I came up and I said, "Major Webster, where are you going?" She turned around and we talked and we were about a foot away from each other and I was speaking with her.

CM (Maj Matthews): Was she generally unhappy about being in the primary care setting?

WIT: Yes. She was very--

CM (Maj Matthews): I assume she felt that was like a demotion.

WIT: She was already--yes, she was very unhappy about that.

Questions by assistant recorder:

Q. When you spoke to her, did you raise your voice to her?
A. Not at all.

AREC: I am showing defense counsel Hearing Exhibit 18, which is a Memorandum for Record dated 30 January 1998 from Major Burkett.

CM (Capt Georgescu): Major Burkett, just as a matter of clarification, the first day you gave her thirty minute appointments?

WIT: Yes.

CM (Capt Georgescu): So she wasn't getting just everybody walking through, she was getting every thirty minutes a patient after sick call?

WIT: Right, after sick call. And sick call, again, was not assigned amounts. I believe in some of those slots, she was given patients from another provider. But still, I don't think she had--I'm not sure of the numbers she had, but it wasn't more than she would have seen in a twenty minute or thirty minute--they weren't overflow. Understanding at that time, our family

practice clinic was seeing patients at fifteen minute slots.

Questions by assistant recorder:

Q. Major Burkett, I am showing you an MFR which is labeled as Hearing Exhibit 18. Do you recognize that?
A. Yes, I do.

Q. Can you tell the board what it is?
A. This is the memo I wrote after the outburst concerning the lunch incident with Major Webster in the ER hallway.

CIVRC: I'm sorry, what was the date of that?

WIT: This is dated 30 January '98. The incident was on the 29th of January '98.

AREC: I am handing Hearing Exhibit 18 to the board.

Questions by assistant recorder:

Q. Major Burkett, based on your observations of Major Webster, what is your assessment of her as a physician?
A. Well, from those--that encounter, limited to that, I was concerned about her skills and ACLS, first of all, which is essential for someone to work in the emergency room setting. And then I was--with the second incident, I was concerned about her ability, you know, to handle any type of pressure and to work with other people on a congenial basis. That was a singular incident and she was upset. So, at that point, I was concerned about her professionalism. But at that point, I didn't know--I didn't--I thought she could probably still function as a provider if she brushed up on her ACLS and if she learned to control her temper when she was angry and to be more professional.

Q. Since then, has your opinion changed?
A. Only based on other incidents that I have observed or heard about and also in evaluating and putting together some of the things for this case.

AREC: The government has no further questions at this time.

CIVRC: Ten to one, I am going to be long with this witness. You might want to take a break now.

CC: Let's take a break. Let's be back at 1:30.

(The hearing recessed from 1250 hours to 1330 hours.)

CC: We are going to go back on the record and we will continue with the cross-examination of Doctor Burkett.

**CROSS-EXAMINATION**

Questions by civilian respondent's counsel:

Q. Doctor Burkett, I don't think I've ever met you. I think we talked once over the phone about getting me set up when I came down.
A. That's correct.

Q. Doctor Burkett, I want to talk about this Code Blue a little bit more with you. How long was the code blue going before you arrived, or do you even know of your own knowledge?
A. I don't know. I know it takes me about four or five minutes to get from my house to the ward.

Q. But you don't know if you got a call at home there was a Code Blue or what?
A. That's correct.

Q. So it wasn't a circumstance that you were there, you specifically came in for it?
A. No, they called me on the phone and said, "Doctor Burkett, we have a Code Blue going on. Please come in as soon as you can.

Q. I assume that you were--I was going to say I was going to assume that you were the senior person on the scene with regards to the military hierarchy but really Doctor O'Neil was there as well?
A. Correct.

Q. Did he come in after you or before you?
A. He came in a little after I did.

Q. With regard to this case, there was an official inquiry and official investigation of this, wasn't there?
A. There was.

Q. As a result of that, there was no finding that anything that Doctor Webster did or failed to do resulted in the death of this patient, correct?
A. As far as I know.

Q. I just wanted to make that clear because I don't think it was clear to the board before. I assume that you don't have any problem if a doctor has a difficult time getting a scope in to say, "I want somebody else to do it"?
A. Not at all.

