# ADMINISTRATIVE (AFBCMR) RECORDS

**Wilma P. Webster, 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**

**Docket Number BC-2002-01487**

## VOL 2 OF 3

**(pgs 460-874)**

**PRIVACY ACT DATA OF 1974**

*****

**Under the Privacy Act of 1974, information reflected (including attachments) must be safeguarded. Disclosure of information is IAW AFI 33-119, AFI 33-127, AFI 33-129, AFI 33-332, AFI 33-219, and PL 93-579. For Official Use Only (FOUO)**

*****

# United States of America

## DEPAR[illegible]NT OF THE AIR FORCE

Andrews AFB, Maryland, February 8, 2006

I HEREBY CERTIFY [illegible]m the official custodian of all Air Force records and material on file in the office of t[illegible] Force Board for Correction of Military Records, and that the papers attached hereto a[illegible]ntic copies of Air Force records and material contained in said files relative to the cas[illegible]LMA P. WEBSTER, 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, AFBCMR Case File Number BC-2002-01487.

MACK M. BURTON
Executive Director
Air Force Board for Correction
of Military Records

I HEREB[illegible]TIFY that MACK M. BURTON, who signed the foregoing certificate, is the Executiv[illegible] of the Air Force Board for Correction of Military Records and OFFICIAL CUSTO[illegible]d that to his certification as such, full faith and credit are and ought to be given.

IN TESTIMONY WHEREOF, Michael W. Wynne, Secretary of the Air Force, have hereunto caused the seal of the Department of the Air Force to be affixed and my name to be subscribed by the Administrative Assistant to the Secretary of the Department, at the city of Arlington, State of Virginia.

this 15th day of February, 2006.

MICHAEL W. WYNNE
*Secretary of the Air Force.*

By ______________________
*Administrative Assistant.*

# VOLUME II

Q. So before the patient was taken down for the post-mortem?
A. As far as I know. After the patient was pronounced dead and I left shortly after. I wasn't there for the x-rays.

LA: One point of clarification. Let's put some identifier on--

CIVRC: Nineteen and 20.

LA: --on 20, the patient name or something.

CIVRC: Why don't we just say x-rays? I don't want to violate the patient's confidentiality here?

LA: Social security 5212?

CM (Maj Matthews): Yeah, 5212.

REC: Patients have no right of privacy when they are deceased.

CIVRC: In the military?

REC: When they are deceased, they do not.

CIVRC: You might be interested to know that the Supreme Court just ruled that they did, but that's one thing and another.

Questions by civilian respondent's counsel:

Q. Okay, Doctor, let me ask you this. Has anybody ever criticized you for not properly intubating this patient?
A. No, only--no.

Q. Has anybody lost faith in your abilities because of that?
A. Not that I know of.

Q. And I assume you weren't sent for an advanced--I always have a problem with acronyms, but the Advanced Life Support Course refresher?

A. I was not.

Q. By the way, do you know whether or not, as a result of that memorandum, whether or not Doctor Webster was?
A. I know that it was decided that she not go back to ACLS because they found that her ACLS was current and the only action taken after that was for her to show that she could do some intubations after she had her wrist surgery.

Q. Doctor, have you ever tried to do an intubation without a stylet?
A. Yes.

Q. What were those circumstances?
A. I had a code here and--and--uh--no, not here, I'm sorry--not here. Only on mannequins and then a code back when I was a resident.

Q. In your experience, generally, is a stylet available for use?
A. Generally.

Q. Let's talk about this incident when Doctor Webster wanted to go to lunch, all right? Doctor, this was her first day there, right?
A. Correct.

Q. Could it have been that this confrontation, instead of taking place in the emergency room, actually took place in the area on the second floor where the elevator goes to primary care?
A. No, absolutely not. It took place next to the ER landing where the ER physicians had their lockers at that time and next to the office where the ER nurses' office is.

Q. Now, it is my understanding, from your testimony, that when you confronted Doctor Webster, that she yelled loud enough that you could hear her how far down the hall?
A. Well, I was standing right next to her. I said, I would think you could have probably heard her down the hall.



461

Q. How sure are you?
A. Well, I can't be sure at all. I wasn't down the hall.

Q. Can you at least--
A. It was loud enough that I saw other people turn their heads.

Q. Can you imitate as to how long the sound was?
A. Uhm--if I was to--any particular wording you want me to use?

Q. The wording you remember she used.
A. I am not going to lunch--wait--well--I am going to lunch. (Speaking in a loud voice.)

Q. I am going to lunch in that tone. Well, certainly, I think the people in the next county could hear that. At any rate, Doctor, let's talk about the first day in the clinic. Certainly, you don't begrudge a doctor to get lunch, do you?
A. Not at all.

Q. As a matter of fact, it is important for them to stay awake, stay alert while they are treating patients, right?
A. (Indicated affirmative response.)

Q. And we all recognize a good lunch contributes to that, right?
A. Yes, sir.

Q. Now when you confronted Doctor Webster, at least according to your memo, you offered her some of your lunch?
A. That's correct.

Q. And she apparently didn't like what you were having that day?
A. Well, she refused.

Q. At any rate, and then you also though cautioned her that, if she kept going, you would have to report her to the commander, right?
A. That's correct.

Q. And then after you did that, you walked back up the stairs and she walked back up after you?
A. That's correct.

Q. And she continued to see her patients?
A. She did. She did see her patients. She took a few minutes and ate something that she was able to get in the clinic there, and then she did go back and see her patients.

Q. So although she had an angry reaction to you telling her she could not go to lunch, and that's what you did tell her, wasn't it? That's what it says here.
A. That's correct, could not go out for lunch.

Q. No, it doesn't say that. It says, "I said that I was informed"--wait a minute. "I informed her that she had patients scheduled and she did not have time to go eat. I offered some lunch that I brought."
A. Did not have time to go eat.

Q. Now, again, this was her first day in the clinic?
A. Correct.

Q. Had she ever worked in primary care here at Howard, to your knowledge?
A. Uh--no.

Q. Had she ever worked primary care anywhere that you know of?
A. I do not know.

Q. Now, besides seeing sick call patients and having these thirty minute patients and taking some patients from somebody else, she saw approximately the same number the other providers were, isn't that what you testified to?
A. No, no, I don't think she did.

Q. Oh, do you think she saw less or more?
A. She saw less.

Q. Do you have any kind of documentation of that?
A. Not on me, no.



463

Q. Now there were some problems in the clinic, weren't there, that made her life just a little bit more difficult than normal?
A. In what way?

Q. Well, for example, the computer had a virus in the system, right?
A. Not that I recall.

Q. The only PDR in the room was very outdated.
A. It's possible there was an outdated PDR.

Q. The needed forms were not in her room?
A. The files that the doctor who had used that room before had forms in it, as far as I know. We stock those in fairly standardized--

Q. I'll tell you what, let's speed this up a little bit, Doctor.
A. Sure.

CIVRC: The next exhibit is 20?

LA: Twenty-one.

CIVRC: That's why I asked. Doctor Webster is not the only one that is forgetful.

Questions by civilian respondent's counsel:

Q. Let me hand you Exhibit 21. Have you ever been provided a copy for a response?
A. I never--I have not seen this except while I was going through the preparations for--

REC: If we could be told what that exhibit is exactly?

CIVRC: I'm sorry.

Questions by civilian respondent's counsel:

Q. Why don't you identify Exhibit 21? What is it entitled?
A. It says, "Memorandum for Doctor Teodoro Mendez from Major Wilma Webster, Response to Your Letter of

Counseling." So this is a response to a letter of counseling from Doctor Mendez dated 10 February '98.

Q. Okay, and if you will note, she gives a list of several problems there?
A. Right.

Q. Are you aware of whether or not those problems did--were existing in the clinic at that time?
A. At that time, I am not aware of any of these problems. Like I said, I'm the family practice clinic chief at that time and working in the room right next to her. Neither she, nor any of my other physicians, told me about any of these problems at the time.

Q. Okay, thank you, Doctor. Doctor, this is a credentials hearing and I assume--how long did Doctor Webster work in your primary care clinic?
A. Well, I believe she worked in there for a couple of weeks. I don't recall the exact time she was moved out. Again, at the time, I wasn't really her supervisor. She was under the flight and they moved her around.

Q. There has been some discussion about one of the reasons that we need to have her credentials removed is because she is not rendering care in accordance with the standard of care for practice of medicine. Do you agree with that?
A. I would say that her privileges are being revoked, not her credentials, per se. But her privileges have been revoked because she is not capable of giving safe, competent care.

Q. I am sure then, Doctor, while she was under your care, you had to review the treatment records of the patients that she saw?
A. Another provider did review her--some of her records.

Q. Well, let me ask you a question. Where's the beef, Doctor? Do you have any medical records to show to this board that show Doctor Webster rendered unsafe medical care, as you just opined?



465

A. Well, no, I don't have any records from the primary care chart reviews where she did anything that was drastic or considered unsafe.

Q. Nothing that you felt--nothing that was ever brought to her attention?
A. Not during the time in family practice clinic.

Q. As a matter of fact, Doctor, there are no patient records, are there, that are going to be brought before this board that shows that she practices unsafe medicine, are there?
A. As far as I know, no.

CIVRC: I think that's all the questions I have.

**EXAMINATION BY MEMBERS**

Questions by Major Matthews:

Q. During the attempts at intubation, she was at the head of the bed?
A. She was.

Q. I'm trying to picture all of this. She was at the head of the bed--
A. She was.

Q. --when you walked in.
A. Yes.

Q. She was attempting to intubate unsuccessfully. Was she bagging in between intubation attempts?
A. The tech was trying to bag.

Q. Who was holding the mask?
A. No one was actually--the tech was holding the bag just with two hands and no one was holding the mask at the time I came in.

Q. What was Major Webster doing?
A. She was getting her stuff ready. She was standing there and then she took her attempts to intubate.

Q. In your opinion, when you walk into a room, there is always someone that is in control. Like right now, when I walked in, he was in control of that room. Who was in control of that room?
A. Well--

Q. In your opinion.
A. In my opinion, I thought she was--they were looking at her as the code leader.

AREC: The government has some follow-up questions we would like to ask.

CC: Go ahead.

**REDIRECT EXAMINATION**

Questions by assistant recorder:

Q. Doctor Burkett, I want to ask you about the intubation that you did during the Code Blue.
A. Sure.

Q. Did you properly intubate the patient?
A. Absolutely.

Q. Why are you convinced of that?
A. Because when I did the intubation, I visualized the cords well, I used the proper tube, I placed it in. I--after I did that, I held the tube in my hands and I listened for breath sounds and I heard breath sounds on both sides. I had someone else listen--

CC: Is there any point pertaining to her because he is not on trial for intubating the code. We know that situation so I am sure Edwin intubated her just fine. Is there anything pertaining--

CIVRC: I am going to object to that comment, and I am going to move to challenge the chairman for cause because he expressed an opinion about the evidence--

CC: No.

CIVRC: You know--



467

LA: I've got to rule on a challenge for cause. Maybe we are just, because it's coming on 2:00 and we had a late break. Maybe he misspoke. He probably didn't want him to rehash something that's the same thing, but if it's evidence--

CC: Right, if it is evidence pertaining to this defendant, but as far as--what I don't understand is why are we talking about Edwin's intubation. I guess that is what--

CIVRC: Okay, the reason for that is that everybody seems to think this failure to intubate--you know, that is one of the things they are using to justify the pulling of her credentials, all right, was something extraordinary and--

CC: I guess that is where--

(Members conferred.)

CC: Can we just take a few minutes and we'll go talk?

WIT: If I may, I can make a comment about that.

LA: Well, I want to clarify this. If you want to challenge a member for cause, now it has been convened and in the middle you believe there is someone who is unable to sit in fairness--

CIVRC: I think it is inappropriate, Mr. Chairman, to make gratuitous statements about a witness with regards to evidence and voice an opinion as far as what your opinion is of the evidence in the room. I think it shows a prejudice, all right. In other words, it is an inclination, on your part, to give Edwin, as you refer to him, more--you know, cloak him in the credibility of what was said and that is my only point. I think it is wrong. I don't think it is fair. I think it shows a bias.

LA: What would you like me to do? I've never had this occur--

CIVRC: I've never had it occur.

LA: --three hours in. I will listen to you further, but I will have to excuse the members because I have to rule on that personally.

CIVRC: I know. I think maybe that is what needs to be done.

LA: Why don't we take a five minute break? I'll ask the panel members to excuse out that way as well as the witness.

(The members went to the deliberation room. The witness went to a separate office. The hearing recessed from 1355 hours to 1357 hours, 17 February 1999.)

LA: We are back on the record.

(The members and witness were not present.)

CIVRC: His statement indicated that he was sure Doctor Burkett did the intubation fine. That is a comment on the evidence. The reason this is being brought up is we are attacking his credibility and trying to show motivation why he might not be the most objective when it comes to Doctor Webster.

That statement shows a bias and a comment on the evidence that should not have come forward out of the chairman's mouth. It taints the whole panel. It is an "atta-boy, don't worry about it, we are sure you are fine", and I think it shows a prejudice on his part and a bias which I could not have known about prior to him making that statement.

AREC: Sir, I think, when you take the comment, I think you have to listen to it in its totality. The chairman's initials comments were that this information--essentially, he was saying that it is not relevant because Major Burkett wasn't on trial, that he did not feel that was necessary to hear about. I think that is what is most relevant.

As far as that comment that he made, "I'm sure you did the intubation well", I don't see that as a comment that would control the other panel members. I'm sure they can come to their own conclusions. I think that initial comment really conveys what the chairman was speaking about, was that this information was not relevant because what Major Webster--Major Burkett did was not relevant. He was trying to bring this back to the focus on Major Webster and her performance.

REC: I concur with that, sir, in that I believe that his thoughts and I'm not--

CIVRC: Are we going to be double-teamed here?

REC: --certain--

CIVRC: I always thought there was only one lawyer speaking for each side.

LA: Well, I think I'd like it to be relaxed. If there is something more--

CIVRC: Well, I don't. I want the record to be clear.

LA: It is. Captain Valderrey is now speaking. They had two here. If there were three lawyers, I would want three people right now because I think this is that important.

CIVRC: That's fine. I just wanted to point it out.

REC: I believe that the chairperson feared, and I can't say for certain, but I certainly think that the chairperson feared that, you know, this would become a mini-trial in and of itself. We have--trial not in a literal sense, but you know, we have got Doctor Webster here and the whole purpose behind this hearing here today, and I believe that he was fearing, you know, getting into this mini little hearing with Doctor Burkett. He was fearing that that was going to occur.

CIVRC: The whole purpose of cross-examination is to bring out biases and prejudices of the witnesses, all right. This statement by the board member, which he is the

chairman and he made it in front of the other two was, that he was sure that Edwin did the intubation just fine. I'm sorry, I think that statement, by itself, shows a prejudice and a bias and not a neutrality which they are supposed to exhibit.

LA: I can see it now when you say this. At the time that he uttered it, I was following. I saw that he was watching closely what the question was going to be. I took it to mean he understood what Doctor Burkett's testimony was going to be. He had probably formed an opinion, based on how he had it described, and you added theatrics about pulling out the tube, which, that's not facts in evidence, we don't know. Was he swayed by that? I don't know. However, I heard him say, "he is not on trial". I mean, he understood, from this evidence before from this witness, that we are not going to get anything more. We are not cross-examining the witness. He has stated his statement.

My fear is this. This little episode that we are encountering right now is the whole reason that I don't like lawyers even involved in this proceeding. I know that they are part of it. They need to have rationality. They have to have sanity. But it is peers. That is why these doctors, I think, don't like us sometimes. They walk into a room. They don't want us even to participate. I really don't want to have to rule on somebody because I saw nothing, prior to my discussions this morning with any of these panel members to show me they knew anything about the case that would taint your client. They assured me they were going to be fair and impartial, listen to the evidence, put their heads together and roll with it only on what they saw. I told them the evidence is only going to come in documentary form or from witnesses and that the lawyers will argue and argue to the point where it pisses you off. I told them like that. I said, "Let that just go over. I don't want that to affect this hearing at all." So I really would like to put it on track. I would like to go back there. I've got enough right now where I'm not convinced that the individual is unable to be fair and impartial with the evidence before him because I didn't hear him say he was not going to treat your client with

fairness. I think he was getting to the point that, "I don't think we are getting anywhere with this witness. He is not here to reclarify. I think he has already spoken to it." And then, when I hear you reclarify it, I can see where your point has some merit, but I don't think it rises to the level of busting this hearing now two hours or three hours into it because I am not sure that would be fundamentally fair to your client either at this point.

CIVRC: The only thing I want to ensure for my client, Mr. Legal Advisor, is that we get a fair and impartial jury to hear this, peers who are not tainted and can sit here and impartially hear it. And his statement indicates to the contrary. It would not be fair to my client if, in fact, if she didn't get that fair and impartial hearing.

So I have got to make the objection for the record. I understand you don't like lawyers having to make technical objections. But when something is this fundamental, it is something that, quite frankly, I have to raise and voice it for the record.

REC: Sir, I would concur with you, Major Boyce, in that perhaps the chairperson based his own opinion on what he heard of the witness and decided that that witness did intubate properly. But that does not necessarily mean that he is not taking all the evidence into consideration. It does not necessarily mean that he will be biased in any way. He has clearly indicated that he wants to see all the evidence.

LA: He struck me, in fact, earlier when you were objecting to certain evidence, the little side bar that I had with him and we put our heads together, he said, "I want to see all of the evidence." In fact, it was something that was not particularly bad for your client, but he wanted to see it.

So I think he wants to see--in fact--

CIVRC: And I understand the rulings that he has made on these issues and you understand my position.