LA: I sure do.

CIVRC: That basically we are relitigating and retrying something that a board has already heard and ruled on. And now this record is going to be subject to appeal and overturned because basically we are relitigating an issue that has already been decided by the Air Force. And that position will not change ever on the part of Doctor Webster and counsel.

LA: I think you can make that argument very, very effectively. When this record does go up, I'm sure that is going to get a lot of attention.

I don't--

CIVRC: All I need is a ruling from you and we can get moving.

LA: My ruling is to call the members back in because I don't believe that I have heard anything that would show this panel has an opinion which is so intractable they are unable or unwilling to give full consideration to all the weight of the evidence.

I will admonish them, when they are all in here, if they have any comments on the weight of the evidence and there is no way you would have known that but for a spontaneous utterance, and no one, lawyers or any of us, should be commenting. I think that we can do that, from time to time, lawyers included, but that is not evidence, per se.

CIVRC: No question that is not evidence because he is a trier of fact.

LA: He is frustrated. We are into two witnesses and it is 2:00 o'clock and he probably really--he didn't see any more--I didn't speak to him about this, but I will on the record because I think it is important they just sit here. They are just sitting here looking and I do want them to participate and I don't want to offend them any more. I think you have got a good panel, as good as we are going to see. I don't think we would be accomplishing the best interests of the United States Air Force to--

CIVRC: You may well be right. I have an objection. I have an obligation to protect my client's rights and make the objections on the record.

LA: Fair enough. I am going to bring them in.

(The members entered the hearing at 1407 hours, 17 February 1999.)

LA: Our panel has been reconvened. I have heard the objections and I have heard the responses from both sides. Our chairperson will remain.

I would like to have--and this is not directed just specifically at the chairperson, but at anyone in this hearing--the weight of the evidence that comes before us can be determined later. That is what closed door deliberation is all about.

Right now, both sides are expected and have fair, ample opportunity, as it is their right to do, because this hearing is extremely important for Doctor Webster, that all the evidence that comes forward, good, bad or anything in between from either side, be just presented, that's all. Later, behind closed doors, how ever you wish to weigh evidence, that's important.

Both lawyers are doing their best. Each side is diligently working because they both have important interests at stake. We are going to have some heated opinions the next day or two, I'm sure. I want to keep focused and I want this hearing to proceed fairly for all parties concerned.

Where are we with the next witness?

CM (Maj Matthews): We were still with--

LA: Oh, I'm sorry, we still have Doctor Burkett.

AREC: Yes, sir.

**REDIRECT EXAMINATION** (continued)



474

LA: Doctor Burkett has taken the stand. I remind you, sir, you are still under oath.

WIT: Yes, sir.

Questions by assistant recorder:

Q. Doctor Burkett, I want to direct your attention to the intubation or rather the Code Blue that you saw Major Webster on. Can you recall whether or not she had--whether a stylet was used during that attempt at intubation?

A. During the code, yes, she was using a stylet. There were stylets available.

(Court reporter indicated difficulty hearing witness.)

WIT: I said there were stylets available.

Questions by assistant recorder:

Q. What is the significance of using a stylet versus not in that type of situation?

A. Well--

CIVRC: Excuse me, we have got a panel of three doctors here on the stand and one emergency room specialist. I'm sure they know the significance of using a stylet. I mean, we are not with a jury of lay people. If the board feels it is important--

CM (Maj Matthews): We do have the medical knowledge, but if you want to talk about it, go ahead. We will listen. We don't want to get in the way. But, yes, we are very aware of why stylets are used.

Questions by assistant recorder:

Q. Now, Major Burkett, you said it was possible, after the Code Blue for the tube that was used in the intubation to move. Can you explain that?

A. Right, because when I intubated the patient, I was still holding the tube and standard protocol is we know

if you put a tube in the trachea, you must tape it down and secure it for it to be in the proper position if you let it go. At the time, we put some tape around it, but I still continued to hold it because I wanted to make sure it was in the right place while we gave this patient the oxygen. When I--the patient was sweaty. It was hot. There was perspiration or whatever. The tube--when it gets--it's warm, there is saliva, it gets slippery. And it can slip if you let it go. So when I let go after the patient was pronounced dead, then it is very possible the tube slipped down. But while I had it in and was intubated--had the patient being ventilated, the positioning was confirmed by the auscultation of the lungs. Plus, on the post-mortem x-ray, if you will notice, it not only talks about the tube being two centimeters down, but it does comment that both lungs were aerated also in that post-mortem x-ray radiology reading.

Q. Major Burkett, I want to direct your attention to the, I guess, outburst by Major Webster when she was going to lunch. When you wrote that MFR, why did you write that?

A. Because I thought that her behavior was unprofessional and inappropriate, and I felt that her supervisor needed to know that. And I was concerned that, if she continued to be so angry about her move to the clinic, that other outbursts like that would occur or possibly. So I wanted to let her supervisor know so he could address that situation with her.

Q. Did you have any supervisory--were you a supervisor of Major Webster at that time?

A. No, I was not her supervisor. As I said, I was the clinic chief, but she was moved from another element to work in the clinic that I worked in, but, I was not her rater nor her supervisor. At that point, Doctor Mendez, who was the flight chief, was acting as her supervisor.

Q. Okay, and were you aware of any obligation, I guess, to counsel her at that time?

A. For me?

Q. Yes, for you personally.
A. No, no.

AREC: No further questions at this time.

LA: Mr. Martin?

CIVRC: No further questions.

CM (Capt Georgescu): Actually, if I may, I have one question.

**EXAMINATION BY MEMBERS**

Questions by Captain Georgescu:

Q. She worked for about two weeks, you said?
A. I believe. I'm guessing at that. I don't recall the amount of time. It wasn't very long.

Q. How did things go after the first day? We've heard a lot about the first day, but as things moved along?
A. Well, actually, the second day, I believe she had a similar incident with going late, but I wasn't aware of that until later.

Q. Were her appointments at any time shortened from half an hour?
A. No, no, it never got to that point.

Questions by Major Steffen:

Q. You say standard appointment slots for primary care were?
A. At that time, they were fifteen minutes.

CC: Okay.

LA: Doctor Burkett, we would like to again thank you for coming over. Once again, we remind you this entire proceeding is nothing more than a further extension of the Quality Assurance process as it is outlined in Title 10, Section 1102. For that reason, I would like you to be very cautious to speak to no one, outside of the attorneys in this case, or to me if there is some matter that comes up. But no one else outside this

case will hear about what went on in this room, your questions or your responses, okay?

WIT: Yes, sir.

(The witness left the room.)

REC: The government would like to call Doctor Teodoro Mendez.

**DOCTOR TEODORO MENDEZ**

was called as a witness by the government, was sworn and testified as follows:

**DIRECT EXAMINATION**

Questions by recorder:

Q. Can you please state your name for the record, spelling out your last name?
A. My name is Teodoro Mendez. Last name is M-e-n-d-e-z.

Q. Where do you reside, Doctor Mendez?
A. I reside in Panama City, Panama.

Q. Do you know Major Wilma Webster?
A. Yes, I know her.

Q. If she is present in this room, can you point to her and call her by name?
A. On my right side. (Witness pointed to respondent.)

REC: Just let the record reflect correct identification of Major Webster.

Questions by recorder:

Q. Doctor Mendez, where do you work?
A. I work at the 24 Medical Group, specifically, primary care Flight in family practice clinic.

Q. How long have you worked at Howard?
A. Since April 1992.

Q. Can you briefly describe your education and your clinical training for the board?

A. I studied medicine here in Panama. I am originally from Puerto Rico. Studied medicine here in Panama, did my internship here, residency training in OB/GYN. I came to work in '92 as a general practitioner. Since then, that has been my position. Starting when we opened the hospital, I became the medical liaison. That means that, since I am U.S. and I have a Panamanian license, I am like the liaison between our medicine and the local hospitals.

Q. You indicated earlier you know Major Webster. How do you know her?

A. When--by 1997, when we opened the hospital, I was named the chief of the primary care clinic's flight. That includes the ER. We started receiving the new providers to fill the positions. On the providers we received credentials for the ER, one of them was Major Webster. So part of my job, with the chief of medical staff at that time, was to review the credentials on the providers. Since her arrival to our clinic, I interact with her as fellow provider and supervisor of the area, the flight chief.

Q. You indicated that part of your responsibilities as chief of the primary care clinic flight is to oversee credentials.

A. Yes.

Q. Would you know if Major Webster is emergency room board certified?

A. No, she is not emergency room board certified or at least was not at that time. She was--she may--if she passed the board, but she failed I understand twice on the oral examination. She is not, at least on the credentials at that time, she was not board certified.

Q. Now Major McCrary was made chief of the ER, is that correct?

A. Yes.

Q. Did you take part in the decision to choose Major McCrary--

A. Yes.

Q. --as the chief of the ER? And can you please explain to the members your thought process?
A. Yes, on the providers that we were receiving credentials for the ER, the senior officers with experience on the ER was Major McCrary and Major Wilma Webster. We received Major McCrary at least one or two months before Major Webster arrived. But since they have more or less the same qualifications, the chief of medical staff at that time and we decided the best way to be fair was to wait until she was here to evaluate both of them and then give our recommendation to our squadron commander, and then let the colonel make the selection at that time. We waited at least a month until after her arrival to give the recommendation to Colonel Addison.

Q. And Colonel Addison was?
A. She was the squadron commander of the Medical Operations.

Q. At that time?
A. At that time, yes.

Q. And you recommended that they select Major McCrary?
A. Yes.

Q. And why Major McCrary over Major Webster?
A. Because of his capabilities as a leader of the ER, because of the way that he interacts with the personnel in the ER and with the patients and because of the way that he managed the daily workload of patients.

Q. Now did anything specific happen during the time Major Webster was in the ER that caused you some concern?
A. Uh--yes, several issues. Mainly it was her difficulties in the way people deal with the workload of patients. As you know, ER may be few patients or you may have several patients at the same time. That stressed out Major Webster and the waiting time when she was working in the ER was always high. The leaves without being seen was, most of the time, higher than with other providers. And I started receiving complaints from providers. The technicians and the



480

nurses in the ER felt uncomfortable with the way that she managed the patients on the ER.

Q. Did she ever make any kind of errors that you know of?
A. Errors that we can recall, well, one--there is one specific one with a medication that she gave to the patient that was not the one that the patient was supposed to receive. I think it was some decongestant instead of the Tylenol from the MOD cabinet. After hours, the pharmacy is closed. So if we are going to prescribe a medication for a patient, you need to go actually open it, take the medication, write over the label of the medication and hand it to the patient.

REC: If I could just stop you for a moment, I think this may help you out. I am going to show Major Webster's attorney what has been marked as Hearing Exhibit 22.

CIVRC: No objection.

REC: It is a three-page document, dated 20 April '98, regarding--well, it is an Air Force Form 765. I will now show that to the witness.

Questions by recorder:

Q. Would that be the incident that you are talking about, Doctor Mendez?
A. Yes.

Q. Now, could you please explain how this mistake could be made?
A. In order to avoid this kind of mistakes, there is a very strict protocol to give medications to the patients. First, you need to write on the 558, that is the ER form. Then you need to write actually a prescription, a handwritten prescription, not the prescription like during working hours. You walk to the MOD cabinet, that is the cabinet with medications. You put the prescription on the cabinet, you take the medication, look at the label and you need to write the patient's name, social security, the dosage and the instructions for the patient and then you sign over the label and you give it to the patient. The purpose of

this is to avoid this kind of problems that can be very dangerous for the patient.

CM (Maj Matthews): What time of day was that?

WIT: This was 1858.

CM (Maj Matthews): What was the patient number in the top right-hand corner? How many patients?

WIT: (No response.)

REC: I will retrieve that from the witness and provide it to the board.

CIVRC: What was the number?

CM (Maj Matthews): It's gone, it didn't copy. Well, actually, it is 00, the first and that doesn't make sense.

WIT: There is a time the patient arrived and the time when the patient was seen and the time of discharge.

CM (Maj Matthews): The log number will tell how many patients--

WIT: Yes, how many patients.

CM (Maj Matthews): --just to get an idea of how busy it was, just to try to get a feel for things.

REC: Her activity file, which you all will be getting, has another copy of that. I don't know if it has the number that you are looking for.

CM (Maj Matthews): May I see it, please?

(Recorder complied.)

CC: We can continue, please.

Questions by recorder:

Q. Doctor Mendez, about how much would you personally interact with Doctor Webster a day, how much time?

A. Well, it depends because, when she was assigned to the ER when she was on night shift, I won't have person to person contact. I can say that I--from--with the ER physicians, I am one of the ones that has more contact because of my double position as the flight chief and as the host nation liaison. Every time at night, for example, every time we need to transfer a patient on an emergency downtown, the ER doctor calls me--not for instructions because they are well qualified to do their job--but for guidance on to whom and where to send patients and because it is my responsibility to follow that patient and to assure that he is receiving proper medical care. So doing the day, I go at least two or three times to the ER walking around to see how things are, trying to interact with our people. And at night on the phone, if the patient needs to be transferred, I interact on the phone with the providers.

Q. Do you recall any other instances, such as a Code Blue, that occurred in the ER?
A. Instances, specifics?

Q. Instances of--
A. Yes.

Q. --that may have caused you some concern. I'm sorry, I'm jumping back.
A. Things have caused concern because I not only need to interact with the providers, as flight chief, I need to interact with our technicians and our nurses to see how they perceive everything. There was always concerns about how Major Webster managed the patient. They report to me that she used to put one patient in each one of the rooms and then go back and to mix the records or to forget what she was doing with one of the patients. So the technicians started to get stressed out and also because of the wait in time patients started going to the front desk of the ER. Patients started asking them what happened and why are they so late. Referring to the Code Blue incident, I did not have any personal input on the episode of the Code Blue. I was in the city at the time. I received a phone call from the ER that a Code was in progress. So my--that meant in my position as host nation medical



983

liaison I went to the ER of San Fernando Hospital to assemble a team waiting for the patient, but the patient was never transferred because the patient died. So for the incident, I was not present. My relation with that was the next morning when I asked Major Webster what happened and she informed me in front of others that she was not able to intubate because she was suffering from a problem with her wrist that was going to have to--she was going to have surgery. And she could not handle the endotracheal--the laryngoscope properly. As flight chief, being that our ER at night, you are--really the ER provider is the only provider in the whole facility, that person must be fully qualified for ACLS, so I informed Major Webster that starting the next day, she was going to be transferred to the outpatient clinics where there would always be another provider around just in case this--any of this happened, and that we are going to do that until she has her surgery, she was fully recuperated and we have proof that she can intubate. She went and she had surgery, she came back after rehab. She went for ACLS with a mannequin. She was not able to intubate, but there was not the instrument--the endotracheal tube was missing, was not in there. So after talking to Lieutenant Colonel Rodriguez-Vazquez, it was decided that--for her to go with Major Angeloro, the chief of anesthesia, to do intubations on two live patients, of course, monitored by him. She did it in two of the patients with no problems and she also passed a course in pediatric advanced life support. After we had that proof, we relocated Major Webster back in the ER.

Q. I'm assuming you reviewed a lot of patient feedbacks on Doctor Webster.

A. I review all the feedbacks for my area. They always call our attention that the complaint was the same, is basically the sense of insecurity the patients feel on her treatment, her medical care of them and their families. They complain basically about the waiting time. They complain of she not being able to coordinate properly their treatment, like her forgetfulness, not remembering things she was going to do with them. So they did not feel comfortable with her in the ER.

REC: I'd like to show you what I've marked as Hearing Exhibit 23. I will show it to Major Webster's counsel. For the record, they are various patient inputs regarding Major Webster's care.

CIVRC: We have no objection. This is going to be--

REC: I have marked it as 23.

Questions by recorder:

Q. I will provide that to the witness.
A. These are several of the incidents, waiting for hours or not listening to me like she was thinking of other things at the same time, she was forgetful. It was like a pattern that we had in the ER related to Major Webster. When we knew that she was going to be there, patients were going to be late and we were going to have complaints. And one patient--some patients would say they come to the ER and, if they knew that she was there, they would just wait until the next day. We need to understand that around 90 to 95 percent of all the visits to the ER are not life-threatening emergencies, but acute care visits. But also we need to understand that what, for us, is an acute care visit for patients is an emergency.

Q. Thank you, I will retrieve that from the witness and provide it to the chairperson. Now I know you don't have the exact figures here, but can you please tell the board what kind of percentages are we talking about with respect to patient complaints that Major Webster had in comparison to the other ER providers at Howard.
A. Without having specific numbers, I can say that fifty to sixty percent of the complaints in the ER was for Major Webster, twenty to twenty-five percent to one other provider and the other twenty to twenty-five percent is in between the rest of the three providers.

Q. Okay, you indicated that Major Webster was, due to her wrist problem, removed from the ER.
A. Uh-huh. (Affirmative)

Q. And she was placed in primary care?
A. Yes.

Q. How long was she in primary care?
A. I think it was around three months, three months because of the surgery and recuperation and all things, yes.

Q. How was her performance in primary care?
A. Well, there we have a new provider in primary care. It is a different setting, not only when comes from the ER or from another base, our appointments are every 15 to 20 minutes. With a new provider, we give the provider 30 minutes at least for the first two weeks. We did that with Major Webster. In spite of that, she was late with the patients always. She was very stressed out because she didn't want to be in the outpatient clinics. We understood that and we talked to her several times about that. The patients started complaining about the same, being late, forgetting about things, feeling the insecurity. I don't know if you want...

Q. Were there any other problems?
A. Uh--when you work in the ER, more or less, you are--at least in our setting where we only have one provider in the ER--you are the MOD. You are the provider mainly at night. When you work in the outpatient clinics, you work on a team. There are several providers. The difference is that, in her case, every thirty minutes, you have a new patient. It doesn't matter if you are late or not, you have a new patient in your door. Sometimes you, either because it is a very difficult patient and you need to ask a bunch of questions or you need to remove a tumor or something like that, you are late and sometimes you don't have time for lunch or you need to have a very fast lunch and you need to ask one of your fellow providers to cover for you so you can have something. In her case, she was late at lunch and the afternoon and on two or three occasions she just left to go and have lunch. But we understand that everybody needs to have some food, but what we cannot accept is to leave the clinic and leave the patients alone without telling others, without talking to other providers. We cannot do that.

Q. Did you ever give her a letter of counseling?

A. There was an incident where--the primary care clinic Flight is divided into five elements or clinics, ER, family practice, OB/GYN, pediatrics and internal medicine. The chief of the family practice clinic at that moment was Major Edwin Burkett. So when she left the first day or the second day and left patients without being seen during lunch time, he went and talked to her and told her in the area of the ER in front of the elevator that she could not do it--not to do it again and she had an outburst against Major Burkett. We had witnesses from the techs in the ER. That was not appropriate, so I gave her a letter of counseling because of her behavior to the chief of the clinic, at that time, Major Burkett, and because, as providers, we cannot leave patients without being seen. If we are going to leave our area of work, we need to notify another provider or the nurse. Ideally, you should talk to the chief of the area. But for us, I think it is enough if I come and say, "Well, Doctor Smith, look, I need to have something for lunch. I still have this patient. Can you see the patient?" Or you call tell the patients, "Look, I am going to go downstairs to grab something. I'll be back in a minute." That was not the case.

REC: I'd like to show you what has been marked as Hearing Exhibit 24. I will show that to Major Webster's counsel.

CIVRC: No objection.

Questions by recorder:

Q. I am now providing it to the witness.
A. This is--

Q. Doctor Mendez, does that exhibit--
A. That is the letter of counseling that I gave and specifically number one was the incident with Major Burkett. Number two was the leaving the patient waiting for more than an hour, what I just explained. And it was just telling her that, as an Air Force officer and a medical professional, we were not supposed--will not accept that.



482

REC: Thank you. I will retrieve that from you and provide it to the chairperson.

If I could just retrieve Exhibit 21, please. (Addressing members.)

I am now going to provide the witness with Hearing Exhibit 21.

Questions by recorder:

Q. That was Major Webster's response to your letter of counseling, correct?

A. Uh-huh. Yeah, this is a rebuttal letter from Major Webster where she explained that how many patients we have on sick call and how many patients she used to see on those days. First of all, she refers to me and Major Burkett, but we are a bad example of how many patients are seen a day. As flight chief, I have a lot of work and I barely see patients. But in spite of that, I saw more or less the same patients. On sick call, everybody has the same amount of patients. They go in order, one chart on each door. If we have a lot of sick call patients, that means that everybody has the same amount of patients. We all understand about the need to have food or the need to do personal things like the PALS. I was going to take the same PALS course, so I called and asked maybe if she could send the book to me because we were too busy. First of all, Major Burkett and myself, we are not good examples. In spite of that, Burkett saw more patients and more or less I saw the same amount of patients. Second, it is not the specific instance, but it is the way you do things in this profession. We have personal needs, yes, but we cannot leave the patients alone. She also refers about, in number five, about all the needs that she found in the rooms. Those are exactly the same rooms for each provider. They are checked every day for the routine things and every week for specific things with a list of items. I remember that, after the first incident, Major Webster told me that she was missing all of these and I made very specifically the nurse manager to be sure that she had everything. In spite of that, she was being late with every patient--with patients every day.

Q. So, in your opinion, did her response have any merit to it?
A. No.

REC: Thank you, I will retrieve that from you and provide it to the board.

Questions by recorder:

Q. Do you know if Doctor Webster was aware that she could not leave for lunch if she had patients?
A. After the first day, Major Burkett told her. She did that the next day and the next two days.

Q. Can you please explain?
A. The first day after she left patients and she left for lunch, Major Burkett talked to her. That's when we had the incident. The next two days, she did it. One of the days she left a patient in the afternoon and came back at like 3:00 o'clock or 1500 hours or 1600 hours and came back at least ninety minutes after that. This is also important because the clinic closes at 1615. So that means that a tech needs to stay until she came back after the clinic was supposed to be closed.

REC: I want to show you what has been marked as Hearing Exhibit 25. I will provide that to Major Webster's counsel.

CIVRC: No objection.

Questions by recorder:

Q. Can you tell me what that is, Doctor Mendez?
A. This is the OPR--the last OPR for Major Webster after all of these incidents. It became a referral OPR after we marked "does meet the standard" in three of the six items.

Q. Does your signature appear anywhere on that document?
A. I'm sorry?

Q. Does your signature appear anywhere on that document?

A. Yes, my signature is of her supervisor. If we look on page 2 on "rater overall assessment" is the--I wrote the reasons why the commander removed her from the patient care.

Q. Can you just briefly tell the board why Major Webster was issued a referral OPR?
A. I made it very specific to emphasize the administrative organization aspect, not related to patient care that Major Webster has. I recognize her as an excellent teacher. She wrote articles for the Tropic Times. She can teach excellent smoking cessation classes, for example. But on the daily patient care, either because of the high stress level of the ER or the high volume level of the outpatient clinics, she was not able to function in that arrangement. That's why, if you read these, it is very clear how she functioned pretty well on the, for example, what they call Health and Wellness Center, instructed patients, writing articles, helping Doctor Efthimiadis in the area. But in the outpatient clinics and the ER, she was not able to function properly.

Q. I will retrieve that from you and provide it to the chairperson. So, in your opinion, is Major Webster able to work in the ER, in your opinion?
A. No. In my opinion, Major Webster is an excellent person, well-trained in several aspects, but she cannot deal with, again, with the high stress and sometimes high volume of the ER or the daily high volume routine of the outpatient clinics.

Q. So she, in your opinion, wouldn't be able to work in the ER or primary care?
A. Not in our facility.

REC: Thank you. No further questions.

CC: Can I ask you one question?

**EXAMINATION BY THE MEMBERS**

Questions by Major Steffen:



496

Q. On both the LOC and on the referral OPR, you sat down with Major Webster and reviewed these and expressed your concerns with her?
A. Yes.

Questions by Major Matthews:

Q. Did she have an explanation for why she left patients on consecutive days without being seen?
A. She gave me the rebuttal letter. It's on the rebuttal.

CIVRC: Could we have a five minute break?

CC: Sure.

(The hearing recessed from 1450 hours to 1454 hours, 17 February 1999.)

LA: We are back in session. All relevant parties are here.

**CROSS-EXAMINATION**

Questions by civilian respondent's counsel:

Q. Doctor, you have made some pretty sweeping statements here before the board, generalities really. Have you got any documentation to bring before this court to establish that my client got fifty percent of the complaints while she was in the ER?
A. No, but I was not asked to bring specifics. They asked me about my impression.

Q. Do you have specifics?
A. No.

Q. So, even if you had been asked to bring it, you don't have it?
A. Not any more.

Q. And let's talk about these complaints that you got. This is the complaint on the Benadryl and the Tylenol, and I am not going to spend too much time on it. It's not a major issue. But Doctor Webster reported that also, herself, didn't she? She noted it on the record

that she had made a mistake and given Tylenol instead of Benadryl, right?
A. Uh-huh. (Affirmative)

Q. So that is one complaint. And then we have six more complaints here?
A. Uh-huh. (Affirmative)

Q. Are there any more?
A. Not that I am aware of.

Q. So we have got six complaints over the entire time that she was in the emergency room?
A. (No response.)

Q. Right?
A. To me, yes.

Q. Now, by the way, when you got these complaint forms, did you present them to Doctor Webster so that she could learn from these and see what was going on?
A. We discussed the situation with Major Webster.

Q. What I am asking you is, did you present these to her, prior to this credentialing?
A. I can't recall if we presented all of them, but at least a few of them, yes.

Q. Which ones in there did you present to her?
A. I could not tell you which ones specifically.

Q. There is no documentation you ever presented these to her, right?
A. No.

Q. There was an incident involving a patient who came in with a torn meniscus. Do you remember that now?
A. Uh-huh. (Affirmative)

Q. That, I think, is going to be in evidence. And she was given a chance to respond on that one, wasn't she?
A. (Indicated affirmative response.)

Q. But there is no documentation on this?
A. No.