Q. Tell me, Doctor, do you have any medical records here to bring to this board that shows that Doctor Webster didn't treat any of these patients appropriately?
A. I never said that she didn't treat patients appropriately.

Q. Oh, she does treat--so you don't have a problem with her treatment of the patients, only the speed with which she sees them?
A. It depends on how do you see medical care, not only medical treatment, but the perception and the trust that the patients and the families have in you.

Q. I understand that, Doctor, but I am asking you, can you answer that question that I asked you?
A. I answered that, yes.

Q. My question though was, your problem with her is not her treatment of patients, but the speed with which she sees the patients?
A. Well, first of all, I don't have a problem with her--

Q. Oh--
A. --as a person.

Q. Do you have a problem with her as a doctor?
A. As the area chief, the problem was the treatment of patient. That includes the time of patient waiting without being seen and the form of the management of the patients in the ER.

Q. Tell me something, Doctor, you made some statements that patients came to you and said, if they found Doctor Webster was on board that day, they wouldn't go and see her, they would just wait and come back another day?
A. Uh-huh. (Affirmative)

Q. Is there any documentation of that?
A. No.

Q. In all the writings that you have done that are before this board, you have never commented on that, have you?
A. No.

Q. Now, with regard to leaving without being seen, first of all, do you remember how many patients she saw during the time she was in the ER?

A. No.

Q. Does 1151 sound about right to you?
A. No, I cannot--I would not like to say a number.

Q. Okay. Would you at least agree that, when you see--when you are going to compare with the leaving without being seen rate, that you should at least compare it to the number of patients that were seen on a particular day or a particular month, if you are going to be fair?
A. Can you say it again, please?

CIVRC: Sure. Let me just show you what I am talking about here. What we did, Doctor, and I guess this would be an appropriate time to mark these--we'll just mark these right now, 25?

REP: Twenty-six.

CIVRC: (Marked chart as Hearing Exhibits 26 and 27.)

Questions by civilian respondent's counsel:

Q. What we did, Doctor, the first thing we did was Doctor Webster went through the records to figure out who worked in various months. That's on Exhibit 26. And the rate, in other words, the number per month, of leaving without being seen. Do you see that?
A. Uh-huh. (Affirmative)

Q. All right, and then what I did was I put, on Exhibit 27, we put the total number of patients that were seen per month by provider and the number of leaving without being seen each month. Do you see that?
A. Uh-huh.

Q. Doctor, don't you think that is the fair way of seeing what her ratio is of her patients seen versus patients leaving?
A. Not necessarily.

Q. Okay.
A. May I explain why I say not necessarily?

Q. Sure.
A. Because other things--if we go--if this happened in the outpatient clinics where you have a regular every thirty minutes, I agree with you, that will be mathematically correct, right. But it also depends on how the ER functions. If you have a real emergency, when you have six patients in the waiting room and four or five of them are going to come tomorrow with just a cold or fever or something like that.

Q. Exactly, Doctor.
A. So that makes it difficult to see, you know, to show.

Q. And I think that is my point exactly, Doctor. Because we don't have any records of how many patients were seen on a particular day, when those people left without being seen, at least not provided to this board or to me, we don't know what the circumstances were why patients left on a certain day, do we?
A. It can be provided, but obviously it was not provided to you or the board.

Q. And there is nothing documenting that these patients left when it was a slow day and just because Doctor Webster was slow to get to them, is there, that you are aware of?
A. Not provided here, no.

Q. Now you said Doctor Webster was in primary care for three months, correct?
A. It was--

Q. Approximately, more or less?
A. Yes.

Q. Nobody is going to hold you to that, Doctor, but that is your best estimate sitting there, right?
A. Yes.

Q. This letter of counseling, I believe, covers her first three days.

A. Uh-huh.

Q. Anything happen after that that needed counseling?
A. Not--not that kind of problem.

Q. Okay, the problem you are talking about is slowness in seeing patients?
A. Uh-huh. (Affirmative)

Q. Are there patient complaint forms in primary care?
A. A few of those complaints are from primary care.

Q. So some of these not only involve primary care, but also the ER?
A. Uh-huh. (Affirmative) At least one is from the--

Q. That's what I want to find out, how many are from the ER. Let's see, this is from the ER, right? (Witness and civilian respondent's counsel reviewing complaint forms.)
A. Yes. This is ER too and this is outpatient clinics.

Q. Okay, that is one. And for the record, so the record is clear, that is page 3 of Exhibit 23. Okay.
A. This is ER. This must be outpatient clinic. This is for a physical. This is page 6.

Q. So now we have four complaints while she worked in the ER and two while she worked in primary care.
A. Uh-huh. (Affirmative)

Q. Do you have any more?
A. Not that we can present.

Q. And is it your position before this board that a provider should lose her credentials if she is not as fast seeing patients as other people?
A. It's not only as fast as seeing patients as other people. I think that that is not the issue and that is not what I said. What I said is that is a combination of issues. I was not asking about credentials. I was asking about--my position here is of her working in the ER and in the outpatient clinics.

Q. Okay, and your feeling is that she can't work in the ER or the primary clinic because she doesn't see patients fast enough, is that correct?
A. No, no, that is not what I said. What I--

Q. I'm trying to find out what you said, Doctor.
A. Can I--

Q. Please.
A. There are several things that interact together in Major Webster's care of patients. The time for her to see each patient was bigger than any other provider. It is not only leave without being seen. There are specific rules in the ER and some of you are more aware than any of us on these, like two hours waiting or four hours waiting, patients coming back to the ER. It is also the way to see patients. If you fill each one of the rooms and you come back and you don't remember what the patient has, the patient perceives that and that is in one or two of the complaints over there.

Q. Why don't you show me those complaints over here that document that?
A. (Referring to Exhibit 23.) Like it is four hours for paperwork that took five minutes. She was unaware how to operate the computer and was the only doctor available.

Q. What was the date of that, Doctor?
A. It has no date.

Q. Do you think it might have been when she first started in the ER and had a lack of familiarity with the--
A. It is not on the--

Q. --computer?
A. --"the provider wasn't willing to listen to what I was saying. I have high fever and am fully aware of what is going on with my body. I requested the same medicine I had been taking for ten years. She told me it wasn't available at that time and I work nights and I"--I can't understand but it is again about--

Q. I understand those are both complaints, but how does that work to put these patients in the room and the methodology of her working?
A. Doctor Webster was very forgetful.

Q. Doctor, can you answer the last question? You said--you have read two complaints to this board, and I'll give you a chance to go through all of that, all right?
A. Uh-huh.n (Affirmative)

Q. But you said to this board that the problem with her was the way she put patients in rooms and the way she saw patients. Those two complaints that you've read, they don't have anything to do about waiting rooms or forgetting to see the patients, do they?
A. But you have to let me finish. They--

Q. Let's take the first two complaints.
A. Uh-huh.

Q. Does that have anything to do with it?
A. Yes.

Q. Tell me. Where does it say--
A. What I said--do you want this or do I keep this? (Referring to Exhibit 23.)

Q. No, you may keep it right now.
A. Okay, what I said, I'm going to repeat this very slowly. First, the wait in time was too much. Second, the way that she put patients in the rooms. It is not just to assign rooms to the patient. Fill the rooms with patients and then coming back and not remembering the patient or at least making the patient feel like she was not listening or not paying attention.

Q. Let me stop you right there. Where, in those complaints, shows that, Doctor? That is all I am asking is for you to tell this board. Since you have made that general statement, I would like to see somewhere in those complaints where it shows that.
A. (Reviewing Exhibit 23.) "Doctor Webster was very forgetful in the emergency room. I wait from 3:30 to 11:30 and was not called from the"--I cannot read it. "medicine. Need better doctor who knows what they are

doing." That is part of the problem. If you put patients in different rooms and when you come back, if you don't know it or you don't remember what the patient has or if the patient perceives--it is not only treatment, but the perception of the patient.

Q. Let me ask you something. To be fair on these complaints, don't you think it is appropriate to pull the patient's record and see whether or not that is justified or not, the complaint?
A. I think that is fair.

Q. Did you do that?
A. Yes.

Q. You pulled patients' records?
A. Yes, it is not here, but we pulled the patients' records on each one. There is a process for all the complaints with the person from Quality--you can ask them how this is--

Q. Where are these records, Doctor?
A. They are not here.

Q. Doctor, on this letter of counseling you gave her, there was no UIF started as a result of that, was there?

CM (Maj Matthews): Excuse me, what is a UIF?

CIVRC: A UIF is an Unfavorable Information File.

WIT: It goes to your records and your credentials.

CM (Maj Matthews): That is the next step beyond a letter of counseling or something?

CIVRC: No, when you are given--it is my understanding and the Legal Advisor can correct me--when you are given a letter of counseling, the commander has a choice either to start a UIF file on you or not, depending upon their judgment with regard to how serious the offense is.

WIT: Normally, you wait until the second one unless it is something very severe.

CIVRC: I think that is all I had, thank you.

LA: Any redirect at all?

REC: Briefly.

**REDIRECT EXAMINATION**

Questions by recorder:

Q. Doctor Mendez, do you have any ulterior motives for coming here today? Do you have something against Doctor Webster?
A. Absolutely not. I think that she is an excellent person, an excellent human being. My relationship with her as a person, I never had a problem with her.

Q. So when you said that about fifty to sixty percent of all the complaints were aimed at Major Webster, did you have any ulterior motive for saying that? Are you out to get Major Webster for any reason?
A. No.

Q. Do you know if everybody who is--every patient who is dissatisfied with their care, does every single patient file a complaint?
A. No.

Q. Do you recall hearing from your staff that patients would leave once they heard Major Webster was the medic on duty?
A. Yes, and when the staff come, you may have time to ask them if you are going to invite them to come.

LA: Could you repeat that again, sir?

WIT: Sure. The question was if I recall if my staff--the staff from the ER telling me about leaving without being seen and patient dissatisfaction. My answer was, yes, numbers I cannot give. And when they come, if they come to the hearing, you can ask them.

REC: Thank you, no further questions.



500

## RECROSS-EXAMINATION

Questions by civilian respondent's counsel:

Q. I just have one. Doctor, tell me who, on your staff, made those statements to you. Give me their names.
A. Captain Ryan Shercliffe.

Q. Okay, he is going to be here. He is a nurse, right?
A. Yes. He is the ER's nurse chief.

Q. And those complaints were raised by him not until May of '98, correct?
A. When he started putting them in writing.

Q. Who else?
A. All the techs come through him. If I give you the names of the techs, basically, they went to him as the supervisor of the area and he came to me.

Q. What about the providers? Any providers? I'm talking about doctors.
A. The chief of the ER, Major McCrary.

Q. Anybody else?
A. (No response.)

Q. Among the professional staff, the doctors?
A. They com--not complained, but they come to work, she still have patients waiting in the rooms and she wants to see the patients until she is finished with them.

Q. Doctor, isn't it a fact that many of the providers were very grateful to Doctor Webster that she would stay after a shift to finish up her patients before leaving the ER?
A. You should ask them, not me.

Q. They were your staff, too, weren't they?
A. Yes, but--

Q. Do you know Doctor Mark Luff?
A. Yes.

Q. He was one of your ER providers?

A. At that time, yes.

Q. Let me show you what has been marked as Exhibit 26. Doctor Luff could not be here because of his duties.

LA: We are up to 28.

CIVREC: Twenty-eight rather.

Questions by civilian respondent's counsel:

Q. Do you have any reason to disagree with that?
A. (Reviewed Exhibit 28.) No.

Q. Do you think this squares with your evaluation of Doctor Webster?
A. I don't really think that. I may be looking at other areas.

CIVRC: I've been marking exhibits without getting them introduced in evidence. I am going to move that they all be in. I have shown them all to counsel.

REC: No objection.

LA: There is no objection. Everything is admitted.

CIVRC: Thank you.

I think that is all for now. Thank you.

REC: If I could just briefly ask a couple of follow-up questions on those questions?

**REDIRECT EXAMINATION**

Questions by recorder:

Q. Doctor Mendez, who in your staff at the ER deals the most with patients coming in and checking in and who sees them sitting in the waiting room and who hears what they are saying and who do they tell their feelings to? Do they tell their feelings and things of that nature to the techs or do they tell them to the doctor?

A. Normally, to the techs and the techs will express them to their NCOIC or supervisor.

Q. And why do they tell them to the techs? Is it because they are right there at the front desk?
A. Because it is closer to them and they are the first one that interact with the patients.

Q. So if a patient was going to complain to anybody about a long waiting period, who would they complain to? Would they walk up and complain to the tech that is at the front desk of ER?
A. Yes.

Q. Can you tell me why did Major Webster stay and finish up her patients? Was that a requirement?
A. No, that is not a requirement. That is something that she elected to do.

Q. And what would the reason be? Do you know of any reason why?
A. No.

Q. Was that standard practice?
A. It is not routine or standard practice, but it is not-- we cannot ask her not to stay. If she wants to do it, she can do it.

REC: Thank you. No further questions.

**RECROSS-EXAMINATION**

Questions by civilian respondent's counsel:

Q. Let me ask you one other thing, Doctor. You said the techs are the best ones to judge?
A. (No response.)

Q. Am I misquoting you or not?
A. No, I didn't say the best one to judge. The question that I received was, "Who will receive the complaints from the patients?" and I said the techs because they are the one at the front desk and the one that screens the patient.



503

Q. Stacey L. Lindgren, she is an emergency room technician, isn't she?
A. At that moment, yes.

Q. Let me show you Exhibit 29. This is a statement that she wrote to "whom it may concern" on Doctor Webster.
A. Uh-huh. (Affirmative)

Q. Would you agree with me that statement certainly doesn't sound like she is having a problem with Doctor Webster?
A. Not by Airman Lindgren.

CIVRC: Thank you. Move for the admission of 29.

REC: No objection from the government.

Questions by civilian respondent's counsel:

Q. Do you know--and I am probably going to mispronounce this horribly, Doctor--it's Sonderegger?
A. Yes.

Q. Okay, he is the NCOIC of Patient Administration?
A. Uh-huh. (Affirmative)

Q. He also would be in a position to get complaints and know about the slowness and that of--
A. Not about the slowness, but complaints because he handled the records.

Q. Just so we get a balanced view, Doctor, let me show you the letter that he wrote in support of Doctor Webster.
A. (Reviewed document.)

Q. He certainly has got a different view than you do, right, Doctor?
A. Yes.

CIVRC: Move for the admission of 30.

REC: No objection from the government.

CIVRC: That's all I have, thank you.

CC: I don't think we have any questions.

LA: Doctor Mendez, thank you again--

REC: Just if I can--one--

**REDIRECT EXAMINATION**

Questions by recorder:

Q. Doctor Mendez, how many techs work in the ER?
A. Over ten.

Q. Over ten?
A. Yes.

REC: Thank you, no further questions.

LA: Sir, your services won't be needed any more. We again thank you for coming down and sharing your testimony with us. We would remind you though that this is a protected hearing. Things that were discussed in here, questions and your responses to those are to stay with you only. You are not to share those with anyone. So if you are asked to, please communicate with either of the counsel or to me. Thank you.

WIT: Thank you.

(The witness left the room.)

REC: The government would now like to call Senior Airman Kristen Goode.

**SENIOR AIRMAN KRISTEN GOODE**

was called as a witness by the government, was sworn and testified as follows:

**DIRECT EXAMINATION**

Questions by recorder:

Q. Can you please state your rank and your name for the record, spelling out your last name?

A. Senior Airman Kristen Goode, G-o-o-d-e.

Q. Do you know Major Wilma Webster?
A. Yes, ma'am.

Q. If she is present, can you please point to her and call her by name?
A. Major Webster (to whom the witness pointed).

REC: Let the record reflect a correct identification of Major Webster.

Questions by recorder:

Q. Where are you stationed, Airman Goode?
A. The 24th Medical Group.

Q. And what do you do at the 24th Medical Group?
A. I'm the routine Aeromedical Evacuation clerk.

Q. What is your duty title?
A. I a Health Information Management Journeyman.

Q. And how long have you held that position?
A. For two years.

Q. And you have been in the Air Force how long?
A. Three years.

Q. Can you tell me some of your general duties as a Health Information Management Journeyman?
A. Here at Howard, any patients who need to go on a routine air evac back to Wilford Hall Medical Center have to go through me. I have to take care of their orders, appointments; depending on whether they are retired, active duty or Army or Air Force, they all have to handled different. Also, the Navy and Marines and Coast Guard are something entirely different. I process them from like beginning to end, before they get to their appointment, while they are at their appointment and when they return so that they follow up with the physicians who send them.

Q. You stated that you know Major Webster. Can you please tell me about the very first time you had a meeting with her?
A. Uh--the first time I actually met Major Webster was the 15th, I believe, of September last year. It was when she came by my office. She had to pick up her travel orders. She was traveling TDY to Wilford Hall Medical Center for an appointment, and that was the first time that I had actually ever officially met her.

Q. Did she tell you anything that appeared to be inappropriate?
A. Uh--when I gave her her orders, I kind of usually give a brief--a briefing, a short one. They get a briefing when they pick up their orders. They also get another briefing the next day at the terminal. The initial briefing, Major Webster came to pick up her orders and she told me of a dream sequence that she had had the night before--uh--in regards to shooting everyone in the dream sequence. She didn't actually say who everyone was, but she said that, in her dream sequence, that she had--she was shooting everyone that she had a very orgasmic feeling after she had shot everyone to which she kind of, I guess, physically expressed her feelings. And I just kind of ignored it because I really didn't know how to respond. And then she said that she heard sirens in the background coming to get her and what was my feeling of what would happen to her if something like that had happened.

Q. And this was the first time you ever met her face to face?
A. Yes.

Q. Did this come up in conversation? Did you ask her about a dream that she had had the night before?
A. No, I was giving a briefing, letting her know to bring like her medical records to the terminal and that she didn't need to have her passport, just her military ID, bilingual card and that kind of stuff.

Q. So she voluntarily gave up all of this personal information on the dream?
A. Yes, ma'am.



507

Q. Did she ask you--and you may have said and I may have just lost track--did she ask you what you thought would happen if she killed everybody?
A. Yes, and the--she asked twice and the first time I just ignored it. And the second time was kind of after the brief--I was trying to kind of wrap everything up and she was getting up to leave and she asked again and I just said that I didn't know, that I just figured she would go to Leavenworth or something and kind of shrugged it off and went back into my office.

Q. So she asked if you knew what would happen to her if she did kill these people, if she killed whoever she was talking about?
A. Correct.

Q. Was that the last time you saw her in your office that day?
A. Yes.

Q. Did you see her again?
A. The next morning was the air evac so the morning of the air evac everybody meets at the passenger terminal and they all go through a mass briefing. And it was during that briefing that Major Webster expressed her anxieties, I guess, in regards to the flight.

Q. Was Major Webster prepared? Did she have everything that she needed?
A. No, she didn't bring her medical records with her. She said--one of the first few things I say is, "Does everybody have their medical records, their x-rays?" Depending on what type patient you are, you need different items to go with you. She said she must have had a Freudian slip and she had forgotten her medical records and she needed somebody to go back and get them. So I just called to my office and had somebody track them down.

Q. Did everyone else there have all the items they needed?
A. Yes.

Q. So Major Webster was the only one who was missing--
A. Correct.

Q. --an item? Okay, please continue. This was a planned briefing that you had?
A. Yes, ma'am.

Q. After I talk about the records and some medications, then I also note that everybody went through the front door of the terminal because you have to go through the x-ray machine which is in compliance with DoD anti-hijack procedures, otherwise I would have to rifle through everybody's baggage, at which time she made a comment that she would like to blow up the plane.

Q. How many people were present when she made this comment?
A. Probably about--ballpark of twenty-five people.

Q. And she said, "I want to blow up this plane"?
A. Yes, she said, "I want to blow up the plane."

Q. She didn't say, "I hope the plane blows up"?
A. No, not to my recollection.

Q. Did you say anything in response to her telling you, "I want to blow up the plane"?
A. I just made the comment again, you know, "Everybody went through the x-ray machine." And I said, basically--looked at her specifically and said, "You did go through the x-ray machine, correct?", to which she responded, "Yes, but now they are making plastic explosives which cannot be detected by x-ray machines."

Q. Once again, did she say this in front of--
A. Yes.

Q. --twenty-five or so people?
A. Yes, ma'am, at which time I thought the first answer would have stopped it, but I didn't know what to say so that morning it was to my benefit that my OIC was there, Captain Krier, and two other supervisors, Sergeant Millington and Sergeant Ellison, were also there. So I just kind of looked their way for somebody to tell me something to do because I didn't really know what else to do. And they just kind of said, "Finish your briefing and then we will take care of this." So I just finished the briefing.



509

Q. Okay, and then what happened after you finished?
A. I usually, before the patients and the crew have any interaction, I have to brief the crew members, the two nurses and the three medical technicians, in regards to any patient's special needs, all their diagnoses, medications, any extenuating circumstances. So Captain Krier went with me that morning so that when we briefed the crew I could let them know about the situation that had arisen. And the medical crew director, at the time, was not there so the head nurse said that she was going to go talk to them because usually in a case like this they wouldn't take the patient on the plane; they would just refuse.

Q. Okay, and what happened then?
A. After that, the medical crew director came back and he said that he was not going to take her on the plane, to which the nurse that originally had kind of been the go-between between the medical crew director and myself, said that she would like to speak with Major Webster on her own and that they would like myself to go through her luggage, hand go through her luggage, to make sure that there was no device in there. So I went through her luggage and didn't find anything, and the nurse went ahead and spoke with Major Webster and discussed the severity of basically what had been said and came back and let us know that it was her feeling--the nurse's feeling--that Major Webster was just very anxious about the flight, you know, really apprehensive about going, didn't want to go to Wilford Hall and that was kind of why things were said the way they were. And then they asked if there was any way that I could speak with her physician. Her referring physician hadn't really ordered any medications for the flight and they asked if there could be something--Xanax I think is what they asked to be ordered. So I called back to the physician who, at the time, said he didn't feel that she was any threat. He would order Ativan by mouth as needed, but that would be at the discretion of the crew. And it was still up to them whether or not they would take her. And when they heard that they were going to have the Ativan, they discussed it among themselves and decided that they had enough people on the crew to handle any situation that arose, and after

speaking further with Major Webster, decided that they could handle it if anything arose.

Q. Did you ever reduce what--those incidents you explained to me when she came into your office and told you about the dream sequence and this later incident at the PAX terminal, did you ever reduce that to writing?
A. I wrote a memorandum for record the--uh--late in the afternoon the day of the air evac and I think I completed it the next morning.

REC: I am going to show Major Webster's counsel what has been marked as Hearing Exhibit 31.

CIVRC: I don't have any objection.

Questions by recorder:

Q. I will now present that to the witness. Is that the MFR that you wrote?
A. Yes, ma'am.

Q. Is that your signature that appears on that document?
A. Yes.

Q. Now let me ask you, if someone told you that they were going to blow up a plane or wanted to blow up a plane today at the PAX terminal at a briefing, what would your response be?
A. I would just call the SP's and let them take care of it. After the incident, I had a meeting with Colonel O'Neil, the Hospital Commander, who instructed me he doesn't care what happens, if anybody makes a remark like this, joking or not, whatever the case may be, that we just need to let the SP's take care of it and not try and take care of things ourselves.

Q. Even if it was Major Webster?
A. Yes, it doesn't matter who it is.

Q. Why didn't you call the SP's on that occasion?
A. Pretty much 'cause I was caught off guard. I had no idea how to deal with any situation like that. Nothing like that had ever come up to that point or has since and I had no idea how to handle the situation. So when



SV

I looked to Captain Krier, she said, "Tell the crew. Let them deal with it." So that is what I did. You know, if they had said, "Call the SP's", that's what I would have done. But I had no idea.

Q. Thanks, I'm going to retrieve that exhibit from you and provide it to the chairperson. Did you ever have any further contact or further encounters with Major Webster?

A. Uh--afterwards, there was another instance. She had to return to Wilford Hall for a follow-up at another time and she had come by my office. We were trying to work out the semantics of the second air evac. And at that time, she had also requested a copy of the memorandum for record.

Q. And did she say anything specific about that memorandum for record to you?

A. Uh--she just stated that if I didn't have the memorandum for record, that I really needed to have a record that said that she did not say she wanted to blow up the plane that morning, that it was a misunderstanding or a miscommunication and I needed to write that down and have it documented.

Q. So was she, in essence, asking you to take out the portion that said that she wanted to blow up the plane?

A. I don't know that she knew that I had that memorandum written that actually had that statement in it. But I do believe that she was trying to let me know that, in case I was recalling things the way I had written them that morning, that that was not the way she was recalling them. I believe she was just trying to state there was a difference in opinion and that my opinion should reflect her own opinion. They should, you know, coincide, I guess.

Q. Do you believe that what you wrote down is the truth?

A. Yes.

Q. Do you believe that that is, in fact, what she said and what you heard?

A. Oh, yes, definitely because I wrote that the morning--that afternoon so that was that day.



5/2