REC: Thanks, no further questions.

CC: Could I ask one question real quick?

WIT: Yes.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Major Steffen:

Q. At the time at the air evac center, were there any circumstances going around where there was like a high stress volume, other than Major Webster obviously going to Wilford Hall? Was the plane late? Were they being rushed? Were there any--

A. No, not particularly. I believe that morning the medical crew was running behind so I believe that, when it all came down to it, the plane probably left late that morning, but I don't believe there was any other situation going on at that time, no.

**CROSS-EXAMINATION**

Questions by civilian respondent's counsel:

Q. Senior Airman Goode, those were pretty stupid statements to make, weren't they?

A. (No response.)

Q. We can at least agree on that, can't we?

A. Okay.

Q. All right, but I don't exactly understand the setting that we are in. You are giving this briefing and suddenly Doctor Webster just volunteers this?

A. That's--the briefing is in a small setting. The setting we were in that morning was a conference room setting, very similar to the one right outside the other side of that door, a very small setting, a lot of people. There were children sitting on the floor and everything. And when I was going through the briefing, I did come to the part about--usually, when I let people know they have to go through the metal detector, I tell them the reason why. It is in compliance with DoD anti-hijack procedures, something really quick to



S/B

kick out. And that was about the point where she made the comment.

Q. Didn't you, in fact, ask if anyone had concerns or if she had concerns about going on the airplane?
A. At the end of every briefing, I always ask everybody if anybody has any questions or concerns or comments because it always seems to be better to ask in a open forum because, if somebody doesn't have the guts to ask, maybe somebody else will and that way we can have everybody kind of on the same page.

Q. And isn't that, in fact, when she made the statement that you allege she made?
A. Not that I recall. I recall hearing it earlier on.

Q. Okay, and the exact words, I've got your memorandum here. You've got, "I just want to blow the plane up."
A. Okay.

Q. Are you certain that those are her exact words?
A. Yes, I don't recall anything else.

Q. Okay, well, the reason I asked is, I assume you told that to the flight crew, didn't you?
A. Correct. That was what was told to the flight nurse.

CIVRC: Okay. (Showing document to recorder.) I am going to move for the admission of 32 which is the--before I give this to you, she is going to object, Mr. Chairman--which is the aeromedical evacuation patient record which reflects, in the flight nurse's handwriting, what she was told.

CM (Maj Matthews): From who?

CIVRC: From the flight nurse.

CM (Maj Matthews): Told from who?

CIVRC: Senior Airman Goode.

REC: I would just object to that. It is not a complete record. It says "continued" on the bottom and there is no further information.

Questions by civilian respondent's counsel:

Q. (Provided exhibit to witness.) We've got this aeromedical evacuation patient record. Do you see that here?
A. Uh-huh. (Affirmative)

Q. Let's get down to where it says, "Overheard by others stating, 'I hope the plane blows up'."
A. Uh-huh. (Affirmative)

Q. Could that be what you, in fact, heard Doctor Webster say?
A. That is not what I recall at all.

Q. And there, they talk about it was overheard.
A. It was overheard by others because there was a roomful of people. That is correct.

Q. Was she--
A. And she admitted this--said this is what Major Webster told them.

Q. Right.
A. Correct.

CIVRC: Fair enough, that's all the questions I have. Thank you.

LA: Thirty-two is admitted.

CIVRC: Thank you.

CC: Yeah, we will go ahead and admit it.

LA: Airman Goode, we certainly appreciate you coming over here. You've been very patient and helpful to the panel. We want to remind you though that no one is to ask you of your interaction over here or ask you what you said or what questions were posed to you, and if they do, I'm going to ask you that you not discuss this matter with them at all, okay, unless directed to do so by the Med Group Commander. He is the only person who would be directing you to do that. If anyone does, I

want to speak to any of the attorneys involved in this proceeding or bring it to my attention, okay?

WIT: Sure, not a problem.

LA: Thank you for your attendance.

(The witness left the room.)

LA: A break for anyone?

REC: We've got two other witnesses that will probably go as fast or faster than this one and then that would probably be a more appropriate time if that is okay with the board.

LA: That's fine with me.

CC: Okay.

REC: The government would like to call Teddy Callender.

**MS. TEODOLINDA CALLENDER**

was called as a witness by the government, was sworn and testified as follows:

**DIRECT EXAMINATION**

Questions by recorder:

Q. Can you please state your name for the record, spelling out your last name?
A. My first name, Teodolinda, Callender. Last name is C-a-l-l-e-n-d-e-r.

Q. It probably would be appropriate for you to spell your first name as well.
A. T-e-o-d-o-l-i-n-d-a.

Q. And where do you reside, Ms. Callender?
A. Panama, Republic of Panama, downtown.

Q. Do you know Major Wilma Webster?
A. Yes, I do.

Q. If she is present, can you point to her and call her by name?
A. Yes, Major Webster right there (to whom the witness pointed).

REC: For the record, correct identification of Major Webster.

Questions by recorder:

Q. Where do you work, Ms. Callender?
A. I work for the Med Group and I do something called Business Excellence which is performance improvement overall.

(Court reporter asked witness to speak up.)

Q. What are some of your duties in that position?
A. I work for the Med Group and I do basically what's called--I'm the Director of Business Excellence and it is performance improvement on mainly overall policies, overall looking at measurements. I was brought--actually, I am detailed from the Wing. I actually work for the Wing Commander, but I was detailed to the Med Group during their changeover from a clinic to a hospital to help the clinic with the merger of services. So I am the customer care person for the Med Group so I do all the--most of the complaint and surveys, trending, statistics, statistical type information to help the executive team make decisions.

Q. You indicated that you know Major Webster. Can you tell me how you know her?
A. Uh--my office is across from the orderly room. I first saw her when she arrived checking in. Other than that, I saw her name a couple of times in looking at customer surveys, talking to her in the hallways and she would stop by the office and say hello and we would talk a bit. She did participate in one of my classes, but most of the times it was her entry into the building to do business with the orderly room.

Q. You said she participated in one of your customer care classes. Did anything occur during the class that caused you any kind of concern?
A. Well, yes, the class was--uh--it is basically a difficult class teaching customer care in the military setting, and we had some discussions, open discussions, on attitudes and what we should do and not do and she was very vocal or she a strong opinion about support, leadership support, and emotional also because of certain things that happened to her in the past, and she shared it with us. But because of the setting and because of the leadership comments, and it's a difficult class to teach and you are trying to convince people this will work and we need to support the customers so it was difficult.

Q. Can you be specific? Was she disruptive in any way?
A. With comments about leadership.

Q. What kind of comments?
A. If we were talking about support and it may have had to do with a video I think we were looking at and she was not in agreement with some of the things I was saying. It had to do with--oh, I know, it had to do with customer complaints or taking care of customers and hearing out the complaint and seeing what the problem is and she had definite views of how the customer would always--we would always support the customer and not listen to the staff. I didn't exactly get the gist of it. It had to do with something that happened to her and I never got down to the bottom of it but those types of comments.

Q. Did she cry during the class?
A. Yes, something that had to do with her son, I think, yeah.

Q. Was her behavior appropriate, in your opinion?
A. In my opinion, no. I needed more support from her being the top officer in that class. I just--it was--

Q. She was the senior ranking person there?
A. Yes, right. It was the most difficult class I taught in a while.

Q. What kind of effect did her actions have on the attendees of the class?
A. I can't remember specific words, but they thought I handled the situation and the comments appropriately and they didn't know how--"Do you do this all the time?" and, you know, "Do you get comments like that all the time? Does this happen often?" I tried to, you know, what you do as a facilitator, just guide the class to--where I wanted it to go, but it was very difficult--uh-

Q. After that class--I'm sorry, go on.
A. No, nothing else.

Q. After that class, did you try to mentor her?
A. Yeah. We talked--we talked several times in my office and I--

Q. Can you explain why you--
A. Well, I saw her very distressed one day. It really affected me. I really tried to mentor and it shouldn't be this way, but I try to mentor women, especially in the building, if they are going through hard times or whatever.

Q. You say you saw her in distress one day. Can you just tell the members--
A. Yeah.

Q. --about that?
A. She came into the building late and something had happened and she was crying, but she was just standing there on the landing in front of the conference room door and I asked her if she needed someone or if she was looking for someone and she did not say much to me. She was talking--mumbling and she never said anything directly to me, but she was in distress. And that--that bothered me and I needed to talk to her some more.

Q. Okay, where was she? What building was she in at the time?
A. 186, administrative building.

Q. So you decided that you needed to talk to her and try to help her out?

A. Right.

Q. Okay, did she make any comments that were inappropriate to you after those two incidents that you--

A. Yeah, we were talking about the future of preventive medicine and sometimes when you think things are not for you, maybe it's your future, maybe this is the way, you know, and I like prevention better than cure and we went through this and she was really fed up. She said, "You know, I--these guys are all jerks and I, you know, I just feel like getting rid of them or killing them or something like that." I did tell her about that comment, I said, you know, "You realize what you just said. Do you understand that this is, you know, if you think that way, this could be reported?" And she said, "No, I am just kidding", and she just smiled.

Q. When she said, "these guys" or "those guys", who was she referring to?

A. Leadership.

REC: I'd like to show you what has been marked as Hearing Exhibit 33. I will show that exhibit to Major Webster's counsel.

CM (Maj Matthews): Do you have the month of the class, just for reference sake?

WIT: It was sometime in July. I can't remember the date.

CC: July of '98?

WIT: Yes.

CM (Capt Georgescu): And we assume the second discussion you had in your office was after she was sent over to prevention?

WIT: Yes, I was trying to convince her that that--

CIVRC: No objection.

WIT: --would be--that sometimes when life gives you lemons, you make lemonade and this might be a good thing to get out of the ER and do prevention. You know, that was

I would like to show Major Webster's counsel what has been marked as Hearing Exhibit 48.

CIVRC: No objection.

REC: I would like to provide that to the witness.

Questions by recorder:

Q. Can you tell me what that is, Major McCrary?
A. Somewhere in--actually, probably two days before this, because I got it out fairly quickly--in May, approximately in mid-May, I was asked by our hospital commander to gather all written information that I had on--negative--on Major Webster pertaining to her poor performance in the emergency room. And I have a file on all my providers. And this is what I had written about Major Webster. That is what this documentation is. And the final is a comment based upon this documentation by myself.

REC: I will retrieve that from you and provide it to the chairperson. For the record, it is a memorandum dated 20 May '98. It is two pages signed by Major McCrary.

Questions by recorder:

Q. You mentioned staff complaints earlier. This all started with staff complaints. Can you be a little more specific?
A. I said patient complaints.

Q. Patient complaints--
A. Right.

Q. --I'm sorry.
A. We have a survey, as probably everybody knows, the departments have surveys.

LA: Wait just one second and let them look at this.

(Board members reviewed exhibits that had been provided to them.)

LA: Go ahead.

the discussion that we were--that's what we were talking about.

Questions by recorder:

Q. I'm going to provide you with Hearing Exhibit 33. Can you tell me what that document is?
A. (Witness reviewed exhibit.) I wrote this document after the comments because over and over again I see things that go badly for a staff member or for other people and no one did anything about it. This document was really only for--a memo for me, but I was going to give the commander a copy because I wanted her to get the type of help that I thought she needed or support or--I don't know. I just couldn't live with the last comment about killing everybody. So that is when I sat down and wrote down these things.

Q. Who is that memo addressed to?
A. To the commander.

Q. The Medical Group Commander or the Wing Commander?
A. Med Group Commander.

Q. And when she told you that she wanted to--felt like killing those guys, was she referring to Wing leadership or Medical Group leadership?
A. We were talking about the decision--the Medical Group decision to switch her from the ER to other duties.

Q. I just wanted you to clarify that. I will provide the chairperson with Hearing Exhibit 33. Would it be fair to say that you wrote the memorandum, which was Hearing Exhibit 33, to protect the customer?
A. Yes, I did credentials for ten years, medical credentials. And having done that, I know that we owe some responsibility, not only to the customers, but to Major Webster, herself. We owe her whatever help she needed. We needed--we needed to care of, you know, the problem so that is why I did that.

REC: Thank you, no further questions.

CIVRC: No questions.

CC: No questions.

LA: Well, thank you very much, again, Ms. Callender, for coming in and talking with us and being real flexible. If you have never been in these hearings in the past, I would ask that you not speak about your testimony or any of the questions that were raised here and that is to be fair to the doctor. And only later, let's say the Med Group Commander much, much later had a need to discuss it after this matter, then you could discuss it, but not until this is concluded. Thank you.

WIT: Thank you.

(The witness left the room.)

CC: Let's take a five minute break.

(The hearing recessed from 1555 hours to 1608 hours, 17 February 1999.)

**MS. LINDA THOMAS**

was called as a witness by the government, was sworn and testified as follows:

**DIRECT EXAMINATION**

Questions by assistant recorder:

Q. Ms. Thomas, would you state your name for the record?
A. Linda Thomas.

Q. And, Ms. Thomas, where do you live?
A. Fort Clayton.

Q. Are you here in Panama as a military dependent?
A. Yes.

Q. How long have you been here in Panama?
A. Two and a half years.

Q. Do you know Major Wilma Webster?
A. Yes.

Q. Do you see her in this room today?
A. Yes. (Pointed to witness.)

Q. Let the record reflect the witness has identified Major Webster. Ms. Thomas, since you have been here in Panama, have you had treatment at the Howard emergency room?
A. Yes.

Q. Did you have treatment in January of last year?
A. Yes.

Q. During that treatment, were you treated by Major Webster?
A. Yes, I was.

Q. Can you tell us what led you to go to the emergency room?
A. I was bitten by a stray cat.

Q. What happened when you got to the emergency room?
A. It's been a long time, but I saw Doctor Webster. Well, first, I saw the technician. Then I saw Doctor Webster. She gave me--well, first, she told me that I would probably need rabies shots and I would need to come in the next day. She would refer it to a board or a committee that reviews that. Uh--she--let me see--she talked to me a little bit about rabies shots because that kind of scared me and said they weren't so bad and that she had had them before. And then she--let me see--she examined the wound and she gave me some ointment for it, an antibiotic ointment. And then she went out and she got a bottle of pills that she said she was going to give me. And she gave me the pills and then she sat down and she was writing something in the record. I looked at the bottle to see what it said because--in case I had any questions. And it said something about not having dairy--I think it said dairy products during the--while I'm taking that medication. And so I said to her, "Does this mean I can't have dairy products for the whole ten days?" And she looked up and she said, "What?" And she said, "Oh, no, that's not what I meant to give you." And she took the bottle back and she left, and then she came back in with--I think it was Amoxicillin, but I am not sure. It was

something that I knew so, when I saw it, I knew what that was. And she said, "This is what I meant to give you." Then she was--uh--she was getting ready to leave. The technician was going to clean it and I said to her, "Do I need a rabies shot?" and she, "Oh, yeah, you probably do." So she told the technician that after he cleaned it, he should give me a rabies shot also. And then--

CIVRC: She said rabies or tetanus?

WIT: I'm sorry, I'm sorry--a tetanus shot. Then a--just a couple of minutes later, before he had even cleaned it, she was writing in the record again and she looked up and she said, "Has she had a rabies shot?" And I said to her--I'm sorry--"a tetanus shot". I said to her, "No, remember, we just talked about that. I haven't had one and you told him to give me one." And she said, "Okay", and after that, she went out and the technician cleaned it off and gave me the tetanus shot and I left.

Questions by assistant recorder:

Q. How much time--from what you remember, how much time passed between when Major--from when the tetanus shot was first mentioned and when you heard Major Webster ask about it again?

A. I--I don't remember exactly, but I would guess two to three minutes because I remember being really surprised because we had just talked about it. So it couldn't have been more than a couple of minutes.

Q. How did you feel about the level of patient care that you received from Major Webster?

A. Well, she was very nice. But I was concerned about the fact that she didn't bring up a tetanus shot, herself, and the fact that she gave me the wrong medication. It all turned out fine, but only because I had read the bottle and I had brought up the tetanus shot and not everybody will do that. And that's what I was concerned about.

Q. At any point did you write a statement regarding this incident?

A. Yes, yes, I did.

AREC: I am showing defense counsel a statement dated February 22nd, 1998, which has been marked--

CIVRC: No objection.

AREC: --as Hearing Exhibit 34.

Questions by assistant recorder:

Q. Ms. Thomas, I am showing you a statement which has been marked as Hearing Exhibit 34. Do you recognize this?
A. Yes.

Q. Can you tell the board what it is?
A. It is a statement that I gave my husband and it has to do, partly about the visit to the emergency room, and then also some other problems that occurred later during that entire incident.

Q. I am showing the board Hearing Exhibit 34. Ms. Thomas, can you tell the board why you wrote up this statement?
A. Yeah, my husband had received a number of complaints and concerns. At that time, the Medical Group was kind of going through growing pains. They had just taken over not too long before that, and he had received some--several complaints having to do with various medical problems and then a few on Doctor Webster, as well. So when I told him what had happened to me in the emergency room and after what was happening, he asked me to write this statement because he was putting together a package of statements for Doctor O'Neil.

AREC: The government has no further questions at this time.

CC: Can I ask a question? Who is your husband?

WIT: Carl Thomas, Theater Support Brigade Commander.

CC: Over at Fort Clayton?

WIT: Uh-huh. (Affirmative)

CIVRC: I have no questions.

CM (Maj Matthews): I have a couple of questions.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Major Matthews:

Q. Did you indeed receive rabies shots that day?
A. Well, a couple of days later I did.

Q. A couple of days later?
A. Yeah.

Q. The cat had bitten you that night?
A. Yes.

Q. Was the wound cleaned?
A. Yes, the technician cleaned it.

Q. With soap and water?
A. Betadine, I think.

CM (Maj Matthews): Okay.

LA: Ms. Thomas, we certainly appreciate you coming here and being very flexible. It was helpful to the panel to have you here. I would like for you to know though that you are not to discuss anything that was raised in this room with anyone outside this hearing. Again, thank you for your cooperation and have a good day.

WIT: Thank you.

REC: The government would like to call Colonel Terrence O'Neil, however, I'm not quite certain he has arrived yet, so if I could just check.

CC: Okay.

(Recorder left the room and reentered.)

REC: He is not here yet. I expect him momentarily. I don't know if you want to take an in-place recess or what?

(The hearing recessed from 1617 hours to 1621 hours, 17 February 1999.)

**COLONEL TERRENCE J. O'NEIL**

was called as a witness by the government, was sworn and testified as follows:

**DIRECT EXAMINATION**

Questions by the recorder:

Q. Can you state your rank and your name for the record and spell out your last name?
A. Okay, Colonel Terrence J. O'Neil, O-apostrophe-n-e-i-l, U.S. Air Force Medical Corps.

Q. Do you know Major Wilma Webster?
A. I do. She is seated on my right side.

Q. Please note for the record correct identification of Major Webster. How long have you been in the Air Force, sir?
A. I joined the Air Force the 15th of June, 1971.

Q. How long have you been at Howard Air Force Base?
A. Since the 8th of August, 1997.

Q. And what is your job title?
A. Commander, 24th Medical Group.

Q. What are some of your duties as 24th Medical Group Commander?
A. Direction, guidance, assurance of compliance with regulations, quality of medical care, general oversight. As the Joint Task Force Panama Surgeon, I am responsible for making sure that there are community assets for medical care, peacetime and wartime, military and civilian, available as needed, whatever the mission is in this area.

Q. Can you briefly describe for the board what your educational and experience, related experience, consists of briefly?



S27

A. Okay. Undergraduate, California Institute of Technology, 1971, double major, biology and chemistry; subsequently a year and a half as a Disaster Preparedness Officer in the Air Force at Nellis Air Force Base and at Rocky Mountain Arsenal, Colorado; subsequently, Medical School, University of California, San Diego, 1972 to 1976; subsequently, I did a Categorical Medicine internship and residency at Wilford Hall Air Force Medical Center in San Antonio, Texas. I completed that and went into a two-year Nephrology Fellowship that was one year in Clinical Nephrology at Wilford Hall in San Antonio. Subsequently, a year of bench research with Jay Stein at the University of Texas, San Antonio. Thereafter, I went for my first staff position as a staff nephrologist, Clark Air Base, Philippines. I was there from 1981 to 1984. I came back to Travis air Force Base in 1984 as a staff nephrologist. I was at Travis for the next thirteen years. In 1993, I was offered the chief of the Department of Medicine; ran the Department of Medicine and the Medicine Residency Program as the Residency Program Director from 1993 to 1995. In late 1995, I was asked to become SGH, Chief of Hospital Services position. This continued through to 1996. I dual-hatted as SGH and Medical Operations Squadron Commander for six months in 1996; subsequently completed a year as MDOS Commander at Travis in August of 1997 and transferred here.

REC: Thank you, sir.

I would like to show Major Webster's counsel what has been marked as Hearing Exhibit 35.

CIVRC: That's fine.

Questions by recorder:

Q. I would like to show the witness what has been marked as Hearing Exhibit 35.
A. Yes.

Q. What is that, sir?
A. That is my curriculum vitae current up through the 1st of February of this year.

Q. Does that accurately reflect all of your education and experience?
A. It does.

REC: Thank you. I will provide that to the chairperson.

Questions by recorder:

Q. Now you say you know Major Webster. Can you please tell me when you came to know her?
A. Well, shortly after my arrival here, I tried to go around to meet as many of the people as I could in the unit. And Major Webster, at that time, was working in the emergency services and I met her pretty much routinely on a walk-through.

Q. Can you describe the first interaction that you had with Major Webster that caused you concern?
A. The one that I remember was the evening of the arrest of Staff Sergeant Hill. I live on base and when Staff Sergeant Hill had his cardiac arrest on the ward, they put out an all-call on the beepers saying that there was a Code Blue on-going in the inpatient unit, and I responded.

Q. Can you tell the board members what occurred?
A. At the time that I entered the room, there was an on-going arrest. Major Webster was at the patient's head. There was a bag valve mask oxygenation being applied and they were in the process of setting up IV's and getting equipment. The crash cart had arrived in the room a short period before I arrived. It was on my right between myself and Major Webster at the head of the bed. When I arrived--shortly after I arrived, Doctor Burkett and one of the staff nurses from the emergency room--the room began to fill up. Major Webster was running the code. After a number of minutes, it was suggested that bag valve mask was not the most effective and appropriate way to intubate the patient, and Major Webster initiated an intubation of the patient.

Q. Was she able to intubate the patient?



529

A. No, after an attempt lasting a good forty-five seconds to a minute, she stated that she could not, that her wrist did not have the strength to do so, and we returned to bag valve mask on the patient. Subsequently, she exchanged positions with Doctor Burkett. He moved to the head of the bed and the patient was intubated. During that time--during the balance of the arrest which lasted approximately an hour and a half, I remained on the patient's left, either at the chest or spelling the individual that was doing the chest compressions.

Q. Why did this entire incident cause you concern?

A. It caused me concern because an emergency room physician has, as one of their critical skills and abilities, the ability--or should have the ability to intubate a patient and perform endotracheal respirations. In the case here, I did--was not aware beforehand that Major Webster had carpal tunnel and had surgery scheduled. And her statement was, to me, "My wrist is too weak. I don't have the strength. Someone else will have to intubate the patient." That worried me immediately. Subsequently, I talked to the chief of the medical staff and the chief of the emergency room and said that, if there were a mechanical problem with the strength of her wrist, she should not be in the emergency room alone until the surgery had been completed and until she demonstrated adequate strength to be able to intubate a patient under any reasonable circumstances.

Q. What action did you take after this incident, if any action at all?

A. I instructed Doctor Mendez and Doctor McCrary to remove her from emergency room duty until such time as she had had the carpal tunnel surgery and had demonstrated the sufficient strength by some objective method or working on the mannequin to prove that a patient could be properly intubated.

Q. Did you require her to be trained in any areas?

A. Well, I did, and let me say that the second thing that concerned me about Major Webster's performance was that, shortly after--I don't know if it was one or two days after the arrest--Major Webster approached me and

stated that she had misspoken, that it wasn't the strength of her wrist--it wasn't the carpal tunnel, that it was the head position, the patient's neck was too thick and that she could not perform the intubation for that reason rather than the one that she had told me previously. This--

Q. How did--
A. --worried me.

Q. --you feel about that, that she changed her story basically on you?
A. Well, it was--it is a life-saving skill and to suddenly change your story as to why you hadn't been able to do it in an arrest situation called into mind credibility and the truthfulness of what was being told to me. For that reason, I discussed it further with Major McCrary and Doctor Mendez. And they agreed that, in addition to a period of time to recover strength and possible physical therapy after surgery, that skills verification would be accomplished using the ACLS paradigm with a mannequin to show that, not only was there sufficient mechanical facility to effect an intubation, but also the technical expertise was there. I subsequently received a report that on the initial post-surgical recovery attempt to demonstrate intubation, that Major Webster had not demonstrated an adequate facility doing the intubation to pass criteria and a second retraining or skill verification procedure was brought into line and that was to work with anesthesiology to demonstrate that the technical facility existed as well as the strength in a monitored situation. Subsequently, I believe it was Major Angeloro who sent a note to Doctor McCrary stating that she had demonstrated sufficient technical skill at intubation, that he was confident she could do so. At that point, I felt comfortable in allowing Doctor Mendez to return her to emergency room duty.

Q. Where was she in the interim?
A. In the interim, she was in the primary care clinic performing physicals and doing primary care medical duties.



531