Q. After she was in primary care and she recovered from her surgery, did she go back to the ER?

A. She did go back to the emergency room for a period of time after that, yes.

Q. Okay, and then what, if anything, occurred when she returned to the ER?

A. Well, between primary care and the emergency room, I got a string of complaints from patients involving incidents. One particular incident that I remember was a patient wrote me a customer report that Major Webster had broken down into tears in front of him, had stated that she hated her job, she hated what she was doing here, she could be sent to prison for what she was doing here and that that worried him a great deal. In another incident, after a series of delays in seeing patients, there was a--I would say a vigorous verbal disagreement between Doctor Burkett and Doctor Webster regarding whether she could leave when there were patients waiting to go out to lunch when some of the patients had been waiting close to two hours. She insisted that she would do so and did, in fact, leave. And that prompted a counseling session with Doctor Mendez in the emergency room. Subsequently, there were a couple of instances that again bothered me. One was an instance in which the--a pediatric patient which had a fever and a flu-like episode was given Benadryl elixir instead of Tylenol, was counseling to take it as if it was Tylenol, and left the emergency room with the wrong medication; subsequently was discovered, called back. And another issue in which a woman was bitten by a stray cat on Fort Clayton. Because of the coatimundi and the high incidence of rabies in this country, that is a very high concern. The risk is high. The outcome is potentially serious. That is something that every emergency room provider needs to know cold. Yet this individual showed up--the patient showed up over at Public Health and there appeared to be complete confusion about what was supposed to be given next. The report that was given to me was that the doses of medication that were prescribed appeared to be ambiguous, whether it was the vaccine or the antiglobulin. The patient appeared to have been given no clear guidance on what would happen next. So they showed up over at Public Health, and the orders, as

written, were inexecutable. This required further consultation between Public Health and the emergency room to clear it up.

Additionally, there was an incident reported to me in the emergency room where an individual, one of the emergency room staff, asked about, "Well, shouldn't certain patients be seen?", and the response was, "So what if they complain?" or it amounted to that.

In another incident, two routine pediatric patients were triaged into the treatment room ahead of an individual who had abdominal pain and had an IV started. In spite of the fact that the emergency room staff stated that they had brought the discrepancy to Major Webster's attention, she continued to see the pediatric patients over the abdominal pain patient.

That, plus, as I visited the emergency room, as I talked to Doctor McCrary and the staff, as I--I began to periodically visit the ER because, in this location, with no U.S. standard emergency room available, other than ours, the ER is the forward shields of the entire hospital, the organization that must rapidly and effectively triage in peacetime and be ready to respond in wartime to--or in case of a mass casualty--to almost any contingency requiring flexibility, knowledge, adaptability. Our ER, with its thin manning, was a critical point of concern. And I got the feeling that the staff were worried, that when Major Webster was on call, they didn't feel comfortable. So I would visit up to the ER, and on a couple of occasions I saw Doctor Webster, with two or three people in the beds, appearing overwhelmed, standing hand to mouth, thinking slowly, uncertain, it seemed, of what to do next. This also worried me.

I asked Doctor Mendez and Doctor McCrary for additional input and I got a summary in the spring of 1998 of a number of problems as perceived by him, as the chief of the emergency room, and the patient complaints that Teddy Callender was showing to me that were coming in. And I reached the point where I had a crisis of confidence in Major Webster.

REC: Thank you.

I am going to show Major Webster's counsel what have been marked as Hearing Exhibits 36 and 37.

CIVRC: No objection.

REC: I am going to provide those exhibits to the witness.

Questions by recorder:

Q. Sir, can you tell me what those exhibits are? They've got numbers on the bottom right, so if you could refer to the number before you answer.

A. Exhibit 37 is a memo for record, dated 6 February, 1998 detailing a meeting that I had with Lieutenant Colonel Mark Robbins who was, at that time, the chief of the medical staff at the 24th. It was during this period that the concatenation of patient complaints, staff concerns, and my personal concerns about Major Webster's capability in the emergency room were building. I asked, in view of Doctor Webster's evident level of anguish, nervousness, unease, discomfort, what services we might need to give her, what considerations we might need to give her to help her adapt, to help her to be effective in the emergency room and just to let him know that it was an issue of concern to me, but he, as the chief of the Medical staff, had the ultimate responsibility at a tactical level for knowing what was going on with his people and for finding out if the quality of care that Major Webster could give in the ER was being impaired by physical, technical or emotional problems. And I also let him know that, in view of my growing concerns, I was letting Headquarters ACC know that I might need, although I didn't identify her by name to Headquarters ACC at the time, that there was a provider on my emergency room staff that I was concerned about and that, in view of the absolute importance of the ER, that they might need to provide us emergency room coverage on call if things evolved further. Keep in mind that I spent three years at Clark Air Base in the Philippines. We were called upon routinely to be MOD in the emergency room. And in a situation like that, I did not want to be faced with a situation where I would be having to choose between a

provider whose skills I couldn't count on or people whose emergency room experience was inadequate to provide ER services. So, consequently, that's why I contacted Headquarters ACC. I did not want to go to an MOD type of situation that I remembered very well from Clark and did not feel that the quality of care could be sustained.

Hearing Exhibit 36 is a memo for record that I wrote to Doctor Webster from a meeting that I held with her on the 22nd of May 1998. The annotation to it is "second copy delivered 26 May 1998". I neglected to give her a copy of the signed document on the date of the initial meeting on the 22nd of May, and I subsequently gave her, hand-carried a copy to her on the 26th in which I relieved her of her emergency room duties.

This was very painful for me. I didn't enjoy doing it. As Commander, my responsibility is to assure that the individuals and the quality of care that they can give is the very best that I can deliver. If I lose confidence in someone, in their ability to perform, it's incumbent on me to relieve them of their duties, the same way it would be for Colonel Trebon to relieve me in an instant if he ever lost confidence in me. And I pointed out to her that she had had some prior counseling, that these were on-going problems, this was May of '98, the counseling dated from November of 1997, that I had seen personally no improvement in a pattern of duty performance that resulted in my losing confidence in her, that it was not an adverse credentialing action, and that I was going to move her into another position in the Medical Group, one in which she could use her skills as a physician, but not in the emergency room where I had lost confidence in her.

Q. Thank you, sir. I will retrieve those two documents from you and provide them to the chairperson. So where did you put Major Webster after you removed her from the ER the second time?

A. I talked to Lieutenant Colonel Addison and Doctor Robbins and we felt that her duties--that her skills could be used productively in the Health and Wellness Center where she could counsel patients, do health and

preventative wellness education, do smoking cessation, duties that would not involve the complex milieu of emotion, rapid decision-making and fingertip memory for procedures that I felt she had trouble with in the emergency room.

Q. And how did she do at the HAWC?
A. She did very well.

Q. And why would you say that she did well? What are the reasons behind that?
A. Doctor Webster is a brilliant individual. Her intelligence is clearly above normal. The HAWC did not require the kind of emotion-laden, rapid decision-making, prioritization of complex tasks and immediate action that I saw as a pattern of problems for her in the ER. She writes very good articles on patient education which we have continued to publish in the base paper and I have encouraged her to do so. She has brought them to me and said, "Is this within the political context acceptable to this community?", issues on sex, drinking, nutrition, exercise. She has done very well in that position.

Q. In your opinion, did you give Major Webster a fair chance at proving her capabilities as a physician here at Howard?
A. I returned her to the ER in spite of the fact that I had some concerns. I continued her there until a pattern of performance that I could not ignore had accumulated. Yes, I believe that I gave her as fair a shake as I could and still be honest to my commitment to protecting the health of the community that I am responsible for.

Q. Did you write a letter to the Physical Evaluation Board?
A. I did.

REC: I am going to show Major Webster's counsel Hearing Exhibit 38.

CIVRC: No objection.

REC: I will provide that to the witness.

Questions by recorder:

Q. Would that be the letter you wrote to the PEB, sir?
A. Yes. Hearing Exhibit 38, 13 November 1998.

Q. What does the letter say?
A. Okay, I was told by the PEB that a commander's letter was recommended, and I wrote a summary, in accordance with the DoDI that covers commanders' letters on PEB's to them in order to describe from a commander's viewpoint what I felt the problem to be, primarily one of emotional lability, disorganization, my personal observations, the incident of the cardiac arrest, her equivocation on the reason why she could not intubate the patient, and then subsequent incidents which further confirmed that I could not give her my trust in a more global patient care setting. Understand there are three issues involved. The first is the commander's personal trust in a position--in a person in a given duty position. In this case, Major Webster's duty position is emergency room physician. That is her job title, and that is what she states her professional first love and best expertise is in. Second is the issue of world-wide duty qualification. If I, as a military member, am not physically and emotionally fit to go world-wide at a moment's notice to any location, however, austere, without requiring medical, psychiatric or other resources that are a drain on that unit, then my feeling is the person should not be world-wide qualified for duty. That is separate from concern about qualification in a particular AFSC. And third is the issue of whether an individual, as a physician, as a care-giver, is equipped and fit to deliver patient care to people needing medical assistance. Three separate issues. I have crossed the issue of my personal faith in her in the emergency room and decided that she did not have it. When she was on her way to the--well, let me back up. During the period of time she was in primary care, the incident of breaking down, the emotional lability, further concerned me about her mental coping ability under stress, certainly a worthwhile thing to have in the patient care environment. Then, as a result of worsening angst, concern, anguish, to the point that I

asked her on at least two occasions, "Major Webster, are you in any danger of hurting yourself? Have you considered suicide?", to which she responded, "No, I have not. Absolutely, I have not." Fine. But her worsening sense of disorganization and frustration and anger led her commander, Lieutenant Colonel Addison, to issue a commander directed mental health evaluation. The commander directed mental health evaluation was accompanied by both psychiatric and psychometric analysis. The psychometric analysis showed that she had industrial impairment. Depending on the observer, the degree of the impairment varies. But on two evaluations here in Panama there was evidence of--

CIVRC: Excuse me, Colonel, I don't mean to interrupt. I've got to object again on the basis it is going into physical disability and mental disability that has already been decided by the PEB. They have made their ruling. We are relitigating issues the board has already heard and ruled on.

LA: I think what we will probably want to do is similar to the other, still note it on the record obviously, but it goes to state of mind of the commander and what led up to why we are sitting here today. And obviously, you are going to raise that issue at the right time.

It has been brought to my attention we need to take a very brief administrative recess for a very important phone call.

(The hearing recessed from 1655 hours to 1706 hours, 17 February 1999.)

WIT: In the--

CIVRC: Can we at least have a question?

Questions by recorder:

Q. Colonel O'Neil--
A. Yes.

Q. Let me just retrieve that from you--
A. You had asked me about this--

Q. --and provide it to the chairperson.
A. --document and what it communicated. In my commander's statement, I further stated that some other incidents had taken place that, in the case of the PEB, made me question this individual's world-wide fitness for duty including an incident in which a senior airman and the aeromedical evacuation flight, while preparing--counseling Major Webster for an air evac flight back to Wilford Hall, Major Webster had vouchsafed to her that, no, she didn't hope the flight went well, in fact, she would rather the plane would blow up. On another incident, she vouchsafed to an individual that she had had a fantasy involving coming in to the hospital and shooting all the people in it and that that incident--that that fantasy had been so powerful she had had an orgasm.

CIVRC: Excuse me, again, I don't mean to interrupt you, Colonel. But maybe if the Colonel was aware that all of those instances have already been discussed here, it could probably shorten this quite a bit. Again, I am not trying to shut you off, Colonel. I just want you to know that has all been presented here.

WIT: Those--

Questions by recorder:

Q. Okay, sir, why don't we start--
A. Okay.

Q. You wrote this letter to the PEB.
A. Yes.

Q. Are you aware of the PEB results?
A. I am indeed.

Q. Okay, what are your comments on those results?
A. That the PEB has--

CIVRC: Wait a minute.

WIT: --the right to make--

CIVRC: I'm going to--

WIT: --a determination.

CIVRC: Just a minute.

WIT: Yes.

CIVRC: What his opinion is on the PEB results has no place in this board hearing, period. It was an Air Force board that made the decision and they ruled.

(Chairperson and legal advisor conferred.)

REC: The PEB results are Hearing Exhibit 6 for your reference.

CC: It's noted, and we are going to allow Colonel O'Neil's opinion.

WIT: I wrote a letter to the PEB stating that, again, on Colonel Jack Saylor's recommendation to express my feelings and concerns regarding whether the decision of the PEB was correct or not. However, in the end result, I have taken no action to restrict or profile Major Webster because, as counsel pointed out, the action of the PEB is their action, and I am bound to uphold it and I have done so. It goes back to the three separate areas that I have to consider with respect to anyone under my command: do I trust them in their AFSC; is their physical condition sufficient to permit them to be world-wide qualified; and is their physical and psychological condition and technical expertise sufficient that--should they be in the practice of medicine? Those are three separate and distinct facts.

REC: I'm just going to back up a little here, sir. I am going to show Major Webster's counsel what has been marked as Hearing Exhibit 39.

CIVRC: You know, the only thing I have, because I think to be fair, the memos that were attached to this letter ought to be included with the exhibit, and I am sure counsel

has those some place along the line. I know I had one--

LA: This is Hearing Exhibit 39?

CIVRC: Right. I know I have one of the exhibits which was Doctor Webster's--no--well, it says 12 June memo. Rather, I've got Doctor Addison's 23 June memo which I think, for completeness, should be included and the other things that are referenced as well.

LA: Are the other items that are referenced going to be brought in at any other time or could we just clarify it and say "without attachments"?

CIVRC: I think I may have Major Webster's memo.

REC: I believe some of those will be coming in through other witnesses.

CIVRC: I don't think we need to bring them in through other witnesses. If we have them here, we ought to just go ahead and attach them now. I understand this is Colonel O'Neil's letter.

LA: It looks like the Med Group Commander has cited four attachments.

CIVRC: I have found two so far. If you will give me a chance, I may have--I've got the third one. (Reviewing documents.)

LA: We can stipulate that we are going to get them at some point.

CIVRC: I've got three of the four exhibits so we don't have to delay the witness.

REC: If you can let me know which one you are missing?

CIVRC: The only one that is missing is the undated table showing total number of episodes of patients leaving without being seen.

I'm not certain. I can't vouch for the other document I have. So I will just have to give you those three and tell you one is missing.

LA: So if we could have Hearing Exhibit 39, it now consists of three items appended to it which are reflected as attachments on there. The one attachment which is not reflected deals with a table of no shows or--

CIVRC: Leaving without being seen.

LA: We have sufficiently identified it. Whether it comes in later or not--

CIVRC: I think the important thing is the various responses.

REC: I just have an objection to submitting a highlighted--

CIVRC: I don't have any problem with running a copy and taking that out.

REC: I may have an unhighlighted copy.

LA: The important thing, so that we all realize, I know there are going to be some that come in with highlighting like this item or others, but at least we identify it now so that later on up the chain someone doesn't think that someone has tampered with the record. If a portion is highlighted, we just need to note it--

CIVRC: That can be fixed. Because of that highlight, obviously, it can be copied and it will not show up.

LA: I see.

(Recorder and civilian respondent's counsel looking through documents.)

CIVRC: On the previous exhibit, I don't think that was the case.

May I suggest something in the interest of time? Why don't we just get the doctor to identify that, but before it is presented to the board, we can take a--we

can get it cleaned up, if that is acceptable to the chairman so we can move this along?

CC: That's definitely acceptable.

Questions by recorder:

Q. Sir, I am going to provide you with Hearing Exhibit 39. Can you just briefly describe to the board what that document consists of and what that document is saying?

A. This was a memorandum for record that I wrote on 24 June 1998. It is identified as Hearing Exhibit 39. I reviewed a series of memoranda that had to do with the working relations between Major Webster and Major McCrary. Major Webster worked, of course, as a staff physician in the emergency room. Major McCrary was the emergency room chief. Major Webster wrote a memo to me on the 12th of June stating that she had--that she desired to be chief of the emergency room and had a number of concerns about the behavior and skills of Major Doctor McCrary. It also identified a memo from Lieutenant Colonel Addison, Major Webster's squadron commander, to me in which Lieutenant Colonel Addison responded to Doctor Webster's concerns regarding Doctor McCrary in which she stated that his emergency room was disorderly, that he had made some derogatory comments about a mandatory charting method called SOAPP, and the use of something called the panic book which was a set of algorithms, memory joggers to use in emergencies. My summary was that Major Webster's memo lacked sufficient substance to justify my decision in her not being chief of the emergency room, that it appeared that the choice had been made by Lieutenant Colonel Addison using a proper and justifiable approach, and that it did not warrant my overriding it, that the pattern of activity which evolved subsequently to that appeared to more reflect Major Webster's duty performance than adverse reporting or prejudicial reporting by Doctor McCrary and that that pattern of behavior and performance in the ER had had an effect on the community which reduced community sense of assurance, trust in our entire emergency services which had ranged as high as the Theater Support Brigade because of the number of complaints coming in. The historical reason for that is that the Army does not go

by appointed health care services. They believe in sick call and walking into the emergency room. So a disproportionate number of patients walking into the emergency room were young Army people, and when they encountered a situation they found profoundly disturbing, many of them went through their command chain to the Theater Support Brigade Commander to complain about emergency services at the 24th Medical Group. And I finished the memorandum for record saying that, although not everything that was done by either Lieutenant Colonel Addison or Major McCrary was perfect, that it did not appear to cross any lines of propriety or judgment that would authorize me, as the commander, to overrule either Major McCrary's or Lieutenant Colonel Addison's actions.

REC: Thank you, sir. I will retrieve that document from you and provide it to the board at a later time.

CC: Okay.

Questions by recorder:

Q. One final question, Colonel O'Neil. Why do you feel Major Webster's credentials should be removed?

A. It is--and believe me, this is--this is a difficult thing to say. I'm a provider myself. Medicine is my life, as I know it is for Major Webster. A pattern of events has taken place here which has led me to fundamentally question Major Webster's ability to effectively diagnose and treat ill people. It is not one single event, but a combination of things involving two tries in the emergency room, one try in primary care and subsequent events which included psychometrics and diagnosis that lead me to believe that a combination of behavioral and physical factors render it likely that, at some point in the future, it is more likely that one of Major Webster's patients will suffer an irreversible damaging event than I can't accept as the individual charged with the responsibility for the quality of health-care. And believing that, and having seen enough instances of both performance and objective medical documentation to lead me to question that, I cannot support her continuation as a provider of medical care.

REC: Thank you, sir. I have no further questions.

**CROSS-EXAMINATION**

Questions by civilian respondent's counsel:

Q. Doctor, we can at least agree that we've got a great first name and middle initial. Let me ask you the same question I've asked everybody that's come in this room. Where is one medical record that shows that a patient that was treated by Dr. Webster failed to get appropriate care? Do you have one?
A. Medical record that I can lay my hands on right now?

Q. Yes.
A. The report of the treatment following the rabies--the bite--animal bite was inappropriate treatment. The medical record of the misdispensing of the medications in the emergency room, that was not appropriate medical treatment.

Q. Is that it?
A. Yes, that's as far as I let it get.

Q. That's as far as you let it go, okay, Doctor. So basically--now I would assume that, with your concerns, you would have people looking at her medical records pretty closely and as a part of the records review as well, right?
A. Dr. McCrary has a records review program in the emergency room.

Q. And there's also one for primary care, correct?
A. Yes.

Q. And yet, despite all these concerns, there isn't any medical record to be brought before this credentials board which shows that Doctor Webster in any way provided substandard medical care, is there?
A. If you say that no records have been brought forward, then I accept that.

Q. Doctor O'Neil, let me ask you this, too, because I am going to try and shortcut some of this stuff. It is

late in the day and we would like to get to one last witness, I think. But let me ask you this. You have talked about a string of complaints. Before this board, in writing, I believe we now have seven complaints and I know of eight. I think there is one more that is going to be coming in. Is that all the written complaints we have on her, as far as you know?
A. Of the ones which there is documentation in writing, yes.

Q. Now, you said also that you had gotten complaints from the Brigade Commander. Is that Colonel Thompson?
A. Colonel Thomas.

Q. Thomas, yes. As a matter of fact, his wife is the one that complained about the rabies.
A. Okay.

Q. But what I want to know is, all of these Army troops that complained up the ladder, were they all saying Wilma Webster's name, or were they just saying they weren't happy with your emergency room?
A. Of the ones that I reference to Major Webster, all of them were specific instances of care in which they were seen by Doctor Webster.

Q. The two you referenced, is that what you are talking about?
A. No, the written customer complaints referred in writing as far as the file.

Q. The six of them that are sitting here and the other one, seven.
A. Yes.

Q. I just wanted to make sure there weren't any others that we were leaving out here. So, it's--if I had to sum it up, it's your feeling that you just don't feel like this doctor can provide quality medical care, is that correct?
A. That is correct.

Q. But when it comes to the objective evidence to back up that gut feeling that you have, we really don't have anything except for seven complaints?

A. And the psychometric evaluation by Doctor Brian Campbell, Assistant Chief of Psychiatry at Wilford Hall, that says severe industrial impairment.

Q. Yes, and, of course, that was already done by the PEB, you are aware, and they found that Doctor Campbell, who relied upon Doctor Poser, the preeminent expert in the field, and Doctor Poser saw this lady and said, "wrong".

A. Different question. My question is of world-wide capability for deployment, not capability to deliver medical care. Separate issue entirely.

Q. All right. We are not going to agree on this, are we, Doctor?

A. I am going to tell you what I know to be the facts.

Q. I just want to make sure that I know, when you start talking about strings of complaints and all this stuff, that we have the objective evidence here that you are talking about because I don't want global statements. I want to know, if you are saying something, is there something to back it up and what that is, and I think you have identified that.

A. Yes.

Q. Is there anything else that you can think of?

A. No.

CIVRC: I don't have any more questions, thank you.

LA: Any redirect?

REC: Nothing further.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Captain Georgescu:

Q. Sir, a couple of questions for you.

A. Okay.

Q. First of all, let's talk a little bit about the code. You were there, I understand, a few minutes afterwards, after the code started?

A. I don't remember the exact number of minutes, but it was not very long after the code started that I was there.

Q. Okay, and I understand the patient was in v-fib.
A. Right.

Q. And the problem was with the airway management. Besides the airway management, did you notice anything else, failure to defibrillate or wrong administration of medication or anything else like that that you remember?
A. By the time I arrived on the scene, I was told that no electricity had been applied and that Doctor Webster was having difficulty with the intubation within the first few minutes. I did not see electricity applied during the first few minutes after I arrived on the scene. That initial few minutes that I was physically present in the room was occupied with an attempt to get the patient adequately intubated while chest compression was being administered.

Q. Was there at any point that they decided to go ahead--was the whole code involved in--the whole code was revolving around intubating the patient, or at any point people started to defibrillate or push medications or anything else like that?
A. Defibrillation was administered on at least--at least two occasions. I am speaking very carefully because I'm trying to tell you exactly what I remember, and at a year and a half distance in time, it's hard to remember exactly. But defibrillation, chemicals were administered. The patient was intubated and, as the person standing at the chest, alternating between giving chest compression and listening for bilateral breath sounds, feeling the femoral pulse, after the patient was intubated, then the code began to flow smoothly.

Q. Was Major Webster still the one running the code at that point, after intubation?
A. I think, at that point, it had become more of a shared issue between Doctor Burkett and Doctor Webster because, as I recall, he was still at the head or close

to the head of the bed and that is generally where the person running the code is standing.

Questions by Major Matthews:

Q. Do you recall if he was intubated and then defibrillated or which came first?
A. At this distance in time, the only things I clearly remember are the ones I charged myself with, feeling for a pulse on chest compression and listening for bilateral breath sounds. The pulse was not easily palpated, despite adequate chest compression, which was what led to the supposition that he might have had a pulmonary embolus. But I do know that there were bilateral breath sounds present for the entire period of time that I was listening to them throughout the code.

Q. Do you have any idea how long--was Staff Sergeant Hill in the hospital a long time, or did he just--
A. He had just gotten in within twenty-three or twenty-four hours earlier. He had gone home with a flu-like illness--

Q. Did Doctor Webster--
A. --some pleuritic chest pain.

Q. --admit the patient or--
A. No, he was admitted to another staff person. Doctor Webster was on call in the emergency room, and when the nurse called the code, she came over immediately.

CIVRC: For your edification, one of the witnesses who will come to testify--not to testify about this code, by the way--but is going to come and testify was the PA who sent him over for the admission.

Questions by Major Matthews:

Q. Another question. Did you ever see Doctor Webster use a bag valve mask to attempt to ventilate the patient?
A. I'm placing myself in--I would have to say I remember that. Yes, I do believe that was the case.

Q. Do you remember if it was adequate or effective?

A. I remember listening in the rush of things for breath sounds over the lung fields bilaterally and never not hearing reasonable breath sounds. I believe--

Q. You heard breath sounds with the bagging?
A. Yes.

Q. And one last question. Did you ever discuss the PEB results with anyone on the phone that was involved and got their impression of--in order words, where you know it says she was world-wide qualified, but there is a category 3 here that doesn't pertain to that and we had a question if they had any impressions that you talked to somebody about--
A. I discussed the results with Doctor Jack Saylor, who is the Director of PEB's at Wilford Hall.

Q. He is a physician?
A. He is.

Q. Clinician or--
A. I do not know.

Q. Did he have an opinion--
A. He was the--

Q. --from what he wrote--
A. He was the one who suggested to me that I write a reclama letter.

Q. What's that mean?
A. An appeal to the PEB--that he had concerns about the findings.

Q. Why would he say write an appeal? He didn't like what they decided or--
A. His--I asked him about--if there was any mechanism--

CIVRC: Excuse me, again, I--

CM (Maj Matthews): This is a question--

CIVRC: I have a running--I understand, but I've got to have a running objection on these questions about what the PEB

board did and his discussions afterwards because it is not really--

CM (Maj Matthews): I have it right here, I just have a question--

CIVRC: No--okay--

CM (Maj Matthews): --what it means.

CIVRC: If you don't--

CM (Maj Matthews): I just have a question what it means. He is explaining it to me. I thought I could ask that question.

CIVRC: Okay, if he is explaining it--I mean, if he knows what it means.

CM (Maj Matthews): He talked to that person who was involved in it.

CIVRC: No, Doctor Saylor was not involved in that. He was not sitting on the board--

CM (Maj Matthews): Oh, he wasn't?

CIVRC: --on the PEB board at all.

WIT: He is the administrator in charge of the process.

CM (Maj Matthews): I see. Did he sit and watch or observe it or anything?

WIT: I do not know.

CIVRC: He did not.

Questions by Captain Georgescu:

Q. Before Doctor Webster arrived here, she had, I assume a few years of Air Force duties if she was considered as the chief clinician for the ER. Did you get any kind of feedback from her previous commanders or any kind of