evaluation that you've seen before from her previous jobs?

A. I did not talk to one of her previous commanders. I talked with her about her previous experiences in which she maintained that there had been no problems, in fact, that she had gotten an award for patient satisfaction in the past. But I did not go to one of her previous commanders to ask him about her performance.

Q. There's no OPR's coming your way, previous OPR's, where you take a look at or things like that? I'm not even sure if that--

A. There is a personnel file, but it really didn't matter. She came to me with no evidence of prior administrative problems. And what I was dealing with was current behavior and current concerns.

Questions by Major Steffen:

Q. One final question from me is, since you are the commander and obviously in charge of all of the physicians in the whole Med Group here, this process that Major Webster has gone through from day one until we are here, do you think it has been appropriate and well documented and she has been appropriately counseled? I mean, everything has been handled on the up and up, do you feel?

A. It is my feeling that Major Webster has been given every opportunity to defend herself, her actions, have a second chance in the emergency room, a chance in primary care, a full availability of privately obtained neuropsychiatric and physical evaluations and privately obtained independent counsel. Yes, I fully--the process of getting from here to there, I have kept those three categories of judgment and concern separated at each step along the way and the rules that apply differently to each of those three categories of events have been maintained.

**RECROSS-EXAMINATION**

Questions by civilian respondent's counsel:

Q. Just--Doctor, did you say, when you removed her to the Health and Wellness Center, that that was not an adverse credentialing action?
A. That is correct.

Q. And that she did well there, as far as you know?
A. Yes.

Q. And is it your feeling that this--that she can't function as a physician in the Health and Wellness Clinic?
A. She has functioned in the Health and Wellness setting until now, that is correct.

Q. But my question is, is it your feeling that she cannot continue to function in that setting?
A. That is what I asked the credentials committee for their opinion on.

Q. So, consequently, what you are asking this board is, can we at least keep her in the Health and Wellness Center?
A. No, what I asked this--what I asked the credentials function for was their recommendation to me whether they, as independent advisors, felt that she was qualified to continue as a credentialed provider.

Q. So this board basically then could find that she is going to remain a credentialed provider, but that her duties would be limited to the Health and Wellness Center, is that correct?
A. That is within the authority of a credentials function.

Q. Thank you, and that would not be an adverse function that would require, for example, writing to, if you know, to the State Boards where she practices or anything else?
A. Her privileges in emergency medicine and family practice, were that to be the finding, would have to be rescinded, and as such, that would be an adverse action and would require, subject to opinion by ACC/SG and counsel, reporting.

Q. That pretty well tells me where I have got to go. Thanks, Doctor.

HEARING TRANSCRIPT
PART II

# TAB 6

A. Thank you very much.

REC: Nothing further.

LA: Thank you, sir.

(The witness left the room.)

REC: The government would like to call Lieutenant Colonel Remington.

**LIEUTENANT COLONEL KENNETH REMINGTON**

was called as a witness by the government, was sworn and testified as follows:

**DIRECT EXAMINATION**

Questions by recorder:

Q. Can you please state your rank and name for the record and spell out your last name?
A. Lieutenant Colonel Kenneth Remington, R-e-m-i-n-g-t-o-n.

Q. Thank you. Do you know Major Wilma Webster?
A. Yes.

Q. And if she is present, can you point to her and call her by name?
A. Major Webster right here to my right. (Witness pointed to respondent.)

REC: For the record, please note correct identification of Major Webster.

Questions by recorder:

Q. Where do you work, Colonel Remington?
A. I am the Medical Operations Squadron Commander.

Q. How long have you been--is that here at Howard?
A. Yes.

Q. How long have you been the MDOS Commander?

A. I've been here since the 14th of August of '98.

Q. Who was your predecessor?
A. Lieutenant Colonel Martha Addison.

Q. Sir, what do you do by trade?
A. When I am not doing this, I am a nurse anesthetist.

Q. Can you briefly explain your educational and clinical training to the members?
A. My--I have one degree in physical geography. I have a bachelor of science nursing degree.

CIVRC: If this will save time, we will stipulate that he is a great nurse anesthesiologist, the greatest that ever came down the pike.

WIT: I certainly couldn't argue with that.

REC: No argument here. I will press.

Questions by recorder:

Q. What are some of your duties as the MDOS Commander?
A. It is my responsibility to see to the administrative ends of running the squadron, ensuring personnel have--we have the people that we need where we need them, oversight of clinical operations.

Q. Okay, how do you know Major Webster?
A. Major Webster is part of the squadron, a member of my squadron.

Q. Did she come before you arrived at Howard or was she already in place when you arrived?
A. Major Webster was here when I arrived.

Q. And, as the new MDOS Commander, were you briefed by Colonel Addison, your predecessor, on any of the particulars surrounding Major Webster's performance or any disciplinary problems she was having with Major Webster?
A. Very briefly. Major Addison--Colonel Addison and I had approximately one morning and about five to ten minutes of overlap before the change of command ceremony. At



556

that time, she went over a couple of situations that were on-going. One of them involved Major Webster, and told me where I could find the documentation to review regarding that case and one or two other situations that were on-going at that time.

Q Did she give you any documentation on Major Webster?
A. She did not. She told me where the documentation was stored under lock and key.

REC: I am going to show Major Webster's counsel what have been marked as Hearing Exhibits 40 and 41.

CIVRC: No objection.

REC: I will provide those to the witness.

Questions by recorder:

Q. Sir, can you tell me if that documentation that you have got in front of you, Hearing Exhibits 40 and 41, are those some of the documents that were in Colonel Addison's file on Major Webster?

CIVRC: You know, I am going to--I have no objection to these documents. I don't think we have to go through the process of proving them up. We will stipulate they are government records. I just don't see any need to go through this tortuous exercise. We are not in a courtroom, I don't believe.

LA: That's fine.

REC: Fine, I will retrieve those from the witness.

Questions by recorder:

Q. Can you tell me what about Major Webster causes you concern, whether that is anything inherent in her personality, her ability to deal with patients or otherwise?
A. I cannot directly address Major Webster's ability to deal with patients. I have never observed her doing so. Any insight that I may have on that is based totally on my review of documentation that was provided

to me when I took over. At the time I came here, she was at the Health and Wellness Center. Administratively, Major Webster is difficult to work with, primarily centered around, I think, the fact that--uh--there is an on-going feeling that she brings to me that the entire structure of the Air Force has been set up to do her in.

Q. Is the 24th Medical Group trying to do her in?
A. There's not enough time in anybody's day to put in the amount of planning, I don't believe, that would be required to provide the level of interaction that I've heard the Air Force accused of. I wish we were that organized. No.

Q. Did you give Major Webster a referral OPR?
A. Yes, I did.

Q. Why?
A. That was a proceeding which had started before I was there. I read through the documentation, felt that, at the point that was at, what I had to do administratively was to determine if I could logically determine how they got to the point of giving that referral OPR. I did. I could see the logic in that process. I gave Major Webster a chance to rebut the referral OPR and in the letter of rebuttal I could find nothing that caused me to disagree with the paperwork that had been presented to me up to that point. So I presented the OPR.

Q. Have you treated Major Webster harshly?
A. I think I have gone out of my way to try to see to it that her rights have been protected. I don't know if that exactly answers the question, but I have tried to treat her fairly.

CIVRV: I would also suggest this is all self-serving. It doesn't go to anything with regards to the credentials of the provider.

Questions by recorder:

Q. Were you aware of Major Webster's performance in the ER and primary care?

A. Uh--no.

Q. I assume what we are talking about here is what has been put into evidence?
A. That is correct.

Q. Six complaint forms, seven complaints?
A. That's correct.

CIVRC: That's all I have, Doctor--I mean, Colonel Remington.

REC: Nothing further from the government.

LA: Sir, we certainly appreciate your flexibility coming over. It's been helpful. At the conclusion of everyone's testimony I do remind them that this is a continuation of the Quality Assurance materials under Title 10, Section 1102. So everything we say would be privileged, and you are not to discuss your testimony or any of the questions brought to your attention.

WIT: I understand.

LA: Thank you very much.

WIT: Thank you.

(The witness left the room.)

REC: We have nothing else today.

(The hearing recessed for the evening at 1750 hours, 17 February 1999.)

LA: We are reconvened again for the second day of our hearing here at Howard Air Force Base at the legal office. All relevant parties are now convened.

(The hearing was recalled to order at 0740 hours, 18 February 1999.)

LA: Let's clear up the matter of Hearing Exhibit 39. Could you restate what it is, as well as the attachments?

REC: Sure. Hearing Exhibit 39 is a memorandum for record written by Colonel O'Neil, dated 24 June '98. It indicates that there are four attachments. However, one of the attachments, which is an undated table showing total number of episodes of patients leaving without being seen, could not be located. The other three have been located and are attached.

LA: Okay. And identify for us 40 and 41.

REC: Hearing Exhibit 40 is a memorandum for record, dated 23 March '98, written by Lieutenant Colonel Martha W. Addison, regarding "Events Leading up to Your Removal from ER". Hearing Exhibit 41 is dated 21 May '98. It is a memorandum for Major Webster. It is a two-page document signed by Lieutenant Colonel Addison.

LA: Mr. Martin, do you have an exhibit?

CIVRC: Yes, I have Exhibit 42, which is included in the government's package, dealing with the review of the case of the active duty Army member who died and who was the subject of the code. It's from a Stephen A. McGuire, Colonel, 1st MDOS/CC, Langley Air Force Base, Virginia.

REC: No objection from the government.

CIVRC: Forty-two will be admitted then?

LA: Forty-two is in.

REC: Also at this time, the government would like to have the following evidence put into evidence: Hearing Exhibit 43, which is a résumé of Doctor Richard F. LaMacchia, and that is spelled L-a-m-a-c-c-h-i-a. I have marked that as Hearing Exhibit 43.

Hearing Exhibit 44 will be a memorandum for Lieutenant Colonel Addison from Doctor LaMacchia regarding a commander directed evaluation of Major Wilma Webster. I will provide Hearing Exhibits 39, 40, 41, 43 and 44 to the chairperson.

CC: Thank you.

CIVRC: Subject to my continuing objection about going into the physical and mental health of the patient, since that has already been determined by the Physical Evaluation Board at Lackland Air Force Base, we have no objection.

CC: Is the hospital ready?

LA: Do we have a witness at this time?

REC: Yes, we do. The government would like to call Captain Ryan Shercliffe.

**CAPTAIN RYAN SHERCLIFFE**

was called as a witness by the government, was sworn and testified as follows:

**DIRECT EXAMINATION**

Questions by recorder:

Q. Can you please state your rank and your name for the record?
A. Captain Ryan Shercliffe.

Q. Can you spell out your last name, please?
A. S-h-e-r-c-l-i-f-f-e.

Q. Do you know Major Wilma Webster?
A. Yes, I do.

Q. If she is present, could you point to her and call her by name?
A. Doctor Wilma Webster (to whom the witness pointed).

REC: Please note for the record correct identification of Major Webster.

Questions by recorder:

Q. Are you stationed here at Howard?
A. Yes, I am.

Q. What is your job title?

A. My job title is chief, emergency room.

Q. What is your trade?
A. I am a registered nurse.

Q. What are some of your duties as chief of ER?
A. I'm the supervisor to currently eighteen enlisted personnel, civilian medical personnel who work in the emergency room here at Howard Air Force Base. I am responsible for all nursing functions in the emergency room.

REC: I'm showing Major Webster's counsel what has been marked as Hearing Exhibit 45.

CIVRC: No objection.

REC: I am handing that exhibit to the witness.

Questions by recorder:

Q. Is that your CV?
A. Yes, it is.

Q. Does that accurately reflect your education and experience?
A. Yes, it does.

REC: I will retrieve that from you and provide it to the chairperson.

CC: Thank you.

Questions by recorder:

Q. How do you know Major Webster?
A. Major Webster was a physician assigned to the emergency room. We worked together.

Q. Did you work side by side with her?
A. She was my superior officer and, yes, we did work side by side.

Q. How often would you estimate the two of you were on the same shift working side by side?

A. Very variable over the period of time. I would estimate an average would be five, maybe six 12-hour shifts per month, but there would be entire months where we would be on opposite shifts and we would not work directly together at all so maybe somewhere in the neighborhood of 50 to 60 hours per month on average.

Q. Did you have any specific experiences working with Major Webster that caused you concern?
A. There's a couple of memos for record that I had written in April and May that raised some issues of concern to me and I had forwarded them to my superiors.

Q. Can you explain what was in those memoranda?
A. From memory, it would be difficult. I know I have my notes.

REC: I can provide those to you. I am showing Major Webster's counsel Hearing Exhibit 46.

CIVRC: No objection.

REC: I am providing that exhibit to the witness.

Questions by recorder:

Q. Will that help you refresh your memory?
A. Yes, it does. One of the memos for record is dated the 25th to 26th of April. And it stated four items from a shift that Major Webster worked. She worked the night shift. I had not worked the night shift with her. I worked the following day shift. But one of the items that I have on here is a problem with a dog bite report where a patient was seen by another doctor during the day and Doctor Webster had come on during the night shift and she hadn't completed some of the paperwork and felt that she didn't have to complete the paperwork, that the paperwork should be done by the physician who had seen the physician who had seen the patient earlier in the day. So I raised that to the attention of her supervisor.

Also that evening, there was an ambulance run on Fort Clayton and she wanted the--before she made a determination on the destination of the ambulance, she

wanted a rhythm strip from the patient and they didn't have that capability, and she refused to give the destination of the ambulance without the rhythm strip and, according to the shift leader, they were at an impasse. And after the shift leader explained the dispatch procedures and it was her responsibility to determine the destination of the ambulance, she authorized the ambulance to go to San Fernando.

The third case is a patient who was term pregnant, brought in by her husband, and her water had broken. And Doctor Webster recommended that the husband take the patient down to Piadilla Hospital for delivery, and the husband had refused, said that he didn't know how to get to the hospital and he wasn't comfortable driving his wife to the hospital. There was a delay in getting the patient down to that hospital while the patient waited for a commercial taxi to come and pick them up.

Q. Could that patient have taken an ambulance?
A. That would be at the discretion of the physician. Once the patient's water breaks, they are at some risk for infection. And I believe some would deem it a medical emergency, but that would be at the discretion of the physician. My concern, in this matter, is that we need to provide care to this patient. If they refuse that care, we need to find a mechanism--a suitable mechanism for them to get there.

The final entry was just a concern of mine that, after working the night shift, Doctor Webster left at 1300 the following afternoon and she was scheduled for duty again at 1800 that night. And, you know, from my recollection, there were other instances where Doctor Webster, after change of shift, had remained behind to take care of various matters, mostly pertaining to patients that she had initiated care to and, in this particular case, it was just a question of crew rest and would she be fit for duty five hours later, to return to duty.

The other memo is dated the 19th of May. This is a day shift Doctor Webster and I were working together. This regards two pediatric patients who were checked into

the emergency room and also booked appointments for later that morning in the Pediatric Clinic, and the charts were what we call put in the rack for the doctor to review and make the determination of whether they should be referred on to those appointments. At the time, there was one patient receiving treatment and two others ahead of the patients who had appointments for later in the day. Doctor Webster opted to see both of the pediatric patients and treat them and discharge them. When I asked her why she did that, she said that she didn't realize the order in which the patients had presented to the emergency room. This was after, you know, we had worked for many months in the emergency room. In my opinion, there's a number of ways to determine that. They are racked in order. Each of the forms has a log number so there is a sequential order of the charts. It would be easy to determine the order in which they had come to the emergency room. All things being considered equal, you would generally see patients in the order in which they arrive, first come, first served. Now if one person is sicker than another, of course, their care would be given priority. But it did cause a delay for the patients who were already in the emergency room ahead of these patients that were not referred to appointments later in the day. She told me that she had not looked through the charts, now being four of them at the one time, to determine the urgency of the patients. She had just grabbed one. She said that she would rather not turn anyone away. At the time, it was policy to try to utilize available appointments for non-urgent patients in the clinic. She felt that the technicians should make appointments for the patients without her involvement and do what is called triage out and directly refer patients to available appointments. But we did not have policies to allow for technicians and nurses to triage out the patients who presented seeking emergency care and were registered in the emergency room. It is the responsibility of the physician then to refer them on to an appointment.

We had a conversation obviously. At the end of that conversation, she expressed to me that she would try to refer patients to open appointments in the future. And that's the content of the memo.

REC: I will retrieve that from you. Just for the record, Hearing Exhibit 46 consists of two memoranda. One is dated 25-26 April '98. The other is dated 19 May '98. I will provide that to the chairperson.

Questions by recorder:

Q. Through your experience in working with Major Webster, would you say that she is predictable, a predictable ER provider? Did you know what to expect from Major Webster?

A. In some regards, yes, and in others, no. I guess my global concern and the content of the conversations with the squadron commander and part of the reason why I was asked to do memos for record of things that were pertinent was a feeling that the triage process wasn't working properly when she was on shift in the emergency room. I think the memo points out cases where, rather than patients being seen either first come or by the most pressing need, they were seen somewhat randomly. And that caused concern to us. It generated concern from the patients. It is fairly easy, if you are in the waiting room and you know that you checked in ahead of someone and you see someone get called first, you know, to question that. And oftentimes, there is a very valid explanation for it if the patient was sicker or they needed something or maybe their problem could be handled very quickly and you could get them in and out. So there is a number of reasons why. I wouldn't say that it is our practice to say, you know, we just randomly pick a chart or do whatever we feel. There is some semblance of order to the process that we have, and a lot of that responsibility does fall on the physician.

Q. Can you explain or describe what the ER setting would look like when Major Webster was on duty as opposed to when she was not on duty?

A. Uh--I think, you know, anecdotally or whatever, just from my recollection, that it may or may not have been any busier, but one of the things that Major Webster and I seemed to have a problem with was keeping track of charts. On one of the walls in the emergency room, we have a series of bins that are labeled. The charts

are in order of patient arrival or studies pending or in progress. And we are pretty good about being able to keep track of where people are. We did have some problems keeping track of where people's charts were. We would track them down in rooms and different things like that. Other things that were a little bit different was most of the physicians get their--when they order lab results, they will pull their lab results back out of the computer system so if the doctor had a patient and a record and ordered the lab test to be done, the chart would normally go back up into the rack "studies pending" and wait there. Thirty minutes later, forty-five minutes later or an hour later, whenever the physician felt the lab should be ready, they would check in the computer system and review their lab results. Doctor Webster seemed to prefer to have the staff print out the lab results when they were ready. I tried to do this for her and it did seem to help us work together quite a bit when I got hard copies of the lab results, found the patient's chart, assembled the chart back together and put it in the rack for her. So we did try different strategies to work better, both her and I together and the other staff with her together to improve the processes that we have. But her approach was a bit different from the other doctors, not necessarily bad, just different, which we worked with different staff from day to day and were constantly switching. I guess the ER then would look different when she was working than when she was not working. But...

Q. Was Major Webster organized when working in the ER?
A. In a comparative sense, I would say no. I think that the other--regarding where the charts were and things like that, I don't recall to the degree having to locate charts in patients' rooms or, you know, retrieve a chart from the room where the patient wasn't, that type of thing.

REC: Thanks. No further questions.

LA: I normally wouldn't do this, but I've got a question.

**EXAMINATION BY THE LEGAL ADVISOR**

Questions by the legal advisor:

Q. Was there ever an adverse outcome as a result of these missing charts? There was some confusion you stated, but was there any bona fide thing you can show this panel of an outcome that had gone awry?
A. No, not that I am aware of. And, again, my concerns were not the medical appropriateness of the treatment. It was more geared towards an awareness--a situational awareness of all the potential things that are going on in the emergency room at one time. I don't recall, because she was not aware of a patient who was there or when a chart was missing, of anyone suffering a bad outcome from that. That was never the intent of the memos that I wrote. It was more that it was risk management, you know, that if we are not aware of what is in our waiting room, what's waiting to be seen, we could be exposed to a potential bad outcome.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Major Matthews:

Q. Captain Shercliffe, you have a unique opportunity to work with different doctors.
A. Yes, I do.

Q. As well as with Major Webster. From a nursing standpoint, and you have a bachelor's, I believe in emergency nursing?
A. Yes--a master of science in nursing. My clinical focus was in emergency nursing.

Q. I think you have a unique opportunity to just, in general, kind of compare how it was with Major Webster and it was with other physicians. Was there a real large discrepancy you found between how they handled certain cases or certain patients?
A. The medical management of?

Q. Right, from a nursing standpoint. Did you notice a real large discrepancy?
A. No.

Q. No large discrepancy of how patients looked towards Major Webster as compared to other physicians?
A. I don't understand the question.

Q. In other words, their impression of her as a doctor or their attitude towards her as a physician that you noticed.
A. Anecdotally, there were some people who had seen Doctor Webster in the past and had not wanted to see her in the future. But that is not exclusive to her.

Q. Some of the other doctors had the same problem?
A. Exactly.

Q. As a whole though, did you notice--
A. Not to a significant difference. People with similar types of illnesses got similar types of lab work done, similar types of x-rays done. I'm not a physician, but from my nursing perspective, the care rendered the patient was comparable.

Q. Did you take care of any sick patients with Doctor Webster?
A. Oh, yes.

Q. And did you notice anything different or anything that seemed unusual with the way she managed that patient's care?
A. In general?

Q. Specifics, if you have them.
A. I would probably not be able to give any specifics. In general, Doctor Webster does very thorough and very detailed, very comprehensive exams of patients. And that type of examination tends to take longer periods of time than a very focused exam. I don't mean to label physicians, but in my mind, as I see them, there's people who align themselves more with the surgeons and people who align themselves more with the internists, a very systems approach, very head to toe, very comprehensive, lots of laboratory tests, very thorough in their approach to managing the patient. Some have a very focused approach. And these tend to be more of the emergency room physicians. The presenting complaint triggers a focused exam of those

body systems that figure in. That problem is handled, and that problem handled thoroughly and the patient is discharged.

Q. So her approach is different?
A. For that, yes.

Q. It wasn't really unusual?
A. No, from working in bigger emergency rooms, where there were more than one physician on staff, there would generally be a mix of these personality types and styles and doctors would take the charts suited to their specialties. Surgical or trauma patients went to the surgeons that handled the focused side of it. Medical patients went to the people with a medical background. One of the recommendations that I made to the squadron commander was that I felt she would work better in an environment with other physicians where she could have easier access to consultation, take the types of patients that her style suited best and work well in that environment. Particularly at nights, but really twenty-four hours a day in the emergency room, it is very autonomous. You are the only physician. You have to be able to, I guess, do both. And her--you know, in my opinion, her style is more geared towards the internal medicine, a very comprehensive review of the patients. Again, that led back to a process systems concern of mine that, while focusing on one patient, that could be at the expense of other people waiting to receive care who may need care, particularly if she wasn't aware and reassessing the whole present patient population to see if they needed immediate action.

Q. One last question. So your confidence in her as a physician, when you were on duty with her, was fine?
A. Yes, sir.

Q. I mean, you weren't scared for the patients when she was on duty?
A. I felt that, if she was seeing a patient in a room--

Q. Patient safety?
A. Right--and I had a patient that had a concern, that it would be difficult for me to get her--to break her free

from what she was doing to take care of this patient when, in my determination, this patient needed care either immediately or that person then could wait. Her approach to patients was more methodical than linear. She started things, worked--

Q. If you expressed your concerns about a patient, would she acknowledge those?

A. I don't have documentation--there's one instance that I do remember specifically where a person had called. Their child had taken some of their prescription medicine at home. I interrupted Doctor Webster. The person was on hold. I had instructed one of the technicians to go into our computer system and pull up the poison information on medicine. I interrupted Doctor Webster and asked her to talk to the mother on the phone to give some instructions on what they should do as far as the ingestion at home. She said to take a message and she would call the patient back. So when I left that conversation, I guess I left with the feeling that she might not have actually processed what I said, you know, that there is a child at home that had taken a lot of medicine. I felt that it needed her immediate attention, that the patient she was seeing could wait, to determine if there were any immediate home care things that needed to be done. I took the information from the computer myself. I read it to the patient over the phone. And everything leads to, you know, bring the patient to the emergency room. But certainly some ingestions you would want to induce vomiting. There are things you want to do immediately depending on the risk to the patient. And after the fact, and in closing the conversation, then I gave Doctor Webster the print-out and the information on what I had done for that patient. I believe she and I then had a conversation about the ER and not having poison control in Panama, some things we could do in the future to improve the way we manage poisonings which is all well and good. My concern, at the time, was I didn't feel comfortable that I couldn't break her away from what she was doing to handle something I identified as potentially more serious.

Questions by Major Steffen: