Q. You being the chief of ER Nursing, and basically the techs and nurses fall under you, were there concerns by techs and other nurses of similar problems, being focused on one problem and not being able to deal with the general flow of the ER?

A. Uh--yes, there were, again, systems types of issues. The memo that I had reflects things, that the shift leader from the night before had a problem with the dog bite report. When I came on duty the next day, they said, "This is a problem that I had with the physician." Or, "We had a problem with an ambulance run." That one was also in the memo, those types of things.

Q. But it was never a medical concern, it was more of a flow of an ER type things?

A. Again, yes. My ultimate recommendation, and what started the memos, was that I felt that it might be better for the emergency room and better for Doctor Webster that she practice in a different environment. Then I was tasked by, at the time, Colonel Addison, the Squadron Commander, to make notes to that regard and forward them to the Flight Commander.

**CROSS-EXAMINATION**

Questions by civilian respondent's counsel:

Q. Basically, I don't have any problem with what you said obviously. But I do have just--you were asked to do memos by the squadron commander?

A. Yes.

Q. In other words, so basically you went to your people and said, "If you see anything that Doctor Webster is doing wrong, let me know so I can put it in a memo?" Would that be accurate?

A. I had a weekly meeting with the squadron commander who was dual-hatted. She was also the chief nurse. The content of that meeting was issues pertaining to the emergency room in general and nursing issues, of course. So, in those meetings, and in addition to talking to the element chief, Doctor McCrary, and the Flight Commander, Doctor Mendez, what Colonel Addison had recommended that I do is, after many months and



523

what appeared to be a smattering of isolated incidents and really no what we felt was an improvement in the processes and flow of patients when Doctor Webster was working on shift, was--her recommendation to me was to, you know, annotate things and forward them to her superiors.

Q. And I assume you passed that on to your staff as well?
A. I asked them that, if there were items of concern, that they should direct that towards me, that if they felt it should be written as far as a memo, they could do that. And if they just wanted to pass it on to me verbally, they should do that also. Again, you know, Doctor Webster is my superior officer. This would be one of the parts of the job that I am not particularly fond of.

Q. I understand. Let me ask you this. Did this interest, on the part of the squadron commander, where she said, "You need to start documenting and making memos", did that start around the 26th of April or was it even before that?
A. Uh--I know that is the date of the first memo that I had written. I know there was a series of conversations leading up to those memos being written so I would say the interest began before that.

Q. And yet, despite this interest and despite telling the staff to, you know, look at these concerns and report them on Doctor Webster if there was a problem, there was basically two memos written, one on 17 May and one on 26 April '98, concerning the issues that you have already talked about, right?
A. I kept copies of the two that I submitted. The originals of those were submitted on or about the dates that they were written.

Q. I'm not questioning when you submitted them. I'm not even questioning the authenticity of these, all right. I just simply want to bring out the fact that, despite her being under this kind of scrutiny, during this period of time, with the staff watching everything she did, we basically end up with two memos concerning four or five items of concern, is that correct?



574

A. That I had written and kept personal copies of, yes. Now, there may have been e-mails. I periodically delete my e-mail that I have written that I don't recall the content of.

Q. That you would have given to Colonel Addison?
A. No, I normally send my e-mails to the element chief, at the time, and currently Doctor McCrary, with courtesy copies to Doctor Mendez. Now I don't know if either of them would have kept them. Those types of items and concerns would not go to Colonel Addison, other than I had a scheduled weekly meeting with her, "How's it going in the emergency room? What are the issues? What's happening?", and being brought up.

Q. Sitting here today, the only two memos you have got are these two?
A. Yes, sir, yes, sir.

CIVRC: That's all I have.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Captain Georgescu:

Q. I have one question.
A. Yes, sir.

Q. We were handed some sweeps, those customer feedback things.
A. Yes.

Q. And I was wondering, how often do you guys do those sweeps in the ER? Do you do it--I know in my clinic we do it once a quarter.
A. Once a quarter they are scheduled by the Quality office, and of course, the survey forms are out and available for the patients to fill out at any time.

Q. So they are out there available--
A. Right.

Q. --but you guys do sweeps only once--
A. Yeah. Periodically, twice a month, I check the box because if someone had a concern that needs to be

addressed, I'd feel uncomfortable calling them ninety days after the fact. So I check the box, looking just for the ones that have comments and maybe initiate some follow-up on those and then we will have what's called the sweep week where we are handing them to the patients at the end of the quarter. They all go in the box and then, when the sweep week is gone, I take all of them for that quarter and do some data analysis and forward them to the Quality office.

REC: Nothing further from the government.

CIVRC: Nothing further.

LA: Thank you for coming in. We would like to remind you though that everything discussed in this room stays in this room. If anyone were to ask you about your testimony, you are not permitted to discuss it, okay?

WIT: Very good.

(The witness left the courtroom.)

REC: The government would like to call Major James McCrary.

**MAJOR JAMES McCRARY**

was called as a witness by the prosecution, was sworn and testified as follows:.

**DIRECT EXAMINATION**

Questions by recorder:

Q. Please state your name for the record, spelling out your last name and your rank.
A. James Edward McCrary, M-c-C-r-a-r-y, Major.

Q. Do you know Major Wilma Webster?
A. Yes.

Q. If she is present, can you point to her and call her by name?
A. Wilma Webster (to whom the witness pointed).



526

REC: Please let the record reflect correct identification of Major Webster.

Questions by recorder:

Q. What do you do, Major McCrary?
A. I am the Commander of Emergency Services Flight, 24th Med Group.

Q. What are some of your duties in that position?
A. I supervise all MOD's that work in the Emergency Department. I--I write and help implement departmental policies. I supervise my nurse manager who supervises my NCOIC who supervises all my EMT's and my civilian workers.

Q. What is your educational background?
A. I graduated from the University of Texas in '95, graduated from the University of North Texas Health Science Center in '89, Osteopathic Medicine.

Q. How do you know Major Webster?
A. Major Webster was my assistant director of the department.

Q. Did you work with her?
A. Yes.

Q. How long did you work with her?
A. On the record, six months.

Q. How long did you actually work with her?
A. About four.

Q. And why was that?
A. Major Webster was out of the department for two months that I can recall.

(Court reporter indicated difficulty in hearing answer.)

WIT: She was out of the department two months of the six.

Questions by recorder:



5??

Q. During the time that you worked with Major Webster in the ER, did you have the opportunity to observe her at all?
A. Clinically, in her clinical work?

Q. In any way.
A. Of course, I observed her.

Q. What observations did you make?
A. That's kind of broad. You have to be more specific.

Q. Clinically, did you observe her?
A. No.

Q. Did you observe her administratively?
A. Yes.

Q. What kind of conclusions can you make, based on your observations?
A. At the time that I--at the time I wrote a counseling, we had a counseling--a verbal counseling session. Based on the previous information that I had, Major Webster was performing poorly in the emergency room.

Q. I'm sorry, I didn't catch the last part.
A. She was performing poorly in the emergency room.

Q. Can you expand on that?
A. There had been--most of it was generated by patient complaints, let me just say that in the beginning. And I had been directed by my supervisor, my immediate supervisor, to counsel Major Webster. He didn't give me any instructions on how to counsel her. So I chose to do a verbal counseling which is my choice for the first step in the process. We talked. We had talked before, but more informally, about some of the same issues. Some of the patient waiting times, I thought, were a little longer than should have been. It was longer than the other providers had. Some of the left without being seens, those kinds of things. We talked about that. I never had to counsel Major Webster on any clinical--any clinical, medicine type things. That's not what we counseled about.

Q. Did you ever give her a written letter of counseling?

A. No.

Q. Did you ever--was that the only time that you counseled Major Webster?
A. Yes. I wrote a letter about the counseling session which is a little different, as anybody who is a supervisor probably knows.

Q. An MFR on the counseling session?
A. Yes.

REC: I'd like to show Major Webster's counsel what has been marked as Hearing Exhibit 47.

CIVRC: No objection.

REC: I would like to provide that to the witness.

Questions by recorder:

Q. Can you please tell me what that is?
A. Yes, this is documentation of a counseling--a verbal counseling session that I had with Major Webster on November 30th.

Q. You were chief of the ER at that time?
A. Yes, at that time, we were still an element, and I had been named chief approximately twenty-five days prior to this letter.

Q. You were named how many days prior to that letter?
A. Approximately twenty-five.

Q. So you had just become her supervisor twenty-five days prior and just twenty-five days after you became her chief--
A. That's correct.

Q. --you issued her a counseling?
A. Yes.

REC: I will retrieve that document and provide it to the chairperson.



579

I would like to show Major Webster's counsel what has been marked as Hearing Exhibit 48.

CIVRC: No objection.

REC: I would like to provide that to the witness.

Questions by recorder:

Q. Can you tell me what that is, Major McCrary?
A. Somewhere in--actually, probably two days before this, because I got it out fairly quickly--in May, approximately in mid-May, I was asked by our hospital commander to gather all written information that I had on--negative--on Major Webster pertaining to her poor performance in the emergency room. And I have a file on all my providers. And this is what I had written about Major Webster. That is what this documentation is. And the final is a comment based upon this documentation by myself.

REC: I will retrieve that from you and provide it to the chairperson. For the record, it is a memorandum dated 20 May '98. It is two pages signed by Major McCrary.

Questions by recorder:

Q. You mentioned staff complaints earlier. This all started with staff complaints. Can you be a little more specific?
A. I said patient complaints.

Q. Patient complaints--
A. Right.

Q. --I'm sorry.
A. We have a survey, as probably everybody knows, the departments have surveys.

LA: Wait just one second and let them look at this.

(Board members reviewed exhibits that had been provided to them.)

LA: Go ahead.

WIT: Our customer surveys were available to outpatients in the department, and we have a box that they put the surveys in. Then, at the end of the month, the nurse manager pulls them and goes through them and will present any particular one. Mainly, we screen the ones that mention providers or staff by name. All the other ones go on somewhere else. There was a high number of patient complaints that mentioned Major Webster by name. And those are the ones that I mentioned in the document there. There were others that might have alluded to her, but I didn't--we didn't mention those. I didn't mention those in my documentation at all. But the high patient complaints basically was causing a problem for me because it was a causing a problem for the staff. Morale was down and that kind of general thing. I got complaints all the time, and I must say, all of them wasn't about Major Webster. There were other people in my department I had problems with--were having problems. But she was one of the big ones at the time, in terms of patient complaints. My supervisor, again, my immediate supervisor, asked me to do something about it.

Q. One of the problems was leaves without being seen, is that correct?

A. Indirectly, yes. Left without being seen, that's a statistic that all emergency rooms document and track. It can be important. Sometimes it is; sometimes it is not. But if it is an urgent or emergent problem, it is a problem. If not, then it is not a big problem. All emergency rooms have it, and all we do is we take the indicators and we see what our national average is, and if we are at it or below it, we say good and pat ourself on the back. If you are above it, you are concerned, but--because if something happens with one of those patients, then, you know, it is basically a big problem.

REC: I'd like to show Major Webster's counsel what has been marked as Hearing Exhibit 49.

CIVRC: There is no objection.

REC: I'd like to provide the witness with Hearing Exhibit 49.

Questions by recorder:

Q. Can you tell us what that document is, sir?
A. Okay, I was asked to compilate (sic) or recompilate (sic), actually, all the left without being seens by Doctor Webster. Actually, I gave that task to our systems chief who is Rich Abel. And these are the numbers he spit out of the computer from October to May.

Q. And those are just on Major Webster, correct?
A. Yes.

Q. I would like to retrieve Hearing Exhibit 27--I'm sorry, 26. According to your statistics, what was the total number of leaves without being seen during the month of November '97?
A. Thirteen.

Q. How about for December '97? And let me back up one second. Did she work the whole month of October?
A. No.

Q. When did she start in October?
A. I believe the 15th.

Q. Mid-month?
A. Yes.

Q. Okay, and I'm sorry, December '97, her total leaves without being seen, according to your data, is?
A. Twenty-three.

Q. What does this number tell you on Exhibit 26 for December '97?
A. It's not accurate.

Q. What does it say?
A. Five.

Q. And what was your number again?
A. Twenty-three.

Q. How about January '98?
A. Three.

Q. And what does this number say on Exhibit 26?
A. It says two.

Q. How about April and May of '98?
A. April is one; May is--

Q. Did--
A. I'm sorry.

Q. Did she work the whole month of April?
A. Again, mid-month.

Q. Mid-month?
A. Yes. Five for--May is five.

Q. May is five?
A. Uh-huh. (Affirmative)

Q. And this exhibit says?
A. Five--is it five or six? Yeah, six.

Q. Six, okay. Is that data that you have got in front of you accurate?
A. As far as I know it is. He pulled it right out of the computer.

Q. Is that computer updated with the most current information?
A. Yes, this would definitely be the most current.

REC: I will retrieve that exhibit from you and provide it to the chairperson.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Major Steffen:

Q. So Rich Abel compiled this information?
A. Yes.

Q. He is still here?

A. Oh, yeah. Nobody else could get it. I just might tell you, however, that the figures here were roughly the figures that I used to calculate in my letter. (Indicating Exhibit 26.) I didn't have these figures at that time. (Referring to Exhibit 49.)

REC: Please note that the witness was referring to Exhibit 26.

Questions by Major Steffen:

Q. So those figures on that board were consistent with the letter you had written?
A. Roughly.

Q. And these are different than what you--
A. Those are--

Q. Where did you get your statistics for that letter?
A. Out of CHCS at the time, but we pulled them ourselves and there wasn't anything--we didn't have anybody that could do it at the time, they told us. So we had--

Q. So you just had to kind of pick and choose through what you could see and now--
A. Well, what we can do or what Ryan can do, actually, is pull out all LWBS's for that month and it gives you a number and it shows who did it and who saw what. But it gives everyone all together so you have just got to count Doctor Webster's versus somebody else's. He gave me a query to give me all LWBS's for November.

Q. So this is probably the most accurate? (Referring to Exhibit 49.)
A. Yes.

LA: When you say this, you are talking about Exhibit 49?

CC: This Exhibit 49.

WIT: Right, it is done by a real computer person.

LA: Have you ever asked him in the past to conduct and pull queries out of CHCS before?

WIT: For just anything?

LA: Do you rely on that?

WIT: Yes.

LA: You have used him in the past?

WIT: Sure, Ryan does, oh, yeah.

Questions by Captain Georgescu:

Q. Did you get similar numbers for other providers?
A. Similar numbers?

Q. In other words, did you order this for other providers?
A. No, actually not. You mean, recently? No.

Q. I was just wondering if we had this to--
A. To compare to?

Q. --compare?
A. No, we don't.

Questions by Major Steffen:

Q. But he could gather that information?
A. Yes.

REC: I am going to show Major Webster's attorney what have been marked as Hearing Exhibits 50, 51 and 52.

CIVRC: At this point, I am going to object to this because this was never provided to us. I thought that was what was originally provided. (Referring to Exhibit 49.) Obviously, it is not. It is something that has been pulled up recently. We have not been given a chance to examine this information or to look at it, or tear it apart. It is not on their list.

REC: It was just provided to us, for the record.

LA: I will just clarify this. As we all understand, the rules are going to have to be a little more relaxed.

This board actually has the capability to request this, plus additional evidence. If this data could in any way assist them--he can rule. I am going to ask the chair to rule.

CIVRC: I understand that position, but I want to make it clear to the board that, when we made decisions in that, we did it based upon what the government provided us, and now at the last minute, we are suddenly being provided new information which we haven't had a chance to review.

CM (Maj Matthews): We are not assuming you lied or cheated. We are not assuming that.

CC: Right.

CM (Maj Matthews): We understand the limitation of what you had.

CIVRC: My objection still stands.

CC: Sure.

REC: I will provide Hearing Exhibits 50, 51 and 52 to the witness.

**DIRECT EXAMINATION** (CONTINUED)

Questions by recorder:

Q. Major McCrary, can you please relate to the board what those documents are and refer to them--

CIVRC: Excuse me, just for the record, I do need a ruling on my objection.

CC: It is noted, but we are going to allow the information.

CIVRC: Thank you.

Questions by recorder:

Q. Please refer to each document as it is numbered in the bottom right corner.



58c

A. Okay. The first document is 50 and it is entitled "Maryland Hospital Indicators." Do I need to explain what that is?

CC: I think everybody knows.

REC: Please press then.

WIT: What I have is two of the Maryland indicators that were pertinent to this case, and one was the percentage of leaves without being seen nationally compared to an emergency room of a size comparable to ours and, of course, a Level 3. And the mean rate was 1.3. The first three quarters were tracked, and this was something that was not even done by our department. This was done by the hospital secretary. She gave it to us. And it shows that, during the first quarter, we were at one percent which was low, which was lower than the national average. And in each other quarter, we went down from that. Just something I noticed myself, even if you use these numbers--

LA: When you say these numbers, you pointed to something. Please identify what you are talking about.

CM (Capt Georgescu): Exhibit 26?

WIT: Exhibit 26. The averages were above--Major Webster's averages were like 2.1 I think I calculated really fast in my head. So that is above the national average.

REC: Are you talking about Exhibit 27?

WIT: Twenty-seven.

REC: Okay, which was based on the numbers in 26.

WIT: Okay, the other indicator was A-2 which was another patient complaint that we got a lot. That was registration time in the emergency room. There's two categories. There's a greater than four hours and a greater than six hours. Initially, when we first started the emergency room out, we used the greater than six hour indicator, but it turned out that we were so far below--at the time, we didn't know what the

national average was, so I can't say below national average, but it was so slow we had to start tracking greater than four hours. And, again, the average greater than six hours--national average from Maryland--was 3.6. Our averages for all three quarters were below two percent. However, Major Webster's was fairly high. And this is the documentation, again, spit out by Abel as requested by me.

Questions by recorder:

Q. Can you please identify what number?
A. Fifty-one and fifty-two. Fifty-one is greater than four hours which, quite honestly, I would say we didn't track again in the first three quarters that Major Webster was here. So we really don't have any numbers to compare them to unless you ask Rich to spit it out for everyone. And also, Maryland doesn't give a percentage because four hours for an emergency room, nobody really looks at it, to be honest. But hers was eleven percent. Everybody else was lower, I don't know how much lower. But greater than six hours was 3.7 which, actually, was right around the national average. But everyone else was lower. You just--you know, you have to do that. You have to compare it to everyone else in our department.

REC: I will retrieve those from the witness and provide them to the chairperson.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Major Steffen:

Q. Doctor McCrary, on all these numbers that you just gave us, was Doctor Webster counseled on these numbers about her times?
A. Yes, that's what--if you look in that, we talked about that--

Q. But these are relatively new.
A. --but not based on those numbers. It was a perception.

Q. Perception and not actually based on physical numbers?
A. Right, exactly.

Q. And what sort of a response did you get out of that? How did she respond to that counseling?
A. (No response.)

Q. Did you see a change in her times?
A. Actually, immediately after the counseling, yes, I saw--

Q. So there were attempts made to speed up the process?
A. Yeah.

**DIRECT EXAMINATION** (CONTINUED)

Questions by recorder:

Q. Major McCrary, based on everything that you said here today, do you believe that Major Webster should practice emergency medicine?
A. That's a loaded question. That's a loaded question.

LA: What's your opinion on her ability?

WIT: It's poor for practicing emergency medicine. That's a different question than what she asked.

Questions by recorder:

Q. Why are you here testifying today?
A. I am testifying to the facts in evidence.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Major Steffen:

Q. When you say it is poor, can you expand on that? In what way is it poor?
A. I've practiced emergency medicine on and off for eight and a half years. And one thing I know about the emergency medicine physician is you have to have certain abilities. You can be lacking in some, but there are some essential abilities that you have to have. One is the ability to weed out who is sick from not sick. I mean, it is a real essential ability. And in doing so, you know, you have to have a skill of

triaging people and those kinds of skills. And you have to be able to weed out who is sick and who is not sick. And generally, that shouldn't take very long to do. I didn't, from my observation of Major Webster, I didn't see that, that skill.

Questions by Major Matthews:

Q. Were you doing one hundred percent chart reviews back then?
A. (No response.)

Q. On Major Webster, were you doing one hundred percent chart reviews?
A. No.

Q. Fifty, eighty percent?
A. The initial time--part of this is it is a new department, new head that they took a while to decide who.

Q. Let me go back a little bit. We have in emergency medicine, as you know, kind of the 24, 48, 72 hour returns, the ones that bounce back?
A. Right.

Q. Did you notice there was a larger percentage of those, in general, when you were working from Major Webster or did you notice a trend?
A. There was a slightly higher--and again, we weren't tracking it--but there seemed to be a higher return of patients that were seeing--

Q. Of those patients that came back, was there a real discrepancy in those among diagnosis and treatment plan, or was the charting just totally off, anything really unusual?
A. No.

Q. Did she manage any patients in the department that you knew were sick that you reviewed the chart, an interesting case or something that called your attention to it?
A. Let me just be clear on what I am saying here, okay. I haven't said anything about Major Webster's clinical



590

management of patients. From all I have seen, that has been good. We are talking about other things.

Q. So of the sick patients, you didn't notice a dangerous--or anything that you felt--
A. No.

Q. --that she could harm patients?
A. Other than the time spent waiting for consults and that kind of stuff which can factor in after a while.

Q. But what we hear a lot of--see if you agree with this. She had some difficulty with multi-tasking and maybe got stressed out when she had too much workload. Would that be your assessment, being the chairman of the department and her supervisor?
A. I would say she had difficulty managing a lot of cases at once, it seemed from the feedback I got from my staff. Again, I didn't supervise her directly. We don't work the same shift. But from the feedback I got from my nurse manager who was there a lot and my staff, there seemed to be that problem, yes.

**DIRECT EXAMINATION** (CONTINUED)

Questions by recorder:

Q. One final question. Would you want to have Major Webster back in the ER?
A. No.

REC: Thanks, no further questions.

**CROSS-EXAMINATION**

Questions by civilian respondent's counsel:

Q. Doctor McCrary, let's start first with Exhibit 39. (Retrieved exhibit from board members.) I have Exhibits 47, 48 and Exhibit 39. Would it be correct to say, Doctor McCrary, that there has been a little bit of friction between you and Doctor Webster from the very beginning?
A. Right now, I am thinking in scientific terms. You have to have--

Q. No, I am not talking about scientific terms. I am talking about working relationships.
A. For friction, you need two surfaces. I would say, no, there wasn't any friction on my side.

Q. Okay, but there was with regards to Doctor Webster, right?
A. Yes.

Q. Now, as I understand your testimony here today, as far as you don't have any examples to bring before the board of any patient that was mistreated by Doctor Webster, correct?
A. That's correct.

Q. As a matter of fact, you called Doctor Webster before this hearing and told her you didn't want to come and testify, didn't you?
A. That's true.

Q. And you also told her that the only reason you did Exhibit 48 was because you had been directed to do it, right?
A. That's true.

Q. Let's go a little bit--look at these things just a little bit more, and if I jump around, please forgive me. But right now, in evidence, I think we have, based upon the testimony we had from Doctor Mendez, four complaints from the emergency room that are in evidence, okay.
A. Okay.

Q. You had documented--are all of these from the emergency room or do some of them cover her time in primary care?
A. No, these are all from our records in ER.

Q. So we have got one on 14 October, one on 27 October, one of 11 November, one on 12 November, another one--no, that--we will get to number five in a minute, and then we've got--because these aren't all patient complaints that you have listed here, are they?
A. Right.