Q. So there's four there, five, looks like five complaints from the ER, is that right?
A. Really, four.

Q. So there are four, so we have got the four here. And that's the string of complaints you are talking about from patients?
A. That's the string of written complaints from emergency medicine that mention Major Webster by name.

Q. Okay, and of course, the problem I have is that, as you know, my client is here and they are talking about taking her credentials away, not just practicing in the ER, but practicing anywhere, okay?
A. Uh-huh. (Affirmative)

Q. So I need to know specifics. And when you talk in generalities, it makes it very difficult, for example, for me to defend. I mean, I understand people have opinions. I once was told that opinions are like something else and everybody has one. But at any rate, that's my problem with your testimony, all right? For example, let's look at number five here where it says, "Lieutenant Colonel Robbins places memo in PAF noting non-compliance with standing documentation on downtown consults."
A. Right.

Q. Is that--was that a major issue?
A. No, sir.

Q. He does that on everybody, doesn't he?
A. Yes.

CIVRC: As a matter of fact, let's go ahead and what's the next exhibit?

LA: You are at 53.

CIVRC: Fifty-three, thank you.

Questions by civilian respondent's counsel:

Q. As a matter of fact, let me show you Exhibit 53, which is an e-mail that Doctor Webster--that's the wrong one,

sorry. (Looking through documents.) Give me just a second. Let me show you Exhibit 53, which is basically a letter from Doctor Robbins pretty much confirming what you said, that he noted the problem once and thereafter, she was in compliance. Do you have any dispute with that?

A. No.

CIVRC: Move for the admission of 53.

REC: No objection.

Questions by civilian respondent's counsel:

Q. Does it boil down to the fact that, while Doctor Webster's care of patients is appropriate, that she just takes too long? Would that be a fair assessment?

A. Yeah.

REC: I just have a couple of brief questions.

**REDIRECT EXAMINATION**

Questions by recorder:

Q. Major McCrary, why didn't you want to testify here today?

A. I hate testifying in court, number one.

Q. Is that the one reason, you hate to testify? You get nervous?

A. I don't get nervous. I just--do you want me to really explain it?

Q. You just hate to testify?

A. I don't--I don't think it is, a lot of times, the best for you or the proper way to do things. There's other venues that should be taken sometimes. And, from what I've seen, and I've only been in court one other time and it happened to be here and it happened to be as an expert witness on a murder case, actually attempted murder case, and I didn't want to do that, but you know, you have an obligation to do it. But a lot of times, what I saw in that happen was a direction of the

truth and that's basically why and I don't necessarily agree with what's going on right now.

CM (Maj Matthews): What do you mean, you don't agree?

WIT: You've been in the military long enough to know, you know, there's a certain way of doing things. I mean, how do you jump from a verbal counseling to taking away somebody's credentials?

CM (Maj Matthews): So you feel that they shouldn't have taken away her credentials?

WIT: I don't have any comment on that. That is way beyond me. That is what I have been trying to tell Major Webster the whole time we have been together. A lot of these decisions were way beyond me. I just have to implement them sometimes. But this is not one I am implementing.

Questions by recorder:

Q. Are you here today to protect the patient?
A. I am here today to testify to facts in evidence.

Q. As I recall, during one of our conversations, you indicated to me that she was afraid she was going to kill someone. Do you have any comment on that? Or words to that effect. I don't remember the exact wording. You were afraid she was going to kill someone or someone was going to die or words to that effect?
A. What are you asking?

Q. I'm just trying to get your comments.
A. I gave you my comments.

Q. So you feel like someone will die basically if she is returned to the ER? Something is going to happen?
A. That's not a simple question to answer. It really isn't. I've indicated that Major Webster had poor performance in the emergency room. Anything else I may have said is not on record. It is not anything I have indicated, okay. People say a lot of things from feelings, and I'm not willing to go on record saying that.



595

Q. But you do agree that you don't want her back in your ER?
A. With her past performance, no.

REC: No further questions.

**RECROSS-EXAMINATION**

Questions by civilian respondent's counsel:

Q. My apologies, and I want to thank you for your honesty, but I want to ask you something here, and this has nothing to do with you, all right, but it has to do with some kind of statistical analysis here. In the letter--did you ever see the letter that Colonel Addison wrote back in response to a complaint that Doctor Webster filed against you?
A. Uh--if I could see it?

CIVRC: Sure, I will be happy to. And for the record--

REC: If I could see what you are referring to?

CIVRC: --it is the first attachment to Exhibit 39. It is a memorandum for Colonel Terrence J. O'Neil from Lieutenant Colonel Martha Addison, dated 23 June 1998.

Questions by civilian respondent's counsel:

Q. Have you ever seen that?
A. (Reading exhibit.)

Q. I'll tell you what, take your time to read it because I do want to ask you some questions.

CIVRC: Permission to excuse Doctor Webster for a second.

CC: Yes.

CIVRC: We can stay on the record.

WIT: No, I've never seen this.

LA: While she is gone, we are in recess.

(The hearing recessed from 0852 hours to 0855 hours, 18 February 1999.)

REC: Just for the record, I don't know where he is going, but I don't see the relevance in that yet.

CIVRC: You will.

REC: Note it for the record.

LA: So that this would help the panel, are we admitting a new exhibit?

CIVRC: No, it is already in evidence.

CM (Capt Georgescu): One of the attachments of 39.

LA: All right.

WIT: (Reviewing exhibit.) I didn't know a lot of this stuff.

Questions by civilian respondent's counsel:

Q. Do you agree with Doctor Addison's assessment of your emergency room in that?
A. Colonel Addison.

Q. Colonel Addison, I'm sorry, you're right. She's a nurse. Do you agree with that assessment that she has put in here?
A. Do I agree with this?

Q. Yes.
A. I mean, there are like seven or eight different things there.

Q. I understand. What about disorganization?
A. Was there disorganization? Of course.

Q. And the one thing I want to bring out, and I'm going to tell everybody why I am doing this. Yesterday we had testimony from Doctor Mendez that fifty percent of the

complaints from the ER were generated on Doctor Webster, all right?
A. Uh-huh. (Affirmative)

Q. And in this letter, they say you have got a couple of complaints yourself? I don't care what the complaints are. They are not relevant to anything here, but have you gotten some complaints?
A. Not any written complaints that I know of.

Q. So when she mentions this, you don't know anything about it?
A. No.

Q. If you got a couple, that would make you--
A. Fifty percent of hers.

Q. Fifty percent of hers.
A. There's a lot of stuff in there that I don't agree with, and I can point it out, if you want.

Q. Sure, go ahead. Well, that's all right. I don't think it is relevant for Major Webster, okay. I thought, since there was something in here on you, you had a right to review it and take a look at it. Let me ask you something else. You are a busy emergency room, aren't you?
A. Relatively, not any more.

Q. When Doctor Webster was there, were you a busy emergency room?
A. Yes, we were a lot more busy.

Q. And thinly staffed?
A. Yes.

Q. So I assume that you never had the luxury of being able to put her with another emergency room provider for any extended period of time to help her, perhaps, adopt better methods for seeing patients quickly?
A. Well, we did have Doctor Li in the beginning. She did work with us.

Q. For how long?
A. Probably the first three months.

Q. She worked with Doctor Webster on the same shift, they worked together side by side, because I have got Doctor Li coming in to testify?
A. Yeah, she did a cross-shift, a--we call--Doctor Li didn't have her license, but yet, she was tasked as an emergency room provider. So the only way they could work is that she had a licensed physician working with her.

Q. So basically in that situation, you had Doctor Webster more or less supervising her?
A. Oh, yeah, she was the assistant.

Q. I understand, but what I am asking is this. You didn't have the luxury, for example, when these statistics starting going up and started to be a concern, you didn't have anybody, for example, to work with Doctor Webster in the emergency room and see if you could suggest things to her that might speed things up, did you?
A. No.

Q. And that was never tried, was it?
A. No, it was actually never thought of because this is a person that's been director of two emergency rooms before she got here.

Q. I understand.
A. You know, you wouldn't think you would need to do that.

Q. But don't you think, for example, since, in your opinion, she renders good medical care, as far as you can tell, that that provider perhaps, because of the uniqueness of this emergency room, might, for example, have benefited from someone to kind of tutor her a little bit?
A. No, no, not with her experience.

Q. And so, basically, you don't think there is any way that she could change her practice in any way to speed up seeing patients?
A. (No response.)

Q. You don't know?

A. No.

Q. Okay, and that's fair. But in the past, when you have talked to her about things, she at least has been receptive and tried to do what you told her to do?

A. The statistics following the counseling session showed that.

CIVRC: Thank you. That's all I have.

REC: Nothing further.

LA: Doctor McCrary, thank you for joining us. We certainly appreciate your candor. When you leave this facility, we want you to know that we are under Quality Assurance rules. Title 10, Section 1102, as you are familiar with it, applies, and you are not to discuss your testimony or any of the questions that went on in this room with anyone, okay?

WIT: Okay.

LA: Thank you.

(The witness left the room.)

CC: Do you have anybody else?

REC: The government has no further witnesses. However, at this time, we would like to just offer some additional documentary evidence.

The government has Major Webster's Provider Activity Folder, as well as her Credentials File, that we would like to put into evidence at this time.

CC: After these are put in, we are going to take a break. Then we will come back.

CIVRC: That's fine. We do have one thing to raise before we take a break.

CC: Okay.

LA: I want to make sure, because if that is the original, the original is staying with the facility. We are going to have a copy made of this.

REC: These are both copies.

CIVRC: They are going to be what number?

REC: I will mark the Provider Activity File as--

LA: Fifty-four.

REC: --as 54 and her Credentials File as 55.

Major Webster's medical records are forthcoming. The hospital has yet to deliver those, so the government would just request, once they do arrive, that they be allowed to be put into evidence as well.

CIVRC: And, again, the--

REC: I will provide the chairperson with these.

CIVRC: Again, the objection is that her medical records are not relevant to this hearing in any way, shape or form.

CC: Well, for the carpal tunnel and those sorts of things, we think they are.

CIVRC: All right, for the carpal tunnel.

CC: So your objection is noted, and we are going to just look at that.

LA: If we can though, there is no sense in cluttering this up with dental record and annual exams, if we can make it focused, because we need not expand this record beyond what is relevant.

CIVRC: I'm sure a narrative was written and an op report, and I would hope that those would be sufficient.

CM (Maj Matthews): I would be interested in seeing prior to when she first made it known and the carpal tunnel was diagnosed.



60

CIVRC: It was diagnosed prior. As a matter of fact, she was scheduled for surgery--

CM (Maj Matthews): We would like to see that.

CIVRC: That's fine. We have no objection to that.

CM (Maj Matthews): In addition, we have heard mention of a 1993 MEB.

CIVRC: I don't know where that is. I have never seen that.

CM (Maj Matthews): It would be in her medical records.

CIVRC: If it's there, fine.

CM (Maj Matthews): So we would like to see that.

CIVRC: Again, I am going to object to that on the basis that that issue goes to the physical evaluation board which has already considered all of those items and ruled.

CC: You had comments, you said?

CIVRC: The only thing I have, Mr. Chairman, is that I had been told this morning that Doctor or Major Angeloro will not be available.

(Respondent and counsel conferred.)

CIVRC: He is out there? Why don't we, before we break, why don't we bring him in? He's only going to take, I would say, five minutes tops.

CC: Fine.

**MAJOR MICHAEL B. ANGELORO**

was called as a witness for the respondent, was sworn and testified as follows:

Questions by recorder:

Q. Can you please state your rank and your name for the record and spell out your last name?
A. Major Michael B. Angeloro, A-n-g-e-l-o-r-o.

Q. Do you know Major Webster?
A. Yes, I do.

Q. If she is present, can you point to her and call her by name?
A. Major Webster (to whom he pointed).

REC: Please note for the record correct identification of Major Webster.

**DIRECT EXAMINATION**

Questions by civilian respondent's counsel:

Q. I've always had this problem with nurse anesthetists, I keep wanting to call them doctor. So please, if I slip into that don't be offended (addressing witness) and don't be offended (addressing members). Major, from the records we have been provided, it is my understanding that you were the one that checked out Major Webster on her intubation skills, is that correct?
A. That's correct.

Q. First of all, I'm going to suggest to you that the evidence is going to show in this case that, when she was initially tested on intubation skills, she was not provided a stylet. Do you always intubate with a stylet?
A. I do not always intubate with a stylet.

Q. Is it customary though to use one?
A. If the person doesn't do them regularly, and they feel they need a stylet, it's another tool for intubating that should be available.

Q. So, if someone has difficulty intubating without a stylet, that does not necessarily mean that they are not competent to do airway management?



603

A. If I had difficulty trying to intubate somebody and I didn't have a stylet, I would take the stylet and put it in the tube.

Q. Now the next thing is, that she came up, and it is my understanding that basically you had her do two intubations and her airway management was competent on each time, is that correct?
A. Yes, it was.

Q. You only had her do two?
A. That's all I felt was really necessary, and I had asked the person who had asked me to evaluate if they wanted me to do any more and they felt that was fine, send them a memo, and I did.

Q. So can I take from your testimony then that you feel, at least from what you observed, that she is competent to intubate a patient?
A. At the time I observed her, she was competent to intubate patients.

Q. And that was after the death of that active duty Army person, or maybe you don't even know about that?
A. I believe so, I'm not real sure.

CIVRC: That's all I have, thank you.

**CROSS-EXAMINATION**

Questions by recorder:

Q. Just briefly, sir--
A. Yes?

Q. Are you aware that we are here today to decide whether Major Webster's credentials should be taken away?
A. I have heard that. I wasn't told that personally by anybody.

Q. Are you aware of any of the facts and circumstances surrounding Major Webster and her ability to practice medicine?
A. No, I am not, not at all.

REC: Thank you very much.

LA: We certainly appreciate having you come here. As we tell all the witnesses, what you have discussed here is very important to this doctor, and it is covered by the Quality Assurance process for the Air Force. For that reason, you are not to discuss your testimony or any of the questions brought to your attention ever unless directed to do so by higher authority, okay?

WIT: Uh-huh, understood.

CIVRC: I also know that out there waiting is a surgeon. Again, I think his testimony will take about the same amount of time.

LA: Let's do him next.

(The witness left the room.)

**MAJOR DAVID COPP**

was called as a witness by the respondent, was sworn and testified as follows:

Questions by assistant recorder:

Q. Would you state your name and rank for the record?
A. David Copp, Major.

**DIRECT EXAMINATION**

Questions by civilian respondent's counsel:

Q. Doctor Copp, what do you do here at the facility, just for the record?
A. I'm a general surgeon.

Q. In the time that Doctor Webster was assigned to the ER, did you have occasion to interact with her?
A. Yes, when she had consults for me from the emergency room.



60r

Q. When you were called on consults by Doctor Webster, did you find that the work-ups on the patients were appropriate?
A. Yes, when I got there, there were occasional things missing, but for the most part, all her work-ups were.

Q. Comparing her to the other ER providers--
A. Not much--

Q. --no better, no worse?
A. --difference.

Q. From anything that you saw, did you have any question about her competency to practice medicine?
A. No, nothing from what I saw.

CIVRC: That's all I have, thank you.

**CROSS-EXAMINATION**

Questions by assistant recorder:

Q. Major Copp, did you ever have an opportunity to observe Major Webster working in the ER?
A. Only from work-ups that she gave me. I never really observed what she was doing until when I got there.

Q. You said there were some things missing in consults. What type of things were those?
A. Well, it's just when, maybe during abdominal pain, which was the usual thing I get called for around here, she may have not gotten x-rays or not gotten specific labs that sometimes I would have gotten. But I--it's not something that I would expect every doctor to always get either.

Q. Are you aware that the purpose of this hearing today is to evaluate whether Major Webster will be able to retain her privileges to practice here?
A. Yes.

Q. Are you aware of all the details surrounding this hearing?
A. Most of them, at least I think, I'm not sure.

Q. Regarding the details, are you aware of details that happened specifically within the ER with Major Webster?
A. Uh--not really.

AREC: No further questions.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Captain Georgescu:

Q. The only question I have is, have you seen, in your clinic or your experience, any patients that have seen Doctor Webster in the ER and she might have missed something or, you know, they might have caught it later on or anything like that?
A. No, I haven't had any problems like that.

CM (Capt Georgescu): All right.

LA: Thank you, Doctor Copp. You have been very helpful and patient. We certainly appreciate it. It is a very important matter. We would remind you though, as all the witnesses, that you are not to discuss your testimony or any questions posed to you, unless directed to do so by higher authority, and I don't think that is going to happen. So if it does, you can, but otherwise everything is sensitive and protected under Quality Assurance.

WIT: Okay.

(The witness left the room.)

CC: Let's take about a fifteen minute break. We will start back at 9:30.

(The hearing recessed from 0912 hours to 0922 hours, 18 February 1999.)

LA: We are back on the record.

**CAPTAIN MARK P. WESTRICK**

was called as a witness for the respondent, was sworn and testified as follows:

Questions by recorder:

Q. Can you please state your rank and your name for the record, and spell out your last name?
A. Yes, ma'am. Captain Mark P. Westrick, W-e-s-t-r-i-c-k.

**DIRECT EXAMINATION**

Questions by civilian respondent's counsel:

Q. Everybody has been asking this, I don't know why, but you know Doctor Webster, don't you?
A. That is correct.

Q. Can you identify her?
A. She is sitting to my right.

Q. Thank you. Would you tell us what your duties and responsibilities are here at the hospital?
A. Yes, I have two responsibilities. My primary responsibility is Director of the Clinical Laboratory. I am responsible for overseeing all laboratory operations for the 24th Med Group here at Howard and over at Clayton. I also serve as the 24th Medical Readiness Officer.

Q. In your position as the lab officer, have you had the occasion to review providers' requests for lab data?
A. Yes, I do a review every day of all lab studies that have been reported out and, of course, if anything unusual is ordered, it is brought to my attention, either by my staff or by the provider, depending on the situation and the circumstances.

Q. Would that include Doctor Webster, during the time that she has been here?
A. Yes, it would.

Q. And, in your review of her lab work, have you found anything out of the ordinary or questionable in any way?
A. No, sir.

Q. You also know her socially?

A. Yes, there's been a few times we have had dinner together with friends.

Q. Has she ever done anything inappropriate, as far as you are concerned?
A. No, sir.

Q. She hasn't said anything crazy to you like she was going to shoot you or anything like that?
A. No, sir.

Q. From what you have seen in the lab work, have you seen any indication that Doctor Webster is not a competent physician?
A. From the lab work that she has ordered, there is nothing that would lead me to believe that she is anything but a competent physician.

CIVRC: Thank you very much. Your witness.

**CROSS-EXAMINATION**

Questions by recorder:

Q. Just a few questions. Are you aware that we are here today to determine whether or not Major Webster's credentials should be taken away?
A. I am aware of that fact, yes, ma'am.

Q. Are you aware of any of the specific facts and circumstances surrounding this case?
A. A few facts, yes.

Q. Is it possible to determine whether or not a doctor is a competent provider by looking at their requests for lab work?
A. That would be one facet of the bigger picture.

REC: Thank you, no further questions.

LA: Captain Westrick, we certainly appreciate your flexibility coming over here. It looks like you are done. We would remind you though that you are not to discuss your testimony or any of the questions posed to you during this hearing, okay?

WIT: I understand.

LA: Everything is still Quality Assurance and as sensitive as anything else you deal with, so you are not to discuss it.

WIT: Not a problem.

LA: Thank you very much.

WIT: Thank you, sir.

(The witness left the room.)

**DOCTOR BYRON EFTHIMIADIS**

was called as a witness by the respondent, was sworn and testified as follows:

Questions by assistant recorder:

Q. Would you state your name for the record?
A. Byron Efthimiadis.

Q. Would you spell your last name, please?
A. E-f-t-h-i-m-i-a-d-i-s.

**DIRECT EXAMINATION**

Questions by civilian respondent's counsel:

Q. Doctor, how are you currently employed here at the hospital?
A. I am the Health Promotion Coordinator.

Q. Are you currently Doctor Webster's supervisor?
A. Yes.

Q. Before talking about that, it is my understanding you also have a specialty in Pediatrics?
A. Correct.

Q. It is my understanding that you can recall at least one occasion where you were called by Doctor Webster on a patient of hers?
A. Correct.

Q. Will you tell the board about that?
A. I don't remember the dates exactly--

Q. That's fine.
A. --but it was a time frame in 1997, I think. It was October or about that time. I was on call that night, and I got a call from Major Webster in regards to a child that came in and she suspected the baby to be diabetic, a juvenile diabetic. And she called me and I came and, indeed, the baby was diabetic. And we started establishing treatment and she was helping me, you know, with treatment.

REC: I'm sorry, can you speak up? I can't hear a word you were saying.

WIT: I'm sorry.

REC: Can you speak up, please, I can't hear you.

WIT: Yes. What I was saying is that I was on call that night and I got a call from Major Webster in regards to an infant that came in and she suspected to be a diabetic infant and she asked me to come over to check the baby and I did. And, indeed, the baby was a diabetic and we had to establish treatment and she helped me with that.

Questions by civilian respondent's counsel:

Q. And that's the only incident you can remember, correct?
A. That's correct, that's correct.

Q. From that one incident, did you see any indication that she was not a competent physician?
A. Not--not to my knowledge.

Q. Were you pleased with the work-up she had done for you?
A. Oh, yes, she was very helpful, yeah.

Q. Now, you are currently her boss, right?
A. That's correct.

Q. How has she been performing in her duties for you?
A. Well, in spite of all the interruptions that she has been through, she has been doing very well.

Q. Doctor, if this board chooses not to revoke her credentials, would you like her back?
A. Yes.

Q. Do you think she is that good?
A. Yes, we need the help.

CIVRC: Pass the witness.

**CROSS-EXAMINATION**

Questions by assistant recorder:

Q. Doctor, I'm sorry if I mispronounce your last name. Can you say it again?
A. Efthimiadis, but you can call me Byron.

Q. Okay, sir. Now, let me make sure, you work in the Health and Wellness Center, is that right?
A. That's correct.

Q. Now, the Health and Wellness Center, that isn't a high stress environment, is it?
A. I'm sorry, what's the question?

Q. It is not a high stress environment, is it?
A. Well, it is not a high stress, but there is stress. I mean, there are deadlines to be met.

Q. But it is not high stress dealing with caring for patients at the Health and Wellness Center?
A. No.

Q. And you haven't seen Major Webster care for patients in the emergency room, have you?
A. Well, I have seen her when--the night that I was called, that night.



612