Q. And that was in the emergency room?
A. That's correct.

Q. And it was just that one occasion, right?
A. That's correct.

Q. And that was in 1997, right?
A. That's correct.

Q. You haven't seen her practice in the family practice clinic, have you?
A. No.

AREC: No further questions.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Captain Georgescu:

Q. The only question I have, did she ever express any kind of--any kind of--did you see her stressed out while she was working at the Wellness Center?
A. Stressed out? The only time she was stressed out was when she was involved with her problem, you know, the investigation.

Q. Did she verbalize to you, at the time, that she wasn't pleased working at the Wellness Center?
A. No.

Questions by Major Matthews:

Q. Does she see patients at the Wellness Center?
A. Well, our contact with patients is--you know, we do screening, blood pressure, cholesterol, you know. Yes, she does, I mean she has to interpret the findings.

Q. How many patients does she see a day?
A. Well, it varies anywhere from maybe--well, when we go to health fairs, we see a lot.

Q. How about the average though on a daily work day?
A. I would say about two to three a day.



613

LA: Apparently, that is all, Doctor. We certainly appreciate your attending here and we remind you that everything that was spoken in this hearing, including your own testimony, is privileged, and you are not to discuss it with anyone, okay?

WIT: Sure.

LA: Thank you very much.

WIT: Thank you.

(The witness left the room.)

**CAPTAIN RANDALL LANGSTEN**

was called as a witness by the respondent, was sworn and testified as follows:

Questions by recorder:

Q. Can you please state your rank and your name for the record, and spell out your last name?
A. Captain Randall Langsten, L-a-n-g-s-t-e-n.

REC: Thank you, your witness.

**DIRECT EXAMINATION**

Questions by civilian defense counsel:

Q. Would you please tell us, Captain, what your duties and responsibilities are here at the hospital?
A. My official title is Commander of the Public Health Flight. I oversee the Public Health. We are involved in a number of areas, Occupational Health, Communicable Disease Prevention and Control, Occupational Health. We also do the Food and Facility Sanitation Inspection. I also have some responsibilities over the Immunization Clinic.

Q. I showed you--we had a Mrs. Thomas come in and testify, and I think, when you and I met, I showed you her complaint, correct?
A. Correct.

Q. With regards to the way she was handled, from the standpoint of the bite by the cat, did you see anything unusual about that that gave you concern?
A. No, I didn't see anything unusual.

Q. With regards to the forms that have to be filled out when there is a dog bite, I think you told me they are pretty antiquated, aren't they?
A. Yeah, it is a very old form. It is a Department of Defense Form that was developed by the Army, and there's a lot of problems with it.

Q. And you also told me that it is not an unusual occurrence for you to have to call an ER provider and ask for additional information, is that correct?
A. Correct.

Q. And there, again, that's because of the antiquated form?
A. Yeah.

Q. And with regards to Doctor Webster, can you remember whether she was any worse or any better than anybody else when it came to these items?
A. No, like I told you earlier, I only remember ever calling once and I don't really remember any of the specifics of the case. I can't even--you know, I see over a hundred of them a year and, you know, without going back and looking up a specific case, it really doesn't stand out.

Q. Have you worked with Doctor Webster since she has come to the Health and Wellness Center?
A. Yes, I have been involved with her where she has written a number of articles and come up and bounced ideas off--off of us, come up with drafts of articles and asked if there was anything--especially there was one on food safety and one on sexually transmitted diseases which are areas that we oversee too. She came up and I gave her some ideas, some additional ideas for the--

Q. In the time--excuse me--
A. --article.



615

Q. --I'm sorry, were you finished?
A. Yeah.

Q. In the time that you worked with her, did you ever observe her do anything inappropriate or give you any pause for concern?
A. No.

Q. If you had to be treated, would you have any concern about being treated by Doctor Webster?
A. No.

Q. Would you allow your family to be treated by her?
A. (Indicated affirmative response.)

CIVRC: Thank you, that's all I have.

**CROSS-EXAMINATION**

Questions by recorder:

Q. Captain Langsten, were you present when Major Webster treated Ms. Thomas for this cat bite?
A. No.

Q. So you are not aware of the fact that she handed her a bottle of medication and realized, when the patient told her--asked her a question about that medication--that she had given her the wrong medication? Are you aware of that?
A. No--well, I had read the statement on Tuesday.

Q. Okay.
A. That's the extent of my knowledge of it.

Q. Okay, so you weren't aware of the fact that the patient asked her, "Don't I need a tetanus shot?", and Major Webster replied, "Oh, yeah"? Were you aware of that?
A. No.

Q. And that Major Webster forgot she had talked about the tetanus shot three minutes after Ms. Thomas asked her if she needed a tetanus shot?
A. What is the question? Was I aware of that? No.

Q. Have you ever witnessed Major Webster work in the ER?
A. No.

Q. Have you ever witnessed her working in primary care?
A. No.

REC: I have no further questions.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Major Matthews:

Q. I've got a question. There's a rabies board on this base?
A. Correct.

Q. And you are in charge of that?
A. Uh--

Q. Let's put it another way. Are the forms that come through the Public Health office regarding rabies exposure, potential exposure, you review all of those?
A. Yes.

Q. In general--well, let's not try generally, but when the forms come in and you see a stray cat written down as the offending agent or the animal involved, does normally--is rabies vaccination already started in the emergency department, or do you find that you have to initiate the treatments?
A. Ideally, what should happen is that, before the treatment is started they call the RAC which consists of--the Rabies Advisory Council--which consists of the treating physician, myself and one of the flight surgeons.

Q. And how often does that occur?
A. It just depends on--we have tried to improve the process. Now--

Q. How often does it occur?
A. I'd say--

Q. How many times on one hand? Go ahead.



609

A. Do you want a percentage or a number?

Q. No, how many times has it occurred? Can you count them?
A. (No response.)

CC: Less than ten, less then five?

WIT: I can't--

Questions by Major Matthews:

Q. So more than you can count on a few fingers?
A. Oh, yeah.

Q. Okay, but normally do you see that they convene this board in the emergency department, or do they initiate treatment or do they defer to you to determine if they initiate treatment?
A. A lot of times they will defer to us or the veterinary clinic asking about the availability of--there is a number--a matrix that we use to determine whether prophylaxis is needed to be started or not and often, if it is a clear cut case, a stray animal, they are not able to get a hold of the animal, a lot of times they will go ahead and start.

Q. But it is not one hundred percent? Sometimes people don't start it right away, sometimes they do?
A. Right, sometimes they do.

Q. If you see stray cat on the form and they can't find the animal--
A. Right, or they may hold off on it. If they say, "We know we can get this animal in quarantine", then a lot of times I will get it the next morning, review it, talk to one of the flight surgeons about it. Then we come to a decision on it.

Questions by Major Steffen:

Q. That matrix information is in the ER, available--
A. Yeah, there is a--

Q. Clear cut, they know what number to reach and who to call?
A. Right.

LA: Captain Langsten, that appears that is all the questions to be posed to you. You are free to depart, but I want you to know that everything we have discussed, including your testimony you have provided to us, is protected under Quality Assurance. So you are not free to discuss it, okay?

WIT: Okay.

(The witness left the room.)

**CAPTAIN STEVEN G. CUSACK**

was called as a witness by the respondent, was sworn and testified as follows:

Questions by the assistant recorder:

Q. For the record, would you state your name, spelling your last name, please?
A. Steven G. Cusack. My last name is C-u-s-a-c-k.

**DIRECT EXAMINATION**

Questions by civilian respondent's counsel:

Q. Captain Cusack, would you please tell this board what your position and responsibilities are here at the hospital?
A. I am the chief of Pharmacy for Clayton and Howard, both sides.

Q. First of all, with regards to Doctor Webster, it is my understanding that you have worked with her as well as you have even been her patient?
A. Yes.

Q. In your interactions with her, how has she impressed you with regards to your facet, that is, pharmacy?
A. As a pharmacist, one of the things she did that was good was she would maximize what she would do. In

other words, she would do what was the protocol in care and guidance. Take for example, a cold. If somebody had a cold, they would come in and say they had a cold. She wouldn't routinely give them antibiotics unless she actually thought they needed them because, logically, you know, doctors say antibiotics aren't really necessary in a cold unless somebody has an infection. She would do that routinely so that you would know she was at least paying attention to what she was doing. Other things, she would always start on the lower cost, more efficient medicine first and work your way up, by giving it ample time. She wouldn't go to the big guns first which was good. From my standpoint, she was always good to have because you know, when you ended up on one of the higher cost drugs, she started at the lower cost drugs first. She would wear out the other options.

Q. How was her knowledge of pharmacology?
A. Very good, obviously, to be able to do that step by step.

Q. Did you ever--how did you find her as far as her keeping up with the latest pharmaceutical information?
A. She did very well routinely because she was on the P&T. She knew most of the new items that were discussed and would be able to carry on conversations and stay current. In other words, she would know what they were talking about with the newest drugs.

Q. Was that because she was a member or because of the reading she had done, from what you had observed?
A. Obviously, because of her reading. It was not because of the membership. It was because of the reading she had done.

Q. There is one incident involved, and you and I have already talked about this incident, and you are aware of the fact where she gave--
A. Benadryl for Tylenol.

Q. Benadryl for Tylenol, right?
A. Yeah, they are--as you can see by the bottles--

CIVRC: Let me hand you these two bottles. I don't know whether we need to mark them as exhibits or not, probably not.

LA: If they are demonstrative aids, no.

WIT: Matt probably knows it from the ER, but this is just standard issue. We got rid of one. We got rid of this and switched to another manufacturer because it happened too often. They look identical.

Questions by civilian respondent's counsel:

Q. So this was not an unusual occurrence?
A. No, she's not the only one to do it, unfortunately, so we had to take it off. We just use this inside the hospital and we try to keep another one in the MOD cabinet.

LA: The item in your right hand is identified as what?

WIT: That's Tylenol and this is Benadryl.

LA: Could you identify what is in your right hand because later we will have a verbatim record and I want--

WIT: Okay, in my right hand, I have the Benadryl, the four ounce bottle of Benadryl. In my left hand, I have the four ounce bottle of Tylenol.

Questions by civilian respondent's counsel:

Q. Let's move on to your treatment from Doctor Webster. Tell the board a little bit about how you met Doctor Webster as a provider.
A. Oh, I had to go TDY and I had to get a prescription for Zantac. I've had reflux for years, and so I wanted to have a legitimate prescription to go with me instead of just taking a bottle and going. I just went up there thinking I could do what I had been doing for the last eight years, just going to a doctor and saying, "Write me a script", and I could get in and get out. But she actually did a--she wouldn't do that. She would make me go through the work-up. And I was kind of like, "Oh, I don't got the time", and then I realized nobody



62

ever did that. I had been doing it for eight years, just going in to the doc and saying, "I know what I got. Give me this." So it was nice that she actually took the time to do it, and she kind of ran through a whole bunch of stuff for me, educational-wise. So it was handy.

Q. From that experience and your experience with her, both on the committee you chair and your operations with her in the pharmacy, would you have any concerns about her treating you or your family?
A. No, no.

Q. Have you ever seen anything that gave you concern or pause that called her competency into question?
A. No.

CIVRC: Pass the witness.

**CROSS-EXAMINATION**

Questions by assistant recorder:

Q. Captain Cusack, could I see those bottles that you had?
A. Yes. (Provided bottles to assistant recorder.)

Q. Now are these two bottles from the MOD cabinet--
A. Yes,

Q. --that's in the emergency room?
A. Uh-huh. (Affirmative)

Q. And this is how they are listed, these exact bottles here?
A. There's a label that normally goes over them that is a standard printed label that looks similar except for the writing on it. It is the same white hospital label that is legally required to go on it that until recently would be put anywhere and sometimes it would actually cover up the name--what you see there--but the name would also be listed in print on the prescription label. So it wouldn't appear exactly like that because you would have a white label with some canned printed messages on the front.

Q. A white label would be over this label here?
A. Sometimes, yeah. It would randomly be put on there, but most of the time it would end up over that.

Q. And that's how it would be in the MOD cabinet?
A. Yes.

Q. And that was in the emergency room where Major Webster worked, right?
A. Yes.

Q. Have you ever seen Major Webster dispensing medication in the emergency room before?
A. I can't remember specifically, no. I've been in there enough times to see enough docs, but I can't remember specifically if she was one to dispense while I was in there.

Q. And you have never seen Major Webster practicing in the family practice clinic, have you?
A. On me.

Q. Other than yourself, have you seen her practice or treating other patients in the family practice clinic?
A. No, no, sir.

Q. Through the course of your job, you wouldn't have occasion to see her do that regularly, would you?
A. No, no, sir. I mean, do you mean physically up there watching her treat patients?

Q. Yes, actually--
A. No, sir.

Q. --observe her treating patients?
A. No, I'm downstairs.

Q. You mentioned during direct that Major Webster would often choose the lower cost medications, is that right?
A. Yes.

Q. Certainly there are other factors to consider on a doctor's performance, other than choosing low cost medications, isn't that right?

A. Other factors, other than that that would gauge how they work or how--

Q. Yes, how effective they were in performing as a physician?
A. That's a pretty decent one if you are going to pick one. I mean, I don't know how you want to rate that, but there are others. That's a good one because it obviously shows that they know what the current guidelines are, you know what I'm saying? Like that's what you are supposed to do doing. You are supposed to start at the bottom and work your way up and try to hit them with the easiest, quickest one first instead of utilizing the more expensive, more, I guess, broad spectrum antibiotics.

Q. But you would agree there are other factors to consider when evaluating a physician?
A. Yeah.

AREC: No further questions.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Captain Georgescu:

Q. I have a question. During your visits, how long did the whole visit take? Do you remember?
A. No, actually, I just was--it was the first time it happened, so I had nothing to gauge it against. I can't remember.

Q. So you don't remember if it was ten minutes or half an hour?
A. I can't remember.

Q. Any follow-ups?
A. I did stop back, but I actually missed the appointment. She had me check back, but I missed the appointment.

CM (Capt Georgescu): That's all.

LA: Captain Cusack, you are free to leave. I'd--

AREC: Sir, the government would like to ask some additional questions.

LA: Please do.

**RECROSS-EXAMINATION**

Questions by assistant recorder:

Q. Captain Cusack, I want to ask you again about the Tylenol and the Benadryl, as it appears in the MOD cabinet. I just wanted to clarify, you said that when it is in the cabinet, that there would be a blank label that is over this?

A. It is a preprinted label as if--try and imagine a postage stamp. It is about that big. It is about maybe two inches across the top and an inch across the side.

CM (Maj Matthews): We are aware of the label.

AREC: You are aware of the label? (Addressing board)

CM (Maj Matthews): It is the directions how often to take it, the name of the doctor, name of the patient. We are aware of the label.

AREC: Okay, I wanted to clarify that there was a blank label over it.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Captain Georgescu:

Q. This is standard for a whole lot of medications, if I remember--

A. It's the law they have to have a label.

Q. But I'm talking about all the other pills, they come in the same kind of bottles?

A. The pills come in the same kind of bottles. But the liquids come in whatever bottle the manufacturer has.

CM (Maj Matthews): You have to read the label because you can't see.

LA: Captain Cusack, now it looks like you are free to leave. When you do leave, just as you would expect, this is a Quality Assurance process, so you are not free at all to discuss your testimony or any of the questions posed to you.

WIT: Okay, sir.

LA: Thank you for coming.

WIT: Yes, sir.

CC: We are going to take about five minutes.

(The hearing recessed from 0952 hours to 1003 hours, 18 February 1999.)

LA: We are back on the record.

AREC: Major Matthews had expressed an interest in hearing from Lieutenant Lester, who was one of the nurses on the Code Blue that happened in January of last year. We are still trying to get in contact with her. I think she is--I called her duty section, and she is not on duty. I guess she works shift work so she is not on duty today. But I have been working through Major Burkett to try to get in contact with her.

**CAPTAIN ANN LI**

was called as a witness by the respondent, was sworn and testified as follows:

Questions by recorder:

Q. Please state your rank and your name for the record, and spell out your last name.

A. Captain Ann Li, L-i.

REC: Your witness.

**DIRECT EXAMINATION**

Questions by civilian respondent's counsel:



626

Q. Captain Li, would you please tell the members of the board how you are engaged at the hospital currently?
A. Right now, I work as a primary care physician over at the primary care clinic at Fort Clayton.

Q. And just a brief rundown on your credentials, I assume you are a licensed physician now? There was some question that, when you first came here, you weren't licensed?
A. Correct.

Q. What was the problem there?
A. It's just a routine procedure. For the State of New Jersey, it takes over one year to issue a license.

Q. Did you have the occasion to work in the emergency room when you first came here?
A. Correct, I worked in the emergency room for about eight months.

Q. During that period of time, did you have the occasion to work with Dr. Webster?
A. Yes, numerous times.

Q. From your--did you have a chance to evaluate her practice?
A. We worked together a lot, yes.

Q. From that time, did you come to any conclusions with regard to her competency as a physician?
A. She was, I would say, a very competent physician, very caring, very meticulous.

Q. We've heard a lot that she is slow. Did you find her to be slow?
A. Part of the factor of being slow, how you may judge is subjective. I felt she was very meticulous and very thorough. She does take her time with each individual patient.

Q. Did that cause a problem in the emergency room?
A. At the times when you have a hundred or so patients coming to visit, that could cause a traffic jam, a patient waiting--a long waiting.



627

Q. Did that wait, in your experience, ever result in any patient not receiving appropriate care?
A. Not to my knowledge.

Q. Doctor Li, you also know Doctor Webster socially?
A. Correct.

Q. In the time that you have known her, have you ever had--has she ever said anything to you or done anything that gives you concern about either her mental health or her competency?
A. Not at all.

Q. The last issue I want to discuss with you is a pretty tough issue, and I want to thank you for at least letting me ask the question because yesterday, when we talked, you were reluctant. Have you gotten any pressure about coming here and testifying?
A. I personally felt it, yes.

Q. From who?
A. From supervisor.

Q. Who was that?
A. Particularly Major Burkett.

Q. Can you be more specific about the pressure you felt?
A. Uh--presently, I am applying to Aerospace Medicine Program. I've been told any deviation out of norm might jeopardize my chance of being accepted.

Q. But yet, you are still here to testify for Doctor Webster?
A. Correct.

Q. I assume you don't, from what you've seen, you see absolutely no reason to pull her credentials?
A. Not whatsoever.

Q. In the emergency room or any place else?
A. I have never seen her practice in any forms other than good medicine.

CIVRC: Thanks, Doctor Li.

**CROSS-EXAMINATION**

Questions by recorder:

Q. Captain Li, did Major Burkett ask you to testify in a certain way? Did he tell you to lie?
A. No.

Q. Did you--were you present during a Code Blue where Major Webster was present?
A. No.

Q. No?
A. No.

REC: Thanks, no further questions.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Major Steffen:

Q. So you would have no problem at all with Major Webster taking care of any type of patient in the emergency room? You felt very comfortable with the way she managed patients, the way she was able--
A. I have gone to her personally myself a few times when I was sick.

Q. So you never had a problem at all with that?
A. No.

CC: Okay.

Questions from Major Matthews:

Q. The same thing from other people that worked with Major Webster--you worked closely with her. Did you notice a major difference in the care that she gave patients compared with working with Doctor McCrary or Doctor Tall or any other physicians that were down there?
A. Every physician, of course, has their own style of practice. Major Webster came from a background in internal medicine, which I think, is her style of practice, very thorough, very meticulous. Major

McCrary, of course, has been many years doing emergency medicine. The main concern is what is called quick and dirty work. That's just a totally different style.

Q. Is there a major difference between the work-up, diagnosis and treatment plans?
A. Sometimes, but I think the bottom line is the treatment plan and the diagnosis always come down to be the same. It doesn't matter how you go about doing it.

Questions by Captain Georgescu:

Q. My question is, I understand you guys were working together for a while, the same kind of shift hours, sharing the patient load.
A. Correct.

Q. Did you get a feeling about your pace versus her pace? Were you seeing more patients than her?
A. There are times, yes. You can't judge the number of patients seen as a gauge to measure competency because there are times you are stuck with one difficult case that can just take up the whole day, your whole shift.

Q. Right, but over the time, the time spectrum, you know, did you notice a pattern of you seeing more patients on a quicker rate than she would be able to see?
A. I wouldn't say so, no.

Questions by Major Matthews:

Q. Did you and Doctor Webster take in any sick, truly emergency patients together?
A. We don't take care of patients together, per se.

Q. Or if you had a real sick patient, you would probably both be involved. Did you have any of those?
A. We have consulted each other as there are times I can't figure out an x-ray. I would knock on her door, knowing she is inside and there are times she sees an interesting case, a patient with a lesion--

Q. How about an emergency? Did you guys take care of any emergencies?

A. True emergencies? There are very, very few true emergencies on Howard.

Q. I understand, I am here.
A. I would say no.

Q. I haven't yet either. Just in reference to Doctor Burkett, I am still confused. Did you feel there was a threat--
A. It was a personal feeling, yes.

Q. So you felt that, if you were here to testify on behalf of Doctor Webster, that that would--might jeopardize your chance--
A. Not in terms of testifying, per se. But I was told to keep a low profile until I get to Aerospace Medicine.

Q. And you think that was in reference to this?
A. At the time, yes.

Q. Have you had problems with Doctor Burkett before?
A. Yes.

Q. Personal, professional?
A. Professional.

Q. Is that more of a supervisory/subordinate role in terms of--
A. Correct, unfair treatment.

CC: Anything else?

REC: Nothing, sir.

LA: Doctor Li, it appears there are no more questions. We certainly appreciate you coming in here and I'm sure Doctor Webster appreciates it as well. As you know, it is an extremely sensitive matter we are dealing with, and it is protected under the Quality Assurance process, and I know you are familiar with that. If someone were to ask you what you said in this room or about the questions posed to you, you may not respond to that. Do you understand that?

WIT: Okay.

LA: Thank you.

(The witness left the room.)

**TECHNICAL SERGEANT THOMAS SONDEREGGER**

was called as a witness by the respondent, was sworn and testified as follows:

Questions by assistant recorder:

Q. Please state your name, your first name and last name, spelling your last name for the record.
A. Thomas Sonderegger, S-o-n-d-e-r-e-g-g-e-r.

**DIRECT EXAMINATION**

Questions by civilian respondent's counsel:

Q. Would you please tell the board, and for the record, what your position is here at the hospital?
A. I'm the NCOIC of Patient Administration in the Operations Squadron of the 24th Med Group.

Q. In that position, have you had a chance to interact with Doctor Webster?
A. I have.

Q. What has your impression been of her?
A. I find Doctor Webster to be a very honest and thorough person and has given everything that I needed from her for any sort of documentation to me in a timely manner. I've had no problems with her at all.

Q. Why do you say she is very thorough?
A. Well, I worked her medical board processing case, which part of my duties is the PEBLO, which is the Physical Evaluation Liaison Officer. In that light, I need to gather a lot of documents from members even though--and dealing with suspenses that are set by Air Force. Even though Doctor Webster's medical board was initiated at Wilford Hall, there was still certain personnel documents that she had to deliver to me timely and complete to fax forward to Wilford Hall. And I spend a