lot of time on the phone trying to get information from people, but in her case, I got everything on time.

Q. With regards to her treatment of patients, have you had any interaction with her with regards to her doing follow-up on records?
A. Yeah, part of Patient Administration is just that, following up with information and trying to gather documents, stuff that isn't in medical records, or phone numbers, addresses, things like that. With her tenure in the ER, sometimes Doctor Webster would come into my office and look for--follow up with patients, trying to call them. She is bilingual so she is able to talk to them downtown and a lot of times we don't have good patient contacts, and she has been one of the physicians that have done that.

Q. Without casting aspersions on anybody, was that kind of unique for a physician to do that?
A. Right, you know, I think that--you know, I consider that thorough. Other doctors have done that, too. But some of them may not need to come to me for that. They may already have that information. But, you know, personally it impresses me.

Q. Have you, in your interaction with her, ever had her say anything inappropriate to you?
A. No.

Q. Has there been anything that she has said or done that would lead you to question either her mental status or her competency to practice medicine?
A. No.

Q. You are in charge of the PEB here. You are familiar with the regs involving the physical evaluation board?
A. I process the paperwork.

Q. If a physical evaluation board returns a person to active duty without finding any mental or physical defect, what does that mean?
A. It is final.

Q. What do you mean, final?

A. From the standpoint of PEBLO, the PEB process that is at the hospital level, once the decision is made through them and the member accepts that, it is done. The process is complete. Return to duty is return to duty, if that is what you are getting at, return to duty.

Q. Yes. Have you had any experiences where commanders have called you to be upset about the fact that a person was returned to duty?

A. Most certainly.

Q. And what have you told them in each occasion?

A. Well, the process, if they are returned to duty, is the commander can look to retrain or reclassify the individual on the administrative side. But from the hospital side, it is done and it is then in a different arena than the medical board.

Q. Would you have any problem with Doctor Webster being your doctor?

A. No.

Q. How about treating your family?

A. No.

CIVRC: Thank you, I pass the witness.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Major Matthews:

Q. The PEB, that determines if they are world-wide qualified as an Air Force officer?

A. You don't have to be world-wide qualified just to be found fit.

Q. Okay, so fit for duty, but do they determine if they are fit to be a physician, for instance?

A. No.

Q. Just fit for duty, fit for the Air Force?

A. Right, different standards for different services.

Q. They don't say she can be a doctor; it just says she is fit to do whatever you say she is supposed to do in the Air Force?
A. Yes.

AREC: The government has no questions.

Questions by Captain Georgescu:

Q. You said that you got calls from commanders before regarding--upset that people got returned by the PEB?
A. Right, sometimes some of the commanders will expect an expectation of discharge.

Q. Anything on this case?
A. Oh, this wasn't handled at my level. A medical officer on our staff is done at another facility. I'd process the personnel documents that she had to give to me.

Q. I just wanted to clear that up.
A. But not in her case, no. That is just what happens in general through the process.

CIVRC: We are going to stipulate that was not the purpose of the question.

Questions by Captain Georgescu:

Q. I just wanted to make sure. You have never been a patient of Doctor Webster here in Panama?
A. I don't believe so. I don't think so.

LA: It looks like you are free to go at this point. As with all the witnesses who come in here, this is a Quality Assurance process. You are not allowed to talk about testimony in any fashion or the questions posed to you.

WIT: Okay.

LA: Thank you.

(The witness left the room.)

**CAPTAIN MICHAEL TALL**

was called as a witness by the respondent, was sworn and testified as follows:

Questions by assistant recorder:

Q. Please state your name and rank for the record.
A. Michael Tall, Captain.

Q. Would you spell your last name, please?
A. T-a-l-l.

AREC: Your witness.

**DIRECT EXAMINATION**

Questions by civilian respondent's counsel:

Q. Doctor Tall, you are an emergency room provider here?
A. Yes.

Q. Have you had the occasion to work with Doctor Webster?
A. We rarely work overlapping shifts, but there were times when we were working together at the same time.

Q. Was there anything that impressed you about Doctor Webster and her care of her patients?
A. Well, the--there's different schools of thought, but one thing I appreciated being, not being a true emergency provider, just being a general medical officer was--and we were very busy, much busier than we are now--it was nice of her, I thought many times, to take care of the patients that she was already taking care of when I came on shift so we avoided complicated hand-offs, in other words, so the whole work-up did not have to be done again and patients did not have to go through certain parts of their physical exam again and I always appreciated that.

Q. Was that something she pretty much initiated and encouraged of the other providers as well?
A. I think that there were different folks who would work the night shift and the day shift. I don't remember her working too many night shifts. I could be wrong. But I think it was sort of a, if she did it for us, she

expected us to do the same for her. And I know, if she ever did work the night shift, I tried to finish my patients, too.

Q. Doctor Tall, did you see anything in her practice of medicine that concerned you with regard to her competency as a physician?

A. Uh--well, the only access I would have to medical record review, at the time--we changed our system now where we are reviewing all records, but sometimes patients would come back to the emergency room for a second visit for multiple reasons and there's many reasons that are legitimate reasons, and we would always have to see what's been done before, either in the clinic or in the emergency room. And in reviewing patients that had come back and reviewing her work, it looked like certainly more than a satisfactory job had been done the previous time they were seen.

Q. We didn't talk about this on the phone, but I just want to ask you. Because of her--we have been told that she is thorough, but slow. Would you agree with that?

A. Well, there's--again, that could be said. I think that would be one way of saying it. But there's--

Q. Is there another way?

A. There's other ways because people who come into the emergency room are triaged into emergency, urgent and all the way down to minimal. And I think, as other providers have noted when they come down here, we see mostly minimal patients. A lot of it is because there's no clinic appointments available, and some folks will try to please everybody and take care of people as fast as possible and some folks will take care of the more serious patients and try to make sure no medical harm is done to anybody. And the minimal patients are supposed to have an understanding, when they come in, that they will be seen as an opportunity arises, that it is not a first come first served. I think that, as the providers I work with, if you take the average patient time in the ER, and I don't have the numbers, but she probably did take more time. Whether--it is not up to me to judge whether that was good or bad. That is her own style.



637

Q. Thank you. Doctor Tall, would you have any problem with Wilma treating you or any of your family?
A. I think we probably all have trouble with anyone who treats ourselves or our family, but no, no more than anybody else. A little knowledge can be a bad thing for us. So, no, I would say, no.

CIVRC: Thanks, Doctor Tall.

**CROSS-EXAMINATION**

Questions by assistant recorder:

Q. Doctor Tall, were you present during a Code Blue on January 24th, 1998, that Doctor Webster was the lead doctor on?
A. No, I had heard about it, and I had even--I believe I had offered to come in after the Code Blue was over in case Doctor Webster needed some time off to--because it was obviously a traumatic event. But I wasn't present. In fact, she passed word to me that she was fine and that I didn't need to come in and replace her.

Q. You weren't present during the code, right?
A. No.

Q. Did you work jointly with Major Webster on any emergencies in the emergency room?
A. I don't recall. There was a time when we had an overlap provider and that, I believe, was mostly Doctor Li during the time that Doctor Webster was in the emergency room. So that time between the time I came in at 6:00 p.m. and 6:45 or 7:00 when she would be finishing up her patients, I don't recall any specific patients.

Q. No specific patients that you were involved with?
A. No, not together, not jointly with her.

Q. Did you ever see Major Webster give patient care in the family practice clinic?
A. No, I've never seen her give care. She was in the family practice clinic providing care at the same time I was in the emergency room, but there was no direct observation.

Q. So, at that time, when she was in the family practice clinic and you were in the emergency room, you didn't see what she--her practice then?
A. No, because it is actually physically separated. The emergency room is on the first--on the ground floor and the family practice clinic is on the second floor. And the only time I would come up there is if I was consulting a radiologist or something of that sort.

AREC: No further questions.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Major Steffen:

Q. As a peer of Doctor Webster's in the ER, would you have a problem if she were returned to the ER to serve as a physician?
A. No, no, I wouldn't have a problem. In fact, some of the things that I've heard her criticized for, being thorough but slow, that may have been a problem as far as patients' perceptions, as far as complaint generations. I understand, although I have not read any complaints, that there were complaints about waiting times and whatnot. But, as of right now, our patient load has dropped from mid-sixties to thirty, if we are lucky, and I think any concerns about waiting time would probably be less. It probably would even be better. She would even have a better situation right now if she were to return.

Q. So in the current state, it wouldn't be a problem--
A. No.

Q. --but if she were being overwhelmed with 75 to 80, it may be difficult?
A. Because we just don't see that number here any more.

Questions by Captain Georgescu:

Q. I have a couple of questions. First of all, did you ever get a chance working with her, to see her triage patients? I understand that's--I don't work in the ER, but that's a job a physician is supposed to be doing?

A. Yeah, they are actually triaged two times. The technician at the front will triage them, based on what the chief complaint is. Certain words are words that cause alarm. Chest pain would an example. And then based on the vital signs, the technician will screen the vitals. Then, if the technician has any questions, they are to go back and ask the provider, "What do you think about this patient?" They are also triaged the way the charts are set up on the wall, as I think a good ER provider is always looking one or two patients ahead to see what needs to be treated. Some people are very fast. Some patients can be treated very fast and they can actually be seen. And sometimes there is one that you think has been mis-triaged up front that you will call first.

Q. I was wondering if you saw her triage, if you saw her system?

A. No, because usually by the time I would come on shift, the patients were already under her care.

Q. Did you get any feedback from the ER staff? You know, you guys work with the same techs, with the same nurses. Did you get anything--I know stuff like that kind of hangs around.

A. I think, keeping my eyes and ears open, I have heard cases where they believed the patients were mis-triaged. I think there was one case, and again, I didn't review the chart and don't know the specifics, where they had brought a certain patient to her attention and whether or not who was right or wrong, I don't know, but they kind of disagreed with it.

Q. Right. No, my question was whether it was some kind of feeling, more than just specific cases, about if you got any kind of feedback from the ER staff, more than just specific cases.

A. Just one or two instances where I heard the techs talking, where I came on that night and they were a little bit surprised at the way somebody was triaged.

Q. And you mentioned you would have her come back to the ER the way it is right now. My question is, if she was to be moved from this place going to another ER that is



640

more of a standard ER, would you still want her to be working at that emergency room?

A. Well, again, it depends on how much emphasis you want to place on satisfying the patients. In other words, medically, I think that she would be fine. However, we are a customer care oriented Air Force now, and I think there would be maybe more patient complaints, primarily about the waiting, not about the medical service rendered, but primarily about the waiting. And I think sometimes in the emergency room you want fast people and sometimes in some cases you are glad to have a thorough person.

CM (Captain Georgescu): That's all I have.

LA: Doctor Tall, you are free to leave. We sincerely appreciate you coming in here. People from your work site probably know you are over here.

WIT: They do.

LA: Doctor Tall, you are not free to talk to them at all about anything you said or any questions posed to you.

WIT: Understood.

(The witness left the room.)

CIVRC: There's two witnesses. I've already told the legal advisor, one is a PA by the name of Major Joan Marine. They couldn't let Doctor Li and PA Marine go at the same time, so she is presumably on her way over here. The other witness is Doctor Marta Olmus and I don't know anything about her status at all.

CM (Maj Matthews): That is Doctor Mendez' wife, so we could easily find that out.

CIVRC: With regard to Doctor Olmus, I do have a letter from her. Her testimony would be basically that she has seen OB/GYN patients and that her treatment had been appropriate. If she doesn't show up, I don't have any problem using this letter instead. Why don't we go ahead and mark it?

LA: You are at 56.

CIVRC: All right, we will mark this as 57.

LA: No, 56.

REC: The government has not been provided with that at all.

CIVRC: Oh, I'm sorry. (Provided document to recorder.)

CC: So right now, there's no witnesses?

CIVRC: My understanding is there is none. And I want to call, obviously, Doctor Webster to the stand. If I put her on, I would imagine she is probably going to be the longest witness you have because you are going to have 101 questions for her. So I really don't know what we should do because I really don't want to delay this. I want to be able to get this to you all so you can hopefully make a decision today.

CC: Let's take fifteen minutes or so to see if we can get Marine over here or one of the other ones.

(The hearing recessed from 1030 hours to 1137 hours, 18 February 1999.)

AREC: The board calls Major Burkett to testify.

**MAJOR BURKETT**

was recalled as a witness by the board members, was sworn and testified as follows:

Questions by assistant recorder:

Q. Would you state your name and rank--

LA: That's all right. You are the same person we spoke to yesterday and you are still sworn.

The board has some clarification questions, apparently.

**EXAMINATION BY MEMBERS OF THE BOARD**

Questions by Major Matthews:

Q. Is there any chance you can give kind of a timeline of what actions the credentials committee took, from your best recollection, and we can give you some ideas if you need to refer to, against Major Webster and maybe the thought process behind each one?
A. Okay. As I said, I was--

Q. Can we use that board right here and write it or do you need to write? Oh, we can write. Go ahead.
A. If it's better for you.

Questions by Major Steffen:

Q. So basically she was in the emergency department and then was removed. Can you kind of start from there, what the process was and why she was removed?
A. Right. Basically, when she was removed and put into the primary care clinic in January, I worked with her then, and then, like I said--

(Court reporter asked witness to speak up.)

WIT: Like I said, when she was removed from the emergency room and put into the primary care clinic, after that, she was taken out of primary care and sent to the Health and Wellness Center.

Questions by Major Matthews:

Q. From the emergency department, were any actions from the credentials committee officially taken against--
A. Okay, at that point, there wasn't any credentials convening in that early part of '98. I did not--wasn't called upon with this credentials action--this privilege action until, I guess, we met in November. So that was like October when this was decided that it needed to be done, around the time of her illness and admission at Wilford Hall.

Q. That's Exhibit 1. This is the first time that you were involved in official actions against her? (Witness was provided Hearing Exhibit 1.)

A. This was the first time I was involved in any official actions with her. Now I know she was--

LA: What Hearing Exhibit is that?

WIT: This is the 25 November '98 memo for the Med Group commander on a special credentials function.

LA: That's Exhibit--

CC: One.

CM (Capt Georgescu): Down at the bottom is the penciled number. (Addressing witness.)

WIT: One, correct.

Questions by Major Matthews:

Q. At that point, the committee decided to?
A. Okay, and then, so the committee met and this is spelled out what we did in here and the credentials function at that point voted to revoke her privileges.

Questions by Major Steffen:

Q. What day was that on?
A. This was 25 November. The actual function met on the 18th of November, but this was dated after I--this is not the minutes. This is my memo about the meeting and then the minutes were separate.

Questions by Major Matthews:

Q. So, to the best of your knowledge, did she ever have her privileges suspended?
A. No, up to that point, she never had--she had not had her privileges suspended up to that point.

Q. Limited?
A. Not at all. She was--uh--removed on the basis of a command decision to a different area of duty. But her privileges were not suspended at that point.

Q. So she went from--

A. It was an administrative action to remove her from medical care, not a privilege action. The privilege action did not occur until--

Questions by Major Steffen:

Q. So what triggered the privilege action, I guess, is what I am confused on. She went from ED to primary care to ED and then to the HAWC?
A. Right, in the midst of that time, she had a command directed psychiatric evaluation.

Q. Okay.
A. And then, from there, administration was--you know, evaluated her or getting those recommendations, and then she had another--an episode of viral induced illness and then had her follow-up evaluation at Wilford Hall, leading to the MEB which then--the command decided, well, this is the time to look into whether she needs her privileges adjusted or revoked or limited, et cetera.

Q. Now that was prior to the results of the PEB coming back?
A. That was prior to the PEB.

Questions by Major Matthews:

Q. Can you read the reasons why you revoked the privileges, as stated on that form?
A. "In conclusion, the credentials function of the 24th Medical Group recommends unanimous--by unanimous vote to revoke all emergency physician and primary care physician privileges from Major Wilma Webster based on her diagnoses of progressive multiple sclerosis and cognitive disorder."

Q. Are you aware that she has had further evaluations of those two problems?
A. I'm aware of that.

Q. So, in response, if she does not have those two problems, or, if there is a question whether she has those two problems, do you think then you wouldn't revoke her privileges now looking at that?

A. No, because this is--this is--uh--the recommendation to the commander. If--you know, I did another further evaluation of this in the privilege notification with a point by point summary of the allegations, each allegation. And, you know, I don't know--I know that whoever she saw--and I didn't see all the final results of her--her second consult, but I understand that she was--that it was said that she did not definitely have MS, but, to me, that is beside the point because I don't know if it says anything about her not having a cognitive disorder because there are many, many tests that have been done on her, the neuropsychologic testing, that showed deficits in function. It doesn't matter whether that is from MS or Guillain-Barre or some other sort of disorder maybe they haven't diagnosed. But the neurologic functioning, particularly under pressure, et cetera, like that, those are present and have been proven to be present. So based on this, sure, I was--we were going off preliminary information that we had. That's what we--but the decision was based on these diagnoses, but the underlying thing is the process of whatever her function is.

Q. It seems like probably, until you got more information, maybe suspend her privileges and get more information and then you still would revoke based on information you got, and that was this letter?

A. Right. Well, this one voted to revoke and the way this was done, if you read this, is we had testimony from the psychiatrist--

Q. Right.

A. --and some of the same people who were here today, went over very lightly some of the patient complaints and stuff like that, but mainly it was based on what her function was, neurologically or psychologically. And based on that, the committee went down her privilege list, the forms--I don't know if you have seen those yet, but we had--

CC: In her credentials file?

WIT: In her credentials file, we had a master privilege list that lists, what can we do at this facility, in these



646

two areas. And each person on that committee went over that list during the committee and decided by themselves what they thought she could do and could not do based on the discussion and upon their assessment of her functional status. And then, as a group, they decided--they voted on what she could and couldn't do and then they decided whether--that--if the things she could do was enough to say she could function as a medical professional.

Questions by Major Steffen:

Q. So each one of these members, had they worked with Doctor Webster before--
A. As far as--

Q. --that made up this board, that you know of?
A. As far as I know--

Q. Or actually have seen her in a clinic?
A. --none of these people on this board saw her as a patient, as far as I know, and none of them were her supervisor or anything like that. I don't know about personal--

Q. So really, they didn't have--
A. --relationships.

Q. --direct contact as far as patient care, as far as you know?
A. As far as I know, no. You know, those were particularly excluded if, you know, they were in a position like that.

Q. And, based--I know you said each one of them went through each one of these things. Now what did they base their judgment on? Was it based on chart review? Was it based just on personal opinion? Was it based on just the information that was given by the witnesses and the neuropsych testing?
A. In this case, it was based mostly on the assessment of function given by the professionals who evaluated her at Wilford Hall for her neuropsych testirg and her neurologic--

Q. But it wasn't actually based really on her actual patient care here at this facility?
A. Not on actual patient care here.

Questions by Major Matthews:

Q. Exhibit 5, the notification of privilege hearing, those were itemized reasons why--
A. Correct.

Q. --you revoked and took away her privileges or just took away all privileges and those are the reasons?
A. Well, this is--this is--this is--uh--was mainly for this hearing. This was prepared in support of this revocation of privileges.

Q. To explain why?
A. To explain why and because she requested the hearing. If she didn't request the hearing, this probably never would have been done.

Questions by Major Steffen:

Q. But you guys didn't consider a suspension or abeyance or any of--
A. Oh, yes, oh, yes. If you look at the--

Q. I haven't had a chance to read through it.
A. And I didn't vote in this committee because I was the chairman and I was just assessing the situation. When we opened the committee, I particularly said, you know, if you want--I said, "This is a very important committee hearing. It is considering revocation or adjustment of a provider's privileges and these are the things we need to decide and vote on. To not take any action, the physician keeps her current privileges. To monitor and evaluate, the physician is supervised for a period of time and performance is assessed. To limit or revoke, I mean, limit specific privileges so some are revoked and others are not; or to revoke completely." And that is how I laid it out at the beginning and that is how I laid it out before the vote and when they went through the privilege list. And the vote was unanimous to completely revoke on both.

Q. You said that this actual committee was command directed. Did that mean it came from O'Neil directly?
A. Right, the credentials function, yes, it was directed to--

Q. Directly from him, he made the decision that we need to have it--
A. Right.

Q. --based on information--
A. I didn't get the direct order from him.

Q. Right, but that's where it came from.
A. But it said we need a privilege function to determine her privilege status because she is undergoing an MEB for this neurologic disorder and here we have some of the information so far. What should we do as far as her privileges? Is she safe to continue treating patients here if she comes back, you know, et cetera.

Questions by Major Matthews:

Q. So on the itemized things that you list, basically, in order to suspend or revoke privileges, you have to have response to three items in the regulations: it is response to gross provider misconduct, professional incompetence, or negligence that is self-evident to pose a significant threat to patient's safety and well-being. So misconduct, incompetence or negligence. Do you think those itemized things--we have not had an opportunity to really look over them thoroughly--do you think they apply to any of these three items that would be a reason to revoke her privileges?
A. Uh--well, it would be incompetence, but I--you know, I am missing on something. But I think there is another things that--it is not in that--it's in a different part.

Q. What is that?
A. It is provider's health and function, okay, and--

Q. And you feel that--
A. I'm not exactly sure--

Q. --her health and function--

A. --where that part is.

Q. --provided a threat?
A. Right. And so it is not a matter of her--

Questions by Major Steffen:

Q. So it was more from a healthy function standpoint that the board took the--
A. Right. This is--seems like she has a medical condition that has--is hindering her cognitive abilities.

Questions by Major Matthews:

Q. So let me go back. If she did not have a medical condition, again, you wouldn't revoke her privileges?
A. If she has a cognitive deficit and you tell me that she has the flu--I mean, what--where is the--it doesn't matter where the cognitive deficit comes from. If that has been proven and evidenced either in her--the way she interacts and the way she interacts with patients and staff and her memory and psychological testing and, you know, several other psychiatric, psychologic and neurologic physicians saying she has some sort of impairment, to me, you know, that is significant. And obviously, you know, she is a very brilliant person, a very smart person, and has maybe--I don't know how long this has been going on or if it has been, but she compensates in a lot of ways because she is smart. But there comes a point maybe where she won't be able to compensate. And that's why I brought up the part about the code when we were involved in that. It had nothing to do with her not being able to intubate. That was a physical thing and separate. It was just her organization in the midst of that situation that was disturbing and she forgot a bunch of very important things at the time. And like I said, that was my first real professional experience with her and I would have said, "Well, you know, I would have thought she would have been more experienced," but I didn't know at that point. But in subsequent things and upon looking at this, I am thinking maybe that was--this was a manifestation of her inability to function properly.

Q. Because of the nature of my specialty and Doctor Webster's is autonomous, especially here with single coverage, did the group or committee entertain any possibility of sending her to another institution for a month or whatever it may be to work with someone side by side to properly evaluate her skills and thought processes in a setting that you were questioning?

A. Away from--

Q. Right, did anyone entertain that suggestion? I understand your initial response was to revoke because she had medical problems--

A. In the committee, we said, yes, can she be monitored and evaluated and then this-you know, reconsider and we couldn't do that here. But, no, I don't recall anyone specifically saying, "Let's send her somewhere else to do that."

CC: Do you guys have anything else?

REC: One moment.

(Recorders conferred.)

WIT: The other thing, I don't know if maybe some people got the wrong idea, but this is a--to me, a privilege hearing for 24th Medical Group to revoke her privileges here. Now obviously that would have a big impact on her, but it is not taking away her medical license or not saying to take away her diploma, et cetera. It is that the 24th Medical Group credentials function decided that she was not able to perform the privileges she could do here. And maybe that will apply somewhere else and likely it will apply somewhere else. But that would be up to another institution to decide, based on, if they were revoked and remained revoked her, then that is a decision for another institution to decide.

CIVRC: I don't think that is quite an accurate statement because the regulations say, if the privileges are revoked, it is an adverse determination and must be sent to her licensing boards. So I don't believe--

CC: She will--

CIVRC: --that is an accurate--

CC: --get--it does get turned in.

CIVRC: Right.

WIT: I understand they are notified, but--

CM (Maj Matthews): But the other hospital doesn't have to abide by it.

WIT: Right.

CM (Maj Matthews): They have their own choice.

CIVRC: I understand that.

WIT: That was my point.

LA: One person at a time, please.

Questions by Captain Georgescu:

Q. I have another question. Just to clarify, once she was sent to the HAWC, when was she sent to the HAWC?
A. Again, I don't remember that exact date, but it was, I believe, late spring, March--February or March.

Q. Did she do anything from that point until November--was her job satisfactory or unsatisfactory? Did she do other things that worried you that you went to the board to--
A. Well, while she was working in the HAWC, one, I wasn't her supervisor. I didn't have any supervisory role over her. But she didn't have any patient assessment or contact as a physician.

Q. But there was no negative feedback at that point?
A. During that time, I don't know of any negative feedback. There was nothing that I put in here that I found, complaints that were formal to put in here.

CM (Capt Georgescu): That's all. Does anyone else--