AREC: Yes, the government has some questions.

CC: Go ahead.

**REDIRECT EXAMINATION**

Questions by assistant recorder:

Q. Major Burkett, do you know of any instruction in the AFI or any regulation that would have allowed Major Webster to be sent to another facility where she could be monitored while being assigned here at the 24th Wing?

A. I don't know of any regulation that would say that. AFI 44-119 doesn't specifically say, yes, go ahead and send them somewhere else. It just says monitor and evaluate as a choice.

AREC: The government has the minutes of the credentials function that met in November. We would mark this as Hearing Exhibit 57. We think it would be useful to the board.

CIVRC: No objection.

AREC: I am handing Hearing Exhibit 57 to the board.

The government has no further questions.

**EXAMINATION BY MEMBERS OF THE BOARD**

Questions by Major Steffen:

Q. I just have one more. We've heard through various providers, especially in the ER now, the census is about a third of what it was at the time she was working in the ER. What would be your feeling if she was placed back into the ER where you are seeing, instead of 70 to 80 patients a day, that she is seeing 20 to 30 a day?

A. I wouldn't be comfortable with that because it doesn't matter about the volume. She could--sure, she could see some patients, and if there were a few at a time, that's fine. But I don't know, on a long-term basis, how her--she would be able to care for them. In the

emergency room, we are talking about single incidences. But if a code came in, someone, then I would be concerned. I would be concerned that she might not function well and perform well to save that patient's life.

CM (Maj Matthews): It is so difficult with one--there are just not enough sick patients to really get a trend. It is scary enough, one patient, you are right that you are concerned with. It just seems that she should have more exposure to that and that's why I mentioned another institution.

LA: Doctor Burkett, thanks for coming. And just like yesterday, you are not authorized to tell anyone about what you said here. Thanks.

(The witness left the room.)

CIVRC: She is still not here. (Referring to witness, Joan Marine.)

CC: Do you want to proceed?

CIVRC: My problem is, she is going to go--although I don't mind interrupting her testimony.

CC: Why don't we just start?

CIVRC: In that case, we will call Doctor Webster.

REC: Before you continue, just one administrative matter. A lot of the exhibits have been offered, but they haven't been accepted down the line.

LA: Unless there is any objection, everything comes in.

REC: Okay, I just wanted, for the record--

LA: Numbers 1 through 57 are deemed all admitted.

**DOCTOR WILMA P. WEBSTER**

was called as a witness in her own behalf, was sworn and testified as follows:

Questions by assistant recorder:

Q. Would you state your name and rank for the record?
A. Wilma Pauline Webster, Major.

Q. Would you spell your last name, please?
A. W-e-b-s-t-e-r.

AREC: Your witness.

**DIRECT EXAMINATION**

Questions by civilian respondent's counsel:

Q. Doctor Webster, I am going to try and make, at least my examination, relatively brief and leave the examination of you to your fellow physicians that are sitting on this board. But there are a couple of things I think would be important to bring out. First of all, Doctor Webster, what does your medical license mean to you and your right to practice and see patients and treat them?
A. It means an awful lot.

Q. If you had to rank it among the important things in your life, would it rank right up there as being the most important?
A. Right after my children.

Q. Let's go right to the statements that you made. (Referring to Exhibits 12 and 13.) I think, according to everything we've been told, the first time you made one of these inappropriate statements was on August 10th, 1998, or about that period of time, when you told people that you would like to blow this place up. Did you make a statement like that?
A. Well, I don't remember exactly, but I probably did.

Q. Let's go on. I think the next time is when--by the way, you are not trying to justify any of these statements, are you?
A. No, they were stupid.

Q. The statement--what exactly did you say in that? Tell us the circumstances involving that.

A. When I was going to the airport, against my will, to go to Texas to have the psychiatric evaluation--

Q. Can you speak up just a little bit?
A. Oh, sorry. Going to Texas for the psychiatric evaluation, command ordered, I was greeted by a very nice airman who said, "How are you, Major Webster?" She seemed so friendly and nice. And I said, "Not very good. I don't really want to go. In fact, if that plane blew up right now, I'd be glad about it." That's all I said.

Q. Were there other patients standing around when you said that, or do you even know?
A. I don't think I said it very loud. I just said it to talk to that girl.

Q. We've been told it happened in a conference room. Is that where it happened?
A. But there were other people around, yes.

Q. And you realize under no circumstances should you ever make any kind of statement like that around an airplane?
A. That was very stupid.

Q. You also made some other statements, one other statement I think that is before the board, about threatening to blow people up or shoot people. Did you make statements like that?
A. What I did, I was telling them a dream, and I was telling them that really dreams are helpful when you are as angry and stressed out as I am, that I have these dreams where I shoot everybody, feel good about it for a couple of seconds, like an orgasm or something, but the dream doesn't stop there. After I feel good that these people that are threatening my livelihood are gone, then the police come, they take me away and all my autonomy is taken away and they have a funeral for the people that I hated and those people become heroes and wonderful and I become the bad lady and I can't see my chidden and I am stuck in jail. And I say those dreams are good because, even though I want--would like, in my mind for a few seconds, to do something bad, from the dreams I can tell that I really

don't want to do that. And I told that dream to multiple people to tell them that I am really upset now, I have this feeling that I would like to do this, but my dreams show me that it just wouldn't work.

Q. Tell me something, Wilma. Have you ever had a similar occurrence like this at any time in your life?
A. Like this, no.

Q. Have you ever made stupid statements? I mean, I'm sure all of us have from time to time, but I am talking about in inappropriate settings like this.
A. I don't think--not like this.

Q. Wilma, to your knowledge, have you ever mistreated a patient while you were stationed here?
A. No.

Q. Have you always rendered proper care?
A. Yes.

Q. The only reason I am going to bring it up is because it is mentioned in Doctor LaMacchia's report. Your initial assignment was at Yokota?
A. That's true.

Q. You practiced in the emergency room there?
A. Yes.

Q. When you practiced in that emergency room, it is my understanding from what I read in that report, there was one incident where you sent a patient to the Radiology Department, and it was later determined that that should not have occurred and, as a result, the patient had to have a code--a code was called on the patient.
A. I don't think the code was the result of my sending him there.

Q. All right, he suffered a code at the Radiology Department?
A. That's correct.

Q. Was that a mistake on your part?

A. I shouldn't have sent him to the Radiology Department, although I did send him with a technician accompanying him.

Q. At the time you sent him down--
A. With an IV.

Q. Can you tell me what you missed that now causes you to think that maybe you shouldn't have sent him down there?
A. I had interpreted his fast heart rate as atrial fibrillation. It still might have been that, but when I listened to it, it sounded like atrial fibrillation. But I should have documented that first. I should have gotten an EKG first to verify that, and I should have ordered my x-rays done in the emergency department if there was any possibility of him being hypovolemic.

Q. There is one other incident that is mentioned in the reports, and that is of a lady who was pregnant and was coming in complaining of stomach pain and she was later found to have ectopic pregnancy which was caught and treated.

LA: Excuse me, sir, I hate doing this. Are we talking about facts--does the board have these?

CIVRC: They are in LaMacchia's--

LA: Oh, LaMacchia's, I'm sorry.

CIVRC: That's right, and I apologize for that.

Questions by civilian respondent's counsel:

Q. Tell us about that case.
A. Yes, the girl was actually an acquaintance of mine. She had no abdominal pain when she came in. She said she had had pain before, but now it was gone. And she was two months pregnant, I think, and I sent her home and told her, if the pain came back, to come back. I did not do the pelvic exam, and I should have.

Q. Was part of that because she was your friend?
A. Possibly.



658

Q. Now this was at Yokota and you were at Yokota from when?
A. I was at Yokota for three years, starting in 1992.

Q. Prior to that time, you had been at Desert Shield and then Desert Storm?
A. Yes, in '91.

Q. And you mentioned an incident where you would occasionally forget your gas mask while you were over there and you realized that, if they had ever dropped gas, you might die running to go get your gas mask. Was that a common occurrence among the troops over there?
A. People did it.

Q. During your civilian tenure, because prior to that you were in civilian practice of medicine in emergency medicine, correct?
A. Yes.

Q. Had you ever been sued because of any malpractice?
A. Never.

Q. Had you ever had your privileges suspended or revoked for any reason?
A. Never.

Q. Any actions taken by any licensing boards against you?
A. Never.

Q. There is an incident that Doctor LaMacchia documents where he implies that the first--what you did right out of residency was become a director of an emergency room and that you left because--you were let go because of, I think, poor documentation. Can you enlighten us on that? I mean, you did tell Doctor LaMacchia all this stuff, right?
A. Well, he got the facts wrong.

Q. Okay, well, go ahead. Why don't you straighten it out?
A. I finished my internal medicine residency, but I had put some subjects in there to give me more practice in emergency medicine which is what I've always wanted to



650

do, like ophthalmology and anesthesiology rotation. And, as soon as I graduated from my residency program, I answered an ad to work in the emergency department and I went to upstate New York to Rochester, New York, and worked in a hospital there. This was my first American emergency medicine position. It was a fairly busy emergency department with a lot of trauma, and the first four months I was doing okay. But this was a group that had--it was called NEMA Emergency Medicine, and they had had multiple problems before that, and the previous three or four physicians before me had been fired and they were activity trying to get rid of NEMA. And--

Q. What is NEMA?

A. Northeast Emergency Medical Association, I think. And then, they wanted NEMA to put a director from NEMA, but NEMA couldn't find one so they hired a director from--that wasn't a NEMA person and that director belonged to ACEP, American College of Emergency Physicians, and had very strict ideas about documentation on records. And he criticized a lot, and I improved on a documentation a lot from him. In fact, I've taken on everything he suggested which is NEMA suggestions--I mean, ACEP suggestions. And there were a couple of other stupid things I did. I put, for example, atropine in somebody's eye and it was a corneal abrasion and they say, if you put atropine in somebody's eye, you will get fired. They stay--decrease vision for about two weeks. But in some books, it is suggested, old fashioned books that I had found that suggest that, but you shouldn't do it normally, just an ophthalmologist should.

Q. And as a result of those, you were let go?
A. I was let go.

Q. And then, from that point on, you were working in emergency rooms, either as a provider or as a director?
A. NEMA told me that, although that hospital didn't want me, that they liked me, that they wanted me and NEMA transferred me to another hospital in Pennsylvania where I worked for the next four years.

Q. Okay.
A. And became their director.

Q. Tell me something. While you were doing civilian practice, were you faced with real emergencies? I'm not talking about what we've heard about the Air Force where basically it is treated as another area for sick call. Did you actually treat a lot of emergencies?
A. In Pennsylvania, we saw--I saw a lot of emergencies. One thing that I especially remember, because of the aged population, we had a lot of triple A's there, what we mean is aortic abdominal aneurysms that had burst. So I got to see those fairly frequently. And lately, when I was stationed at Lakenheath, people were amazed at how fast I diagnosed one and argued with the surgeon that it was and she said it wasn't until I was proven right. So--

Q. Now, going back to Yokota, were any privileges actions taken against you?
A. At Yokota?

Q. Yes.
A. After those two episodes, I was placed on abeyance.

Q. And what is abeyance?
A. It is kind of like a suspension of privileges for a while.

Q. And how long was that?
A. I don't know, maybe a month or so.

Q. And during that month, what did you do?
A. I worked in family practice.

Q. Any problems there in family practice?
A. No.

Q. Were you returned to the emergency room?
A. Yes.

Q. And did you continue to work there throughout the entire remainder of your tour?
A. Right.

Q. And how long was that, from the time you came back from this abeyance?
A. I'm--well--I'm not sure.

Q. Would you agree with me, that no matter what is happening in your personal life, you try not to let that impact upon patient care?
A. That's true.

Q. However, there was something that happened in Yokota in your personal life that was impacting, wasn't it?
A. (Indicated affirmative response.)

Q. Would you tell the board what that was?
A. (Respondent began to cry and paused to gather her composure.) I need a Kleenex.

CIVRC: I don't know where there is one.

(Court reporter provided tissues.)

RESP: My grown son was a pedestrian hit by a car in England and taken to a British emergency department, seen by the doctors there who saw a Mexican-American foreigner.

Questions by civilian respondent's counsel:

Q. I'll tell you what, let's not go into what they did, but why don't you just tell us what resulted?
A. Yeah, missed a diagnosis of a cord injury and sent him home with a broken cord and no brace on his neck.

Q. And what happened as a result?
A. And came back quadriplegic.

Q. Okay. Let's move forward now. Your next assignment from Yokota was at Lakenheath?
A. Yes.

Q. What was your position at Lakenheath?
A. I was an emergency physician.

Q. Tell us about the volume of patients you saw there?
A. We saw a lot of patients.

Q. Was it similar to Panama, greater than Panama?
A. I think it's more. I think it was more. But we had a system there where we would put the patients--everybody in a room and then I would go from room to room. It worked really well. It worked fast.

Q. Did you have any problems with patients leaving without being seen there?
A. Uh--I don't know if I was more than other people. I--they did counsel me to hurry up and move faster, and especially with the system where you moved them--where all the rooms were filled and then you went from room to room, so that seemed to work better. So I liked that--

AREC: I'm going to object at this point--

RESP: --and it worked good.

AREC: --in that the leave without being seens at Lakenheath aren't relevant to our proceedings here as far as her privileges at Howard.

CC: That's noted, but we are going to go ahead and allow that.

CIVRC: Thank you.

Questions by civilian respondent's counsel:

Q. And after you were counseled, were you able to get your statistics in line?
A. I did good. I did okay.

Q. Did you ever have your privileges suspended there?
A. No.

Q. And no untoward events?
A. No.

Q. And were you given any kind of commendation or anything for your service there?
A. Well, they gave me a plaque that said, "good job"--"thanks for your good job at Lakenheath" or something like that.

Q. How about any military awards?
A. No, I didn't get a military award. I did get a plaque for being the honorary speaker for Women's Day for the base ceremony.

Q. When you left Yokota, were you given an award and ribbon for your services?
A. Yes, I was.

Q. What was that ribbon?
A. I was given the Achievement Medal for the--because I got more positive patient comments than anybody else consistently month after month.

Q. Wilma, with regards to--there's one other thing mentioned, and again, some of this is mentioned in LaMacchia's narrative, so that is why I am going into it because I agree with the government, most of this is not relevant, but because it is before the board, I have to go into it. There's one thing mentioned in Doctor LaMacchia's summary where it says that a nurse, who had been put in charge over the emergency room after you were removed, came to you and asked you to do a prescription refill and you refused. Has Doctor LaMacchia got that right or not?
A. No.

Q. Tell us what that was.
A. The nurse asked me to write a prescription for Acyclovir to put on somebody's lip. And I said, "I don't write prescriptions for Acyclovir ointment for lips because that is not supposed to do that much good and it is a waste of the government's money. It might make a day or two difference in the length that that stays on the lip, but I don't think that is valid, and I will not--you can't tell me I have to write a prescription."

Q. Now, let's bring it up to Panama now. And let's start with probably the most serious allegation against you and that is on the code. I'm not a physician and I'll let the physicians query you on that. But what I want to know is, first of all, why weren't you able to intubate the patient?

A. Because my left wrist was too weak. I tried. I thought I could do it, but when I tried with that big necked guy--big guy, I felt very weak. I felt weaker trying to do it. So I did my best and I asked somebody else to do it.

Q. At that time, had you been scheduled for carpal tunnel syndrome already?
A. Yes, since Lakenheath.

Q. Was that the first time you realized that there might be some impairment to your working in the emergency room?
A. Yes, sir.

Q. And was that the first time that problem had ever surfaced as far as the treatment of patients?
A. Yes, sir.

Q. As far as you are concerned, were your actions, during that code, appropriate?
A. Yes.

Q. And, again, I'll let the doctors go into the details of that. Let me ask you this. There is in here a memo from Doctor Burkett setting out his criticisms--no, this is the notification. I'm talking about the one on the code. Anyway you have seen--let me show you Exhibit 1--no, I'm sorry, that's not it either. (Trying to retrieve exhibit from members.) It doesn't matter. You've seen in this hearing the letter where he was critical, not only of inserting the airway, but also the positioning of the head. In fact, in here, he said he was more concerned about the positioning of the head. You saw in this hearing where he criticized about the defibrillation not being started, and about the CPR being stopped and then started again. Were you ever provided that?
A. No.

Q. When did you find out, if ever, that there was any criticisms of you regarding that code?
A. Way late.

Q. How late?

A. I'm not exactly sure. I think it--

Q. Was it during this process?
A. Yeah, during--I think it was during this process.

Q. So you were never given a chance to go back to the record or even respond to his criticisms, is that correct?
A. That's correct. They gave me a pile of paperwork when we started this process. It took me even a while to get through all of that because of all the problems related to this process.

Q. To your own knowledge, was there an independent review done of the entire care of this patient?
A. Yes, there was.

Q. And was there any findings made against your handling of the code--
A. No, sir.

Q. --to your knowledge?
A. No.

Q. And that was conducted by people not here?
A. That's correct.

Q. I'm not going to go through each of the patient complaints and things like that. Maybe the board will want to do that, but I think it is important that the board realize some of the things about the PEB because it is--it has been brought up here. When you were--when the MEB recommended a physical evaluation board, and when the informal physical evaluation board came back with their findings, their findings initially were that you were going to get fifty percent--you were fifty percent disabled and you should get retired--temporarily retired, is that correct?
A. That is correct.

Q. Are you on a specific time contract?
A. Yes, I think so.

Q. You are how old?
A. Fifty-seven.

Q. I hate to ask a lady her age, but I will do it anyway. Is there any way you can get a retirement from the military?
A. No.

Q. So basically, you had the opportunity to accept those findings, take the money and run, is that correct?
A. That's correct.

Q. Instead, what did you do when you found out there was going to be a medical board? Who did you go see?
A. When I found out there was going to be a medical board?

Q. I'm talking about with regard to other physicians?
A. Okay, for a second opinion?

Q. Right.
A. Well, this is the second time people have been trying to tell me that I have multiple sclerosis which I know I don't have. And--but they keep telling it to me. I proved it once that I don't have it, and now they are saying it again, even though I had no new symptoms, no nothing, until I had the Guillain-Barre, and so I decided to go to the very most important expert in the world on multiple sclerosis and I found his name from an article of his--well, I know his name. But it was the name of the person that wrote the original article on which diagnosis of multiple sclerosis is based and he is very famous, works for a Harvard University related hospital. And I called them up and said I wanted to make an appointment because I wanted to know the real truth.

Q. And his findings were that you did not have MS or any other cognitive problem?
A. Well, he didn't check for cognitive problems.

Q. Okay.
A. His finding was that I don't have MS, that I have Guillain-Barre, a variant of it called Miller-Fischer variant, and I also went--as long as I was there at the Beth Israel Hospital, I got an appointment with the head of the Neuropsychiatric Department to do another neuropsych evaluation, and I said, again, I wanted to

know the real truth. So her evaluation, which granted, I wasn't under stress when I did it, and maybe that makes for a lot of the difference because the other one, I felt like I was under a lot of stress, and I felt like they were serving the government and my commander and I did much better on this.

Q. So you chose to fight it?
A. Because I want the truth. I don't want--I never asked for a free ride. I have never--I would never accept to be retired, accepting diagnoses which are not true and which would limit what I can do in civilian life, no way.

Q. There are a couple of complaints that you were forgetful in the emergency room. Are you a forgetful person in the emergency room?
A. Not really.

Q. Let's go to this thing on the rabies. You heard Mrs. Thomas come in and describe what happened. Let's go first to the drug. What drug did you give her initially, as best you recall? First of all, you were never given this complaint, right?
A. No, never was.

Q. As a matter of fact, all the complaints in evidence weren't given to you--the patient complaints weren't given to you until this process began?
A. One of them was given to me earlier, the knee one.

Q. And the government chose not to put that in evidence and you did a response to that, so I assume they don't have a problem with it. Let's--
A. I gave her--

Q. What medicine did you give her?
A. I don't remember that well, but looking at the complaint, and knowing what I normally do, I think I wrote her--I think the first prescription was for Doxycycline. And I think the second prescription, when I changed my mind, was for Amoxicillin Clavulanate.

Q. In other words, what I'm trying to figure out here, you heard her statement where she said she got the bottle,

she started asking you about can she take this with milk or not and you said, "I don't want to give you that, let me give you something else". That sounds to me like you made a mistake, you gave her the wrong thing?

A. No, they are just two different ways to treat the same thing. The more modern way to do it or the more expensive, however you want to see it, is the Amoxicillin Clavulanate.

Q. What prompted you to make the decision, "No, I don't want to give you this, I am going to give you this", the fact that she started reading off about the milk?

A. No, that just reminded me it was a Tetracycline type drug.

Q. Okay, and that's when you made the change?

A. (Indicated affirmative response.)

Q. There was no mix-up between medications or anything like that?

A. Not that I remember, not that--I don't think so.

Q. Doctor O'Neil, when he was in here, said, regarding that incident, that you had misprescribed the rabies vaccine. I know the complaint doesn't say that if you read it all the way through. It turns out the mistake was made at another--I think at the Army ER, but I'm not certain. But did you have any role in prescribing that?

A. Let me tell you what I can remember of this case.

Q. Okay.

A. This was a stray cat that the woman said she had kind of adopted, so it wasn't completely stray. It was around her house. And I told her, "Well, if you can watch that cat for ten days, keep it, you know, shut up for ten days", then we won't have to give you the rabies shots unless the cat gets sick. So you are"--you know, she said she knew important people, I think the people in the Public Health where she is there and stuff. So I said, "Well, check with them, but right now, get that cat under watch and watch it and we can hold off on the rabies".

Q. You also told her to go to Public Service--to--
A. To Public Health.

Q. --Public Health though as well, right?
A. I think I did.

Q. As a matter of fact, she acknowledges that in what she says, okay. I'm not even going to talk about the Tylenol incident. If you all want to go into that, that's fine. I think we have exhausted that. Doctor Webster, given what you have heard in this room, do you want to go back to the ER?
A. I think there is a lot of politics in the ER. I think, when I gave the letter to Colonel O'Neil that I was telling him that I was very disappointed that I wasn't made director, being that I am the board certified one, being that I'm the one--

Q. You aren't board certified, are you?
A. Board certified in internal medicine and being that I'd had twelve or fourteen years of ER experience, I felt very sad about that. But I think I started in motion--I raised waves which you never do in the military. And I have created a lot of problems for myself, politics, and I don't want to get somewhere where I am going to be repeatedly put through this.

Q. You are working over at Health and Wellness?
A. Uh-huh. (Affirmative)

Q. Do you mind working there?
A. They are very nice. It is very boring, very slow. There are things I can get interested in. It's just a short time I hope I will be here still. But I want to eventually go back to the ER. That is what I am used to working and that is what I always have done.

Q. With regards to your privileges, can you think of anything you have done that should cause this board to take your privileges away from you, either to practice in the emergency room or primary care?
A. Nothing, and I'm--I passed the emergency medicine exam, the written exam. It's the oral that I haven't passed yet. But I am slated to take it again in October.

Q. So you are continually studying?
A. I can't study with this going on.

CIVRC: I think that is pretty obvious. I am going to turn you over to the government so they can ask some questions of you and to the board. But let me suggest that Major Marine has arrived, and rather than keep--because I expect the examination to be extensive, rather than keep her, maybe we ought to bring her in real quick because I think she will take maybe five minutes.

CC: Why don't we take a break and then we will see Marine? Let's take about ten minutes.

(The hearing recessed from 1240 hours to 1257 hours, 18 February 1999.)

LA: We are back on the record.

AREC: I'm sorry, you said we have another witness who is here?

CC: Major Marine.

AREC: Are you going to call her now?

LA: Right, we are going to call her out of order.

AREC: Okay.

CIVRC: thank you.

**MAJOR JOAN MARINE**

was called as a witness by the respondent, was sworn and testified as follows:

Questions by recorder:

Q. If you would, please state your rank and your name for the record and spell out your last name?
A. Major Joan Marine, M-a-r-i-n-e.

REC: Thank you. Your witness.

**DIRECT EXAMINATION**

Questions by civilian respondent's counsel:

Q. Major Marine, would you please, for the members of the board who don't know, would you please tell them what you do for the hospital?
A. I am the only physician assistant that is in Panama now. I am stationed over on the Army base doing Army things.

Q. How long have you been in the military?
A. Nineteen years and seven months.

Q. Have you had the occasion to work with Doctor Webster at all?
A. Not directly with her, but I do see her patients after they have been to the emergency room and come back to Clayton.

Q. If you had to estimate the number of patients that you have seen that have been treated or beforehand by Doctor Webster, what would that estimate be?
A. Um--well over seventy.

Q. And looking at her work-ups and doing the follow-up on her patients, have you ever seen anything that concerns you about her medical practice?
A. No, nothing.

Q. If you got sick, would you be afraid to be treated by her?
A. No.

Q. Would you be willing to be treated by her?
A. Sure.

Q. Do you feel that way about your family as well?
A. Yes.

CIVRC: I think that's all I have. Thank you.

**CROSS-EXAMINATION**

Questions by recorder: