Q. Just one question, ma'am.
A. Uh-huh. (Affirmative)

Q. You work over at Clayton?
A. Yes, I do.

Q. So you don't have any personal interaction with Major Webster? Have you ever seen her working? Have you ever seen her treating patients?
A. Yes, I have. On occasion, they do send me to Howard, and I have seen her in the clinic. I have never worked in the same office that she was in, never worked in the emergency room beside her, no.

REC: Thanks, no further questions.

**REDIRECT EXAMINATION**

Questions by civilian respondent's counsel:

Q. Just one question. Do you occasionally call her for consults or to talk to her about patients?
A. Yes, if I have any questions on a patient that she seen, I'll give her a call.

Q. I assume that means you respect her judgment, her medical judgment?
A. Yes.

Q. Has she ever said anything inappropriate to you that gave you any pause for concern?
A. No, not at all.

CIVRC: That's all I have.

REC: Nothing further.

LA: Apparently, there are no further questions. Major Marine, thank you for coming over. This entire process is what we call Quality Assurance. I am sure you are familiar with that process to a certain degree.

WIT: Yes.

LA: So for that reason, you are not free to talk about this case with anyone. The questions that you were posed, they stay in this room.

WIT: Sounds good.

(The witness left the room.)

LA: For purposes of convenience, we took the last witness out of order. Doctor Webster is still sworn and is going to be speaking to her attorney again.

CIVRC: I will pass the witness.

LA: Okay.

**CROSS-EXAMINATION**

Questions by recorder:

Q. Doctor Webster, you indicated you may have said a statement to the effect of "blowing up the place, blowing up the plane". Can you tell me how you would not remember saying such a statement? Is it because you say it frequently?
A. No, that's because I don't remember the exact wording. I remember the one statement that I said was approximately "if the plane blew up right now, I actually would be glad I wouldn't have to get on it".

Q. That's not my understanding of what you testified to. Maybe I am missing something. I was under the impression that you stated that you may have said something to that effect, but you don't really remember.
A. Yeah, I don't think that was the exact wording.

Q. So it is the wording that is different?
A. Yes. I made stupid statements, that's correct.

Q. And from your testimony, it sounds like your dream sequence you talked about sounds as if, you could get away with it you would, is that true?
A. Not at all.

Q. Okay, because you told us that you had a dream and you killed the Med Group--I don't know, management, leadership, whatever, and that they were heroes and you weren't because they died and you were not and your dream told you that you shouldn't kill--you shouldn't kill them?
A. My dream--I think dreams, throughout my life, are kind of a way to plan the future and if you dream how things happen, then you see how you should really do them and--

Q. And if you weren't going to get caught, you probably--
A. No, that's incorrect.

Q. Okay, just what it sounded like. That's exactly what it sounded like.
A. It didn't have anything to do with being caught. It had more to do with the rest of it about how people would think towards me, how I would think about myself, the whole emotional thing--

Q. Okay, let's move on--
A. --it wouldn't turn out right.

Q. --Major Webster. Let's move on. Do you think it was appropriate for you to state right outside of Doctor LaMacchia's office in front of technicians that you had been sexually abused as a child and, oops, you forgot to tell that to Doctor LaMacchia? Was that appropriate?
A. I just wanted to tell him that that had happened, that that was--

Q. But you told the technician that you didn't even know outside in the reception area?
A. I--are you saying that I told Doctor LaMacchia or that I told the receptionist?

Q. You told some airman outside of Doctor LaMacchia's office, according to his report. Is that true?
A. I don't remember exactly, but it probably is. I remember that I had forgotten to tell him that, and I wanted to make sure that he was aware of that. And it's not secret information. I mean, it is not something I should go out and publish in the newspaper.

Q. And you think it was appropriate for you to say that in front of a technician--
A. I think it was--

Q. --in a public area?
A. Well, I don't think it was a very public area.

Q. Okay, so the front office is not a public area?
A. I think that there weren't other people around listening. I think the airman was fine.

Q. How about public areas such as the first floor right near the ER where you shout, "I will go to lunch"? How about that, is that appropriate behavior?
A. I did not shout.

Q. Okay, so Major Burkett lied today or yesterday?
A. Major Burkett, I thanked him for showing correctly the intensity of my voice when--

Q. Major Burkett is pretty soft-spoken, wouldn't you say?
A. He correctly showed the intensity of my voice when I said that. And I thanked him for saying that. I said, "I thought you wouldn't have shown the truth. That is what I thought of you. But you pretty much said it correctly--did it correctly."

Q. So that, once again, was appropriate to shout, "I am going to lunch in a public area"? That is appropriate officer, doctor, professional behavior?
A. I think it is incorrect to not let your employees eat lunch.

Q. That's not the question I am asking you.
A. And I think--

Q. Please answer the question.
A. --it is correct for me to state that I am going to lunch and--

Q. Despite the fact that clients--
A. --I did not--

Q. --or patients are--

CIVRC: Can we let the witness at least finish her answer before we give--

REC: The witness is not--

CIVRC: Wait a minute.

REC: --answering my questions.

CIVRC: Mr. Legal Advisor, I am going to object. Let the witness answer the question and then she can ask her next question.

LA: Let's just--

REC: If the witness can just be instructed to answer the question asked and not talk about the right to lunch--

CIVRC: She is answering the question.

REC: --instead of the appropriateness of her remarks. That was my question.

LA: Why don't we just have--

WIT: I didn't shout it.

Questions by recorder:

Q. My question to you is, was it appropriate to bring that up in that setting, that public setting, is that appropriate?
A. We were in front of the elevator and I said, "I am going to lunch."

Q. My question once again, was that appropriate to take that up in a public setting such as that?
A. He, in a public setting, told me, "You can't go to lunch."

Q. Once again, I repeat my question.
A. Once again, I answered.

REC: Legal Advisor, if you could just--

LA: I think we are--

REC: --instruct her to just answer the question.

LA: The question I heard posed was, did you think that was appropriate conduct for an officer to respond, in the manner you did, in whatever tone that would have been, was that appropriate?

WIT: If I did it again, I would say it lower down but I wasn't saying anything wrong.

LA: I guess that is the response.

WIT: But next time, if I do it again, seeing that all of the--the bad repercussions that I got from saying, "I am going to lunch", emphatically, I should have called him into an office and said it. But then he said it to me out there in front of the elevator, so...

Questions by recorder:

Q. You were on your way out, correct?
A. I was getting on the elevator.

Q. So he had to say something to you before you left, correct?
A. I can see how he would say that, but he could have said, "Doctor Webster, please come into the office with me".

Q. How about telling Airman Goode, an airman that you just met, that you had a dream sequence about killing people and that you had an orgasmic feeling? Was that appropriate physician behavior, appropriate officer behavior to tell an airman, first-term airman, three years in the Air Force?
A. I should not have told her that.

Q. I'm not going to get into the Code Blue; I am sure the board will. Wouldn't you agree that there was no ultimate finding--or rather, wouldn't you agree that the standard of care was ultimately determined to be met during that Code Blue?

A. That is determined what it was, yes.

Q. Wouldn't you also agree that had Major Burkett done something wrong with the intubation, that he wouldn't have met that standard of care?
A. That is not correct.

Q. So Langley, when they reviewed it and said the standard of care had been met, they really didn't mean that because Doctor Burkett really didn't insert the tube properly?
A. I think it is because that is a moot point. It really doesn't matter. It didn't change anything. It is beside the point.

Q. They can question you later on that. Let's go to the medication, the Tylenol/Benadryl. I understand there is an MOD cabinet in the ER, is that correct?
A. Yes, that's correct.

Q. I understand also that these bottles, when they are in the MOD cabinet, have labels on them that are blank, correct, and that you have got to fill in the information?
A. Uh-huh. (Affirmative)

Q. How do you not know what you are giving if it says so right on the label and you are actually writing the prescription on the label?
A. I--

Q. Isn't that difficult, a difficult mistake to make?
A. I grabbed the bottle from the side that should have had the Tylenol and, without even looking at it--I should have looked at it.

Q. So you didn't look at it?
A. I should have looked at it. I should have read it carefully, but it was from the side that was supposed to have Tylenol, and I just wrote on it the amount of Tylenol that was supposed to be taken and gave it to the patient in a hurry at the moment.

Q. So it takes at least a minute or so to write out a prescription, so during that entire time that you are

writing on this bottle, you don't look at it and see what it is?
A. I apparently didn't that day.

REC: I don't think I have any further questions.

**EXAMINATION BY THE BOARD MEMBERS**

Questions by Doctor Matthews:

Q. I have a few questions. First of all, you mentioned that you wanted, for once and for all, get to the multiple sclerosis expert to rule out why everybody thinks you have MS?
A. Well, to tell me if I do or not.

Q. Is that what initiated the board in 1993, everybody thought you had MS? What was the reason that people thought you had MS besides the ones I've heard today? Who is everybody that thought you had MS and why?
A. When I joined the military, I knew--let's go back a little bit. I had chewed on something, crunched down on a tooth, and after that, I started with pain going over my head multiple times a day, almost like tic douloureux type pain. And I thought it was from the tooth that I had crunched on so I went to see the military dentist first because I was just back from Desert Storm. Then he said--he said he didn't find anything because I thought it also could be related to my wisdom tooth. And he sent me to the oral surgeon because my wisdom tooth needed working on and the oral surgeon looked at me and he said, "I'm not going to operate on your wisdom tooth and I don't see anything in the tooth, but I want you to go to the neurologist to evaluate this tic douloureux type pain", and so I went to a neurologist who ordered an MRI and the MRI turned out abnormal. But he said it could be MS, but--

Q. Just based on the MRI? Were you having cognitive problems then that people identified?
A. No, nothing.

Q. Just based on the MRI?
A. He said, "It could be MS, but you don't have any symptoms or signs so you don't have it. Some people

get those changes anyway, so that's fine." Actually, before he told me that, the broken tooth fell out. After I had the MRI, but before he gave me the result, the broken tooth fell out, the pain stopped, but I was stuck with an abnormal MRI which really worried me. So then I was scheduled to join the Air Force, and I did. And during training, I--

Q. I'm confused. You were initially in Desert Storm and then you were scheduled to join the Air Force?

A. I was an Army Reservist.

Q. Okay, got it. I'm sorry.

A. So I was scheduled to join the Air Force and I joined and during initial training, I was determined I would continue my Army running every day, but the Air Force wasn't doing it. So I was getting up at 3:00 a.m. and running and then working hard all day, staying awake until 11:00 o'clock at night and I wasn't sleeping. I was sleeping about three or four hours every night. During this period where I was--

Q. Was that at MIMSO, is that where you are now?

A. Right, MIMSO. And it is stupid to insist that much on so much training, that was too obsessive compulsive, but during that time, I got double vision which lasted the whole month. And I was able to complete MIMSO, cross over the one-rope bridge, the two-rope bridge, three-rope bridge, all of that, did everything. Finished MIMSO, but I knew I had--but now I had a symptom to go with the MRI. So I went to an ophthalmologist near Edwards Air Force Base where my step-daughter lived and he said, "You have got to rule out MS. But since you are fine, go ahead to Japan where you are supposed to go and they can work you up there." So I went to Japan and they started working me up. But I like to push things, to get it done fast. So I pushed for them to complete the evaluation. And every time we got a test back, I said, "Now we are supposed to do this." I probably would have been left alone if I hadn't pushed them to finish everything, but they did and then they thought, "Well, you have got to rule out still possible MS. We are going to send you to a MEB." And the MEB decided nah.

Q. Okay, to the code, the Code Blue. This seemed to be a focal point of a lot of why we are meeting here today. Can you start from when you got the call, go from there and tell me exactly what happened, what you did and what everybody else did.
A. Oh, I was working in the emergency department and there was a code called in the hospital. So we ran over there and I don't remember that well, but I think what I remember is that, when I got there, they were doing CPR, and as usual, I took my hand to feel the pulse in the groin and asked a little bit about the patient and looked at the monitor. I had a question whether I felt a little pulse, question. And Airman Burke said, "Look, he is breathing on his own." And, indeed, he was.

Q. What did the monitor tell?
A. The monitor looked like v-fib.

Q. During CPR?
A. During CPR.

Q. I'm a little confused. So you interpreted the monitor while CPR was in progress and you saw what?
A. It looked like v-fib.

Q. Okay, did you stop CPR to look at the monitor and see what the patient's real rhythm was?
A. I then--and then Airman Burke said, "Look, he is breathing on his own." So I said, "Okay, a count of five." And we stopped CPR and he continued breathing on his own. But the monitor still looked like v-fib. So I told everybody to check the leads because it didn't make sense. People with v-fib don't go around breathing on their own, and then there was the pulse that I thought I had felt. And I--uh--decided at that point--I'm a little bit hazy here, but I decided to go--oh, in the count of five that we did, he was breathing for a while by himself, continued breathing by himself with that rhythm still there which didn't make sense. So I opted to intubate the patient. And I had trouble intubating and then the other--

Q. So he was breathing by himself, you felt a pulse, you saw v-fib--



632

A. Questionable pulse and it looked like v-fib.

Q. And he was breathing on his own, but you decided you still wanted to intubate him even though he was breathing on his own?
A. Yeah.

Q. Why?
A. Because when I did the count of five, he got worse and we stopped bagging and he got--

Q. I'm sorry, let me digress again. When did you start bagging him?
A. He was bagged--they were bagging him when I got to the room.

Q. I thought he was breathing on his own. I am still confused.
A. They were bagging him, but then he was taking--I think they were bagging him, but then he was taking breaths on his own in addition. This is hazy.

Q. And then you counted five seconds and you--
A. And he looked worse.

Q. In what sense?
A. He was getting cyanotic.

Q. Okay.
A. So I said, "Okay, let's intubate him. I'm going to intubate him right now."

Questions by Major Steffen:

Q. And you still had the lead of v-fib?
A. Still looked like it, but I was doubting it.

Questions by Major Matthews:

Q. And then you had difficulty intubating him?
A. Yeah.

Q. And then what happened?
A. Burkett did it.



683

Q. Tell me about your attempts. You don't have to tell the whole thing, but you tried once--
A. Yeah.

Q. --couldn't get it, what did you do next?
A. I think I just--bagged suddenly a lot, you know, and then tried again and then bagged again.

Q. And then what?
A. And then I said, "I can't do this", because I felt--my wrist felt incredibly weak.

Q. Was he a tough patient to intubate overall?
A. Yes, he was.

Q. It does take a lot of strength to lift up a head like that.
A. I've had the surgery now and my strength is back, but I, indeed--

Q. And the--
A. And we started.

Q. Then what?
A. We started defibrillating.

Q. So you were in control?
A. It continued looking like that and I finally believed it.

Q. Tell me what you--you were in control still of the code?
A. I was in control all along.

Q. What happened next, he was intubated by Doctor Burkett and being ventilated, I assume?
A. Yeah.

Q. What happened?
A. Then--uh--I think I went--I-when I wasn't defibrillating--

Q. Tell me about the defibrillation. What did you do?
A. Uh--everybody off and 360 jewels.

Q. So you shocked 360 first?
A. Uh-huh--no, I'm sorry--

Q. That's okay.
A. Two hundred.

Q. Did you get a response?
A. No.

Q. Then what did you do?
A. Uh--three hundred.

Q. Did you get a response?
A. No.

Q. And then what did you do?
A. Three sixty.

Q. Did you get a response?
A. No.

Q. Then what did you do?
A. Continued CPR.

Q. Then what?
A. I ordered Epinephrine every three minutes, one milligram.

Q. Okay. Did he respond to that?
A. No response to that, and I don't know if I ordered Bretylium or not.

Q. So you gave Epinephrine?
A. I gave Epinephrine every three minutes.

Q. You gave Epinephrine once. It's been a minute. What did you do after that? You gave Epinephrine the first time--
A. I told--yeah, no response.

Q. And then what did you do?
A. And then we defibrillated, I think. That is what I should have done. I don't remember any more.

Q. It's hard to remember, and then what did you do after defibrillation?
A. I told them Epinephrine every three minutes.

Q. And then what did you do after that? Bretylium or anything?
A. I think maybe I went to Bretylium, but I'm not sure.

Q. You don't remember. How long did the code last?
A. Uh--not that long. I terminated it fairly fast because I always say that I don't like pounding on dead bodies.

Q. How old was he?
A. He was thirty-one.

Q. He had an IV in, I assume, already in the ward?
A. I think he did. I don't remember.

Q. Did you sign the record, once it was complete, of the code?
A. Uh-huh and then I asked, because I was very worried about this young guy, and I was thinking possibility of pulmonary embolism or possibility of some kind of leukemia and I thought, "We've got to have a good idea if we get a chest x-ray and see what it is that happened to this young man." And so I asked for--because I was a chief deputy coroner for many years--well, for about three years in my county in civilian life and I knew that was something you could do, so I asked for a post-mortem chest x-ray.

Q. How many people have died while you were--under your care, directly--not from--as a result from you, but--
A. In my life?

Q. --have died in front of you?
A. In my life?

Q. Yes.
A. Oh, in front of you in my life?

CIVRC: And I think limited to your medical practice.

Questions by Major Matthews:

Q. Right.
A. Uh--

Q. Basically a code situation or something--
A. Fifteen, twenty, twenty-five, something like that.

Q. How many deaths did you have here at Panama?
A. Oh, that's one, this is it.

Q. See, I remember my deaths. I remember because I cry with each death, and if a thirty-one year old person died with me, I'd remember it very well.
A. Oh, I felt...

Q. But you still have difficulty remembering the exact circumstances of that code. I'm sure it is stressful. I'm sure that has a play in it. I wish we had some records. That is very frustrating for everybody.
A. You know, it was--I felt very bad. I think I was overwhelmed with feeling bad about the fact that I had trouble intubating. I really felt bad about that. And a lot of worry about what this young man could have, although I was, like I said, thinking about my sequential diagnosis.

Q. Did he have family here?
A. No, I called and notified the family afterward. I talked to them and I also went to the post-mortem exam because I--well, I believe in post-mortem exams, number one. And number two, I felt that people were going to cause me problems because of that.

Questions by Major Steffen:

Q. Where was that done, the post-mortem?
A. It was done at Gorgas. There's not any Gorgas left, there wasn't, but there was still a place where they do the post-mortem exams.

Questions by Major Matthews:

Q. Besides the inability to intubate which happens, was there anything different that you would have done in that code situation? I mean, you are ACLS qualified which is just a certificate, but you have got some

training, background. You've now had some time since then. Is there anything different you would have done in that code situation?

A. Well, you know, I checked in the ACLS book and there is one place where it says that defibrillation isn't any use or any good if the patient isn't oxygenated. But I would have probably believed--perhaps believed that v-fib faster, but it still didn't make sense that he was breathing.

Q. This is bothering me a little bit. When you see a rhythm, I mean a critical rhythm, and CPR is in progress, do you--are you--you cannot interpret that rhythm with CPR in progress.

A. But I did stop the CPR.

Q. And you saw what rhythm?

A. It was still v-fib.

Q. You questioned that? What was the first treatment you give for ventricular fibrillation?

A. That is defibrillation.

Q. Okay.

A. But I take you back to Yokota. Do you remember there is a place where it says there was some problem with the two carts brought to the ER?

Q. We haven't read it yet, but go ahead.

A. There is a place--there is a code I was involved in in Yokota. It looked like v-fib. I felt pulses. I said, "This can't be. He's got v-fib." I felt more and more sure so I had them take it off and he still looked like v-fib. In the end, it turns out they had accidentally connected--the techs had connected two code carts. One lead was from one code cart, two leads from the other and it looked like v-fib, although it really wasn't and the pulse I was feeling was correct.

Q. Did this patient have that, two code carts--

A. No, did not.

Q. This patient was turning cyanotic in front of you, had a questionable rhythm, you were still questioning--

A. At first he wasn't, but he was getting bagged.

Q. And as he was turning cyanotic or not doing well, as you said, your first treatment for this gentleman in the rhythm that you interpreted as best you could was--
A. Was v-fibrillation.

Q. Okay.
A. Although they say that defibrillation without sufficient oxygenation really doesn't work. And this guy apparently was in the end stages of whatever he had--

Q. So according to the American Heart Association--
A. Says defib. But the book, itself, says--

Q. What is the second line drug after Epinephrine?
A. After Epinephrine for--

Q. For v-fib.
A. For v-fib--uh--lidocaine.

Q. And yet you thought you gave Bretylium after Epinephrine, but you couldn't remember or--
A. Oh, no, I'm sure I gave Lidocaine, I'm sorry. I--uh-- made a--that error there. It was Lidocaine, I'm sure.

Q. Can you tell me the circumstances, you left the civilian world and came in the military. You were a Reservist in the Army first?
A. Yes, I was.

Q. You had some trouble with NEBA?
A. NEMA, NEMA.

Q. Well, not with them, but with the other physician at the hospital and then you went to another hospital in Pennsylvania?
A. Uh-huh.

Q. For four years you worked there?
A. I'm not sure if it was three years or four years.

Q. Why did you decide to leave that and decide to join the military full-time? Did you have problems at that hospital?

A. They wanted to get rid of NEMA.

Q. At the Pennsylvania hospital?
A. They wanted to keep me, and they were doing negotiation to keep me, but there was problems with the negotiation.

Q. How so?
A. I don't know, how much money they wanted or what.

Q. So there was a new group coming in?
A. There was a new group coming in.

Q. Was it a national organization?
A. Huh?

Q. A national organization?
A. No, it's a group of people headed by Maryland--

Q. A fairly large group then?
A. No.

Q. No?
A. It's a small group.

Q. They chose not to employ you as part of their group or you didn't want them or--
A. They wanted to, but there is an exclusion clause on my contract with NEMA and they say that I could have gone against that and I could have--

Q. So you were forced out of your job, but not because of any problem with you, but just because of logistical problems?
A. Yes.

Q. And then you decided you would choose to join the service?
A. No, no, not right away, no. They gave me recommendations to go to several other hospitals near there and I worked in two different hospitals, not in the area that was prohibited, but just outside of it in two emergency departments in Hazelton-St. Joseph Hospital and in Muncey Valley Hospital for years.

Q. Let me ask a question now. You mentioned the atrial fibrillation patient. I'm just trying to get your thought process. I'm trying to get to know you the best I can.
A. Yeah, I'm sorry, I'm stressed out from these questions I wasn't expecting.

Q. That's okay. With this a-fib patient you had a problem with in Yokota and went to get an x-ray, just tell me about him. What was his complaint? I know this doesn't pertain to Howard, but I just want to know your thought process. What was he there for?
A. Because he was itching and he had a rash and he was thirsty.

Q. Why did you say such unusual statements, such as blowing up stuff?
A. I--

Q. When--sorry--when you knew you were--I mean, you were in trouble. I mean, you were concerned, I'm sure, given you are a logical person, higher education. We all have the same diplomas behind us. You know, it's at the point you straighten your tie, look nice, "Yes, sir." I don't understand. What were you--I mean, I've never been through what you've been through, but you tell me.
A. Well, because ever since I turned in the letter to O'Neil, approximately since then, saying that I thought I should have been made director of the emergency department--

Questions by Major Steffen:

Q. When was that? I don't mean to interrupt you, but do you remember time-wise when that was?
A. Uh--

CIVRC: I think the letter is one of the attachments to 39, I think.

WIT: Within a month of so after that, I started--more and more problems started developing and then McCrary wrote his letter and Addison was causing me--

CIVRC: No, I don't think that is the letter. I'm sorry.

WIT: It seemed like my whole world was--

REC: Which letter is this you are referring to?

CC: Her letter to O'Neil about Doctor McCrary--

WIT: First they told me that--

REC: I don't know if that is in evidence.

WIT: --I would be the one to run the ER meetings. So I said, great, that's fine. I was thinking things were really going better. And I didn't mind it as assistant director. I said I will do a good job at it and I will work hard on this and I tried to cooperate with McCrary. I led this meeting, I wrote the minutes after the meeting and I was real happy. Then within a couple of days of that, then they took me out of the ER and it was like totally unexpected at that point.

Questions by Major Steffen:

Q. That was after the code, correct?
A. That was--yeah.

Q. But it was after the code you got taken out of ER, right?
A. Oh--no, I think that was a different time, I'm sorry. Let's go back to the code. Right after the code, also which I think was very traumatic to me--

Q. Sure.
A. --was--after the code, this bad experience where I can't intubate somebody, and they say that after a code you should have this session where you get together because otherwise people have problems thinking about it afterwards. Well, instead of--they did have a session like that, but then right after the code, then it is like they kick me out and that was super traumatic. Not only I felt bad about my arm being weak, but then, no, because of the code you couldn't intubate, you are out of the ER, you have to go to family--to primary care. So when I went to primary



692