A. Yes.

CIVRC: I've already showed all these.

CC: Okay.

CIVRC: I believe we are on--

LA: Fifty-eight.

CIVRC: Fifty-eight, all right. Besides that schedule, I want to put in some letters from people who could not be here for one reason or another.

The first exhibit, Exhibit 60, is a letter written by Mr. Frank Dean Weber.

LA: Exhibit 59.

CIVRC: I'm sorry. Fifty-nine is a letter written by Wilma's aunt, Alice Gamble, who basically talks about the fact that she is not an anti-social person, et cetera. But it is just to give you some kind of flavor of what her family thinks of her.

CC: Okay.

CIVRC: Exhibit 60 is a letter dated February 15th, 1999, again, from her uncle, Frank Dean Weber.

RESP: Cousin.

CIVRC: Cousin, I'm sorry.

Exhibit 61 is a letter of support on behalf of Major Webster dated 5 February 1999 from Phyllis F. Jones, Captain, U.S. Air Force Nurse Corps, Nursing Manager, Fort Clayton Clinic.

CC: Okay.

CIVRC: Exhibit 62 is a letter from Doctor Ngo who is a pediatrician here at Howard who also, by the way, sat on the initial credentials board which revoked it, talking about her experiences with Doctor Webster.

CC: Okay.

CIVRC: Exhibit 63 is a letter dated 24 June 1998 from a Jodi L. McMasters who is one of the patients that she treated. We obviously didn't have a chance to go around and survey all of her patients, but just so you all will know there are some people who think she is good.

And then Exhibit 64 is a letter from John S. Best, also a patient and whose family was treated by her.

CC: Okay.

CIVRC: And that concludes our presentation.

CC: Do you have closing statements?

REC: Yeah, I don't know if you want to take them up now or take a short recess?

CC: At 2:30, we will come back for closing statements.

(The hearing recessed from 1415 hours to 1445 hours, 18 February 1999.)

LA: We are back on the record now. Apparently, we don't have any other exhibits to get in. Both sides have no further exhibits and no further witnesses.

Panel, do you all have any witnesses you would like to recall at this time?

(Negative responses.)

LA: We would note that the panel has had full access to Doctor Webster's medical records. They reviewed them fully, had access to them. They don't see there is anything there they would like to have on the record.

So at this point, if you don't have anything further, we will go to closing now. Is that okay?

REC: That's fine.

CIVRC: It is my understanding we are going to be limited to no more than ten minutes?

LA: Right.

REC: As you all know, the ER is a pretty important place. It's real fast-paced. It can be really stressful. You've got to show leadership if you are the ER doctor. You've got to take control. You've got to show organization. You have got to show that you know what you are doing. You have got to show that you know what the next step is, and you've got to think logically. And the government feels that the evidence brought forth during the last two days shows that Major Webster has none of those qualities that are necessary for an ER provider.

Further, as you all know, Major Webster was placed in family care and also had problems there. That is why the government is here today to put on its case and is convinced that you will find Doctor Webster should not be a credentialed provider any more.

I just want to briefly give you an overview of everything that all the witnesses have said during the past two days. (Recorder used demonstrative aid on easel during closing.)

You had Doctor Fey, who is a psychiatrist here at Howard. He told you that she has got a cognitive disorder, not otherwise specified. He actually dealt with her one on one. It's not like this is hearsay. He also said she is forgetful. She does socially inappropriate things, and I would also like to refer you, if you wouldn't mind, to Exhibit 10, which is Doctor O'Conner's letter. And Doctor O'Conner, mind you, is the neuropsychologist who did a work-up on Major Webster, who Major Webster selected to do the work-up. The very last page of that exhibit, and I will just quote here, "Despite her considerable strengths and superior intelligence, her problems in the area of memory and processing speed may intrude upon work performance, particularly in situations requiring a rapid response to complex types of



715

information. There are two solutions to this problem. Her work responsibilities may be reorganized and reduced, so that she may complete her assignments effectively. The other solution is for her to identify work that is engaging for her intellectually and emotionally, but that is not time dependent." And that is from her own doctor that she individually acquired and had do her examination.

Let's move on to Dr. Burkett. He told you all about the Code Blue. I am not going to get into it because personally I would probably mispronounce a lot of these words. But the point got across that Doctor Burkett arrived and she was not doing what she should have been doing. Doctor Burkett told you about how she was moved into family practice and how she had some problems there. They usually don't put--have family practice providers see patients every half-hour. They have them see patients every fifteen or twenty minutes. They had Doctor Webster seeing patients every thirty minutes and yet she was still behind. And then, of course, there was the lunch outburst in the heavy traffic area of the hospital where she indicated that she was going to lunch.

Moving on to Doctor Mendez, he had a lot to say here. He was instrumental in choosing Major McCrary over Major Webster for the chief of the ER. He indicated to you that he gave Major Webster plenty of time and opportunity after she got here. Since Major McCrary arrived first, he wanted to wait and give Doctor Webster an opportunity so he could compare the two and he indicated that he was more than fair. He gave more than ample opportunity and time to Major Webster before he made the input on his decision to choose Major McCrary as the ER chief.

He also told you that he's in charge of credentials or rather he oversees the credentials of all the providers and that Major Webster is not yet board certified and that she failed the oral portion of that exam at least two times. He also told you about the Benadryl/Tylenol mix-up which I don't want to get into too much detail here, but that Major Webster even said on the stand today, herself, that she agreed that, yes, you had to

out decision to remove her from the ER. Once again, he is trying to prevent an adverse outcome. We are trying to be preventive here.

Colonel Remington didn't have any first-hand knowledge, so to speak, of everything that went on here. He did receive all the documentation regarding Major Webster from Lieutenant Colonel Addison, his predecessor. He was filled in on the whole background and problems that were occurring with Major Webster. He also agreed that the Air Force and himself have been fair to her.

Captain Shercliffe was the ER nurse. He testified that she had difficulty with the triage, she had trouble prioritizing, she couldn't handle a large amount of patients, she had very--she had problems and difficulties focusing on more than one task. He told you of an incident where she was in her office with a patient and he got an emergency call on the phone about somebody whose child had taken some of their prescription medication. He needed guidance right away. What did she tell him? "Oh, you know, just take their number. I will call them back later." So what did he do? He did whatever he could. He looked up what that medication was and he gave that person some advice, but that is not what should have happened.

Major McCrary, his opinion of Major Webster, poor. He is the chief of the ER. He told you the true number of leaves without being seen and other related stats. The leaves without being seen during Major Webster's, I guess, tenure in the ER was very high. Sometimes they were low, but then Major McCrary indicated that that was because she had only worked half the month. He gave her a counseling session, and you've got those exhibits in front of you. And he indicated he does not want her back in the ER. No way does he want her back in the ER.

Doctor LaMacchia, which obviously he is not here today. He didn't come testify today. However, his evaluation is Exhibit 44. I would like you to take a close look at that and I've just taken portions of that that I wanted to bring to your attention. She got lost a lot in his office. If you will read the report, you will

see she didn't know where she was going. She would constantly get lost in the office, outside the office on her way back, just not all together there. He said, quote, "She has got attention and concentration deficits. She is mildly impaired in more complex tasks of sustained attention and concentration. Does not perform well under stress. Lack of personal situational awareness."

So there you have it. Those are the government witnesses. And in closing, the government would like you to consider all the documentation that you have got in front of you. We would like you to take into consideration some of the letters of support or some of the supporting witnesses for Doctor Webster and note that a few of those exhibits, those letters, were written by family members. Take those for what they are worth. My parents would probably say great things about me, no matter what.

Also a lot of the witnesses that were here today did not work with her, only know her in small, limited capacities. Okay, they never worked alongside her. They didn't know the facts and circumstances surrounding the case, so we would just ask you to take those for what they are worth.

The government argues that Major Webster, she may look good on paper. She may have immaculate patient notes and summaries and I think you call them SOAPP notes. But I ask you to consider, she is good on paper, is she good in practice? And the government argues she is not. They are two different things and you have got to see outside that and look how she is in practice. A good example would be her testimony here today in answering questions on the spot. Was she quick enough? Did she--was she organized? Is she good in practice? She may be good on paper, but that doesn't get us anywhere. That doesn't help a patient who is dying.

Don't wait for a bad patient outcome to happen. It is true and the government admits that no bad patient outcome has happened yet. That is why we are here today. We are trying to be proactive. The government argues that you have got a lot of evidence in front of



720

you to take her credentials away. And in the alternative, if you decide that her credentials should not be taken away, you should severely limit her ability to practice. You should limit it to a setting in which there is constant, constant supervision, very low stress, very low key, somewhere where her disorganization, her lack of confidence, her slow speed will not cause a bad patient outcome. And that may mean keeping her even here at the HAWC. The HAWC is a good place for her, low stress. She has been doing great. She had witnesses coming in saying how great she was doing. She is writing these articles. She is doing preventive medicine, blood pressure screenings, things like that. Perhaps that is a more appropriate setting for Major Webster.

Thank you.

CIVRC: Gentlemen, perhaps the most difficult and weighty responsibility that an attorney has is when he carries the career of his client on his shoulder. You are all physicians. I don't have to tell you how important it is, how important the medical license is to you all. You are doing what you love to do and it is important.

There has been a lot of discussion here about Major Webster not being a proper provider. But there's been absolutely no evidence presented to you with regards to her ever having done any improper medical care. Doctor Mendez says, "I can't say anything bad about her clinical work." Doctor McCrary, who the record shows, these two didn't get along, said, "No, as far as clinically, I think she is fine." He also gave the opinion you don't go from a letter of counseling to pulling somebody's credentials.

Doctor Burkett has only the code, and I am going to talk about that in a minute. And Doctor O'Neil has only the code, and what did he say? She didn't intubate the patient, but after that, the code went smooth, which is contrary to what Burkett says.

Now we have got some independent evaluation of that code as well. And that code was reviewed by Langley and they apparently found no problems. I don't have



721

the records of the code. I wish I could bring them to you. What I really wish is that Doctor Webster would have been able to look at those records and confront the issues that are before you.

Doctor Matthews, you said that every code you have had you remember and you think about and you can remember everything you did.

CM (Maj Matthews): That died.

CIVRC: Yeah, that died. But have you ever been in a situation where, suddenly four months later, you have been accused of doing something wrong in a code, the records aren't available, and at the same time, you are being sent for a medical evaluation, the next thing you know you are getting a referral OPR, the next thing you know you are being pulled from all of your clinical responsibilities and seeing patients, then you are put on an airplane, you are flown to Wilford Hall, you get Guillain-Barre Syndrome, you've been out of the ER for a year? I ask you, can you put yourself in those shoes? Think about that.

I think the only things we can say at this point in time is at least some independent body looked at this and apparently didn't find anything wrong.

You know, I am really sorry to even talk about this, but you know, I will admit I look at this and I say, well, gee, I see that is Elixir, APAP Elixir and then this is Hydromine Elixir and I can see that as clear as a bell. But you have got to remember what the pharmacist said when he came in. Do you remember? He said this was a common problem. Doctor Webster wasn't the only one that did that. Other providers did it as well. And it was such a problem that they quit buying Tylenol from the same manufacturer so they could get it in a different bottle. I don't think that shows that Doctor Webster is an inadequate physician. But she didn't try and cover it up. She wrote her own note on it. And that was freely acknowledged by everybody that came here.

Patient complaints. My God, people. Let's talk about the medical information desk reports. I know your position in this board is that, well, even though she was returned from the PEB, it doesn't necessarily mean that she is physically able to practice medicine, all right? But let's start using our common sense just a minute. Look at the records. Compare what Poser says and compare what Doctor O'Conner says. And then ask yourself, if this is a doctor with these cognitive dysfunctions who has poor organization, who is forgetful, who can't find her way out of offices, then wouldn't we see in the period of time that she was in the emergency room and in the period of time that she was in primary care, and I've got nine complaints on her--I'm sorry, four in ER and I think two in primary care--wouldn't we see more complaints than that? Let me ask you something else, too, because I've done a lot of these boards.

Have you ever seen eleven people come in to vouch for a provider who they are saying is so bad they need to have their credentials pulled? I've never seen it. Her co-workers, every one of them came in here, people who work with her. Doctor Li, who apparently under feeling pressures from command, came in here and said, "She's great." Doctor Tall. Doctor Luff submitted a report saying he thought she was fine.

Listen to what the people say. If the medical is correct, how can she do this? It doesn't make sense. You have got to use your common sense here. This woman is not an impaired provider. As a matter of fact, I think one of your documents specifically says she is not an impaired provider.

Finally, look at the regulation that you are asked to use. And again, sometimes I get my best ideas from other people. In this case, I am going to steal it from Doctor Matthews. Doctor Matthews pulled 44-119 just so he could see himself, and it says that you are supposed to pull privileges if there has been gross provider misconduct, professional incompetence or negligence. And you heard Doctor Burkett, one of the chief advocates here, saying none of those happened.

He still doesn't want her back. Doctor O'Neil doesn't want her back.

You are in a tough situation. Your boss is telling you, "I don't want her back." But there is no evidence to substantiate what he is asking you to do. I would ask you, when you are in deliberations, take her name off the documents and put your name on the documents and ask yourself is it fair to jeopardize her privileges in any way when there has been no showing, that not only has she not harmed a patient, but that she has done a good job when she treats patients. And that's been the whole testimony from this witness chair. Not one person has come in and said she did anything to harm a patient, but more importantly, they said she did a great job. She did a good job. She worked up patients. She was conscientious. the pharmacist said she stayed current on her drugs. There wasn't anybody--the lab officer said he looked at her lab work. I agree with the government, if you just look at one aspect of that testimony, that's not enough. But when you look at everybody and what everybody said, finally, look how far the government has to stretch.

You know we heard about the leaky boat in the opening argument by the government. The only leaky boat here is the one the government is trying to sell you because there is no evidence that she did anything wrong, nothing. But there is evidence that she is a competent provider.

Now, folks, she has been out and away from the hospital for a long time. And I'm not suggesting that maybe before you put her back in, that it wouldn't be wise, for example, to send her to another course on ACLS, that it wouldn't be wise maybe even to monitor her for a while because she has been away for a year, she has been under stress, she hasn't had time to study. And, quite frankly, if I left the practice of law for a year, I would want somebody to watch me if I came back after that. But there is no basis to pull her privileges which is a punitive action, which is an action which can reflect upon--which will be referred to a licensing board and will have a detrimental

effect, and if you don't think so, you are not in the real world.

Again, put your name there.

Finally, I want to conclude by saying, that because of the pressure I have and the weight that I have on my shoulders in representing a doctor--and I've done it before, and by the way, I've had doctors say even more stupid things that what she said under the thought of losing their livelihood, I have to be aggressive. I have to represent the interests of my client to the utmost. If I have done anything to offend any of you all or get you mad, please, be mad at me. Don't be mad at my client.

I want to thank you for your thoroughness and your attention throughout this and to listen to all of this evidence, and I hope that you will do what the committee says it is. This is a peer review. Look at her as your peer, and then ask yourself, would I want my privileges taken away if the only things that ever came out in a hearing was that I provided good medical care for my patients? Thank you.

LA: That concludes all the statements we are going to get in this hearing. But before we completely close, I want to account thoroughly. We don't have to do it on the record. We can take an administrative recess. But I want to make sure every single exhibit is accounted for on this table. So we are going to be in a brief recess. Following that, we are going to close the hearing.

(The hearing recessed from 1511 hours to 1518 hours, 18 February 1999.)

LA: We are here to account for some administrative matters. Mr. Martin, apparently, you have one item that you would like to address.

CIVRC: Yes, Exhibit 20 which is the x-ray on the person that was coded, we are moving to withdraw this exhibit. It should not have been admitted. It was merely a demonstrative aid to back up Exhibit 19 which is the



125

report and was also, quite frankly, submitted before we knew about the independent review. But at any rate, we are offering to withdraw this exhibit, realizing fully that, by withdrawing this exhibit, we waive any right to complain on appeal, if an appeal occurs, that this was not included as part of the record. Does that satisfy you?

LA: Again, thank you for that. I realize it is unorthodox. It would not typically be done. But you raised it to our attention and the hospital counsel does not see a need to--I don't think it would assist the panel. They have assured me that it does not. So if it assists you, and you are confident that it is in the best interest of your client, then I am all for withdrawing Exhibit 20.

CIVRC: Thank you. For the record, I am going to give it to the hospital counsel.

RESP: Actually, I--

CIVRC: I am going to give it to Major Webster so she can return it.

RESP: I signed it out.

LA: Are there any other matters here because, at this point, we are at the conclusion and we will formally close this hearing? Are there any other matters that we need to address?

REC: Nothing from the government.

CIVRC: Nothing from Doctor Webster.

CC: As chairperson, again, I would like to thank counsel for both Doctor Webster and the hospital for presenting the evidence in an orderly manner.

I would like to officially say that this committee hearing is now closed and we will go into deliberations.

(The hearing closed at 1521 hours, 18 February 1999.)



726

**REPORTER'S CERTIFICATE**

I certify that these proceedings were recorded by me with stenomask court reporting equipment and that the foregoing transcript is a true, accurate and verbatim account of the credentials hearing.

9 March 99
Date

Jeanne R. Starr
JEANNE R. STARR, GS-9
Court Reporter

737

**DEPARTMENT OF THE AIR FORCE**
USAF JUDICIARY AREA DEFENSE COUNSEL
PATRICK AIR FORCE BASE FLORIDA 32925-3238

21 December 98

MEMORANDUM FOR 24 MDG/CC

FROM: AFLSA/ADC
1201 Edward H. White II St., Ste. N-110
Patrick AFB, Florida 32925

SUBJECT: Request for Hearing

1. My client acknowledged receipt of the notice of proposed revocation of privileges dated 3 December 98 on 9 December 98. By and through counsel and in accordance with the rights enumerated in Chapter 4 of Air Force Instruction 44-119, dated 1 October 1995, Major Wilma Webster hereby respectfully requests a hearing to review the proposed action.

2. I can be contacted at DSN 854-4423 and the fax number is DSN 854-4425.

SCOTT E. HARDING, Capt, USAF
Area Defense Counsel

WILMA P.WEBSTER, MAJ USAF MC

DEPARTMENT OF THE AIR FORCE
24TH MEDICAL OPERATIONS SQUADRON (ACC)
HOWARD AFB, PANAMA

**7 January, 1999**

**MEMORANDUM FOR Wilma Webster, Major USAF, MC:**

**FROM: 24th MDG/SGH (Major Edwin K. Burkett)**

**SUBJECT: Notification of Privileges Hearing**

1. The credentials hearing committee will conduct a hearing that may adversely affect your clinical privileges. Depending on the final outcome, HQ AFMOA/SGPC may report the matter to appropriate civilian regulatory agencies. I refer you to AFI 44-119, chapter 4 for discussion of your rights and responsibilities in this matter. Information on what specific matters are reported to civilian regulatory agencies may be found in the same regulation, chapter 4 and 6.

2. Allegations being investigated are:

A. That you suffer from a chronic, progressive demyelinating disease (Multiple Sclerosis) with significant cognitive and behavioral damage that makes you unable to safely conduct patient care. Also that you lack acceptance or insight into the disease and this compounds your risk to quality patient care. The bases for these allegations are as follows:

1) You underwent a Command Directed Psychologic Evaluation dated 14 July 1998 at the 24th Medical Group, Panama conducted by Major Richard La Macchia which concluded that you:

-Had consistently poor motor skills performance, particularly under pressure.

- Possible aspects of a Cognitive Disorder evidenced by neurospychologic deficits consistent with diffuse brain dysfunction

-Functional impairment that would prevent you from performing at or above the standard of care required for an ER physician

- Lack of awareness of any of your deficits

2) According to a discharge summary dated 18 October 1998 you were admitted to a Turkish Hospital for an acute disabling weakness attributed to an immunologically mediated mechanism. Dr. Emil Goldenberg and Dr. Hayim Babur stated that you had:

- Acute Guillain-Barre

- This led to your admission and Neurology workup at Wilford Hall Medical Center

3) On 4 August 1998 a narrative summary was completed from your neuropsychologic evaluation at Wilford Hall Medical Center, San Antonio, Texas conducted by Lt. Col. Brian Campbell that concluded that you have:

- Cognitive Disorder, not otherwise specified

- Personality change due to Multiple Sclerosis

- Antisocial, histrionic, and narcissistic personality traits

4) On 7 November 1998 a narrative summary was completed from your Neurology evaluation at Wilford Hall Medical Center (WHMC), San Antonio, Texas was by Dr. Richard Popwell and Dr. Gary Gronseth and you were diagnosed as having:

- Laboratory supported, clinically-definite Multiple Sclerosis (MS)
- Had an acute inflammatory demyelinating polyneuropathy (AIDP)

The narrative states that there is a long-term functional impact because, whether this presentation was AIDP or an MS exacerbation, similar attacks in the future could occur and once again debilitate you.

5) On 20 November 1998 from Lt. Col Brian Campbell wrote a memorandum to Dr. Jack Saylor, MMB concerning your Social and Industrial Impairment Ratings. He stated that:

- "Her difficulties lead to marked military impairment and disqualify her for worldwide duty. I would rate her social and industrial impairment as severe. Although she may be employable, I doubt that she can continue with her practice of medicine safely and competently"

**B**. On 5 different occasions you have demonstrated labile emotional, behavioral, and personality traits in front of patients that have caused patients to lose confidence in your ability to treat them.

1) According to a patient complaint dated 11-12-97 Samantha Houston says that, "Dr. Webster was very, very forgetful and (I was) waiting in the emergency room from 3:30PM to 11:30pm."

2) A patient complaint submitted by Brian Denmark states that you gave him poor service and that "The provider was unwilling to listen to what I was saying." You "refused" to renew a prescription he had been taking for 10 years.

3) Another patient complaint dated 27 Oct 1997 by Kenneth R. Teel states that " Dr. Webster was absent minded"

4) A memorandum dated 7 February 1998 from patient SGT John Silbaugh says that during his appointment you began to cry. This made him nervous and when he asked you what was wrong you said, " I hate this job." He stated that you also said that the work you were doing could put you in jail.

5) A memo dated 6 May 1998 from patient Michelle Schroder describes an ER encounter. She complained of knee pain but says you told her that her XRAYS were fine and there was nothing wrong with her knee. She says she saw Orthopedics a few days later and was told she had a torn meniscus, and was scheduled for arthroscopic surgery. She says, "I was extremely disappointed with the service and care provided by Maj. Webster, especially when she told me nothing was wrong with my knee. I would not feel very confident if a life threatening emergency occurred while she was the attending Emergency Physician."

C. You have demonstrated poor insight and impulse control evidenced by emotional outbursts and inappropriate statements in public locations including contemplation of acts of violence against persons, and against an aeromedical evacuation aircraft.

1) On 29 January 1998 you responded in an angry, loud, and unprofessional manner when you were instructed that you had scheduled patients checking in and should not go out to eat for

lunch. Dr. Edwin Burkett, Chief of Family Practice, dated 30 January 1998, notes the episode in a memorandum.

2) On 15 September 1998 you detailed to Aeromedical Evacuation Technician SRA Kristen Goode a dream you had where you "shot everyone" and this gave you an orgasmic feeling. On 16 September, in front of SRA Goode and several patients, and just prior to boarding the Air Evac mission you stated that " I just want to blow up the plane." SRA Goode dated 17 Sept 1998 documents these comments in a memorandum.

**D**. You have been noted to perform in a forgetful and unorganized manner on several occasions and to demonstrate poor judgement, including documented incidences of dispensing incorrect medication to patients.

1) You received a Letter of Counseling from Dr. James McCrary, Chief of Emergency Services, on 30 November 1997. He counseled you on excessive patient waiting times, forgetting about patients and having them wait too long before making a final disposition, having multiple patient complaints about you, and complaints about poor communication and instructions on your part by ER staff. He said, " I've seen a pattern of difficulty in handling the work-load in this Emergency Department when alone as sole MOD".

2) On 24 January 1998 you inefficiently handled a Code Blue according to a Memorandum for Record by Dr. Burkett dated 31 January 1998. It states that:

-You did not seem to grasp the importance of head position for ventilation of the patient and the patient was not being ventilated even though a technician was tying to bag him. You did not ask for assistance from another physician until you had made 3 unsuccessful intubation attempts.

- You neglected to order CPR on a pulseless patient.

- Thirdly, you had failed to order initial defibrillating shocks on a patient you knew to be in Ventricular Fibrillation until reminded by others.

3) On 3 February 1998 you received another Letter of Counseling from Dr. Teodoro Mendez, Chief of Primary Care Flight. He counseled you on the following:

- The outburst incident noted above in paragraph C.1.

-That on 2 February you left two scheduled patients unseen and took lunch for more than an hour. The same day you left another patient waiting after clinic hours on your request but you had left the building.

-On 3 February you again left for lunch for more than an hour while two patients with morning appointments waited unseen.

4) Based upon notes from Capt Ryan Shercliffe, Emergency Room Nurse, dated 19 May 98 you failed to follow appropriate triage procedure in the ER and took care of two stable pediatric appointments prior to seeing more acute patients. He states, "She did not realize what order the patients arrived, she had not looked over the charts to assess urgency."

5) On 26 May 1998, based on notes from Captain Shercliffe, you showed that you were unaware of the urgent transport policy for ambulance pick-ups on the East Bank. On the same day you also refused an ambulance for a pregnant patient whose water had broke here at Howard, instead you chose to let her wait for a commercial taxi to take her downtown.

6) ER notes on SF 558's dated 20 April 1998 at 1839 and 2220. You prescribed Tylenol elixir but actually handed out a bottle of Benadryl elixir from the MOD cabinet for patient Alexandria Ordaz.

F. You failed to initially acknowledge a known physical limitation, left wrist weakness, that prevented you from performing a successful intubation during the cardiac arrest referred to in paragraph D.2. You stated after the incident that your wrist was weak but later recanted the statement. Your conduct has caused the 24th Medical Group to lose confidence in your willingness to disclose any physical impairment that may limit your ability to safely conduct parts of your duties as an Emergency Room Physician or Primary Care Physician.

1) A 23 March 1998 Memorandum for Record by Lt.Col Addison, MDOS/CC, is titled "Events leading up to your removal from the ER". Paragraph 2 begins, " Following the Code Blue on 24 Jan98, you made an admission that you were not able to intubate the patient (a large male with a thick neck) due to lack of strength in your wrist. As you were already scheduled for surgery on this extremity, the decision was made to remove you based on risk factors and the fact that in the Emergency Room you could be the only provider placed in the same situation".

2) On 22 May 1998 another memorandum by Colonel Terrence O'Neil, and signed by you, is titled "Relief From Emergency room Duties Due to Performance". In paragraph 1 it says, " You stated during a Code Blue procedure in my presence that your wrist was too weak to successfully intubate a patient. You later told me that you had mis-spoken; that your wrist was really not the cause of the problem".

3) On 6 April 1998 a memo from Dr. Jose Rodriguez-Vazquez, SGH, documents your Airway Management Evaluation observed by him and Dr. Eric Ulloa, Primary Care Physician. This occurred after your recovery from Carpal Tunnel Surgery on your left wrist. They concluded that you took overall too much time to intubate a mannequin, had poor technique positioning the head and neck, poor technique with the laryngoscope, and several prolonged attempts. They suggested that you try live patient practice with the Nurse Anesthetist in the Operating Room.

3. The hearing will be at **the Howard AFB Legal Office, Building 238, on 17 February 1998 starting at 0800.** You have the right to present evidence and call witnesses on your behalf, to cross-examine witnesses called by the committee, and to consult and be represented by legal counsel. It is your responsibility to arrange for the presence of any witnesses you desire. As a military provider a military legal counsel is available to you at your request. You may retain a civilian attorney at your own expense. The committee currently expects to call the these witnesses:

Lieutenant Colonel Kenneth Remington, USAF, 24MDOS/CC, DSN: 284-6988
Dr. Gregory Fey, Capt. USAF, 24MDOS/SGOHP, DSN 284-6410
Dr. Richard LaMacchia, Major USAF, 24MDOS/SGOHP, DSN 288-4971
Dr. Teodoro Mendez, 24 MDOS/SGOPL, DSN 284-3014
Dr. James McCrary, Major USAF, 24MDOS/SGOPE DSN 284-3636
Dr. Edwin Burkett, Major USAF, 24MDOS/SGOPL DSN 284-3014
Captain Ryan Shercliffe, USAF, NC, 24MDOS/SGOPE DSN 284-3636
Senior Airman Kristen Goode, USAF, 24MDSS/SGST DSN 284-6324

4. Failure to appear at the hearing will be construed as a waiver of those rights set out in AFI 44-119, chapter 4, paragraph 4.15. The Chairperson of the credentials hearing committee may change the time and place of the hearing upon your written request, if based on good cause.

73

EDWIN K. BURKETT, Maj USAF, MC
Chairperson, Credentials Function

1st Ind: Major Wilma P. Webster, USAF, MC 8 January 1999

TO: Chairperson, Credentials Function (Major Burkett)

I acknowledge receipt of the Letter of Notification of Privileges Hearing, dated 7 January, 1999.

Date 08 JAN 99

WILMA P. WEBSTER, Maj, USAF, MC

Copy –

**DEPARTMENT OF THE AIR FORCE**
**24TH MEDICAL OPERATIONS SQUADRON (ACC)**
**HOWARD AFB, PANAMA**

**8 January, 1999**

**MEMORANDUM FOR Wilma Webster, Major USAF, MC:**

**FROM: 24th MDG/SGH (Major Edwin K. Burkett)**

**SUBJECT: Documents Supporting Allegations for Privilege Notification**

1. I have given Major Wilma Webster a copy of all of the documents that I used to prepare the letter notifying her of her Privilege Hearing. The documents are in a sealed manila envelope. If there is anything missing it is not intentional and will be provided upon request.

EDWIN K. BURKETT
Maj USAF, MC
24MDG Associate SGH

1st Ind: Major Webster

I acknowledge receipt of the envelope.

date 17 JAN 99
WILMA P. WEBSTER

**Global Power For America**

734