lunch. Dr. Edwin Burkett, Chief of Family Practice, dated 30 January 1998, notes the episode in a memorandum.

2) On 15 September 1998 you detailed to Aeromedical Evacuation Technician SRA Kristen Goode a dream you had where you "shot everyone" and this gave you an orgasmic feeling. On 16 September, in front of SRA Goode and several patients, and just prior to boarding the Air Evac mission you stated that " I just want to blow up the plane." SRA Goode dated 17 Sept 1998 documents these comments in a memorandum.

**D**. You have been noted to perform in a forgetful and unorganized manner on several occasions and to demonstrate poor judgement, including documented incidences of dispensing incorrect medication to patients.

1) You received a Letter of Counseling from Dr. James McCrary, Chief of Emergency Services, on 30 November 1997. He counseled you on excessive patient waiting times, forgetting about patients and having them wait too long before making a final disposition, having multiple patient complaints about you, and complaints about poor communication and instructions on your part by ER staff. He said, " I've seen a pattern of difficulty in handling the work-load in this Emergency Department when alone as sole MOD".

2) On 24 January 1998 you inefficiently handled a Code Blue according to a Memorandum for Record by Dr. Burkett dated 31 January 1998. It states that:

-You did not seem to grasp the importance of head position for ventilation of the patient and the patient was not being ventilated even though a technician was tying to bag him. You did not ask for assistance from another physician until you had made 3 unsuccessful intubation attempts.

- You neglected to order CPR on a pulseless patient.

- Thirdly, you had failed to order initial defibrillating shocks on a patient you knew to be in Ventricular Fibrillation until reminded by others.

3) On 3 February 1998 you received another Letter of Counseling from Dr. Teodoro Mendez, Chief of Primary Care Flight. He counseled you on the following:

- The outburst incident noted above in paragraph C.1.

-That on 2 February you left two scheduled patients unseen and took lunch for more than an hour. The same day you left another patient waiting after clinic hours on your request but you had left the building.

-On 3 February you again left for lunch for more than an hour while two patients with morning appointments waited unseen.

4) Based upon notes from Capt Ryan Shercliffe, Emergency Room Nurse, dated 19 May 98 you failed to follow appropriate triage procedure in the ER and took care of two stable pediatric appointments prior to seeing more acute patients. He states, "She did not realize what order the patients arrived, she had not looked over the charts to assess urgency."

5) On 26 May 1998, based on notes from Captain Shercliffe, you showed that you were unaware of the urgent transport policy for ambulance pick-ups on the East Bank. On the same day you also refused an ambulance for a pregnant patient whose water had broke here at Howard, instead you chose to let her wait for a commercial taxi to take her downtown.

6) ER notes on SF 558's dated 20 April 1998 at 1839 and 2220. You prescribed Tylenol elixir but actually handed out a bottle of Benadryl elixir from the MOD cabinet for patient Alexandria Ordaz.

F. You failed to initially acknowledge a known physical limitation, left wrist weakness, that prevented you from performing a successful intubation during the cardiac arrest referred to in paragraph D.2. You stated after the incident that your wrist was weak but later recanted the statement. Your conduct has caused the 24th Medical Group to lose confidence in your willingness to disclose any physical impairment that may limit your ability to safely conduct parts of your duties as an Emergency Room Physician or Primary Care Physician.

1) A 23 March 1998 Memorandum for Record by Lt.Col Addison, MDOS/CC, is titled "Events leading up to your removal from the ER". Paragraph 2 begins, " Following the Code Blue on 24 Jan98, you made an admission that you were not able to intubate the patient (a large male with a thick neck) due to lack of strength in your wrist. As you were already scheduled for surgery on this extremity, the decision was made to remove you based on risk factors and the fact that in the Emergency Room you could be the only provider placed in the same situation".

2) On 22 May 1998 another memorandum by Colonel Terrence O'Neil, and signed by you, is titled "Relief From Emergency room Duties Due to Performance". In paragraph 1 it says, " You stated during a Code Blue procedure in my presence that your wrist was too weak to successfully intubate a patient. You later told me that you had mis-spoken; that your wrist was really not the cause of the problem".

3) On 6 April 1998 a memo from Dr. Jose Rodriguez-Vazquez, SGH, documents your Airway Management Evaluation observed by him and Dr. Eric Ulloa, Primary Care Physician. This occurred after your recovery from Carpal Tunnel Surgery on your left wrist. They concluded that you took overall too much time to intubate a mannequin, had poor technique positioning the head and neck, poor technique with the laryngoscope, and several prolonged attempts. They suggested that you try live patient practice with the Nurse Anesthetist in the Operating Room.

3. The hearing will be at **the Howard AFB Legal Office, Building 238, on 17 February 1998 starting at 0800.** You have the right to present evidence and call witnesses on your behalf, to cross-examine witnesses called by the committee, and to consult and be represented by legal counsel. It is your responsibility to arrange for the presence of any witnesses you desire. As a military provider a military legal counsel is available to you at your request. You may retain a civilian attorney at your own expense. The committee currently expects to call the these witnesses:

Lieutenant Colonel Kenneth Remington, USAF, 24MDOS/CC, DSN: 284-6988
Dr. Gregory Fey, Capt. USAF, 24MDOS/SGOHP, DSN 284-6410
Dr. Richard LaMacchia, Major USAF, 24MDOS/SGOHP, DSN 288-4971
Dr. Teodoro Mendez, 24 MDOS/SGOPL, DSN 284-3014
Dr. James McCrary, Major USAF, 24MDOS/SGOPE DSN 284-3636
Dr. Edwin Burkett, Major USAF, 24MDOS/SGOPL DSN 284-3014
Captain Ryan Shercliffe, USAF, NC, 24MDOS/SGOPE DSN 284-3636
Senior Airman Kristen Goode, USAF, 24MDSS/SGST DSN 284-6324

4. Failure to appear at the hearing will be construed as a waiver of those rights set out in AFI 44-119, chapter 4, paragraph 4.15. The Chairperson of the credentials hearing committee may change the time and place of the hearing upon your written request, if based on good cause.

776

EDWIN K. BURKETT, Maj USAF, MC
Chairperson, Credentials Function

1st Ind: Major Wilma P. Webster, USAF, MC 8 January 1999

TO: Chairperson, Credentials Function (Major Burkett)

I acknowledge receipt of the Letter of Notification of Privileges Hearing, dated 7 January, 1999.

Date 08 JAN 99

WILMA P. WEBSTER, Maj, USAF, MC

| | | |
|---|---|---|
| | INFORMAL | |
| X | FORMAL | |

# FINDINGS AND RECOMMENDED DISPOSITION OF USAF PHYSICAL EVALUATION BOARD

DATE: 28 JAN 99

1. THE BOARD CONVENED AT Lackland AFB TX 78236-5607
2. A QUORUM WAS PRESENT AS INDICATED ON EXHIBIT A — PER ATTACHED ORDERS (*EXHIBIT A*)
3. EXHIBITS ATTACHED: A - C, G - I

| 4. MEMBER'S NAME (Last, First, Middle Initial) | 5. GRADE | 6. SSN | 7. YEARS OF SERVICE UNDER 10 USC 1208 | 8. COMPONENT |
|---|---|---|---|---|
| WEBSTER, WILMA P. | MAJ | 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 | 06 | REG AF: ; USAFR: X ; ANG: |

9. FINDINGS CONCERNING INDIVIDUAL DEFECTS OR CONDITIONS

COLUMN A - Include degree of severity.

COLUMN C - Enter "YES" for in line of duty, "M" for intentional misconduct, "N" for willful neglect, "A" for incurred during a period of unauthorized absence, or "NA".

COLUMNS B and D - Enter "YES", "NO", or "NA".

COLUMNS E and F - Self-explanatory.

| A. DIAGNOSIS | B. INCURRED WHILE ENTITLED TO RECEIVE BASIC PAY | C. LINE OF DUTY (Applies Only if Item 9B is YES) | D. PROXIMATE RESULT OF PERFORMING MILITARY DUTY (Non-EAD USAFR and ANG only) | E. DISABILITY RATING (Percent) | F. VA DIAGNOSTIC CODE |
|---|---|---|---|---|---|
| CATEGORY I - UNFITTING CONDITIONS WHICH ARE COMPENSABLE AND RATABLE: NONE. | | | | | |
| CATEGORY II - CONDITIONS THAT CAN BE UNFITTING BUT ARE NOT CURRENTLY COMPENSABLE OR RATABLE: | | | | | |
| 1. GUILLAIN-BARRE SYNDROME/MILLER FISCHER VARIANT, RECURRENT, EPTS WITHOUT SERVICE AGGRAVATION WITHOUT RESIDUALS. | | | | | 8199-8105 |
| 2. POSSIBLE GLAUCOMA, CONTROLLED WITH TIMOPTIC OPHTHALMIC DROPS. | | | | | 6099-6013 |
| CATEGORY III - CONDITIONS THAT ARE NOT SEPARATELY UNFITTING AND NOT COMPENSABLE OR RATABLE: ANTISOCIAL, HISTRIONIC, AND NARCISSISTIC PERSONALITY TRAITS. | | | | | |

| 10. ADDITIONAL FINDINGS | YES | NO | NA |
|---|---|---|---|
| A. MEMBER IS UNFIT BECAUSE OF PHYSICAL DISABILITY | | X | |
| B. DISABILITY WAS INCURRED IN LINE OF DUTY IN TIME OF WAR OR NATIONAL EMERGENCY OR AFTER 14 SEPTEMBER 1978 | | | |
| C. DISABILITY WAS THE DIRECT RESULT OF ARMED CONFLICT OR WAS CAUSED BY AN INSTRUMENTALITY OF WAR AND INCURRED IN LINE OF DUTY DURING A PERIOD OF WAR | | | |
| D. DISABILITY WAS THE DIRECT RESULT OF A COMBAT RELATED INJURY | | | |
| E. DEGREE OF IMPAIRMENT [ ] IS [ ] MAY BE PERMANENT | | | |

| 11. COMPENSABLE PERCENTAGE | 12. RECOMMENDED DISPOSITION |
|---|---|
| N/A | RETURN TO DUTY |

| 13. OVERCOMES PRESUMPTION OF FITNESS | 14. SIGNATURE OF PEB PRESIDENT OR PEB REPRESENTATIVE |
|---|---|
| YES [ ] NO [X] NA [ ] | |
| SEPARATION/RETIREMENT DATE: | CHARLES J. MANGANELLO, COLONEL, USAF |

REMARKS CONTINUED ON ATTACHED SHEET

Hearing Exhibit 6

778

FINDINGS AND RECOMMENDED DISPOSITION OF USAF PHYSICAL EVALUATION BOARD, dated 28 JAN 99, pertaining to WEBSTER, WILMA P., MAJOR, 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

Continuation of Item 9, Findings concerning individual defects or conditions:

| A. DIAGNOSIS | B. | C. | D. | E. | F. |
|---|---|---|---|---|---|
| None. | | | | | |

Continuation of Item 15, REMARKS: Testimony and medical evidence, including a substantial package containing an opinion from one of the world's foremost experts on multiple sclerosis (Dr. Poser), indicates that the member does not have multiple sclerosis but rather recurrent GBS/Miller Fischer Variant. Member experienced various symptoms to include dizziness, diplopia, intermittent facial paralysis, vertigo, sensory loss (EPTS 1973-1991 and 1992 at MIMSO training resulting in an MEB/RTD), and, most recently, complete short-term quadriplegia (1998). It appears the member has had complete resolution of her recent flare, she exercises vigorously (runs about 8 miles/week, does 80 push-ups/sit-ups weekly, cycles up to 20 miles per week, rides stairmaster 4-5 times per week), she takes no medications, and she requires no follow-up. Member's counsel made a very compelling case, through the use of various charts, which graphically portrays the member's performance in the ER as comparable with other assigned providers. The FPEB argues that the member has no unfitting residuals of her GBS, finds her fit, and recommends Return To Duty without limitation. It should be noted that member's Axis II non-compensable diagnoses (Histrionic, Antisocial, and Narcissistic Personality Traits) are well-documented in the medical record, to include member's own exhibit H which suggests she was prone to disorganization and unusual behaviors extending back to childhood. These diagnoses, while not unfitting or compensable under the provisions of the Disability Evaluation System (DES), certainly might be judged "unsuitable" warranting administrative separation in the future. Finally, member's GBS, characterized by infrequent exacerbations, is clearly EPTS, it has not been permanently aggravated by her brief military service but rather represents the normal course of the disease, and is not believed to be either compensable or ratable even if found to be unfitting in the future.

# GREGORY C. FEY, MD

Capt, USAF, MC
Clinical Psychiatrist
Pennsylvania License No. 058738
Diplomate, American Board of Psychiatry and Neurology

PSC 1, Box 2438, APO AA 34001
(Work DSN 313/284-6410 Home 507/236-7287)
e-mail: feyshay@sinfo.net

## WORK EXPERIENCE

Jul 97 – Present

**Chief, Mental Health Clinic.** 24th Medical Operations Squadron, Howard AFB, Panama
Element Chief for Howard AFB Mental Health Clinic. Only psychiatrist for US Southern Command Active Duty personnel and their dependents, DoD, and Panama Canal Commission population. Responsible for all outpatient and inpatient psychiatric care, inpatient psychiatric consultations, air evacuations for all mental health and substance abuse patients, and initiation of medical evaluation boards for mental health diagnoses. JCAHO Champion for Patient Rights and Organization Ethics. HSI Champion for Behavioral Health. Member of Executive Committee of the Medical Staff. Member of Closed Records Review Committee. OPR for use of restraints—has included writing restraint policy, instructing providers and reviewing charts for compliance to policy. Member of Pharmacy and Therapeutics Committee—Performance of Drug Utilization Evaluations for prescription of psychiatric medications by nonpsychiatric providers.

## EDUCATIONAL EXPERIENCE

| | |
|---|---|
| June 93 – June 97 | **Psychiatry Residency.** Wilford Hall Medical Center, Lackland AFB, TX. |
| June 96 – June 97 | **Chief Resident in Psychiatry.** Wilford Hall Medical Center |
| August 89 – May 93 | **MD.** University of Pennsylvania School of Medicine, Philadelphia, Pennsylvania. |
| August 85 – May 89 | **BS.** Summa Cum Laude, Moravian College, Bethlehem, PA |

## BOARD CERTIFICATION

| | |
|---|---|
| 1998 | American Board of Psychiatry and Neurology #45105 |
| 1994 | National Board of Medical Examiners #431965 |

## PROFESSIONAL MEMBERSHIPS AND SOCIETIES

American Psychiatric Association- General Member
Texas Society for Psychiatric Physicians
American Academy of Psychiatry and the Law

## ADDITIONAL EDUCATION AND TRAINING

| | |
|---|---|
| Oct 98 | Forensic Psychiatry Review Course, AAPL |

HEARING EXHIBIT 7

30

| | |
|---|---|
| Oct 98 | American Academy of Psychiatry and Law, Annual Conference |
| June 98 | Advances in Neuropsychiatry, American Psychiatric Association (APA)<br>Medical Ethics 101, APA |
| June 98 | Outcomes Assessment: Use of Rating Scales, APA<br>Diagnostic Challenges in Neuropsychiatry, APA |
| May 98 | Advanced Cardiac Life Support Course, Howard AFB |
| Apr 98 | Critical Incident Stress Management Basic Course<br>USAF/SG approved trainer, Howard AFB |
| June 97 | Rapid, Single Session Assessment in the Age of Managed Care, by the New England Educational Institute |
| May – June 97 | Combat Casualty Care Course, Fort Sam Houston, TX |
| May 97 | Psychiatric Training for Disaster, APA<br>The Evaluation and Management of Pain, APA<br>Suicidal Behavior: Assessment and Treatment, APA<br>Liability Prevention for the Clinician, APA |
| Feb 97 | American Group Psychotherapy Association Annual Meeting |
| Oct 96 | Psychiatry: A Comprehensive Review and Update, by Massachusetts General Hospital |
| Aug 96 | Advanced Psychoanalytic Self Psychology, by the New England Educational Institute |
| Aug 95 | Essential Psychopharmacology, 6th Annual Seminar presented by Harvard Medical School, Department of Continuing Education |
| Aug 95 | Clinical Neurology for Psychiatrists, presented by Albert Einstein College of Medicine & Montefiore Medical Center |

# FACSIMILE ELECTRO MAIL TRANSMITTAL

*(This information collection is not subject to OMB review under PL-96, The Paperwork Reduction Act.)*

***WARNING!! - DO NOT TRANSMIT CLASSIFIED INFORMATION OVER UNSECURED TELECOMMUNICATIONS SYSTEMS. OFFICIAL DOD TELECOMMUNICATIONS SYSTEMS ARE SUBJECT TO MONITORING AND USE OF DOD TELECOMMUNICATIONS SYSTEMS CONSTITUTES CONSENT TO MONITORING.***

**SECTION I - TO BE COMPLETED BY ORIGINATOR**

| CLASSIFICATION | TRANSMISSION | PAGE |
|---|---|---|
| [X] FOR OFFICIAL USE ONLY | [ ] IMMEDIATE [X] ROUTINE | PAGE 1 OF 3 PAGES |

| TO *(Office Symbol, Point of Contact, and Address)* | FAX NO. DSN | FAX NO. COMMERCIAL |
|---|---|---|
| Legal Office | 5558 | |

| ELECTRONIC MAIL ADDRESS *(E-Mail)* | VOICE NO. DSN | VOICE NO. COMMERCIAL |
|---|---|---|
| | | |

SUBJECT

| FROM *(Office Symbol, Point of Contact, and Address)* | FAX NO. DSN | FAX NO. COMMERCIAL |
|---|---|---|
| Dr Gregory Fey | 284-3377 | 507-284-3377 |

| ELECTRONIC MAIL ADDRESS *(E-Mail)* | VOICE NO. DSN | VOICE NO. COMMERCIAL |
|---|---|---|
| | 284-6410 | 507-284-6410 |

REMARKS

| RELEASER'S SIGNATURE | DATE | TIME |
|---|---|---|
| David L Mentz, SSgt | 29 Jan 99 | 14:18 |

**SECTION II - TO BE COMPLETED BY ELECTRO MAIL OPERATOR**

| DATE TRANSMITTED | TIME TRANSMITTED | TRANSMITTER'S SIGNATURE |
|---|---|---|
| | | |
| **DATE ADDRESSEE CONTACTED** | **TIME ADDRESSEE CONTACTED** | **CONTACTOR'S SIGNATURE** |
| | | |

AF FORM 3535, FEB 95 *(EF-V1) (PerFORM PRO)* PREVIOUS EDITION IS OBSOLETE.

782

# REFERRAL FOR CIVILIAN MEDICAL CARE

SUBMIT CHARGES TO: ☑ REFERRING UNIFORMED SERVICES FAC. ☐ CHAMPUS

| MEDICAL RECORD | CONSULTATION SHEET |
|---|---|

REQUEST

| TO: Neuropsychology | FROM: (Requesting physician or activity) Dr. LaMacchia, Psychology | DATE OF REQUEST 10 Jun 98 |
|---|---|---|

REASON FOR REQUEST (Complaints and findings)
56 y.o. AD AF ♀ physician who has been referred for Command directed evaluation. In 1992, pt. was diagnosed with MS but later Re diagnosed with phoria. Longer-term problem with spatial functioning - directions, getting lost etc.

ANTICIPATED LENGTH OF TREATMENT:

PROVISIONAL DIAGNOSIS
R/o Organic Process

DOCTOR'S SIGNATURE
[signature]
RICHARD LAMACCHIA, MAJ, USAF
212 54 6201 AFSC 42P3
Chief, Mental Health Services
Fort Clayton, Panama

APPROVED: Teodoro Mendez, MD
SGOPL, NI M
24th MDGS

PLACE OF CONSULTATION: ☐ BEDSIDE ☐ ON CALL

☒ ROUTINE ☐ TODAY ☐ 72 HOURS ☐ EMERGENCY

CONSULTATION REPORT

**NOTE:**

Neuropsychological Report, is attached here as a separate document (5 pages long).

[signature] Ricardo De Obaldía, Ph.D.

Dr. Ricardo De Obaldía
Clinical Neuropsychologist

(Continued on reverse side)

| SIGNATURE AND TITLE | DATE |
|---|---|
| Dr. Ricardo De Obaldía, Ph.D. - Clinical Neuropsychol | July 7, 1998 |

| IDENTIFICATION NO. | ORGANIZATION | REGISTER NO. | WARD NO. |
|---|---|---|---|
| (Panama) #PE-5-42 | HCI- Centro Medico Paitilla (PANAMA) | CIP (Panama) #453 | |

PATIENT'S IDENTIFICATION (For typed or written entries give: Name - last, first, middle; grade; rank; hospital or medical facility)

DD Form 2161, OCT 78 (EG)

Webster, Wilma 284-3636
ADAF 04
1572-54-3446

HP: 214-7564
DP.

12 JUNE 98 3:15 PM - PT
Dr. Obaldia
Officina 618

PATIENT/RESPONSIBLE FAMILY MEMBER SIGNATURE

SPONSOR'S FULL SSAN

Hearing Exhibit 8

OPTIONAL FORM 99 (7-90)

**FAX TRANSMITTAL** # of pages ►

| To Dr Fey | From Dr LaMacchia |
|---|---|
| Dept./Agency | Phone # 288 4971 |
| Fax # 284 3377 | Fax # 288 5403 |

78

-*Visual-Spatial*: Visual recognition of objects and figures. Visual discrimination of shapes, sizes, lengths, colors, and *figure/ground relationships*. Visual-spatial orientation skills. Mental operations in space (synthesis & construction skills).

-Higher Cutaneous & Kinesthetic: Basic cutaneous sensations. Muscle and joint sensations. Higher and complex stereognostic skills (Tactile recognition of shapes, objects, figures). Threshold of discrimination between 2 points, etc.

3) HIGHER COGNITIVE FUNCTIONS:

-Receptive Oral-Speech: Phonemic hearing. Auditory word recognition. Understanding of *simple sentences*. Understanding of complex logical-grammatical structures. Observation for pathognomonic sensory dysphasic signs.

-Expressive Oral-Speech: Articulation of speech sounds. Repetitive speech. Nominative speech. Narrative speech. Automatic & spontaneous speech. Observation for pathognomonic motor dysphasic signs (in articulation, fluency, naming, vocabulary, and *grammar*).

-Written Speech (Receptive/Reading and Expressive/ Writing: Phonetic analysis and synthesis of letters, words, sentences *and texts*. Observation for dyslexic and dysgraphic pathognomonic signs.

-Arithmetical Skills: Comprehension of numerical structures. Performance on simple and complex arithmetical operations (in writing and mentally). Observation for pathognomonic discalculic signs.

-Memory Skills: Inmediate and delayed retention *(with & without interference)*. Selective memories (auditory /visual, verbal /non-verbal, inmediate /remote). Observations for pathognomonic *amnesic signs*.

-Basic Intellectual Processes (Non-Verbal): Logic reasoning. Concept formation. Abstract reasoning. Discursive intellectual activities and non-verbal problem solving.

4) BASIC ATTENTION & CONCENTRATION PROCESSES:

Assessment of direct Attention, and sustained attention (Concentration).

-Expressive Oral-Speech: Normal-average, without significant difficulties or the presence of dysphasic signs in her verbal-motor expression (articulation, fluency, denomination, vocabulary or grammatical structure).

-Reading: Normal-average, for her level of education. No dyslexic signs in her oral reading. However, her reading comprehension level was moderately impaired (30%), probably due to attention/ concentration or inmediate memory difficulties.

-Writing: Normal-average, for her level of education. Motor component (calligraphy) was adequate without distorsions. There were not signs of dysgraphia in any of the 3 types of writing: Visual (copy), Auditive (dictation), and Mental (spontaneous).

-Arithmetical Skills: Normal-average for her level of education. There were not signs of discalculia in any of the 4 basic arithmetical operations.

-Memory (Weschler Memory Scale- Form I):

| | | |
|---|---|---|
| a) Auditory (Inmediate)= | 27% | (Moderately impaired). |
| b) Visual (Inmediate)= | 70% | (Normal-low average). |
| c) Auditory (Delayed)= | 17% | (Moderately impaired). |
| d) Visual (Delayed)= | 25% | (Moderately impaired). |

NOTE: Clinically, there were not observed significant difficulties in Remote memory (long-term memory).

-Basic Intellectual Processes (Raven Matrices Test- General Scale). In the RAVEN Test, which assesses non-verbal general intellectual factors (G-Factor), like logic reasoning, abstract reasoning, concept formation and concept generalization, it was obtained a total score of 49 in thirty minutes work. This score is equivalent to a percentil of +- 50%, which is low for her actual level of education (MD degree).

4) <u>ATTENTION & CONCENTRATION PROCESSES</u> (WAIS-R Subtests and Others).

| | Raw Score | Scaled Score | |
|---|---|---|---|
| -Digit Span | 16 | 11 | (Normal-average). |
| -Digit Symbol | 47 | 11 | (Normal-average). |
| -Arithmetic (mentally) | 11 | 10 | (Normal-average). |
| -Trail Making Test- A | 48" | | (Mildly impaired). |
| -Trail Making Test- B | 93" | | (Mildly impaired). |
| -Digit Vigilance Test (1 P) | 325" | | (Moderately impaired). |

785

## IV. DISCUSSION:

In this general neuropsychological assessment it was not found any major or severe deficit in any of the 4 basic functional areas evaluated (Fine Motor/3, Perceptual [illegible] and Attention & Concentration Processes). Although it was observed some difficulties in the following areas:

1) Fine Motor Functions: Mild difficulties in complex manual movements.

2) Perceptual Functions: Mild difficulties in complex visual-spatials tasks.

3) Higher Cognitive Functions:
   - -Reading: Moderately impaired in reading comprenhension/retention (30%).
   - -Memory: Moderately impaired in inmediate memory (Visual and Auditory).
   - -Non-Verbal Intellectual Processes: Mildly impaired in non-verbal problem solving.

4) Attention & Concentration Processes: Mildly impaired in more complex tasks of sustained attention (concentration). Principal difficulties were observed in tasks involving conceptual mental "tracking" which require to follow a sequence mentally (Trail Making Test), and in a task that examine the ability to sustain and focus attention (Digit Vigilance Test).

The above results, especially with mental tracking difficulties are generally associated with mild diffuse brain dysfunction, and according to the main Neuropsychology Manual (Lezak, 1994), this is usually seen in ... "mild head trauma and many cases of multiple sclerosis patients".

p.360

The current low performance on the RAVEN Test (Non-verbal problem solving test) in this patient who has a highly competitive educational degree (MD with specialization in Internal Medicine), seems to suggest a loss from premorbid superior skills.

Regarding to the memory difficulties (Weschler Memory Scale), this patient has personally mentioned that her "concentration & memory have always been relatively poor". She explained that if she concentrates on a specific topic she often is not aware of competing sources of information. She also mentioned that during her school years she lost many books and has even lost her car in parking lots. Also mentioned, that she always has kept notes as memory aids. All this personal information provided by the patient herself, might suggest also a history of a possible developmental disorder since childhood ("Attention Deficit Hyperactivity Disorder of a residual type").

Sincerely,

Ricardo De Obaldia, Ph.D

Dr. Ricardo De Obaldía
Clinical Neuropsychologist
Register CIP (Panamá) #453
Register CSS (Panamá) #6585
RUC- (Panamenian ID) #PE-5-42

cc: RDO/rdo

786

613-110 NSN 7540-00-634-4127

**MEDICAL RECORD** | **CONSULTATION S.**

**REQUEST**

TO: Neuropsychology Maj Brian Campbell

FROM: (Requesting physician or activity) Psychiatry-- Howard AFB

DATE OF REQUEST 4 Aug 98

REASON FOR REQUEST (Complaints and findings)

57yo female ADAF 04 ER physician with H/O past MEB diagnosis of Multiple Sclerosis('92), disputed by patient and she was retained in military. More recently occupational difficulties-- performance-related. Work-up by psychologist and neuropsychologist indicated cognitive dysfunction suggestive of possible subcortical illness. Overlay of possible Adult ADHD. Performance-related anxiety and performance of some of exam in Spanish may have affected results. Patient would benefit from repeat neuropsychological testing, since this is a matter of fitness for duty.
Neurology consult and MRI also part of work-up at Wilford Hall

PROVISIONAL DIAGNOSIS

r/o Cognitive D/O, NOS

DOCTOR'S SIGNATURE GREGORY C. FEY, MD Capt, USAF, MC Chief, Mental Health Clinic 069AA, AFSC 44P3

APPROVED

PLACE OF CONSULTATION ☐ BEDSIDE ☐ ON CALL

☒ ROUTINE ☐ TODAY ☐ 72 HOURS ☐ EMERGENCY

**CONSULTATION REPORT** 17Sep98@0800

RECORD REVIEWED ☐ YES ☐ NO PATIENT EXAMINED ☐ YES ☐ NO

PSC 1, Box 2438
APO AA 34001

NEUROPSYCHOLOGY SERVICE / MMPBN
59th MEDICAL WING
2200 BERGQUIST DR. SUITE 1
LACKLAND AFB TX 78236-5300

Please see attached report

(Continue on reverse side)

SIGNATURE AND TITLE | DATE 2 OCT 98

IDENTIFICATION NO. | ORGANIZATION | REGISTER NO. | WARD NO.

PATIENT'S IDENTIFICATION (For typed or written entries give: Name-last, first, middle; grade; rank; rate; hospital or medical facility)

Webster, Wilma P
ADAF 04
20-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
6 July 41

HEARING EXHIBIT 9

CONSULTATION SHEET
Medical Record

STANDARD FORM 513 (REV. 8-92)
(EF-V1) (PerFORM PRO)
Prescribed by GSA/ICMR, FIRMR (41 CFR) 201-9.202-1

737

**TO:** Neuropsychology **FROM:** Psychiatry, Howard AFB, Panama **DATE:** 4 Aug 98

**REFERRAL QUESTION:** This 57 year old ADAF 04 ER physician has a previous history of MEB and diagnosis of multiple sclerosis, subsequently disputed by the patient. She was retained in the military. She has more recent performance related occupational difficulties. Psychological and neuropsychological evaluations suggest cognitive dysfunction suggestive of possible subcortical illness. There is also a possible overly of adult ADHD. Additional assessment was requested as part of determining her fitness for duty.

**REFERRING PROVIDER:** Gregory C. Fey, Capt, USAF, MC

**TESTS ADMINISTERED:**

Beck Anxiety Inventory (BAI)
Beck Depression Inventory (BDI)
Boston Naming Test (BNT)
California Verbal Learning Test (CVLT)
Category Fluency (Animals)
Continuous Visual Memory Test (CVMT)
Controlled Oral Word Association Test (COWAT)
Finger Tapping Test (FTT)
Grip Strength
Grooved Pegboard
Hooper Visual Organization Test (VOT)
Judgment of Line Orientation (JLO)
Luria-Nebraska, Motor Scale, Visual Scale
MicroCog
Paced Auditory Serial Addition Test (PASAT)
Rey-Osterrieth Complex Figure Test (CFT)
Shipley Institute of Living Scale
Spreen Sentence Repetition Test
Stroop Color-Word Task
Symbol Digit Modalities Test (SDMT)
Symptom Check List (SCL-90-R)
Tactual Performance Test (TPT)
Token Test
Trail-Making Test, Parts A & B
Wechsler Adult Intelligence Scale Revised (WAIS-R)
Wechsler Memory Scale, Revised (WMS-R)
Wide Range Achievement Test 3 - Reading, Arithmetic (WRAT3)
Wisconsin Card Sorting Test (WCST)
Woodcock-Johnson Psycho-Educational Battery - Revised (WJR)

**REFERRAL INFORMATION:**

Maj Wilma P. Webster is a 57 year old, right handed, divorced, Caucasian, female with 20 years of education. She was referred by Dr. Fey, Chief of the Howard AFB Mental health Clinic. The reason for the referral involved completing a neuropsychological assessment to determine her fitness for military duty. He also seeks Neurology consultation and MRI. Current rule out diagnosis is cognitive disorder NOS. She was seen as an outpatient on 17-Sep-98.

**DOCUMENT AND INFORMATINO REVIEW.**

1. Outpatient Medical Record
2. Selected mental health chart notes from Dr. Fey
3. MFR by SrA Goode regarding Maj Webster's pre-flight behavior on 15 Sep 98.

4. MFR by SSgt Millington regarding Maj Webster's pre-flight behavior on 16 Sep 98.
5. MFR of 14 Sep 98, Maj Webster
6. MFR of 8 Sep 98, Col O'Neil.
7. MFR of 3 Sep 98, Maj Webster
8. MFR of 17 Sep 98 by Mr. Callender regarding Maj Webster's behavior.
9. MFR of 18 Aug 98, Col O'Neil
10. OPR of 13 Aug 98 (draft)
11. CDE of Maj Webster, written by Maj La Macchia, 14 Jul 98.
12. Neuropsychological Evaluation of Maj Webster, written by Ricardo De Obaldia, Jun 98.
13. MFR of 26 May 98, Col O'Neil.
14. MFR of 20 May 98, Maj McCrary, Chief, Emergency Services
15. Performance Feedback completed by Maj Webster's supervisor, 14 Apr 98.
16. Letter by Henry Raming, Ph.D., of 8 Sep 93.
17. Letter by Maj Webster to MEB, 8 Sep 93.
18. Letter by Arnold Kambly, MD, of 10 Nov 93.
19. MRI Report, 12 Aug 93.
20. MRI of Sep 98

## HISTORY:

**Subjective Complaints.** The patient began our initial interview by vehemently denying that she has MS. She continues to fear the initiation of another MEB. She acknowledges job-related difficulties and accompanying stress. She acknowledges feelings of intense anger lately. She is angry for being removed from the ER and believes she is qualified not only as an ER physician but should also lead the department. She believes these actions are due to "politics." She felt her letter to Col O'Neil, stating that she should have been ER director, exacerbated the situation. She denies cognitive, emotional, or behavioral limitations that would preclude competent practice of emergency medicine.

**History of Present Condition.** She was an Army Reservist and was augmented for Desert Storm. Her medical group was mobilized in Nov 90 and entered Saudi Arabia just before war commenced. She was delighted to be sent there because she had majored in Arabic studies in undergraduate school and had wanted to visit. She worked as an internal medicine and emergency medicine. The mission involved the care of Iraqi prisoners of war. She worked in 120 temperatures and did not have difficulties tolerating heat. She returned to CONUS in Jun 91. She had problems with her teeth and went to the VA hospital and then to an oral surgeon. She was referred to a neurologist secondary to lancinating HA pain. The neurologist suggested a MRI that suggested periventricular demyelination.

Following her tour she spent one month in Saudi Arabia in King Faisel hospital in Feb 92. She decided to apply for active duty in the Army but was not offered an overseas tour. She then decided to enter the AF. During her MIMSO training she developed double vision. She had to complete training with one eye closed. This worried her because she knew she had a previously abnormal MRI. She became worried about her medical condition. She sought consultation at Edwards AFB and they suspected MS. Additional work-up was completed while she was stationed in Yokota. Her suspected MS was based on the MRI, double vision, and presence of oligoclonal bands. At Travis AFB, she was further evaluated, and they concluded she had MS. She reported intermittent tingling in her left hand and they tested for carpal tunnel which was negative (she later had surgery for carpal tunnel). The tingling and weakness have since remitted. During this period, she was doing regular exercise and felt capable of doing anything. She took ACSC and passed.

She disputed her MS diagnosis and was retained in the military; however, she reported that she was "very traumatized" by this experience. The MEB process commenced in Yokota, was transferred to Travis, and lasted 5 months. She sought second opinions for her diagnosis. She incurred $14,000 indebtedness. She felt a great deal of anger. She felt the diagnosis of MS was "rubber stamped" until the very end when WHMC PEB concluded that she could not be diagnosed as having MS.

739

While at Panama she had surgery for wisdom tooth removal that led to a broken jaw and left sided facial numbness. While intubating a patient during a code, she mentioned that she experienced weakness in her left wrist. She requested assistance from another provider, Dr. Burkett, FP. The patient died. She was identified as an impaired provider for intubation purposes and was placed in family practice. She felt punished by this move. Dr. Burkett "piled" on the patients and she got very behind. She was confronted by Dr. Burkett over taking lunch and was accused of having outbursts. She wrote a letter to Dr. Mendez, head of the outpatient services flight, indicating her criticisms of Primary Care operations. She claimed that following the submission of this letter, things got better. She underwent carpal tunnel surgery in Mar 98. Her strength returned and she petitioned to return to the ER.

She was told she needed to recertify her skills to intubate adults and children along with CPR. She intubated the mannequins without the stylet and, because she took too long, she was told she flunked. Her failure seemed "bogus and sadistic." She was told she would need to test with the anesthesiologist, who would examine her ability to intubate patients. She completed several intubations successfully.

A Performance Feedback was completed in Apr 98 by her supervisor, Dr. Mendez, that she provided for review. Following her PF in April, she complained to the hospital commander, Col O'Neil, about her unhappiness in working in Primary Care. She also informed the commander how she should have been made the director for the ER, arguing that she had more experience than her counterpart, Maj McCrary. Col O'Neil said he would look into her complaints. Finally, she returned to the ER. She served as the assistant director. Maj McCrary, the director, started tracking patients who left the ER without being seen. He concluded that more of her patients left than for other providers. Two patient complaints surfaced against Maj Webster. One patient complained that Maj Webster was the worst doctor ever and was extremely forgetful. Another complained that the patient was not promptly referred for narcotic medication with an orthopedic surgeon. Maj McCrary submitted an MFR on 20 May 98 which indicated he had lost confidence in Maj Webster. She was removed from the ER on 21 May, being told that Col O'Neil had lost confidence in her. She rebutted this decision. She was then promptly referred for a commander directed mental health evaluation, which included neuropsychological evaluation. The evaluation revealed cognitive dysfunction suggesting subcortical illness. In addition, there was suggestive evidence of possible adult ADHD. Performance related anxiety might have impacted the results of this evaluation. Furthermore, some of the testing was completed in Spanish. Dr. Fey concluded that repeat evaluation, MRI, and neurological consultations were merited.

She was removed from patient care and detailed to work in Health and Wellness. She is currently involved with smoking cessation. She writes health-oriented letters for the newspaper. Her subsequent OPR looked "terrible." The draft OPR was provided for my review. The OPR was revised by the new squadron commander, Lt Col Remington. She wonders if she is a victim of racial prejudice, noting that Lt Col Addison (Sq. commander), Maj Burkett, and Maj McCrary are black.

**Previous Medical and Psychiatric History.** Her mother and brother are diabetic. There is a family history of obesity. She reports poor vision secondary to glaucoma and conjunctivitis. She wears bifocals. She denies difficulty with reading.

Psychiatric history includes patient belief that her mother was schizophrenic. She was raped at gun point in 1979. She previously saw a psychologist to help control her anger during the time she went through her MEB (92). She was seen at RAF Lakenheath by MH personnel for self-referred occupational concerns (Apr 97). At that time, there was no evidence that she was an impaired provider.

**Outpatient Medical Record:** Medical conditions include history of diplopia and glaucoma. Diplopia was reported in Aug-Sep 92 with suspected white matter disease and MS. She was a Weight Management Program participant and was evaluated in Aug 96. She weighed 172.5 pounds. Surgery for carpal tunnel syndrome occurred in Feb 98.

Narrative Summary from David Grant Medical Center (admitted 10 Aug - 9 Aug 93). Neurological consultation suggested MS. Dr. Alan Zolner performed a neuropsychological evaluation. Her Verbal IQ was 125

and Performance IQ was 104, a significant difference. He concluded, "these results are believed to be a mild under estimate of premorbid function, which is believed to have been in the overall superior range." She had difficulty with abstract reasoning, struggling to test potentially correct hypotheses. Remote memory was intact. Nonverbal recall was WNL. Verbal information performance was mixed but fell within normal limits. There was no evidence of significant depression; however, she mentioned suicidal ideation without intent. Dr. Zohner concluded that she suffered from a mild loss of higher cognitive function. His impression was of an organic mental disorder, chronic and mild, manifested by mild loss of intellectual and problem solving abilities. Accompanying psychiatric evaluation yielded no diagnosis on Axis I or II. She manifested compulsive and "somewhat intrusive behavior" during her hospitalization at David Grant Medical Center. Physicians found her behavior to be unusual, eccentric, and at times inappropriate. This behavior may have been related to her multiple sclerosis. MS was supported by periventricular white matter disease on MRI, positive oligoclonal bands, neurologic symptoms compatible with MS, and at least a question of decreased cognitive function as evidenced by neuropsychiatric testing. She was referred for MEB.

MEB summary was reviewed and the patient was evaluated (23 Jun 93). Lab results showed (+) oligoclonal bands, (-) myelin basic protein, elevated IgG index of 1.12, protein 25, glu 64, WBC 0, RBC 2.2 (Jan 93). MRI in Dec 92 revealed bilateral periventricular high intensity areas consistent with MS and lesions in the corona radiata, consistent with arterial sclerotic changes. Maj Ginsberg concluded, "a diagnosis of MS can be made." Symptoms were mild and subclinical. Psychiatric evaluation was negative indicating no history consistent with frequent errors in clinical judgment or 'swings' in cognitive function that would suggest disability. She was determined to be experiencing a normal reaction for someone undergoing an MEB process.

She rebutted the MEB on 8 Sep 93 and sought a second psychological opinion concerning her cognitive performance. Dr. Raming completed another evaluation and noted FS IQ of 136, verbal IQ of 140, and performance IQ of 122. There were no noticeable emotional or behavioral intrusions, she manifested good concentration and she was cooperative during the evaluation. In Dec 93, the patient was notified that she was certified to return to duty. Her diplopia was felt to be related to decompensated phoria and not MS.

**Relevant Social History.** She said, "I idolized my father completely." He spent most of his time working in the garage on electronics projects. Northrop hired him as an electronics technician, making guided missiles during the war. She reported that her mother was "a dreamy lady... my diagnosis was paranoid schizophrenia, although it was never officially diagnosed." Her mother was hospitalized once for a mental breakdown. Her mother talked to herself out loud. She felt the Jews and Communists were after her. Her parents got divorced when she was 10. "So it was just my mother and four horrendous kids. The house was always a horrible mess and I blamed her. She was very religious and forced me to go to church when I didn't want to I rebelled against her by refusing to go to church. I decided I was an atheist at the age of 16 and argued with her about that."

She left home and moved in with her cousin's family. The patient was 16 at the time. She helped take care of the children. She left because she really couldn't stand her mother. The mess in the house embarrassed her, and she was embarrassed to bring friends home. She did not live with her father because he had remarried to a woman who was disabled with MS.

She never got along with her younger sister. The patient was the oldest saying, "I was bossy and used to beat up on her all the time and she never forgave me. I was the oldest, fat, and pictured myself as ugly. She was the cute little blonde girl that everybody adored so of course I beat her up She was quieter and not as outgoing as I was." Her sister studied to be a CPA and worked as an accountant.. She was a chain smoker and was married several times. Things were not in good order in her house, reminding Maj Webster of her mother. Furthermore, "My sister started to sound very much like my mother. She broke down and started to make less and less sense. She was asked to see a mental health professional and she absolutely refused, even when I suggested this." Sometimes she makes sense and sometimes she doesn't. She talks about Dade County (FL) politics, black-white cultural phenomena, the Hispanic culture. She started calling my work in Panama, telling the technicians that Maj Webster was killing people.

791

She mentioned her uncle, who had a Ph.D. in psychology. Maj Webster said, "He decided he should personally teach us about sex. He told me all the details of his sex life with his wife. He fashioned himself to be in love with me. He fondled my genitals and would have done more if I had let him." She was very angry with him for many years after that. This relationship began in her mid-teens and lasted for years.

She excelled in academics. She averaged A's and B's in Pasadena and Mira Costa high schools (CA). She received a National Merit Scholarship and attended undergraduate school in UCLA. She struggled academically her first two years and lost her scholarship. She disenrolled and she worked for several months as a secretary. She enrolled at El Camino CC in Redondo Beach and her grades improved. She reapplied for her scholarship, received this award again, and reentered UCLA. She received excellent grades, averaging A's and B's. She provided her high school and college transcripts for review.

She married a Mexican national and moved to Mexico, residing there for 15 years. She had her children there. She lived in a poor neighborhood without running water. She got a job teaching English in Mexico City, working in that capacity for 10 years. Her husband became extremely jealous and became violent: "He would insult me in Spanish. I used the same language with him. He hit me in response." Domestic violence occurred several times each year. She swore she would leave him but had no support system. When she told him she was going to leave him, she was beaten, and fired a gun at her. She left her home and moved into her own apartment. She eventually brought the children to live with her. The couple divorced amicably.

She completed medical school in Mexico and received good grades. She was the President of her medical school class. During her last year of medical school her father suffered a stroke and she brought him to live her. She then returned to the USA and passed her medical exam for foreign graduates. She applied for a residency position in Michigan. She passed her internal medicine exam on her second try. She liked working in the Emergency Department but her foreign education interfered with a placement in the ED. She initially worked in the ER for 5 months in Rochester NY (84). She lost the job due to "politics." She admitted a patient with chest pain and this angered another provider. She wrote a letter of complaint to the chief of staff. She was criticized for her documentation and for placing atropine in someone's eye.

**Collateral Interview of Dr. Greg Fey.** Dr. Fey said she might have chronic personality difficulties. She is socially inappropriate and her behavior has got her in trouble in the ED. She is angry about the referral and thinks she has been railroaded. During the pre-flight air evacuation briefing, she said, "I wish I could blow up the aircraft, I'm so mad about all this going on." She said this in front of 12 other patients who are waiting for the plane. The technician (SrA Goode) asked her if she went through the metal detector. Maj Webster replied that there were plastic bombs that could not be detected by the metal detector. The commander (Col O'Neil) thought her threats were serious enough to merit additional evaluation; however, Dr. Fey doesn't see her as a homicidal threat. He is more concerned about her ability to function as an AF officer in the ED. She has had some dreams of going on a shooting spree but she denies plans for acting this out. Her commander wanted her to be referred to MHC to evaluate her risk for suicide/homicide.

Dr. Fey mentioned that she has been decredentialed as an ER physician and works in Health and Wellness, completing wellness articles, fitness screens, and cholesterol levels. Her problems included difficulties observed while performing a code, irritability in the ED, and problems completing her job tasks in a timely manner. A nurse felt Maj Webster did not manage the code appropriately and could not intubate the patient with her left hand. Maj Webster actually suffered from carpal tunnel syndrome, which affected her strength. She had weakness in her left hand secondary to this syndrome.

Some of her symptoms, originally thought to be due to MS, were found to be caused by other factors. MRI showed white matter lesions in the brain. Some elevations were found in CSF (IgG index and oligoclonal bands). The board did not uphold the diagnosis and she does not currently have symptoms of MS.

Dr. Fey noted that Maj Webster has manifested unusual, puzzling behavior. For example, every time she comes for her psychiatric appointment she forgets her hat. She has left her car door open when she has come to see Dr. Fey. Several patients have complained about her forgetfulness. On one occasion she gave Benadryl to a

patient instead of Tylenol. She has had problems with temper and had a crying outburst. Dr. Fey noted that the ER physicians at Howard tend to be over worked and are heavily stressed. Another ER physician had difficulty as well.

Dr. Fey notes that Maj Webster denies that she has difficulties. She is not socially connected. Although she is not sexually seductive or impressionistic, she does have histrionic, emotional outbursts. There is a component of narcissism but this is not malignant and certainly WNL for physicians. She cannot inhibit her inappropriate responses. The etiology of this problem is equivocal, perhaps reflecting a cognitive problem or ADHD. Dr. Fey screened for ADHD and she was well below the cutoffs. There is no childhood evidence of ADHD. There appears to be problems with executive functioning, planning and organization, social judgment, and emotional impulse control. The puzzle involves etiology.

**Collateral Interview of Col O'Neil.** I spoke with Col O'Neil regarding Maj Webster's recent behavior. A worried member of Tricare staff spoke with him yesterday about Maj Webster's behavior during a preflight interview. She indicated she wanted to blow up the plane. No evaluation was performed. She is under stress. Her continuation of professional activities is threatened. Dr. Fey had seen her within the previous 24 hours, and she was not a danger to herself or others. Her statements were impulsive and disinhibited. She denied she would carry out these threats. Prior to this incident, she made a series of statements to SrA Goode involving a pleasurable dream, in which she shot everyone. Col O'Neil stated that within 24 hours, she expressed two events involving threats against others. The commander noted that Maj Webster has displayed a pattern of disorganized and problematic behavior that led to her removal from a patient care setting.

**Collateral Interview of Col Sel. Gary Gronseth, WHMC Dept. of Neurology.** Dr. Gronseth believes the Verbal-Performance differential on the WAIS-R is a matter of "hard wiring," and not a pathological indicator. She meets clinical criteria of possible MS based on 2 neurological episodes, the first in 1974 involving facial paralysis associated with diplopia and the second in 1992 involving double vision. She would meet lab criteria for probable MS, demonstrating two attacks, lesions on MRI and oligoclonal bands on CSF. An earlier MRI would suggest MS but is not very specific. Elementary neurological functioning is normal so she probably does not have subcortical dementia. She probably has dysfunctional executive process which is non-progressive.

After reviewing the MRI of Sep 98, Dr. Gronseth summarized clinical and laboratory findings. Although he said he could not make the MS diagnosis with certainty, he said that "more likely than not" Maj Webster suffered from MS. He was 65% confident of this diagnosis. Maj Webster stated she would like further evidence and recommended a lumbar puncture to examine other laboratory indicators. Dr. Gronseth concurred and escorted the patient to neurology for the procedure. As of this date, the patient apparently had a lumbar puncture but did not report to the lab for blood work. Results of the oligoclonal band survey are pending.

**Collateral Interview of Maj Chip Massey, WHMC Neuroradiology:** Maj Massey reviewed an MRI taken on 25 Sep 98 and indicated the data suggested extensive and severe white matter abnormalities in the corpus callosum, consistent with "classic MS." She has a pretty advanced case. An additional lesion was found in the C2 cervical spinal cord, also consistent with MS. He is 90% confident that this pattern represents MS. From the previous report, it appears that her condition has worsened.

## BEHAVIORAL OBSERVATIONS:

She was oriented to person, place, and date, but erred significantly on her time estimation (9:30 versus 11:00). She could not identify the President preceding Bill Clinton (**WMS-R Information and Orientation** = 12/14; 1st percentile). She appeared to be well kept, well nourished, and in no acute distress. Hygiene and grooming are managed independently, effectively, and appropriately. She was approriately dressed. There was no evidence of delusions, hallucinations, obsessions, ideas of reference, phobias, suicidal or homicidal ideation. Mood was mildly anxious, irritable, and dysphoric. Her affect was full range. There was no evidence of neurovegetative signs of depression. Speech was fluent; however, she occasionally mispronounced words and made a variety of paraphasic errors.. Voice quality was unremarkable. Thoughts were goal oriented and questions were addressed appropriately. The client was able to give an account of life events in chronological order. Recitation of personal

793

history appeared normal. Personal insight was fair; however, she seemed to lack appreciation for the magnitude of her deficits or the impact of her behavior on others. There were no abnormalities of gait or evidence of apraxia. The client established a positive relationship with our staff and was cooperative. In completing our biographical questionnaire, she omitted her age and date of birth. Her test results are considered an accurate reflection of her current cognitive functioning.

**TEST RESULTS:** Individual test performance was compared to a sample of age matched peers. When appropriate and available, performance was compared to peers with similar age and education. When discussing the results of MicroCog, we compared Dr. Webster's performance to the reference group of 18-34 year olds, allowing for an analysis of her performance to that of a sample of individuals who are performing at relatively optimal levels (Powell et al., 1993). When appropriate, corresponding age-education matched comparisons are noted as well. These are abbreviated "A/E." Scores are reported using commonly accepted classification of ability levels using conventions endorsed by Drs. Joe Matarazzo (1972), David Wechsler (1958, 1981) and Muriel Lezak (1995, p. 159). These conventions are listed below:

| Classification | z - Score | Percent Included | Lower Limit of Percentile Range |
|---|---|---|---|
| Very Superior | +2.0 and above | 2.2 | 98 |
| Superior | +1.3 to 2.0 | 6.7 | 91 |
| High Average | +0.6 to 1.3 | 16.1 | 75 |
| Average | +/-0.6 | 50.0 | 25 |
| Low Average | -0.6 to -1.3 | 16.1 | 9 |
| Borderline/Mildly Impaired | -1.3 to -2.0 | 6.7 | 2 |
| Moderately to Severely Impaired | -2.0 and below | 2.2 | --- |

**General Intelligence.** Maj Webster has been repeatedly evaluated with the WAIS-R. Results suggest that she is functioning in the very superior range of intelligence overall (1998 WAIS-R FSIQ = 136, 99th percentile, mean = 100, SD = 15 ). There was a significant discrepancy between verbal (1998 VIQ = 140, 99th percentile) and performance (1998 PIQ = 122, 93rd percentile) indices. This differential may reflect chronic superior verbal abilities when contrasted to nonverbal skills; however, Knight's (1992) review of the literature suggest a Verbal - Performance differential parallel to that produced by Maj Webster. MS patients demonstrated the highest subtest scores on Verbal scales. The poorest performance was observed on tests that are timed and require considerable dexterity. Overall intellectual decline was mild.

When tested repeatedly, effects of practice may lead to a gradual rise in overall performance scores. When examined in 1993, Dr. Zohner observed a Full Scale IQ of 116 (86%), Verbal IQ of 125 (95%), and Performance IQ of 104 (61%). Anxiety may have attenuated her performance on this initial examination. Using the standard error of measurement, her 1993 Full Scale IQ of 116 is significantly different from her more recent Full Scale IQ (99% confidence interval). Effects of practice and attenuated anxiety may have contributed to this differential; however, an overall summary index may mask individual variation in specific cognitive domains and, therefore, should be interpreted with caution (Lezak, 1988).

**Language.** Conversational speech was fluent and articulate with intact comprehension, syntax, semantics and word finding. **Vocabulary** (Shipley raw score = 37; 63T, 90%) and general verbal intelligence (1998 WAIS-R Verbal IQ) scores exceed her age matched peers, indicating that general verbal abilities are intact. She had no difficulty following a series of verbal commands (**Token Test**, raw = 44/44 correct), and previous assessment revealed intact expressive speech. On a standardized reading test, she scored at the 81st percentile and within the high average range (**WRAT3**, raw score = 53). On a test of confrontational naming (**BNT**) she scored within the high average range (raw = 58/60; 80%). On a timed test of verbal fluency, she generated 50 words to the letters F, A, and S over a three-minute period, scored at the 60th percentile and within the average range (**COWAT**). On a test of categorical fluency, she was asked to generate animal names. She produced 16 words in 3 minutes for low average performance at the 14th percentile.

7949