I am concerned about the mistakes made by doctors in my case. Had I not been vigilant, I would have received the wrong medication in the emergency room, no tetanus shot and an inadequate amount of globulin. Such mistakes could be disastrous in the future.

I must say that I found your technical staff, particularly Airman Drake at Ft. Clayton, to be very professional, caring people. My concern is the quality of care I received from your doctors.

LINDA L. THOMAS
288-7299

# CURRICULUM VITAE

## A. IDENTIFICATION

| | |
|---|---|
| Date: | 1 February 1999 |
| Name: | Terrence Jay O'Neil |
| Grade: | Colonel |
| Birth Date: | 1 June 1950 |
| Social Security Number: | 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 FR |

## B. BACKGROUND

Undergraduate Education

| | |
|---|---|
| School: | California Institute of Technology, Pasadena, CA |
| Major: | Biology and Chemistry (double major) |
| Degree: | Bachelor of Science, with Honors |
| Date: | June 1971 |

Professional Education

| | |
|---|---|
| School: | University of California, San Diego, La Jolla, CA |
| Degree: | M.D. |
| Date: | June 1976 |

Postgraduate Education

Internship and Residency

| | |
|---|---|
| Hospital: | Wilford Hall USAF Medical Center 59th MDG, Bergquist Dr., Lackland AFB TX |
| Specialty: | Internal Medicine (Categorical) |
| Dates: | 1 Jul 76 - 30 Jun 79 |

Fellowship (Clinical Nephrology)

| | |
|---|---|
| Hospital: | Wilford Hall USAF Medical Center |
| Program Director: | Col Cleve Collins, USAF MC |
| Dates: | 1 Jul 79 - 30 Jun 80 |

Fellowship (Bench Research Nephrology)

| | |
|---|---|
| Hospital: | University of Texas Health Science Center Floyd Curl Drive, San Antonio TX |
| Program Director: | Dr. Jay H. Stein |
| Dates: | 1 Jul 80 - 24 Jun 81 |

893

HEARING EXHIBIT 2

Clinical Appointments

Internist, Department of Primary Care, Howard AB, Panama, 20 August 1997 to Present

Chairperson, Department of Medicine / Medicine Element Leader, 60 MDG (David Grant Medical Center (DGMC), Travis AFB CA, 15 Apr 93 to 1Feb 95

Staff Internist / Chief of Renal Medicine, 60 MDG (DGMC), Travis AFB CA, 25 Jun 84 to 15 Apr 93

Assistant Clinical Professor of Medicine, University of CA, Davis, 1987 to 1997

Assistant Professor of Medicine, Uniformed Services University of the Health Sciences, F. Edward Hebert School of Medicine, Bethesda, MD, Mar 95 to present

Staff Positions (Most Recent Listed First)

Hospital: 24th Medical Group CC (ACC), Howard AB, Panama, August 1997 to present

Hospital: 60 MDG / DGMC (AMC), Travis AFB CA
60th Medical Operations Squadron Commander (MDOS/CC, SGO); 24 August 96 to present
Chief of the Medical Staff (SGH); 1 Feb 95 to 24 Aug 96
Chairperson, Dept of Medicine/Medicine Element Leader; 15 Apr 93 to 1 Feb 95
Program Director, Internal Medicine Residency Program; 1 May 93 to 28 Aug 95
Chief, Renal Medicine Service; 25 Jun 84 to 15 Apr 93

Hospital: Clark AB USAF Regional Medical Center, 13AF, Clark AB, Philippines. 24 Jun 81 to 28 Jun 84
Staff Internist/Nephrologist, Director of Dialysis Unit
Pacific Air Forces Consultant in Nephrology; 1982 to 1984

Licensure and Certification

(i) Professional Licensure
State of Washington: License Number 0016348 State of California: License Number G-58793

(ii) Specialty Board Certification
Diplomate in Internal Medicine: ABIM 1984 Diplomate in Nephrology: ABIM 1988

Professional Organizational Membership

Fellow, American College of Physicians
Member of Board of Governors, Society of Air Force Physicians

894

Military Associate Member, Solano County Medical Society
Military Member, California Medical Association
Military Member, American Medical Association
Member, International Society of Nephrology
Member, American Society of Nephrology
Regular Officer Member, Air Force Association

Honors and Executive Positions Held

60th Medical Operations Squadron Commander; 24 Aug 96 to Present
Chief of the Medical Staff, 60 MDG / DGMC; 1 Feb 95 to 24 August 96
Program Director of Internal Medicine Residency, 60 MDG / DGMC; 1 May 93 to 1 Feb 96
Chairperson of Department of Medicine / Medicine Element Leader, 60 MDG/DGMC; 15 Apr 93 to 1 Apr 95
Assistant Chairperson of Department of Medicine, 60 MDG / DGMC, 1 Aug 92 to 15 Apr 93
First Winner of the Air Force Association Paul Myers Award for Physicians, 1982
Member, Society of Clinical Consultants to the Surgeons General Nephrology Manpower, Apr 93 to Present
Special Consultant to the PACAF Surgeon General in Nephrology, 1982-1984
USAF Regional Medical Center, Clark AB, Hospital Infection Control Committee, 1983-1984
USAF Regional Medical Center, Clark AB, Hospital Pharmacy and Therapeutics Committee, 1983-1984
USAF Commendation Medal, 1984
USAF Meritorious Service Medal, 1993
Dept of Family Practice Clinical Instructor of the Year, 1985
Dept of Medicine Clinical Instructor of the Year, 1992
Department of Medicine Quality Assurance Program Monitor, DGMC, 1985-1987
Chairperson Hospital Pharmacy and Therapeutics Committee, DGMC, 1987-1988
Chairperson Institutional Review Board, DGMC, 1989 to June 1996 Critical Care Committee, DGMC, 1980-1981
Institutional Animal Care and Use Committee, DGMC, 1990 to 15 Jan 95 Internal Medicine Residency Program Resident Clinical Competency Review Committee, 1988-1993
Chairperson, Travis AFB Catholic Chapel Funds Council, 1992 to Oct 94

## C. PUBLICATIONS

Articles

The Role of High-Energy Phosphate in Norepinephrine-Induced Acute Renal Failure in the Dog, Sinsteden TD, O'Neil TJ, Hill S, Lifschitz MD, Stein JH, Circ Res, 1986:59,93-104

Brief Group Therapy Following Myocardial Infarction: Eighteen-Month Follow-up of a Controlled Trial, O'Neil TJ, Rahe R, Psychiatry in Medicine, 1975:6(3), 349-358

Successful Twin Pregnancy After Renal Transplant Maintained on CyclosporineA Immunosuppression, Burrows DA, ONeil TJ, Sorrelis TL, OB-GYN, 1988:51,765-7

Korean Hemorrhagic Fever: Case Report and Observations on the Successful Resuscitation of a Patient With Renal Failure, O'Neil TJ, Hayes CG, Military Medicine, 1986:151,329-30

Problems With the Trimethoprim-Sulfamethoxasole Regimen For Oropharyngeal Gonorrhea, O'Neil TJ, Manipon N, Military Medicine, 1985:150,47-8

Metoclopramide Kinetics in Patients With Impaired Renal Function, and Clearance by Hemodialysis, Lehman CR, Heironimus JD, Collins CB, O'Neil TJ, Pierson WP, Crowe JT, Melikian AP, Wright GJ, Clin Pharmacol Ther, 1985:37(3),284-9

The Excavation of Marin-374 (Archaeology Field Text for Novato Unified School District); Later excerpted into "The Amateur Scientist", Stong CL, ed., Scientific American, Dec 1967

Renal Transplant Donation (Letter), O'Neil TJ, Military Medicine, 1988:153,101-2

Organizational Firm Trials and Informed Consent Documents (Letter), O'Neil TJ, I.R.B., 1992:14(3)9

Abstracts

Independent Single-Station Reverse Osmosis Water Supplies In a Mobile Hemodialysis Unit for the Military Hospital; Air Force Regional ACP Meeting, Society of Air Force Physicians, March 1983

Hemodialyser Re-Use at Clark AB USAF Regional Medical Center: A Safety-Efficacy Study; Air Force Regional ACP Meeting, Society of Air Force Physicians, March 1984

On the Mechanism of Protection From Acute Renal Failure by Mannitol, Lasix, and Bradykinin; American Society of Nephrology National Meeting, November 1983

The First Report of a Successful Twin Pregnancy in a Transplant Patient on Cyclosporine and Medrol; Air Force Regional ACP Meeting, Society of Air Force Physicians, March 1988

96

Continuous Arteriovenous Hemofiltration/Dialysis at David Grant USAF Medical Center: Three Years' Experience; Air Force Regional ACP Meeting, Society of Air Force Physicians, March 1989

Experience With Human Recombinant Erythropoeitin Therapy at David Grant USAF Medical Center; Air Force Regional ACP Meeting, Society of Air Force Physicians, March 1990

Quality of Water Produced for Hemodialysis by Military Reverse Osmosis Water

Purification Unit; American Society of Nephrology National Meeting, November 1991 1

Discovery of a Previously Mis-Diagnosed Kindred of Fabry's Disease Through Renal Biopsy; Air Force Regional ACP Meeting, Society of Air Force Physicians, March 1992

## D. CONTINUING MEDICAL EDUCATION (Past 4 Years)

Joint Commission on the Accreditation of Health Care Organizations; Course on Hospital Accreditation Standards and Survey Process, David Grant Medical Center, Travis AFB CA, 3 1 Jan- 1 Feb 1995

Ophthalmology for Non-Ophthalmologists, David Grant Medical Center, Travis AFB CA, 5-8Nov 1995

Medical Group Staff Training Symposium (Hq Air Staff), Leesburg VA, 2024Mar95

Physicians in Medical Management Seminar (PIMS) I and II, American College of Physician Executives, Wright-Patterson AFB, OH, 15-29 Sep 94

7th Annual DGMC Tahoe Medical Conference, 6OMDG Sponsor, 3 to 5 Feb 95

National Symposium on Continuous Ambulatory Peritoneal Dialysis, University of Missouri, San Diego CA, 3-7 Feb 93

Air Force Regional Meetings of the American College of Physicians / Society of Air Force Physicians: 2-6 Mar 96

American Society of Nephrology Annual Scientific Meetings: San Diego CA 11/95, San Antonio, TX 11/97

Wilderness Medicine, 9-14 August 1996, Snowmass, CO

Advanced Cardiac Life Support Instructor Course (Certified Instructor in ACLS) 11/90, recertified instructor 1996, Course Instructor 12-13 May 1998

Region 3/Region 15 Summer TRICARE Conference, Atlanta, GA, 28-30 July 1998

Armed Forces Institute of Pathology, Risk Management Program, 13Nov98

United States Atlantic Command, Joint Task Force Surgeons' Training Seminar, Norfolk VA, 3-6 Nov 1998

Germ Warfare, Part I, Fort Clayton, Panama, 6 August 1998

Uniformed Serviced University of the Health Sciences (USUHS) TRICARE Winter Conference, Washington D.C., 9-12 February 1998

Combat Casualty Care Course / Advanced Trauma Life Support Course (Certified), Camp Builis TX 6/90

Medical Knowledge Self-Assessment Programs (MKSAP-ACP), Programs VIII (1989), IX (1991), and X (1994)
Health Resources Study Center Conference for Providers of Managed Care, December 1995 1
Armed Forces Institute of Pathology, Medical Legal / Risk Management Modules, February 1996
Air Force Medical Service Senior Leadership Training Seminar, May 1996
Wilderness Medicine; University of California, San Diego (sponsor) August 1996

## CONTINUING MILITARY EDUCATION

Air Command and Staff College, Seminar, Clark AB, Philippines, 1984

Air War College, Seminar, Travis AFB CA, 1988

DGMC Commander's Sr. Medical Officers'Administrative Seminar, Jan-Jun 1988

# DEPARTMENT OF THE AIR FORCE
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

22 May 1998
Second Copy Delivered
26 May 1998

MEMORANDUM FOR Major Wilma P. Webster

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Relief From Emergency Room Duties Due to Performance

1. I regret that I must act effective today to relieve you of your emergency room duties. This action is taken based on a pattern of unacceptable duty performance beginning November 1997. Specifically; on a number of occasions you have received negative customer feedbacks documenting disorganization, lack of willingness to listen to patient problems, and inappropriate emotional outbursts. You have a rate of patients choosing to leave the emergency room without being seen three times higher than the average for other 24MDG E.R. physicians, despite having no higher patient count on your duty periods. You stated during a Code Blue procedure in my presence that your wrist was too weak to successfully intubate a patient. You then later told me that you had mis-spoken; that your wrist really was not the cause of the problem. You consistently did not follow established documentation procedures on consults for downtown civilian providers. In the case of a cat-bite, you did not assure proper follow-up to assure that both rabies anti-globulin and counseling regarding rabies vaccine were given. On another occasion, you handed a patient diphenhydramine instead of acetaminophen syrup for her child.

2. You have been counseled in November 1997 by the Chief of Emergency Services, by the Chief of the Medical Staff, LtCol Robbins, and recently by Capt Shercliffe regarding the lack of an orderly and systematic approach to dealing with E.R. patients. Maj Mc Creary has also spoken with you on several occasions, including one formally-documented counseling session 30 Nov 97 regarding problems. Despite these opportunities to self-correct or seek help, you have continued a pattern of duty performance which has resulted in my losing confidence in you as an Emergency Room physician.

3. This is not an adverse credentialing action.

4. You will continue to serve in the 24th Medical Group, in a capacity to be decided in concert with your Medical Operations Squadron Commander.

5. You are encouraged to seek legal as well as stress/emotional/psychiatric counseling in order to help you deal constructively with this episode. You have three duty days to submit a written response to this action for my consideration. You are free to seek any and all authorized means of appeal.

6. You will acknowledge receipt of this letter by signing below.

TERRENCE JAY O'NEIL, Col, USAF, MC
Commander

1st Indorsement: I acknowledge receipt of this letter.

Wilma P. Webster

WILMA P. WEBSTER, Major, USAF, MC

2nd Indorsement: 3 duty days is by COB 29 May 98

AFD=c:\medgroup\complain\webster\relief.doc 900

*Global Power For America*

HEARING EXHIBIT

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

6 Feb 98

MEMORANDUM FOR RECORD

FROM: 24MDG/CC

SUBJECT: Issues Surrounding Complaint by Maj Webster

1. I had a meeting with LtCol Mark Robbins, the Chief of the Medical Staff this AM in my office. We discussed the issues brought up by the complaint and surrounding details furnished by Maj Webster yesterday. I announced my intent as being the placing of Maj Webster in a practice situation temporarily where she felt comfortable and less-stressed, while assuring supervision and review of clinical performance regarding both that setting and the possibility of her eventual return to an Emergency Room setting.

2. My concern, shared by LtCol Robbins, was that the nature of the problems seen 85% of the time in Emergency Rooms is acute Family Practice health issues which could easily have been dealt with on an appointed basis. A lack of familiarity and comfort with treating those sorts of patients in an outpatient setting causes concern which both of us felt justifiable in looking toward Dr. Webster's return to an E.R., where speed and triage is even more important.

3. Additionally, Dr. Webster's level of anguish and subjective distress needs to be assessed during the period she is convalescing from her planned wrist surgery, so that her ability to deal with patient care issues undistractedly is safe and adequate. I informed Dr. Robbins that LtCol Rodgers had seen Dr. Webster yesterday afternoon and offered her his ongoing services for emotional support and stress management.

4. Finally, I informed Dr. Robbins that I had let HQACC know that the issue was active, and that Col Santiago would be kept informed, incase some sort of E.R. coverage proved to be needed were the stress situation on Dr. Webster to deteriorate further.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

Cc: SGH/LtCol Robbins
SGO/LtCol Addison

AFD=c:\medgroup\complain\webster2.doc

*Global Power For America*

901

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

13 November 1998

MEMORANDUM FOR: HQ AFPC/DPPDS (Physical Evaluation Board)

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Commander's Letter on Major Wilma P. Webster

1. IAW DoDI 1332.38 I write to convey my impression of the effect of Maj Webster's medical condition on her ability to perform her medical duties, and to deploy/mobilize worldwide.

2. At this time, Maj Webster is pending 24MDG Credentials Function determination regarding her ability to perform as a credentialed independent practitioner. There are no other administrative actions pending at this time.

3. Maj Webster was noted by the staff and her co-workers in the Emergency Room at Howard to be emotionally labile and disorganized. I personally witnessed her on duty and was struck by the sense that she was struggling to maintain focus and control. During a cardiac arrest I participated in with her she was unable to start an endotracheal airway, stating that she lacked strength in her left wrist to perform the maneuver with the laryngoscope, attributing it to carpal tunnel syndrome. This delayed the intubation. She was temporarily relieved of Emergency Room duty until after carpal tunnel surgery was performed, and she had recovered sufficiently to perform intubation correctly on a manikin. In retrospect, the wrist and forearm weakness that led to the incident may have been an early symptom of the subsequently-diagnosed demyelinating illness. Additionally, on another occasion she broke down into tears while seeing a Primary Care patient. On a more recent incident, she made comments about "blowing up the plane" prior to going air-evac to Wilford Hall for her first evaluation there earlier this year. She insisted it was "a joke", but made other inappropriate comments to a technician regarding fantasies of shooting a number of people because she was angry. She was evaluated by Mental Health here; these comments were felt to be dis-inhibited impulsive statements which she had no intention of acting on. As Medical Group Commander, I relieved Maj Webster of duty based on lack of confidence that she could reliably perform her duties as Emergency Room Physician before I knew the neurologic diagnosis. As senior physician at the 24th Medical Group, knowing that Maj Webster has been diagnosed with a demyelinating central nervous system disease with at least one episode of acute reversible extremity weakness, and in view of her past emotional lability and unpredictable speech, I feel that she cannot be relied upon to perform her duties as Emergency Room Physician, nor to perform mobility duties.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

C:\AAMDGRP1\COMPLAIN\WEBSTER\cdrstmnt.doc 902

**Global Power For America**

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

24 June 1998

MEMORANDUM FOR RECORD

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Review of Documentation Regarding Dr. Webster and Dr. McCreary

1. I have reviewed a series of memos regarding the relationship between Major Wilma Webster and Maj James McCrary. These include a memo from Maj Webster to me (12Jun98), a memo from LtCol Martha Addison to me (23Jun98), a table showing the total number of episodes of patients leaving without being seen (LWOBS) which is undated, and a memo from Maj McCrary to me dated 22Jun98.

2. Judged against the background, Maj Webster's memo lacks sufficient substance to justify altering or amending my actions. Maj Webster intensely wanted the job of E.R. director; sufficiently so to have an appointment with me shortly after Dr. MrCrary was selected by LtCol Addison to dispute her choice. Dr. Webster was relieved of her Emergency Room duties by me in May as a result of repeated episodes of disorganized behavior and a clinical style which elicited concern and lack of trust. This community lack of trust reached as far as the office of the Theater Support Brigade Commander, the 24th Wing Commander, and the Air Combat Command Surgeon. There appear to be areas where Dr. McCrary is not perfect. However, on balance, he continues to maintain my trust. The E.R. staff and the patient population continue to react favorably to his care and his management of the E.R. This is in sharp contrast to the multiplicity of concerns raised to me about Dr. Webster's clinical management style.

3. No individual—myself included—always does everything perfectly. However, I continue to believe that my actions in relieving Dr. Webster and validating LtCol Addison's decision to continue Dr. McCrary in his present capacity are justifiable based on objective and verifiable patterns of behavior and performance, after reviewing the documentation attached and considering the historical context that the documents were created in.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

4 Atch:
1. memo from Maj Webster to me (12Jun98)
2. memo from LtCol Martha Addison to me (23Jun98)
3. undated table showing total no. episodes of patients leaving without being seen (LWOBS)
4. memo from Maj McCrary to me dated 22Jun98

AFD=c:\aamdgrp1\complain\webster\24jun98.doc

24th Medical Operations Squadron
Howard AFB, PA

MEMORANDUM FOR COL TERRANCE JAY O'NEIL 23 Jun 1998

FROM: LT COL MARTHA W. ADDISON

SUBJECT: RESPONSE TO DR. WEBSTER'S CONCERNS REGARDING DR. McCRARY

Sir, I appreciate the opportunity to respond to Dr. Webster's concerns regarding Dr. McCrary as addressed in her letter to you dated 12 June 1998. I have written feedback from Dr. McCrary, which is attached, and I have interviewed Dr. Teddy Mendez, the Primary Care Flight Commander. These comments, along with mine, will be included to address her concerns. I will address them in the same fashion that she did for continuity's sake.

1. Dr. Webster's comments about the continuous state of disorganization in the ER cannot be laid entirely upon the feet of Dr. McCrary but has to be looked at in part as being caused by the system. Both Drs. Webster and McCrary came into the ER with the thought that they were going to be the ER director. I informed the then SGH, Dr. Robbins, and Dr. Mendez that were would see how both members worked out prior to naming an ER director as they seemed so close on the files that I was privy to. After observing both in their work environment, I made the decision to put Dr. McCrary in charge as Dr. Webster seemed to have problems getting organized from the first day. She arrived without uniforms (stated that she had mailed them and couldn't believe that they had not arrived) and while she certainly seemed eager to work, did not have what I consider to be officer-like qualities. Some specific examples are in our very first encounters. On our initial one on one conversation she let me know that she had not washed her hair as the hotel did not have shampoo. I mentioned to the ER staff several times that their uniforms were not meeting standards. She was approached by Col Trebon who told her that she needed a name tag on her BDUs after I had informed her that her uniforms were not within standards. One particular am I saw her in the ER and again told her that she needed to smarten up her uniforms. She informed me that she had worked all night and that was why they were wrinkled. After being in the military for 20 plus years, I know the difference between uniforms that have not seen heat versus wrinkled ones. Once we finally sorted out who was working the ER, things seemed to smooth out more. Dr. Webster never let me forget that she felt slighted because she was not put in charge of the ER and even went as far as insinuating that Dr. McCrary had arrived first and consequently had the opportunity to gain favor and thus was given the position. A lot of Dr. Webster's concerns are based upon the fact that she was not the ER director. As far as her observation of Dr. McCrary's handwriting, she has a good point, as unfortunately, it is hard to interpret a lot of the provider's handwritings. Dr. Rodriquez has addressed the actual documentation to include writing along the sides of the 558, etc. This area seems to be improving.

2. Dr. McCrary and most of the other providers are resistant to change to include the SOAPP. While this is not consistently done anywhere in the facility, it is catching on. Prevention has purchased reminders like pens, mouse pads, etc. Quality checks are going on in various areas to check for compliance. If Dr. McCrary made these comments to Dr. Webster, I certainly can understand her concern for him not reinforcing the policy.

3. I agree that in the beginning when he was making the schedule, Dr. McCrary gave the appearance of looking after self more than coworkers. Dr. Mendez added to this confusion as he did not seem to understand scheduling rules. I got together with both of them, showed them how to do a cyclic schedule that is fair, consistent and predictable. On 12 hour shifts this schedules allows every other weekend off unless leave, TDYs, etc come into play. The unit is trying to adopt this schedule but has not done so completely. In the last few months, and after several sit down sessions with Dr. McCrary by myself and Dr. Mendez, I think things are improving in the ER. I also made the suggestion to Dr. McCrary that someone besides himself do the schedule. It is my understanding that this is what is happening now.

4. Dr. Webster shows different stats on LWBS that were given to me by Capt Shercliffe when he was asked to look at this data. Attachment 2 addresses this. This chart takes into consider the fact that a patient could present during the duty time of one provider and leave during the shift of the second provider. In this case, both providers are credited with 0.5 of a LWBS. Dr. Webster does average the highest.

5. Again, she addresses Dr. McCrary's lack of respect in his email from home stating that Dr. Mendez was "jacking around with the schedule". While this certainly is not a show of respect, I wonder about the "vulgar term". I have discussed with Dr. McCrary the expressing of his opinion. His feelings are that the fact that he sent this out on his personal PC does not make it official; I disagree. I also find it hard to believe that any of us never said less that desirable things about our superiors. I guess the difference is putting it in writing.

6. The panic book which I have seen is to be used by ER providers as a guide. I feel that there is an overreaction to the Epi and #2 addresses to give 0.3 Epi, 1:1000 sub q at any site but any person who is authorized to give drugs, to include technicians, know what sub q means. I can see Dr. Webster pointing this out but I certainly would not exact a seasoned ER doctor to give this medication in a site with an end arteriole. It's kind of sad to think that everything has to be spelled out but maybe this is the case.

7. Dr. Webster's comments on Dr. McCrary's form of leadership may have some merit. Dr. McCrary certainly is a somewhat "no nonsense type" person and initially he did seem to want to control all the functioning within the ER. Dr. Mendez and I have discussed this with him, more times than one, and I see some changes. One example is the other doctors getting involved in scheduling, doing the agenda for staff meetings, writing policies, OIs, etc. Dr. Webster has volunteered for several of these things and has done the same. Dr. McCrary, like most of us, certainly has room for improvement but in light of who is available and willing to be the ER director, he continues to be my choice. I still have one on one discussions with him to ensure that he understands what I mean by leadership, being the unit director, etc.

8. Dr. Webster's last statement about Dr. McCrary being considered for a psychiatric evaluation after her's is completed is without warrant. While he certainly has had some patient complaints and I have acknowledged that he needs to continue to work on his leadership style, this is not the same type thing that I have witnessed with Dr. Webster. I have been present during a Code Blue with Dr. Webster where I still question her skills as an ER provider, I have been approached by several staff members and patients with concerns regarding her abilities and emotional status. This is a sad situation as I know that Dr. Webster truly desires to be an outstanding Air Force officer and contribute positively, however, what I see in terms of her practice and the outcomes, leaves me to believe otherwise.

9. Sir, while I tried to answer Dr. Webster's concerns and to be objective, please consider this for what it is worth. As I have deliberately given my opinions and observations, this alone may color my objectivity, but I have tried to be as fair as I can. Please direct any questions to myself and again, thank you for the opportunity to answer Dr. Webster's concerns.

Martha W Addison

MARTHA W. ADDISON, Lt Col, USAF, NC
Commander, Medical Operations Squadron

905

22 JUN 98

MEMORANDUM FOR COL TERRENCE J. O'NEIL

FROM: MAJ JAMES E. MCCRARY

SUBJECT: REPLY TO MAJ WILMA WEBSTER

1. Sir, if Maj Webster had a number of concerns about my behavior, why didn't she convey them to anyone before now? My feeling is that her letter is a feeble attempt to discredit me, so that my memorandum concerning her actions will look less damaging. I will never-the-less answer her points as requested by Lt Col Addison.

2. It is true that my work area is sometimes stacked with papers, books, etc. It may look to be in a state of disorganization to the untrained eye, however, its the way I work, and I am very efficient. I have several duties and I can work on several things at the same time. I call it organized disorganization. ('You' may not know where things are, or what I'm doing, but I do) Maj Webster's suggestion that any delay in the ER's organization can be related to my lack of organization, is ridiculous. Any such delay stemmed from first, a delay in choosing a Director, than second by me constantly having to put out brush fires in the ER. (Many caused by Maj Webster)

3. I'm sorry to say that I must have missed the handwriting analysis course in med school, but I don't recall hearing about any analogy between handwriting and personality characteristics from my professors! Anyway, even if my personality traits are different (and they probably are), if they have no negative impact on patient care and/or customer service, they should be of no concern to Maj Webster or anyone else.

4. I along with other providers have gone on record with dis-satisfaction with the broad use of the SOAPP notes. However, I support Air Force policies even if I disagree with certain aspects of a policy. I don't recall any conversation with Maj Webster calling myself "a rebel", although I may have used a similar term or phrase referring to some abstract reference in a conversation that she was party to. I have instructed all ER providers to use the second P, and I do so myself. We don't have 100% compliance in the ER due to the nature of some cases, but we're trying. This type of petty nit-picking is typical of Maj Webster, she has always seemed to me to be more concerned about things like SOAPP notes than patients.

5. It pains me to see a so called professional stoop to attacking another by name calling. Maj Webster attacks my integrity in writing. This looks like liable to me. I will be contacting legal on the matter. She can not prove true anything she says about giving myself better holiday time, easier shifts or disregard for my co-workers. It can be shown that most if not all of the dates she has voiced concern over in the past, were not

Atch 2

scheduled by me, but by my supervisor! More to come on this one in particular, after I speak to legal.

6. I'm not sure what data Maj Webster gave you, but the data I complied from CHCS, as well as more recent (and more vivid) data from Capt Shercliffe indeed shows Maj Webster's LWOBS average to be about three time the normal. See attachments.

7. I resent the fact that Maj Webster used this item. First, this was a reply to an e-mail that she sent me at my home, I personally ask her not to discuss any business related topics on my personal e-mail. Secondly, she mistakes a "Eubonics" phrase for a vulgar term. The term "jacking around with....." simply means messing around with or changing things around. I'm not sure what she thinks it means, anyway I can tell you that it was a personal message and not meant to show lack of respect for my supervisor. (For whom I have great respect)

8. The Panic Book is collection of "guidelines" from existing OI's and standards, not anything I made up. I made it clear at our providers meeting that it was to be used only as a starting block for those "high profile" cases. I also personally told Maj Webster the same and that I purposely didn't make it an official document for the above reasons. P.S. With any guideline you must use common sense and clinical judgment.

9. Most worrisome indeed. I compiled all written documentation on Maj Webster concerning her performance in the ER. I stated facts that were already documented, and as her supervisor commented on my lack of confidence in her ability as an ER provider. I'm sorry that she feels that this was an "attack". I would also like to state that I am not a dictator but I am the Chief/OIC/Director of the ER and operate within my rights as such.

10. I'm appalled at Maj Webster's last statement/suggestion. But given what she going through presently, I understand it.

JAMES E. MCCRARY, Maj, USAF, MC
CHIEF, EMERGENCY SERVICES
24TH MDG, HOWARD AFB, PANAMA

907

12 JUNE 98

MEMORANDUM FOR: COL TERRENCE JAY O'NEIL

FROM: MAJ WILMA WEBSTER

SUBJECT: MAJ JAMES McCRARY

1. Sir, I have had a number of concerns about the behavior of Maj James McCrary and I would like to take the liberty of voicing them to you right now:

2. I noticed very soon after I met him that he seems to be in a continuous state of disorganization. You may often see this evidenced by multiple papers, books and other debris in disarray about his work place. I believe the organization of the ER has taken longer because of his lack of organization. It appears to be a personality characteristic seen even in the disarray of his handwriting.

3. Instead of immediately embracing the Air Force policy of the SOAPP notes, he resisted, even telling me once when I was supporting their use, that he was "a rebel". As Emergency Department Chief, he should support Air Force policies; it is not the time to be a rebel.

4. A leader should set an example and demonstrate his personal integrity to be above suspicion. The way that Maj McCrary gave himself better holiday time than his co-workers and his preference for the easier shifts, throws doubt on his personal integrity. In contrast, it shows selfishness and a disregard for the feelings of his co-workers.

5. Other breaches of integrity were the untruths that he wrote about me in the letter about my performance. In his letter he said I had three times the LWBS of other ER physicians. However the data I provided you on spreadsheets disproves that, and I am sure you have the ability to check out my figures with your computer and can verify who is telling the truth.

6. On one occasion, when e-mailing me a note about the ER schedule from his home, he showed a lack of respect for our supervisor, Dr. Mendez, by using the vulgar term "jacking around with the schedule", which I found inappropriate. As ER Chief he should show more respect. See annexed e-mail message.

7. In that e-mail he spoke of a 'Panic Book'. This was 12 printed pages on different subjects, with no cover letter, and no author noted. When I received 'The Panic Book', I did not know who sent it. I doubted its credibility because of such statements as "give 0.3 cc epi, 1:1000 sub Q *at any site*", which implies that epi can be given anywhere, even in a toe or a finger. As we all know, epi given in sites with end arterioles, can cause severe damage and must be avoided. He should be careful not to give out such erroneous information and should provide coversheets and sign handouts he produces.

8. Most worrisome, and in direct contradiction to the stated goals of the 24th Medical Group, is is dictatorial form of leadership. The American College of Emergency Physicians itself espouses a more democratic form of leadership as proposed in their book, Managing the Emergency Department, a Team Approach. Not only is he a dictator, but a cruel one at that, as evidenced by his way of attacking my professional ability, apparently to get me out of the way. I also think the aforementioned vulgar e-mail message displays an envy of any who would share his power.

9. I believe Maj James McCrary has some major personality flaws that seriously impair his function as Chief of the Emergency Department. I would suggest that once you have completed my evaluation that you also seriously consider a psychiatric evaluation of Maj James McCrary. This is not because I would still want to replace him because I am happy in the Health and Wellness Center, but because I am concerned about the good function of the department.

WILMA P. WEBSTER, MAJ, USAF, MC
Physician, Health and Wellness Center

MEMORANDUM FOR RECORD 23 March 98

TO: Dr. Webster

FROM: LtCol Addison

RE: EVENTS LEADING UP TO YOUR REMOVAL FROM ER

1. I am writing this memo in an effort to address and clarify some issues that continue to arise. In an effort to avoid further confusion, I have asked Dr. Mendez to be a witness to this conversation. Despite repeated conversations with you addressing why you where not put in charge of the Emergency Room , you continue to state that the decision was based on personalities versus skills and experience. (Conversation with Dr. O'Neil, 5 Feb 98). You obviously continue not to believe that Drs. Mendez and Robbins and myself made a conscientious decision to wait until both yourself and Dr. McCrary arrived, evaluate your credentials, PIF and demonstrated work performance and then make a decision, based on a known factor - watching two professionals operate as well as evaluating their credentials.

2. Following the Code Blue on 24 Jan 98, you made an admission that you were not able to intubate the patient (a large male with a thick neck) due to lack of strength in your wrist. As you were already scheduled for surgery on this extremity, the decision was made to remove you based on risk factors and the fact that in the Emergency Room you could be the only provider and placed in the same situation. You immediately protested, which is acceptable. Since being placed in the Primary Care Clinic you have stated that you were not treated fairly by Dr. Burkett. You have acted out with loud outbursts and banging on lockers in the ER. You were given a letter of counseling by Dr. Mendez regarding actions between yourself and Dr. Burkett. You sent a rebuttal on the letter, dated 10 Feb and to date, I have not been appraised of any additional outbursts from you. Based on this input, I made the decision not to create an Unfavorable Information File. You were given a letter dated 12 Feb 98 that explained this.

3. I have received written input from a patient commenting about you crying while the patient was seen at sick call. I have had inquiries from other concerned members regarding your emotional state and your perception that you are being punished. You make no bones about letting me know how unhappy you are about working in the Primary Care area and have proceeded to let me know that I have been punishing you since you first arrived. (Conversation 18 March 98 when I said "good morning" and asked how you were doing and you proceeded to tell me how I was wronging you.)

4. Dr. Mendez has assured me that you are aware of the game plan to return you to the ER after you have completed ACLS, either by course or by machine. My understanding is that a March date has been set up and this effort coordinated. You still protested when your profile was removed, despite this knowledge.

5. As the Squadron Commander, I am asking you to realize that you are an officer in the USAF and to act accordingly. If you feel that I have wronged you, please sit down with my supervisor, Col O'Neil, and clear up the matter. Regardless of w here you are tasked to work in the 24th Medical Group, I expect professionalism and a spirit of teamwork. Please accept responsibility for yourself and your actions.

MARTHA W. ADDISON, LtCol, USAF, NC
Commander, Medical Operations Squadron

COMMENTS:

909

webl HEARING EXHIBIT 4/_

**DEPARTMENT OF THE AIR FORCE**
**24TH MEDICAL OPERATIONS SQUADRON (ACC)**
**HOWARD AFB, PANAMA**

21 May 98

MEMORANDUM FOR MAJ WILMA WEBSTER, 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

FROM: 24 MDOS/CC

SUBJECT: Command-Directed Mental Health Evaluation

1. Under the authority of DoD directive 6490.1 and the Air Force Surgeon General's guidance for its implementation (dated 8 Jul 94), you are directed to report to the Corozal Mental Health Clinic, located on the first floor of Bldg 115 (Corozal East, above bank) for an evaluation on Thursday, 28 May 1998 at 0945. Maj Richard LaMacchia of the Mental Health Clinic was contacted and concurs with this referral.

2. The reason behind this referral is the following behavior on your part, which has come to the attention of your supervisors or myself.

Customer feedback documenting disorganization, lack of willingness to listen to patient problems, and inappropriate emotional outbursts. You do not deal well with patients presenting with routine clinic type problems, as evidenced by an increase in patients who leave without being seen while you are on duty. There continues to be strained working relations with co-workers.

3. If you believe this referral to be unwarranted or unfair, you have the right to the following consultations in connection with this command-directed mental health evaluation:

a. You may seek advice from the referral Area Defense Counsel located in Bldg 88, Rodman (USNS Panama Canal) (283-3610).

b. You may register a complaint with the Air Force Inspector General or DoD Inspector General through 24 WG/CVI, located on the third floor of Bldg 703, Howard AFB (284-4512).

c. You may contact your elected representative in Congress to seek his/her intervention.

d. You may challenge this referral through the chain of command.

e. A list of Member's Rights has been provided.

91C

Hearing Exhibit -11

4. You also have the right to request an additional mental health evaluation by any DoD employed mental health provider who is reasonably available. You may consult a private provider at your own expense.

5. You are advised that exercise of any of the above-listed rights is your absolute prerogative, however, it shall not necessarily delay the scheduled evaluation. You must acknowledge receipt of this notification by signing the bottom of this letter.

Martha W. Addison

MARTHA W. ADDISON, Lt Col, USAF, NC
Commander

Receipt acknowledged this 22nd day of May, 1998.

Wilma P. Webster

WILMA WEBSTER, Maj, USAF, MC
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

1 Attachment:
Member's Rights under DoD Directive 6490.1

all