MEMO FOR RECORD

Met with Dr. Webster and MSgt Byrne, acting first sergeant. Dr. Webster given paperwork for command directed mental health evaluation and sheet containing member's rights. She will report to the Health and Wellness Center on Tuesday, 26 May 1998, 0700, to Dr. Byron for her duties. Dr. Webster will be assigned to the HAWC until further notice.

Martha W Addison

MARTHA W. ADDISON, LtCol, USAF, NC
Commander, Medical Operations Squadron

Receipt acknowledged:

Wilma P. Webster

WILMA WEBSTER, Maj, USAF, MC

# COMMANDER'S REQUEST FOR MENTAL HEALTH EVALUATION OF PERSONNEL

*(THIS FORM IS PROTECTED BY THE PRIVACY ACT) (HAFB/AFI 37-132)*

| TO: | FROM: | CMDR'S DUTY PHONE: | DATE: |
|---|---|---|---|
| 24MDOS/SGOHP | 24 MDOS/CC LT COL MARTHA W. ADDISION | 284-6988 | 21 MAY 98 |

**I REQUEST A MENTAL HEALTH EVALUATION OF THE FOLLOWING INDIVIDUAL**

| NAME *(LAST, FIRST, MI)* | RANK | SSAN | DUTY PHONE | MARITAL STATUS |
|---|---|---|---|---|
| WEBSTER, WILMA | 04 | 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 | 284-3636 | SINGLE |

| AGE | DOS | DATE ASSIGNED UNIT | DEROS | AFSC/MOS & DUTY TITLE |
|---|---|---|---|---|
| 56 | 31 JUL 2001 | 5 OCT 1997 | 5 OCT 1999 | 044E3A, EMERGENCY SERVICE PHYSICIAN |

| TOTAL MILITARY SERVICE | | AQE/ACB SCORES | | | |
|---|---|---|---|---|---|
| YEARS: | MONTHS | MECH: | ADMIN: | GEN: | ELECT: |
| 6 YRS | 4 | | | | |

| SECURITY CLEARANCE: | TYPE: | PRP: | FLYING STATUS: | SPECIAL DUTY: |
|---|---|---|---|---|
| YES (circled) / NO | SECRET | YES / NO (circled) | YES / NO (circled) | YES / NO (circled) |

**1. WHY DO YOU FEEL THIS INDIVIDUAL NEEDS TO BE EVALUATED? DESCRIBE ACTUAL BEHAVIORS, EVENTS, OBSERVATIONS (DESCRIBE RATHER THAN LABEL)**

CUSTOMER FEEDBACK DOCUMENTING DISORGANIZATION, LACK OF WILLINGNESS TO LISTEN TO PATIENT PROBLEMS AND INAPPROPRIATE EMOTIONAL OUTBURSTS. DOES NOT DEAL WITH PATIENTS PRESENTING WITH ROUTINE CLINIC TYPE PROBLEMS AS EVIDENCED BY AN INCREASE IN PATIENTS WHO LEAVE WITHOUT BEING SEEN WHILE PROVIDER IS ON DUTY. THERE CONTINUES TO BE STRAINED WORKING RELATIONS WITH CO-WORKERS.

**2. HOW HAVE YOU TRIED TO RESOLVE THE PROBLEM?**

MEMBER HAS BEEN COUNSELED ON SEVERAL OCCASIONS, BUT NO IMPROVEMENTS NOTED. SAME RESULTS CONTINUE.

**3. WHAT ARE THE INDIVIDUAL'S STRONG & WEAK POINTS?**

STRONG POINTS -- DESIRE TO DO GOOD JOB. VOLUNTEERS REGULARLY FOR ADDITIONAL DUTIES

WEAK POINTS -- EASILY FLUSTERED WHEN DEALING WITH ROUTINE PATIENTS WHICH ARE A LARGE PORTION OF OUR WORKLOAD. PROBLEMS WITH RELATIONS WITH OTHER CO-WORKERS.

(OV

NDIVIDUAL PERFORMANCE

'AST MILITARY PERFORMANCE: UNSATISFACTORY [ ] MARGINAL [X] SATISFACTORY [ ] GOOD [ ] EXCELLENT [ ] UNKNOWN

AWARDS & OUTSTANDING ACCOMPLISHMENTS:

1) CONVICTIONS/VIOLATIONS OF UCMJ OR POLICY:

NONE

2) PUNISHMENTS OR ACTIONS TAKEN:

NONE

PENDING CHARGES OR INVESTIGATIONS:

NONE

LIKELIHOOD OF SATISFACTORY COMPLETION OF CURRENT ENLISTMENT:

[ ] VERY UNLIKELY [X] UNLIKELY [ ] LIKELY [ ] VERY LIKELY [ ] NO OPINION

5. PROPOSED DISPOSITION:

a. [X] DISCHARGE FROM MILITARY
[ ] DECERTIFICATION FROM PERSONAL RELIABILITY PROGRAM
[ ] WITHDRAWAL OF SECURITY CLEARANCE
[ ] CROSS TRAINING
[ ] OTHER (SPECIFY):

b. HAVE INDIVIDUAL'S DUTIES BEEN CHANGED PENDING RESULTS OF EVALUATION?
IF "YES" HOW HAVE THEY BEEN CHANGED:

YES, CONTRIBUTE BY WORKING IN AREA(S) THAT ARE NOT DIRECTLY RELATED TO PATIENT CARE

c. DOES COMMAND DESIRE MEMBER'S CONTINUED ASSIGNMENT WITH UNIT: [ ] YES [X] NO

DOES MEMBER DESIRE CONTINUED ASSIGNMENT WITH UNIT: [ ] YES [X] NO

6. HAS INDIVIDUAL BEEN INFORMED OF HIS/HER REFERRAL FOR MENTAL HEALTH EVALUATION? [X] YES [ ] NO

7. WHAT SPECIFIC QUESTIONS WOULD YOU LIKE ANSWERED IN THE MENTAL HEALTH EVALUATION?

IS THE PERSON AWARE OF LIMITATIONS?

8. COMMENTS:

TYPED NAME & RANK OF UNIT COMMANDING OFFICER DIRECTING THIS EVALUATION:

MARTHA W. ADDISON, Lt Col, USAF, NC
Commander, 24th Medical Operations Squadron

SIGNATURE OF UNIT COMMANDER:

Martha W Addison

HAFB FORM 6 (REVERSE)

1099

2 MAY 1998

MEMORANDUM FOR LT COL MARTHA ADDISON

FROM: MAJ WILMA WEBSTER

SUBJECT: Command Directed Mental Health Evaluation

1. In response to your request for a command directed mental health evaluation, I will say that indeed I do think it is unfair and unwarranted. On the other hand, I welcome the opportunity to prove to you that I am mentally healthy and dispel any anxiety you have on that score.

2. The only occasion I was aware of strained relations with a co-worker was my first day working in Primary Care Clinic when I was not allowed to go eat lunch and I emphatically demanded to go eat.

3. After being sent to Primary Care Clinic against my wishes, I did cry softly while at work on day. I felt I was being punished for having an arm too weak to intubate a difficult patient at a time when I could do intubations on easier ones. And nobody seemed to care about my opinions of what to do.

4. I was told there were multiple patient complaints against me yet I have only been given a chance to respond to one of these. This seems to indicate a definite problem with communication in our E.D.

5. I disagree when you say I do not listen to patient problems, and do not deal well with patients presenting with routine clinic type problems. I have personal pride and always do my best at whatever I am asked to do. My conscience is definitely clear on that score.

6. I prefer to work in the Emergency Department even though most of the patients are routine type patients. Yet at any given moment I am happy taking care of the minor things, and do not desire any big emergency to happen. When I do get the emergencies, what is pleasurable is being able to diagnose correctly and knowing the right thing to do at the right moment.

7. I do not think it is necessary to severely limit the routine patients that come to the ED. I often tell technicians it will take the same time to see them as to send them elsewhere. It was at the suggestion of the nurse and after previous guidance by Maj Mc Crary that I sent your friend with back pain upstairs to Primary Care, the day before you gave me the letter directing me to a Mental Health Exam.

8. Patients often demand antibiotics for colds or simple short term diarrheas that do not warrant such treatment. Are we so afraid of complaints that we give in to all their requests? In the third world such overuse has led to lethal multiple-drug resistant organisms. In the United States we protect our patients by limiting drug use to medically approved cases. Other patients want narcotics for their chronic pain. I have seen too many addicted people with chronic pain to want to be the one that starts them down that slippery slope. They will complain, but in the long run I will have done them less harm.

9. The May schedule did not appear until April 31st when I found I was to work the night of May 14th even though my SMRT training lecture on "Deployment to Desert Storm" was to be at 15:30 that day. I came on base several hours early to get everything prepared for the lecture. That night I was seeing patients a lot slower than usual, and two of them left without being seen. If this data is part of the reason for the referral, it has more to do with the organization of the ED than with my mental health.

10. I think our last conversation was very meaningful. I truly appreciated your candidness, when you indicated that I cause you apprehension because I seem to come on very strong. I was not aware of this and it is important to know how one comes across to others. Obviously this is something I have to work on. I also worry that perhaps the nurse/doctor relationship intimidates you somewhat, but you should not think about that. I have been in the military long enough that I have respect for your rank. Besides, my first commander, Col Garten, also a nurse, was someone who influenced me a great deal.

Wilma P. Webster

WILMA P. WEBSTER, MAJ, USAF

1100

Med in

response to O Cof
Addison letter

I have decided
prefer to PCS.

This is response to
letter of 21 May 98.

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

27 May 1998

MEMORANDUM FOR Major Wilma Webster, USAF, MC

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Response to Your Letter of 24 May 98; Commander-Directed Mental Health Evaluation

1. I have reviewed your response dated 24 May 98 to LtCol Addison's letter directing you to report 28 May 98 to Bldg 115, Corozal East, at 0945 for a Commander-Directed Mental health evaluation. I find the procedure followed by LtCol Addison to be proper, and her justification given for the directed evaluation to be adequate.

2. Therefore, I am confirming LtCol Addison's directive to you to undergo the evaluation as directed.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

1[st] Indorsement: Acknowledgement of Receipt

I acknowledge receipt of this letter.

WILMA WEBSTER, Maj, USAF, MC

CC: MDOS/CC

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

14 July 1998

MEMORANDUM FOR: 24MDOS/CC (LtCol Addison)

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Results of Commander-Directed Neuropsychiatric Evaluation of Maj Wilma Webster

1. I have carefully reviewed the results of the evaluation, dated 14 July 1998, signed by Maj La Macchia. They are concerning, and I feel that further evaluation is justified.

2. First, the patient requested an outside independent evaluation, so the testing was repeated. Both evaluators find that there are documented nonverbal learning, perceptual functioning, attention, and concentration deficits with pronounced functional degradation due to anxiety. Neither evaluator finds objective deterioration in intellectual skills. The resulting diagnosis is not a basis for finding of provider impairment, as I understand AFI 44-119. However, the findings are qualitatively consistent with her failure to perform in the Emergency Room under the kind of pressures found at this facility.

3. The evaluator's recommendation is for further formal workup of a possible cognitive disorder. In the context of her difficulties here, and my action to relieve her of E.R. duties, I feel that the evaluation performed constitutes justification for further neuropsychiatric workup at a medical center, with either a follow-on PCS re-assignment or MEB/PEB as the outcomes of that evaluation.

4. Please contact HQACC/SG and request that Maj Wilma Webster be PCS'd to the patient squadron at a suitably-staffed and –equipped medical center in CONUS for en-route workup as indicated by her evaluation here at Howard. In view of the provider's sensitivity to being an object of rumor and general knowledge of her situation, I recommend that consideration be given to having that evaluation be done at a non-USAF medical center.

5. Based on this evaluation, I do not foresee Maj Webster being able to return to active patient care duties at 24MDG.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

AFD=c:\aamdgrp1\complain\webster\neureval.doc

*Global Power For America*

1103

**DEPARTMENT OF THE AIR FORCE**
**24TH MEDICAL OPERATIONS SQUADRON (ACC)**
**HOWARD AFB, PANAMA**

14 Jul 98

MEMORANDUM FOR: Lt Col Addison

FROM: Maj La Macchia

SUBJECT: **COMMANDER-DIRECTED EVALUATION** of Maj Wilma Webster, 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

**IDENTIFYING INFORMATION**

Maj Webster is a 57 year old, divorced female serving on active duty in the USAF, stationed at 24th Medical Group, Howard AFB, Panama. Dr. Webster is an emergency room physician currently assigned to the Health and Wellness Center. Dr. Webster was referred for evaluation following negative customer feedback citing :disorganization, lack of willingness to listen to patient problems, and inappropriate emotional outbursts. Additionally, Dr. Webster "does not deal with patients presenting with routine clinic type problems as evidenced by an increase in patients who leave without being seen while provider is on duty and continued strained working relations with co-workers". Dr. Webster completed the required protocol for referral for this evaluation and was provided the appropriate waiting time before initiating the evaluation; at the outset of our first meeting I explained that my role was to conduct the evaluation for the benefit of the commander. The member acknowledged these remarks and the evaluation proceeded.

**PROCEDURES UTILIED**

Review of personnel records
Clinical interviews
Psychological testing
Neuropsychological Consult, Dr. Ricardo Obaldia
Staff discussions of behavioral observations
Review of previous testing

**HISTORY OF PRESENT PROBLEMS**

In August 93 Dr. Webster was evaluated at Travis AFB (TDY status) during her tour to Yakota AB, Japan for probable multiple sclerosis (MS). She was admitted to Internal Medicine Service and was seen on consultation by Neurology, Neuropsychology, and Psychiatry with documentation in her Medical Evaluation Board. Apparently an MRI identified areas of neural demeylination and double vision; the diagnosis was later changed to decompensated phoria. The member was returned to duty. Dr. Webster's professional problems have continued as documented in her personnel and credential file regarding a patient who she evaluated in the ER, who she then sent on to radiology where the individual required a code blue intervention; apparently someone was also blamed for using two crash carts during the code and crossing the leads. More recently Dr. Webster was noted to have significant difficulty managing another code blue in the Howard ER in terms of staff leadership and direction and in terms of medical protocol. History also reveals that Dr. Webster was fired from her



1100

first emergency room directorship following a residency in internal medicine purportedly for documentation problems and a disagreement about the admission of a patient. In a later incident, Dr. Webster was criticized for not conducting a pelvic exam on a pregnant women with abdominal pain. She was replaced in the directorship by a nurse who she later had a run in with concerning the nurse's request that a prescription of Acylovir be refilled for a patient. More recently at Howard AFB, the above-cited concerns expressed by Lt Col Addison have occurred as stated.

## MEDICAL/MILITARY HISTORY

Dr. Webster completed Medical School in Mexico in 1979; in 1983 she was enrolled in an Internal Medicine Residency. In 1989 she joined the Army Reserves to, in her words "the kids were gone, I was divorced, and I wanted to travel, meet guys, and start dating again".. Dr. Webster entered active duty in 1992 and was assigned to Desert Storm. She reported that she enjoyed the challenge very much; from her married years in Mexico she had become comfortable with living in primitive surroundings so it was an easy adjustment to adapt to the war. She told me that she frequently forgot her gas mask, which was required to be with you at all times, in the bathroom. Dr. Webster stated "I would have died had gas exploded while running back to retrieve my mask". Fortunately, this possibility did not happen. Prior medical history includes being hit in the head during childhood - "I saw stars" - but without loss of consciousness. She had whooping cough at age 1. Dr. Webster also thought she may have inhaled automobile emissions during her youth as her father's vehicle was not in good condition and she remembered being sleepy a lot in the car.

## SOCIAL HISTORY

Dr. Webster states that her mother was probably a paranoid schizophrenic, often hallucinating, and who did not take medication. She reported a poor maternal relationship with her mother which generated feelings of antagonism and rebelliousness. Her mother died in her 60's from diabetes. Dr. Webster's father offered a closer union. She idealized him and felt that he was flawless, except "for a temper problem". Apparently the father lost his temper with a policeman and was physically abusive to his first wife. On one occasion, the father kicked his boss in the buttocks while the boss was bent over; he lost his job. The parents were fanatic Baptists with some earlier influence from Quaker childhood socialization. The parents divorced when Dr. Webster was ten years old. Dr. Webster reports she enjoyed her early schooling but often would attend school dirty due to neglect at home. She recalls being lost and inattentive at times yet "my reading skills were very good". She lived thereafter with extended family. Dr. Webster also had one younger sister and two brothers. The relationship with her sister was hostile as Dr. Webster often initiated fights with her sister. She recalls her as "Lizard breath", short for Elizabeth. Elizabeth is described as co-dependent and has achieved the work title of CPA Brother John is obese and diabetic and brother Jimmy has hypertension, obesity and cannot maintain employment. Her father died at age 59 following a stroke and subsequent pneumonia. Dr. Webster lived with some of her extended family and by age 16, took of the responsibilities for caring for a horse and would also pick pickles each summer for income. She later attended UCLA and became pregnant by the Mexican worker in the school's coffee shop. She had an abortion. They moved together to Mexico and after finishing college, Dr. Webster started Medical School. She gave birth to a son and then later married the father, the same Mexican man she had been with. The family lived in a rural area and had no running water in the home. She reported that her husband was physically abusive and had affairs leading to their divorce in 1971/72. Abusive behaviors included forced sex and shooting a gun off near her ear. Dr. Webster



1105

eventually lived with another man for 8 years. She had a second child, Steven, out of wedlock. Currently the first child, William is now 33 years old and is a quadriplegic. Steven is 24 years old. Dr. Webster also mentioned her sexual history citing inappropriate sexual touching of her by an Uncle when she was a teenager. She was also raped as an adult while staying overnight in a "pink motel". When her boyfriend left the room to re-position their parked car, a masked man entered the room and raped her. Dr. Webster recalled being, inpart, "sexually excited" by this event; the rapist asked if she was enjoying it and she said "how can I, I hardly know you". Preservice drug use included marijuana "to enhance our sexuality". She denied problems with other illicit substances and denied alcohol problems.

## PREVIOUS PSYCHOLOGICAL TESTING

The WAIS-R intelligence test was administered during the 1993 MEB process. Results were as follows:
Verbal IQ: 125 (Superior)
Performance IQ: 104 (Average)
Full Scale IQ: 116 (High Average)

The evaluator noted the significant difference between the verbal and nonverbal scores of 21 points. He felt it could represent a mild deterioration from premorbid functioning or a reflection of a life-long process. Intrusive and compulsive behavior evidenced by Dr. Webster during her hospitalization could represent personality change due to MS or exacerbation of underlying personality traits under stress.

On 8 Sept. 93, Dr. Webster requested a second opinion regarding these test results. She had complained of feeling "extremely stressed and defensive" during testing. The same intelligence test was re-administered. Results were as follows:
Verbal IQ: 140 (Very Superior)
Performance IQ: 122 (Superior)
Full Scale IQ: 136 (Very Superior)

She produced a statistically significant deferential between verbal and non-verbal performance abilities of 18 points. The overall higher results were attributed to test learning and reduced test anxiety. The VIQ - PIQ differential was reproduced and again raised the question why? The evaluator felt it represented either her habitual mode of functioning or a "reduction in performance ability resulting from other variables".

## CURRENT PSYCHOLOGICAL TEST RESULTS

A. Neuropsychology Consultation: Dr. Ricardo De Obaldia
During testing, Dr. Obaldia noticed good levels of motivation and high levels of anxiety. She sometimes had difficulty organizing her thoughts into chronological order. Her mood was rather dysphoric. Results are summarized as follows:

1.) <u>Fine Motor Functions:</u> Mild difficulties in complex manual movements

2.) <u>Perceptual Functions:</u> Mild difficulties in complex visual-spatial tasks



1106

3.) Higher Cognitive Functions:
a. Reading: Moderately impaired comprehension and retention (30%).
b. Memory: Moderately impaired immediate memory in both visual modality and auditory modality.
c. Non-Verbal Intellectual Processes: Mildly impaired in non-verbal problem solving.

4.) Attention and Concentration Processes: Mildly impaired in more complex tasks of sustained attention and concentration. Principal difficulties were observed in conceptual mental tracking and sequencing and in the ability to sustain and focus attention.

Dr. Obaldia stated: "the above results especially with mental tracking difficulties are generally associated with mild, diffuse brain dysfunction usually seen in mild head trauma and many cases of multiple sclerosis patients. A low performance on a non-verbal problem solving test in this highly trained Internal Medicine physician suggests a loss from premorbid superior skills." Dr. Obaldia believes that Dr. Webster may also have Adult Attention Deficit Disorder, Residual Type, to account for early childhood memory difficulties (lost books, lost her car in a parking lot, need to rely on notes as memory aides). Dr. Webster reported that "if she concentrates on a specific subject/topic she is often not aware of competing sources of information".

## ADDITIONAL TESTING

I administered the following procedures:
1. Weschler Adult Intelligence Scale Revised
   After reading Dr. Obaldia's report on 9 July 98 I noticed that a full intelligence test had not been administered. I administered the subtests he did not and used his scores for the other subtests. Although not a clinically perfect situation, it did allow for a hypothetical IQ assessment.

2. Minnesota MultiPhasic Personality Inventory-2 (MMPI-2)
3. Millon Clinical Multiaxial Inventory III (MCMI-III)
4. Beck Depression Inventory

## TEST RESULTS

A. Intelligence Testing (10 July 98)
   Verbal IQ: 134 (Very Superior)
   Performance IQ: 122 (Superior)
   Full Scale IQ: 135 (Very Superior)
   VIQ - PIQ Difference: 12 points

The patient benefited from test - retest learning on the subtest of block design which she had taken with Dr. Obaldia earlier but his score was not available. With the exception of that score, the remaining non-verbal subtests are in the average range as compared to the verbal subtests which are very superior except two subtest which are sensitive to attention and concentration. These two tests were by contrast significantly below the other verbal tests and only average to the normative group. Dr. Webster showed high levels of anxiety during the performance subtests which were openly timed with a stop watch which she openly confessed overwhelmed her with tension. She does not perform



1167

well under pressure. A comparison of the intelligence tests shows a verbal IQ range from 125 thru 140, a performance IQ range from 104 thru 122, and a Full Scale IQ from 116 thru 136.

The consistent findings are:

A. Relatively poor nonverbal learning and visual perceptual functioning as compared to verbal skills.
B. Attention and concentration deficits
C. Anxiety overload during timed tests
D. There does not appear to be a current objective deterioration in intellectual skills as measured by the WAIS-R.

PERSONALITY TESTING

The member feels as though she is being punished by being made to undergo this evaluation. Personality testing suggests this individual desired to "put her best foot forward" and be judged in the best, most desirable light while maintaining an overly cautious and defensive approach. Negative results would be expected to be minimized under these conditions. Dr. Webster, nonetheless, demonstrated significantly high histrionic and narcissistic subscores; descriptors associated with these scores suggest like individuals seek out attention and praise, like to make a good impression, and are not socially confident. They can be immature and impulsive, showing anger in episodes of temper tantrums. Dr. Webster agrees that she may be a risk taker and do things others don't approve of for the personal enjoyment of doing so. She also agrees that she is generally oriented toward pleasure-seeking and self-gratification and may occasionally show bad judgment. She agrees that it is somewhat difficult to maintain close relationships; she enjoys an exhibitionistic style. She feels envy of others at times.

BEHAVIORAL OBSERVATIONS

During testing sessions and interview sessions, the member's environment was manipulated to assess her memory and visual learning abilities occurring during the process of talking or interviewing. On 28 May, staff observed Dr. Webster to be confused and disoriented during testing at the Corozal East Clinic. After each of 2 breaks, staff had to help Dr. Webster find the testing room on both occasions. Dr. Webster had also arrived 90 minutes early because "I wanted to make sure I could find my way here". Following testing, Dr. Webster was interviewed in my office for two hours. She could not find her way back to my office after a break. After testing she could not find her way out of the building and had to be escorted to the exit door. Ten minutes after her departure from the building, SSgt Bunnenberg drove from the building only to find Dr. Webster driving back and forth on the only main road of Corozal East; he stopped his car and waved at her to get her attention but she did not notice; SSgt Bunnenberg continued to follow her until some time later she found her way to the only gate. On 12 Jun, I interviewed Dr. Webster in my same office. Although she wanted to provide me with copies of previous evaluations, she could not readily locate them in what appeared to be a very disorganized briefcase. At the conclusion of the meeting, she returned to my office as she had lost her military cap. With help, we found the hat amongst her papers in the briefcase. She was uncertain as to how to exit the building again. Once helped to the exit door, she appeared lost as to where her car was parked in the small area. On 22 Jun, I met Dr. Webster in the clinic space for an interview and I told her that I would meet her in my office and allowed her to find my office. I found her sitting on the couch of an office in a different hallway that we had never used. Clearly the interior design was dramatically different than my office (e.g. 3 foot nautical life ring on my office



1108

wall) where we had to date, already spent over 4 hours together. When I directed her to my office, she coped with the realization by directing attention to an irrelevant picture on the wall. After a 45 minute discussion, Dr. Webster and I took a break. She could not find her way back to my office once again. On 23 Jun I observed Dr. Webster, as an aside, unsafely back her car out of a parking space near the post office. She cut off a truck which had the right of way and who was forced to blow his horn and stop abruptly. On 28 May, Dr. Webster had completed her meeting with me and was now standing in the technicians office awaiting a future appointment when she started to provide history of adolescent sexual abuse. She seemed unaware of the inappropriate physical location to be discussing personal materials. On 10 July, Dr. Webster arrived for intelligence testing and upon seeing a soda on my desk left over from lunch, asked quite seriously if I would have one for her. These episodes reflected less that expected social judgment, personal boundaries, and social skills.

## INTEGRATION OF DATA

The following themes are evident:

1. Consistent inferior non-verbal learning and perceptual motor skills as compared to verbal skills.
2. Consistent poor performance on timed non-verbal manual, perceptual - motor, spatial - reasoning tests due to both
   a. inferior skills
   b. overwhelmed by anxiety
   c. interaction of anxiety lowering performance and lower performance skills causing the perception of threat (to esteem, to employment) and raising anxiety greatly - a vicious cycle
3. Neuropsychological deficits consistent with diffuse brain dysfunction, possibly MS, and probably reflecting a decline of adulthood skill levels. (Dr. Obaldia).
4. Possible residual Attention Deficit Disorder, Adult type, impacting organization skill and concentration. (Dr. Obaldia)
5. Poor reading comprehension (Dr. Obaldia) as compared to patients self-report for reading skills in school and medical school
6. Behavioral observations of significant lack of personal situational awareness and spatial learning; poor social boundaries and social judgment
7. Disorganization
8. Minor temper tantrum toward examiner and idiosyncratic, occasional circumstantial consistently over-inclusive self disclosure suggesting lower than expected levels of personal ego cohesion

## DISCUSSION

There are two main branches of this evaluation. They are A. Functional Consideration and B. Medical Differential Diagnostic Considerations. From a functional standpoint, I do not see how Dr.



1169

Webster can perform at or above the standard of care for an emergency room physician. My concerns are:

1.) Without spatial learning how can she recall the location of items on emergency crash carts and find them or direct someone to them under anxiety.

2.) Without adequate memory and concentration, how can she recall patient symptoms, reasons for referral, previous treatments, under time pressure.

3.) With poor motor and perceptual motor skills can she adequately intubate, resuscitate, place electrodes for EKG, EEG, defibrillator under pressure

4.) With a deficient level of cognitive fluidity and flexibility how can this physician, under significant time pressure and anxiety, sequence a set series of protocols while simultaneously running parallel set(s) of medical sequences and being simultaneously ready to shift focus and priority to another set. As Dr. Webster stated, "If I concentrate on a specific topic I'm often not aware of competing sources of information". Dr. Webster's difficulty with the coded patient in the ER where according to Lt Col Addison, "Dr. Webster was focused to such an extent on intubation that she did not notice/attend to the absence of a heart beat"...

5.) Personality traits combined with an impoverished early childhood and vulnerable self-esteem leading to an individual who is today quick to defend her actions to compensate for personal inadequacies all the while seeking praise and attention. Secondly, she admits to going slowly during her patient encounters to assure a rigorous exam. One must question to what extent she also goes slowly to compensate for above - described deficits thereby contributing to patients leaving without being seen. I also suspect an aspect of slowness represents resistance to authority and vents primitive hostility, superiority, control, and entitlement to work by a different set of rules.

In summary these functional deficits represent the portrait of an individual who may fall below the standard of patient care in situations involving complex thinking, judgment, memory, spatial learning, cognitive flexibility, management of other staff and self, monitoring anxiety and defensiveness. Taken together, I do not feel Dr. Webster is aware of her deficits. I believe she defends against their coming into awareness, and when they do, she projects discomfort, blame and negative outcome onto others. As an example, I fully expect that she will deny the findings of this report, devalue and diminish and minimize its opinions, and further, file an Inspector General complaint for political harassment, all consistent with observations gleaned during the workup.

Turning to Medical and Differential Diagnostic issues, it is difficult to place a neurocognitive disorder diagnosis on this patient. Although the diagnosis Cognitive Disorder Not Otherwise Specified is substantiated by observational and clinical test findings, it cannot be made because at present the diagnostic picture lacks objective evidence of a systemic general medical condition or central nervous system dysfunction. To this end, a full medical workup to include neurology, internal medicine, neurodiagnostics (MRI, CT, EEG) would address this aspect. At present the current diagnostic picture is as follows:

Axis I 1) Attention Deficit Disorder, Adult type, residual, per Dr. Obaldia

2) Possible aspects of Cognitive Disorder, NOS requiring medical workup

3) Occupational Problem

Axis II Histrionic, narcissistic, and inadequate traits contributing to peer difficulties and patient dissatisfaction outcomes, occasional strange/bizarre affect incongruent with thoughts expressed (e.g. rape incident)

**RECOMMENDATIONS**

1. Serious peer evaluation of Dr. Webster's functional ability to meet standard of care in areas of high risk in emergency room in independent, unstructured settings especially when lightening quick thinking and acting under the weight of anxiety and peer scrutiny are present.

2. Neuro-medical consultations as suggested

3. Thank you for the opportunity to participate in this most important evaluation

Respectfully Submitted,

RICHARD F. LA MACCHIA, Maj, USAF, BSC
Chief, Mental Health Clinic, Ft Clayton
Republic of Panama



1111

# Neurology Consultation

1998-09-25
15:52

**History**

**ID:** Dr Wilma Webster (20572543446) is a 57-year-old European American female.

**Present Illness:** She presents for neurology consultation because of performance related occupational difficulties. The member underwent a command-directed mental health evaluation on or about July 98 because of alleged problems with her performance as a physician. Work up by a psychologist and neuropsychologist indicated cognitive dysfunction suggestive of a possible subcortical illness.

Dr Webster denies cognitive difficulty of any sort. She denies any change in her thinking or memory abilities.

The patient does have a history of previous neurologic symptoms. These are well documented in Medical-Evaluation-Board material form 1993. Briefly, the patient was diagnosed with multiple sclerosis base on a history of prior unexplained neurologic symptoms, CSF Obands and increased IgG index, and an MRI showing multifocal subcortical white matter lesions. Dr Webster challenged the diagnosis of multiple sclerosis and was returned to duty. Additionally, in 1993 the patient had neuropsych testing wherein the possibility of a cognitive disorder was raised. A performance verbal IQ discrepancy was noted. One neuropsycologists commented at that time that her verbal-performance IQ differential may " may reflect her long-term (habitual) mode of cognitive functioning...".

Her neurologic symptoms are summarized below.

1973: Bilateral lower facial paralysis associated with vertigo and double vision lasting about 1 month and resolving

1973: A separate episode of poor balance while bending over associated with vertigo and nausea. Vertigo resolved after 1 week

1991: Couldn't tell the difference between hot and cold in her legs, resolved after 1 week

1992: Lancinating pains left face trigeminal neuralgia entertained, pain resolved after a bad tooth fell out

1992: Near constant double vision for about 1 month that resolved. Eventually diagnosed as a "broken phoria"

No neurologic complaints since

| | | |
|---|---|---|
| ☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 505, & SF 506) | ☐ OPERATION REPORT (SF 516) | NAME: Wilma Webster |
| ☐ CONSULTATION SHEET (SF 513) | ☐ NARRATIVE SUMMARY (SF 502) | REGISTER NO.: DOB: 06-Jul-1941 — SSN: 20-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 |
| ☑ CHRON RECORD OF MEDICAL CARE - (SF 600) | ☐ AUTOPSY PROTOCOL (SF 503) | UNIT: AD |
| ☐ PROGRESS NOTE (SF 509) | ☐ | DATE DICT: — DATE TYPED: 28-Sep-1998 |

I can find no documented evidence of abnormal neurologic signs except for annotations of possible extensor plantar responses (vs withdrawal).

**Medications:** Timoptic 0.25%.

**Allergies:** TCN

**Past Medical History:** Sicca Syndrome, Varicose Veins, Glaucoma, Spina Bifida Oculta, Carpal Tunnel Syndrome and left SP release with resolution of symptoms.

**Habits:** None smoker. 1 glass of a day.

**Examination:**

**Mental Status:** History consistent and coherent. Speech fluent and not dysarthric. Comprehension normal. Intellect appeared consistent with background. Mood appropriate, normal affective range.

**Cranial Nerves:** Visual fields full to confrontation without extinction. Pupils 4 mmR, 4.5 mmL, both reactive to light. Relatively large commitant exophoria at near. No evidence of an INO. No ptosis. Extraocular movements full conjugate, without nystagmus. Facial strength normal and symmetric. Tongue and palate move in the mid line. Hearing intact to voice. Discs sharp.

**Motor:** Strength 5/5 deltoids, infraspinatus, triceps, biceps, wrist extensors, hand intrinsics, illiopsoas, hamstrings, quadriceps, dorsiflexors and plantar-flexors. No fix or drift. Normal tone and bulk throughout.

**Reflexes:** DTR's present, symmetric and not pathologically brisk at both biceps, triceps, brachioradialis, quadriceps and Achilles. Plantar response flexor bilaterally on today's exam.

**Complex motor:** Finger-nose-finger and heel-shin accurate. Normal fine finger movements and rapid alternating movements.

**Gait:** physiologic with normal arm swing and normal heel\toe and tandem walking.

**MRI**

From 1992 reviewed.: Multifocal white matter hyperintensities in the periventircular region, some oval shaped with long axis oriented perpendicularly to the lateral ventricle. These are suggestive of but not diagnostic of multiple sclerosis.

**Impression**

I see no clinical evidence to support the diagnosis of a subcortical dementia.

A diagnosis of MS cannot be made or excluded with certainty

The patient does not meet criteria for clinically definite Multiple Sclerosis.

| | | |
|---|---|---|
| ☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 505, & SF 506) | ☐ OPERATION REPORT (SF 516) | NAME: Wilma Webster |
| ☐ CONSULTATION SHEET (SF 513) | ☐ NARRATIVE SUMMARY (SF 502) | REGISTER NO.: DOB: 06-Jul-1941 — SSN: 20-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 |
| ☑ CHRON RECORD OF MEDICAL CARE - (SF 600) | ☐ AUTOPSY PROTOCOL (SF 503) | UNIT: AD |
| ☐ PROGRESS NOTE (SF 509) | ☐ | DATE DICT: — DATE TYPED: 28-Sep-1998 |

Because of a history of attacks of focal neurologic symptoms consistent with CNS dysfunction without other explanation, she does meet Rose's clinical criteria for possible MS.

Because of a history of attacks and abnormal CSF, the patient meets Poser's criteria for laboratory-supported probable MS.

**Recommendations**

Agree with plans for repeat Neuropsych testing to determine stability of scores

Unfortunately further neurologic diagnostics will not clarify the situation

From a neurologic standpoint, Dr Webster remains qualified for world wide duty

**Follow up:** With a neurologists prn recurrent neurologic symptoms or signs.

Gary S. Gronseth, Lt Col, MC and FS
Chairman Neurology
Pager: 1269 Phone: (210)670-7671

**Addendum:**

Reviewed MRI ordered by Dr Fey done on 25 Sep. This demonstrates multifocal subcortical hyperintensities. These are more numerous than on her previous scan. A high cervical hyperintensity is also visible. This MRI is more suggestive of multiple sclerosis but remains non-diagnostic.

It is possible for multifocal white matter disease from MS to cause subtle cognitive difficulties. Unfortunately, I cannot state with certainty that the multifocal hyperintensities on Dr Webster's MRI are clinically significant. White matter "lesions" on MRI are very common in patients over age 40 and tend to worsen with age. Although Dr Webster's MRI changes have certain morpholobgical features that suggest MS, these changes are not specific for MS. It is therfore conceivable taht the white matter lesion visible on Dr Webster's MRI are clinically silent.

Gary S. Gronseth, Lt Col, MC and FS
Chairman Neurology
Pager: 1269 Phone: (210)670-7671

| | | |
|---|---|---|
| ☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 505, & SF 506) | ☐ OPERATION REPORT (SF 516) | NAME: Wilma Webster |
| ☐ CONSULTATION SHEET (SF 513) | ☐ NARRATIVE SUMMARY (SF 502) | REGISTER NO.: DOB: 06-Jul-1941 — SSN: 20-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 |
| ☑ CHRON RECORD OF MEDICAL CARE - (SF 600) | ☐ AUTOPSY PROTOCOL (SF 503) | UNIT: AD |
| ☐ PROGRESS NOTE (SF 509) | ☐ | DATE DICT: — DATE TYPED: 28-Sep-1998 |

MEDICAL RECORD REPORT

AMERIKAN HASTANESİ

October 22, 1998

To Whom It May Concern,

Dr. Wilma WEBSTER is diagnosed as Quillain-Barre Syndrome which occured after a viral infection of the upper respiratory system. She has recovered very rapidly after being taken into the VKV American Hospital. She has almost complete motor recovery of the hand and the forearms. She also has almost complete recovery of motor strength of the feet. The muscles of the shoulder and the hip girdle have also regained most motor strength.

The patient's recovery rate points to a good prognosis and she is expected to recovery fully in a short time

Best Regards
Chief of PMR Dept.
V.K.V. American Hospital

Treatment Recommendations

- Active resistive exercises for muscular with strength of above 3
- Coordination exercises of the upper and lower extremities
- Active assistive and self assistive exercises for the shoulder girdle muscles.
- Exercises for balance and posture.

Güzelbahçe Sk. No: 20 Nişantaşı 80200 İstanbul - Türkiye Tel. : (0.212) 231 40 50 (20 Hat) Fax : (0.212) 234 14 32

AMERIKAN HASTANESI

## DISCHARGE SUMMARY

PATIENT NAME :Mrs.Wilma Webster

PROTOCHOL NO :321735

ADMITTED DATE :18.10.1998

Mrs.Wilma Webster is a 57 year old female who presented with a transient distal dysesthsia which she describes as if she was wearing soft slippers, generalized weakness in a progressive ascending pattern, mild difficulty with breathing and feeble cough. Prior history was significant for a two day episode of diaarhea starting on October 3. Subsequently she had an " upper respiratory infection".

Neurological examination revealed absence of deep tendon reflexes, bilateral Babinski's reflexes and quadriparesis with muscle strenght of 4 + proximally and 4 distally in the upper extremities 3 proximally and 4 distally in the lower extremities.

An electrophysiology study was requested with the presumptive diagnosis of Guillain Barre. Nerve conduction studies performed five days after the onset of symptoms showed findings consistant with early stage acquired demyelinating polyneuropathy (prolonged distal latency in motor response obtained with stimulation of left tibial nerve and absence of F responses).

A spinal tap was performed with the following findings : Protein 69 mg/dl, PNL Ø mononuclear 20 cells/ml. Oligoclonal band (MS ?) and Lyme AgG and IgM titers are still pending. Normal results were obtained for the following laborotory tests; blood glucose, urea, ANA, sedimentation rate, Anti DNA, infectious mononucleosis serology, TSH, blood gases. There is no acute labarotory findings of Hepatitis A & B & C & Cytomegalovirus infections. Liver enzymes are slightly augmented. She had pyuria and bacteriuria. In urine E coli was cultured and ciprofloxacin 500 mg p.o. BID has been started. Urine deltaaminolevunilic acid, porphobilinogen results are pending.

She was admitted to intensive care unit and given 0,4 gr/kg of imnunoglobulin by I.V infusion for 5 days. Proflaxis for DVT was provided by SC injection of LMWH (Fraxiparine 0.3 ml SC BID). During her hospitalization vital signs were stable, hemogram electrolytes and CPK results were normal.

1116