A physical rehabilitation program was initiated. Her breathing difficulty and feeble cough resolved and there was minimal improvement in her muscle strength.

On further questioning the patient provided the information that she had periods of double vision and vertigo in 1972. In 1992 she demonstrated double vision and left sided tic douleureux which prompted an investigation for multiple sclerosis. This investigation (cranial MRI) yielded periventricular demyelination and meningioma. In view of this history and bileteral Babinski signs a cranial and cervical MR was obtasined. Nonenhancing demyelinating plaques were onserved in periventricular deep white matter located in supratentorial region ranging in size from 2-8 mm accompanied by artophy of corpus callosum. There was a 10x8 mm. Menengioma in the right medial temporal area. Cervical MRI revealed two nonenhencing demyelinizing plaques. The patient was admitted and treated for acute GUILLAIN BARRE and did not demonstrate and signs or symptoms of MS presently.

The patient and her associates were informed of her condition and all possible medical risks and they consented to discharge from hospital with the intention of overseas travel (air ambulance) and agreed to pursue pending further medical work up on her own responsibility.

Chief of Neurology Department
Dr. Emil Goldenberg

Neurologist
Dr.Hayim Babur

illness.

COMPARISON: None available.

PROCEDURE: Sagittal T1 weighted, sagittal FLAIR, axial FLAIR, axial T2, and axial T1 weighted images of the brain were obtained. Sagittal T1 weighted, sagittal fast spine echo T2 weighted, axial T1 weighted, and GRE images of the cervical spine were also obtained.

BRAIN: Moderate prominence of the ventricular system is noted, consistent with central atrophy. Extensive white matter increased signal is noted in the corona radiata, centrum semiovale, extending to the corpus callosum, perpindicular to the ventricular system, and extending to the atria. This is consistent with advanced demyelinating disease, such as multiple sclerosis. A consistent with advanced demyelinating disease, such as multiple sclerosis. A small focus of increased signal is present next to the right clinoid process, extra-axial, most likely representing a small meningioma.

Missing Pages!

CERVICAL SPINE: A focal area of increased signal is noted in the cord at the C2-3 level, most likely representing an MS plaque. In addition, cervical spondylosis is present at C4-5, and C5-6. No other significant abnormalities are present.

IMPRESSION: 1. EXTENSIVE WHITE MATTER CHANGES AS DESCRIBED, CONSISTENT WITH ADVANCED DEMYELINATING DISEASE SUCH AS MULTIPLE SCLEROSIS. 2. FOCAL LESION IN THE RIGHT TEMPORAL FOSSA, CONSISTENT WITH MENINGIOMA, AS DESCRIBED. 3. FOCAL DEMYELINATING PLAQUE IN THE UPPER CERVICAL SPINE, AS DESCRIBED.

**EVALUATION:**

Major Webster was admitted to the neurology inpatient service at WHMC under my care on 10/26/98 for what was assumed to be an acute inflammatory demyelinating polyradiculoneuropathy (AIDP or Guillain-Barre Syndrome) versus an exacerbation of Multiple Slerosis versus a post-infectious syndrome. At the time of her admission it was thought that she had exam findings suggestive of both central and peripheral nervous system involvement. The former of these was supported by her bilateral Babinski reflexes and bladder complaints (although her urinary frequency could have been due to the E.Coli. UTI that had been diagnosed in Istanbul), while the latter was supported by her areflexia in her right upper extremity and bilateral patella and ankle reflexes (which were present one month prior in Dr. Gronseth's clinic notes). Her strength deficits could have been due to either a central or peripheral process, but given lack of spasticity were more likely peripheral in nature.

She was enrolled in an agressive physical and occupational therapy program and her strength rapidly improved over the course of her stay. By the date of this report she was ambulating well for more than 150 feet without assist devices.

She was also switched from Ciprofloxacin to Levoquin 250 mg po qd for her UTI, which was extended given her otitis media.

Her hospital course was otherwise unremarkable.

☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 505, & SF 500)
☐ CONSULTATION SHEET (SF-513)
☐ CHRON RECORD OF MEDICAL CARE - (SF 600)
☐ PROGRESS NOTE (SF 509)
☐ OPERATION REPORT (SF 516)
☐ NARRATIVE SUMMARY (SF 502)
☐ AUTOPSY PROTOCOL (SF 503)
☐

NAME: Wilma Webster

REGISTER NO.: DOB: 06-Jul-1941

SSN: 20-572-54-34

UNIT: AD

DATE DICT.:

DATE TYPED: 03-Nov-1998

MEDICAL RECORD REPORT

OPTIONAL FORM 275 (12.7 Prescribed by GSA and 1 C FPMR (41 CFR) 101.11.60

50275 101 Computer Rev. Jun 94

Given the inavailability of raw data from the peripheral nerve studies done in Istanbul and the obvious problem of operator dependent results in such testing, repeat nerve conduction velocities (report attached) were conducted by Dr. King to assist in confirmation of AIDP. The study was normal and therefore was non-diagnostic of either AIDP or MS.

Of note, during her stay Major Webster did acknowledge that on prior outpatient exams she had consciously inhibited her plantor reflexes from being extensor. However, the significance of this must be questioned since such reflexes are not able to be appropriately assessed in a non-relaxed individuals.

**CONSULTATIONS:** Otolaryngology for serous otitis media.

**SURGICAL PROCEDURES:** n/a

**FINAL DIAGNOSIS:**

#1 Acute inflammatory demyelinating polyneuropathy.

#2 Laboratory-supported, clinically-definite multiple sclerosis.

**LINE OF DUTY:** YES

**DISCUSSION:**

Major Webster presented a diagnostic challenge to the neurology ward service by presenting with a history and exam consistent with AIDP and having a pre-existing diagnosis of probable MS. Her diagnosis of AIDP was clinically based on preceding viral illness, exam findings, clinical disease course and response to IVIG[1]. The finding of CNS disease on exam (extensor plantor reflexes) changed her probable diagnosis of MS into a laboratory supported clinically definite one[2]. Consideration was given to the possibility of her presentation being an unusual variation of MS exacerbation, but we were unable to prove this theory. The repeat electrodiagnostics were thought to be non-diagnostic as there was the possiblity that they could be normal in the setting of complete health, AIDP or MS. Other possible etiologies for acute onset weakness were entertained (tick paralysis, acute porphyria, metabolic/toxic disorders), but were ruled out by lack of history to suggest such and non-supportive lab data. As for her cognitive complaints, they were not the basis of her admission and had been extensively evaluated previous to her admission. I am in agreement with the attached assessment per Dr.

| | | |
|---|---|---|
| ☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 505, & SF 506) | ☐ OPERATION REPORT (SF 516) | NAME: Wilma Webster |
| ☐ CONSULTATION SHEET (SF-513) | ☐ NARRATIVE SUMMARY (SF 502) | REGISTER NO.: DOB: 06-Jul-1941 — SSN: 20-572-54-34 |
| ☐ CHRON RECORD OF MEDICAL CARE - (SF 600) | ☐ AUTOPSY PROTOCOL (SF 503) | UNIT: AD |
| ☐ PROGRESS NOTE (SF 509) | ☐ | DATE DICT: — DATE TYPED: 03-Nov-1998 |

MEDICAL RECORD REPORT

Campbell, with particular attention to be given to its additional support for Major Webster's diagnosis of MS.

**FUNCTIONAL IMPAIRMENT:** Major Webster is currently physically unable to ambulate for long distances, but given the speed of her recovery so far I expect that she will eventually regain the majority of her strength. As for the impact on her functionality in the long term, whether this presentation be AIDP or an MS exacerbation, similar attacks in the future could occur and once again debilitate her. As for her cognitive deficits and their impact on her functionality, I will defer further commentary to Dr. Campbell's attached report.

**Qualified for worldwide duty:** No

**Profile:** 4, not qualified for world-wide duty

**References:** 1. Asbury AK, Cornblath DR. Assessment of current diagnostic criteria for Guillain Barre syndrome. Ann Neurol 1990;27(suppl):S21-S24.

2. Poser CM, Paty D, Scheinberg L et al. New diagnostic criteria for multiple sclerosis. Ann Neurol 1983;13:277-231.

Richard E. Popwell, Jr., M.D.
Captain, USAF MC
Resident, Neurology
Pager: 2130 Phone: (210)292-7671

Gary S. Gronseth, Lt Col and MC and FS
Chairman Neurology
Pager: 1269 Phone: (210)670-7671

| | | |
|---|---|---|
| ☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 505, & SF 506) | ☐ OPERATION REPORT (SF 516) | NAME Wilma Webster |
| ☐ CONSULTATION SHEET (SF-513) | ☐ NARRATIVE SUMMARY (SF 502) | REGISTER NO. DOB: 06-Jul-1941 / SSN 20-572-54-344 |
| ☐ CHRON RECORD OF MEDICAL CARE - (SF 600) | ☐ AUTOPSY PROTOCOL (SF 503) | UNIT AD |
| ☐ PROGRESS NOTE (SF 509) | ☐ | DATE DICT / DATE TYPED 03-Nov-1998 |

MEDICAL RECORD REPORT

OPTIONAL FORM 275 (12 77)

50275-101 Computer Rev. Jun 84

DEPARTMENT ...
59 MEDICAL WING (AETC)

110F

10 Nov 98

MEMORANDUM FOR 24 MDG/CC

FROM 59 MDOG/MMB

SUBJECT Medical Evaluation Board (MEB) on MAJOR WILMA P. WEBSTER

1. MAJOR WEBSTER, WILMA has been referred to our Department for Medical Evaluation Board processing. 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

2. As part of this process, DoD Instruction 1332.38 requires the individual's immediate commander (or past commander if assigned to the Patient Squadron) provide a statement with the information below. SUSPENSE is three duty days from receipt of the action memorandum.

a. Impact of the member's medical condition on the ability to perform the duties of his/her office, grade, rank or rating and ability to deploy or mobilize as applicable.

b. Whether the individual is pending administrative action or judicial/non-judicial punishment (or is contemplated) that could result in demotion or dismissal from the USAF. A Negative Reply is required.

3. Any change in the individual's status must be reported to this office immediately

4. In accordance with AFR 168-4 and AFI 36-3212, this individual may not be reassigned, discharged or released from active duty; placed in a TDY status; or placed on leave outside the local area (except emergency leave) before receiving final determination of the case from either HQ AFPC/DPAMM or HQ AFPC/DPPDS. If allowed to go on leave, please notify this office at the first duty day opportunity.

5. Address the commander's statement to : HQ AFPC/DPPDS (Physical Evaluation Board). Forward the statement to: Boards and Exams, 59 MDOG/MMB, 2200 Bergquist Dr., Ste 1, Lackland AFB, TX 78236-5300.

6. In the interest of timeliness, the statement may be datafaxed to 59 MDOG/MMB at DSN 554-7486 or commercial (210) 292-7486 and the original posted by normal mail.

7. POC for further information, please contact the Department of Boards and Exams, 59 MDOG/MMB, DSN 554-7231 or (210) 292-7231.

Steve O Bell
STEVE O. BELL, TSgt, USAF
NCOIC, Medical Evaluations Boards

cc: Medical Board Section

Rcvd 11/12/98
for MDG/CC S

1121

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

13 November 1998

MEMORANDUM FOR: HQ AFPC/DPPDS (Physical Evaluation Board)

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Commander's Letter on Major Wilma P. Webster

1. IAW DoDI 1332.38 I write to convey my impression of the effect of Maj Webster's medical condition on her ability to perform her medical duties, and to deploy/mobilize worldwide.

2. At this time, Maj Webster is pending 24MDG Credentials Function determination regarding her ability to perform as a credentialed independent practitioner. There are no other administrative actions pending at this time.

3. Maj Webster was noted by the staff and her co-workers in the Emergency Room at Howard to be emotionally labile and disorganized. I personally witnessed her on duty and was struck by the sense that she was struggling to maintain focus and control. During a cardiac arrest I participated in with her she was unable to start an endotracheal airway, stating that she lacked strength in her left wrist to perform the maneuver with the laryngoscope, attributing it to carpal tunnel syndrome. This delayed the intubation. She was temporarily relieved of Emergency Room duty until after carpal tunnel surgery was performed, and she had recovered sufficiently to perform intubation correctly on a manikin. In retrospect, the wrist and forearm weakness that led to the incident may have been an early symptom of the subsequently-diagnosed demyelinating illness. Additionally, on another occasion she broke down into tears while seeing a Primary Care patient. On a more recent incident, she made comments about "blowing up the plane" prior to going air-evac to Wilford Hall for her first evaluation there earlier this year. She insisted it was "a joke", but made other inappropriate comments to a technician regarding fantasies of shooting a number of people because she was angry. She was evaluated by Mental Health here; these comments were felt to be dis-inhibited impulsive statements which she had no intention of acting on. As Medical Group Commander, I relieved Maj Webster of duty based on lack of confidence that she could reliably perform her duties as Emergency Room Physician before I knew the neurologic diagnosis. As senior physician at the 24th Medical Group, knowing that Maj Webster has been diagnosed with a demyelinating central nervous system disease with at least one episode of acute reversible extremity weakness, and in view of her past emotional lability and unpredictable speech, I feel that she cannot be relied upon to perform her duties as Emergency Room Physician, nor to perform mobility duties.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

C:\AAMDGRP1\COMPLAIN\WEBSTER\cdrstmnt.doc

DSN 554-7231

# facsimile transmittal

To: COLONEL REMMINGTON

Fax: (313) 284-3617

From: TSgt Steve O. Bell

Date: 17 NOV 97

Re: MAJOR WILMA WEBSTER

Pages: 25 (INCLUDING COVER SHEET) 25

CC:

☐ Urgent ☒ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

Notes:

... OFFICE IS FORWARDING THE FOLLOWING PACKAGE ON MAJOR WILMA WEBSTER ...D TO ACCOMPLISH HER CREDENTIALS PACKAGE. THE PACKAGE CONSIST ...OLLOWING. 1. AF FORM 570. 2. NARRATIVE SUMMARY. AND 3. NEURO- ...H EVAL. PLEASE REVIEW THE PACKAGE IN ITS ENTIRETY, AND CONFIRM ... RECEIPT OF 25 PAGES. THANK YOU

Missing 3 pages

NCOIC, Medical Evaluation Board
WHMC, Lackland AFB, TX

SENSITIVE INFORMATION

11

# NOTIFICATION OF PATIENT'S MEDICAL STATUS

## IDENTIFICATION

| I. NAME OF PATIENT, GRADE, SSAN | DATE | HOUR |
|---|---|---|
| Maj Wilma Webster 20/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 | 11-9-98 | 1100 |
| | INPATIENT UNIT: 9D | REGISTER NO. |
| | SERVICE: Neurology | PHYSICIAN: Popwell |

## REASON FOR REPORT

| II. | | | |
|---|---|---|---|
| | COMMUNICABLE DISEASE | | VERY SERIOUSLY ILL PATIENT |
| | INJURY INCURRED AFTER ADMISSION | | SERIOUSLY ILL PATIENT |
| X | ANTICIPATED MEDICAL BOARD/PHYSICAL EVALUATION BOARD ACTION | X | INCAPACITATING ILLNESS OR INJURY |
| | | | REMOVE PATIENT FROM VERY SERIOUSLY ILL, SERIOUSLY ILL OR INCAPACITATING ILLNESS OR INJURY LISTS |
| | PROLONGED HOSPITALIZATION (90 days or longer) | | REQUEST MEDICAL RECORDS |
| | DEATH | | OTHER (Specify in remarks) |

III. DIAGNOSIS

Acute Inflammatory Demyelinating Polyradiculoneuropathy

## PROGNOSIS/NEXT OF KIN DATA

| IV. | | | | |
|---|---|---|---|---|
| RECOVERY IS | X | EXPECTED | NOT EXPECTED | NOT ASSURED. FURTHER OBSERVATION NECESSARY |

| | YES | NO | | YES | NO | | YES | NO |
|---|---|---|---|---|---|---|---|---|
| PRESENCE OF RELATIVES DESIRED | X | | NEXT OF KIN IS AT BEDSIDE | | X | ORGAN DONOR SITUATION | | X |
| CLEARANCE BY CHIEF OF SERVICE | X | | NEXT OF KIN HAS BEEN NOTIFIED | X | | | | |

| DATE | NAME OF PHYSICIAN | SIGNATURE |
|---|---|---|
| 11-9-98 | R. POPWELL JR. M.D | [signature] |

## V. ACTION BY PATIENT AFFAIRS/ADMINISTRATIVE OFFICER OF THE DAY ON VERY SERIOUSLY ILL, SERIOUSLY ILL, INCAPACITATING ILLNESS OR INJURY, AND DEATH CASES

| ACTION | DATE | HOUR | ACTION | DATE | HOUR |
|---|---|---|---|---|---|
| REPORT RECEIVED | | | HOSPITAL PERSONNEL NOTIFIED (Specify below) | | |
| BASE PERSONNEL RESPONSIBLE FOR CASUALTY NOTIFICATION ADVISED | | | | | |
| OTHER BASE PERSONNEL NOTIFIED (Specify below) | | | | | |
| | | | | | |
| | | | | | |

REMARKS

| DATE | NAME OF PATIENT AFFAIRS/ADMINISTRATIVE OFFICER OF THE DAY | SIGNATURE |
|---|---|---|
| | | |

124

# MEB Narrative Summary

November 7, 1998
10:59:00

**INTRODUCTION:**

Major Wilma P. Webster, MD (20572543446) is a 57-year-old, right handed, European-American, female followed in neurology clinic at WHMC by Dr. Gary Gronseth for probable Multiple Sclerosis.

**HISTORY:**

**Present Illness:**

Dr. Webster initially presented for neurology consultation on September 25, 1998 because of performance related occupational difficulties.

Per Dr. Gronseth's note:

*The member underwent a command-directed mental health evaluation on or about July 98 because of alleged problems with her performance as a physician. Work up by a psychologist and neuropsychologist indicated cognitive dysfunction suggestive of a possible subcortical illness.*

*At that time Dr Webster denied cognitive difficulty of any sort. She denied any change in her thinking or memory abilities.*

*The patient does have a history of previous neurologic symptoms. These are well documented in Medical-Evaluation-Board material form 1993. Briefly, the patient was diagnosed with multiple sclerosis based on a history of prior unexplained neurologic symptoms, CSF Obands and increased IgG index, and an MRI showing multifocal subcortical white matter lesions. Dr Webster challenged the diagnosis of multiple sclerosis and was returned to duty. Additionally, in 1993 the patient had neuropsych testing wherein the possibility of a cognitive disorder was raised. A performance verbal IQ discrepancy was noted. One neuropsycologists commented at that time that her verbal-performance IQ differential may " may reflect her long-term (habitual) mode of cognitive functioning...".*

*Her neurologic symptoms are summarized below.*

*1973: Bilateral lower facial paralysis associated with vertigo and double vision lasting about 1 month and resolving*

*1973: A separate episode of poor balance while bending over associated with vertigo and nausea. Vertigo resolved after 1 week*

*1991: Couldn't tell the difference between hot and cold in her legs, resolved after 1 week*

*1992: Lancinating pains left face trigeminal neuralgia entertained, pain resolved after a bad tooth fell out*

*1992: Near constant double vision for about 1 month that resolved. Eventually diagnosed as a "broken phoria"*

*No neurologic complaints since*

*I can find no documented evidence of abnormal neurologic signs except for annotations of possible extensor plantar responses (vs withdrawal).*

Dr. Webster presented this admission via aerovac from her vacation in Turkey where she developed a flu-like illness that progressed into severe muscle weakness over the course of a few days. Reportedly she was doing well until Oct. 3, 1998 when she developed diarrhea followed by a sore throat, and stuffy nose. This persisted and an irritable cough was added on Oct. 6. only to be followed by insomnia, facial pain and

| | | |
|---|---|---|
| ☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 605, & SF 506) | ☐ OPERATION REPORT (SF 516) | NAME: Wilma Webster |
| ☐ CONSULTATION SHEET (SF-513) | ☐ NARRATIVE SUMMARY (SF 502) | REGISTER NO.: DOB: 06-Jul-1941 — SSN: 20-572-54-344[illegible] |
| ☐ CHRON RECORD OF MEDICAL CARE - (SF 600) | ☐ AUTOPSY PROTOCOL (SF 503) | UNIT: AD |
| ☐ PROGRESS NOTE (SF 509) | ☐ | DATE DICT — DATE TYPED: 03-Nov-1998 |

MEDICAL RECORD REPORT

112

discomfort in the teeth two days later. She reports feeling miserable at that time but was still fighting her illness. By Oct. 14 she began to notice shortness of breath and a "big belly" which she initially attributed to overeating, but subsequently realized was due to weak abdominal musculature. The next day she began to have weakness in her legs and noticed increasing urinary frequency. This worsened to the point where she couldn't walk by Oct. 17 and was beginning to have difficulty using her upper extremities as well. At that time she sought medical care and by 18 Oct. was hospitalized in Istanbul.

She was evaluated by a neurologist in Istanbul who found her to be areflexic except for bilateral Babinski reflexes and with both upper and lower extremity muscle weakness in a proximal-weaker-than-distal pattern. Nerve conduction velocities were conducted and were c/w acquired demyelinating polyneuropathy. Lumbar puncture was done and demonstrated an elevated protein of 69 and 20 mononuclear cells. She was also found to have a E.Coli. urinary tract infection and was initiated on Ciprofloxacin 500mg po bid.

She was assigned a diagnosis of Guillain-Barre Syndrome and was given a five-day course of intravenous immunoglobulin (IVIG). Physical therapy was initiated. Her initial complaints of SOB and cough resolved, and her upper extremity muscle weakness greatly improved prior to her transfer to WHMC.

Of note, because of her history, consideration was given to possible diagnosis of MS, and imaging studies were done to assist in such w/u. These yielded non-enhancing peri-ventricular demyelinating plaques from 2-8mm, a 10x8mm meningioma in the R medial temporal area, and two plaques in the cervical spine. CSF for O-bands as a multitude of other studies were pending at the time of her transfer.

On admission, the patient reported greatly improved strength in her upper extremities, but was still extremely weak in her lower extremities. She denied any vision changes, headache, facial numbness/weakness, difficulty swallowing/phonating, focal numbness or dysethesia, vertigo, dizziness. She reported the constitutional symptoms as above had largely resolved.

**Past History:** Keratoconjunctivitis sicca, varicose veins, glaucoma, spina bifida oculta, carpal tunnel syndrome and left SP release with resolution of symptoms, dysplasia on PAP smear.

**Medications:** Timoptic 0.25%, Heparin sq, Cipro 500 bid.

**Allergies:** TCN

**Habits:** None smoker. 1 glass of a day.

**Family History:** No history of similar neurological complaints or disease.

**Review of Systems:** See above in summary.

09 NOV

**PHYSICAL EXAMINATION (On Admission):**

| | | |
|---|---|---|
| ☐ HISTORY & PHYSICAL EXAMINATION (SF 604, SF 605, & SF 606) | ☐ OPERATION REPORT (SF 516) | NAME Wilma Webster |
| ☐ CONSULTATION SHEET (SF-513) | ☐ NARRATIVE SUMMARY (SF 502) | REGISTER NO. DOB: 06-Jul-1941 / SSN 20-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 |
| ☐ CHRON RECORD OF MEDICAL CARE - (SF 600) | ☐ AUTOPSY PROTOCOL (SF 503) | UNIT AD |
| ☐ PROGRESS NOTE (SF 509) | ☐ | DATE DICT / DATE TYPED 03-Nov-1998 |

**General:** Middle-aged white female in NAD.

**HEENT:** Normocephalic and atraumatic, no alopecia, no scleral or conjunctival abnormalities, disc sharp bilaterally with spontaneous venous pulsations present, left TM slightly erythematous with serous fluid and bubbles behind membrane, nares and oropharynx without lesions or erythema, no jugular venous distension, no lymphadenopathy, no carotid bruits.

**Cardiovascular:** Regular rate and rhythm without obvious murmur, gallop, or rub.

**Lungs:** Clear to ausciltation bilaterally.

**Abdomen:** Bowel sounds in all four quadrants, non-tender, non-distended, soft, no masses, no hepatosplenomegaly.

**Extremities:** No clubbing or cyanosis. Trace edema at ankles bilaterally. Moderate varicosities in lower extremities bilaterally.

**Mental Status:** History consistent and coherent. Speech fluent and not dysarthric. Comprehension normal. Intellect appeared consistent with background. Mood appropriate, normal affective range. Patient did use notes she had written earlier to provide accurate dates of disease progression.

**Cranial Nerves:** Visual fields full to confrontation without extinction. Pupils 4 mmR, 4.5 mmL, both reactive to light. Relatively large commitant exophoria at near. No evidence of an INO. No ptosis. Extraocular movements full conjugate, without nystagmus. Facial strength normal and symmetric. Tongue and palate move in the mid line. Hearing intact to voice. Discs sharp.

**Motor:** Strength 4/5 deltoids, 5/5 triceps, 5-/5 biceps, 4+/5 wrist extensors/flexors, 4+/5 hand intrinsics, 2/5 illiopsoas, 3/5 hamstrings, 2/5 quadriceps, 4/5 dorsiflexors and 5/5 plantar-flexors. No fix or drift. Normal tone and bulk throughout.

**Reflexes:** DTR's absent at knee, ankle, and RUE. 1+ in LUE. Plantar response extensor bilaterally.

**Complex motor:** Finger-nose-finger and heel-shin accurate. Normal fine finger movements and rapid alternating movements.

**Gait:** Deferred.

## ANCILLARY DATA:

**Laboratory:**

09 Oct 98 @ 1200 (Coll) CEREBROSPINA
OLI BAND...........
PRESENT 4 BANDS

| | | | |
|---|---|---|---|
| IGG CSF ........ | 3.75 | (0-5.8) | MG/DL |
| ALB CSF ........ | 16.10 | (10.0-31.0) | MG/DL |

☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 505, & SF 506)
☐ OPERATION REPORT (SF 516)
☐ CONSULTATION SHEET (SF-513)
☐ NARRATIVE SUMMARY (SF 502)
☐ CHRON RECORD OF MEDICAL CARE - (SF 600)
☐ AUTOPSY PROTOCOL (SF 503)
☐ PROGRESS NOTE (SF 509)
☐

NAME: Wilma Webster
REGISTER NO.: DOB: 06-Jul-1941
SSN: 20-572-54-344
UNIT: AD
DATE DICT:
DATE TYPED: 03-Nov-1998

MEDICAL RECORD REPORT

OPTIONAL FORM 276 (12-77)

10275 101 Computer Rev. Jun 94

IGG SER........ 1070.00
ALB SER........ 3780.00
IGG INDX........ 0.82 H (0.34-0.66)
ALB INDX........ 4.26 (0-9.0)
IGG SYN........ 4.46 (-9.24-5.88) MG/DAY

28 Sep 98 @ 1700 (Coll) CEREBROSPINA
GLU,CSF........ 58 (40-70) MG/DL

28 Sep 98 @ 1700 (Coll) CEREBROSPINA
APPEAR........ CLEAR
COLOR........ COLRLES
RBC.......... 27 /CMM
NUC CELL........ 0 (0-5) /CMM
PATHBODY........ CONCUR

25 Aug 98 @ 0001 (Coll) PAP SMEAR(UNKNOWN)
SOURCE OF SPECIMEN:
CERVICAL CYTOLOGIC MATERIAL (CERVICAL)
Smears Received: 1
CLINICAL DIAGNOSIS AND HISTORY:
Previous Cytology Dx: 4/98 LGSIL ECC 7/98 SHOWED MINIMAL TO MODERATE DYSPLASIA
Cytology Comment: HOW 1972 PR:HERRERA CH:G4P2
FINAL DIAGNOSIS:
CERVICAL CYTOLOGIC MATERIAL:
SATISFACTORY FOR EVALUATION.
ENDOCERVICAL COMPONENT SEEN.
EPITHELIAL CELL ABNORMALITIES.
ATYPICAL SQUAMOUS CELLS OF UNDETERMINED SIGNIFICANCE.

22 Jul 98 @ 0800 (Coll) BLOOD
LEAD SCREEN...... 5 (0-40) ug/dL

28 Apr 98 @ 0001 (Coll) PAP SMEAR(UNKNOWN)
SOURCE OF SPECIMEN:
CERVICAL CYTOLOGIC MATERIAL (CERVICAL)
Smears Received: 1
CLINICAL DIAGNOSIS AND HISTORY:
L.M.P. Date: 1991
Cytology Comment: HOW 879 PR:HERRERA CH:G4P2 ROUTINE PE:WNL
FINAL DIAGNOSIS:
CERVICAL CYTOLOGIC MATERIAL:
SATISFACTORY FOR EVALUATION.
ENDOCERVICAL COMPONENT SEEN.
EPITHELIAL CELL ABNORMALITIES.
LOW GRADE SQUAMOUS INTRAEPITHELIAL LESION: MILD DYSPLASIA.

## Radiographic Studies:

UNENHANCED BRAIN AND CERVICAL SPINE MRI SCAN, 25SEP98.

HISTORY: The patient is a 57-year-old female with multiple sclerosis diagnosed in 1992, now with occupational difficulties, performance related. Psylogical testing showed cognitive dysfunction, suggestive of subcortical

☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 505, & SF 506)
☐ CONSULTATION SHEET (SF-513)
☐ CHRON RECORD OF MEDICAL CARE - (SF 600)
☐ PROGRESS NOTE (SF 509)
☐ OPERATION REPORT (SF 516)
☐ NARRATIVE SUMMARY (SF 502)
☐ AUTOPSY PROTOCOL (SF 503)
☐

NAME: Wilma Webster
REGISTER NO. DOB: 06-Jul-1941
SSN: 20-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
UNIT: AD
DATE DICT
DATE TYPED: 03-Nov-1998



112

# Electromyography Report

1998-11-02
15:22:26

**ID:** Dr Wilma Webster (20572543446) is a 57-year-old female.

**Introduction:** She presents for electrophysiologic evaluation because of R/O AIDP.

**Nerve Conduction Studies**

| S | Nerve Study | Latency Result | Latency Normal | Amplitude Result | Amplitude Normal | Conduction Velocity Result | Conduction Velocity Normal |
|---|---|---|---|---|---|---|---|
| R | Post Tib F-wave ankle | 51.1 | | | | | |
| L | Peroneal CMAP EDB | 5.0 | < 6.6 msecs | 6.6 | > 2 mVolts | 46 | > 42 M/sec |
| R | Peroneal CMAP EDB | 4.1 | < 6.6 msecs | 6.4 | > 2 mVolts | 46 | > 42 M/sec |
| R | Post. Tibial CMAP AH | 4.7 | < 6.6 msecs | 9.9 | > 2 mVolts | 45 | >42 M/sec |
| L | Post. Tibial CMAP AH | 5.1 | < 6.6 msecs | 8.7 | > 2 mVolts | 46 | >42 M/sec |
| L | Post Tib F-wave ankle | 50.1 | | | | | |
| L | Peroneal F-wave ankle | 54.8 | < 57 msecs | | | | |
| R | Peroneal F-wave ankle | 54.3 | < 57 msecs | | | | |
| R | Median F-wave wrist | 25 | < 32 msecs | | | | |

**Summary:** Normal Study

**Impression:** Normal F wave latencies and conduction velocities

**Recommendations:** []

Randall B. King ,COL USAF
Staff Neurologist

☐ HISTORY & PHYSICAL EXAMINATION (SF 504, SF 505, & SF 506)
☐ CONSULTATION SHEET (SF-513)
☐ CHRON RECORD OF MEDICAL CARE - (SF 600)
☐ PROGRESS NOTE (SF 509)
☐ OPERATION REPORT (SF 516)
☐ NARRATIVE SUMMARY (SF 502)
☐ AUTOPSY PROTOCOL (SF 503)
☐

NAME: Wilma Webster
REGISTER NO.: DOB: 06-Jul-1941
SSN: 20-572-54-344
UNIT: AD
DATE DICT:
DATE TYPED: 03-Nov-1998

MEDICAL RECORD REPORT

OPTIONAL FORM 275 (12 77)

**TO:** Neuropsychology **FROM:** Psychiatry, Howard AFB, Panama **DATE:** 4 Aug 98

**REFERRAL QUESTION:** This 57 year old ADAF 04 ER physician has a previous history of MEB and diagnosis of multiple sclerosis, subsequently disputed by the patient. She was retained in the military. She has more recent performance related occupational difficulties. Psychological and neuropsychological evaluations suggest cognitive dysfunction suggestive of possible subcortical illness. There is also a possible overly of adult ADHD. Additional assessment was requested as part of determining her fitness for duty.

**REF[illegible]RING PROVIDER:** Gregory C. Fey, Capt, USAF, MC

**TESTS ADMINISTERED:**

Beck Anxiety Inventory (BAI)
Beck Depression Inventory (BDI)
Boston Naming Test (BNT)
California Verbal Learning Test (CVLT)
Category Fluency (Animals)
Continuous Visual Memory Test (CVMT)
Controlled Oral Word Association Test (COWAT)
Finger Tapping Test (FTT)
Grip Strength
Grooved Pegboard
Hooper Visual Organization Test (VOT)
Judgment of Line Orientation (JLO)
Luria-Nebraska, Motor Scale, Visual Scale
MicroCog
Paced Auditory Serial Addition Test (PASAT)
Rey-Osterrieth Complex Figure Test (CFT)
Shipley Institute of Living Scale
Spreen Sentence Repetition Test
Stroop Color-Word Task
Symbol Digit Modalities Test (SDMT)
Symptom Check List (SCL-90-R)
Tactual Performance Test (TPT)
Token Test
Trail-Making Test, Parts A & B
Wechsler Adult Intelligence Scale Revised (WAIS-R)
Wechsler Memory Scale, Revised (WMS-R)
Wide Range Achievement Test 3 - Reading, Arithmetic (WRAT3)
Wisconsin Card Sorting Test (WCST)
Woodcock-Johnson Psycho-Educational Battery - Revised (WJR)

**REFERRAL INFORMATION:**

Maj Wilma P. Webster is a 57 year old, right handed, divorced, Caucasian, female with 20 years of education. She was referred by Dr. Fey, Chief of the Howard AFB Mental health Clinic. The reason for the referral involved completing a neuropsychological assessment to determine her fitness for military duty. He also seeks Neurology consultation and MRI. Current rule out diagnosis is cognitive disorder NOS. She was seen as an outpatient on 17-Sep-98.

**DOCUMENT AND INFORMATINO REVIEW.**

1. Outpatient Medical Record
2. Selected mental health chart notes from Dr. Fey
3. MFR by SrA Goode regarding Maj Webster's pre-flight behavior on 15 Sep 98.

4. MFR by SSgt Millington regarding Maj Webster's pre-flight behavior on 16 Sep 98.
5. MFR of 14 Sep 98, Maj Webster
6. MFR of 8 Sep 98, Col O'Neil.
7. MFR of 3 Sep 98, Maj Webster
8. MFR of 17 Sep 98 by Mr. Callender regarding Maj Webster's behavior.
9. MFR of 18 Aug 98, Col O'Neil
10. OPR of 13 Aug 98 (draft)
11. CDE of Maj Webster, written by Maj La Macchia, 14 Jul 98.
12. Neuropsychological Evaluation of Maj Webster, written by Ricardo De Obaldia, Jun 98.
13. MFR of 26 May 98, Col O'Neil.
14. MFR of 20 May 98, Maj McCrary, Chief, Emergency Services
15. Performance Feedback completed by Maj Webster's supervisor, 14 Apr 98.
16. Letter by Henry Raming, Ph.D., of 8 Sep 93.
17. Letter by Maj Webster to MEB, 8 Sep 93.
18. Letter by Arnold Kambly, MD, of 10 Nov 93.
19. MRI Report, 12 Aug 93.
20. MRI of Sep 98

**HISTORY:**

**Subjective Complaints.** The patient began our initial interview by vehemently denying that she has MS. She continues to fear the initiation of another MEB. She acknowledges job-related difficulties and accompanying stress. She acknowledges feelings of intense anger lately. She is angry for being removed from the ER and believes she is qualified not only as an ER physician but should also lead the department. She believes these actions are due to "politics." She felt her letter to Col O'Neil, stating that she should have been ER director, exacerbated the situation. She denies cognitive, emotional, or behavioral limitations that would preclude competent practice of emergency medicine.

**History of Present Condition.** She was an Army Reservist and was augmented for Desert Storm. Her medical group was mobilized in Nov 90 and entered Saudi Arabia just before war commenced. She was delighted to be sent there because she had majored in Arabic studies in undergraduate school and had wanted to visit. She worked as an internal medicine and emergency medicine. The mission involved the care of Iraqi prisoners of war. She worked in 120 temperatures and did not have difficulties tolerating heat. She returned to CONUS in Jun 91. She had problems with her teeth and went to the VA hospital and then to an oral surgeon. She was referred to a neurologist secondary to lancinating HA pain. The neurologist suggested a MRI that suggested periventricular demyelination.

Following her tour she spent one month in Saudi Arabia in King Faisel hospital in Feb 92. She decided to apply for active duty in the Army but was not offered an overseas tour. She then decided to enter the AF. During her MIMSO training she developed double vision. She had to complete training with one eye closed. This worried her because she knew she had a previously abnormal MRI. She became worried about her medical condition. She sought consultation at Edwards AFB and they suspected MS. Additional work-up was completed while she was stationed in Yokota. Her suspected MS was based on the MRI, double vision, and presence of oligoclonal bands. At Travis AFB, she was further evaluated, and they concluded she had MS. She reported intermittent tingling in her left hand and they tested for carpal tunnel which was negative (she later had surgery for carpal tunnel). The tingling and weakness have since remitted. During this period, she was doing regular exercise and felt capable of doing anything. She took ACSC and passed.

She disputed her MS diagnosis and was retained in the military; however, she reported that she was "very traumatized" by this experience. The MEB process commenced in Yokota, was transferred to Travis, and lasted 5 months. She sought second opinions for her diagnosis. She incurred $14,000 indebtedness. She felt a great deal of anger. She felt the diagnosis of MS was "rubber stamped" until the very end when WHMC PEB concluded that she could not be diagnosed as having MS.

1131

While at Panama she had surgery for wisdom tooth removal that led to a broken jaw and left sided facial numbness. While intubating a patient during a code, she mentioned that she experienced weakness in her left wrist. She requested assistance from another provider, Dr. Burkett, FP. The patient died. She was identified as an impaired provider for intubation purposes and was placed in family practice. She felt punished by this move. Dr. Burkett "piled" on the patients and she got very behind. She was confronted by Dr. Burkett over taking lunch and was accused of having outbursts. She wrote a letter to Dr. Mendez, head of the outpatient services flight, indicating her criticisms of Primary Care operations. She claimed that following the submission of this letter, things got better. She underwent carpal tunnel surgery in Mar 98. Her strength returned and she petitioned to return to the ER.

She was told she needed to recertify her skills to intubate adults and children along with CPR. She intubated the mannequins without the stylet and, because she took too long, she was told she flunked. Her failure seemed "bogus and sadistic." She was told she would need to test with the anesthesiologist, who would examine her ability to intubate patients. She completed several intubations successfully.

A Performance Feedback was completed in Apr 98 by her supervisor, Dr. Mendez, that she provided for review. Following her PF in April, she complained to the hospital commander, Col O'Neil, about her unhappiness in working in Primary Care. She also informed the commander how she should have been made the director for the ER, arguing that she had more experience than her counterpart, Maj McCrary. Col O'Neil said he would look into her complaints. Finally, she returned to the ER. She served as the assistant director. Maj McCrary, the director, started tracking patients who left the ER without being seen. He concluded that more of her patients left than for other providers. Two patient complaints surfaced against Maj Webster. One patient complained that Maj Webster was the worst doctor ever and was extremely forgetful. Another complained that the patient was not promptly referred for narcotic medication with an orthopedic surgeon. Maj McCrary submitted an MFR on 20 May 98 which indicated he had lost confidence in Maj Webster. She was removed from the ER on 21 May, being told that Col O'Neil had lost confidence in her. She rebutted this decision. She was then promptly referred for a commander directed mental health evaluation, which included neuropsychological evaluation. The evaluation revealed cognitive dysfunction suggesting subcortical illness. In addition, there was suggestive evidence of possible adult ADHD. Performance related anxiety might have impacted the results of this evaluation. Furthermore, some of the testing was completed in Spanish. Dr. Fey concluded that repeat evaluation, MRI, and neurological consultations were merited.

She was removed from patient care and detailed to work in Health and Wellness. She is currently involved with smoking cessation. She writes health-oriented letters for the newspaper. Her subsequent OPR looked "terrible." The draft OPR was provided for my review. The OPR was revised by the new squadron commander, Lt Col Remington. She wonders if she is a victim of racial prejudice, noting that Lt Col Addison (Sq. commander), Maj Burkett, and Maj McCrary are black.

**Previous Medical and Psychiatric History.** Her mother and brother are diabetic. There is a family history of obesity. She reports poor vision secondary to glaucoma and conjunctivitis. She wears bifocals. She denies difficulty with reading.

Psychiatric history includes patient belief that her mother was schizophrenic. She was raped at gun point in 1979. She previously saw a psychologist to help control her anger during the time she went through her MEB (92). She was seen at RAF Lakenheath by MH personnel for self-referred occupational concerns (Apr 97). At that time, there was no evidence that she was an impaired provider.

**Outpatient Medical Record:** Medical conditions include history of diplopia and glaucoma. Diplopia was reported in Aug-Sep 92 with suspected white matter disease and MS. She was a Weight Management Program participant and was evaluated in Aug 96. She weighed 172.5 pounds. Surgery for carpal tunnel syndrome occurred in Feb 98.

Narrative Summary from David Grant Medical Center (admitted 10 Aug - 9 Aug 93). Neurological consultation suggested MS. Dr. Alan Zohner performed a neuropsychological evaluation. Her Verbal IQ was 125

113

and Performance IQ was 104, a significant difference. He concluded, "these results are believed to be a mild under estimate of premorbid function, which is believed to have been in the overall superior range." She had difficulty with abstract reasoning, struggling to test potentially correct hypotheses. Remote memory was intact. Nonverbal recall was WNL. Verbal information performance was mixed but fell within normal limits. There was no evidence of significant depression; however, she mentioned suicidal ideation without intent. Dr. Zohner concluded that she suffered from a mild loss of higher cognitive function. His impression was of an organic mental disorder, chronic and mild, manifested by mild loss of intellectual and problem solving abilities. Accompanying psychiatric evaluation yielded no diagnosis on Axis I or II. She manifested compulsive and "somewhat intrusive behavior" during her hospitalization at David Grant Medical Center. Physicians found her behavior to be unusual, eccentric, and at times inappropriate. This behavior may have been related to her multiple sclerosis. MS was supported by periventricular white matter disease on MRI, positive oligoclonal bands, neurologic symptoms compatible with MS, and at least a question of decreased cognitive function as evidenced by neuropsychiatric testing. She was referred for MEB.

MEB summary was reviewed and the patient was evaluated (23 Jun 93). Lab results showed (+) oligoclonal bands, (-) myelin basic protein, elevated IgG index of 1.12, protein 25, glu 64, WBC 0, RBC 2.2 (Jan 93). MRI in Dec 92 revealed bilateral periventricular high intensity areas consistent with MS and lesions in the corona radiata, consistent with arterial sclerotic changes. Maj Ginsberg concluded, "a diagnosis of MS can be made." Symptoms were mild and subclinical. Psychiatric evaluation was negative indicating no history consistent with frequent errors in clinical judgment or 'swings' in cognitive function that would suggest disability. She was determined to be experiencing a normal reaction for someone undergoing an MEB process.

She rebutted the MEB on 8 Sep 93 and sought a second psychological opinion concerning her cognitive performance. Dr. Raming completed another evaluation and noted FS IQ of 136, verbal IQ of 140, and performance IQ of 122. There were no noticeable emotional or behavioral intrusions, she manifested good concentration and she was cooperative during the evaluation. In Dec 93, the patient was notified that she was certified to return to duty. Her diplopia was felt to be related to decompensated phoria and not MS.

**Relevant Social History.** She said, "I idolized my father completely." He spent most of his time working in the garage on electronics projects. Northrop hired him as an electronics technician, making guided missiles during the war. She reported that her mother was "a dreamy lady... my diagnosis was paranoid schizophrenia, although it was never officially diagnosed." Her mother was hospitalized once for a mental breakdown. Her mother talked to herself out loud. She felt the Jews and Communists were after her. Her parents got divorced when she was 10. "So it was just my mother and four horrendous kids. The house was always a horrible mess and I blamed her. She was very religious and forced me to go to church when I didn't want to I rebelled against her by refusing to go to church. I decided I was an atheist at the age of 16 and argued with her about that."

She left home and moved in with her cousin's family. The patient was 16 at the time. She helped take care of the children. She left because she really couldn't stand her mother. The mess in the house embarrassed her, and she was embarrassed to bring friends home. She did not live with her father because he had remarried to a woman who was disabled with MS.

She never got along with her younger sister. The patient was the oldest saying, "I was bossy and used to beat up on her all the time and she never forgave me. I was the oldest, fat, and pictured myself as ugly. She was the cute little blonde girl that everybody adored so of course I beat her up She was quieter and not as outgoing as I was." Her sister studied to be a CPA and worked as an accountant. She was a chain smoker and was married several times. Things were not in good order in her house, reminding Maj Webster of her mother. Furthermore, "My sister started to sound very much like my mother. She broke down and started to make less and less sense. She was asked to see a mental health professional and she absolutely refused, even when I suggested this." Sometimes she makes sense and sometimes she doesn't. She talks about Dade County (FL) politics, black-white cultural phenomena, the Hispanic culture. She started calling my work in Panama, telling the technicians that Maj Webster was killing people.

1133

She mentioned her uncle, who had a Ph.D. in psychology. Maj Webster said, "He decided he should personally teach us about sex. He told me all the details of his sex life with his wife. He fashioned himself to be in love with me. He fondled my genitals and would have done more if I had let him." She was very angry with him for many years after that. This relationship began in her mid-teens and lasted for years.

She excelled in academics. She averaged A's and B's in Pasadena and Mira Costa high schools (CA). She received a National Merit Scholarship and attended undergraduate school in UCLA. She struggled academically her first two years and lost her scholarship. She disenrolled and she worked for several months as a secretary. She enrolled at El Camino CC in Redondo Beach and her grades improved. She reapplied for her scholarship, received this award again, and reentered UCLA. She received excellent grades, averaging A's and B's. She provided her high school and college transcripts for review.

She married a Mexican national and moved to Mexico, residing there for 15 years. She had her children there. She lived in a poor neighborhood without running water. She got a job teaching English in Mexico City, working in that capacity for 10 years. Her husband became extremely jealous and became violent: "He would insult me in Spanish. I used the same language with him. He hit me in response." Domestic violence occurred several times each year. She swore she would leave him but had no support system. When she told him she was going to leave him, she was beaten, and fired a gun at her. She left her home and moved into her own apartment. She eventually brought the children to live with her. The couple divorced amicably.

She completed medical school in Mexico and received good grades. She was the President of her medical school class. During her last year of medical school her father suffered a stroke and she brought him to live her. She then returned to the USA and passed her medical exam for foreign graduates. She applied for a residency position in Michigan. She passed her internal medicine exam on her second try. She liked working in the Emergency Department but her foreign education interfered with a placement in the ED. She initially worked in the ER for 5 months in Rochester NY (84). She lost the job due to "politics." She admitted a patient with chest pain and this angered another provider. She wrote a letter of complaint to the chief of staff. She was criticized for her documentation and for placing atropine in someone's eye.

Collateral Interview of Dr. Greg Fey. Dr. Fey said she might have chronic personality difficulties. She is socially inappropriate and her behavior has got her in trouble in the ED. She is angry about the referral and thinks she has been railroaded. During the pre-flight air evacuation briefing, she said, "I wish I could blow up the aircraft, I'm so mad about all this going on." She said this in front of 12 other patients who are waiting for the plane. The technician (SrA Goode) asked her if she went through the metal detector. Maj Webster replied that there were plastic bombs that could not be detected by the metal detector. The commander (Col O'Neil) thought her threats were serious enough to merit additional evaluation; however, Dr. Fey doesn't see her as a homicidal threat. He is more concerned about her ability to function as an AF officer in the ED. She has had some dreams of going on a shooting spree but she denies plans for acting this out. Her commander wanted her to be referred to MHC to evaluate her risk for suicide/homicide.

Dr. Fey mentioned that she has been decredentialed as an ER physician and works in Health and Wellness, completing wellness articles, fitness screens, and cholesterol levels. Her problems included difficulties observed while performing a code, irritability in the ED, and problems completing her job tasks in a timely manner. A nurse felt Maj Webster did not manage the code appropriately and could not intubate the patient with her left hand. Maj Webster actually suffered from carpal tunnel syndrome, which affected her strength. She had weakness in her left hand secondary to this syndrome.

Some of her symptoms, originally thought to be due to MS, were found to be caused by other factors. MRI showed white matter lesions in the brain. Some elevations were found in CSF (IgG index and oligoclonal bands). The board did not uphold the diagnosis and she does not currently have symptoms of MS.

Dr. Fey noted that Maj Webster has manifested unusual, puzzling behavior. For example, every time she comes for her psychiatric appointment she forgets her hat. She has left her car door open when she has come to see Dr. Fey. Several patients have complained about her forgetfulness. On one occasion she gave Benadryl to a 113[illegible]

Case 1:05-cv-01333-CCM Document 10-10 Filed 04/10/2006 Page 19 of 20

patient instead of Tylenol. She has had problems with temper and had a crying outburst. Dr. Fey noted that the ER physicians at Howard tend to be over worked and are heavily stressed. Another ER physician had difficulty as well.

Dr. Fey notes that Maj Webster denies that she has difficulties. She is not socially connected. Although she is not sexually seductive or impressionistic, she does have histrionic, emotional outbursts. There is a component of narcissism but this is not malignant and certainly WNL for physicians. She cannot inhibit her inappropriate responses. The etiology of this problem is equivocal, perhaps reflecting a cognitive problem or ADHD. Dr. Fey screened for ADHD and she was well below the cutoffs. There is no childhood evidence of ADHD. There appears to be problems with executive functioning, planning and organization, social judgment, and emotional impulse control. The puzzle involves etiology.

**Collateral Interview of Col O'Neil.** I spoke with Col O'Neil regarding Maj Webster's recent behavior. A worried member of Tricare staff spoke with him yesterday about Maj Webster's behavior during a preflight interview. She indicated she wanted to blow up the plane. No evaluation was performed. She is under stress. Her continuation of professional activities is threatened. Dr. Fey had seen her within the previous 24 hours, and she was not a danger to herself or others. Her statements were impulsive and disinhibited. She denied she would carry out these threats. Prior to this incident, she made a series of statements to SrA Goode involving a pleasurable dream, in which she shot everyone. Col O'Neil stated that within 24 hours, she expressed two events involving threats against others. The commander noted that Maj Webster has displayed a pattern of disorganized and problematic behavior that led to her removal from a patient care setting.

**Collateral Interview of Col Sel. Gary Gronseth, WHMC Dept. of Neurology.** Dr. Gronseth believes the Verbal-Performance differential on the WAIS-R is a matter of "hard wiring," and not a pathological indicator. She meets clinical criteria of possible MS based on 2 neurological episodes, the first in 1974 involving facial paralysis associated with diplopia and the second in 1992 involving double vision. She would meet lab criteria for probable MS, demonstrating two attacks, lesions on MRI and oligoclonal bands on CSF. An earlier MRI would suggest MS but is not very specific. Elementary neurological functioning is normal so she probably does not have subcortical dementia. She probably has dysfunctional executive process which is non-progressive.

After reviewing the MRI of Sep 98, Dr. Gronseth summarized clinical and laboratory findings. Although he said he could not make the MS diagnosis with certainty, he said that "more likely than not" Maj Webster suffered from MS. He was 65% confident of this diagnosis. Maj Webster stated she would like further evidence and recommended a lumbar puncture to examine other laboratory indicators. Dr. Gronseth concurred and escorted the patient to neurology for the procedure. As of this date, the patient apparently had a lumbar puncture but did not report to the lab for blood work. Results of the oligoclonal band survey are pending.

**Collateral Interview of Maj Chip Massey, WHMC Neuroradiology:** Maj Massey reviewed an MRI taken on 25 Sep 98 and indicated the data suggested extensive and severe white matter abnormalities in the corpus callosum, consistent with "classic MS." She has a pretty advanced case. An additional lesion was found in the C2 cervical spinal cord, also consistent with MS. He is 90% confident that this pattern represents MS. From the previous report, it appears that her condition has worsened.

## BEHAVIORAL OBSERVATIONS:

She was oriented to person, place, and date, but erred significantly on her time estimation (9:30 versus 11:00). She could not identify the President preceding Bill Clinton (**WMS-R Information and Orientation** = 12/14; 1st percentile). She appeared to be well kept, well nourished, and in no acute distress. Hygiene and grooming are managed independently, effectively, and appropriately. She was approriately dressed. There was no evidence of delusions, hallucinations, obsessions, ideas of reference, phobias, suicidal or homicidal ideation. Mood was mildly anxious, irritable, and dysphoric. Her affect was full range. There was no evidence of neurovegetative signs of depression. Speech was fluent; however, she occasionally mispronounced words and made a variety of paraphasic errors.. Voice quality was unremarkable. Thoughts were goal oriented and questions were addressed appropriately. The client was able to give an account of life events in chronological order. Recitation of personal

113

history appeared normal. Personal insight was fair; however, she seemed to lack appreciation for the magnitude of her deficits or the impact of her behavior on others. There were no abnormalities of gait or evidence of apraxia. The client established a positive relationship with our staff and was cooperative. In completing our biographical questionnaire, she omitted her age and date of birth. Her test results are considered an accurate reflection of her current cognitive functioning.

**TEST RESULTS:** Individual test performance was compared to a sample of age matched peers. When appropriate and available, performance was compared to peers with similar age and education. When discussing the results of MicroCog, we compared Dr. Webster's performance to the reference group of 18-34 year olds, allowing for an analysis of her performance to that of a sample of individuals who are performing at relatively optimal levels (Powell et al., 1993). When appropriate, corresponding age-education matched comparisons are noted as well. These are abbreviated "A/E." Scores are reported using commonly accepted classification of ability levels using conventions endorsed by Drs. Joe Matarazzo (1972), David Wechsler (1958, 1981) and Muriel Lezak (1995, p. 159). These conventions are listed below:

| Classification | z - Score | Percent Included | Lower Limit of Percentile Range |
|---|---|---|---|
| Very Superior | +2.0 and above | 2.2 | 98 |
| Superior | +1.3 to 2.0 | 6.7 | 91 |
| High Average | +0.6 to 1.3 | 16.1 | 75 |
| Average | +/-0.6 | 50.0 | 25 |
| Low Average | -0.6 to -1.3 | 16.1 | 9 |
| Borderline/Mildly Impaired | -1.3 to -2.0 | 6.7 | 2 |
| Moderately to Severely Impaired | -2.0 and below | 2.2 | — |

**General Intelligence.** Maj Webster has been repeatedly evaluated with the WAIS-R. Results suggest that she is functioning in the very superior range of intelligence overall (1998 WAIS-R FSIQ = 136, 99th percentile, mean = 100, SD = 15 ). There was a significant discrepancy between verbal (1998 VIQ = 140, 99th percentile) and performance (1998 PIQ = 122, 93rd percentile) indices. This differential may reflect chronic superior verbal abilities when contrasted to nonverbal skills; however, Knight's (1992) review of the literature suggest a Verbal - Performance differential parallel to that produced by Maj Webster. MS patients demonstrated the highest subtest scores on Verbal scales. The poorest performance was observed on tests that are timed and require considerable dexterity. Overall intellectual decline was mild.

When tested repeatedly, effects of practice may lead to a gradual rise in overall performance scores. When examined in 1993, Dr. Zohner observed a Full Scale IQ of 116 (86%), Verbal IQ of 125 (95%), and Performance IQ of 104 (61%). Anxiety may have attenuated her performance on this initial examination. Using the standard error of measurement, her 1993 Full Scale IQ of 116 is significantly different from her more recent Full Scale IQ (99% confidence interval). Effects of practice and attenuated anxiety may have contributed to this differential; however, an overall summary index may mask individual variation in specific cognitive domains and, therefore, should be interpreted with caution (Lezak, 1988).

**Language.** Conversational speech was fluent and articulate with intact comprehension, syntax, semantics and word finding. Vocabulary (Shipley raw score = 37; 63T, 90%) and general verbal intelligence (1998 WAIS-R Verbal IQ) scores exceed her age matched peers, indicating that general verbal abilities are intact. She had no difficulty following a series of verbal commands (Token Test, raw = 44/44 correct), and previous assessment revealed intact expressive speech. On a standardized reading test, she scored at the 81st percentile and within the high average range (WRAT3, raw score = 53). On a test of confrontational naming (BNT) she scored within the high average range (raw = 58/60; 80%). On a timed test of verbal fluency, she generated 50 words to the letters F, A, and S over a three-minute period, scored at the 60th percentile and within the average range (COWAT). On a test of categorical fluency, she was asked to generate animal names. She produced 16 words in 3 minutes for low average performance at the 14th percentile.

113