Case 1:05-cv-01333-CCM Document 10-13 Filed 04/10/2006 Page 1 of 20

50th percentile and within the
On a test of reading Passage Comprehension, she scored at the
high average range (WJR, raw score = 36). In Writing Fluency skill in quickly formulating and writing simple sentences was evaluated. Each sentence must related to a given stimulus picture and use a set of three provided words under timed conditions. Performance on Writing Fluency was high average at the 84th percentile (WF raw = 27). She accurately identified errors in punctuation, grammar, and spelling (Proofing = 29; 91st percentile).

Knight (1992) reports that aphasia is uncommon in patients suffering from MS.; however, studies have found that MS patients are vulnerable to decline in tests of verbal fluency, clearly areas of vulnerability in Maj Webster's performance. Her lowest scores in language measures occurred on tests of semantic (14th percentile) and letter fluency (60th percentile)

**Attention.** On tests of concentration, attention, and freedom from distractibility, her performance fell within normal limits. When tested earlier this year, she was asked to recite a series of digits; she repeated 7 digits forwards and 5 digits backwards for average performance at the 63rd percentile (WAIS-R, Digit Span). When presented with serial digits on a computer screen, she reproduced 2 forward for high average performance at the 75th percentile (MicroCog, Numbers Forward). When asked to produce numbers backward, she reproduced 8 backward and scored at the 84th percentile and within the high average range (MicroCog, Numbers Backward). On a alphabet vigilance test, she scored at the 75th percentile (MicroCog, Alphabet). She was presented with a series of 16 words and asked to identify words belonging to four different categories in four different trials. She scored within the average range for the first list (MicroCog, Wordlist 1 Total Score = 15; 37%) and the average range for the second list Wordlist 2 Total Score = 14; 37%). On a test of concentration effectiveness and ability to avoid distraction, she scored at the 38th percentile and within the average range (Stroop, Color Word score = 92; 0 errors). When asked to mentally track a series of ascending numbers by using paper and pencil, she scored at the 10th percentile (Trails A, 41 seconds, 0 errors). When asked to track two alternating series of ascending numbers and letters, she scored at the 21st percentile (Trails B, 69 seconds, 0 errors).

On a test of information processing speed, immediate memory, and sustained attention, Maj Webster was asked to listen to a series of paired numbers so that each number was added to the one immediately preceding it: The second number was added to the first, the third to the second, the fourth to the third, etc. Four different trials were administered, with 49 pairs of numbers presented in each trial. With each succeeding trial, the interval between number presentations decreased from 2.4, to 2.0, to 1.6 and, finally, to 1.2 seconds (PASAT). Her total score of 139 was intact.

**Calculations.** The patient's performance on the WAIS-R Arithmetic test reflects average mental calculation abilities. She adequately performed a series of mental operations involving addition, subtraction, multiplication, and division. Many of these operations involved of series of sequential mathematical operations. This subtest also required *working memory*, a complex attentional process in which one must maintain information in awareness while performing mental operations on it.

When presented with a series of calculations on a computer screen, she scored at the 37th percentile and within the average range (MicroCog Math TS = 6). This test minimized demands on complex attentional processes and was more of an examination of calculation ability. More demanding calculations and mathematical ability was assessed with the WRAT-3. Here, she performed adequately (WRAT-3 Arithmetic Raw = 44; 61%). There was no evidence of dyscalculia on this examination.

**Visuospatial Abilities.** She was asked to match a complex ambiguous design to one of seven designs. She provided 7 of 7 correct visual discriminations (CVMT Visual Discrimination). She was asked to view a series of analog clocks and accurately estimate their correct time. On this task she scored within the high average range and at the 75th percentile (MicroCog Clocks TS = 7). Her judgment of line orientation was intact at the 74th percentile (JLO = 29). Her copy of a complex figure, paying careful attention to overall form quality as well as interior detail, was average for her age group and placed her at the 59th percentile (Rey-Osterrieth Complex Figure, copy score = 32/36). On the Hooper Visual Organization Test, she was presented with 30 fragmented line drawings and asked to synthesize the drawings mentally and offer a verbal name for each of the objects. The resulting score of 25/30 was average and at the 42nd percentile. She struggled on a visuospatial performance task,



113

where her performance ranged from mildly impaired to low average (TPT, 8-21%). Overall, Maj Webster manifested generally intact visual-spatial and visual organization abilities.

**Memory.** She was asked to listen to sentences of increasing length and complexity (Spreen Sentence Repetition). Her age corrected score of 17 was intact at the 70th percentile. Her immediate recall of two verbally presented stories placed her at the 51st percentile and within the average range (WMS-R, Logical Memory I, 22/50 correct). Following a 30 minute delay with interfering activity her delayed recall score placed her at the 29th percentile and within the average range (Logical Memory II, 14/50 correct). Her story recall during our examination was slightly better than that obtained by Dr. Ricardo De Obaldia. On a former version of the Wechsler Memory Scale, she scored at the 27th and 17th percentile, respectively, for immediate and delayed story recall. Nevertheless, her relatively weak verbal recall is surprising considering her very superior Full Scale IQ.

MicroCog presented a short passage for her to read and memorize. She spent average time memorizing the passage. Her immediate recall of the story was average (Story Immediate Recall, raw score = 10; 75%). Following 20-30 minutes of intervening activity, her recall of the original story was low average (Story Delayed Recall, raw score = 19; 25%).

On the CVLT, Maj Webster was asked to learn a 16 item shopping list over 5 trials. Her total score of 50/80 words across 5 trials placed her at the 24th percentile and within the low average range. Learning strategy was analyzed using a variety of CVLT indices. In general, she eschewed more efficient learning strategies in favor of repeating words in their serial position (semantic cluster ratio = -2 SD). She was somewhat inconsistent in recalling words across five trials (76% Recall Consistency = -1 SD). . Following the fifth trial, she was presented with an interference list and she remembered 6/16 words for low average performance at the 16th percentile. She was then asked to recall all the words from the original list. She remembered 8/16 words for performance at the 16th percentile (Short Delay Free Recall). On cued recall, she was presented with 4 categories in which the words belonged, e.g., "Tell me all the shopping items that are spices and herbs." She recalled 8/16 words and scored at the 2nd percentile and within the moderately impaired range (Short Delay Cued Recall). Following a 20 minute delay with interfering activity, she freely recalled 8/16 words from the original list and scored at the 16th percentile (Long Delay Free Recall). On cued recall, she recited 9/16 words for performance at the 16th percentile (Long Delay Cued Recall). When given a recognition memory test for the 16 target words, she correctly identified 13/16 words among 28 distracter items and made 3 false positive identifications. Her Discriminability score of 86%, was low average at the 16th percentile. Again, her relatively weak verbal learning and memory performance is unusual, given her outstanding performance on the Wechsler intelligence scales.

She studied a visually presented series of 3X3 matrices in which 3 to 5 blocks contained a colored square; she was then required to immediately reproduce the pattern using a numeric keypad. She scored at the 5th percentile and within the mildly impaired range (MicroCog Tic Tac TS = 28). When asked to study a series of 4 line drawings and then reproduce them immediately from memory, she scored at the 68th percentile and within the average range (WMS-R, Visual Reproduction I, 32/41 correct). Following a 30 minute delay with interfering activity, she scored at the 85th percentile and the high average range (WMS-R, Visual Reproduction II, 33/41 correct). She correctly recognized 4/4 visual reproduction drawings among a series of distracters. Her 30 minute recall of the Rey-Osterrieth complex figure placed her at the 37th percentile and within the average range (12.5/36 correct).

In a visual learning task, she was presented with a series of 7 recurring complex, ambiguous designs that were repeated seven times across 112 trials (CVMT). The task involved the discrimination between seven recurring designs and 63 distracter items that appeared only once. The visual learning Total score of 69 was low average and at the 14th percentile. When taking hits and false alarms into consideration, she scored within the average range and at the 38th percentile (CVMT, d-Prime = 1.74). She had mild difficulties separating novel stimuli from recurring items (25 False Alarms; 92nd percentile). On 30 minute delayed recognition, she correctly identified 3 of 7 target items among a series of distracters, for average performance at the 28th percentile. When faced with difficult visual discriminations, Maj Webster struggled to discern subtle differences between target and distracter stimuli.

her tactual form board

Her tactile and spatial memory were assessed following her tactual form board. Furthermore, she was able to examination (TPT). She correctly recalled eight of ten shapes (50th percentile). correctly locate only 2 of 10 shapes (24th percentile). .

MS patients consistently demonstrated memory deficits (Knight, 1992). In the early stages of the disease, memory impairment tends to be variable and mild. However, on more difficult word list learning, MS performance is substantially reduced relative to normal controls. Maj Webster demonstrated this pattern on the CVLT, tapping verbal memory. MS patients appear to be particularly vulnerable on supraspan word lists (Knight, 1992). In the visual memory domain, she had little difficulty on routine tasks but deficits appeared as the demands increased. She had difficulty discriminating between target and distracter stimuli on a visual learning and memory task (CVMT). Again parallel to the literature on MS, Maj Webster demonstrated intact performance on immediate span tests (Digit Span, Spreen Sentence Repetition)

**Motor Skills.** Psychomotor abilities reflected variable manual dexterity, fine motor coordination, and speed. On Luria measures of motor programming and coordination, she scored at the 79th percentile and within the high average range (Luria-Nebraska Neuropsychological Batter, Motor Scale = 12). However, she was somewhat impulsive and slow in performing complex motor programs. Her left hand appeared stiff. On a test of motor speed and coordination, performance reflected low average ability (Trail Making Test, Part A). On a test of finger tapping, she averaged 40.60 taps in 10 seconds and scored at the 18th percentile with the dominant, right hand. With the left hand she averaged 37.40 taps in 10 seconds and scored at the 34th percentile. On a grooved pegboard task, she scored at the 27th percentile using the dominant, right hand (69 seconds, 0 drops) and the 4th percentile using the left hand (101 seconds, 0 drops). On a written digit symbol substitution task, extremely sensitive to overall cerebral integrity, she scored at the 3rd percentile and within the mildly impaired range (Symbol Digit Modalities Test, 32 correct, 5 errors). Her performance on the oral version was severely impaired (33 correct, 4 errors, <1%). Her earlier 98 performance was intact (WAIS-R Digit Symbol, 63%).

She approached a tactual form board test with an unusual strategy (TPT). Initially she had difficulty understanding the instructions given by the examiner. She originally took a block and then went over the board with her hand. When she realized this strategy was not working effectively, she put the block down and went over the entire board with her right hand. She then started placing blocks in the form board. Using her dominant hand, she needed 11 minutes and 37 seconds to place all 10 blocks in their proper positions. Her age and education corrected performance was mildly impaired at the 8th percentile. During the second trial, using her left hand, she felt the entire board first and then placed all 10 blocks in position in 7 minutes and 12 seconds (21st percentile). With both hands, she felt the board with her left hand and used her right hand to place blocks. She said, "It just didn't seem right." She completed the board in 6 minutes and 5 seconds (8th percentile). TPT performance taps multifactorial dimensions and is sensitive to frontal and parietal dysfunction as well as diffuse damage (Spreen and Strauss, 1998).

**Executive Functions, Concept Formation, Abstract Reasoning, and Mental Flexibility.** Executive functions involve cognitive abilities that assist in planning, initiating, programming, sequencing, and maintaining goal-oriented behavior. Executive functions allow an individual to track whether ongoing behavior is in accordance with that which is intended. Executive control further allows for course corrections when merited, to adapt to changing contingencies, or to correct inappropriate behavior. Her planning and organization abilities were noted. There was some evidence of impulsivity and disorganization.

In a measure of verbal, inductive reasoning, Maj Webster scored at the 63rd percentile and within the average range (MicroCog Analogies, scale score = 11). On a nonverbal test of concept formation, hypothesis testing, and problem solving, she had difficulty completing the task effectively (Ravens Progressive Matrices = 49 correct in 30 minutes, 45%). On a test of problem solving, mental flexibility, and hypothesis testing, Maj Webster scored within the average range (WCST). She was asked to take a deck of 128 cards and match the top card to one of four key cards that varied by shape, color, and number of objects. Once she provided 10 consecutive correct matches, the examiner switched the correct category without telling her. The examiner provided feedback by saying "correct" or "incorrect" for each response. A total of 6 categories were presented. She successfully completed 6 categories in 74 trials (128 trials maximum), made 10 errors (55th percentile) and 3 perseverative



113c

Case 1:05-cv-01333-CCM Document 10-13 Filed 04/10/2006 Page 4 of 20

responses (58th percentile). On yet another test of abstract reasoning, her performance was intact and was superior to her age matched peers (Shipley Abstract = 32; 66T).

MicroCog presented twelve sets of 4 visual stimuli that were used to examine abstraction and conceptual flexibility (**Object Match**). She was initially asked to identify a figure that did not match the other three. Once she made her initial response, she was supposed to switch conceptual set by selecting a different figure that did not match the remaining three. In this way, difficulty with shifting cognitive set may be discerned. Performance on the initial match was high average at the 75th percentile (Object Match A, TS = 12). Performance on Object Match B was average (TS = 10).

**Mental Processing Speed.** There was evidence of slowing on a test of psychomotor speed and ability, where Maj Webster scored within the mildly impaired range: On **SDMT**, she transcribed 32 figures in 90 seconds but made 5 errors (3rd percentile). On the oral version of the test, she provided 33 correct response and made 4 errors, for severely impaired performance at less than the 1st percentile. During her earlier 98 assessment, she rapidly completed a digit vigilance cancellation task (DV Time = 325 seconds; 82%). When asked to copy a complex figure, she was able to complete the drawing within the allotted 5 minutes (time = 2 minutes, 39 seconds). Most neurologically intact individuals readily complete this drawing within 2.5 to 5 minutes. On the timed **Stroop** color-word task, she was fairly slow in reading the color ink and scored at the 38th percentile. She was low average on the timed **Trail Making Test**, Part A, where she was asked to use a pencil to rapidly connect a series of ascending numbers. She was low average when she had to alternate between a series of ascending numbers and letters (Part B). During her previous 98 assessment, she was mildly impaired on both subtests (5th percentile). She struggled on a tactual form board examination, scoring within the mildly impaired to low average range (TPT Total Time = .83 minutes/block; 9.7%). During the **PASAT**, Maj Webster was asked to rapidly perform a series of additions. Her performance was intact. On tests of timed **verbal fluency**, she scored within the low average to average range.

Estimates of reaction time to auditory, visual, and visual signals preceded by an auditory signal were derived using **MicroCog**, a computer based neuropsychological test battery. Relative to the reference sample of normal adults, she was mildly impaired at the 5th percentile (**Reaction Time** standard score = 75; A/E SS = 102, 55%). Her simple reaction time in the early portion of the test placed her at the 9th percentile (**Timers 1**, scale score = 6). Her performance remained constant as the test neared completion (**Timers 2**, scale score = 6; 9%). When matched for age and education, her performance was average at the 50th percentile (A/E SS = 10, 50th percentile). A global index of information processing speed reflected severe impairment (**Information Processing Speed**, standard score = 57, <1%; A/E = <1%). **Information processing accuracy** was intact (standard score = 103; 58%; A/E = 70%). When examining the complex interaction between information processing accuracy and speed, she scored at the 5th percentile and within the mildly impaired range (MicroCog, **General Cognitive Functioning**, standard score = 75; A/E = 13%). These findings may parallel those observed by others, who report that Maj Webster is slow to complete her medical duties, is forgetful, and may be cognitively impaired.

**Personality and Emotional Factors.** On two standardized tests of depression, Maj Webster indicated minimal levels of dysphoria (**Beck Depression Inventory**, raw = 8, WNL; SCL-90-R, DEP = 0.54, 56T). Suicidal ideation was absent. On two standardized tests of anxiety, she indicated minimal elevations (**Beck Anxiety Inventory**, raw = 4, WNL; SCL-90-R, ANX = 0.60, 59T). Her **MMPI-2** was completed on 28 May 98 (new Welsh code 4+-6835/1792:0# K+-/LF). The MMPI-2 reveals a valid profile with a significant elevation on scale 4. The validity profile suggests an individual who is attempting to deny significant stress or conflict; however, individuals with elevations on scale 4 may demonstrate a lack of social conformity or self-control. There is a persistent tendency to conflict with societal mores. These individuals may demonstrate antisocial tendencies, rebelliousness, poor adjustment to authority, superficial relationships, and impulsive behavior. In fact, MMPI scales that favor impulsive behavior tend to be more elevated, and therefore more likely to occur, than scales that inhibit acting out (Hy, Pd, Pa, Sc, Ma, Si versus Hs, D, Pt). These individuals seek immediate gratification and tend to behave without regard to the social consequences of their actions. Unable to profit from experience, acting out may be followed by a period of quiescence only to be repeated at a later date. They have poor tolerance for frustration, poorly controlled anger, and may be prone to outbursts of aggression. These individuals are often seen as egocentric, superficial, and lacking insight. Furthermore, they are described as impulsive, irresponsible,

114

careless, and immature. Although quick to form superficial relationships, they have difficulty maintaining intimate contacts. Scale 0 (Si) is typically low and tends to correlate with more pathognomonic behavior as this scale approaches a T score of 30. There may be a history of substance abuse, assaultive behavior, poor financial status, and vocational difficulties.

These individuals are rarely self-referred but typically come to the attention of mental health professionals through referral. Their psychopathic qualities make them poor therapy candidates. They see themselves as superior to others, externalize blame, and have poor insight. This pattern of behavior may be alleviated by maturation; however, a low Scale 2 combined with a Spike 4 code type suggest poor prognosis for behavior change. This high 4, low 2 pattern is evident in Maj Webster's profile.

She was previously assessed with the MCMI-III. The Millon instrument highlights characterological features involving histrionic and narcissistic personality dynamics. Her approach to the test was to present herself in the most favorable light (Desirability BR = 84). She may appear somewhat histrionic and narcissistic. She has a strong need to present herself as socially acceptable and competent. She may have difficulty admitting to personal shortcomings and externalize blame. She may present as immature, superficial, and impulsive. She may be prone to verbal outbursts and sarcasm. Indeed, both her MMPI and MCMI suggest an individual who cannot effectively inhibit her verbal outbursts or irritation. She speaks her mind cathartically, without regard to the potential impact on others. She failed to consider the impact of her statements to SrA Goode when she externalized her wish that the plane be destroyed. Similarly, most prudent individuals would not communicate a dream experienced as pleasurable that involves the death of colleagues. Her apparent inability to appreciate the consequences of her actions is of great concern, particularly in serving in an emergency or primary care setting.

<u>Current Risk Assessment:</u> She denied suicidal or homicidal intent or plans. She denied previous suicide attempts. She denied significant depressed mood. Although angry and frustrated, she intends to do no harm to others. She denies a previous history of violence. She denies substance abuse or alcoholism. She admits that she may open her mouth to express her displeasure. The purpose of these communications is to be therapeutic but realizes that others might misinterpret her intent. She has no plans to hurt anyone within her chain of command or anyone else. She denies delusions or hallucinations. She admitted to being raped at gun point in 1979, while living in Mexico. Occasionally she will have dreams of being raped by members in her unit (commander and boss) whom she feels are threatening her military career and her practice of medicine. **My impression is that she is LOW risk for suicide and/or homicide.**

**ADHD:** Teachers told her she was very forgetful. She used to forget her books. She remembers her teachers saying that if her head wasn't attached she would have lost it long ago. She said, "I still lose things, particularly under stress." She denied attentional deficits. She could remain in her seat during class. She denied hyperactivity, being wound up, or having to be constantly on the go. She enjoyed dancing long hours in Mexico but saw dancing as a good opportunity to burn up calories and lose weight. She denied ADHD symptoms. She was never identified as ADHD in school at any level.

**BIPOLAR:** She denies a history of manic episodes. She denies periods of sleeplessness, elevated, expansive or irritable mood. With reference to sleep she said, "I always say that sleep is what I do best."

**EXTROVERSION:** She likes to talk, overcompensating for original introversion. While at WHMC, she went to Toastmasters meeting and delivered a speech. She won an award for her speaking.. During Desert Storm, she made a comment about Red Cross and Swiss policy that females could not examine Saudi men. She made a comment about that "fucking Red Cross that won't let me do my job." She was counseled for this comment. In Panama, she let people know how unhappy she was working in Primary Care. She was asked what her purpose was for communicating what she did to SrA Goode. She said the airman "seemed so friendly I just said what I felt. I should not have said it. I should have controlled what I said with no malice. I was expressing my anger at the whole situation."

114

Case 1:05-cv-01333-CCM Document 10-13 Filed 04/10/2006 Page 6 of 20

She said there are two main interests in her life: There is a continuous attempt to escape boredom and a continuous attempt to achieve maximum organization. She feels these are opposing forces. The more exciting her life is the more unorganized it becomes.

## CONCLUSIONS AND RECOMMENDATIONS:

The results of her cognitive assessment reveal several deficits on tests of verbal and visual learning and memory, semantic verbal fluency, psychomotor speed, and attention/concentration. Overall, intellectual abilities fall within the very superior range. Yet, on sensitive indices of cerebral functioning, Maj Webster had significant difficulties. The SDMT is "usually the most sensitive to the presence of acute or chronic 'organic' cerebral dysfunction (A. Smith in Lezak 1995, p. 380). On both the written and oral versions of this symbol substitution test, Maj Webster exceeded the cutoff score of 1.5 standard deviation (SD) below the mean. In fact, her written performance was -1.88 SD and oral performance was -2.4 SD below the mean. Poor performance on this examination may point to difficulties with concentration and tracking along with generalized brain dysfunction. Similarly, patients who perform poorly on the TPT generally reflect compromised brain function (Lezak, 1995). Although Maj Webster's overall intelligence ratings are outstanding, a summary index like IQ may mask subtest variability and compromised functional systems.

The following discussion presumes that Maj Webster suffers from probable MS. Poser et al. (83) proposed criteria for establishing the diagnosis and she appears to fulfill these criteria. Clinically definite MS requires evidence of two attacks, with each attack defined with neurological symptoms lasting more than 24 hours, caused by two distinct CNS lesions. Attacks (e.g., one involving blurred vision and the other facial weakness) should be separated by more than one month. A clinically probable diagnosis of MS is defined as the occurrence of two attacks and clinical evidence of a lesion responsible for one, but not both, of the attacks. During her Travis MEB, , providers concluded she suffered from MS and cited evidence of periventricular white matter disease on MRI, positive oligoclonal bands, elevated IgG index ,and neurologic symptoms. Currently, based on Dr. Gronseth's review of Maj Webster's medical history and recent MRI, there is at least a 65% probability of MS. She meets clinical criteria of possible MS based on 2 neurological episodes. She would meet lab criteria for probable MS, demonstrating two attacks, lesions on MRI and oligoclonal bands on CSF. An earlier MRI suggests MS but is not very specific. Elementary neurological functioning is currently normal so she probably does not have subcortical dementia. Maj Massey reviewed her MRI taken on 25 Sep 98 and indicated the data suggested extensive and severe white matter abnormalities in the corpus callosum, consistent with "classic MS." Dr. Massey suggests the patient has an advanced case of the disease. An additional lesion was found in the C2 cervical spinal cord, also consistent with MS. He is 90% confident that this pattern represents MS. From the previous MRI report, it appears that her condition has worsened; however, this conclusion must be advanced cautiously since Dr. Massey was unable to view the original films.

Knight (1992) reports "cognitive impairment is a frequent and disabling consequence of MS" (p. 153). In one review of 8 studies, the prevalence of cognitive deterioration in MS samples ranges from 54-65%. This estimate is supported by Lezak (1995), who reports a prevalence of cognitive dysfunction based on comprehensive neuropsychological assessments ranging from 30-70%. Cognitive sequelae of multiple sclerosis may include slowed mental processing, defective retrieval, and deficits in concept formation, verbal fluency, nonverbal reasoning, psychomotor speed and coordination, complex attention, concept shifting and mental flexibility (Lezak, 1995; Lishman, 1987). These deficits may be subtle and missed on most routine mental status or neurological evaluations (Lezak, 1995). For example, Peyser *et al.* (1980) found that, among MS patients judged to be cognitively intact on neurological evaluation, 50% were impaired on Halstead's Category Test. Impairment was seen whether neurological involvement was mild or severe, suggesting that cognitive deficits were present early in the disease. In summary, Peyser *et al.* stress that impairments can be subtle, not apparent to the patient, and may be missed in routine neurological exam (Lishman, 1987, p. 592). Deficits may be marked on timed tests and perceptual tasks may be more severely impacted than in other brain damaged groups (Lishman, 1987, p. 591). .

Surridge (1969) examined 108 MS patients versus a control group suffering from a progressive paralyzing disease, muscular dystrophy. He found that MS patients suffered from loss of memory for recent events and impaired conceptual thinking. Psychometric testing revealed impaired general intellectual efficiency, nonverbal

114.

reasoning, and memory functions. Language functions were usually preserved. There was usually an absence of aphasia, agnosia, and apraxia.

Depression, irritability, and/or euphoria make coexist with this condition and psychiatric disturbance may be prevalent (Lezak, 1995; Lishman, 1987). Emotional lability and denial are observed and may be correlated with euphoria. Hysterical, conversion symptoms are characteristic of the disease, and tend to surface as the disease progresses. Surridge (1969) noted that of 108 MS patients, 75% suffered from psychiatric abnormality versus less than 50% of controls, 61% demonstrated intellectual deterioration, 53% showed mood abnormalities, 27% were depressed, 26% euphoric, and 10% showed exaggerated emotional expression. Impaired awareness of disability was found in 31% of MS patients and 40% showed personality change, typically involving the development of irritability. I suspect that Maj Webster's behavior, judgment, and emotional outbursts are a consequence of advancing MS. Dr. Fey noted that there appears to be problems with irritability, executive functioning, planning and organization, social judgment, and emotional impulse control Maj Webster presents with somewhat histrionic, emotional outbursts.. Col O'Neil stated that within 24 hours, she was involved in two events that reflected poor judgment and threats against others. The commander noted that Maj Webster has displayed a pattern of disorganized and problematic behavior that led to her removal from a patient care setting.

Dr. La Macchia nicely summarized his concerns in a commander directed mental health evaluation of 14 Jul 98. His behavioral observations are of particular significance (pp. 5-6). Concerning his section on Integration of Data, we find independent support for items 1, 2, 3, 6, 7, and 8. We do not find adequate evidence for a diagnosis of attention deficit disorder, nor do our data on reading comprehension support the conclusion that she suffers from poor comprehension: On a test of reading Passage Comprehension, she scored at the 80th percentile. We now have sufficient medical data to support a diagnosis of cognitive disorder not otherwise specified. Furthermore, I believe the changes in Maj Webster's judgment, mood, and behavior are a direct consequence of worsening MS. Her ability to function as an ER or primary care physician is significantly impaired. I recommend that she be referred for a medical board examination.

**DSM-IV DIAGNOSES:**

Axis I 294.9 Cognitive Disorder NOS
310.1 Personality change due to multiple sclerosis, combined type

Axis II V71.09 Antisocial, histrionic and narcissistic personality traits

Axis III History of glaucoma, probable multiple sclerosis.

**This report contains sensitive medical information covered by the Privacy Act. The utmost discretion is required in the handling and disclosure of its contents. The responsibility for further release of this report belongs to the addressee.** If I might be of further assistance, please do not hesitate to contact me.

BRIAN R. CAMPBELL, Lt Col, USAF, BSC
Neuropsychology Service
Wilford Hall Medical Center / MMCNB
(210) 292-7712; DSN 554-7712
FAX (210) 292-5109; DSN 554-5109

## REFERENCES

Adams, R.D. and Victor, M. Principles of Neurology, Fifth Edition. New York: McGraw-Hill, Inc., 1993.

American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, 4th Edition. Washington, D. C.: APA, 1994

Bonner, J.S. & Bonner, J. J. The Little Black Book of Neurology, 2nd Edition. St. Louis: Mosby Year Book, 1991.

Christensen, A. Luria's Neuropsychological Investigation. Munksgaard, 1974.

Graham, J. R. MMPI-2: Assessing Personality and Psychopathology, 2nd Edition. New York: Oxford University Press, 1993.

Greene, R. L. The MMPI-2/MMPI: An Interpretive Manual. Boston: Allyn and Bacon, 1991.

Heaton, R. K., Grant, I., and Matthews, C. G., Comprehensive Norms for an Extended Halstead-Reitan Battery. Odessa, FL: Psychological Assessment Resources, 1991. Chapters I-5.

Knight, R.G. The Neuropsychology of Degenerative Brain Diseases. Hillsdale, NJ: Lawrence Erlbaum Associates, 1992.

Lachar, D. The MMPI: Clinical Assessment and Automated Interpretation. Los Angeles: Western Psychological Services, 1985

Lezak, M.D. IQ: R.I.P. Journal of Clinical and Experimental Neuropsychology. Vol. 10, No. 3, 1988, pp. 351-361.

Lezak, M.D. Neuropsychological Assessment, Third Edition. New York: Oxford University Press, 1995.

Lishman, W.A. Organic Psychiatry. The Psychological Consequences of Cerebral Disorder, Second Edition. London: Blackwell Scientific Publications, 1987.

Matarazzo, J.D. Wechsler's Measurement and Appraisal of Adult Intelligence, 5th Edition. Baltimore: Williams and Wilkins, 1972.

Peyser, J.M., Edwards, K.R., Poser, C.M., & Filskov, S.M. Cognitive function in patients with multiple sclerosis. Archives of Neurology. 1980, Vol. 37, pp. 577-579.

Powell, D.H., Kaplan, E.F., Whitla, D., Weintraub, S. Catlin, R., Funkenstein, H.H. MicroCog. Assessment of Cognitive Functioning. San Antonio: The Psychological Corporation, 1993.

Spreen, O. and Strauss, E. A Compendium of Neuropsychological Tests. New York: Oxford University Press, 1991.

Surridge, D. An investigation into some aspects of multiple sclerosis. British Journal of Psychiatry, 1969, Vol. 114, pp. 749-764.

Wechsler, D. The Measurement and Appraisal of Adult Intelligence, 4th Edition. Baltimore: Williams and Wilkins, 1958.

Wechsler, D. WAIS-R Manual. New York: The Psychological Corporation, 1981.

114

# DEPARTMENT OF THE AIR FORCE
# WILFORD HALL MEDICAL CENTER (AETC)

20 November, 1998

MEMORANDUM FOR DR. JACK SAYLOR, MMB

FROM: MMCNB

SUBJECT: Social and Industrial Impairment Ratings for Maj Wilma Webster, 20-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

1. I have consulted with Dr. Joe Chozinski on social and industrial impairment ratings for Maj Wilma Webster. Her difficulties lead to marked military impairment and disqualify her for world wide duty. I would rate her social and industrial impairment as severe. Although she may be employable, I doubt that she can continue with her practice of medicine safely and competently. Furthermore, her difficulties have produced considerable social impairments. Her social judgment has been questionable and has contributed to patient and staff complaints. She may require continual outpatient psychotherapy to help her adapt to and compensate for her deficits. I suspect her disqualification from military duties and the threat to her continued practice of medicine may lead to considerable emotional despair and even significant depression. She may become unstable and present as a suicide risk.

2. She has demonstrated considerable denial and minimization of her medical condition and associated emotional, cognitive, social, and behavioral impairments. I concur with Dr. La Macchia who stated that Dr. Webster is not aware of the magnitude of her deficits. She may continue to argue for her competence to practice medicine in spite of evidence to the contrary. She may have difficulty tracking and accepting the results of the MEB process. Her competence to participate in this process was not formally evaluated but should be monitored by the board members.

BRIAN R. CAMPBELL, Lt Col, USAF, BSC
Vice Chairman, Department of Psychology

E-mail address: campbell_b@whmc.af.mil

114

| INFORMAL | FINDINGS AND RECOMMENDED DISPOSITION OF USAF PHYSICAL EVALUATION BOARD | DATE |
|---|---|---|
| X FORMAL | | 28 JA |

1. THE BOARD CONVENED AT Lackland AFB TX 78236-5607 PER ATTACHED ORDERS (EXHIBIT A

2. A QUORUM WAS PRESENT AS INDICATED ON EXHIBIT A — 3. EXHIBITS ATTACHED: A - C, G - I

| 4. MEMBER'S NAME (Last, First, Middle Initial) | 5. GRADE | 6. SSN | 7. YEARS OF SERVICE UNDER 10 USC 1208 | 8. COMPONENT |
|---|---|---|---|---|
| WEBSTER, WILMA P. | MAJ | 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 | 06 | REG AF / X USAFR / ANG |

9. FINDINGS CONCERNING INDIVIDUAL DEFECTS OR CONDITIONS

COLUMN A - Include degree of severity.

COLUMN C - Enter "YES" for in line of duty, "M" for intentional misconduct, "N" for willful neglect, "A" for incurred during a period of unauthorized absence, or "NA".

COLUMNS B and D - Enter "YES", "NO", or "NA".

COLUMNS E and F - Self-explanatory.

| A. DIAGNOSIS | B. INCURRED WHILE ENTITLED TO RECEIVE BASIC PAY | C. LINE OF DUTY (Applies Only if Item 9B is YES) | D. PROXIMATE RESULT OF PERFORMING MILITARY DUTY (Non-EAD USAFR and ANG only) | E. DISABILITY RATING (Percent) | F. VA DIAGNOSTIC CODES |
|---|---|---|---|---|---|
| CATEGORY I - UNFITTING CONDITIONS WHICH ARE COMPENSABLE AND RATABLE: NONE. | | | | | |
| CATEGORY II - CONDITIONS THAT CAN BE UNFITTING BUT ARE NOT CURRENTLY COMPENSABLE OR RATABLE: | | | | | |
| 1. GUILLAIN-BARRE SYNDROME/MILLER FISCHER VARIANT, RECURRENT, EPTS WITHOUT SERVICE AGGRAVATION WITHOUT RESIDUALS. | | | | | 8199-810 |
| 2. POSSIBLE GLAUCOMA, CONTROLLED WITH TIMOPTIC OPHTHALMIC DROPS. | | | | | 6099-601 |
| CATEGORY III - CONDITIONS THAT ARE NOT SEPARATELY UNFITTING AND NOT COMPENSABLE OR RATABLE: ANTISOCIAL, HISTRIONIC, AND NARCISSISTIC PERSONALITY TRAITS. | | | | | |

| 10. ADDITIONAL FINDINGS | YES | NO | N |
|---|---|---|---|
| A. MEMBER IS UNFIT BECAUSE OF PHYSICAL DISABILITY | | X | |
| B. DISABILITY WAS INCURRED IN LINE OF DUTY IN TIME OF WAR OR NATIONAL EMERGENCY OR AFTER 14 SEPTEMBER 1978 | | | |
| C. DISABILITY WAS THE DIRECT RESULT OF ARMED CONFLICT OR WAS CAUSED BY AN INSTRUMENTALITY OF WAR AND INCURRED IN LINE OF DUTY DURING A PERIOD OF WAR | | | |
| D. DISABILITY WAS THE DIRECT RESULT OF A COMBAT RELATED INJURY | | | |
| E. DEGREE OF IMPAIRMENT IS MAY BE PERMANENT | | | |

| 11. COMPENSABLE PERCENTAGE | 12. RECOMMENDED DISPOSITION |
|---|---|
| N/A | RETURN TO DUTY |

13. OVERCOMES PRESUMPTION OF FITNESS: YES ___ NO X NA ___

SEPARATION/RETIREMENT DATE:

14. SIGNATURE OF PEB PRESIDENT OR PEB REPRESENTATIVE

CHARLES J. MANGANELLO, COLONEL, USAF

REMARKS CONTINUED ON ATTACHED SHEET

114

FINDINGS AND RECOMMENDED DISPOSITION OF USAF PHYSICAL EVALUATION BOARD, dated 28 JAN 99, pertaining to WEBSTER, WILMA P., MAJOR, 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

Continuation of Item 9, Findings concerning individual defects or conditions:

| A. DIAGNOSIS | B. | C. | D. | E. | F. |
|---|---|---|---|---|---|
| None. | | | | | |

Continuation of Item 15, REMARKS: Testimony and medical evidence, including a substantial package containing an opinion from one of the world's foremost experts on multiple sclerosis (Dr. Poser), indicates that the member does not have multiple sclerosis but rather recurrent GBS/Miller Fischer Variant. Member experienced various symptoms to include dizziness, diplopia, intermittent facial paralysis, vertigo, sensory loss (EPTS 1973-1991 and 1992 at MIMSO training resulting in an MEB/RTD), and, most recently, complete shor term quadriplegia (1998). It appears the member has had complete resolution of her recent flare, she exercises vigorously (runs about 8 miles/week, does 80 push-ups/sit-ups weekly, cycles up to 20 miles per week, rides stairmaster 4-5 times per week), she takes no medications, and she requires no follow-up. Member's counsel made a very compelling case, through the use of various charts, which graphically portrays the member's performance in the ER as comparable with other assigned providers. The FPEB argues that the member has no unfitting residuals of her GBS, finds her fit, and recommends Return To Duty without limitation. It should be noted that member's Axis II non-compensable diagnoses (Histrionic, Antisocial, and Narcissistic Personality Traits) are well-documented in the medical record, to include member's own exhibit H which suggests she was prone to disorganization and unusual behaviors extending back to childhood. These diagnoses, while not unfitting or compensable under the provisions of the Disability Evaluation System (DES), certainly might be judged "unsuitable" warranting administrative separation in the future. Finally, member's GBS, characterized b infrequent exacerbations, is clearly EPTS, it has not been permanently aggravated by her brief military service but rather represents the normal course of the disease, and is not believed to be either compensable or ratable even if found to be unfitting in the future.

Continuation of AF Form 356, OCT 95 PREVIOUS EDITION IS OBSOLETE

114

Beth Israel Deaconess Medical Center

Harvard Medical School

Department of Neurology
Senior Neurologist

Visiting Professor of Neurology

Charles M. Poser, MD, FRCP, FRCPG
Beth Israel Deaconess Medical Center
330 Brookline Avenue • Boston, MA 02215 USA
617 667-2063 • Fax 617 667-5216
Internet: cposer@bidmc.harvard.edu

January 15, 1999

Dr. Wilma Webster
PSC # 1 Box 3178
APO AA 34001

Dear Dr. Webster:

You were seen at your request on January 13, 1999. You had already provided me with a fairly detailed recital of your past medical history and current complaints.

I noted the following particularly relevant data: a congenital spina bifida occulta associated with a "fleshy brown growth in the middle of the back" were discovered in ? The first episode of neurological problems occurred in 1974, characterized by bilateral, lower facial weakness, loss of taste, vertigo and garbled speech. This apparently resolved spontaneoulsy after a month. The second episode occurred in 1992 while you were under the stress of intensive Air Force training and suffered from lack of sleep. The only symptom seems to have been a recurrence of the previously experienced double vision.

In October 1997 you developed a Guillain-Barre syndrome for which you were admitted to Wilford Hall Medical Center. You gave me a copy of the discharge summary for that admission. This diagnosis was well documented and I fully agree with it. I note that you were found to be areflexic except for weak LUE reflexes. Bilateral Babinksi signs were elicited. NCV studies confirmed the diagnosis. There was an elevation of CSF protein, normal CSF IgG content but 4 oligoclonal bands were found. T2 weighted MR images of the head revealed several periventricular areas of increased signal intensity.

My own neurological examination revealed the following abnormalities: Reflexes were active and equal in the arms, KJs were 1+ bilaterally, AJs could not be elicited; there were bilateral Babinski signs. I had the opportunity to examine the MRIs and noted the abnormalities as stated.

You told me that you had "never" had ankle jerks and that the Babinski signs had been present for as far as you could remember.

It is clear that the spina bifida, and more importantly what may have been some degree of meningomyelocele, may have caused the absence of ankle jerks and the bilateral Babinski signs. I believe

114

that the 1974 episode represents a Miller Fisher syndrome (a variant of the Guillain-Barre syndrome) rather than the first bout of multiple sclerosis (MS): bilateral facial weakness would be an extraordinarily rare event in MS. The second episode, diplopia, occurring under stress probably represents a recurrence of the previously experienced diplopia in 1974. Finally, the 1997 diagnosis of Guillain-Barre syndrome is completely accurate and amply documented.

Oligoclonal bands are found in many conditions, including the GBS. The MRI changes, while they do appear quite similar to what is often seen, but is not diagnostic in MS are also found in many other illnesses, including post-infectious conditions such as the GBS. There are a number of cases in the literature where a GBS has actually occurred in a patient with well documentd MS: in every such instance that I am aware of, there was a concurrent exacerbation of the MS symptoms; you did not have that in 1997.

In summary, I am not convinced that you have MS. The diagnosis of MS remains, and will continue to be, a clinical one, which cannot be based only on the MRI and/or the presence of CSF oligoclonal bands, in the absence of clinical neurological signs and symptoms compatible with MS. I find that the clinical history is much more in accord with recurrent GBS/Miller Fischer variant, with only the 1992 bout of diplopia as suggestive of MS. That is, in my opinion, simply not sufficient to sustain the diagnosis of MS.

Very sincerely,

Charles M. Poser

Charles M. Poser

1149

Beth Israel Deaconess Medical Center
Department of Neurology
Division of Behavioral Neurology
*Affiliated with the Comprehensive Epilepsy Center*

East Campus
330 Brookline Avenue
Boston, Massachusetts 02215 USA
617 667-8000

West Campus
One Deaconess Road
Boston, Massachusetts 02215 US
617 632-7000

http://www.bih.harvard.edu/behavneuro

*Director*
Albert M. Galaburda, M.D.

*Neurology*
Albert M. Galaburda, M.D.
Michael P. Alexander, M.D.
Alvaro Pascual-Leone, M.D., Ph.D.
Dawn Pearson, M.D.
Daniel Press, M.D.
Thomas Sandson, M.D.
Bruce A. Yankner, M.D., Ph.D.

*Neuropsychiatry*
Bernard Vaccaro, M.D.
Shirlene Sampson, M.D.
Antonio Bullon, M.D.

*Neuropsychology*
Margaret O'Connor, Ph.D.
Peter J. Hayashi, Ph.D.
Dara S. Manoach, Ph.D.
Roberta Trachtenberg, Ph.D.
Joan E. Sweeney
Cornelia [illegible]

*Neurorehabilitation*
Michael P. Alexander, M.D.
Dawn Pearson, M.D.

*Social Work*
Lisa R. Kaspert, L.I.C.S.W.
Glen Bowen, L.I.C.S.W.
Barbara Gustin, M.S.W.
Rebecca Silas, L.I.C.S.W.

*Division Administrator*
Betsy Powers-Stasiak

*Staff*
Erin Bradley
Jean Dooley
Susan Labb
Qjing Lam
Mickey Lentz
Lorna Reid
Mirena Sokolowski

*Research Laboratory*
Albert M. Galaburda, M.D.
Dorothy Hollinger, Ph.D.
Glenn Rosen, Ph.D.
Gordon Sherman, Ph.D.
Antis Zalkalns

*Laboratory for Magnetic Brain Stimulation*
Alvaro Pascual-Leone, M.D., Ph.D.

*Behavioral Neurology Unit*
Beth Israel Deaconess
Medical Center
East Campus
330 Brookline Ave.
Boston, MA 02215
Fax (617) 667-7961

## CLINICAL NEUROPSYCHOLOGY REPORT

| | |
|---|---|
| Patient Name: | Wilma Webster |
| Date of Birth: | 7/6/41 |
| Date of Exam: | 1/11/99 |
| Age: | 57 |
| Handedness: | Right |
| Education: | 21 years |
| Occupation: | Physician |
| Medications: | Timoptic |

<u>REASON FOR REFERRAL</u>: Dr. Webster is a 57 year-old, right-handed physician referred for neuropsychological evaluation of her cognitive status in light of allegations by work colleagues that she has been forgetful and that she has demonstrated cognitive changes that have undermined her work performance. Current test findings will be compared with previous neuropsychological evaluations.

<u>History of Current Symptoms</u>: The following history was obtained from a review of several neuropsychological evaluations, a memorandum from Colonel O'Neil, and from an interview with Dr. Webster, who appeared to be a reliable historian. Dr. Webster reports that she encountered a number of job-related difficulties over the last year or so during which time she was stationed in Panama. She presented a recent memorandum that she received from her commander, Colonel O'Neil. Colonel O'Neil recommended that Dr. Webster's clinical privileges be revoked. In this memo he listed a number of work-related difficulties including emotional lability, forgetfulness, and disorganization. He cited a specific episode when she failed to respond to a medical situation in a competent manner. He also cited an episode when she had made verbal statements of a violent nature. With regard to the incident of hostile verbalization, she notes that when she was boarding a plane to go for a neuropsychological evaluation, she communicated her dissatisfaction to a woman who asked her how she was. She states that she said that if the plane were to "blow up" she would be glad because then she would not have to undergo the evaluation. She states that she immediately retracted the statement and apologized profusely.

-CONFIDENTIAL-

115

Beth Israel Deaconess Medical Center, Boston, is a major teaching hospital of Harvard Medical School.
A founding member of CareGroup,℠ an organized system of quality healthcare serving the individual, family, and community.

With regard to her work performance, she states that she had been a candidate to be director of the military emergency department at Howard Air Force Base but that a male counterpart had been appointed to this position. She wrote a letter to her commander, Colonel O'Neil, to express her disappointment. Around that time and for a year or so prior, she had been having weakness in her left hand related to carpal tunnel syndrome. Because of this weakness she was unable to perform an intubation during a code in the hospital. She requested that another physician perform the procedure. According to her, the patient died and post-mortem x-rays revealed that the tube had been incorrectly placed. Because of her weakness she was transferred to primary care medicine. She states that she did not enjoy this work and that she was treated poorly. She subsequently underwent surgery for carpal tunnel syndrome and regained the strength in her left arm. She petitioned to return to the emergency room. She was required to undergo a simulated exercise focused on intubation prior to her return. She states that she was not provided with the necessary equipment during this exercise and that she failed the exam; she was instructed to receive further training on the procedure with an anesthesiologist. She ultimately was transferred back to the emergency department. However, according to her, she was again removed from her duties there due to the fact that her commander "lost faith in her competence". A neuropsychological evaluation was requested at that time.

Initial testing was conducted by Dr. Ricardo DeObaldia in 1998. Test findings indicated low average performance on measures of fine motor coordination, perception, reading, and memory. Her abilities in these areas were incorrectly described as "impaired" even when raw data indicated that her performance had fallen in the low average range.

Follow up examination by Dr. Brian Campbell occurred in October of 1998. Dr. Campbell reported that Dr. Webster had obtained a Verbal IQ of 136 and a Performance IQ of 122. Her performance on tests of language fell in the high average to superior range. Digit span was average (63rd %ile). Performance on measures of distractibility and mental flexibility fell in the average to high average range. Regarding her memory, sentence memory fell in the high average range whereas memory for paragraph length material was average. Memory for a word list that exceeded her attention span limitations (i.e., the CVLT) fell in the average range (24th %ile). Performance on the CVMT was low average (14th %ile). Performance on tests of problem-solving was average. Motor dexterity across a variety of tasks fell in the average range. In contrast with the above, there was evidence of mildly impaired performance on tasks of processing speed and reaction time. Personality assessment revealed that she did not perform in the depressed range on self-report measures such as the Beck Depression Inventory. On the MMPI she demonstrated an elevation on scale 4 consistent with a tendency not to conform to social norms. It is noteworthy that elevation on scale 4 is sometimes seen in highly educated individuals.

Dr. Campbell attributed Dr. Webster's test performance to MS based on her neuropsychological deficits as well as previous medical evidence of periventricular white matter changes, positive oligoclonal bands, and elevated IgG index and neurologic symptoms. Dr. Webster disputes this

diagnosis and requested another medical opinion regarding her neuropsychological and neurological status at BIDMC.

Regarding the diagnosis of MS, Dr. Webster relates the following history as pertinent. In 1974 she had a two week episode of double vision and shortly afterwards experienced facial paralysis on one side of her face followed by paralysis on the other side. The latter symptoms lasted for approximately one month. She states that she had an episode of vertigo around that time. In 1991 she chewed on something hard and had a sudden pain on the left side of her jaw. The pain radiated to her head. She was sent to a neurologist who ordered an MRI that was suggestive of periventricular white matter disease. In 199? she experienced a recurrence of double vision shortly after she entered the Air Force. She had to complete her initial training with one eye closed and was sent to her first base in Japan to complete further work up. When in Japan an internal medicine physician diagnosed her with MS and she was sent for a Medical Evaluation Board. It was decided that she could not be diagnosed with MS but that she had phoria. She states that laboratory tests have never been definitive for MS. In retrospect, she wonders whether some of her MS-like symptoms were due to psychogenic factors. In this regard, she notes that her step-mother had MS.

Past Medical History: Other significant medical events include the following. In October 1997, while on tour in Turkey, she developed diarrhea and a bad cold followed by quadraplegia. She was hospitalized in a Turkish hospital for five days and was given IgG for a presumptive diagnosis of Guillan Barre syndrome. She was then transferred to an American military hospital.

Personal History: Social history reveals that she was born in Pasadena, California the oldest of four children. She was raised and educated in Pasadena and Redondo Beach, CA. She states that she did well socially and academically. She acquired developmental milestones at normal times and was precocious in terms of her reading. She was able to read at age four. However, reports from elementary school teachers indicate attention and memory problems. Despite these problems, she scored in the top one percent of all US high school students in the National Merit Scholarship Test. She attended UCLA for her undergraduate work. She struggled during her first two years and lost her scholarship but after taking some time off from school she successfully returned to school and did well academically. She had a particular talent for learning languages and did well in Spanish, French, Persian and Arabic. While at UCLA she was the social chairman of the International Students' Association. She met her husband at UCLA at which time he was a cafeteria worker. They moved to Mexico in 1965. They had two children and also raised two other children of whom her husband was the biological father. She states that she was occasionally beaten by her husband. She left him in 1972 and entered medical school in 1973 at UNAM. She was the president of her medical school class. She subsequently returned to the United States (1979) where she passed the medical exam for foreign graduates. She took a residency position in Michigan. She entered the Army Reserves in 1989 and served in Saudi Arabia during Desert Storm (1/17/91-6/12/91). She worked in internal medicine and emergency medicine. After Desert Storm she decided to go in the Air Force

because there were no overseas assignments in the Army. She left the Army in 1992 at which time she entered the Air Force.

Family History: Both parents are deceased. Her father died at 69 after a CVA and within the context of pneumonia. She had a close and supportive relationship with her father. She also described a warm relationship with her father's second wife who was a woman disabled by MS. Her mother died in her 70's. She believes that her mother suffered from paranoid schizophrenia. She also suffered from diabetes and a fractured hip. A younger sister, who lives in Florida, is described as emotionally unstable. A younger brother suffered from behavior problems during early school and has had an erratic work historv. Apparently he is doing well now. Another brother also had psychological problems after a bitter divorce.

Behavioral Observations: On examination, she was alert and oriented x 3 and was able to convey her thoughts in a clear and coherent manner. There was no evidence of delusions or hallucinations. She displayed a full range of affect. Motivation for testing was normal; to this extent, current test findings are considered valid.

EVALUATION PROCEDURES AND TESTS ADMINISTERED:
Review of Records; Clinical Interview; General Intellectual Assessment: Wechsler Adult Intelligence Scale-III; Attention Battery: Utah Criteria; Digit Span; F-A-S Test; The Stroop Interference Test; Calcap; Trail-Making Tests; Memory Battery: Rey Auditory Verbal Learning Test; Rey Osterreith Complex Figure; Warrington Recognition Memory Test; Language Battery: Boston Naming Test; Visuospatial/Perceptual Battery: Visual Cancellation Tests; Benton Facial Recognition Test; Affective: Beck Depression Inventory; MMPI-2.

TEST FINDINGS:
1. General Intellectual Ability: Performance on tests of general cognitive abilities was variable with superior performance on tasks measuring fund of information (>95th %ile), vocabulary (95th %ile), nonverbal problem solving (95th %ile), attention span (91st %ile), working memory (95th %ile) and verbal concept formation (99th %ile). She demonstrated relative difficulties though clearly average performance on tasks of processing speed (50th %ile). There was a marked discrepancy between verbal (VIQ=133) and nonverbal intelligence (PIQ=114). These scores are commensurate with previous testing from 1998 and indicate superior intelligence.

2. Attention: Brief attention span was high average to superior for auditorily presented information. Performance on verbal and nonverbal fluency measures, which are often seen as indices of processing speed and sustained attention, fell in the low average range. There was no evidence of sensitivity to interference on the Stroop paradigm (T=50). Set maintenance and set shifting abilities were normal on the Trail Making (A&B) and Wisconsin Card Sorting Tests. Simple reaction time was high average (81st %ile) on the Calcap test whereas choice reaction time fell in the low average range (19th-47th %ile).

3. Learning/Memory: There was evidence of a "span effect" on the RAVLT, a 15-item word list where recall reached 7/15 after one presentation and was 9/15 after five presentations. Her learning over trials on this test was below expectations. Following a 30-minute delay interval she recalled 6/15 words (16th %ile) and recognized 12/15 with no false-positive errors. On the Warrington Recognition Memory Test recognition of words was flawless (50/50) whereas recognition of faces was average (40/50; 50th %ile). Recall of the Rey Osterreith Figure was below expectations (Immediate recall=12/36; 12th %ile) even though she had copied this figure in an organized and accurate manner.

4. Language: Spontaneous speech was fluent, articulate and prosodic with no evidence of word finding difficulties or paraphasic errors. Praxis was normal for limb and buccofacial commands. Comprehension of simple and complex commands and complex ideational material was intact. Repetition of short and long, high and low frequency, phrases was adequate. Confrontation naming was high average (BNT=58/60). Finger gnosis was intact.

5. Visual Perceptual/Constructions: Basic perceptual abilities were intact. There was no evidence of hemispatial neglect on double simultaneous stimulation. Scanning was normal and systematic on a Letter Cancellation Test. Facial discrimination was average on the Benton Facial Recognition Test (59th %ile). Copy of the Rey Osterreith figure was well organized and accurate Solution of block design problems from the WAIS-III was superior; there was no evidence of broken configuration or failure to appreciate gestalt.

6. Sensorimotor Examination: Motor dexterity was intact on the Grooved Pegboard Procedure.

7. Affective/Personality: There was no evidence of depression a self-report inventory (BDI-II=4). Her MMPI-2 profile was not valid due to an extremely elevated K (defensiveness) scale; hence, the clinical subscales could not be interpreted.

SUMMARY AND RECOMMENDATIONS: Dr. Webster was referred for neuropsychological evaluation in order to obtain a second opinion regarding her cognitive status relevant to her competence to practice medicine. Previous reports have indicated evidence of attention and memory problems that were attributed to MS. She disputes the diagnosis of MS but reports indicate that laboratory testing has been positive.

Current test findings indicate that she is of superior intellectual abilities. She performs in the superior range on tests of vocabulary, fund of verbal knowledge, arithmetic, attention span, and nonverbal problem-solving. Performance on tasks of frontal executive abilities was intact. In contrast with the above, speed of processing and memory for information that exceeded attention span limitations fell in the average to low average range. While these scores do not represent impairments per se, they should be seen as *relative* deficits given her superior IQ. In comparison to previous neuropsychological reports, it is noteworthy that her scores on tests of reaction time ranged from low average (19th %ile) to high average (81st %ile) during the current evaluation. It

may be that her improved performance on these tests was due to the fact that she was less anxious within the context of the current testing environment. Otherwise, her scores were roughly equivalent to those obtained during previous evaluations.

Dr. Webster's relative deficits on measures of processing speed and supraspan learning are consistent with a broad array of neurological, psychiatric, and developmental problems. While MS in the differential, there is nothing definitive in the neuropsychological data that supports this diagnosis. In fact, there is evidence that she was prone to disorganization and unusual behaviors extending back to childhood years. It may be that her current neuropsychological profile is based on developmental factors rather than more recent neurological demise.

The pragmatic implications of current test findings are as follows. Dr. Webster's conceptual reasoning abilities are wholly intact. She is able to think in a flexible manner and is able to engage in nonverbal deductive thinking without a problem. Her fund of knowledge for many types of information is superior. Basic perceptual abilities are intact. Despite her considerable strengths and superior intelligence, her problems in the areas of memory and processing speed may intrude upon work performance, particularly in situations requiring a rapid response to complex types of information. There are two solutions to this problem. Her work responsibilities may be reorganized and reduced so that she may complete her assignments effectively. The other solution is for her to identify work that is engaging for her intellectually and emotionally but that is not time-dependent.

Findings will be discussed with Dr. Webster and will be sent to Dr. Poser for his review, as per her request.

Please contact me if there are questions regarding this evaluation.

Margaret O'Connor, Ph.D.
Director of Neuropsychology

cc:Dr. Charles Poser, Dept. of Neurology, BIDMC
Terry Martin Esq., FAX 210-697-6386
Terry Martin Esq., 9901 IH 10-West, Suite 430, San Antonio, Texas, 78230
BNU File
MOC File

1018

# DEPARTMENT OF THE AIR FORCE
24TH MEDICAL OPERATIONS SQUADRON (ACC)
HOWARD AFB, PANAMA

## Department of Emergency Services

TYPE OF VISIT/SERVICE ER DATE 14 Oct 9

Please circle applicable items: Active Duty Retired Dependent Civilian

USAF USA USN USMC Coast Guard

### TIMELINESS

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Waiting time for registration | 5 | 4 | 3 | 2 | 1 |
| Waiting time before screening | 5 | 4 | 3 | 2 | 1 |
| Promptness of provider | 5 | 4 | 3 | 2 | 1 |

### STAFF SENSITIVITY

| | | | | | |
|---|---|---|---|---|---|
| Staff courtesy | 5 | 4 | 3 | 2 | 1 |
| Staff helpfulness | 5 | 4 | 3 | 2 | 1 |
| Respect for confidentiality and privacy | 5 | 4 | 3 | 2 | 1 |
| Provider's explanation of your condition and treatment | 5 | 4 | 3 | 2 | 1 |

### PHYSICAL ENVIRONMENT

| | | | | | |
|---|---|---|---|---|---|
| Adequacy of waiting area | 5 | 4 | 3 | 2 | 1 |
| Cleanliness of area | 5 | 4 | 3 | 2 | 1 |
| Availiability of reading material | 5 | 4 | 3 | 2 | 1 |

### CUSTOMER SATISFACTION

| | | | | | |
|---|---|---|---|---|---|
| Professionalism of staff | 5 | 4 | 3 | 2 | 1 |
| Care received from staff | 5 | 4 | 3 | 2 | 1 |

(OVER)

1156