Sex: FEMALE Age: 44

ddr: PSC 1 BOX 31... EXERCISING
Chief Complaint: RT KNEE PAIN S/P EXERCISING

Tetanus: UNK
Allergies:
NO ALLERGIES DOCUMENTED
NKDA

Medications
Voltaren

VITAL SIGNS
Time 0840
BP-SY 130
BP-DI 67
Pulse 76
Resp 20
Temp 98.6
WT-Ped

| Orders | Init | Time |
| --- | --- | --- |
| Crutches | | 10:20 |
| ace wrap | | 10:20 |

ASSESSMENT/DIAGNOSIS
Right knee pain

===== DISPOSITION =====
✓ Home __ Full Duty
__ Quarters
__ 24hrs __ 48hrs __ 72hrs

Modified Duty Until:
Day: ____ Mon: ____ Yr: ____

Referred to:
__ Emergency __ Today
__ 72 hours __ Routine

Admitted
Others:

WILMA P. WEBSTER, MAJ
EMERGENCY PHYSICIAN 44E3
24 MDOS, HAFB, PANAMA

Condition Upon Release:
✓ Improved __ Unchanged
__ Deteriorated
Release Time: 10:30

S. 0915 pmHx of 2 surgeries on (R) knee. Was sent to PT 4 days ago & given exercises. She was doing these & her knee "caught" & now it's catching a lot & is painful to walk on. Has f/u appt c Dr Granville 26 ... pain in lateral aspect of knee.
O. Ambulates c a limp. No ballottement of patella. No abnormal mobility on lateral stressing, negative drawer sign. Good distal pulses & sensation.
XRay - No Fx
A. Right knee pain
P. F/U c Dr. Granville as planned. Continue Voltaren as prescribed. Crutches - wt bearing as tolerated.

Signature of Provider/Stamp:
Wilma P. Webster MAJ

Instructions to Patient: Follow up with Dr Granville as planned. Continue Voltaren as previously prescribed. Use crutches with weight bearing as tolerated.

I HAVE RECEIVED AND UNDERSTAND MY DISCHARGE INSTRUCTIONS
Michelle Schroder

30/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 SCHRODER,MICHELLE K
22 Jan 1954 FEMALE
Loc: ER
Spon: SCHRODER,PAUL H
Unit: 0024 SUPPLY SQ

F41
W:84-5151
Rank: SMS
RR: OUTPATIENT RECORDS

H:507-2844997
D:284-5067

SF558

20 MAY 98

MEMORANDUM FOR Lt Col RODRIGUEZ

FROM: MAJ WILMA P. WEBSTER
Assistant Director, Emergency Services

SUBJECT: Letter of complaint from Mrs. Schroder

1. On 02 MAY 98 I saw Mrs. Schroder, a woman with a history of knee problems who had seen PT and who had more pain after doing the exercises they'd given her.

2. She was able to walk with a slight limp, but demanded a brace, crutches and higher powered pain medication. She had already been given Voltaran by another provider. She wanted me to pay attention to her and her demands exclusively and not to others.

3. I did my routine exam on her, checking for balloting of the patella, abnormal mobility on lateral stressing, and presence of a drawer sign; I did not find any instability. I also checked her pedal pulses and her sensation distally. I did not check for reflexes in the leg, nor do I usually check those in cases of knee injury. I did my exam quickly; she was obviously unaware of the meaning of each thing I checked.

4. I ordered an x-ray because she told of a sudden injury. As is my custom, when the technicians are not immediately handy, I asked the patient if she could turn the wheels on her wheelchair to drive it to the elevator. Many patients are happy to do that, especially if they're in a hurry. Otherwise, I have them wait till a technician is free to take them up. I certainly did not expect her to push a wheelchair from behind!

5. Never did I tell the patient there was nothing wrong with her knee. That would not have been intelligent when dealing with a patient who had had two previous surgeries and was at risk for other problems in the future. I did tell her I could not find anything new on my exam and that the treatment she had received was appropriate.

6. She wanted an immediate referral to see Dr. Granville although she already had an appointment for the 26th of May. I explained this was not possible unless she had a new fracture but I told her that possibly through PT she might arrange something.

7. I suggested I could give her Motrin 800 mg tablets but she did not like that. She wanted stronger medication but I was reluctant to begin narcotics in a patient with a chronic problem. I did suggest applying heat for relief but she found objection to that. I told her if ice gave her more relief that it was ok to use that also.

8. Michelle Schroder came to the ER that day with an agenda, and I did not give in to all her demands because it was not what I felt was medically indicated at the moment.

Wilma P. Webster

WILMA P. WEBSTER, MAJ, USAF
Assistant Director, Emergency Services

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

## Emergency Room

Please Circle Applicable Items: Active Duty USAF | Guard USA | Reserve USN | Retired USMC | Dependent USCG | Civilian

| AVAILABILITY | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Availability of medical records | 5 | 4 | 3 | 2 | 1 |
| Availability of ambulance services | 5 | 4 | 3 | 2 | 1 |
| | 5 | 4 | 3 | 2 | 1 |
| | 5 | 4 | 3 | 2 | 1 |

| TIMELINESS | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Promptness of reception | 5 | 4 | 3 | 2 | 1 |
| Waiting time to initial screening | 5 | 4 | 3 | 2 | 1 |
| Waiting time to see provider and/or technician | 5 | 4 | 3 | 2 | 1 |
| | 5 | 4 | 3 | 2 | 1 |

| STAFF SENSITIVITY | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Courtesy and friendliness of staff | 5 | 4 | 3 | 2 | 1 |
| Helpfulness and thoroughness of staff | 5 | 4 | 3 | 2 | 1 |
| Provider's explanation of your condition/treatment | 5 | 4 | 3 | 2 | 1 |
| Confidentiality and privacy | 5 | 4 | 3 | 2 | 1 |

| PHYSICAL ENVIRONMENT | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Adequacy of parking | 5 | 4 | 3 | 2 | 1 |
| Adequacy of waiting areas | 5 | 4 | 3 | 2 | 1 |
| Cleanliness of facility | 5 | 4 | 3 | 2 | 1 |
| Location of facility | 5 | 4 | 3 | 2 | 1 |

| CUSTOMER SATISFACTION | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Professionalism of staff | 5 | 4 | 3 | 2 | 1 |
| How well the care provided met your needs | 5 | 4 | 3 | 2 | 1 |
| Overall quality of care and services received | 5 | 4 | 3 | 2 | 1 |

Did you receive any advice about ways to stay healthy and avoid injury? Yes ☐ No ☐

Please comment on the rating you gave above for "Overall quality of care and services received." ________

Who gave you really outstanding service? ________

Who gave you poor or inadequate service? Dr. Webster. Is she really a Doctor?

(OVER)

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

Please Circle Applicable Items: (Active Duty USAF) | Guard USA | Reserve USN | Retired USMC | (Dependent) USCG | Civilian

Please Circle Clinic Visited: Dental Flight Medicine Immunizations Internal Medicine Mental Health Nutritional Medicine OB/Gyn Optometry Orthopedics Pediatrics Military Public Health Physical Exams Primary Care Surgery (ER)

## ACCESS / AVAILABILITY

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Accessibility of telephone lines NA | 5 | 4 | 3 | 2 | 1 |
| Availability of appointments/follow-up appointments | 5 | 4 | 3 | 2 | (1) |
| Availability of medical/dental records | (5) | 4 | 3 | 2 | 1 |
| Availability of providers and/or technicians | 5 | 4 | 3 | 2 | (1) |

## TIMELINESS

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Promptness of reception | 5 | (4) | 3 | 2 | 1 |
| Waiting time to initial screening | 5 | 4 | 3 | 2 | (1) |
| Waiting time to see provider and/or technician | 5 | 4 | 3 | 2 | (1) |
| Length of appointment | 5 | 4 | 3 | 2 | 1 |

## STAFF SENSITIVITY

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Courtesy and friendliness of staff | 5 | 4 | (3) | 2 | 1 |
| Helpfulness and thoroughness of staff | 5 | 4 | 3 | (2) | 1 |
| Provider's explanation of your condition/treatment | 5 | 4 | 3 | 2 | 1 |
| Confidentiality and privacy | 5 | 4 | 3 | 2 | 1 |

## PHYSICAL ENVIRONMENT

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Adequacy of parking | 5 | 4 | 3 | 2 | 1 |
| Adequacy of waiting areas | 5 | 4 | 3 | 2 | 1 |
| Cleanliness of facility | 5 | 4 | 3 | 2 | 1 |
| Location of facility | 5 | 4 | 3 | 2 | 1 |

## CUSTOMER SATISFACTION

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Professionalism of staff | 5 | 4 | 3 | 2 | (1) |
| How well the care provided met your needs | 5 | 4 | 3 | 2 | (1) |
| Overall quality of care and services received | 5 | 4 | 3 | 2 | (1) |

Please comment on the rating you gave above for "Overall quality of care and services received." I arrived at the ER explaining I was experiencing a recurrance of back pain & needed medication. I offered my medical records to show previous episode. After ~5[illegible] wait, Maj Webster informed me that I could go upstairs to primary care for a[illegible] appt in ~35 mins. She had 2 other patients she was involved with & probab[ly] wouldn't be able to see me before then anyway. I explained that I would have trouble stan[ding] that long (sitting was not an option) but she [said] she couldn't do anything for me. (over)

Who gave you really outstanding service?

Who gave you poor or inadequate service? Maj Webster

~~What needs do you have that w[...] not aware of or have not fulfilled?~~ I [...]nt to PC, where the dr graciously saw me @ 1240. As he flexed my left foot during init exam, my back spasmed + I was in intense pain. I was laid on a bed in the room + shortly was administered a shot of toradol. (~1320). I was also given 10mg flexeril + 400mg ibuprofen (approx 1400). At approx 1450 I tried

~~What expectations do you have related to your healthcare?~~ to get up to go home, but was unable to support my weight. The PC staff commented that I could not remain because they closed at 4:15. I was allowed to take another flexeril + motrin and only after the friend who was with me explained there was no way I could get to the car let alone up stairs to my

If you wish to be contacted regarding your visit please write your name and telephone number:

house, was the decision made to send me to ER to evaluate

Name: Telephone:

the need to admit me or not. While in the treatment room at ER, I overheard Maj Webster commenting to Lt Col Addison that she (Maj Webster) realized I knew important people, but that

Fold Here First

she did what she had been told to do - refer people to prim care. I'm not sure what my knowing anyone has to do with being treated or not.

When I went to the ER, I realized I might have to wait & that even tho I knew what my condition was and what would help, I would need to have a doctor examine me before prescribing medication. I did not expect to be told my situation didn't warrant acute care. (my impression, not actual wordage).

MPS

SGQ
Unit 0530
APO AA 34001

Fold Here Second

115

I want to begin by stating we have some wonderful providers in the Ops Squadron. Dr. Burkett, Maj Gardner, Dr. Mendez, and many more. . .. .These people always listen and seem to truly care about their patients and their previous medical experiences.

Last Sunday, I had a less than desirable experience in the ER. I went in to be seen as I was feeling miserable (not an emergency, but as we were going to be closed on Monday as well, I thought it better to get the doctors opinion than to wait another 2 days before I could go to sick call). Anyway, starting from the beginning, I went in for an annual exam (pap) with Maj Gardner on Thursday (by the way, he is a wonderful person. He takes the time to ask how I am doing as a person and was willing to answer any questions I had regarding the exam, etc--definitely the example of treating others how you would like to be treated). Coincidentally, the same day I woke up with a bad cough, no voice and feeling miserable (I had had congestion for a while--actually since mid Dec when dry season began--and this seemed to be the climax day for both sinus' , a cough, and laryngitis - which led to lack of sleep as well as I was up most of the night coughing). Maj Gardner gave me a prescription for cough syrup and suggested sudafed (which I had some already). I began taking these aggressively; however, I felt like I was getting worse and not better. I recognized symptoms I had had before when I was diagnosed and treated for a sinus infection (pressure in my head, green colored drainage, etc.) So, after four days on that course of treatment I went in to the ER to be seen. This is where my dissatisfaction began.

Let me precursor this by stating, I understand there are different philosophies on courses of treatment and I also have a basic understanding of symptoms of viruses versus infection (ie. laryngitis, I am told is typically virus). What I was truly upset about during the visit was the way I was treated as if I was a five year old rather than an adult who has had experiences and/or knows how my body has reacted in the past. .

I was asked by Dr. Webster to come back to be seen. I said good morning. Before I could even sit down she was saying, "you know what the treatment for laryngitis is?". . .I said, I am actually here because I believe I may have a sinus infection in addition. . .she continued, "not talking." She added, "that is the only way to cure this laryngitis." I responded by stating that I was seen earlier in the week and was given cough syrup and sinus medication but actually felt I was feeling worse and that maybe I had a sinus infection in addition to the virus that we were treating. Before I could continue she said, "Clearly I see no indication of anything other than a basic virus. Laryngitis is a true sign of a virus. . .What I recommend is that you don't talk! Do I need to send a letter to your supervisor telling them that you shouldn't talk?" I said that that would not be necessary--I work here in the medical group as the DML and do not believe my commander would have any concern; although I am planning for a ceremony on Tuesday, so I will still have to talk. But, I added, I am concerned that I do not only have a virus, but also possibly a sinus infection. I have had sinus infections in the past and the only thing that seemed to help was having an antibiotic. She said, well I am going to write in your records that you want antibiotics but I am not going to give you any. You work in the hospital, so you should no that you don't have an infection, losing your voice clearly indicates a virus. (this was all said in an extremely condescending tone) I inquired if it wasn't possible that I had a sinus infection as well. She stated , "well, I suppose it is possible, but I don't think so. . ." (granted in this time, she did look into my ears, throat and nose and patted the stomach). She said if you really think you have an infection then lets x-ray . I mentioned that we were trying to conceive and wanted to know if it was ok to do that? She said, fine, then lets have a pregnancy test. Due to the fact that I would not miss my first day of the period for another few days, it probably wouldn't be accurate, so I mentioned that to her. She raised her hands in the air and said, well then what can we do. She had me sign something and walked out of the room. I waited a few minutes, not knowing if she was coming back or not, then I went to the front desk. I asked if there was anything else I needed to do or sign. She said, no unless you want some sudafed or tylenol. I said that would not be necessary as I already had that medicine.

I guess the bottom line is that she had a notion of my prognosis without taking the time to ask me my experiences or to listen to me as an adult. In addition, the entire time she spoke down to me and wouldn't even look my way--busy writing on the report and telling me my cure is not talking. Rather, she was determined I came in because I was hoarse and that I was misled in thinking that it was even possible to have an infection.

Following this, Dr. Burkett did see me and listened to my history/experiences (and looked in my nose and ears) and determined that yes I actually had an infection and a virus. Last year, the same time I began having allergy problems (basically only during the dry season). These problems did start again mid last month, however, I did not start back up on the Actifed (I still had a half of a bottle and 1 prescription left from last season, since when rainy season starts, my allergies improve and antihistamines are no longer needed--it is wonderful). Anyway, my favorite part of the experience with Dr. Burkett was that he took the time to listen to me. Even if he had determined I was mistaken, I still would have had a good experience in that I would know he truly considered what I as the patient had experienced in the past and he was concerned for my well being. He would also be the type to say, "hey, if you don't get better with this course of treatment, please come back and we will do the best we can to help you feel better."

Well, this is how it happened from my recollection. I realize that being that I was extremely tired and not feeling well, I probably was over sensitive to this situation; however, I suspect that most people that come into the ER or the PCC are feeling ill. Simply by improving bedside manner, this situation would have positively reflected on the med gp instead of this negative feeling that I took with me as a patient leaving the ER. These are my thoughts. . .

Lisa Moore

29 May, 1998

To Whom It May Concern:

Major Wilma Webster has requested a letter in regards to her professional abilities while working in the Howard Emergency Department. This request stems from my brief contacts with her while I was working as a Pediatrician for the 24th Medical Group from the period of June 1997 to December 1997.

My contact with Maj Webster as I recall was her consults with me while on duty on two separate occasions. The first was a child with early onset juvenile Diabetes. Which she correctly diagnosed and referred to myself. The second occasion again was a consult regarding a child with Reactive Airway Disease.

On both occasions Maj Webster responded to the situations professionally, demonstrated adequate knowledge and concern for her patients. In the first case she stayed past her normal duty hours to accommodate the child and assist in the management.

Sincerely,

B.K. Efthimiadis, M.D.
DABP. FAAP

Byron Efthmiadias, MD
Health Promotions Manager
NE – 15/10
36 total years Department of Defense

29 May 1998

MEMORANDUM FOR COLONEL TERRENCE O'NEIL

FROM: 24th MDG/SGOMX
UNIT 0530
APO AA 34001-5300

SUBJECT: Letter of Recommendation

1. Major Wilma Webster is a diligent worker a compassionate and committed professional. I have had the privilege of working with Major Webster over the past few months, and I have found her to be an energetic producer, who clearly excels. I am absolutely sure that Major Webster will quickly become a highly successful and valued asset to the 24th Medical Group.

2. The 24th Medical Group provides direct care and support for the 24th Wing Howard Air Force Base, Panama. This support requires commitment and dedication from individuals like Major Webster. She provided our customers, her patient's with quality services and enhanced the positive image of our medical facility. Central to our successful support is an uninterrupted Emergency Room Operation. Major Webster quickly achieved a solid rapport with her fellow co-workers and staff personnel. This rapport enabled her to familiarize both our staff, and base population thoroughly on emergency room operations and the use of the health care system. I am highly dependent on her abilities. Major Webster has exceptional work quality, and a "can-do" attitude. It's her personal stamp of excellence on everything she does.

3. Major Webster is a pace setter who leads by example. Her aggressive pursuit with follow-up care and documentation greatly enhanced our ability to deliver complete medical care. Her enthusiastic participation and teaching ability aided immensely during our monthly disaster team training. Major Webster has put forth a great deal of effort to get where she is today, and I am confident she will continue to excel.

4. It is difficult, in one letter, to adequately credit an individual of Major Webster's high caliber. She is truly an impressive individual who can and will make a positive difference. Thank you for your consideration. If you desire additional information, please contact me at 284-5696.

THOMAS J. SONDEREGGER, TSgt, USAF
NCOIC, Patient Administration
(17 years active duty)

29 May 98

TO WHOM IT MAY CONCERN
SUBJECT: DR WEBSTER

I believe that Dr. Webster is an exceptional doctor. I have been inspired to strive a little harder and become as knowledgeable and experienced as Dr. Webster. She is an irreplaceable asset to the Air Force, 24th Medical Group, and it would be a deeply felt loss to lose such a medical doctor.

In my opinion, she is a pleasant person to work with and to be around. Her dedication to her patients has driven her to work long hours proving her dedication and unselfishness to duty.

Stacey L. Lindgren, SrA, USAF
Emergency Room Technician

24 Jun 98

To Whom It May Concern:

This letter is in support of Major Wilma Webster. I am a patient of Dr Webster and my visits with her have been satisfying ones. She was very caring and willing to listen to my concerns. I realize first impressions are everlasting, but I also feel that people should not judge someone on that first impression. I have found myself in similar situations and what was originally a bad beginning turned out to be a lasting friendship after the second encounter.

When I first met Maj Webster our personalities were very different. Then I worked with her at the emergency tent for Earth Day where I sat down and got to know her. She is a very unique, caring, and funny lady who I feel has been judged wrongly. I realize that we're in a position that first impressions should be without a doubt caring, understanding and a willingness to give the best medical care possible. Unfortunately some patients are unhappy with these results. I empathize with all the unhappy patients, but on other occasions I have been an unhappy patient and a family member. These unhappy occasions led to educating myself and becoming a better person as a whole.

If there has been a problem with patient sensitivity I feel consideration should be provided with working on her interpersonal skills thus enhancing the total quality of patient care.

Sincerely,

Jodi L. McMasters

Jodi L. McMasters

JODI L. McMASTERS, SrA, USAF
Medical Service Journeyman
7 Years total active duty

01 October, 1998

Col. Terrence Jay O'Neil
Commander
24th Medical Group
Howard AFB, Panama

Dear Sir,

This letter is in support of Maj. Wilma Webster. She consulted me on a number of patients when she was working in the Emergency Department. I always observed that she cared for the patients with genuine concern. She provided good medical care and often stayed extra hours to complete the care of a patient. In addition, Maj Webster keeps current with her medical journals yet is open minded to discuss and accept recommendations of current pediatric care.

Santa C. Ngo
SANTA NGO, LT COL, USAF, MC
Pediatrician

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

20 JANUARY , 1999.

MEMORANDUM TO : WHOM IT MAY CONCERN.

FROM: MARTA C OLMOS DE MENDEZ.

SUBJECT: DR. WILMA WEBSTER.

1. I HAVE HAD PROFESSIONAL CONTACT FOR APPROXIMATELLY ONE YEAR WITH DR. WILMA WEBSTER.
2. SHE HAS REFFERED TO ME PATIENTS.
3. I HAVE NEVER HAD ANY SORT DIFICULTY WITH HER WORK AS A PHYSICIAN CONCERNING HER MEDICAL CARE TO THE PATIENTS SHE HAS SENT.

THANK YOU,

Marta C Olmos De Mendez, MD
24th Medical Group, OB/GYN Clinic
Howard AFB, Panama 34001-5000
PA 0000776

Global Power For America

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

**Please Circle Applicable Items:** Active Duty USAF · Guard USA · Reserve USN · Retired USMC · Dependent USCG · Civilian

**Please Circle Clinic Visited:** Dental · Flight Medicine · Immunizations · Internal Medicine · Mental Health · Nutritional Medicine · OB/Gyn · Optometry · Orthopedics · Pediatrics · Physical Exams · Primary Care · Surgery · Military Public Health

## ACCESS / AVAILABILITY

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Accessibility of telephone lines | 5 | 4 | 3 | 2 | 1 |
| Availability of appointments/follow-up appointments | 5 | 4 | 3 | 2 | 1 |
| Availability of medical/dental records | 5 | 4 | 3 | 2 | 1 |
| Availability of providers and/or technicians | 5 | 4 | 3 | 2 | 1 |

## TIMELINESS

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Promptness of reception | 5 | 4 | 3 | 2 | 1 |
| Waiting time to initial screening | 5 | 4 | 3 | 2 | 1 |
| Waiting time to see provider and/or technician | 5 | 4 | 3 | 2 | 1 |
| Length of appointment | 5 | 4 | 3 | 2 | 1 |

## STAFF SENSITIVITY

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Courtesy and friendliness of staff | 5 | 4 | 3 | 2 | 1 |
| Helpfulness and thoroughness of staff | 5 | 4 | 3 | 2 | 1 |
| Provider's explanation of your condition/treatment | 5 | 4 | 3 | 2 | 1 |
| Confidentiality and privacy | 5 | 4 | 3 | 2 | 1 |

## PHYSICAL ENVIRONMENT

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Adequacy of parking | 5 | 4 | 3 | 2 | 1 |
| Adequacy of waiting areas | 5 | 4 | 3 | 2 | 1 |
| Cleanliness of facility | 5 | 4 | 3 | 2 | 1 |
| Location of facility | 5 | 4 | 3 | 2 | 1 |

## CUSTOMER SATISFACTION

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Professionalism of staff | 5 | 4 | 3 | 2 | 1 |
| How well the care provided met your needs | 5 | 4 | 3 | 2 | 1 |
| Overall quality of care and services received | 5 | 4 | 3 | 2 | 1 |

Please comment on the rating you gave above for "Overall quality of care and services received." ______________

Who gave you really outstanding service? Major Webster

Who gave you poor or inadequate service? ______________

29 MAY 1998

MEMORANDUM FOR COL TERRENCE JAY O'NEIL

FROM: MAJ WILMA WEBSTER

SUBJECT: Relief from Emergency Room Duties Due to Performance

1. Sir, this memorandum is a response to your decision to remove me from Emergency Department duties. With all due respect I disagree with that decision and respectfully ask that my Emergency Department duties be restored as well as my position as assistant director. I suspect that your decision was influenced, in large part, by the woman whom I sent to Primary Care for care. As we both know, she was accompanied by Col. Trebone's wife. While that may not have been a politically correct decision , it was the right one under the circumstances.

2. You state that my incidence of LWBS is three times higher than the average for the other ER physicians in spite of no higher patient count. I reviewed all the charts since I arrived on this base and find those figures are simply not true. Indeed several of the other physicians, including the director, have had multiple LWBS also. My patient count has generally tended to be higher also. Please see annexed spreadsheets.

3. I think you should also take into consideration the frequent switching from day to night shift and the other obligations during the hours before our shift, such as the lecture I gave on Deployment to Desert Storm the day preceding my night shift. I had requested not to work that day. The person who makes the schedules for the ED often seems to have only his own personal requirements in mind and indeed often scheduled himself to work the easier shifts and those alongside a third provider. This same person managed to arrange a schedule that allowed him to switch with another provider to get all the Christmas/New Years holidays off while he scheduled me to work both Christmas and New Years.

4. I have never denied that my wrist was weak before my carpal tunnel surgery. I indeed did use it as an excuse for my inability to intubate a patient, but was very disappointed that I was taken out of the Emergency Department because I had used that excuse. I had been very impressed by how weak my wrist felt, but the patient was indeed a difficult one with a short, thick neck; I knew I was capable of intubating others. That was an old problem, now corrected by surgery and totally irrelevant regarding my performance at this point.

5. The emotional outbursts you are referring to have been grossly exaggerated. In fact, they were not 'outbursts' at all but rather cries of 'foul'. The first was when I emphatically demanded to be allowed to go eat during my first day working in Primary Care Clinic. This was denied me and I went almost all day with practically nothing to eat, as has happened to other people who have been sent to that area. The second was when I was crying softly in the Primary Care Clinic after having been taken out of the Emergency Department because of my weak wrist.

6. In my first weeks working at the 24th Medical Group, I often forgot to put my phone number, as requested, on the Form 2161 for sending consults to downtown civilian providers. I received a letter about this as did many other providers. When I asked Lt Col Robbins why he sent that to me also when I had just been there a short while, he replied that he was so frustrated at the lack of compliance of all the providers that he decided to send that letter en masse.

7. I was counseled in November 1997 by the Chief of Emergency Services because I was not seeing patients fast enough. Soon thereafter I showed I could see as many as he did and more. I did not have a counseling session with Capt Shercliffe, only a few informal words in passing in the hallway. We talked about my habit of seeing multiple patients at one time and moving them to the waiting room while laboratory results are returned. This is a system which has helped with large volumes at previous bases, but the technicians here find it quite confusing.

8. I cannot deny that I once handed out a bottle of diphenhydramine instead of acetaminophen. I picked the bottle up from the area of the cabinet that was supposed to have acetaminophen and without reading the labels, gave it to the patient with directions as per Tylenol. That error was corrected with no harm to the patient and I ordered that a medication error form be filled out and myself told the PT&T Committee meeting about this. Since then I have made a habit of always reading the label carefully even if I take a bottle from the area marked for a certain medication.

9. I do not remember the cat bite patient and doubt I was previously informed about this case, although I had ample experience in Mexico with animal bites and rabies prophylaxis. Still, recently coming from two previous bases in areas with no endemic rabies, this is something I must pay particular attention to.

10. On the first floor of the hospital there is a plaque which states the goals of the 24th Medical Group. I have often stopped to admire it. It confirms "a leadership commitment to: give everyone a stake in our mission and its outcome, create a barrier free working climate that inspires trust and teamwork and continuous improvement, push responsibility and authority downward , be accountable. This outlook is very compatible with the American College of Physician's philosophy as outlined in the book Managing the Emergency Department, A Team Approach, a book I have found extremely useful, and which I would have followed if I had been the director. Instead the present director is using a dictatorial approach and I fear my troubles are an end result of the consolidation of his power.

11. A final concern is that the Director of the Emergency Department has been heard saying disparaging remarks about me to the technicians. The person who told me this thought it was very unprofessional, and my only additional comment about this is to once again cry "foul".

Wilma P. Webster

WILMA P. WEBSTER, MAJ, USAF, MC

# F[illegible]D GRADE OFFICER PERFORMANCE RE[illegible]RT

**I. RATEE IDENTIFICATION DATA** *(Read AFI 36-2402 carefully before filling in any item)*

1. NAME *(Last, First, Middle Initial)*: WEBSTER, WILMA P.
2. SSN: 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
3. GRADE: MAJ
4. DAFSC: 44E3
5. PERIOD OF REPORT — From: 29 Jul 97 Thru: 28 Jul 98
6. NO. DAYS SUPERVISION: 297
7. REASON FOR REPORT: Annual
8. ORGANIZATION, COMMAND, LOCATION: 24th Medical Operations Squadron (ACC), Howard Air Force Base, Panama
9. PAS CODE: AF1CFNN2

**II. UNIT MISSION DESCRIPTION**

To support the interests of the United States of America in daily and contingency operations by optimizing the health of our beneficiaries and establishing a United States Southern Command (USSOUTHCOM) community-based health care delivery system. Coordinates health care services, aeromedical evacuation, medical contingency, and integrated medical logistics support for 20,000 beneficiaries in all Latin America.

**III. JOB DESCRIPTION**

1. DUTY TITLE: Emergency Services Element Physician

2. KEY DUTIES, TASKS, AND RESPONSIBILITIES: Prepares patient histories, performs physical examinations, performs therapeutic and diagnostic procedures, orders diagnostic tests, directs therapy and accurately documents medical records for emergency department (ED) averaging over 10,000 visits annually from a mixed community of US military, Government personnel, and dependents. Coordinates overall ED patient care, verifies treatment protocols, patient transfer agreements and addresses patient complaints. Supervises overall ambulance services in the area, ED nurses, and technicians while on duty. Deputy Director, Emergency Services (ES). Member of the Pharmacy and Therapeutics and the Scope of Care committees.

**IV. IMPACT ON MISSION ACCOMPLISHMENT**

-A provider strongly oriented to the administrative and organizational aspect of the daily routine of the ED
-- Wrote 24 MDG guidelines making detection of family member abuse routine consideration in facility
-- Researched and wrote Scope of Care needed to fulfill the Joint Commission on Accreditation of Health Care Organizations (JCAHO) requirements for the 24th Medical Group's Emergency Services Element
- An officer who enjoys teaching and sharing her knowledge with other members of the organization
-- Gave 10 minute talk to the provider staff on Hemochromatosis; applauded and presentation praised
- Medical officer who willingly cooperates in all types of military activities; often stayed beyond duty shift to finish up patients; served as volunteer to set-up area for group quarterly hail and farewell celebration
- Community-oriented; wrote newspaper article to advertise and attract people to smoking cessation classes

| V. PERFORMANCE FACTORS | DOES NOT MEET STANDARDS | MEETS STANDARDS |
|---|---|---|
| **1. Job Knowledge** Has knowledge required to perform duties effectively. Strives to improve knowledge. Applies knowledge to handle nonroutine situations. | | X |
| **2. Leadership Skills** Sets and enforces standards. Motivates subordinates. Works well with others. Fosters teamwork. Displays initiative. Self-confident. Has respect and confidence of subordinates. Fair and consistent in evaluation of subordinates. | X | |
| **3. Professional Qualities** Exhibits loyalty, discipline, dedication, integrity, honesty, and officership. Adheres to Air Force standards. Accepts personal responsibility. Is fair and objective. | X | |
| **4. Organizational Skills** Plans, coordinates, schedules, and uses resources effectively. Schedules work for self and others equitably and effectively. Anticipates and solves problems. Meets suspenses. | X | |
| **5. Judgement and Decisions** Makes timely and accurate decisions. Emphasizes logic in decision making. Retains composure in stressful situations. Recognizes opportunities and acts to take advantage of them. | X | |
| **6. Communication Skills** Listens, speaks, and writes effectively. | | X |

[illegible] EDITION IS OBSOLETE.

**VI. RATER OVERALL ASSESSMENT**

- Lack of organization and transmission of anxiety to ED patients resulted in loss of confidence of Group Commander in ED performance; provider was detailed to Health and Wellness Center and is doing well
- This officer strongly believes in patient education as essential to care and really emphasizes its importance
  - -- Wrote patient instruction sheets for animal bites, bronchitis, constipation, corneal abrasion, gastroenteritis, head injury, muscle strain, non-specific arthritis, swimmer's ear and wound care
  - -- Produced eight medical articles for the World of Wellness column of local base newspaper; articles on snakbite avoidance, lightning, hemochromatosis, drowning, heat, eye protection, cholesterol control
- A medicine prevention believer, she has put a lot of strength in the Put Prevention Into Practice Program
  - -- Volunteer as facilitator for six-week smoking cessation class at geographically separated Army site

Last performance feedback was accomplished on: 16 Apr 98 *(consistent with the direction in AFI 36-2402.)*
*(If not accomplished, state the reason)*

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| TEODORO MENDEZ, NE-13<br>24th Medical Operations Squadron (ACC)<br>Howard Air Force Base, Panama | Chief, Primary Care Clinics Flight<br>SSN 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 | SIGNATURE [signature] | 13 Aug 98 |
| | X CONCUR | | NONCONCUR |

**VII. ADDITIONAL RATER OVERALL ASSESSMENT**

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| TERRENCE J. O'NEIL, Colonel, USAF, MC<br>24th Medical Group (ACC)<br>Howard Air Force Base, Panama | Commander<br>SSN 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 | SIGNATURE [signature] | 13 Aug 98 |
| | CONCUR | | NONCONCUR |

**VIII. REVIEWER**

| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | DUTY TITLE | | DATE |
|---|---|---|---|
| GREGORY TREBON, Colonel, USAF<br>24th Wing (ACC)<br>Howard Air Force Base, Panama | Commander<br>SSN 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 | SIGNATURE | |

**Instructions**

**All:** Recommendations must be based on performance and the potential based on that performance. Promotion recommendations are prohibited. Do not comment on completion of or enrollment in PME, advanced education, previous or anticipated promotion recommendations on AF Form 709, OER indorsement levels, family activities, marital status, race, sex, ethnic origin, age, or religion.

**Rater:** Focus your evaluation in Section IV on what the officer did, how well he or she did it and how the officer contributed to mission accomplishment. Write in concise "bullet" format. Your comments in Section VI may include recommendations for augmentation or assignment.

**Additional Rater:** Carefully review the rater's evaluation to ensure it is accurate, unbiased and uninflated. If you disagree, you may ask the rater to review his or her evaluation. You may not direct a change in the evaluation. If you still disagree with the rater, mark "NON-CONCUR" and explain. You may include recommendations for augmentation or assignment.

**Reviewer:** Carefully review the rater's and additional rater's ratings and comments. If their evaluations are accurate, unbiased and uninflated, mark the form "CONCUR" and sign the form. If you disagree with previous evaluators, you may ask them to review their evaluations. You may not direct them to change their appraisals. If you still disagree with the additional rater, mark "NONCONCUR" and explain in Section VIII. Do not use "NONCONCUR" simply to provide comments on the report.

| IX. ACQUISITION EXAMINER/AIR FORCE ADVISOR *(Indicate applicable review by marking the appropriate box(es).)* | | ACQUISITION EXAMINER *(If applicable)* | | AIR FORCE ADVISOR *(If applicable)* |
|---|---|---|---|---|
| NAME, GRADE, BR OF SVC, ORGN, COMD & LOCATION | SIGNATURE | | | DATE |

03 September,1998

MEMORANDUM FOR COL. TERRENCE JAY O'NEIL

FROM: MAJ. WILMA WEBSTER

SUBJECT: RESPONSE TO YOUR LATEST LETTER

1. Sir, upon receipt of your latest letter, I was very disappointed that you did not decide to halt the process of giving me a referral OPR begun by LtCol Addison.

2. However, in a recent interview with LtCol. Kenneth Remington, he mentioned errors in the original letter from LtCol Addison and he said he would have to continue to review the situation.

3. In light of the foregoing information, I would like to take this opportunity to continue to appeal your decision to support LtCol Addison's decision to give me the referral OPR.

Wilma P. Webster

WILMA P. WEBSTER, MAJ, USAF, MC
Emergency Physician

CONFIDENTIAL PATIENT CARE MATERIAL

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

16 September 1998

MEMORANDUM FOR: RECORD

FROM: 24MDG/CC (Col O'Neil)

SUBJECT: Serious Threats / Fantasies Reported Concerning Maj Wilma Webster

1. Capt Beth Krier, TRICARE Flight Chief, approached me at 1700 local time. She advised me that her NCO, a SrA, had related having been told by Maj Webster during a pre-aeromedical evacuation interview that Maj Webster had "not slept well last night because she had a dream of going into the hospital and shooting everyone". The SrA also reported to Capt Krier that Maj Webster stated "the dream was so pleasurable to her that she had an orgasm".

2. Later, during the immediate pre-boarding procedure for the air-evac flight, Maj Webster reportedly stated in the presence of the SrA and Capt Krier (and others) "I don't really want to turn in this comments form, I want to blow up the plane". She reportedly was evaluated on the spot by Dr. Fey, who did not feel Maj Webster meant to undertake the actions she had reportedly threatened to make, and prescribed a dose of "two Ativan", according to Capt Krier, which Maj Webster refused to take. She was permitted to proceed on the aircraft.

3. Upon learning of this, I called Wilford Hall USAF Medical Center, and spoke with the AOD SSgt Kyle Bogan at 554-7711, who referred me to the Inpatient Mental health Ward at 554-6434 (Lt Moutrim), who referred me to the Resident on-duty, Capt Kiku Kim. Dr. Kim contacted WHMC air-evac and determined that Maj Webster was staying alone in the VOQ at Lackland. She then contacted her Staff Attending Physician, Dr. Sarah Vanskoy, who reportedly advised that since she had no mechanism other than a self-paid call to Panama to contact me, that I call the Lackland Security Police to have Maj Webster brought to the E.R. for a "Commander-directed mental health evaluation", since the Mental Health Services at WHMC had not yet engaged the patient.

4. I questioned the legality of that guidance, and spoke with Capt Posch, the 24WG/JAG, who advised that since Dr. Fey had not determined Maj Webster to be an acute danger to herself or others while here, there was no legal basis to over-ride the normal mandatory delay between notification of a Commander-directed mental health evaluation and the evaluation itself. He did, however, suggest that a call be made to the VOQ where Maj Webster was staying to non-directly welcome her to Lackland, inform her of her appointment at WHMC, and ask how her trip had gone. If her overall responses seemed appropriate and non-threatening, it would be allowable to permit her to stay at the VOQ overnight. He did recommend, since one of the fantasies reported

Document9