① Refused to complete Bite form
SPS left ED @ 1700 to ✓ vaccination status of Dog, called back
p̄ 1800 MOD had changed shift. Webster would not
complete form. "said Dr Velarde should finish it"

② PCC run to Clayton Health. Pt c̄ palpitation. Webster would not
authorize transport without Rythm strip. Had to speak
to Dispatcher. After explanation of response procedures by Sgt
Cruz she authorized transport to S.F.

③ Angela, RN Team lvr wrote Broke @ New ER. would not
Authorize Valencia Transport even after Husband said
he did not know how to get to Puddle / went to Drin his wife.
Patient waited 30 min in ER for Commercial Taxi

④ Dr Webster finally left @ 1300 and is
Scheduled for duty @ 1800 hrs

CAPTS

**DEPARTMENT OF THE AIR FORCE**
**24TH MEDICAL OPERATIONS SQUADRON (ACC)**
**HOWARD AFB, PANAMA**

April 15, 1998.

MEMORANDUM FOR RECORD

FROM: Teodoro Mendez M.D. SGOP

SUBJECT: Major (Dr.) Wilma Webster Airway Management Capabilities

1. On the 24th of Jan 98 Major Webster was the provider in charge of a Code Blue in the Inpatient Unit. Next day she verbally reported to me that she was unable to intubate the patient because she was suffering a Carpal Tunnel related syndrome with the consequent wrist weakness. She also stated that she was scheduled for surgery with Lt. Col. (Dr.) Granville on the 13 of February.
2. Major Webster was assigned until that day to the ER. Any ER provider must be fully ATLS/ACLS functional. Due to her wrist pathology she was not fully functional to meet the ER requirements. On the 25th of Jan 98 as a Flight Chief I explained the above to her and she was transfer to the outpatient clinics. It was clearly explained to Maj Webster that she must be released from her post operative profile and give prove of her proeficiency on airway management in order to be transfer back to the ER.
3. Maj Webster profile was removed by Dr. Granville the third week of March 98.
4. An airway proeficiency test was done the 24th of March by Dr. Eric Ulloa certified ACLS instructor and supervised by Lt. Col. Jose Rodriguez-Vasquez SGH. Maj. Webster performance was unsatisfactory. It was recommended for her to be re-evaluated by Maj. Angeloro OR Nurse Anesthetist with live patients in the OR.
5. Maj Webster assisted Maj Angeloro with two intubations in the OR. He stated "Her laringoscopy technique was adequate and she was able to intubate both patients on the first attempt".
6. During this time Maj Webster succesfully completed a PALS course.
7. Starting the 16th of April, 98 Major Webster will be transfer to the ER.

Teodoro Mendez, M.D.
Chief, Primary Care Teams Flight

cc. Maj Webster PAF
Maj Webster
Lt. Col. Addison
Lt. Col. Rodriguez-Vasquez

1379

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

6 April 98

MEMORANDUM FOR PRIMARY CARE FLIGHT COMMANDER

SUBJECT: Airway Management Evaluation

1. On 24 March, 1998, Dr. Ulloa and myself evaluated Maj Webster on the Airway Management Station of the ACLS protocol. The reason for this evaluation was basically to assess whether this provider, who is already ACLS certified, could perform the airway management techniques appropriately after undergoing release surgery for her surgical condition.

2. This is to notify you that Maj Webster's performance during the Airway Management was unsatisfactory due to the following reasons:

   a. Overall too much time in the process of endotracheal intubation
   b. Even though the universal steps for evaluating a patient in respiratory arrest were taken, the provider spent too much time trying to localize a stylet to facilitate intubation.
   c. Poor technique positioning and immobilizing the head and neck.
   d. Poor technique handling the laryngoscope.
   e. Poor technique inserting the laryngoscope and finding the landmarks.
   f. Several prolonged attempts

3. It is recommended that Maj Webster contact Maj Angeloro, nurse anesthetist, to set some individual training in the Operating Room. We expect to re-test her airway management techniques after this training.

4. Thanks. If you have any questions, please call me at 4-6343.

José E. Rodriguez-Vazquez, LtCol, USAF, MC, SFS
Chief, Medical Staff

*Global Power For America*

1380

To: mendezt@SGOF@HOWA
Cc:
Bcc:
From: Michael B. Angeloro@SGOF@HOWA
Subject: Dr. Webster Intubation Observation
Create Date: Tuesday, April 14, 1998 3:14 PM
Send Date: Tuesday, April 14, 1998 3:14 PM
Attach:
Certify: N

---

I observed Dr. Webster perform 2 intubations on adult subjects. Her laryngoscopy technique was without problems and she was able to intubate both patients on the first attempt.
I hope this is adequate for your needs.
Mike Angeloro.

1381

:c:
:cc:
rom: Teodoro Mendez@SGOF@HOWA
ubject: fwd: Dr. Webster
late: Tuesday, April 7, 1998 at 1:54:12 pm EST
ttach: c:\mydocu~1\websair.doc
:ertify: N
orwarded By: Teodoro Mendez@SGOF@HOWA

---

:omments By: Teodoro Mendez@SGOF@HOWA
)riginally To: Teodoro Mendez@SGOF@HOWA
)riginally From: Jose E. Rodriguez-Vazquez@SGPF@HOWA
)riginal Date: 4/6/98 12:06 PM
:omments:

:lvira, please add the attachment to Maj Webster PAF
'hanks
)r. Mendez

——————[Original Message]——————

lere is evaluation for airway management. You could send a memo to the Credentials Committee recommending ndirect or direct (whatever you an Dr. McCreary decide) supervision (2s) on airway management areas until she is :leared by Maj Angeloro and SGH.

'hanks

IOSE E. RODRIGUEZ-VAZQUEZ, LtCol, USAF, MC, SFS
:hief, Flight Medicine Flight
:hief, Medical Staff

1322

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

6 April 98

MEMORANDUM FOR PRIMARY CARE FLIGHT COMMANDER

SUBJECT: Airway Management Evaluation

1. On 24 March, 1998, Dr. Ulloa and myself evaluated Maj Webster on the Airway Management Station of the ACLS protocol. The reason for this evaluation was basically to assess whether this provider, who is already ACLS certified, could perform the airway management techniques appropriately after undergoing release surgery for her surgical condition.

2. This is to notify you that Maj Webster's performance during the Airway Management was unsatisfactory due to the following reasons:

   a. Overall too much time in the process of endotracheal intubation
   b. Even though the universal steps for evaluating a patient in respiratory arrest were taken, the provider spent too much time trying to localize a stylet to facilitate intubation.
   c. Poor technique positioning and immobilizing the head and neck.
   d. Poor technique handling the laryngoscope.
   e. Poor technique inserting the laryngoscope and finding the landmarks.
   f. Several prolonged attempts

3. It is recommended that Maj Webster contact Maj Angeloro, nurse anesthetist, to set some individual training in the Operating Room. We expect to re-test her airway management techniques after this training.

4. Thanks. If you have any questions, please call me at 4-6343.

Jose E. Rodriguez-Vazquez, LtCol, USAF, MC, SFS
Chief, Medical Staff

29 JAN 98

MEMORANDUM FOR LtC Martha Addison

FROM: Major Wilma P. Webster

SUBJECT: First day in Primary Care

1. LtC Addison, I worked in Primary Care Clinic today and I was getting used to where things were and how to treat Family Practice style patients. Although I'd been promised only acute patients, Dr. Robbins had to leave to go to Flight Medicine so I was given all kinds of patients.

2. I tried to finish the charts by lunchtime but couldn't. Nobody told me that if I didn't do that I couldn't go to lunch, until it was 13:10 and I was on my way out. Then, very coldly, Maj Burkett told me I would not be able to go eat . . that I must stay and see scheduled patients, so I went all day eating only a pop tart and a sandwich Dr. Mendez gave me. I was feeling very weak and dizzy but Maj Burkett didn't seem to care in the least.

3. Capt Li told me something similar happened when she worked here. What a way to treat your providers. I had been told previously by Gary Browne that if I finished the 2 patients up I could go to lunch and that's what they usually did. I don't blame him in the least. He and all the ancillary staff have been sweethearts. But why wasn't I warned that I would starve if I didn't drop everything at 13:00 and run out.
sic (12:00)

4. As you know I am not lazy or a shirker, but I like to be treated properly and I feel this did not happen today

Wilma P. Webster

WILMA P. WEBSTER, MAJ, USAF, MC
Emergency Physician

1384

DEPARTMENT OF THE AIR FORCE
24TH MEDICAL OPERATIONS SQUADRON (ACC)
HOWARD AFB, PANAMA

31 January, 1998

**Memorandum for Record**

**Subject: Code Blue on 24 January 1998**

1. I was called in from home the night of 24 January 1998 for a code blue in progress on the Inpatient ward. I am writing this memo because I was disturbed by an apparent lack of mastery of ACLS protocol by the Code Leader, Dr. Wilma Webster. As we are all nervous in such a situation and I am reluctant to be judgmental I will try and stick to 3 areas that I felt were discrepant : Airway management, CPR, and Defibrillation.

2. Airway Management and Ventilation: When I arrived Dr. Webster was standing at the head of the bed with an ET Tube and a Laryngoscope, the patient was on a monitor with VFIB showing, and he was pulseless and cyanotic. She had attempted an intubation unsuccessfully. A technician had an Ambu bag and mask to the patient's face but no one was holding the head. I commented that I didn't think he was getting any air and tried to get the tech to do a head tilt. The patient was thick necked and his head was in the mattress so this was very difficult. Dr. Webster made no attempt to position the head or give direction. I came to the head of the bed and auscultated the patients chest but heard no sounds, I then did a chin lift maneuver and noted chest rise and fall with the technician's bagging. Dr. Webster made 2 more intubation attempts unsuccessfully and then asked for someone else to try.

Main critique: Dr. Webster does not seem to grasp the importance of head position for ventilation and that intubation, though important, is not the only way to successfully manage an airway. Even after the code debriefing with LtCol Addison and the team, she insists that the patient was ventilated.

3. CPR: When I arrived CPR was not being done. I asked what rhythm she was seeing and she said VFIB, I agreed after looking at the monitor. I asked if anyone was doing Chest compressions and the team said "no" but someone stepped up to do them. Apparently CPR had been initiated but stopped when Dr. Webster thought the patient had breaths on his own.

Main critique: a pulseless patient needs chest compressions regardless of what is on the monitor or if they are thought to be "breathing".

4. Defibrillation: Dr. Webster was so intent on intubating that she had not ordered Defibrillation on this patient in VFIB. After I had asked about the CPR, LtCol Addison asked if the patient had been shocked yet. Again there was a negative reply and so Dr. Webster then

ordered 3 successive shocks. However, after that, I or LtCol Addison had to suggest repeated shocks after other interventions and drugs were given.

Main critique: The cure for VFIB is Defibrillation. Dr. Webster did not seem to grasp the importance of early and repetitive use of electricity in Vfib.

5. Recommendation : I recommend that Dr. Webster take the next ACLS course in May 1998 prior to working alone in the ER.

6. I have not discussed the critique with Dr. Webster. I am sending a copy to the Flight Chief, the SGH, and the MDOS Commander.

Edwin K. Burkett, MD
Maj USAF, MC
24th MDG, Chief, Family Practice Element
ACLS Affiliate Faculty

DEPARTMENT OF THE AIR FORCE
24TH MEDICAL OPERATIONS SQUADRON (ACC)
HOWARD AFB, PANAMA

v

Howard AFB, 4 February 1998.

MEMORANDUM FOR: Maj.(Dr) Wilma P. Webster

FROM: Teodoro Mendez, M.D.
Chief, Primary Care Clinics Flight

SUBJECT: Letter of Counseling

1. On 29 January 1998 you were informed by Maj (Dr) Burkett, Chief of Family Practice that you needed to finish the medical care of your patients before leaving the clinic for lunch. He also stated that while the FPC routine/acute appointments are every 15 minutes yours are every 30 minutes allowing you time to become acustomed to the different work environment. Your response was "anger laden, loud, physically demonstrative and antagonist".

2. On 2 February 1998 you left your 1100 and 1130 patients waiting for more than an hour while you had lunch at noon. Those patients were seen by the Flight Chief at 1245. At 1800 there was one patient still waiting for you in the lobby of the outpatient clinic; the patient informed the FPC NCOIC that you asked him to wait for you, but you were not in the facility. This constitutes patient abandonment and is not an acceptable provider behaviour.

3. On 3 February 1998 you left your work area, in Primary Care Clinic, to "take lunch" for more than an hour leaving your 1100 and 1130 patients waiting- the same as the day before.

4. Your unprofessional and demonstrative response in public display to the Chief of Family Practice and your attitude towards patient relations and inter-personal relationships are unacceptable for an Air Force Officer and a physician. This behavior will not be tolerated in our organization.

Teodoro Mendez , M.D.
Chief, Primary Care Clinics Flight.

cc: Lt Col Martha Addison, Commander, 24th MDOS
Lt Col Mark Robbins, Chief of Medical Staff, 24th MDG

1st Endorsement:
I acknowlegde receipt of above.

Wilma P. Webster 6 FEB 98
Signature Date
See my response

1387

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

PERSONAL/CONFIDENTIAL MEDICAL INFORMATION

5 Feb 98

MEMORANDUM FOR RECORD

FROM: 24MDG/CC

SUBJECT: Interview With Major Webster

1. Major Wilma P Webster requested to speak with me at 1100 today. She met with me in my office. She indicated that she had two things to discuss with me.

2. She stated that the criteria used to not assign her as Chief of Emergency Services were faulty. She stated that personalities rather than skills and experience had been used to assign Dr. McCreary as the E.R. Chief. She stated that although she at one time thought that the fact she was a female might have played a role in Dr. McCreary (a male)'s selection, she currently does not believe that her gender was a factor. I asked her for clarification on that, and reminded her that this was an issue of EEOC and Federal law, which would require me to order an investigation if she believed that gender was truly a factor. I stated that I would call the EEOC Office in her presence if she felt that gender had been a factor used in her selection. She requested that I not do that, and re-stated that she does not currently believe that her gender was a factor. She stated that she was Board-certified in Internal Medicine, and that she had taken and passed the written part of the Emergency Medicine boards, but had failed "several times" the oral part of the E.R. boards. Maj Webster stated that rather than the passing of the written Boards being a "plus" for her, the failing of the oral Boards had been a "minus", and that she felt this was unfair. Maj Webster stated that she feels she is better qualified to be E.R. Chief than Capt McCreary, and that she outranks him, as well, making her assignment to the position virtually required. She requested an investigation of the criteria used for his selection over hers. I asked Maj Webster what she felt the criteria for an E.R. Flight Chief should be. She responded that they should be years of experience, Board certification (partial or completed), and military rank. I responded that I desired her to write me a memo requesting such an inquiry, stating the criteria which she felt had been used unfairly, and her strengths and any perceived weakenesses as an E.R. Flight Chief.

3. The second issue Maj Webster brought up was her re-assignment to Family Practice Clinic. She stated that she was "miserable", "overwhelmed", and "desperately unhappy". She stated that she had not signed the list of Family Practice procedures given her by Dr. mendez, because she felt uncomfortable with many of them, especially the longitudinal care of pediatric patients. She stated that she had been unable to complete charts, and was constantly missing lunch because "I am unfamiliar with the procedures and how things are laid out in the clinic, and it is taking me much longer than the others". She related that on one day she had an angry outburst involving

AFD=c:\medgroup\complain\webster.doc

Dr. Burkett and herself when she had insisted on leaving for lunch even though her AM patients had not been completed. She stated that a recent letter of admonishment she had received was "punishment", and that she was being "punished" by the staff of Family Practice, who were unfriendly and "not caring". She told me that the reason for her transfer from the E.R. to the Family Practice Clinic had occurred because she had stated during an arrest that she could not intubate a patient because her wrist used to hold the intubation speculum was too weak. [I was personally present at the arrest, along with LtCol Addison, and witnessed Maj Webster make this statement and pass the intubation to Dr. Burkett at the arrest for that reason.] She now states that she said this out of acute embarrassment for not having been able to accomplish the intubation successfully because of a large patient, a thick patient neck, and bad positioning on the bed, and not because of any weakness of her wrist. She states she is doing PALS, and that this AM she successfully accomplished two intubations on pediatric manikins.

4. At this point, she became distraught and tearful. She stated that she is overwhelmed by the feeling that she "is being punished", that she doesn't have time for everyday things like finishing her charts, going to lunch, picking up her mail, and doing the JCAHO and Continuum of Care work which LtCol Addison has assigned her. She stated that she had briefly considered "going AWOL" or "committing suicide", but had dispensed with both "because I have too much to live for, and have too much of a commitment to the Air Force". She stated that she simply felt isolated and distraught. She was now in tears. I asked her if she was considering suicide any longer, and she said "no". I asked her if she desired to speak to someone, in particular, LtCol Rodgers, for stress management counseling. She said "yes". I asked her if she would be willing to go today, if I arranged to have ltCol Rodgers available for her to talk with, and she said "yes". I asked her what she felt would acutely decompress her feeling of being overwhelmed, and her response was:

a. To be placed back in the Emergency Room
b. To see sick call patients
c. To perform physical examinations

I informed her placeing her back into the E.R. would not be possible at this time. I told Maj Webster that, in the absence of LtCol Addison, I would direct that she be assigned to perform physicals and see sick call patients exclusively.

5. When Maj Webster left my office at 1145, she was still somewhat tearful, but in control. She went immediately to the ground floor of Building 186 and I witnessed her introduce herself to LtCol Rodgers, who saw her for a clinical visit immediately.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

AFD=c:\medgroup\complain\webster.doc

**DEPARTMENT OF THE AIR FORCE**
**HEADQUARTERS 24TH MEDICAL GROUP (ACC)**
**HOWARD AFB, PANAMA**

6 Feb 98

MEMORANDUM FOR RECORD

FROM: 24MDG/CC

SUBJECT: Issues Surrounding Complaint by Maj Webster

1. I had a meeting with LtCol Mark Robbins, the Chief of the Medical Staff this AM in my office. We discussed the issues brought up by the complaint and surrounding details furnished by Maj Webster yesterday. I announced my intent as being the placing of Maj Webster in a practice situation temporarily where she felt comfortable and less-stressed, while assuring supervision and review of clinical performance regarding both that setting and the possibility of her eventual return to an Emergency Room setting.

2. My concern, shared by LtCol Robbins, was that the nature of the problems seen 85% of the time in Emergency Rooms is acute Family Practice health issues which could easily have been dealt with on an appointed basis. A lack of familiarity and comfort with treating those sorts of patients in an outpatient setting causes concern which both of us felt justifiable in looking toward Dr. Webster's return to an E.R., where speed and triage is even more important.

3. Additionally, Dr. Webster's level of anguish and subjective distress needs to be assessed during the period she is convalescing from her planned wrist surgery, so that her ability to deal with patient care issues undistractedly is safe and adequate. I informed Dr. Robbins that LtCol Rodgers had seen Dr. Webster yesterday afternoon and offered her his ongoing services for emotional support and stress management.

4. Finally, I informed Dr. Robbins that I had let HQACC know that the issue was active, and that Col Santiago would be kept informed, incase some sort of E.R. coverage proved to be needed were the stress situation on Dr. Webster to deteriorate further.

TERRENCE JAY O'NEIL, Col USAF, MC
Commander

Cc: SGH/LtCol Robbins
SGO/LtCol Addison

AFD=c:\medgroup\complain\webster2.doc

*Global Power For America*

1390

IAFG-D(FWD) SS 20 FEB 98 7 February 1998

MEMORANDUM THRU Commander D Co (Fwd) 202d Military Intelligence Battalion

FOR COL TOUR

SUBJECT: Medical Care

On February 3 1998, I, SGT Silbaugh, John D., upon waking up for work had severe pain in my stomache. I then procceded to get a driver from my company to accompany me to Howard Clinic. When I arrived at Howard I tried to go to the emergancy room. The Airman at the desk told me to go upstairs to sick call. I then waited upstairs for 15 minutes. After having my vitals taken, Dr. Webster attended me. She asked me a few questions and examined the area of concern. She told me to go to the LAB for a urinalysis. Upon completion I went back to her office. DR. Webster proceded to write me a profile. While she was preparing the paperwork she made a mistake. She then began to cry. I was kind of nervous at this point so I tried to comfort her by saying "What's wrong mam?". She then replied with "I hate this job." She began to explain herself by saying that the work she was doing could put her in jail. After the conversation I went back to work as the profile stated.

The next morning I awoke to go to work and again felt the pain so once again I went to Howard Clinic. This time when I arrived I had my vitals taken and was shown directly to Dr. Luff. Dr. Luff then proceded to tell me that the urinalysis from the day before had shown that I had some blood in my urin. He then told me that I possibly had kidney stones and instructed his people to give me an IV. After the IV, I was given a shot, prescribed medication and sent home on two days quarters with instructions to return the next day for X-RAY's and see DR. Pierce.

The next day I took the X-RAY's and saw DR. Pierce. He checked me out, asked me numerous questions, and prescribed more medication. He then sent me back to work.

John D Silbaugh

JOHN D. SILBAUGH
SGT, USA

TOTAL P.01

1391

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

12 Feb 98

MEMORANDUM FOR RECORD

FROM: 24 MDOS/CC

SUBJECT: Reply to Maj Webster's Rebuttal to LOC

1. I met with Dr. Webster on 11 Feb 98 to discuss my response to her LOC received from Dr. Mendez, her flight commander, dated 4 Feb 98. I explained to Dr. Webster the serious nature of a LOC for an officer and informed her that per Legal advice the commander reserved the right to start a UIF file or a copy could be placed in the member's PIF. Based on the situation, the removal from Dr. Webster's usual worksite, ER, I hoped that this was a one time occurrence and consequently, I would not rescind the LOC but would not to initiate a UIF. I did inform Dr. Webster that a copy would be placed in her PIF and I told her that I felt she should continue to seek mental health counseling to include anger management as her actions were not becoming of an officer. Dr. Webster began by telling me that she felt that Dr. Burkett should be counseled as she had been told that he treated all the women who worked in PCC the way she had been treated and that he had not received her very well. I stopped Dr. Webster and informed her that if she was discriminated against I had to call in the appropriate office as we had a zero tolerance for discrimination. She stated, "well, that's hearsay so I won't pursue it". I informed her that if she had no actual facts regarding discrimination I would advise her not to spread hearsay. I also informed her that if she was mistreated by anyone to include myself, we all had a supervisor and I expected to hear about it.

2. We briefly addressed Dr. Webster's written complaints on her rebuttal. I had already addressed the mentioned issues with Dr. Mendez who had asked for 24 hours to look at the same. Dr. Webster acknowledged that she had received a brief orientation and that people helped her when she asked for assistance. She also went on to say that Dr. Burkett was acting better and that she did not know if anyone had talked to him or not. I did not feel as though it as appropriate to discuss Dr. Burkett as Dr. Webster at no time assumed any responsibility for her unofficer like behavior. When specifically questioned about her behavior she responded that she was not her usual friendly, smiling self as she did not want to be in the PCC but did not respond to her angry, loud demonstrative attitude that had been displayed on 29 Jan 98.

3. I finished the conversation with a repeat that no UIF would be filed currently and that I recommended Dr. Webster continue meeting with the Mental Health staff and attend an anger management class. Dr. Webster informed me at this time that she felt "threatened" by the fact that she could get a UIF. I informed her that I was not using this fact as a threat, but that it was the truth. I also informed her that if she did not persist in unacceptable behavior this should not be the case.

Martha W Addison

MARTHA W. ADDISON, LtCol, USAF, NC
Commander, 24th Medical Operations Squadron

CC: SGO/CC: Col O'Neil
SGH: LtCol Robbins

Web 392

23 March 98

MEMORANDUM FOR RECORD

TO: Dr. Webster

FROM: LtCol Addison

RE: EVENTS LEADING UP TO YOUR REMOVAL FROM ER

1. I am writing this memo in an effort to address and clarify some issues that continue to arise. In an effort to avoid further confusion, I have asked Dr. Mendez to be a witness to this conversation. Despite repeated conversations with you addressing why you where not put in charge of the Emergency Room , you continue to state that the decision was based on personalities versus skills and experience. (Conversation with Dr. O'Neil, 5 Feb 98). You obviously continue not to believe that Drs. Mendez and Robbins and myself made a conscientious decision to wait until both yourself and Dr. McCrary arrived, evaluate your credentials, PIF and demonstrated work performance and then make a decision, based on a known factor - watching two professionals operate as well as evaluating their credentials.

2. Following the Code Blue on 24 Jan 98, you made an admission that you were not able to intubate the patient (a large male with a thick neck) due to lack of strength in your wrist. As you were already scheduled for surgery on this extremity, the decision was made to remove you based on risk factors and the fact that in the Emergency Room you could be the only provider and placed in the same situation. You immediately protested, which is acceptable. Since being placed in the Primary Care Clinic you have stated that you were not treated fairly by Dr. Burkett. You have acted out with loud outbursts and banging on lockers in the ER. You were given a letter of counseling by Dr. Mendez regarding actions between yourself and Dr. Burkett. You sent a rebuttal on the letter, dated 10 Feb and to date, I have not been appraised of any additional outbursts from you. Based on this input, I made the decision not to create an Unfavorable Information File. You were given a letter dated 12 Feb 98 that explained this.

3. I have received written input from a patient commenting about you crying while the patient was seen at sick call. I have had inquiries from other concerned members regarding your emotional state and your *perception that you are being punished. You make no bones about letting me know how unhappy you are* about working in the Primary Care area and have proceeded to let me know that I have been punishing you since you first arrived. (Conversation 18 March 98 when I said "good morning" and asked how you were doing and you proceeded to tell me how I was wronging you.)

4. Dr. Mendez has assured me that you are aware of the game plan to return you to the ER after you have completed ACLS, either by course or by machine. My understanding is that a March date has been set up and this effort coordinated. You still protested when your profile was removed, despite this knowledge.

5. As the Squadron Commander, I am asking you to realize that you are an officer in the USAF and to act accordingly. If you feel that I have wronged you, please sit down with my supervisor, Col O'Neil, and clear up the matter. Regardless of w here you are tasked to work in the 24th Medical Group, I expect professionalism and a spirit of teamwork. Please accept responsibility for yourself and your actions.

Martha W Addison

MARTHA W. ADDISON, LtCol, USAF, NC
Commander, Medical Operations Squadron

COMMENTS: Received and will write rebuttal. Norma P. Webster, MAJ

1397

**DEPARTMENT OF THE AIR FORCE**
**24TH MEDICAL SUPPORT SQUADRON (ACC)**
**HOWARD AFB, PANAMA**

30 November 1997

MEMORANDUM FOR RECORD

FROM: 24 MDOS/SGOME

SUBJECT: COUNSELING SESSION

1. This is a letter of documenting a counseling session given to Major Wilma Webster on 30 November 1997.

2. The following topics were discussed pertaining to poor performance in the Emergency Department during duty as MOD.

3. Excessive patient waiting times. Taking too long to see patients that have waited for a number of hours to see a provider. Waiting times and LWBS (left without being seen) far exceeds other providers in the department.

4. Keeping patients that have been seen in the ED too long before making a final disposition. Pattern of not keeping up with return of tests results and "forgetting" about patients still in the department. Slow to call for consults.

5. Receiving multiple complaints by name on patient satisfaction forms. The department suffers.

6. Several complaints by technicians and nursing staff indicating a lack of confidence in working with provider due to incidences of mis-communication or poor instructions.

7. I indicated that I've seen a pattern of difficulty in handling the work-load in this Emergency Department when alone as sole MOD.

8. I conveyed the need to either change or organize the providers present approach to patient care, as to minimize the above problem areas. ~~We have~~ talked about these problems in the past.

JAMES E. MCCRARY, MAJ, USAF, MC
CHIEF, EMERGENCY SERVICES

*Global Power For America*

1394

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP
HOWARD AFB, PANAMA

PRIMARY CARE CLINIC

TYPE OF VISIT/SERVICE Follow up - Primary Care DATE 2 Feb 98

Please Circle Applicable Items: Active Duty Retired Dependent Civilian

USAF USA USN USMC Coast Guard

| AVAILABILITY / ACCESS | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Accessibility of telephone lines | 5 | 4 | 3 | 2 | 1 |
| Availability of appointments | 5 | 4 | 3 | 2 | 1 |
| Availability of providers | 5 | 4 | 3 | 2 | 1 |
| Availability of services | 5 | 4 | 3 | 2 | 1 |
| **TIMELINESS** | | | | | |
| Waiting time for registration | 5 | 4 | 3 | 2 | 1 |
| Waiting time before screening | 5 | 4 | 3 | 2 | 1 |
| Promptness of provider | 5 | 4 | 3 | 2 | 1 |
| Length of appointment | 5 | 4 | 3 | 2 | 1 |
| **STAFF SENSITIVITY** | | | | | |
| Clinic staff courtesy | 5 | 4 | 3 | 2 | 1 |
| Clinic staff helpfulness | 5 | 4 | 3 | 2 | 1 |
| Respect for confidentiality and privacy | 5 | 4 | 3 | 2 | 1 |
| Provider's explanation of your condition and treatment | 5 | 4 | 3 | 2 | 1 |
| **PHYSICAL ENVIRONMENT** | | | | | |
| Adequacy of waiting area | 5 | 4 | 3 | 2 | 1 |
| Cleanliness of clinic areas | 5 | 4 | 3 | 2 | 1 |
| Ease of finding the providers' offices | 5 | 4 | 3 | 2 | 1 |
| Availability of reading material in waiting areas | 5 | 4 | 3 | 2 | 1 |
| **CUSTOMER SATISFACTION** | | | | | |
| Professionalism of staff | 5 | 4 | 3 | 2 | 1 |
| Care received from staff | 5 | 4 | 3 | 2 | 1 |
| | 5 | 4 | 3 | 2 | 1 |

(OVER)

2 Feb 98

I had made an appointment to see Dr. Lopez two weeks prior to this appointment Today I found out he was not at Howard, but at Clayton. However I was not informed of this until about twenty-five minutes after my arrival. I was screened as usual, and your staff is all very professional and courteous. The appointment was originally for 1115 and one hour later I was still waiting to be seen. Major Webster was the provider that was to see me. At about 1225, she came out with her patient and I was her next patient; however she walked behind the primary care counter and disappeared. About ten minutes later I approached the counter and asked if she was eating lunch and was told that she was. I then told the technician that I had been waiting over and hour and it was not right that she had just left me there (along with someone else that was to see her after me) without even saying anything to us. Not even out of common courtesy!

I was finally seen at 1230 by Dr Mendez and was on my way shortly thereafter. My complaint is not the switch of providers, but that I was left there waiting, and if I had not asked I probably would have been left there until Major Webster was done eating.

If you have any questions, please call Edna V. Martinez at 284-4516/5345. I appreciate your attention to this matter.

Edna V. Martinez

1296

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS 24TH MEDICAL GROUP (ACC)
HOWARD AFB, PANAMA

PRIMARY CARE CLINIC

TYPE OF VISIT/SERVICE Sport Physical DATE 2 Feb 98

Please Circle Applicable Items: Active Duty Retired Dependent (circled) Civilian

USAF USA USN (circled) USMC Coast Guard

## AVAILABILITY / ACCESS

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Accessibility of telephone lines | 5 | **4** (circled) | 3 | 2 | 1 |
| Availability of appointments | 5 | 4 | **3** (circled) | 2 | 1 |
| Availability of providers | 5 | 4 | 3 | 2 | **1** (circled) |
| Availability of services | 5 | 4 | 3 | 2 | **1** (circled) |

## TIMELINESS

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Waiting time for registration | 5 | 4 | **3** (circled) | 2 | 1 |
| Waiting time before screening | 5 | **4** (circled) | 3 | 2 | 1 |
| Promptness of provider | 5 | 4 | 3 | 2 | **1** (circled) |
| Length of appointment | 5 | 4 | 3 | 2 | **1** (circled) |

## STAFF SENSITIVITY

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Clinic staff courtesy | 5 | **4** (circled) | 3 | 2 | 1 |
| Clinic staff helpfulness | 5 | **4** (circled) | 3 | 2 | 1 |
| Respect for confidentiality and privacy | 5 | **4** (circled) | 3 | 2 | 1 |
| Provider's explanation of your condition and treatment | 5 | 4 | 3 | 2 | **1** (circled) |

## PHYSICAL ENVIRONMENT

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Adequacy of waiting area | 5 | **4** (circled) | 3 | 2 | 1 |
| Cleanliness of clinic areas | 5 | **4** (circled) | 3 | 2 | 1 |
| Ease of finding the providers' offices | 5 | **4** (circled) | 3 | 2 | 1 |
| Availability of reading material in waiting areas | 5 | 4 | 3 | **2** (circled) | 1 |

## CUSTOMER SATISFACTION

| | Outstanding | Excellent | Satisfactory | Marginal | Unsatisfactory |
|---|---|---|---|---|---|
| Professionalism of staff | 5 | 4 | **3** (circled) | 2 | 1 |
| Care received from staff | 5 | 4 | **3** (circled) | 2 | 1 |
| | 5 | 4 | 3 | 2 | 1 |

(OVER)

391