She mentioned her uncle, who had a Ph.D. in psychology. Maj Webster said, "He decided he should personally teach us about sex. He told me all the details of his sex life with his wife. He fashioned himself to be in love with me. He fondled my genitals and would have done more if I had let him." She was very angry with him for many years after that. This relationship began in her mid-teens and lasted for years.

She excelled in academics. She averaged A's and B's in Pasadena and Mira Costa high schools (CA). She received a National Merit Scholarship and attended undergraduate school in UCLA. She struggled academically her first two years and lost her scholarship. She disenrolled and she worked for several months as a secretary. She enrolled at El Camino CC in Redondo Beach and her grades improved. She reapplied for her scholarship, received this award again, and reentered UCLA. She received excellent grades, averaging A's and B's. She provided her high school and college transcripts for review.

She married a Mexican national and moved to Mexico, residing there for 15 years. She had her children there. She lived in a poor neighborhood without running water. She got a job teaching English in Mexico City, working in that capacity for 10 years. Her husband became extremely jealous and became violent: "He would insult me in Spanish. I used the same language with him. He hit me in response." Domestic violence occurred several times each year. She swore she would leave him but had no support system. When she told him she was going to leave him, she was beaten, and fired a gun at her. She left her home and moved into her own apartment. She eventually brought the children to live with her. The couple divorced amicably.

She completed medical school in Mexico and received good grades. She was the President of her medical school class. During her last year of medical school her father suffered a stroke and she brought him to live her. She then returned to the USA and passed her medical exam for foreign graduates. She applied for a residency position in Michigan. She passed her internal medicine exam on her second try. She liked working in the Emergency Department but her foreign education interfered with a placement in the ED. She initially worked in the ER for 5 months in Rochester NY (84). She lost the job due to "politics." She admitted a patient with chest pain and this angered another provider. She wrote a letter of complaint to the chief of staff. She was criticized for her documentation and for placing atropine in someone's eye.

**Collateral Interview of Dr. Greg Fey.** Dr. Fey said she might have chronic personality difficulties. She is socially inappropriate and her behavior has got her in trouble in the ED. She is angry about the referral and thinks she has been railroaded. During the pre-flight air evacuation briefing, she said, "I wish I could blow up the aircraft, I'm so mad about all this going on." She said this in front of 12 other patients who are waiting for the plane. The technician (SrA Goode) asked her if she went through the metal detector. Maj Webster replied that there were plastic bombs that could not be detected by the metal detector. The commander (Col O'Neil) thought her threats were serious enough to merit additional evaluation; however, Dr. Fey doesn't see her as a homicidal threat. He is more concerned about her ability to function as an AF officer in the ED. She has had some dreams of going on a shooting spree but she denies plans for acting this out. Her commander wanted her to be referred to MHC to evaluate her risk for suicide/homicide.

Dr. Fey mentioned that she has been decredentialed as an ER physician and works in Health and Wellness, completing wellness articles, fitness screens, and cholesterol levels. Her problems included difficulties observed while performing a code, irritability in the ED, and problems completing her job tasks in a timely manner. A nurse felt Maj Webster did not manage the code appropriately and could not intubate the patient with her left hand. Maj Webster actually suffered from carpal tunnel syndrome, which affected her strength. She had weakness in her left hand secondary to this syndrome.

Some of her symptoms, originally thought to be due to MS, were found to be caused by other factors. MRI showed white matter lesions in the brain. Some elevations were found in CSF (IgG index and oligoclonal bands). The board did not uphold the diagnosis and she does not currently have symptoms of MS.

Dr. Fey noted that Maj Webster has manifested unusual, puzzling behavior. For example, every time she comes for her psychiatric appointment she forgets her hat. She has left her car door open when she has come to see Dr. Fey. Several patients have complained about her forgetfulness. On one occasion she gave Benadryl to a



1436

patient instead of Tylenol. She has had problems with temper and had a crying outburst. Dr. Fey noted that the ER physicians at Howard tend to be over worked and are heavily stressed. Another ER physician had difficulty as well.

Dr. Fey notes that Maj Webster denies that she has difficulties. She is not socially connected. Although she is not sexually seductive or impressionistic, she does have histrionic, emotional outbursts. There is a component of narcissism but this is not malignant and certainly WNL for physicians. She cannot inhibit her inappropriate responses. The etiology of this problem is equivocal, perhaps reflecting a cognitive problem or ADHD. Dr. Fey screened for ADHD and she was well below the cutoffs. There is no childhood evidence of ADHD. There appears to be problems with executive functioning, planning and organization, social judgment, and emotional impulse control. The puzzle involves etiology.

**Collateral Interview of Col O'Neil.** I spoke with Col O'Neil regarding Maj Webster's recent behavior. A worried member of Tricare staff spoke with him yesterday about Maj Webster's behavior during a preflight interview. She indicated she wanted to blow up the plane. No evaluation was performed. She is under stress. Her continuation of professional activities is threatened. Dr. Fey had seen her within the previous 24 hours, and she was not a danger to herself or others. Her statements were impulsive and disinhibited. She denied she would carry out these threats. Prior to this incident, she made a series of statements to SrA Goode involving a pleasurable dream, in which she shot everyone. Col O'Neil stated that within 24 hours, she expressed two events involving threats against others. The commander noted that Maj Webster has displayed a pattern of disorganized and problematic behavior that led to her removal from a patient care setting.

**Collateral Interview of Col Sel. Gary Gronseth, WHMC Dept. of Neurology.** Dr. Gronseth believes the Verbal-Performance differential on the WAIS-R is a matter of "hard wiring," and not a pathological indicator. She meets clinical criteria of possible MS based on 2 neurological episodes, the first in 1974 involving facial paralysis associated with diplopia and the second in 1992 involving double vision. She would meet lab criteria for probable MS, demonstrating two attacks, lesions on MRI and oligoclonal bands on CSF. An earlier MRI would suggest MS but is not very specific. Elementary neurological functioning is normal so she probably does not have subcortical dementia. She probably has dysfunctional executive process which is non-progressive.

After reviewing the MRI of Sep 98, Dr. Gronseth summarized clinical and laboratory findings. Although he said he could not make the MS diagnosis with certainty, he said that "more likely than not" Maj Webster suffered from MS. He was 65% confident of this diagnosis. Maj Webster stated she would like further evidence and recommended a lumbar puncture to examine other laboratory indicators. Dr. Gronseth concurred and escorted the patient to neurology for the procedure. As of this date, the patient apparently had a lumbar puncture but did not report to the lab for blood work. Results of the oligoclonal band survey are pending.

**Collateral Interview of Maj Chip Massey, WHMC Neuroradiology:** Maj Massey reviewed an MRI taken on 25 Sep 98 and indicated the data suggested extensive and severe white matter abnormalities in the corpus callosum, consistent with "classic MS." She has a pretty advanced case. An additional lesion was found in the C2 cervical spinal cord, also consistent with MS. He is 90% confident that this pattern represents MS. From the previous report, it appears that her condition has worsened.

**BEHAVIORAL OBSERVATIONS:**

She was oriented to person, place, and date, but erred significantly on her time estimation (9:30 versus 11:00). She could not identify the President preceding Bill Clinton (WMS-R **Information and Orientation** = 12/14; 1st percentile). She appeared to be well kept, well nourished, and in no acute distress. Hygiene and grooming are managed independently, effectively, and appropriately. She was approriately dressed. There was no evidence of delusions, hallucinations, obsessions, ideas of reference, phobias, suicidal or homicidal ideation. Mood was mildly anxious, irritable, and dysphoric. Her affect was full range. There was no evidence of neurovegetative signs of depression. Speech was fluent; however, she occasionally mispronounced words and made a variety of paraphasic errors.. Voice quality was unremarkable. Thoughts were goal oriented and questions were addressed appropriately. The client was able to give an account of life events in chronological order. Recitation of personal



1437

history appeared normal. Personal insight was fair; however, she seemed to lack appreciation for the magnitude of her deficits or the impact of her behavior on others. There were no abnormalities of gait or evidence of apraxia. The client established a positive relationship with our staff and was cooperative. In completing our biographical questionnaire, she omitted her age and date of birth. Her test results are considered an accurate reflection of her current cognitive functioning.

**TEST RESULTS:** Individual test performance was compared to a sample of age matched peers. When appropriate and available, performance was compared to peers with similar age and education. When discussing the results of MicroCog, we compared Dr. Webster's performance to the reference group of 18-34 year olds, allowing for an analysis of her performance to that of a sample of individuals who are performing at relatively optimal levels (Powell et al., 1993). When appropriate, corresponding age-education matched comparisons are noted as well. These are abbreviated "A/E." Scores are reported using commonly accepted classification of ability levels using conventions endorsed by Drs. Joe Matarazzo (1972), David Wechsler (1958, 1981) and Muriel Lezak (1995, p. 159). These conventions are listed below:

| Classification | z - Score | Percent Included | Lower Limit of Percentile Range |
|---|---|---|---|
| Very Superior | +2.0 and above | 2.2 | 98 |
| Superior | +1.3 to 2.0 | 6.7 | 91 |
| High Average | +0.6 to 1.3 | 16.1 | 75 |
| Average | +/-0.6 | 50.0 | 25 |
| Low Average | -0.6 to -1.3 | 16.1 | 9 |
| Borderline/Mildly Impaired | -1.3 to -2.0 | 6.7 | 2 |
| Moderately to Severely Impaired | -2.0 and below | 2.2 | — |

**General Intelligence.** Maj Webster has been repeatedly evaluated with the WAIS-R. Results suggest that she is functioning in the very superior range of intelligence overall (1998 WAIS-R FSIQ = 136, 99th percentile, mean = 100, SD = 15 ). There was a significant discrepancy between verbal (1998 VIQ = 140, 99th percentile) and performance (1998 PIQ = 122, 93rd percentile) indices. This differential may reflect chronic superior verbal abilities when contrasted to nonverbal skills; however, Knight's (1992) review of the literature suggest a Verbal - Performance differential parallel to that produced by Maj Webster. MS patients demonstrated the highest subtest scores on Verbal scales. The poorest performance was observed on tests that are timed and require considerable dexterity. Overall intellectual decline was mild.

When tested repeatedly, effects of practice may lead to a gradual rise in overall performance scores. When examined in 1993, Dr. Zohner observed a Full Scale IQ of 116 (86%), Verbal IQ of 125 (95%), and Performance IQ of 104 (61%). Anxiety may have attenuated her performance on this initial examination. Using the standard error of measurement, her 1993 Full Scale IQ of 116 is significantly different from her more recent Full Scale IQ (99% confidence interval). Effects of practice and attenuated anxiety may have contributed to this differential; however, an overall summary index may mask individual variation in specific cognitive domains and, therefore, should be interpreted with caution (Lezak, 1988).

**Language.** Conversational speech was fluent and articulate with intact comprehension, syntax, semantics and word finding. **Vocabulary** (Shipley raw score = 37; 63T, 90%) and general verbal intelligence (1998 WAIS-R Verbal IQ) scores exceed her age matched peers, indicating that general verbal abilities are intact. She had no difficulty following a series of verbal commands (**Token Test**, raw = 44/44 correct), and previous assessment revealed intact expressive speech. On a standardized reading test, she scored at the 81st percentile and within the high average range (**WRAT3**, raw score = 53). On a test of confrontational naming (**BNT**) she scored within the high average range (raw = 58/60; 80%). On a timed test of verbal fluency, she generated 50 words to the letters F, A, and S over a three-minute period, scored at the 60th percentile and within the average range (**COWAT**). On a test of categorical fluency, she was asked to generate **animal names**. She produced 16 words in 3 minutes for low average performance at the 14th percentile.



1438

On a test of reading **Passage Comprehension**, she scored at the 80th percentile and within the high average range (WJR, raw score = 36). In **Writing Fluency** skill in quickly formulating and writing simple sentences was evaluated. Each sentence must related to a given stimulus picture and use a set of three provided words under timed conditions. Performance on Writing Fluency was high average at the 84th percentile (WF raw = 27). She accurately identified errors in punctuation, grammar, and spelling (**Proofing** = 29; 91st percentile).

Knight (1992) reports that aphasia is uncommon in patients suffering from MS.; however, studies have found that MS patients are vulnerable to decline in tests of verbal fluency, clearly areas of vulnerability in Maj Webster's performance. Her lowest scores in language measures occurred on tests of semantic (14th percentile) and letter fluency (60th percentile)

**Attention.** On tests of concentration, attention, and freedom from distractibility, her performance fell within normal limits. When tested earlier this year, she was asked to recite a series of digits; she repeated 7 digits forwards and 5 digits backwards for average performance at the 63rd percentile (**WAIS-R, Digit Span**). When presented with serial digits on a computer screen, she reproduced 2 forward for high average performance at the 75th percentile (**MicroCog, Numbers Forward**). When asked to produce numbers backward, she reproduced 8 backward and scored at the 84th percentile and within the high average range (**MicroCog, Numbers Backward**). On a alphabet vigilance test, she scored at the 75th percentile (**MicroCog, Alphabet**). She was presented with a series of 16 words and asked to identify words belonging to four different categories in four different trials. She scored within the average range for the first list (**MicroCog, Wordlist 1** Total Score = 15; 37%) and the average range for the second list **Wordlist 2** Total Score = 14; 37%). On a test of concentration effectiveness and ability to avoid distraction, she scored at the 38th percentile and within the average range (**Stroop**, Color Word score = 92; 0 errors). When asked to mentally track a series of ascending numbers by using paper and pencil, she scored at the 10th percentile (**Trails A**, 41 seconds, 0 errors). When asked to track two alternating series of ascending numbers and letters, she scored at the 21st percentile (**Trails B**, 69 seconds, 0 errors).

On a test of information processing speed, immediate memory, and sustained attention, Maj Webster was asked to listen to a series of paired numbers so that each number was added to the one immediately preceding it: The second number was added to the first, the third to the second, the fourth to the third, etc. Four different trials were administered, with 49 pairs of numbers presented in each trial. With each succeeding trial, the interval between number presentations decreased from 2.4, to 2.0, to 1.6 and, finally, to 1.2 seconds (PASAT). Her total score of 139 was intact.

**Calculations.** The patient's performance on the **WAIS-R Arithmetic** test reflects average mental calculation abilities. She adequately performed a series of mental operations involving addition, subtraction, multiplication, and division. Many of these operations involved of series of sequential mathematical operations. This subtest also required *working memory*, a complex attentional process in which one must maintain information in awareness while performing mental operations on it.

When presented with a series of calculations on a computer screen, she scored at the 37th percentile and within the average range (**MicroCog Math TS** = 6). This test minimized demands on complex attentional processes and was more of an examination of calculation ability. More demanding calculations and mathematical ability was assessed with the WRAT-3. Here, she performed adequately (WRAT-3 **Arithmetic** Raw = 44; 61%). There was no evidence of dyscalculia on this examination.

**Visuospatial Abilities.** She was asked to match a complex ambiguous design to one of seven designs. She provided 7 of 7 correct visual discriminations (**CVMT Visual Discrimination**). She was asked to view a series of analog clocks and accurately estimate their correct time. On this task she scored within the high average range and at the 75th percentile (**MicroCog Clocks TS** = 7). Her judgment of line orientation was intact at the 74th percentile (JLO = 29). Her copy of a complex figure, paying careful attention to overall form quality as well as interior detail, was average for her age group and placed her at the 59th percentile (**Rey-Osterrieth Complex Figure**, copy score = 32/36). On the **Hooper Visual Organization Test**, she was presented with 30 fragmented line drawings and asked to synthesize the drawings mentally and offer a verbal name for each of the objects. The resulting score of 25/30 was average and at the 42nd percentile. She struggled on a visuospatial performance task,

1439

where her performance ranged from mildly impaired to low average (TPT, 8-21%). Overall, Maj Webster manifested generally intact visual-spatial and visual organization abilities.

**Memory.** She was asked to listen to sentences of increasing length and complexity (**Spreen Sentence Repetition**). Her age corrected score of 17 was intact at the 70th percentile. Her immediate recall of two verbally presented stories placed her at the 51st percentile and within the average range (**WMS-R, Logical Memory I**, 22/50 correct). Following a 30 minute delay with interfering activity her delayed recall score placed her at the 29th percentile and within the average range (**Logical Memory II**, 14/50 correct). Her story recall during our examination was slightly better than that obtained by Dr. Ricardo De Obaldia. On a former version of the Wechsler Memory Scale, she scored at the 27th and 17th percentile, respectively, for immediate and delayed story recall. Nevertheless, her relatively weak verbal recall is surprising considering her very superior Full Scale IQ.

MicroCog presented a short passage for her to read and memorize. She spent average time memorizing the passage. Her immediate recall of the story was average (Story Immediate Recall; raw score = 10; 75%). Following 20-30 minutes of intervening activity, her recall of the original story was low average (Story Delayed Recall, raw score = 19; 25%).

On the **CVLT**, Maj Webster was asked to learn a 16 item shopping list over 5 trials. Her total score of 50/80 words across 5 trials placed her at the 24th percentile and within the low average range. Learning strategy was analyzed using a variety of CVLT indices. In general, she eschewed more efficient learning strategies in favor of repeating words in their serial position (semantic cluster ratio = -2 SD). She was somewhat inconsistent in recalling words across five trials (76% Recall Consistency = -1 SD).. Following the fifth trial, she was presented with an interference list and she remembered 6/16 words for low average performance at the 16th percentile. She was then asked to recall all the words from the original list. She remembered 8/16 words for performance at the 16th percentile (Short Delay Free Recall). On cued recall, she was presented with 4 categories in which the words belonged, e.g., "Tell me all the shopping items that are spices and herbs." She recalled 8/16 words and scored at the 2nd percentile and within the moderately impaired range (Short Delay Cued Recall). Following a 20 minute delay with interfering activity, she freely recalled 8/16 words from the original list and scored at the 16th percentile (Long Delay Free Recall). On cued recall, she recited 9/16 words for performance at the 16th percentile (Long Delay Cued Recall). When given a recognition memory test for the 16 target words, she correctly identified 13/16 words among 28 distracter items and made 3 false positive identifications. Her Discriminability score of 86%, was low average at the 16th percentile. Again, her relatively weak verbal learning and memory performance is unusual, given her outstanding performance on the Wechsler intelligence scales.

She studied a visually presented series of 3X3 matrices in which 3 to 5 blocks contained a colored square; she was then required to immediately reproduce the pattern using a numeric keypad. She scored at the 5th percentile and within the mildly impaired range (**MicroCog Tic Tac TS** = 28). When asked to study a series of 4 line drawings and then reproduce them immediately from memory, she scored at the 68th percentile and within the average range (**WMS-R, Visual Reproduction I**, 32/41 correct). Following a 30 minute delay with interfering activity, she scored at the 85th percentile and the high average range (**WMS-R, Visual Reproduction II**, 33/41 correct). She correctly recognized 4/4 visual reproduction drawings among a series of distracters. Her 30 minute recall of the **Rey-Osterrieth complex figure** placed her at the 37th percentile and within the average range (12.5/36 correct).

In a visual learning task, she was presented with a series of 7 recurring complex, ambiguous designs that were repeated seven times across 112 trials (**CVMT**). The task involved the discrimination between seven recurring designs and 63 distracter items that appeared only once. The visual learning Total score of 69 was low average and at the 14th percentile. When taking hits and false alarms into consideration, she scored within the average range and at the 38th percentile (CVMT, d-Prime = 1.74). She had mild difficulties separating novel stimuli from recurring items (25 False Alarms; 92nd percentile). On 30 minute delayed recognition, she correctly identified 3 of 7 target items among a series of distracters, for average performance at the 28th percentile. When faced with difficult visual discriminations, Maj Webster struggled to discern subtle differences between target and distracter stimuli.

Her tactile and spatial memory were assessed following her completion of a tactual form board examination (TPT), She correctly recalled eight of ten shapes (50th percentile). Furthermore, she was able to correctly locate only 2 of 10 shapes (24th percentile)..

MS patients consistently demonstrated memory deficits (Knight, 1992). In the early stages of the disease, memory impairment tends to be variable and mild. However, on more difficult word list learning, MS performance is substantially reduced relative to normal controls. Maj Webster demonstrated this pattern on the CVLT, tapping verbal memory. MS patients appear to be particularly vulnerable on supraspan word lists (Knight, 1992). In the visual memory domain, she had little difficulty on routine tasks but deficits appeared as the demands increased. She had difficulty discriminating between target and distracter stimuli on a visual learning and memory task (CVMT). Again parallel to the literature on MS, Maj Webster demonstrated intact performance on immediate span tests (Digit Span, Spreen Sentence Repetition)

**Motor Skills.** Psychomotor abilities reflected variable manual dexterity, fine motor coordination, and speed. On Luria measures of motor programming and coordination, she scored at the 79th percentile and within the high average range (Luria-Nebraska Neuropsychological Batter, **Motor Scale** = 12). However, she was somewhat impulsive and slow in performing complex motor programs. Her left hand appeared stiff. On a test of motor speed and coordination, performance reflected low average ability (**Trail Making Test, Part A**). On a test of **finger tapping**, she averaged 40.60 taps in 10 seconds and scored at the 18th percentile with the dominant, right hand. With the left hand she averaged 37.40 taps in 10 seconds and scored at the 34th percentile. On a **grooved pegboard task**, she scored at the 27th percentile using the dominant, right hand (69 seconds, 0 drops) and the 4th percentile using the left hand (101 seconds, 0 drops). On a written digit symbol substitution task, extremely sensitive to overall cerebral integrity, she scored at the 3rd percentile and within the mildly impaired range (**Symbol Digit Modalities Test**, 32 correct, 5 errors). Her performance on the oral version was severely impaired (33 correct, 4 errors, <1%). Her earlier 98 performance was intact (WAIS-R Digit Symbol, 63%).

She approached a tactual form board test with an unusual strategy (TPT). Initially she had difficulty understanding the instructions given by the examiner. She originally took a block and then went over the board with her hand. When she realized this strategy was not working effectively, she put the block down and went over the entire board with her right hand. She then started placing blocks in the form board. Using her dominant hand, she needed 11 minutes and 37 seconds to place all 10 blocks in their proper positions. Her age and education corrected performance was mildly impaired at the 8th percentile. During the second trial, using her left hand, she felt the entire board first and then placed all 10 blocks in position in 7 minutes and 12 seconds (21st percentile). With both hands, she felt the board with her left hand and used her right hand to place blocks. She said, "It just didn't seem right." She completed the board in 6 minutes and 5 seconds (8th percentile). TPT performance taps multifactorial dimensions and is sensitive to frontal and parietal dysfunction as well as diffuse damage (Spreen and Strauss, 1998).

**Executive Functions, Concept Formation, Abstract Reasoning, and Mental Flexibility.** Executive functions involve cognitive abilities that assist in planning, initiating, programming, sequencing, and maintaining goal-oriented behavior. Executive functions allow an individual to track whether ongoing behavior is in accordance with that which is intended. Executive control further allows for course corrections when merited, to adapt to changing contingencies, or to correct inappropriate behavior. Her planning and organization abilities were noted. There was some evidence of impulsivity and disorganization.

In a measure of verbal, inductive reasoning, Maj Webster scored at the 63rd percentile and within the average range (**MicroCog Analogies**, scale score = 11). On a nonverbal test of concept formation, hypothesis testing, and problem solving, she had difficulty completing the task effectively (Ravens Progressive Matrices = 49 correct in 30 minutes, 45%). On a test of problem solving, mental flexibility, and hypothesis testing, Maj Webster scored within the average range (WCST). She was asked to take a deck of 128 cards and match the top card to one of four key cards that varied by shape, color, and number of objects. Once she provided 10 consecutive correct matches, the examiner switched the correct category without telling her. The examiner provided feedback by saying "correct" or "incorrect" for each response. A total of 6 categories were presented. She successfully completed 6 categories in 74 trials (128 trials maximum), made 10 errors (55th percentile) and 3 perseverative



1441

responses (58th percentile). On yet another test of abstract reasoning, her performance was intact and was superior to her age matched peers (Shipley Abstract = 32; 66T).

MicroCog presented twelve sets of 4 visual stimuli that were used to examine abstraction and conceptual flexibility (**Object Match**). She was initially asked to identify a figure that did not match the other three. Once she made her initial response, she was supposed to switch conceptual set by selecting a different figure that did not match the remaining three. In this way, difficulty with shifting cognitive set may be discerned. Performance on the initial match was high average at the 75th percentile (Object Match A, TS = 12). Performance on Object Match B was average (TS = 10).

**Mental Processing Speed.** There was evidence of slowing on a test of psychomotor speed and ability, where Maj Webster scored within the mildly impaired range: On **SDMT**, she transcribed 32 figures in 90 seconds but made 5 errors (3rd percentile). On the oral version of the test, she provided 33 correct response and made 4 errors, for severely impaired performance at less than the 1st percentile. During her earlier 98 assessment, she rapidly completed a digit vigilance cancellation task (DV Time = 325 seconds; 82%). When asked to copy a complex figure, she was able to complete the drawing within the allotted 5 minutes (time = 2 minutes, 39 seconds). Most neurologically intact individuals readily complete this drawing within 2.5 to 5 minutes. On the timed **Stroop** color-word task, she was fairly slow in reading the color ink and scored at the 38th percentile. She was low average on the timed **Trail Making Test**, Part A, where she was asked to use a pencil to rapidly connect a series of ascending numbers. She was low average when she had to alternate between a series of ascending numbers and letters (Part B). During her previous 98 assessment, she was mildly impaired on both subtests (5th percentile). She struggled on a tactual form board examination, scoring within the mildly impaired to low average range (**TPT** Total Time = .83 minutes/block; 9.7%). During the **PASAT**, Maj Webster was asked to rapidly perform a series of additions. Her performance was intact. On tests of timed **verbal fluency**, she scored within the low average to average range.

Estimates of reaction time to auditory, visual, and visual signals preceded by an auditory signal were derived using **MicroCog**, a computer based neuropsychological test battery. Relative to the reference sample of normal adults, she was mildly impaired at the 5th percentile (**Reaction Time** standard score = 75; A/E SS = 102, 55%). Her simple reaction time in the early portion of the test placed her at the 9th percentile (**Timers 1**, scale score = 6). Her performance remained constant as the test neared completion (**Timers 2**, scale score = 6; 9%). When matched for age and education, her performance was average at the 50th percentile (A/E SS = 10, 50th percentile). A global index of information processing speed reflected severe impairment (**Information Processing Speed**, standard score = 57, <1%; A/E = <1%). **Information processing accuracy** was intact (standard score = 103; 58%; A/E = 70%). When examining the complex interaction between information processing accuracy and speed, she scored at the 5th percentile and within the mildly impaired range (MicroCog, **General Cognitive Functioning**, standard score = 75; A/E = 13%). These findings may parallel those observed by others, who report that Maj Webster is slow to complete her medical duties, is forgetful, and may be cognitively impaired.

**Personality and Emotional Factors.** On two standardized tests of depression, Maj Webster indicated minimal levels of dysphoria (**Beck Depression Inventory**, raw = 8, WNL; SCL-90-R, DEP = 0.54, 56T). Suicidal ideation was absent. On two standardized tests of anxiety, she indicated minimal elevations (**Beck Anxiety Inventory**, raw = 4, WNL; SCL-90-R, ANX = 0.60, 59T). Her **MMPI-2** was completed on 28 May 98 (new Welsh code 4+-6835/1792:0# K+-/LF). The MMPI-2 reveals a valid profile with a significant elevation on scale 4. The validity profile suggests an individual who is attempting to deny significant stress or conflict; however, individuals with elevations on scale 4 may demonstrate a lack of social conformity or self-control. There is a persistent tendency to conflict with societal mores. These individuals may demonstrate antisocial tendencies, rebelliousness, poor adjustment to authority, superficial relationships, and impulsive behavior. In fact, MMPI scales that favor impulsive behavior tend to be more elevated, and therefore more likely to occur, than scales that inhibit acting out (Hy, Pd, Pa, Sc, Ma, Si versus Hs, D, Pt). These individuals seek immediate gratification and tend to behave without regard to the social consequences of their actions. Unable to profit from experience, acting out may be followed by a period of quiescence only to be repeated at a later date. They have poor tolerance for frustration, poorly controlled anger, and may be prone to outbursts of aggression. These individuals are often seen as egocentric, superficial, and lacking insight. Furthermore, they are described as impulsive, irresponsible,



1442

careless, and immature. Although quick to form superficial relationships, they have difficulty maintaining intimate contacts. Scale 0 (Si) is typically low and tends to correlate with more pathognomonic behavior as this scale approaches a T score of 30. There may be a history of substance abuse, assaultive behavior, poor financial status, and vocational difficulties.

These individuals are rarely self-referred but typically come to the attention of mental health professionals through referral. Their psychopathic qualities make them poor therapy candidates. They see themselves as superior to others, externalize blame, and have poor insight. This pattern of behavior may be alleviated by maturation; however, a low Scale 2 combined with a Spike 4 code type suggest poor prognosis for behavior change. This high 4, low 2 pattern is evident in Maj Webster's profile.

She was previously assessed with the MCMI-III. The Millon instrument highlights characterological features involving histrionic and narcissistic personality dynamics. Her approach to the test was to present herself in the most favorable light (Desirability BR = 84). She may appear somewhat histrionic and narcissistic. She has a strong need to present herself as socially acceptable and competent. She may have difficulty admitting to personal shortcomings and externalize blame. She may present as immature, superficial, and impulsive. She may be prone to verbal outbursts and sarcasm. Indeed, both her MMPI and MCMI suggest an individual who cannot effectively inhibit her verbal outbursts or irritation. She speaks her mind cathartically, without regard to the potential impact on others. She failed to consider the impact of her statements to SrA Goode when she externalized her wish that the plane be destroyed. Similarly, most prudent individuals would not communicate a dream experienced as pleasurable that involves the death of colleagues. Her apparent inability to appreciate the consequences of her actions is of great concern, particularly in serving in an emergency or primary care setting.

Current Risk Assessment: She denied suicidal or homicidal intent or plans. She denied previous suicide attempts. She denied significant depressed mood. Although angry and frustrated, she intends to do no harm to others. She denies a previous history of violence. She denies substance abuse or alcoholism. She admits that she may open her mouth to express her displeasure. The purpose of these communications is to be therapeutic but realizes that others might misinterpret her intent. She has no plans to hurt anyone within her chain of command or anyone else. She denies delusions or hallucinations. She admitted to being raped at gun point in 1979, while living in Mexico. Occasionally she will have dreams of being raped by members in her unit (commander and boss) whom she feels are threatening her military career and her practice of medicine. **My impression is that she is LOW risk for suicide and/or homicide.**

**ADHD**: Teachers told her she was very forgetful. She used to forget her books. She remembers her teachers saying that if her head wasn't attached she would have lost it long ago. She said, "I still lose things, particularly under stress." She denied attentional deficits. She could remain in her seat during class. She denied hyperactivity, being wound up, or having to be constantly on the go. She enjoyed dancing long hours in Mexico but saw dancing as a good opportunity to burn up calories and lose weight. She denied ADHD symptoms. She was never identified as ADHD in school at any level.

**BIPOLAR**: She denies a history of manic episodes. She denies periods of sleeplessness, elevated, expansive or irritable mood. With reference to sleep she said, "I always say that sleep is what I do best."

**EXTROVERSION**: She likes to talk, overcompensating for original introversion. While at WHMC, she went to Toastmasters meeting and delivered a speech. She won an award for her speaking.. During Desert Storm, she made a comment about Red Cross and Swiss policy that females could not examine Saudi men. She made a comment about that "fucking Red Cross that won't let me do my job." She was counseled for this comment. In Panama, she let people know how unhappy she was working in Primary Care. She was asked what her purpose was for communicating what she did to SrA Goode. She said the airman "seemed so friendly I just said what I felt. I should not have said it. I should have controlled what I said with no malice. I was expressing my anger at the whole situation."



1497

She said there are two main interests in her life: There is a continuous attempt to escape boredom and a continuous attempt to achieve maximum organization. She feels these are opposing forces. The more exciting her life is the more unorganized it becomes.

## CONCLUSIONS AND RECOMMENDATIONS:

The results of her cognitive assessment reveal several deficits on tests of verbal and visual learning and memory, semantic verbal fluency, psychomotor speed, and attention/concentration. Overall, intellectual abilities fall within the very superior range. Yet, on sensitive indices of cerebral functioning, Maj Webster had significant difficulties. The SDMT is "usually the most sensitive to the presence of acute or chronic 'organic' cerebral dysfunction (A. Smith in Lezak 1995, p. 380). On both the written and oral versions of this symbol substitution test, Maj Webster exceeded the cutoff score of 1.5 standard deviation (SD) below the mean. In fact, her written performance was -1.88 SD and oral performance was -2.4 SD below the mean. Poor performance on this examination may point to difficulties with concentration and tracking along with generalized brain dysfunction. Similarly, patients who perform poorly on the TPT generally reflect compromised brain function (Lezak, 1995). Although Maj Webster's overall intelligence ratings are outstanding, a summary index like IQ may mask subtest variability and compromised functional systems.

The following discussion presumes that Maj Webster suffers from probable MS. Poser et al. (83) proposed criteria for establishing the diagnosis and she appears to fulfill these criteria. Clinically definite MS requires evidence of two attacks, with each attack defined with neurological symptoms lasting more than 24 hours, caused by two distinct CNS lesions. Attacks (e.g., one involving blurred vision and the other facial weakness) should be separated by more than one month. A clinically probable diagnosis of MS is defined as the occurrence of two attacks and clinical evidence of a lesion responsible for one, but not both, of the attacks. During her Travis MEB, , providers concluded she suffered from MS and cited evidence of periventricular white matter disease on MRI, positive oligoclonal bands, elevated IgG index ,and neurologic symptoms. Currently, based on Dr. Gronseth's review of Maj Webster's medical history and recent MRI, there is at least a 65% probability of MS. She meets clinical criteria of possible MS based on 2 neurological episodes. She would meet lab criteria for probable MS, demonstrating two attacks, lesions on MRI and oligoclonal bands on CSF. An earlier MRI suggests MS but is not very specific. Elementary neurological functioning is currently normal so she probably does not have subcortical dementia. Maj Massey reviewed her MRI taken on 25 Sep 98 and indicated the data suggested extensive and severe white matter abnormalities in the corpus callosum, consistent with "classic MS." Dr. Massey suggests the patient has an advanced case of the disease. An additional lesion was found in the C2 cervical spinal cord, also consistent with MS. He is 90% confident that this pattern represents MS. From the previous MRI report, it appears that her condition has worsened; however, this conclusion must be advanced cautiously since Dr. Massey was unable to view the original films.

Knight (1992) reports "cognitive impairment is a frequent and disabling consequence of MS" (p. 153). In one review of 8 studies, the prevalence of cognitive deterioration in MS samples ranges from 54-65%. This estimate is supported by Lezak (1995), who reports a prevalence of cognitive dysfunction based on comprehensive neuropsychological assessments ranging from 30-70%. Cognitive sequelae of multiple sclerosis may include slowed mental processing, defective retrieval, and deficits in concept formation, verbal fluency, nonverbal reasoning, psychomotor speed and coordination, complex attention, concept shifting and mental flexibility (Lezak, 1995; Lishman, 1987). These deficits may be subtle and missed on most routine mental status or neurological evaluations (Lezak, 1995). For example, Peyser *et al.* (1980) found that, among MS patients judged to be cognitively intact on neurological evaluation, 50% were impaired on Halstead's Category Test. Impairment was seen whether neurological involvement was mild or severe, suggesting that cognitive deficits were present early in the disease. In summary, Peyser *et al.* stress that impairments can be subtle, not apparent to the patient, and may be missed in routine neurological exam (Lishman, 1987, p. 592). Deficits may be marked on timed tests and perceptual tasks may be more severely impacted than in other brain damaged groups (Lishman, 1987, p. 591). .

Surridge (1969) examined 108 MS patients versus a control group suffering from a progressive paralyzing disease, muscular dystrophy. He found that MS patients suffered from loss of memory for recent events and impaired conceptual thinking. Psychometric testing revealed impaired general intellectual efficiency, nonverbal

reasoning, and memory functions. Language functions were usually preserved. There was usually an absence of aphasia, agnosia, and apraxia.

Depression, irritability, and/or euphoria make coexist with this condition and psychiatric disturbance may be prevalent (Lezak, 1995; Lishman, 1987). Emotional lability and denial are observed and may be correlated with euphoria. Hysterical, conversion symptoms are characteristic of the disease, and tend to surface as the disease progresses. Surridge (1969) noted that of 108 MS patients, 75% suffered from psychiatric abnormality versus less than 50% of controls, 61% demonstrated intellectual deterioration, 53% showed mood abnormalities, 27% were depressed, 26% euphoric, and 10% showed exaggerated emotional expression. Impaired awareness of disability was found in 31% of MS patients and 40% showed personality change, typically involving the development of irritability. I suspect that Maj Webster's behavior, judgment, and emotional outbursts are a consequence of advancing MS. Dr. Fey noted that there appears to be problems with irritability, executive functioning, planning and organization, social judgment, and emotional impulse control Maj Webster presents with somewhat histrionic, emotional outbursts.. Col O'Neil stated that within 24 hours, she was involved in two events that reflected poor judgment and threats against others. The commander noted that Maj Webster has displayed a pattern of disorganized and problematic behavior that led to her removal from a patient care setting.

Dr. La Macchia nicely summarized his concerns in a commander directed mental health evaluation of 14 Jul 98. His behavioral observations are of particular significance (pp. 5-6). Concerning his section on Integration of Data, we find independent support for items 1, 2, 3, 6, 7, and 8. We do not find adequate evidence for a diagnosis of attention deficit disorder, nor do our data on reading comprehension support the conclusion that she suffers from poor comprehension: On a test of reading Passage Comprehension, she scored at the 80th percentile. We now have sufficient medical data to support a diagnosis of cognitive disorder not otherwise specified. Furthermore, I believe the changes in Maj Webster's judgment, mood, and behavior are a direct consequence of worsening MS. Her ability to function as an ER or primary care physician is significantly impaired. I recommend that she be referred for a medical board examination.

**DSM-IV DIAGNOSES:**

Axis I 294.9 Cognitive Disorder NOS
310.1 Personality change due to multiple sclerosis, combined type

Axis II V71.09 Antisocial, histrionic and narcissistic personality traits

Axis III History of glaucoma, probable multiple sclerosis.

**This report contains sensitive medical information covered by the Privacy Act. The utmost discretion is required in the handling and disclosure of its contents. The responsibility for further release of this report belongs to the addressee.** If I might be of further assistance, please do not hesitate to contact me.

BRIAN R. CAMPBELL, Lt Col, USAF, BSC
Neuropsychology Service
Wilford Hall Medical Center / MMCNB
(210) 292-7712; DSN 554-7712
FAX (210) 292-5109; DSN 554-5109

## REFERENCES

Adams, R.D. and Victor, M. Principles of Neurology, Fifth Edition. New York: McGraw-Hill, Inc., 1993.

American Psychiatric Association Diagnostic and Statistical Manual of Mental Disorders, 4th Edition. Washington, D. C.: APA, 1994

Bonner, J.S. & Bonner, J. J. The Little Black Book of Neurology, 2nd Edition. St. Louis: Mosby Year Book, 1991.

Christensen, A. Luria's Neuropsychological Investigation. Munksgaard, 1974.

Graham, J. R. MMPI-2: Assessing Personality and Psychopathology, 2nd Edition. New York: Oxford University Press, 1993.

Greene, R. L. The MMPI-2/MMPI: An Interpretive Manual. Boston: Allyn and Bacon, 1991.

Heaton, R. K., Grant, I., and Matthews, C. G., Comprehensive Norms for an Extended Halstead-Reitan Battery. Odessa, FL: Psychological Assessment Resources, 1991. Chapters 1-5.

Knight, R.G. The Neuropsychology of Degenerative Brain Diseases. Hillsdale, NJ: Lawrence Erlbaum Associates, 1992.

Lachar, D. The MMPI: Clinical Assessment and Automated Interpretation. Los Angeles: Western Psychological Services, 1985

Lezak, M.D. IQ: R.I.P. Journal of Clinical and Experimental Neuropsychology. Vol. 10, No. 3, 1988, pp. 351-361.

Lezak, M.D. Neuropsychological Assessment, Third Edition. New York: Oxford University Press, 1995.

Lishman, W.A. Organic Psychiatry. The Psychological Consequences of Cerebral Disorder, Second Edition. London: Blackwell Scientific Publications, 1987.

Matarazzo, J.D. Wechsler's Measurement and Appraisal of Adult Intelligence, 5th Edition. Baltimore: Williams and Wilkins, 1972.

Peyser, J.M., Edwards, K.R., Poser, C.M., & Filskov, S.M. Cognitive function in patients with multiple sclerosis. Archives of Neurology. 1980, Vol. 37, pp. 577-579.

Powell, D.H., Kaplan, E.F., Whitla, D., Weintraub, S. Catlin, R., Funkenstein, H.H. MicroCog, Assessment of Cognitive Functioning. San Antonio: The Psychological Corporation, 1993.

Spreen, O. and Strauss, E. A Compendium of Neuropsychological Tests. New York: Oxford University Press, 1991.

Surridge, D. An investigation into some aspects of multiple sclerosis. British Journal of Psychiatry, 1969, Vol. 114, pp. 749-764.

Wechsler, D. The Measurement and Appraisal of Adult Intelligence, 4th Edition. Baltimore: Williams and Wilkins, 1958.

Wechsler, D. WAIS-R Manual. New York: The Psychological Corporation, 1981.



1494

# PHYSICAL PROFILE SERIAL REP

PATIENT ID *(Use plastic card or type/print name)*
WEBSTER, WILMA

GRADE 04
DATE 10 MAR 98
AFSC
SSN
UNIT
BASE

| PROFILE | P | U | L | H | E | S | SUFFIX |
|---|---|---|---|---|---|---|---|
| PREVIOUS | | | | | | | |
| REVISED TEMPORARY | | | | | | | |
| REVISED PERMANENT | | | | | | | |

BLOOD GROUP DATA

| | | |
|---|---|---|
| TYPE AND RH | | |
| G6PD | DEFICIENCY | ☐ NO ☐ YES |
| HEMOGLOBIN-S | SICKLE CELL TRAIT | ☐ NO ☐ YES |

RELEASE DATE OF TEMPORARY PROFILE OR DUTY RESTRICTION

WORLD-WIDE QUALIFIED ☐ YES ☐ NO

PASSES COLOR VISION ☐ YES ☐ NO

INDIVIDUAL DEFECTS/RESTRICTIONS
LT CARPAL TUNNEL RELEASE
DUTY

☐ MEDICAL DEFECT/CONDITION REQUIRES MEB OR PEB PROCESSING. ASSIGNMENT AVAILABILITY CODE *(AAC)* 37 APPLIES.

*As shown by examination or review of Health Record or current course of treatment, individual is cleared for*

☐ OVERSEAS ASSIGNMENT
☐ RETIREMENT/SEPARATION WITHIN ONE (1) YEAR
☐ REMOTE/ISOLATED TOUR
☐ OTHER *(Specify)*

REMARKS

TYPED OR PRINTED NAME AND GRADE OF HEALTH CARE PROVIDER
ROBERT GRANVILLE, MD
SIGNATURE [signature]

TYPED OR PRINTED NAME AND GRADE OF PES MANAGER
LIC. NC 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
ORTHOPAEDIC SURGERY
SIGNATURE

TYPED OR PRINTED NAME AND GRADE OF PROFILE OFFICER
SIGNATURE

| DPMUO | DPMUM | DPMU(R) | DPMPC | DPMAR | | |
|---|---|---|---|---|---|---|
| | | | | | | |

1447

600-1

**HEALTH RECORD** | **CHRONOLOGICAL RECORD OF MEDICAL CARE**

| DATE | SYMPTOMS, DIAGNOSIS, TREATMENT TREATING ORGANIZATION (*Sign each entry*) |
|---|---|
| 10 MAR 98 | DOS 13 FEB 98 |
| | (L) CTR REQUESTING RTD. MD |
| | PT JAMAR R L |
| | 16 16 |
| | 20 16 |
| | 20/24 = 83% 24 18 |
| | 24 20 |
| | 2PD 4mm 17 10 |
| | x RAD RF EXAM |
| | ROM FULL DF LACKS 5° VF |
| | WND HEALING WELL |
| | A GRIP 83% OF DOM HAND ∴ WNL |
| | P DUTY |
| | ROBERT GRANVILLE, MD LTC, MC 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 ORTHOPAEDIC SURGERY |

PATIENT'S IDENTIFICATION (*Use this space for Mechanical Imprint*)

WESSON WILMA
20/ 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

RECORDS MAINTAINED AT:

PATIENT'S NAME (*Last, First, Middle initial*) | SEX

RELATIONSHIP TO SPONSOR | STATUS | RANK/GRADE

SPONSOR'S NAME | ORGANIZATION

DEPART./SERVICE | SSN/IDENTIFICATION NO. | DATE OF BIRTH 1948

# *CURRICULUM VITAE*

## IDENTIFICATION

Date Prepared: 11 NOV 97
Name: WILMA PAULINE WEBSTER
Rank: MAJOR
Specialty: INTERNAL MEDICINE/ EMERGENCY MEDICINE
AFSC: 044M3; Duty AFSC: 44E3
Social Security Number: 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
Date of Birth: 06 JUL 41
Marital Status: Divorced

## BEST PLACE TO CONTACT

Work: Phone: DSN (312) 284-3636
Comm (507) 284-3636
e-mail: webstewp@sgof@howa
corresp: 24 MSS, Unit 0585, APO, AA 34001-0585
Home: Phone: comm (507) phone applied for, not yet available
corresp: PSC#1, Box 3178, APO AA 34001

## CURRENT ASSIGNMENT

Staff Emergency Physician, 24th Medical Group (ACC), Unit #0585, Howard Air Force Base, Panama

## EDUCATION AND TRAINING

| | | | |
|---|---|---|---|
| 1. | BA | 1959-1964 | UCLA, with major in Near Eastern Studies |
| 2. | MD | 1973-1979 | Universidad Nacional Autonoma de Mexico including one year undergraduate rotating internship and one year social service to Mexican government |
| 3. | Residency | 1980-1983 | Providence Hospital, Southfield, Michigan |

## BOARD CERTIFICATION

| | | |
|---|---|---|
| Internal Medicine | 1985 | American Board of Internal Medicine |
| Emergency Medicine | | Qualified to try to 'grandfather' into Emergency Medicine; ABEM written exam passed 30MAY90; still trying to pass oral exam |

1449

## AWARDS/HONORS

| | | |
|---|---|---|
| 1985 | Community Outreach Award | NEEMA Emergency Medicine |
| 1991 | Army Achievement Medal | USAR |
| 1995 | Air Force Achievement Medal | USAF |

## PUBLICATIONS

1990-1992 Editor of Columbia County Medical Society Medical Bulletin

## FOREIGN LANGUAGES

| *language* | *speak/read/write* | *level (novice, conversant,fluent)* |
|---|---|---|
| Spanish | yes/yes/yes | fluent |
| French | yes/yes/yes | fluent |
| Persian | yes/yes/yes | conversant |
| Japanese | yes/yes/yes | conversant |
| Arabic | yes/yes/yes | novice |

## OTHER

1. 1996-1997 — Founded Bury St. Edmunds' Orators, a Toastmasters club, Bury St. Edmunds, United Kingdom
2. 1995 — Won humerous speech contest, Fussa Speakers Club, Yokota Air Force Base, Japan.
3. 1996 — Won serious speech contest, East Dereham Articulate Speakers, East Dereham, United Kingdom
4. 1997 — Won serious speech contest, Ipsw. Electrifiers, Ipswich, UK

MSl

DEPARTMENT OF THE AIR FORCE
HEADQUARTERS AIR FORCE PERSONNEL CENTER
RANDOLPH AIR FORCE BASE TEXAS

25 September 2002

MEMORANDUM FOR AFBCMR

FROM: HQ AFPC/DPAMF1
550 C Street West, Suite 27
Randolph AFB TX 78150-4729

SUBJECT: Application for Correction of Military Records (DD Form 149)
(Wilma Webster, 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)

REQUESTED ACTION: Applicant requests physician incentive pays be paid to her for the time period of 1 January 1999 through 30 November 2000.

BASIS FOR REQUEST: The applicant alleges officials of the United States Air Force and other personnel of the Air Force acted in an arbitrary and capricious manner and in violation of existing law and regulations by limiting applicant's medical credentials by removing her from any practice in emergency room care.

BACKGROUND: A credentials hearing was conducted 17 - 18 February 1999 to address Major Webster's clinical proficiency. The hearing committee unanimously concluded that Major Webster should not practice in an emergency room.

Major Webster appealed this decision to the Air Force Office of the Surgeon General (OSG). The OSG completed a review of the adverse action including Major Webster's appeal. The Air Force Medical Practice Review Board (AFMPRB) concurred that Major Webster posed an unacceptable risk in the emergency room environment and recommended the Air Force Surgeon General (AF/SG) revoke Major Webster's emergency room privileges. The AF/SG agreed with the AFMPRB and directed this action to be reported to the National Practitioner Data Bank and States of known licensure.

FACTS: Revocation of Major Webster's emergency room privileges was authorized in accordance with AFI 44-119 and was done so appropriately at the discretion of the medical facility commander. The action was supported by the AF/SG.

Title 37, Chapter 5, of United States Code, governs physician incentive pays. Section 302, paragraph b (2) states an officer is not eligible for incentive special pay unless the Secretary concerned has determined that such officer is qualified in the medical profession. The Secretary of the Air Force delegated authority to approve and disapprove physician special pays on 22 June 1998.

D 1452

Air Force Instruction 41-109, Special Pay for Health Professionals, states that a Medical Corps officer is entitled to incentive pay if the individual is fully qualified in a medical specialty and practicing in that specialty. Based on the determination of the Air Force Medical Practice Review Board and the AF/SG, this member was not eligible to receive physician incentive pays.

RECOMMENDATION: This office recommends denial of applicant's request to receive physician incentive pays for the time period of 1 January 1999 through 30 November 2000.

COLLEEN J. FALK, MSgt, USAF
Superintendent, Special Pay Branch
Medical Service Officer Management Division
Directorate of Assignments

Attachment:
United States Code, Title 37, Chapter 5, Section 302

DEPARTMENT OF THE AIR FORCE
REVIEW BOARDS OFFICE
RANDOLPH AIR FORCE BASE TEXAS

OFFICE OF THE ASSISTANT SECRETARY

OCT 4 2002

SAF/MRBR
550 C Street West Suite 40
Randolph AFB TX 78150

RE: Case and AFBCMR Docket Number

WEBSTER WILMA P
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 USAF RET MAJ

0201487 BCMR CASE01

MAJ WILMA P WEBSTER USAF RET
3031 ONTARIO COURT
ROSAMOND CA 93560

Your case has been forward to the Air Force for Correction of Military Records (AFBCMR). The attached advisory opinion(s) prepared by the office(s) of primary responsibility are forwarded for your review and comment, if desired.

***THIS IS NOT THE DECISION ON YOUR APPLICATION***

You have 30 days from the date of this letter to comment on the advisory opinion(s) or provide additional evidence in support of your request to the AFBCMR. If you need more time to comment, you must ask that your case be temporarily withdrawn until such time as you are able to proceed. If you have nothing further to add, a response is not necessary. **ALL FURTHER CORRESPONDENCE SHOULD BE SENT TO:**

**AFBCMR**
**1535 COMMAND DRIVE EE WING 3RD FLOOR**
**ANDREWS AFB MD 20762-7002**

We cannot predict when your case will be decided, but assure you that it will be processed in its turn as rapidly as possible and will receive fair and objective consideration. The AFBCMR staff will not provide further status, so the next corresdondence you receive will normally be the decision on your case.

**Please address all correspondence to the AFBCMR at Andrews AFB MD at the above address.** Include your social security/service number and your AFBCMR Docket Number on all correspondence.

For further information of a general nature, visit our web site at www.afpc.randolph.af.mi./safmibr.

William J Anderson
WILLIAM J ANDERSON, DAFC
Chief Review Boards Office
Air Force Review Boards Agency

Attachment
Advisory Opinion(s)

FL-1
Revised 1 Oct 01

E

1454

**STANTON LAW OFFICE**

HISTORIC LIBRARY PLAZA
SUITE 1012
1823 HARNEY STREET
OMAHA, NEBRASKA 68102

(402) 345-0848
FAX (402) 444-1701

ADMITTED IN IOWA AND NEBRASKA

JAMES L. STANTON
ATTORNEY AT LAW

November 7, 2002

AFBCMR
1535 Command Drive, EE Wing, 3rd Floor
Andrews AFB MD 20762-7002

Re: Response to Advisory Opinions
Major (Retired) Wilma P Webster, 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
AFBCMR Case 01 – 0201487

Greetings:

Pursuant to a telephone call between the undersigned and Mrs. Anderson of your office on November 1, 2002, it is my understanding that this response could be submitted by November 8, 2002, because the notice to submit comments on the Advisory Opinions was sent by SAF/MRBR directly to the Applicant and not to myself, thereby causing a delay in my ability to review the Advisory Opinions.

Applicant, Major (Retired) Wilma P. Webster, and I have reviewed the Advisory Opinions, dated 25 Sep 2002, and 16 Aug 2002 respectively, and have the following comments in response:

I. <u>ADVISORY OPINION, HQ AFPC/DPAMFI, Dated 25 Sep 2002:</u>

1. <u>Comment:</u> While we understand the statutes and provisions cited by MSgt Falk, we disagree with the basic premise that the Air Force action in limiting Major Webster's medical credentials was proper. Instead, we contend that Major Webster met the criteria of Title 37, Chapter 5, of United States Code of being "qualified in the medical profession" and that Air Force officials overreacted in limiting her medical credentials, especially by revoking her Emergency Room privileges. Further, Air Force officials acted inappropriately by limiting Major Webster's clinical privileges requiring a 100 % chart review, first for 3 months and later extended to 6 months, and then not providing her with the opportunity of performing clinical provider duties so that she could remove this limitation while she was still on active duty. It was unjust for the Air Force to discontinue Special and Incentive pay to Major Webster.

F 1455

II. ADVISORY OPINION, AFMOA/SGZC, Dated 16 Aug 2002:

1. Comment: Basically, the entire first page restates MajorWebster's requested action, the basis for her request and a brief background of Major Webster's Air Force medical practice. It should be noted that the sentence toward the bottom of the page (fourth sentence) which states "Major Webster initially practiced emergency medicine at Howard AFB, then was moved to the Family Practice clinic, and finally the Health and Wellness Center." should be clarified to show that this took place before the provider credentials hearing took place in February, 1999. As a matter of fact, Major Webster never worked in a Family Practice setting or any other clinical setting after the medical board hearing.

2. Comment: Page 2 of the Opinion continues with a reiteration of the background facts and is basically correct except that in the middle of the fourth unnumbered paragraph, the sentence "The AFMPRB determined her medical impairment was an unacceptable risk in the emergency room environment and recommended the Air Force Surgeon General (AF/SG) revoke Major Webster's emergency room privileges and provide 100% supervision for her Family Practice privileges." is not entirely accurate because the actual recommendation of the AFMPRB stated that:

"(1) She (Dr. Webster) should not practice in an ER setting (this is primarily due to our concern that she does not adequately handle task-saturated events), (2) Family Practice/PrimaryCare/ Aerospace Medicine privileges should (my emphasis) be allowed, (3) In any of these settings, she should be monitored with 100% chart review for no less than three months; and, (4) at the conclusion of that three month period her privileges should be reevaluated." (Atch 2, DD form 149).

You will note that the AFMPRB did not recommend that Major Webster's ER privileges be "revoked" but only that "(3) in any of these settings, she should be monitored with 100% chart review for no less than three months" and that "(4) at the conclusion of that three month period her privileges should be reevaluated." This, in fact, did not occur and that is one of the primary objections Major Webster has with the actions of Air Force officials in her case. Further, it was Major Webster's commander, Colonel O'Neil, who expanded the AFMPRB's recommendation to "rescind" her Emergency Medicine privileges and to direct that her clinical privileges (Family Practice/Primary Care/Aerospace Medicine privileges "be continued in Category '2'



1456