with 100% chart review and full supervision for a period of six months. (Atch 4, DD Form 149).

3. Comment: On the top of the third page of the opinion, the writer sets forth the recommendation of Major Distefano, Chief, Emergency Services, Keesler AFB, MS, which is also found in Attachment 13, of Applicant's DD Form 149, which includes the conclusion that "It would not be prudent to leave Major Webster alone and in charge of an Emergency department." It should be noted that in his letter, Major Distefano says that he only told his staff that Major Webster was at Keesler AFB to be evaluated on her skills pertaining to her specialty and that she was to be evaluated on the question, "Can she manage an Emergency Room by herself for a 12- hour shift on a repeated basis?" While the doctors concluded that they didn't think she should be left alone and in charge of an Emergency department, we would point out that this should not preclude her from being able to prove herself in the future by being an assistant ER provider in a civilian hospital emergency room. Further, the fact that "Most, but not all" of the ER evaluators believed that Major Webster could perform in a satisfactory manner in a controlled, slower clinic setting (meaning Family Practice, etc.,) the significance of this comment seems to have been lost on the reviewer. Although these physicians' observations of Major Webster occurred over a two week period, as opposed to the three month period recommended by the AFMPRB and the six month period recommended by her commander, it is clear that six military physicians had positive comments to make about Major Webster's clinical provider abilities. Nevertheless, no one in authority in the Air Force has given Major Webster the benefit of these positive statements and we contend that these statements are very significant in evaluating Major Webster's abilities to perform medical duties in a clinical setting.

4. Comments: On page 3 the writer makes comments to the effect that when Major Webster arrived at Offutt AFB she was given a Credentialing package with the statement that she only applied for emergency room clinical privileges claiming that it was the responsibility of the physician to apply for credentialing and that credentialing is not awarded until application is made for them. The writer claims Major Webster never applied for Family Practice clinic privileges and, therefore, the Air Force did not have an opportunity to evaluate her in this setting. We disagree with this conclusion because that may be the routine under normal circumstances but that was not Major Webster's circumstances. We believe the Air Force had the duty to take such steps as were



1457

necessary to insure that Major Webster was re-evaluated in both the ER and clinical settings regardless of where she was assigned. Indeed, when her commander, Colonel O'Neil, took his action, (Atch 4, DD Form 149) he stated that "Furthermore, at the end of that period of observation and review, your privileging status will be re-evaluated." It is our contention that this statement clearly shows that it was the responsibility of the Air Force, and not Major Webster, to assure that both her ER and clinical privileging status be re-evaluated. In the Staff Judge Advocate's Memorandum to Major Webster's commander following the Medical Board hearing, he recommended against reassigning Major Webster because he believed it would give the appearance of reprisal against her because of the adverse hearing outcome and also stated that, "if you decide to PCS Major Webster before final action is taken, we recommend such action be coordinated with HQ ACC/SG. In addition, we recommend notifying Major Webster's gaining unit of the present privileging action." (Atch 5, DD Form 149). Thus, it is clear that Colonel O'Neil knew he should coordinate reassignment of Major Webster with HQ ACC/SG and notify Offutt AFB medical officials of Major Webster's situation. As Major Webster states in her statement, however, (Atch 14, Page 8, DD Form 149), that from the time she arrived at Offutt AFB in October 1999 until she left in early December, 2000, "I was allowed only to do administrative tasks, and was never permitted to see any patients in any clinic, although I repeatedly voiced a desire to do so." We want to make it absolutely clear that the Air Force was at fault for not assigning Major Webster to perform clinical duties and in failing to follow through with re-evaluating her performance of clinical duties.

5. Comments on "Discussion": In the middle of page 3 of the Opinion, under the topic labeled "Discussion", the writer addresses several procedural allegations made by Major Webster which will be addressed separately as follows:

(a) The writer dismisses the complaint about Provider rights as outlined in Air Force Instruction (AFI) 44-119 being violated for failure to produce crucial medical records by saying, "This documentation was found just prior to the hearing. This allegation is unsubstantiated since the AF/SG did not consider this information as a basis for the action taken upon her privileges." It is our contention that the writer is incorrect on when the documents were found as the record of the board hearing clearly shows the Medical Board specifically requested supporting documents on the Code Blue



1455

matter including the code sheet, medical records or nursing notes and were told in testimony by Dr. Burkett that the requested materials were not available. (Atch 2, Page 5, DD Form 149). Curiously enough, in his action letter approving the Medical Board report, Major Webster's commander, Colonel O'Neil, noted that he had reviewed the record of the medical board hearing "including the AETC Form 1280 Code Blue Record which was noted as missing at the time of the hearing (my emphasis)". (Atch 4, DD Form 149). This corroborates Major Webster's allegation as it is absolutely clear that the Medical Board did not have the opportunity to review this crucial document which would have been to Major Webster's benefit because the document (now located at Tab B of Atch 6, DD Form 149) clearly shows that even though Major Webster was unable to intubate the patient, the patient was intubated by Dr. Burkett. In its report the Medical Board said that "The board is not as concerned that she (Major Webster) couldn't intubate, but rather is more concerned that she was unable to control an airway. Given the autopsy results of massive pulmonary embolus, we are unable to determine what impact Dr. Webster's inability to maintain a proper airway had on Sgt Hill's death. (Atch 2, Page 6, DD Form 149). The fact that "AF/SG did not consider this information" as stated by the writer, also shows that the Air Force misses the point that crucial documentation favorable to Major Webster was not available for use by the Medical Board even though the board had specifically requested this documentation. This documentation also refutes testimony of Dr. Burkett where he related that Major Webster failed to defibrillate the patient in a timely manner. In fact, the Code Blue document showed that the cardiac arrest began at 2130 on January 24, 1998, and Major Webster attempted defibrillation on the patient at 2133, 2135 and 2142 (Atch 6, Tab B, DD Form 149) which was before Dr. Burkett had arrived at the Code Blue. Because of the passage of time (over one year) and the absence of the Code Blue documentation, Major Webster was at a severe disadavantage in recalling whether she had ordered the patient to be defibrillated. The facts are that this proçedure was done but the Medical Board did not review this documentation before it made its report.

This entire matter is more fully explained on pages 3 and 4 of our Atch 6 of DD Form 149.

(b). Undue Command Influence: As the writer indicates, toward the bottom of page 3, one witness, Captain Li, stated she felt pressured not to testify for Major Webster. The writer then says "This did not have any negative impact for Major Webster." It is our contention that the due process procedure was tainted unfavorably toward Major Webster if any witness was treated in a manner that he or she felt "pressured not to testify" on Major Webster's behalf. Obviously, this witness was made to feel very uncomfortable about testifying because of the actions by some person in higher authority.

(c). Impartiality of Medical Board. At bottom of page 3 of the Opinion, the writer discussed the allegation that the Medical Board showed partiality to Major Burkett's testimony by stating that "This is unsubstantiated." At page 5 of our Atch 6 of DD Form 149, we set out that during the hearing, Major Webster's then attorney challenged Major Burkett on cross-examination regarding whether he had properly intubated the Code Blue patient based upon the fact that post mortem x-rays taken immediately after the patient died following the Code Blue showed that the endotracheal tube was not inserted properly at which time the Chairman of the Medical Board stated: "Is there any point pertaining to her (Major Webster) because he is not on trial for intubating the code. We know that situation so I am sure Edwin intubated her just fine. Is there anything pertaining…"

It is our contention that when her attorney challenged this Board member for cause, his challenge should have been granted. The statement of the Board member clearly shows he was biased in Major Burkett's favor which is crucial to understanding that not only was Major Burgett a key witness against Major Webster but later, on his own initiative, he prepared a letter to Major Webster's commander recommending what action should be taken by him on the board's report. (Atch 3, DD Form 149). It should be noted also that he was the first person to recommend that the monitoring and re-evaluation of Major Webster not be accomplished by the medical unit at Howard AFB.

(d). (Patient Complaint Rate) In paragraph (5) on page 4, in regard to Major Webster's allegation that her patient complaint rate was not higher than her peers, the writer stated that "This office cannot validate this allegation since patient complaint rates were submitted by the medical treatment facility." We do not understand what this comment is intended to mean. The writer goes on to state that ""The patient complaints submitted on behalf of Major Webster demonstrated labile emotional and behavioral issues." We believe this is a fair statement because as noted by the Medical Board, "The only theme we see in these complaints pertains to waiting times. This is always a concern, but it does not appear to have resulted in any adverse outcomes. Accordingly, we are left with only two of the ten complaints which raise our concern." (Atch 2, page 1, DD Form 149). The Medical Board then went on to discuss a complaint about Major Webster's inappropriate emotional outburst along with other documentation on emotional reactions by Major Webster with the Medical Board concluding that "the outbursts were secondary to stress" and that "These incidents are consistent with her inability to handle stressful situations in an appropriate manner. We feel Dr. Webster should limit her practice to settings which do not produce undue stress." (Atch 2, page 5, DD Form 149). The Medical Board also discussed the last complaint which involved an allegation that Major Webster failed to render proper care to a cat bite victim by (1) failure to initiate a tetanus shot; (2) delivering wrong oral antibiotic and (3) incorrect dosage of rabies immunoglobin on prescription. (Atch 2, page 6, DD Form 149). While finding that each of these three aspects of the complaint were true, the Medical Board stated, "they were corrected immediately and "had no adverse effect upon the patient's care and standard of care was met. (My emphasis) and also stated, "Addressing each of these aspects separately, it first should be noted that Dr. Webster self-identified the antibiotic discrepancy. Secondly, Dr. Webster concurred with the patient's need for a tetanus immunization. Lastly, while it may be unclear whether Dr. Webster wrote the prescription for rabies immunoglobin, it is not a surprise that she may have miscalculated the dose, given that the rabies vaccine is rarely prescribed. Its should be noted, however, that Dr. Webster took the appropriate action and sent the patient to Public Health." Atch 2, page 6, DD Form 149).

(e) (Other staff physicians supportive statements): On the top of page 5 of the Opinion, the writer states, "As previously noted, an evaluation in the Keesler AFB medical center emergency room by six peer emergency room physicians unanimously rated major Webster as incompetent in emergency medicine". It should be noted that Major Webster's ER experiences, including at Howard AFB, were at relatively small ER facilities which by their very nature would limit the extent of her capabilities. Keesler AFB, however, was the "home to the Air Force's 2nd largest Emergency Services Department with an annual patient volume of 30,000 to 35,000 visits per year." ) (Atch 13, page 1, DD Form 149). The fact that "Most but not all" of these same Keesler AFB ER physicians also said that Major Webster "could perform in a satisfactory manner in a controlled, slower clinic setting" and "They felt that Major (Dr) Webster had good clinical knowledge in most settings…" (Atch 13, page 1, DD Form 149) should be given strong consideration in restoring unlimited Primary Care privileges to Major Webster.

III. <u>SUMMARY:</u>

A. It is our strong belief that the Applicant, Major Wilma P. Webster, USAF, Retired, was the victim of numerous errors committed by Air Force officials in the handling of her situation and that the net result constituted an injustice to Major Webster. In support of overturning all, or part of the Air Force actions, we would remind the Board that:

1. The actions which allegedly form the basis for the Air Force action did not meet the criteria of AFI 44-119, para 4.5 which required the Air Force to prove "gross provider misconduct, professional incompetence, or negligence that is self-evident and poses a significant threat to patient safety or well-being." Clearly, nothing Major Webster did was life-threatening nor constituted a "significant threat to patient safety or well-being." Her case would have been much more serious if she had been an inept surgeon wherein patients had died or been maimed or if she had many instances of prescribing wrong medications with disasterous results. Nothing Major Webster did remotely approaches such serious consequences. Indeed as stated on page 16 of the continuation sheet to the DD Form 149, the unidentified author of the memorandum to the Surgeon

General, agreed in his memorandum (Atch 9, page 3, para 7) that "it is difficult to translate that information (Applicant's cognitive deficits and personality) directly into a privilege revocation as outlined in AFI 44-119, para 4.5 describing 'gross provider misconduct, professional incompetence, or negligence that is self-evident and poses a significant threat to patient safety orwell-being.' She has never been involved in a malpractice claim, and does not have any documented poor clinical outcomes." It is our position that Major Webster's case clearly did not warrant revocation of her Emergency Medical care privileges.

2. Regarding Major Webster's Primary Care clinical privileges, it should be remembered that the recommendations of the Medical Board at Howard AFB (Atch 2, page 7, DD Form 149) stated that Major Webster's Family Practice/Primary Care/Aerospace Medicine privileges should be allowed with 100% chart review for no less than three months. Also, her Commander 's decision (Atch 4. DD Form 149) stated that he was directing that "(2) your Family Practice/Primary Care/Aerospace Medicine privileges be continued in category '2' with 100 % chart review and full supervision for six months." The Air Force Surgeon General concurred in the action taken by Major Webster's commander. (Atch 7, DD Form 149). Thus, we believe the appropriate action to be taken on these privileges is to merely remove all chart review and full supervision provisions as these conditions do not appear to be appropriate or necessary in a civilian medical practice environment, under the circumstances, especially since six ER military physicians at Kessler AFB clearly indorsed allowing Major Webster to practice medicine in a clinical setting.

3. While the Air Force determined that Major Webster's ER and clinical privileges would be withheld and they were, in fact, withheld not only for the remaining duration of her Air Force active service but also for the past two years as a civilian, the important point at this stage is how to best remedy Major Webster's predicament so that she can re-enter and salvage her medical career in the civilian medical profession. The AF removed her from practicing medicine from about Feb 1998 until she was medically retired in December 2000 and this has continued right up to the present (over 4 1/2 years). Clearly, even if there were justification for the Air Force to initially restrict her ER

privileges, there is no compelling reason for permitting this injustice to go on forever. Rather, there are compelling reasons to restoring all of her medical provider privileges or, at the very least, reduce the restriction to allowing her to practice in an Emergency Room in a capacity other than the chief, ER physician under chart supervision for three months or in a non-ER clinical setting without supervision. This limitation would give Major Webster an opportunity to demonstrate her ER Medicine and Primary Care medical skills in a supervised neutral civilian setting and place the onus of restoring all, or a significant part of Major Webster's medical provider privileges, on her future demonstrated abilities in a civilian medical institution before civilian medical providers and the appropriate state medical licensing department where it should rightfully belong since the Air Force no longer has the responsibility for, nor is placed at risk in any manner by Major Webster's medical capabilities. The Air Force did what it believed was appropriate while Major Webster was on active duty and it should now exit from her life and not interfere with allowing Major Webster to salvage her civilian medical profession.

Respectfully submitted,

JAMES L STANTON
Counsel for Applicant

RECORD OF PROCEEDINGS
AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

FEB 4 2003

IN THE MATTER OF:

WILMA P. WEBSTER

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

DOCKET NUMBER: 02-01487
INDEX CODE: 134.02
COUNSEL: Mr. James L. Stanton

HEARING DESIRED: YES

---

APPLICANT REQUESTS THAT:

1. The findings and recommendations of a Medical Practice Review Board (MPRB) restricting her from practicing Emergency Room (ER) medicine be removed from her records.

2. The determination of the 24th Medical Group commander restricting her from practicing medicine in the Family Practice/Primary Care/Aerospace Medicine clinics without 100 percent supervision for six months be removed from her records.

3. The adverse correspondence provided to the National Practitioner Data Bank (NPDB) by the Office of the Surgeon General of the Air Force (AF/SG) be rescinded, or in the alternative, the restriction be reduced to supervised practice in the ER and clinical settings.

4. She be granted physicians incentive pay and other benefits from 1 Jan 99 through 1 Dec 00.

---

APPLICANT CONTENDS THAT:

The findings and recommendations of the MPRB held at Howard AFB, Panama, and the subsequent actions by her commander and the AF/SG did not meet the criteria set forth in AFI 44-119. The basis for convening the MPRB was primarily ten patient complaints. Of the ten complaints the MPRB found that eight pertained to waiting times that did not appear to have resulted in any adverse outcomes. The two remaining complaints were a letter from an NCO about the applicant crying during his appointment, inappropriate comments she made about hospital officials, a dream she related about shooting hospital leadership, and having discussed her childhood sexual abuse with a technician in the front office. The MPRB concluded that because the applicant did not deny them, the incidents did occur. A physician agreed that while inappropriate, the outbursts were secondary to stress and concluded that she was neither suicidal nor homicidal. The MPRB concluded that these incidents were consistent with her inability to handle stressful situations in an appropriate manner and felt that she should limit her practice to settings which do not produce undue stress. The other incident involved a complaint about the applicant's treatment for a cat bite by a patient who contended that the applicant failed to render proper care by

1465

failing to initiate a tetanus shot, delivering the wrong oral antibiotic, and prescription of an incorrect dosage of rabies immunoglobin. The MPRB found that the allegations were true and that they were corrected immediately and had no adverse effect upon the patient's care.

In another incident, the applicant prescribed a patient Tylenol but handed the patient a bottle of Benadryl instead. The MPRB concluded that the mistake did occur but noted that both medicines were elixir-type drugs in identical bottles with identical labels of the same color manufactured by the same manufacturer. The Pharmacist testified that this error was not uncommon and not isolated to the applicant. The Pharmacist also testified that the applicant was highly regarded for her pharmacological knowledge. The MPRB also noted that there were only two medication errors by the applicant since her arrival six months earlier and that she had seen well over 1,000 patients during that time.

The more serious complaint was a "Code Blue" situation. The main complaints in this situation were her inadequate airway control, inability to properly follow Advanced Cardiac Life Support (ACLS) guidelines, CPR, and defibrillation. The patient died from cardiac arrest. The applicant was in charge of directing Code Blue on the patient with the assistance of Major B--- and Colonel O---. The MPRB found that there was a breach in the standard of care by the applicant and that her conduct did have a potential to adversely affect the quality of patient care. The MPRB noted, however, that it was difficult to objectively assess the situation because they were not provided certain support documents, notwithstanding their request that such documents be produced. Major B-- testified that the requested materials were not available but for some unexplained reasons, they reappeared after the MPRB hearing. The MRPB stated that it had to rely upon eyewitness testimony of Major B--- and Colonel O--- and concluded that the applicant was unable to successfully intubate the patient and failed to adequately follow ACLS protocol. The MPRB noted that she demonstrated a visible uneasiness when confronted with a hypothetical ACLS scenario and did appear to be in control of the situation. The MPRB concluded by stating that under nonstressful situations, she is capable of performing airway management and made the additional comment that there is a tremendous difference between real code and a controlled environment. Counsel states that even including the Code Blue, all of the complaints and allegations against the applicant were non-life threatening and did not affect any of the patients adversely. She saw 1,151 patients in the eight months that she practiced as an ER provider. There were only two medication complaints and nine complaints dealing with patient concerns with time waiting to be seen in the ER. The applicant should have been able to continue to practice ER medicine, or clinical medicine as recommended by the MPRB instead of never being permitted to treat any patients from the time of the board until her medical discharge.



1466

The MPRB noted that it was alleged that the applicant suffered from Multiple Sclerosis (MS), neuropsychological deficits, and carpal tunnel syndrome. The MPRB noted that she faced a Medical Evaluation Board (MEB) and was returned to duty following a determination that she did not have a clinical diagnosis of MS. While stationed in Panama she was evaluated at Wilford Hall Medical Center by the Chairman of Neurology, whose findings were consistent with the diagnosis of MS. An independent neurologist evaluation at the Beth Israel Deaconess Medical Center determined that further clinical symptoms were necessary before a final conclusion was drawn and that her symptoms were more consistent with Guillan-Barre syndrome/Miller Fisher variant. The MPRB agreed that further clinical symptoms should occur before MS could be substantiated and limiting her practice as a physician based on physical disability could not be justified. However, that is exactly what happened despite the MPRB's recommendation. The Air Force had a duty to give her the opportunity to comply with the restrictions placed on her by the MPRB and her commander. She was never given the opportunity to practice as a physician in a clinical setting (except at Keesler AFB) and was not placed in a clinical setting at Howard AFB. Because Howard AFB was scheduled to close, she was reassigned to Offutt AFB. She was sent on temporary duty for two weeks to the medical facility at Keesler AFB for observation of her ER capabilities. The commander of the medical facility at Keesler AFB made a report to her commander at Offutt AFB that all the Air Force physicians at Keesler AFB who observed her actions recommended that she not be returned to duty in an ER but that she would be quite capable of performing medical duties in less stressful medical clinics. While assigned at Offutt AFB she was not assigned to a clinical setting as a physician but instead was relegated to duties of reviewing medical records and those of a file clerk. This arbitrary action totally destroyed her ability to practice as a physician and resulted in another MEB followed by a Physical Evaluation Board (PEB). This action demonstrated the Air Force's quest to remove her from practicing medicine and to ultimately remove her from the Air Force.

The Air Force conducted its hearings, made its recommendations and her commander added his approval with the slight modification of having her clinical practice 100 percent supervised for 6 months instead of the recommended 3 months. Her commander made the decision to go forward with her practicing in clinics instead of the ER. The MPRB noted that she possessed requisite knowledge to be a physician and the physicians who reviewed her ER capabilities agreed that she should be permitted to practice in a clinical setting. Notwithstanding these recommendations, she was never placed in a clinical setting. This not only humiliated her as a military physician but also took away her ability to demonstrate and improve her clinical abilities, but most importantly, took away her livelihood as a physician for the rest of her life. The applicant had the right to rely on the MPRB's recommendation and her commander's statement that she would be placed in a clinical setting. Had this happened she could have at least salvaged her medical career from a standpoint of rendering medical service in a non-emergency room setting both

while in the Air Force and as a civilian. The Air Force initiated a second MEB in July 2000 based again on its assertion that she had MS. The MEB recommended a PEB be conducted which eventually resulted in her medical disability retirement. The Air Force indicated that because of this condition, she should not be placed even in a clinical position. Neither the first PEB nor the MPRB concluded that she could not provide clinical care, therefore, any claim that her medical condition would prevent her from providing routine care was without any basis in fact.

In support of her request, applicant provided her counsel's brief, documentation associated with her clinical privileges hearing and appeals thereof, documentation associated with her MEB and PEB determinations, a copy of her permanent change-of-station orders, documentation associated with her medical skills evaluation at Keesler AFB, a personal statement, copies of clinical neuropsychological reports, a letter from her attorney and her commander's response, policy on medical licensure letter, her statement of military compensation; a copy of her Active Duty Service Commitment Counseling Statement, a Leave and Earnings Statement, and extracts for several Air Force instructions. Her complete submission, with attachments, is at Exhibit A.

---

STATEMENT OF FACTS:

On 20 Jun 92, the applicant, a prior service Army Reserve officer, was appointed a major, Medical Corps, Reserve of the Air Force. She was voluntarily ordered to extended active duty on 28 Jul 92.

A credentials hearing was conducted to address matters that pertain to her clinical proficiency, professional conduct as well as matters affecting her mental and physical well-being. The hearing addressed patient complaints, mental/physical limitations mounting to an unacceptable impairment, forgetful/disorganization in the clinical setting, inappropriate actions, and allegations of substandard care in the ER setting. The applicant was represented by counsel and presented her own evidence and witnesses. The hearing committee unanimously concluded that she should not practice in an ER setting due to the concern that she does not adequately manage task-saturated events, family practice/primary care/aerospace medicine privileges should be allowed, she should be monitored with 100 percent chart review for no less than 3 months, and at the conclusion of the three-month period her privileges should be reevaluated. She appealed the decision to the AF/SG on the basis that the government failed to produce crucial medical records, the government introduced records not provided to the applicant prior to the hearing, the government exerted command influence upon at least one witness, the government failed to assure impartiality of the Hearing Committee, and the government went outside the hearing record to investigate an incident without advising the applicant. AF/SG completed a review of the adverse action and her appeal. AF/SG



1452

agreed with the MPRB and directed this action be reported to the NPDB and States of known licensure.

While stationed at Offutt AFB, the Air Force offered her an additional reevaluation of her emergency room practice. She was sent to Keesler AFB for reevaluation. During this time six ER physicians provided direct evaluation of her ER practice. Their recommendations stated that it would not be prudent to leave the applicant alone in charge of an emergency department, that she was not a competent emergency physician, and most (but not all) evaluators believed that she could perform in a satisfactory manner in a controlled, slower clinical setting. They concluded that she has good clinical knowledge in most settings but all agreed that she couldn't handle the "multi-tasking" needed in the emergency medicine specialty.

An MEB was convened on 1 Dec 98 and referred her case to an Informal Physical Evaluation Board (IPEB) with a diagnosis of Gullian-Barre syndrome, MS, antisocial, histrionic, and narcissistic personality traits, cognitive disorder, and glaucoma. On 28 Jan 99, the IPEB recommended that she be returned to duty.

On 12 Jul 00, an MEB was convened and referred her case to an IPEB with a diagnosis of MS versus, less likely, recurrent Miller-Fisher variant of Gullian-Barre. On 10 Aug 00, the IPEB found her unfit for further military service based on a diagnosis of MS, associated with secondary cognitive deficit and recommended that she be permanently retired with a compensable percentage of 30 percent. The applicant disagreed with the findings and recommended disposition of the IPEB and requested a Formal PEB (FPEB). On 20 Sep 00, the applicant elected to waive her right to an FPEB and indicated that she concurred with the findings and recommended disposition of the IPEB. On 17 Oct 00, the Office of the Secretary of the Air Force directed that she be retired in the grade of major with a compensable rating of 30 percent. She was retired on 1 Dec 00. She served eight years, four months, and four days on active duty.

---

AIR FORCE EVALUATION:

AFMPA/SGZC reviewed applicant's request and recommends denial. SGZC states that it is important to note that she was provided a Credentialing package upon her arrival at Offutt AFB. She only applied for ER clinical privileges. She did not apply for Family Practice clinic privileges. Because she did not apply for Family Practice privileges, the facility did not have an opportunity to reevaluate her after a period of supervision in this clinical setting.

Regarding the applicant's allegation that her rights were violated for failure to produce crucial medical records used by the Credentials Hearing, SGCZ states that the medical documentation was missing for a period of time during the adverse

privileging action and was found just prior to the hearing. AF/SG did not consider this information as a basis for the action taken upon her privileges. Regarding her allegation that there was undue command influence upon at least one witness, SGCZ states that the witness stated she felt pressured not to testify for the applicant, she did testify on her behalf and the testimony did not have any negative impact on the applicant. Regarding her allegation that the medical treatment facility failed to assure impartiality of the hearing committee, SGCZ states that this allegation is based on one statement from a hearing member who stated he had confidence in Major B---'s performance during the code blue incident, Major B---'s performance was not in question and this is irrelevant to this case. Regarding her allegation that one member of the medical treatment facility went outside the Hearing record to investigate a peer review at a different medical facility, SGCZ states that one committee member telephoned Langley AFB to inquire about the results of a peer review on the code blue involving the applicant. No information was provided to the member and giving her the benefit of the doubt, was not considered as a factor in the final decision by AF/SG. Regarding her allegation that she does not have a higher patient complaint rate than her peers, SGCZ states that this allegation cannot be validated since patient complaint rates were submitted by the medical treatment facility. The patient complaints submitted on her behalf demonstrated labile emotional and behavioral issues. Regarding her allegation that she did not have opportunity to respond to the patient complaints and there is no documentation of poor patient outcomes, SGCZ states that there is general agreement that she posses good medical knowledge. Her diagnosed cognitive deficits have impacted her ability to manage a fast-paced, multi-tasked emergency room environment. Once this problem was recognized the facility took action to prevent any medical mishaps. Regarding her allegation that other physicians supported her medical care, SGCZ states that some physicians provided supportive statements; however, none of the statements was from her peer emergency room physicians, the specialty where she was felt to be deficient. Regarding her allegation that the medical facility produced new evidence without providing the evidence to her, SGCZ sates that there is no reference to this information, it was not considered as a factor by the Hearing Committee or the MPRB and had no impact on the final outcome.
The SGZC evaluation, with attachments, is at Exhibit C.

AFPC/DPAMF1 reviewed applicant's request and recommends denial. DPAMF1 states that revocation of the applicant's ER privileges was authorized in accordance with AFI 44-9119 and was done so appropriately as the discretion of the medical facility commander and supported by AF/SG. Title 37, Chapter 5 of the United States Code states that an officer in not eligible for incentive special pay unless the Secretary concerned has determined that such officer is qualified in the medical profession. The Secretary of the Air Force delegated authority to approve and disapprove physician special pays on 22 Jun 98. AFI 41-9109, Special Pay for Health Professionals, states that a Medical Corps officer is entitled to incentive pay if the individual is fully qualified in

a medical specialty and practicing in that specialty. Based on the determination of the Air Force MPRB and the AF/SG, she was not eligible to receive physician incentive pays.

The DPAMF1 evaluation, with attachments, is at Exhibit D.

---

APPLICANT'S REVIEW OF AIR FORCE EVALUATION:

Counsel responded and states that the MPRB did not recommend that the applicant's medical privileges be "revoked" but only that she should be monitored with 100 percent chart review for no less than 3 months and then reevaluated at the conclusion of that period. This, in fact did not occur. It was her commander who expanded the MPRB's recommendation to "rescind" her emergency medicine privileges and to direct that her clinical privileges "be continued in Category 2 with 100 percent chart review and full supervision for a period of 6 months." While the physicians at the ER at Keesler AFB did not think she should be left alone and in charge of an emergency department, counsel points out that this should not preclude her from being able to prove herself in the future by being an assistant ER provider in a civilian hospital. The significance of the fact that most, but not all of the ER evaluators believed that she could perform in a satisfactory manner in a controlled slower clinic setting seems to have been lost in the review. Nobody in authority in the Air Force has given the applicant the benefit of these positive statements and counsel contend that these statements are very significant in evaluating her abilities to perform medical duties in a clinical setting.

SGCZ states that when she was given a credentialing package, she only applied for ER clinical privileges claiming that it was her responsibility to apply for credentialing and that credentialing is not awarded until application is made for them. This may be the routine under normal circumstances but not under the applicant's circumstances. The Air Force had the duty to take the steps necessary to insure that she was reevaluated in both the ER and clinical settings regardless of where she was assigned. The statement of her commander clearly shows that it was the responsibility of the Air Force, not the applicant, to assure that both her clinical privilege status be reevaluated. In the Staff Judge Advocate's memorandum to her commander, he recommended against reassigning her because he believed it would give the appearance of reprisal against her because of the adverse hearing outcome. He further recommended such action be coordinated with the major command and that her gaining unit officials be notified of her situation. From the time the applicant arrived at Offutt AFB she was only allowed to do administrative tasks and was never permitted to see any patients in any clinic despite her repeated voicing her desire to do so. The Air Force was at fault for not assigning her to clinical duties and in failing to follow through with reevaluating her performance of clinical duties.



IU-71

Her commander noted that he had reviewed the record of the MPRB hearing, including the AETC Form 1280 Code Blue Record, which was noted as missing at the time of the hearing. This corroborates the applicant's allegation that the MPRB did not have the opportunity to review this crucial document which would have been to her benefit because it shows that even though she was unable to intubate the patient, the patient was intubated by Major B---. This documentation also refutes testimony of Major B--- where he related that the applicant failed to defibrillate the patient in a timely manner. The facts are that the procedures were done but the MPRB did not review this documentation before it made its report.

During the hearing, her attorney challenged Major B---'s testimony concerning the Code Blue and the challenge was not allowed by the Chairman of the Board. His statement clearly showed that the Chairman was biased in Major B---'s favor which is crucial to understanding that not only was Major B--- a key witness against the applicant but on his own initiative he prepared a letter to the commander recommending what action should be taken and also recommending that her monitoring and reevaluation not be accomplished at Howard AFB.

It should be noted that prior to her evaluation at Keesler AFB her ER experiences were at relatively small ER facilities, which by their very nature would limit the extent of her capabilities. Keesler AFB, however, was home to the Air Force's second largest emergency services department with an annual patient volume of 30,000 to 35,000 visits per year. The fact that most but not all of the Keesler AFB physicians states that she could perform in a satisfactory manner in a controlled, slower clinic setting and felt that she had good clinical knowledge in most settings should be given strong consideration in restoring unlimited primacy care privileges.

Counsel's statement is at Exhibit F.

---

THE BOARD CONCLUDES THAT:

1. The applicant has exhausted all remedies provided by existing law or regulations.

2. The application was timely filed.

3. Insufficient relevant evidence has been presented to demonstrate the existence of error or injustice that would warrant full relief of the applicant's requests. We note that the credentials hearing committee, after deliberation on all the facts of her case, recommended that she should not practice in an ER setting and that she should be allowed clinical privileges with 100 percent chart review and reevaluation after a period of time. Her commander concurred with that recommendation. The MPRB reviewed the facts of her case and made their recommendation to the AF/SG. After review of all the facts of her case and

consideration of her appeal, the AF/SG subsequently concurred with the recommendations of the MPRB. The applicant contends that the actions taken to revoke her ER privileges and limit her to clinical duties were arbitrary, capricious, and were in violation of laws and policy; and requests that those findings and determination be removed from her records. After a thorough review of the evidence of record, it is our opinion that the actions taken to affect revocation of her ER privileges and restrict her to clinical practices were taken appropriately and in accordance with established directives. Evidence has not been presented which would lead us to believe that her commander abused his discretionary authority in this matter or that the actions taken against the applicant were based on anything other than her own performance. Upon her application for ER clinical privileges, she was reevaluated in an ER setting and it was further confirmed and recommended that she should not be placed in an ER department and she be limited to duties in a clinical setting. We note the applicant's requests that the adverse correspondence provided to the MPRB be rescinded, or in the alternative amended. However, we carefully reviewed the data contained in the Adverse Action Report provided to the MPRB and are not persuaded that the data therein is factually incorrect or that the report was improperly submitted. Therefore, we agree with the Air Force offices of primary responsibility regarding these matters, and adopt their rationale as basis for our conclusion that she has not been the victim of an error or injustice.

4. Sufficient relevant evidence has been presented warranting approval of the applicant's request to receive Additional Special Pay (ASP) for the years 1998 and 1999. A review of her pay records reflects that she remained eligible for, and continued to receive payments on her Incentive Special Pay, Multi-year Special Pay, Board Certification Pay, and Variable Special Pay contracts. Based on our review of the evidence of record, it is our opinion that although her ER privileges were revoked, the MPRB had determined that she was qualified to perform in a clinical setting. While we believe that it was at her commander's discretion to relegate her to other duties, we note that based on the findings of the MPRB, the applicant could have practiced in a clinical setting and therefore was entitled to the Additional Special Pay. Accordingly, we recommend that her records be corrected to the extent indicated below.

5. The applicant's case is adequately documented and it has not been shown that a personal appearance with or without counsel will materially add to our understanding of the issues involved. Therefore, the request for a hearing is not favorably considered.

---

THE BOARD RECOMMENDS THAT:

The pertinent military records of the Department of the Air Force relating to APPLICANT be corrected to show that:

a. On 27 July 1998, she executed, and competent authority approved, a 1-year Additional Special Pay Contract, effective 28 July 1998.

b. On 27 July 1999, she executed, and competent authority approved, a 1-year Additional Special Pay Contract, effective 28 July 1999.

---

The following members of the Board considered Docket Number 02-01487 in Executive Session on 18 Dec 02, under the provisions of AFI 36-2603:

Mr. Thomas S. Markiewicz, Vice Chair
Mr. Billy C. Baxter, Member
Mr. Grover L. Dunn, Member

All members voted to correct the records, as recommended. The following documentary evidence was considered:

Exhibit A. DD Form 149, dated 25 Apr 02, w/atchs.
Exhibit B. Applicant's Master Personnel Records.
Exhibit C. Letter, AFMOA/SGZC, dated 16 Aug 02, w/atchs.
Exhibit D. Letter, AFPC/DPAMF1, dated 25 Sep 02, w/atchs.
Exhibit E. Letter, SAF/MRBR, dated 4 Oct 02.
Exhibit F. Letter, Counsel, dated 7 Nov 02.

THOMAS S. MARKIEWICZ
Vice Chair



1470

**STANTON LAW OFFICE**

HISTORIC LIBRARY PLAZA
SUITE 1012
1823 HARNEY STREET
OMAHA, NEBRASKA 68102

ADMITTED IN IOWA AND NEBRASKA

JAMES L. STANTON
ATTORNEY AT LAW

(402) 345-0848
FAX (402) 444-1701

August 19, 2004

AFBCMR
1535 COMMAND DRIVE EE, WING 3RD FLOOR
ANDREWS AFB MD 20762-7002

Re: Request to Reconsider Decision – Wilma P. Webster, SSAN: 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
Docket # BC-02-01487, Issued on Feb 4, 2003.

Greetings:

Request is hereby made to the AFBCMR for re-consideration of the decision entered in the case of my client, Wilma P. Webster, 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, which was decided by the Board on Feb 4, 2003.

In her application, Major Webster requested that:

1. The findings and recommendation of a Medical Practice Review Board (MRPB) restricting her from practicing Emergency Room (ER) medicine be removed from her records. COMMENT: AFBCMR did not grant this request.

2. The determination of the 24th Medical Group commander restricting her from practicing medicine in the Family Practice/Primary Care/Aerospace Medicine clinics without 100 percent supervision for six months be removed from her records. COMMENT: It appears the AFBCMR granted this relief but Major Webster requests clarification of the Board's decision in this regard to assure that her privileges regarding Family Practice/Primary Care/Aerospace Medicine are totally unrestricted.

3. The adverse correspondence provided to the National Practitioner Data Bank (NPDP) by the Office of the Surgeon General of the Air Force (AF/SG) be rescinded, or in the alternative, the restriction be reduced to supervised practice in the ER and clinical settings. COMMENT: It appears the Board granted this request as to clinical settings but did not grant this request regarding ER practice. Major Webster requests clarification of the Board's decision to assure her clinical privileges are totally unrestricted.

4. She be granted physicians' incentive pay and other benefits from 1 Jan 99 through 1 Dec 00. COMMENT: The Board granted this request approving

H 1475

Additional Special Pay, effective 28 July 1998, for one year, and effective 28 July 1999, for one year.

Applicant, Major Webster, specifically requests the Board reconsider its decision in the following regards:

1. Clarify specifically that it was the Board's decision that Dr. Webster's medical clinical privileges either were never restricted in any way, or if they had been restricted, the Board's decision clearly removed all such restrictions on her ability to practice in a medical clinical setting.

2. Remove all restrictions preventing her from practicing Emergency Room (ER) medicine. In support of this request, attached hereto for your consideration are three statements from civilian emergency room physicians (Atchs 29, 30 & 31) supporting the restoration of emergency room (ER) privileges. The attached statements are:

A. Dr. Carol Rogala, D.O. FACEP, had met Major (Dr) Webster on only one occasion, about 10 years ago, during a conference which both were attending. Her only contact since that time was "on rare, sporadic occasions" as she states on page 5 of her statement. Dr. Rogala has practiced Emergency Medicine for over 9 years, sits on an Emergency Practice Medicine Committee and is a former Medical Consultant for the Arizona Board of Medical Examiner. As you will notice from Dr. Rogala's statement, she discusses every aspect of the Findings and Recommendation of the Medical Practice Review Board which was held at Howard AFB, Panama, and commends the Board members for their insight on their responsibilities. Indeed, she points out that "Nowhere in the Board's recommendations did it state that revocation of privileges should be sought."(Page 3, Rogala statement). She is very adamant, however, that her supervisor, Major Burkett, "was entirely vindictive and his actions were intentional" when "Not two days after this (the Board's Recommendations) was signed, Major Burkett fired off a memo (to Colonel Terrence O'Neill) stating,

> '1. Fully concur with the decision about revocation of her Emergency physician privileges.
> 2. ...she should continue without privileges in primary care...'"

Dr. Rogala goes on to state that " Major Webster suffered the ultimate rape. They (Major Burkett, Colonel O'Neill, the Air Force) took her income, her personal and professional life, her dreams, her self esteem, and then they tossed her to the side like yesterday's newspaper." (Page 4, Rogala's Statement) She concludes by stating, "Dr. Webster is no longer in the military, will never interface with these two doctors again, and only wants to practice the profession she trained many years for. Therefore, my recommendation would be as follows: Retract the statement about revocation of privileges in the National Practitioner Data Bank. This is reasonable because it was never the recommendation of the