Clinical Privileges Hearing Board. Write it off as a mistake or an over-reaction, if need be, but just give her life back to her."

Dr. Rogala's complete statement and curricula vitae are attached as Attachment 29.

B. Another physician, Dr. Anne Li, knew Dr. Webster well, having served with her in the Emergency Room at the Air Force hospital at Howard Air Force Base, Panama. She also knows and comments on many of the persons involved in the action taken against Dr. Webster. Dr. Li relates her positive experience of working with Dr. Webster in the ER at the Air Force Base in Panama and that "I never observed any gross negligence or irregularity of any kind from her. Her work ethic was impeccable." Dr. Li's statement and Resume are attached as Attachment 30.

C. The remaining physician, Dr. Brad Lockee, has never met nor talked with Dr. Webster. He is a totally impartial evaluator of her situation and whose credentials and experience are extremely impressive. In fact, I suggest the Board review Dr. Lockee's Curricula Vitae before reading his statement. Dr. Lockee is a former military physician who "can understand the concerns the MPRB had about Dr. Webster's 'interpersonal deficiencies' in a military ER." He goes on to state, "There are physicians who are not a good 'fit' for military service. However, in my experience, these are handled by a personnel or administrative action by the Commander. I have seen such physicians go on to have quality careers in public service."

Later in his statement, Dr. Lockee states,

> "While the Air Force was concerned about Dr. Webster's presence in a military setting being a potential disruption, the sad effect of the Air Force action is that not only was Dr. Webster put out of her medical field in the military, but, more importantly, she has lost the opportunity to practice as a civilian physician in her specialty. The Air Force decision should not have been so far reaching. It should have been left to civilian medical facilities to make any decision about Dr. Webster's medical privileges..." (page 2 of Dr. Lockee's statement).

In his conclusion, Dr. Lockee recommends "that action be taken to remedy Dr. Webster's predicament by reversing any revocation action with a caveat, if appropriate, that her future employers review her ER capabilities, as necessary."

Dr. Lockee's statement and curricula vitae are attached as Attachment 31.

D. To further verify the severe consequences that Major Webster has suffered because of the Air Force revoking her Emergency Medicine privileges, attached as Attachment 32 is a statement by Dr. Webster detailing the adverse effects, including a large monetary loss in annual income, resulting from the Air Force's action in revoking her Emergency Medicine privileges.

CONCLUSION: It is our strong belief that although the initial temporary restriction of Major Webster's ER privileges for three months may have been warranted in order to have her performance supervised, the action by her commander and AF/SG which resulted in the permanent restriction of her ER privileges was totally not warranted and unjustified when the particular facts of her case are carefully considered along with the understanding that the long term consequences of this action has been to prevent Major Webster from earning her livelihood in the civilian community and has cost her an enormous amount of lost income by being prevented from practicing ER medicine after leaving the Air Force. It should also be remembered that the criteria for correcting records is that there must be an error or injustice occurring in Applicant's record. We believe that is clearly the case here. Therefore, we request the Board void the Air Force's decision to limit Major Webster's practice of ER medicine and notify the National Practitioner Data Bank of the reversal of the revocation of Major Webster's Emergency Medicine privileges.

Respectfully submitted,

James L Stanton
Counsel for Applicant

Attachments:

29. Statement, dated April 16, 2004, by Carol Rogala, D.O. FACEP, and Curricula Vitae;
30. Statement, dated, July 12, 2004, by Anne Li, M.D. and Resume;
31. Statement, dated 11/09/2003, by Brad Lockee, M.D. and Curricula Vitae.
32. Statement, dated April 29, 2004, Wilma P. Webster, M.D.

REVIEW OF REVOCATION OF EMERGENCY DEPARTMENT PRIVILEGES

DR. WILMA WEBSTER

I have reviewed the following documents:

1. Notification of Privileges Hearing, January 7, 1999;
2. Findings and Recommendations, Clinical Privileges Hearing, February 18-19, 1999;
3. Dr. Burkett's Recommendation, February 22, 1999;
4. Commander's Action, March 24, 1999;
5. Dr. Webster's Appeal, January 19, 2000;
6. Air Force Surgeon General's Decision, January 19, 2000;
7. Appeal to the NPDB by Dr. Webster's attorney, January 27, 2000;
8. Letter dated June 15, 1999 with the author's name obliterated;
9. Kessler AFB/EM Skills Evaluation, January 15, 2000;
10. Dr. Charles Poser's neurological consult;
11. Findings and Recommended disposition of USAF, Physical Eval.

The first issues to consider are clinical issues. I found it absolutely ludicrous to even bring up 8 patient complaints about 'long waits' in the Emergency Department during a Hearing regarding Clinical Privileges. Any Emergency Physician who has been working longer than five minutes in any E.D. in this country knows that overcrowding, long waits, and ambulance diversion are so common that it has been written about in Newsweek, discussed on the news, the topic of research, and the main focus of the Emergency Practice Medicine Committee on which I sit. These are administrative, or more properly described as 'throughput' issues which reflect upon the whole hospital and the various departments within it, not any single physician. The ninth complaint about a torn meniscus was not a valid complaint. Once again, any practicing Emergency Department physician knows it is not the standard of care for him or her to make this diagnosis as it requires an MRI or arthroscopy. The only requirement for the standard of care is a careful exam, an x-ray, if warranted, possibly a knee brace or immobilizer and referral to an orthopedic surgeon who will definitively diagnose the tear and treat it. The patient's perception, which is rarely congruent with the clinician's, is not acceptable in Peer Review. It is a "Public Relations" issue that we all grapple with daily. The 10th complaint regarding a cat bite is worth discussing. The cellulitis that can result from this bite can not only mandate a hospital admission, but require fasciotomy and long term I.V. antibiotics. However, even given that comment, her peers in the Clinical Hearing submitted a written statement that she immediately identified her errors, corrected them, and no harm came to the patient.

As to the 'code blue situation' as it was so aptly described, I dare any practicing Emergency Physician to stand up and state that they have never been in a situation where

EXHIBIT 29

tabbies



1476

it took 2-3 attempts to intubate. Why do you think anethesiologists have fiberoptic laryngoscopes? Why do you think "The patient with a difficult airway" is a recurring topic at every single annual Scientific Assembly given by ACEP. What's of more interest to me than the code blue was the fact that the chart was mysteriously missing for the hearing but resurfaced in time for Colonel O'Neill to revoke Dr. Webster's Emergency Department Privileges. And as to the comment that she didn't 'order CPR', is Major Burkett announcing to the world that the nurses and respiratory therapists in his Emergency Department are not ACLS certified! They are required to be certified in any hospital I have ever heard about. They can and will run codes without the doctor just like O.B. nurses can and will deliver babies.

It is noteworthy that Major Burkett found the patient complaints and the 'code blue' so important that he brought it to a Hearing but never thought to bring it to the monthly Hospital review where it belonged and would have been dealt with in a collegial fashion. Instead, Major Burkett filled a file with paper which covered innuendoes, a misdiagnosis of MS and personal attacks.

There are a multitude of evaluations which were done by fellow Emergency Physicians, some good and some bad. However, it is noteworthy that when Dr. Webster appealed the decision, there were military personnel who actually had written and oral comments in her favor. Considering the political ramifications that this could have caused any of them in the future, this was quite striking.

I feel the comments made about "multi-tasking" are open for discussion. I do not have information about the census in the ED where Major Webster worked which is important to the issue of multi-tasking. I have yet to work in an Emergency Department that did not have a physician who was known to be slower than the other physicians in the ED on multi-tasking issues. Yet, I have never seen a physician, male or female, have their staff privileges terminated for this reason. In fact, where I presently work we have a physician who can not keep up with the regular patient flow in our ED and is also a military reserve physician but has never drawn any criticism form his military unit for this characteristic when he is working in an ED while on active duty.

As to the misdiagnosis of Multiple Sclerosis that was given to Dr. Webster, there isn't much I can add to the comments that were made at the hearing which stated that Dr. Poser, her independent consultant, was world renowned and that the committee actually deferred to the comments in his consult which clearly elucidated that she did not have M.S. I assume Dr. Burkett, in his wisdom, figured that if he opened the investigation with these comments, and then followed with a variety of complaints, including emotional lability, that everything would fall into place and the Committee reviewing this would just shuffle Dr. Webster out the door. What he failed to realize, however, was that Majors Stefen and Matthews and Captain Georgescu had a much deeper understanding of their responsibilities in the Peer Review process. Many physicians mistakenly believe that they are protected from any litigation or punitive action when acting under the auspices of Peer Review. This protection is only active when members of that committee act in good faith and do not knowingly or intentionally state any falsehoods against the physician in

question. Their findings and recommendations were thorough and indicated a systematic review of the facts which were logical and cogent.

Their recommendations were as follows:

"1. She should not practice in an E.R. setting (this is primarily due to our concern that she does not adequately handle task saturated events);
2. Family Practice/Primary Care/Aerospace medicine privileges should be allowed;
3. In any or all of those settings, she should be monitored with 100% chart review for no less than three months; and
4. at the conclusion of that three month period her privileges should be reevaluated."

They went on to say " while we don't believe the evidence against Dr. Webster rises to a level which would warrant revocation of her privileges, we acknowledge she may not 'fit in' to the unique demands and needs of the United States Air Force..."

I copied the above recommendations word for word for a reason. Not two days after this was signed, Major Burkett fired off a memo stating:

"1. Fully concur with the decision about revocation of her Emergency physician privileges.
2. ... she should continue without privileges in primary care..."

Nowhere in the Board's recommendations did it state that revocation of privileges should be sought. Major Burkett then forwarded this to Colonel Terrence O'Neill who signed a memorandum on 3/24/99 attesting to the fact that he had "fully reviewed the record of subject hearing proceedings... and am approving the recommendation... that your Emergency Medicine privileges be rescinded."

Clearly he did NOT review the record as they did not recommend revocation of privileges nor did they recommend a 6 month chart review.

From here on, Dr. Webster's attorney appealed to the National Practitioner Data Band and she filed an appeal to this mandate. The response to that appeal, written by Colonel Molly Hall, states that the action taken by the Howard AFB was appropriate. Clearly, it was NOT appropriate. They were, in fact, in direct contradiction to what the Hearing Committee had recommended and, therefore, were also in violation of the hospital's bylaws. Unless, of course, it states that "anyone can change the recommendations of a Hearing as they so please" which I doubt is in any bylaws. However, it has crossed my mind that some things are just a "wee bit" different in the military.

Having practiced Emergency Medicine for 9 years, worked in hospitals for 27 years and been a Medical Consultant on a state board which investigated cases such as these, there is no doubt in my mind that the entire process of Dr. Webster's departure from the Air Force, with the exception of the Clinical Privileges Hearing on 2/99 which I felt was professional and done in good faith, was a well orchestrated, premeditated action

with one goal in mind, namely, to railroad Dr. Webster right out the door. And Major Burkett and Colonel O'Neill were very effective in doing so but in their zeal, they went above and beyond the "call of duty", if you will. By pushing through a revocation of staff privileges, she not only was going to be out of their jurisdiction, she was going to be reported to the National Practitioner Data Bank. This is no minor event in the life of a doctor. I have watched this happen before to other physicians and watched the slow, but sure, domino effect of losing staff privileges everywhere with irrevocable effects on family and income. Surely, there are times when this is entirely appropriate and it is in the public's best interest; however, even the unknown writer of the letter, dated June 15, 1999, stated that the way to handle these things was administratively and made note of the fact that Dr. Webster had never been named in a lawsuit. However, Major Burkett and Colonel O'Neill had no problem signing those documents which they knew would seal her fate, while they continued to add to their pension plan and move on and up in their careers. Dr. Webster will not even be able to be employed by an urgent care unit with this in her file at the NPDB. And with the malpractice crisis where it is, with this on her record, it will be very unlikely she will be able to find a carrier to insure her.

Such a simple decision Major Burkett could have made. He only had to follow the recommendations of the very committee that he had brought her in front of. He could have easily gotten her out of his Emergency Department and shuffled her into someone else's clinic. One has to ask why he aimed for the moon in her case. I am not sure what his personal vendetta was and what issues he personally had with her, or perhaps, he, like some other male physicians, simply could not tolerate the presence of a female physician who speaks up. However, there is one thing I am sure of. He was entirely vindictive and his actions were intentional.

A lot has been in the media recently about women in the Air Force who have been raped and even chastised for reporting it. Major Webster suffered the ultimate rape. They took her income, her personal and professional life, her dreams, her self esteem, and then they tossed her to the side like yesterday's newspaper. If Major Burkett really did believe she had complications of Multiple Sclerosis, emotional lability, interpersonal problems, etc., at what point in time was he going to get her medical care or counseling? Was he not a doctor? The only medical "care" he got her was evaluations by several people until he got one to say the magic words, i.e., "she shouldn't be allowed to practice medicine" which were used against her. Perhaps Major Burkett shouldn't be around patients. After all, you can't diagnose a patient with cancer and then tell him, "I am terminating you from my care" because he has complications of the disease.

There is one more thing I am 100% sure of, and that is that Dr. Webster did not receive Due Process and will suffer the consequences of the actions of Major Burkett and Colonel O'Neill for the rest of her life.

In conclusion, Dr. Webster is no longer in the military, will never interface with these two doctors again and only wants to practice the profession she trained many years for. Therefore, my recommendation would be as follows: Retract the statement about

revocation of privileges in the National Practitioner Data Bank. This is reasonable because it was never the recommendation of the Clinical Privileges Hearing Board. Write it off as a mistake or an over-reaction, if need be, but just give her life back to her.

Finally, on a more personal note, I am so appalled at what I read in Dr. Webster's file regarding the actions of these so-called doctors that I advised her attorney, Mr. Stanton, that I will not accept the compensation I originally agreed to. Despite the fact that this took an entire day off to review, compose and type, I could not, in good conscience, accept money from someone who had been robbed of the very ability to make her own. I also refuse to give Major Burkett or Colonel O'Neill the satisfaction of any avenue of criticism towards myself. As to any concerns that anyone reading this will have regarding my relationship with Dr. Webster, let me state for the record that I met her once, approximately 9-10 years ago at a convention in Chicago. I never saw her again. On rare, sporadic occasions, we have corresponded in writing. I was contacted by Mr. Stanton to do this review and accepted to do so purely on a professional basis.

Carol Rogala D.O.

Carol Rogala, D.O. FACEP
Dated: April 16, 2004



1423

# CAROL ROGALA D.O., FACEP

Current Address:
4141 E. Huber Circle
Mesa, Arizona 85205

Phone: 480-396-0732
Fax: 480-396-0207
Email: crogala3@cox.net

**Education**

Cook County Hospital Emergency Medicine Residency
Chicago, IL July 1991 to June 1994
Board Certified, American Board of Emergency Medicine, 1995

Chicago College of Osteopathic Medicine
Chicago, IL 1990 to 1991
Intern
D.O. degree awarded in 1990
Ranked in top quarter of class
Student Representative, Curriculum Committee, 1987
Race Director, 5K Osteopath, 1986
ACLS Instructor, 1989 to 1996

St. Xavier University
Chicago, Il

Bachelor of Science in Nursing, May 1980
Dean's List

**Work Experience**

Rural Wisconsin Health Cooperative; serving rural E.D.'s of southern Wisconsin during my PG2-3 year (moonlighting resident)

Alton Memorial Hospital in Alton, Illinois through EMSA (moonlighting resident)

West Suburban Hospital (moonlighting resident)

Phoenix Memorial Hospital
Payson Regional Medical Center

Yuma Regional Medical Center,
Assistant Medical Director, Emergency Department

Locum tenens physician in Michigan, Illinois, and Arizona

St. Luke's Medical Center in Phoenix

Currently Chandler Regional Hospital, ( St. Joseph's/St. Mary's Carondelet Carondelet Hospitals, Paradise Valley Hospital part time)

National Air Ambulance on international flights

Associate Faculty, Midwestern University

Former Medical Consultant for the Arizona Board of Medical Examiners

Former Critical Care nurse with experience over a 13 year period

**Professional Affiliations**

Active member of the American College of Emergency Physicians

Board of Directors, AZ ACEP since 1994

Alternate Councillor, National ACEP Council

Emergency Medicine Practice Management Committee, National ACEP

Speaker of the Representative Council, Emergency Medicine Resident's Association for 1993-94

Former member of the Illinois College of Emergency Medicine

Former member of the Emergency Medicine Residents of Illinois

Public Affairs Committee, Arizona College of Emergency Medicine

Former member, Arizona Osteopathic Medical Association

Former member Arizona-Mexico Commission, Health Services Committee

State Task Force for Diversion (EMS), co-author of the current Diversion Policy for Central Phoenix

Long Term Care Committee for the State of Arizona

STAB, Systems Subcommittee

**Educational**

Unique Electives Project while Education Committee of EMRA

"Lactic Acidosis in Asthma"; Research project during residency

"The Serotonin Syndrome", a case study in conjunction with Toxicon at Cook County Hospital

"Conscious Sedation", a review article and handout

# STATEMENT

# OF

# ANNE LI

My name is Anne Li. I am a physician presently working in a civilian environment in Iowa City, Iowa.

I first met Major (Dr.) Wilma Webster at the Air Force Base in Panama in September 1997. I had arrived just one week before Wilma and was told by the Chief of Medical Staff that Dr. Webster was to arrive shortly to take charge of the Emergency Department. When she arrived, Wilma and I spent a week in-processing together and I was amazed by her extraordinary linguistic talent.

I was assigned to work in the Primary Care Clinic for three months to get me "up to speed" because I had had only training in General Surgery before entering the Air Force.

There was a Major McCrary who arrived about a month before Wilma and me. Major McCrary had just been promoted to Major not too long before he arrived in Panama and had had no Board Certification in any medical specialty. Needless to say, I was shocked when our Squadron Commander, Lt. Col Addison, went against the recommendation of our Chief of Medical Staff and appointed Major McCrary as the Chief of the Emergency Room (ER) instead of Major Webster. Major Webster clearly had seniority in terms of her rank and her 15 years of experience working in the field of Emergency Medicine plus her Board Certification in Internal Medicine. In my opinion, it was a blatant display of sexual discrimination from a female commander who was not



EXHIBIT
tabbies
30

1427

even a doctor to have made such an erroneous decision, and, a case of racial favoritism as Lt. Col Addision and Major McCrary both are African-American.

In January 1998, I began working in the ER. Dr. Webster understood it was my first time working in the ER. She was very encouraging and eager to teach me about Emergency Medicine. There were a total of five doctors assigned to the ER including Major McCrary. Major McCrary took on the task of scheduling. It was not easy to cover the ER on a "24/7" basis with just five doctors. We all had to work an incredible number of 12 hour shifts every month with no time given to adjust for day and night shift change. Major McCrary, on the other hand, would schedule fewer shifts for himself and very little weekend shifts. Major Webster and I ended up covering almost all the weekend and holiday shifts. I was the most junior doctor in terms of ranking and was assigned by Major McCrary as the designated back-up doctor, "24-7". It meant that I had to show up at work on last minute notices at any time if the doctor on duty fell ill or had to leave work early for any reason or had to respond to outside emergencies. This also meant that I had no back up when I was on duty. It also meant that I could not go any where when I wasn't scheduled to work because I had to be by my phone whenever the ER called for me.

The morale was very low in the ER under Major McCrary's leadership. Major Webster had volunteered to take over the scheduling on many occasions in an attempt to restore some fairness in the ER and to make Major McCrary work the same number of shifts as everyone else. She was met with strong opposition from Major McCrary each time. Major Webster also arranged several staff meetings to give everyone the chance to voice their disapproval of Major McCrary's unfair scheduling practice. Nothing was

changed during the entire nine months I worked in the ER. Major McCrary was untouchable and unapproachable because he had Lt. Col. Addison's complete support.

Because I did not want to work under Major McCrary's leadership I made repeated requests to be transferred out of the ER to return to the Primary Care Clinic. There requests were repeatedly denied so I went to the Social Actions office and filed complaints against Lt.Col. Addison, Mendez (our flight chief) and Major McCrary for their unfair treatment. The retaliation from Lt. Col Addision and Mendez against me was swift. I volunteered to be reassigned to Korea, an assignment no one in his or her right mind would volunteer for, but I did it to get away from their constant persecution of me.

During my last couple of months in the ER, Major Webster was suspended for reasons that were unclear to me at the time. Everyone knew of my friendship with Major Webster and was unwilling to talk about her suspension with me. They began to avoid Major Webster and me like the plague.

I went back to work in the Primary Care Clinic for a few more months while waiting for my orders to go to Korea. Major Burkett was in charge of the Primary Care Clinic and I was under his constant scrutiny because of my association with Major Webster. Major Webster was forced to work in the Primary Care Clinic for a couple of months while recovering from her wrist surgery for Carpal Tunnel Syndrome. Major Burkett treated her very harshly with very little respect even though Major Webster clearly outranked him in terms of years of service and medical experience. I might add that Major Burkett, who is African-American, was also favored immensely by Lt. Col Addison.

During the times I worked with Major Webster, I never observed any gross negligence or irregularity of any kind from her. Her work ethic was impeccable.

During the three years I served in the Air Force, over and over again I encountered blatant sexual and racial discrimination.

I believe Major Webster was treated in a most unfairly manner particularly in view of my personal observations of her dedicated service for the year that I knew her and worked in close proximity with her on many, many days while we were in Panama.

Signed this 12 day of July 2004.

Anne Li

ANNE LI
1628 California Avenue
Iowa City, Iowa

STATE OF IOWA )
(SS
COUNTY OF JOHNSON)

SUBSCRIBED AND SWORN to before me by Anne Li who personally appeared before me on this 12th day of July, 2004.

Mary Reichardt

NOTARY PUBLIC

NOTARIAL SEAL IOWA
MARY REICHARDT
Commission Number 192802
My Commission Expires
October 2, 2006



1490

# Anne Li, M.D.

1628 California Ave. Iowa City, IA 52240 (319) 339-7566

**Education**

1992-1996 University of Medicine and Dentistry of New Jersey-Robert Wood Johnson Medical School- Piscataway, New Jersey
Doctor of Medicine

1986-1989 Hunter College- New York
Pre-med curriculum and graduate study in neuroscience

1978-1982 Parson School of Design- New York
Bachelor of Fine Arts

**Medical Training**

2003- University of Iowa- Iowa City, Iowa
Occupational Medicine and MPH. Projected graduation date- May 2005

2000-2002 University of Texas Southwest- Fort Worth, Texas
Family Practice

1996-1997 Saint Barnabas Medical Center- Livingston, New Jersey
General Surgery

**Professional Experiences**

2002- Locum physician of Emergency Medicine, Urgent Care and Occupational Medicine

1997-2000 United States Air Force

1997-1999 Howard AFB, Republic of Panama- staff Emergency Medicine and Primary Care physician.

1999-2000 Kunsan AB, Republic of Korea- Chief of Flight Medicine Clinic
Clinic responsibilities include flight physicals, deployment medicine and medical disability evaluation.

1990-1992 Columbia University Department of Neurophysiology- New York
Investigative research on the effects of antipsychotic agents on dopaminergic neurons

1989-1992 Hunter College and Manhattan Community College of Nursing- New York
Adjunct lecturer of biology, anatomy and physiology

1979- 1990 Freelance artist- New York

**Honors, Awards and Certifications**

| | |
|---|---|
| 1996 | American Medical Advancement in China Scholarship |
| 1993-1996 | United States Air Force Scholarship |
| 1992 | Jonas Salk Research Award- City Universities of New York |
| 1978-1982 | United Federation of Teachers Scholarship |
| 1978-1982 | Parson School of Design Scholarship |
| 1978 | New York Regents Scholarships for Biology and Mathematics |

*Brad Lockee, M.D.*
*15023 Dorcas Circle*
*Omaha, Nebraska 68144*

James L. Stanton
C/O Stanton Law Office
Historic Library Plaza
Suite 1012
1823 Harney St.
Omaha, Ne. 68102

11/09/2003

Re: Opinion on ER credentials-Wilma Webster

Dear Mr. Stanton,

Thank you for the opportunity to review the case concerning Dr. Webster's credentials board held in February 1999. I agree with one of the reviewers who offered an opinion on a "Privilege Action Appeal" document dated 15 June 1999; "This is a very complex case". I'm especially sensitive to the proceedings because their outcome has a tremendous impact on the future of Dr. Webster's career and her employability as an emergency physician.

I agree that the presentation at the MPRB included occurrences that should not have led to a loss of her privileges as an emergency physician. Patient complaints, hear say, and vague occurrences that happen during a code don't warrant loss of privileges. I note in the MPRB's recommendation: "It is clear Dr. Webster possesses the requisite knowledge to be a physician. She does, however, display several disturbing qualities which make her presence in the military (specifically, a military ER with possible war-time taskings), a potential disruption. Despite some superior traits as a physician (thoroughness, dedication to patients, medical knowledge, etc.), she appears to have certain identifiable, interpersonal deficiencies.

"While these undesirable personality traits have yet to result in an untoward patient outcome, we can easily see where those who review this case may not want her to practice in any military setting. Accordingly, while we don't believe the evidence against Dr. Webster rises to a level which would warrant revocation of her privileges, we acknowledge she may not 'fit in' to the unique demands and needs of the United States Air Force..."

EXHIBIT
tabbles
31



1493

I also served as a military physician in the U.S. Navy and Department of Health and can understand the concerns the MPRB had about Dr. Webster's "interpersonal deficiencies" in a military ER. There are physicians who are not a good 'fit' for military service. However, in my experience, these are handled by a personnel or administrative action by the Commander. I have seen such physicians go on to have quality careers in public service. The action taken against Dr. Webster make this public option very difficult if not impossible. In fact, in Dr. Webster's case, it was this 'fit' that appears to be the main problem, not her competence. In this regard, I also note that an unknown person wrote an input, dated 15 June, 1999, stating in his last paragraph, "I firmly believe that Dr. Webster's cognitive deficits and personality are the essential problem…However, it is difficult to translate that information directly into privilege revocation as outlined in AFI 44-119, para 4.5, describing 'gross provider misconduct, professional incompetence, or negligence that is self-evident and poses a significant threat to patient safety or well-being.' She has never been involved in a malpractice claim, and does not have any documented poor clinical outcomes…This is not a unique case, and I have had providers similar to Dr. Webster in my supervision. I have always handled these cases administratively, although privileging action was discussed. That is the mechanism I would have preferred in this case…"

While the Air Force was concerned about Dr. Webster's presence in a military setting being a potential disruption, the sad effect of the Air Force action is that not only was Dr. Webster put out of her medical field in the military, but, more importantly, she has lost the opportunity to practice as a civilian physician in her specialty. The Air Force decision should have not been so far reaching. It should have been left to civilian medical facilities to make any decision about Dr. Webster's medical privileges. The privileging process is quite extensive in civilian hospitals and I have been part of many such review processes concerning physician privileging. Such a review process would have been the proper and professionally appropriate place to review the capabilities of Dr. Webster's ER capabilities.

I would recommend that action be taken to remedy Dr. Webster's predicament by reversing any revocation action with a caveat, if appropriate, that her future employers review her ER capabilities, as necessary.

Thank you for this opportunity to be of assistance. I wish the best for Dr. Webster and her career.

Sincerely,

Brad Lockee, M.D. ACEP



194

**William Brad Lockee, M.D.**

15023 Dorcas Circle
Omaha, Nebraska 68144
(402) 333-9670

## Education

May, 1971 — **London Central High School**
***London, England***
Graduated Salutatorian.

May, 1975 — **University of Nebraska—Lincoln**
***Lincoln, Nebraska***
Graduated with a Bachelor of Science degree

May, 1979 — **University of Nebraska Medical Center**
***Omaha, Nebraska***
Graduated with honors in Family Practice, Psychiatry, and Anesthesiology.

June, 1980 — **United States Public Health Service**
***New Orleans, Louisiana***
Internship.

## Certifications

1990 — **Board Certification**
*Emergency Medicine*

2000 — *Recertification*

1991 — **American College of Emergency Medicine**
*Fellow*

**ATLS**

**ACLS**
*Fellow, Nebraska Chapter*

**PALS**

**Medical Management**
*120 hours of education obtained*

## Licensure

State of Nebraska
State of Pennsylvania
State of Kansas
State of Iowa

MGS

## Professional experience

4/2003-present — Staff physician-Creighton University
Omaha, Ne.

May, 1992 to 3/2003 — Director of Emergency Services
Nebraska Methodist Hospital
Omaha, Nebraska

July, 1991 to May, 1992 — Staff Emergency Physician
Nebraska Methodist Hospital
Omaha, Nebraska

November, 1994 to Present — Medical Director of Physicians Clinic Urgent Care Clinics
Omaha, Nebraska

January, 1996 to 2001 — Director of Emergency Services
Jennie Edmundson Memorial Hospital
Council Bluffs, Iowa

December, 1994 to 2000 — Medical Director of the Open Door Mission
Omaha, Nebraska

May, 1993 to November, 1996 — Medical Director of Millard E.M.S.
Omaha, Nebraska

July, 1989 to July, 1991 — Assistant Director of a Level II Trauma Hospital
Emergency Department
Johnston, Pennsylvania

December, 1987 to July, 1991 — Staff Emergency Physician
Conemaugh Valley Memorial Hospital
Johnston, Pennsylvania

July, 1986 to December, 1987 — Staff Emergency Physician
Miners Hospital
Spangler, Pennsylvania

September, 1985 to July, 1986 — Director of Emergency Medicine
Hutchinson Hospital
Hutchinson, Kansas

May, 1984 to September, 1985 — Director of Emergency Medicine
Susan B. Anthony Hospital
El Dorado, Kansas

July, 1980 to May, 1984 — Private Practice
General Medicine
Benkelman, Nebraska

## Professional Memberships

American Medical Association
NMA
ACEP
ABEM
NeACEP
PaACEP
MOMS
Midwest Clinical Society

## Elected Positions

Vice President, State Board for Advanced Registered Nurse Practitioners



1496

## Additional professional/administrative activities

I. Transitioned physicians from independent contractor status to employee status.

   A. Developed a physician evaluation procedure that restructured the physician's salaries, based on patient satisfaction, timeliness of care, and five other criteria.

II. Designed and implemented construction of a new Emergency Department at Nebraska Methodist Hospital.

   A. Updated Emergency Department equipment and procedures.

      1. Evaluated and purchased new monitoring equipment, new lighting, and new patient flow schemes for the entire department.

   B. Developed a nurse practitioner program in the Emergency Department.

      1. Developed a triage protocol for nurse practitioners in the Emergency Department, which enabled them to see "urgent care" type patients.

      2. Developed a fee schedule for "urgent care" type patients seen in the Emergency Department, which made the Emergency Department more cost effective for managed care plans.

   C. Developed a fast track program that would expedite care for non-urgent patients that present to the Emergency Department.

   D. Developed an "Emergency Medicine Symposium." An educational opportunity for out-state physicians, and a referral opportunity for Nebraska Methodist Health System specialists.

   E. Participated in traveling to out-state locations to educate physician and nursing staffs on new emergency medicine procedures.

   F. Developed an on-call system of physicians to provide locum tenems coverage for private offices.

   G. Participated on the state level in developing the legal guidelines which nurse practitioners must follow.

      1. Was elected Vice President of the State Board for Advanced Registered Nurse Practitioners.

   H. Developed a clinic, with Sally Jochims, NP, at the Salvation Army Renaissance location to provide care for the under served.

      1. Supervised the Renaissance Clinic.

   I. Established First Aid stations at Memorial Park for the July 4th (1997) celebrations, as well as for the Corporate Cup Run and Run for the Cure for Cancer competitions.

III. Assumed the leadership of Physicians Clinic's Urgent Care facilities.

   A. Direct and schedule over 20 physicians on a monthly basis.

   B. Expanded the Urgent Care facilities from two clinics to four.

   C. Set guidelines and protocols for the Urgent Care facilities.

      1. Developed educational materials for patients in Urgent Care.

      2. Developed a physician's manual for Urgent Care that standardized dress codes, treatment guidelines, etc.

      3. Helped develop radio, mailing, and billboard campaigns to promote the Urgent Care product.

IV. Assumed the Directorship of Jennie Edmundson Memorial Hospital's Emergency Department.

   A. Consolidated two affiliated hospital emergency departments under one medical director.

B. Consolidated two different emergency medicine programs into one Health System program.

C. Developed a Physician's Assistant program in the Emergency Department at Jennie Edmundson Memorial Hospital.

1. Helped develop and promote the program to the medical staff, and then to the community.

D. Developed the Emergency Department and hospital medical staff support necessary to qualify for the Iowa Trauma System.

E. Developed an "Emergency Medicine Symposium." An educational opportunity for out-sate physicians, and a referral opportunity for Jennie Edmundson physicians.

V. Established a free clinic serving the homeless at the Open Door Mission, Omaha, Nebraska.

A. Helped to staff the clinic on a weekly basis. Worked in the clinic as a physician, and also worked with community specialists to procure free medications and supplies for the homeless.

## Additional professional experience and accomplishments

1. Establishment of patient follow-up cards for eleven different conditions that commonly present to the emergency department.
2. Establishment of a quality assurance program monitoring nine medically recognized emergency department conditions.
3. Physician education on a continuing basis. A bi-monthly educational newsletter is written and published.
4. Development of an interactive computer program that was used by the physicians and Emergency Department nursing staff to assess their skills in the emergency department.
5. Education on a formal basis to the EMS system and the local paramedics.
6. Establishment of an educational program for the local elementary school system. Five local schools participate in these lectures.
7. An education program was developed to assist RNs and paramedics in their ACLS course; specifically, acid-base and megacode simulations.
8. Development and implementation of a uniform set of guidelines for emergency department coverage by physicians, and the establishment of patient treatment protocols.
9. Implementation of a "call back" program of patients seen in the emergency department.
10. Development and presentation of an 82 slide presentation on the emergency department of the local hospital with local Rotary and Kiwanis groups in attendance.
11. Development and presentation of a 35-slide presentation on "Exercise and Its Effect on Cardiac Rehabilitation."
12. Volunteer coverage at First Aid station at local lake during a State function attended by 8,000 people.
13. Implementation of a program to perform all hospital physical examinations.
14. Development and implementation of videotaping of monthly lectures that cover various emergency department topics given by local physicians in their specialty fields. These videotapes are used as continuing education for RNs and paramedics.
15. Development and implementation of "Life-Line" for single adults, with potentially serious illnesses, living at home.
16. Assisted in negotiating a $20 million occupational health contract with Bethlehem Steel Corporation.

17. Assisted in formulating ground and helicopter transport protocols for the emergency department.
18. Medic Command physician for ground and helicopter transport of patients to our trauma and heart programs (>300 ground command per month and >90 helicopter command per month.)
19. Medical team member to El Salvador after the 1987 earthquake.
20. Medical mission to Kenya in 1989.
21. Medical mission to Guatemala, June, 1993.

April 29, 2004

James Stanton
1823 Harney Street, Suite 1012
Omaha, Nebraska 68102

This letter will explain why the Air Force's actions are preventing me from ever completing the practice tract toward board certification in Emergency Medicine (EM).

1. After residency programs in EM were initiated, physicians working in the field for a number of years were allowed to take certification exams to become board certified in the specialty, the so called "practice tract."

2. In 1997 the American Board of Emergency Medicine (ABEM) stopped allowing doctors to initiate the practice tract. Now everyone has to do a 3-year residency to achieve board certification unless previously qualified under the practice tract.

3. On July 27, 1990 I qualified to take EM certification exams through the practice tract after ABEM accepted my documentation showing **Internal Medicine** board certification plus completion of 8694 hours of work in emergency departments.

4. I took the written portion of the certification Exam on May 30, 1990 and passed immediately demonstrating adequate knowledge of emergency medicine and qualifying to take the oral portion, popularly known as "oral boards".

5. Being allowed to take the oral boards enables me to call myself "board prepared and many potential employers search for physicians who are "board certified or board eligible/prepared." It is a huge advantage to be in such a group.

6. I was last scheduled to take the oral certification exam on April 14, 2003, but had to withdraw because **they do not permit medical licenses to be in any way restricted** (all my licenses are restricted as a result of the Air Force action on my credentials). This automatically led to closure of my file with ABEM causing me to lose my chance to attempt board certification until a new application is submitted.

7. The problem is that even if I do attempt to file a new application, I will be unable to document any emergency medical experience in the last five years leaving me no chance to qualify for reinstatement. Thus has the Air Force succeeded in preventing me from ever completing the EM practice tract for board certification.

8. Had it not been for the actions of the Air Force I would have spent the last three and a half years working full time in emergency departments as I did before joining the military, earning (as per an ACEP survey) approximately $206,000 dollars annually. Instead I have been depleting my savings and pinching pennies, not the way a hard-working doctor deserves to end a decades-long career.

Sincerely,

Wilma P. Webster, M.D.

EXHIBIT 32

1500

**DEPARTMENT OF THE AIR FORCE**
**WASHINGTON, DC**

DEC 27 2004

**Office of the Assistant Secretary**

MEMORANDUM FOR THE EXECUTIVE DIRECTOR, AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

SUBJECT: Minority Report in the AFBCMR Application of, Wilma P. Webster, 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

The above subject applicant requests that the decision to restrict her from practicing Emergency Room (ER) medicine and the determination that she be restricted her from practicing clinical medicine for six months be removed from her records, and the adverse correspondence provided to the National Practitioner Data Bank (NPDB) be rescinded or the restrictions be reduced. The majority of the Board recommends denial of the requested relief. I have carefully considered all the circumstances of this case and I do not fully agree with their determination.

A clinical privilege hearing was conducted to address proficiency and professional matters pertaining to the applicant. The hearing committee concluded she should not practice as an ER provider and clinical practice should be allowed with a 100 percent chart review for no less than three months, with subsequent reevaluation. Her commander approved the recommendation and amended the chart review to a period of six months. The AF/SG completed a review of the adverse action and her appeal and agreed with the MPRB and directed the action be reported to the NPDB and States of known licensure. She contends that the initial three-month restriction may have been warranted but the action by her commander and the AF/SG was unwarranted and unjustified.

In support of her request, the applicant provided statements from two civilian and a former Air Force physicians. In these statements it was pointed out that 1.) "Nowhere in the board's recommendations did it state that revocation of privileges should be sought."; 2.) "During the times I worked with Major Webster, I never observed any gross negligence or irregularity of any kind from her. Her work ethic was impeccable."; and 3.) "In fact, in Dr. Webster's case, it was this 'fit' that appears to be the main problem, not her competence." Further, the clinical privileges hearing findings stated, "Accordingly, while we don't believe the evidence against Major Webster rises to a level, which would warrant revocation of her privileges, we acknowledge that she may not 'fit in' to the unique demands and needs of the United States Air Force." I believe the crux of the applicant's problems appeared to be more of her difficulties performing in a military environment, rather than her competence as a medical provider. Based on these supporting statements and after a full review of the evidence provided, I believe the applicant has established reasonable doubt as to whether or not it was the intention of clinical privileges board to revoke her privileges. The revocation was based on subsequent recommendations and I believe an injustice has occurred that can only be remedied by expunging the revocation from her records.

Cheryl V. Jacobson

CHERYL V. JACOBSON
Panel Member

I

150

# DEPARTMENT OF THE AIR FORCE

WASHINGTON, DC

Office of the Assistant Secretary

DEC 28 2004

AFBCMR
1535 Command Drive
EE Wing, 3rd Floor
Andrews AFB MD 20762-7002

Major Wilma P. Webster, USAF, Retired
c/o Mr. James L. Stanton
1823 Harney Street, Suite 1012
Omaha, NE 68102

Dear Major Webster

Reference your application submitted under the provisions of AFI 36-2603 (Section 1552, 10 USC), AFBCMR Docket Number BC-

After careful consideration of your application and military records, a majority of the board determined that the evidence you presented did not demonstrate the existence of an error or injustice. The Secretary's designee accepted the recommendation of the Board majority. Accordingly, your application was denied.

You have the right to submit newly discovered relevant evidence for consideration by the Board. In the absence of such additional evidence, a further review of your application is not possible.

BY DIRECTION OF THE CHAIRMAN

RALPH J. PRETE
Chief Examiner
Air Force Board for Correction
of Military Records

Attachment:
Record of Board Proceedings

cc: Mr. James L. Stanton

1502

DEC 28 2004

ADDENDUM TO
RECORD OF PROCEEDINGS
AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS

IN THE MATTER OF:

WILMA P. WEBSTER

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

DOCKET NUMBER: BC-2002-01487
INDEX CODE: 134.02
COUNSEL: Mr. James L. Stanton

HEARING DESIRED: YES

---

APPLICANT REQUESTS THAT:

1. The findings and recommendations of a Medical Practice Review Board (MPRB) restricting her from practicing Emergency Room (ER) medicine be removed from her records.

2. The restriction from practicing medicine in the Family Practice/Primary Care/Aerospace Medicine clinics without 100 percent supervision for six months be removed from her records.

3. The adverse correspondence provided to the National Practitioner Data Bank (NPDB) by the Office of the Surgeon General of the Air Force (AF/SG) be rescinded, or in the alternative, the restriction be reduced to supervised practice in the ER and clinical settings.

---

STATEMENT OF FACTS:

In a previous submission applicant requested the above relief and that she be granted physicians incentive pay and other benefits from 1 Jan 99 through 1 Dec 00.

On 4 Feb 03, the Board considered her submission and denied her requests pertaining to removal of the MPRB findings from her records, removal of the restriction from practicing clinical medicine from her records, and removal of the adverse information provided to the NPDB. After noting that the recommended restriction imposed upon the applicant from practicing medicine in clinical settings was limited to a period of three months (amended to six months) and that she remained eligible to receive Special Pay, the Board granted the portion of her request regarding her entitlement to incentive pay. For an accounting of the facts and circumstances surrounding the Board's decision and the rationale behind the decision, see the Record of Proceedings at Exhibit G.

In her most recent submission counsel states although the initial temporary restriction of her ER privileges for three months may have been warranted in order to have her performance supervised, the action which resulted in the permanent restriction of her ER

1563

privileges was totally not warranted and unjustified when considering the long term consequences of this action. In support of her request, applicant provided her counsel's brief, statements from three civilian physicians, and a personal statement. Her complete submission, with attachments, is at Exhibit H.

---

THE BOARD CONCLUDES THAT:

1. After again reviewing the application and the additional evidence provided in support of her appeal, the Board majority is not persuaded that the requested relief is warranted. In this regard, the Board majority notes that after careful review of the actions taken and recommendations thereof, the AF/SG concurred with the recommendations and exercising his discretionary authority, determined that reporting the adverse information to the NPDB and States of known licensure was appropriate. Notwithstanding the contentions of the civilian and former Air Force physicians, the Board majority remains unpersuaded that the determinations of her former commander and the AF/SG were erroneous or unjust. Therefore, in the absence of persuasive evidence to the contrary, the Board majority finds no basis upon which to recommend granting the relief sought in this application.

2. The applicant's case is adequately documented and it has not been shown that a personal appearance with or without counsel will materially add to our understanding of the issues involved. Therefore, the request for a hearing is not favorably considered.

---

RECOMMENDATION OF THE BOARD:

A majority of the panel finds insufficient evidence of error or injustice and recommends the application be denied.

---

The following members of the Board considered Docket Number BC-2002-01487 in Executive Session on 18 Oct 04, under the provisions of AFI 36-2603:

Mr. Thomas S. Markiewicz, Chair
Mr. Grover L. Dunn, Member
Ms. Cheryl Jacobson, Member

By a majority vote, the Board voted to deny the request. Ms. Jacobson voted to correct the record and submitted a minority report, which is attached at Exhibit I. The following documentary evidence was considered:



504

Exhibit G. Record of Proceedings, dated 4 Feb 03, w/Exhibits.
Exhibit H. Letter, Counsel, dated 19 Aug 04, w/atchs.
Exhibit I. Minority Report, dated

DEC 27 2004

THOMAS S. MARKIEWICZ
Chair



1505

**DEPARTMENT OF THE AIR FORCE**

**WASHINGTON, DC**

DEC 28 2004

**Office of the Assistant Secretary**

MEMORANDUM FOR THE EXECUTIVE DIRECTOR, AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS (AFBCMR)

SUBJECT: AFBCMR Application of WILMA P. WEBSTER, 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

I have carefully reviewed the evidence of record and the recommendation of the Board members. A majority found that the applicant had not provided sufficient evidence of error or injustice and recommended the case be denied. I concur with that finding and their conclusion that relief is not warranted. Accordingly, I accept their recommendation that the application be denied.

Please advise the applicant accordingly.

JOE G. LINEBERGER
Director
Air Force Review Boards Agency