Q. That's what you would expect a competent ER doctor to do, right?
A. That's correct.

Q. So your problem isn't that she asked for assistance, your problem was you don't think she appreciated the position of the head, you felt that CPR should never have been stopped, and that the patient should have been shocked earlier, is that correct? Does that pretty well sum it up?
A. Except for that CPR should never have been stopped. CPR can be stopped, but it's the time period to stop it. You have to remember to restart it again.

Q. How long had it stopped, from the time that it stopped until the time they restarted, do you know?
A. By the time I was there, it was about a minute or two before they restarted CPR.

Q. I assume, when you came in and saw there wasn't any CPR started--
A. Right.

Q. That, in and of itself, did not concern you immediately--
A. Not immediately.

Q. Right, and so, therefore, the absence of this two minute period of time before CPR was started, in your opinion, was not critical to the patient, in this instance?
A. Well, assuming that it had just stopped at the time I walked in.

Q. Okay, but again, unfortunately, we don't have the records, do we?
A. That's correct.

Q. They are totally gone, they have disappeared, right?
A. I don't know where they are. I don't know if they are totally gone.

Q. On that point, if I could have Exhibit 18, this Memorandum for Record, who did you give it to?
A. This Memorandum for Record I gave to the primary care Team's chief, which is Doctor Mendez; to the SGH, who was at the time, Doctor Rodriguez; and the Medical Ops Squadron Commander, who was Lieutenant Colonel Addison.

Q. To your knowledge, was this ever given to Doctor Webster prior to this credentialing process getting started?
A. I don't know.

Q. Certainly, when you write a memorandum for this, you would what the provider to get a copy of it so that they could learn from the critique that you made, correct?
A. That's correct.

Q. If, for example, they had an objection to one of your critiques or felt there was something that you didn't see and you didn't know about that might change your opinion, if they get it right away and the records are there and they haven't vanished, then they can go back and they can fill out a response to you, can't they?
A. That's correct.

Q. But that never happened in this case, as far as you know?
A. As far as I know. That's why I gave a copy to her supervisor.

Q. Now, Doctor, let me preface this, because I think I have to, both to the board and to you, from everything that I have learned about you and I met quite a few people yesterday who are going to be witnesses here, they all believe that you are an extremely fine, competent physician. So what I am going to talk about today is not trying to cast any doubt upon your medical skills, all right. I do have to ask you some questions about the code and your involvement. You were the one that intubated the patient right?
A. That's correct.

Q. And you told this board that you got bilateral breath sounds, that's why you knew you were in right?
A. That's correct.

Q. Okay, you are aware, are you not, that a post-mortem was done on this patient?
A. Yes, I am.

Q. And you are aware, are you not, that part of the reason that x-rays were taken--post-mortem x-rays were taken was because Doctor Webster was concerned about it and wanted to know what happened with this patient?
A. Right.

Q. And you are also aware that she was present during the autopsy?
A. That I didn't know.

CIVRC: (Showed document to recorders.)

Questions by civilian respondent's counsel:

Q. Let me show you Exhibit 19. Have you ever seen that x-ray before, Doctor?
A. I have.

Q. Where do they say that the airway was?
A. That the endotracheal tube with the tip extending approximately two centimeters into the right main stem bronchus.

Q. That's not where it should have been, is it?

A. That's not where it should have been at the time of--

Q. And if--
A. --of giving oxygen to the patient.

Q. And if it was--if this was correct, then you didn't properly intubate the patient either, did you?
A. No, I did properly intubate the patient. If that is correct, all that means is that, after I let go of the tube and the patient was then--things were taken off the patient and moved around, that the tube advanced two centimeters into the right main stem bronchus.

Q. So, and again, you weren't, I assume, in the autopsy where they had to reach and pull with great strength to pull this tube out, were you? (Illustrating by gesturing.)
A. No, I wasn't there.

Q. And if that, in fact, is the case, there is very little doubt that tube could have moved, isn't there?
A. I wouldn't say that. I wouldn't say that it is very likely for a tube--

CIVRC: I want to introduce 19 and 20 which are the x-ray report and the actual x-rays.

CM (Maj Matthews): How soon after the death was--

CIVRC: The dates are on there.

CM (Maj Matthews): How about the time?

CIVRC: All I have are what the records we have.

CC: Was that done in the inpatient unit or where? Do we know where the x-rays were taken?

CIVRC: It was done in the inpatient--

WIT: She ordered the x-ray after--

Questions by civilian respondent's counsel: