Case 1:05-cv-01333-CCM    Document 14 Filed 08/27/2006 Page 1 of 60 Pages

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MAJOR WILMA P. WEBSTER, MC, | ) | |
| USAF, RETIRED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-1333C |
| | ) | (Judge Christine O.C. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

---

### PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR LEAVE OF COURT TO AMEND PLAINTIFF'S COMPLAINT

---

Respectfully submitted,


_____s/Terrence J. Martin, Sr.
**TERRENCE J. MARTIN, SR.**
Law Offices of
TERRENCE J. MARTIN, SR.
THE PARK ON MEDICAL
4115 Medical Drive, Suite 401
San Antonio, Texas 78229
Tel.:  (210) 697-3400
Fax:  (210) 697-6386
Attorney for Plaintiff


August 28, 2006

## TABLE OF CONTENTS

PAGE

PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS AND MOTION FOR
LEAVE OF COURT TO AMEND PLAINTIFF'S COMPLAINT……………………5

STATEMENT OF ISSUES………………………………………………………… 6

STATEMENT OF THE CASE………………………………………………….. 7

    I.    Nature of Case……………………………………………………… 7

    II.    Statement of the Facts………………………………………………… 8

        A.    Call to Active Duty………………………………………… 8

        B.    History of Practice Prior to Decredentialing………………… 8

        C.    Events Following Reassignment to Health and Wellness
            Care………………………………………………………... 9

        D.    Credential's Function Committee Action…………………… 9

        E.    First Disability Process…………………………………… 9

        F.    Letter of Notification Regarding Adverse
            Credentialing Action…………………………………………10

        G.    Credential's Hearing…………………………………………10

        H.    Evidence Introduced at Credential's Hearing………………...11

        I.    Allegations of Forgetfulness/Disorganization………………..18

        J.    Specific Written Complaints…………………………………19

        K.    Memorandums of Captain Shercliffe………………………...19

        L.    Evidence Not Cited by the Credential's
            Hearing Board…………………………………………………..24

        M.    Testimony of Co-Workers and Patients………………….....25

        N.    Inappropriate Behavior/Impulse Control……………………31

O.    Psychologist's Testimony…………………………………33

P.    Neuropsychological Disorder………………………………..35

Q.    Conclusions of Credential's Hearing Board…………………38

R.    Appeal to Air Force Surgeon General………………………....38

S.    Evaluation at Keesler AFB………………………………..39

T.    Second Disability Process……………………………………40

U.    AFBCMR………………………………………………………40

V.    Filing of Complaint………………………………….......43

ARGUMENT…………………………………………………………………...43

I.    This Court Has Jurisdiction under Plaintiff's Causes of Actions……43

II.    Leave to Amend Pleadings………………………………………..47

CONCLUSION…………………………………………………………………48

EXHIBIT "A"…………………………………………………………………..50

## TABLE OF AUTHORITIES

**CASES**                                                                **PAGES**

Fisher v. United States, 402 F. 3d 1167, 1173-74
(Fed. Cir. 2005) (en banc)…………………………………………………….44

Todd V. United States, 386 F.3d 1091, 1094 (Fed. Cir. 2004)……………..5, 44

United States v. Mitchell, 445 U.S. 535, 538 (1980)………………………44

**STATUTES**

5 U.S.C. § 704……………………………………………………………5

28 U.S.C. § 1491(a) (1)……………………………………………..5, 43

28 U.S.C. §1491(a) (2)……………………………………………...43

Rule 15 (a), FRCP………………………………………………..5,48

**USAF REGULATIONS**

AFI 44-119, paragraph 4.18……………………………………………44

AFI 44-119, paragraph 4.20……………………………………………45

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MAJOR WILMA P. WEBSTER, MC, | ) | |
| USAF, RETIRED, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 05-1333C |
| | ) | (Judge Christine O.C. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR LEAVE OF COURT TO AMEND PLAINTIFF'S COMPLAINT

Pursuant to Rule 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), Plaintiff, Major Wilma P. Webster, MC, USAF, Retired, respectfully request that the Court deny the Defendant's, the United States', Motion to Dismiss and as grounds for same, would show the Court that this Court has subject matter jurisdiction based upon 5 U.S.C. 704 and violation by the United States of 5th Amendment to the Constitution of the United States as Defendant, the United States of America, deprived Plaintiff of a valuable property right, the right to practice medicine, without due process of law.  28 U.S.C. § 1491(a) (1) and Todd V. United States, 386 F.3d 1091, 1094 (Fed. Cir. 2004).

Further, pursuant to Rule 15 (a), Federal Rules of Civil Procedure, Plaintiff respectfully requests leave of Court to amend her Complaint which substantially sets forth the grounds for the Court's subject matter jurisdiction, that is, violations of the 7th Amendment to the United States Constitution, and to plead the money damages that Plaintiff suffered for said violations.

5

## STATEMENT OF ISSUES

1.     Whether Major Webster's complaint should be dismissed for lack of subject matter jurisdiction because she has, as claimed by the Defendant, (1) failed to allege a statutory waiver of sovereign immunity that could permit the United States to be sued in the Court of Federal Claims and (2) failed to allege a statute that could be fairly inferred to be money-mandating.

2.     According to the Defendant, assuming that the Court possesses jurisdiction to entertain Major Webster's money claim for additional ASP, whether Major Webster's complaint should be dismissed for failure to state a claim upon which relief may be granted because (1) the undisputed facts demonstrate that Major Webster's claim for additional six months of ASP does not satisfy the statutory conditions for entitlement to ASP and (2) because the Air Force's decision to deny her ASP raises a non-justiciable issue.

3.     According to the Defendant, assuming Major Webster's money claim for additional ASP is not subject to dismissal for lack of jurisdiction or for failure to state a claim, whether the Court should dismiss Major Webster's claims for non-monetary relief because those claims are not "incident of and collateral to" her money claim.

4.     Whether the Plaintiff's complaint sets forth substantially a violation of the 7th Amendment to the United States Constitution for which this court does have jurisdiction.

5.      Whether, "in the interest of justice", the Plaintiff should be granted leave of Court to specifically replead the basis of it jurisdiction as being based on the Defendant's violation of the 7th Amendment to the United States Constitution and replead Plaintiff's grounds for damages and the amount of said damages, including the basis for same.

6.      Whether leave to file her amendment to her Complaint shall cure the defects claimed by the Defendant therefore giving grounds for the Court to deny Defendant's Motion to Dismiss.

## STATEMENT OF THE CASE

**I.    Nature of the Case**

Plaintiff Major Wilma Webster generally agrees with the ***Nature of the Case*** as set forth in the Defendant's Motion to Dismiss with some very significant exceptions.  In the Plaintiff's complaint, under ***CONTENTIONS OF PLAINTIFF***, paragraphs 13 a through o, the Plaintiff specifically pled how the enumerated actions of the Defendant violated her rights to due process and specifically under paragraph 13 o., specifically plead how these violations resulted in the unconstitutional taking of a valuable property right, the right to practice medicine.  The Plaintiff pled:

> "o.      Plaintiff, **as a result of the information filed with the NPDB, has been denied of her livelihood as a practicing physician.  This taking of a valuable property was accomplished without Plaintiff being granted due process of law as is required by the U.S. Constitution.** Consequently the decision of the AFBCMR was arbitrary and capricious and should be rescinded." (Emphasis added.)

Consequently, while not specifically pled under ***JURISDICTION*** in Plaintiff's Complaint, the grounds for the Court's jurisdiction was also set forth in paragraph 13 a through o of Plaintiff's Complaint.

## II.    <u>Statement of the Facts</u>

Defendant, for purposes of its Motion to Dismiss, assumed that all of the facts in Major Webster's complaint were true, but reserved the right to challenge any of the facts in her complaint should the Court deny Defendant's Motion to Dismiss. The **complete** facts as documented in this case are as follows:

A.    **Call to Active Duty:**  On June 20, 1992, Major Webster was ordered to extended active duty as a physician. AR6.

B.    **History of Practice Prior to Decredentialing:**  Major Wilma P. Webster started working in the Howard AFB Emergency Room in October, 1997.  She was removed from her duties as an Emergency Physician on approximately January 29, 1998 due to her Carpal Tunnel Syndrome and placed in the Primary Care Unit.[1]  Following her recovery from her surgery to correct her Carpal Tunnel Syndrome, she returned to the Emergency Room in mid April 1997.  It was during her return to the Emergency Room following her Carpal Tunnel surgery that the Emergency Room Supervisor was directed by the Squadron Commander to write memorandums on anything he felt was inappropriate action by Major Webster in the Emergency Room and was further directed to advise the Emergency Room Staff to advise him of anything that they felt was inappropriate in the care Major Webster was rendering.  Major Webster was reassigned to the Health and Wellness Center on **May 22, 1998** due to the fact that her Commander had lost of confidence in her.  This was not a credentialing action.[2]

---

[1] Page 65 of the Credential's Hearing Transcript
[2] Exhibit 36 to the Credential's Hearing Transcript

C.    **Events Following Reassignment to Health and Wellness Care:** Following her reassignment to the Health and Wellness Center, **a position that involved no treatment of patients**, the following occurred:

1.    Major Webster was given a Command Directed Mental Health Evaluation;

2.    Major Webster received a Referral OPR based upon her alleged poor medical skills and other complaints which were subsequently reviewed during the Credential's Function Committee Hearing;

3.    Major Webster was evaluated by Major LaMacchia as having cognitive deficits and possibly Multiple Sclerosis which made her unfit to practice as an Emergency Room Provider; and

4.    Major Webster suffered Gullian-Barre Syndrome and was returned to Wilford Hall USAF Medical Center.

D.    **Credential's Function Committee Actions:**  While all of the above were occurring, allegations were raised questioning Plaintiff's fitness to continue to practice medicine (AR 243-250), and on November 18, 1998, a Credential's Function Committee was convened to review these allegations, and subsequently a unanimous recommendation was made to the Plaintiff's commander at the 24th Medical Group that Major Webster's medical privileges be revoked.  AR 755-756; 764-765.

E.    **First Disability Process:**  On December 1, 1998, a Medical Evaluation Board ("MEB") was convened to consider Major Webster's fitness for continued service. AR 92-95.  The MEB referred Major Webster's case to an Informal Physical Evaluation

Board ("IPEB") that found that Dr. Webster possessed the following medical conditions that made her unfit for world-wide duty: Gullian-Barre Syndrome, Multiple Sclerosis ("MS"), anti-social, histrionic, and narcissistic personality traits, cognitive disorder, and glaucoma and was recommended a 30% disability rating.  AR 92. Major Webster rejected these findings and demanded a Formal Physical Evaluation Board ("FPEB").  Following the hearing before the FPEB, **the FBEB on January 28, 1999**, found that Major Webster was fit for world-wide duty and was returned to her duty station at the 24th Medical Group, Howard AFB, Panama.

F.    **Letter of Notification Regarding Adverse Credentialing Action**:  While Major Webster was at Wilford Hall USAF Medical Center for her MEB evaluation, the Credential's Function Committee's issued their letter to Major Webster notifying her that they had determined that they had determined that her credentials should be revoked. AR 770-771.  With this letter she was also presented with a package of documents, many of which she had never seen, which were being used to justify the revocation of all of her privileges and further advised that this was an adverse credentialing action which, if accepted, would be reported to her state medical licensing boards.  Major Webster acknowledged receipt of the notice and requested a formal hearing.  AR 772.  On January 7, 1999, Major Webster was notified that her formal Credential's hearing was to be conducted on February 17-18, 1999.  AR 34-38.

G.    **Credential's Hearing:**  On February 17-18, 1999, the 24th Medical Group at Howard AFB, Panama held a formal Credential's Hearing to address the matters that pertained to Major Webster's clinical proficiency, professional conduct, as well as matters affecting her mental and physical well-being.   AR 39-46; 383-727.   The

Credential's Hearing addressed patient complaints, mental/physical limitations allegedly arising to an unacceptable impairment, forgetfulness and disorganization in the clinical setting, inappropriate actions and allegations of substandard care in the ER setting.  AR 39.  Major Webster was represented by civilian counsel at the Credential's Hearing. AR 387.

      H.    **Evidence Introduced at Credential's Hearing:**  At the Credential's hearing the following was introduced into evidence:

      1.    During her time in the Emergency Room, Major Webster saw either 1102 patients or 1151 patients.[3]  The evidence in this case showed that Major Webster had a total of arguably eight complaints during her time in the Emergency Room.[4]  This means that her total complaints equaled either .73 % or .69% of the total patients she saw.  In other words, less than one percent of her patients registered complaints against her.  There was no evidence as to the exact number of patients she saw in the Primary Care Clinic, but she only received three complaints during this period, two of which concerned waiting times and one concerned her crying.[5]  None of her complaints concerned untoward outcomes for her patients.  In addition to the above, Dr. Webster was never given an opportunity to respond to the majority of these complaints and was not even aware of most of them until they were presented to her as a result of this credentialing action.  Hence, she was denied the opportunity at the time to refute same.

---

[3] Exhibits 52 and 27 respectively to the Credential's Hearing Transcript
[4] Exhibits 22 (not a patient complaint), 23, 34 and 54 to the Credential's Hearing Transcript
[5] Exhibit 23 to the Credential's Hearing Transcript

One of these complaints[6] was raised by Mrs. Schroder. This complaint was not raised at the Board Hearing and was overlooked by Major Webster and her counsel in the review of the many documents submitted to her. However, after the hearing and as a result of it being mentioned in the Board's Findings and Recommendations, Major Webster submitted the complaint to Lt. Col. Granville, Chief, Orthopaedic Surgery. He found nothing wrong in the way Major Webster treated Mrs. Shroder.[7] One can only question how many of the other complaints cited by the Board would have been found to be inaccurate or unjustified if Major Webster had been timely provided these complaints and had a chance to investigate them at the time they were made.

2.    The Credential's Hearing Board, in their report, addressed three specific cases involving Major Webster's treatment of patients which are detailed below:

a.    <u>Tylenol/Benadryl Error</u>:  The Credential's Hearing Board's analysis of the Tylenol/ Benadryl issue was fair and based upon the evidence. They acknowledged the testimony of Captain Cusak and found that while an error occurred, it was properly handled by Major Webster and, in fact, was a common error which several doctors throughout the Hospital had made due to the almost identical appearance of the bottles holding the drugs in question.[8]  Their use of this incident in their final recommendations as an example of Major Webster's forgetfulness and disorganization, however, is contrary to the evidence in this case unless the other numerous physicians who also made this error were also forgetful and disorganized.

---

[6] Exhibit 54 to the Credential's Hearing Transcript
[7] Exhibit A to Appeal of Final Privileging Decision Regarding Wilma P. Webster, Major, USAF, MC, dated April 6, 1999
[8] Page 233-234, Credential's Hearing Transcript

b.    Code Blue: The Board found that the allegations contained in Major Edwin K. Burkett's Memorandum for Record dated 31 January 1998[9] and his testimony before the Board[10] restating the "facts" set forth in his Memorandum for Record to be accurate and proof that Major Webster's handling of the Code breached the standard of care.  The Board also used this Code as examples of (1) Major Webster being unable to handle the stress of working as an Emergency Room Physician and (2) her cognitive dysfunction affecting her patient care.

This analysis was faulty because (1) the Board was not provided the AETC Form 1280 Code Blue Record; (2) the Board either disregarded or failed to remember the testimony of both Col. O'Neil and Major Webster; and/or (3) was prejudiced in favor of Major Burkett.  The hearing transcript of the testimony of Dr. Burkett[11] reflects that the records of the Code had simply vanished and no one knew where they were.  In truth and in fact, the records were locked in the Command Section at all times.[12]

Major Burkett's first criticism was that Major Webster did not maintain an adequate airway on the patient until he arrived and repositioned the patient's head.[13]  However, Col. O'Neil testified that he arrived prior to Major Burkett, that the patient was being bagged, that he charged himself with the responsibility of insuring there was bilateral breath sounds throughout the Code, and that there were bilateral breath sounds the entire time he was present.[14]  Major Webster was hazy on the

---

[9] Exhibit 17 to the Credential's Hearing Transcript
[10] Beginning at page 55 of the Credential's Hearing Transcript
[11] Pages 59 and 71, Credential's Hearing Transcript
[12] Exhibit B, Appeal of Final Privileging Decision Regarding Wilma P. Webster, Major, USAF, MC, dated April 6, 1999
[13] Page 60, Credential's Hearing Transcript
[14] Pages 143 and 163, Credential's Hearing Transcript

details of the Code as she had not seen the records of the Code since the incident happened, just as Col. O'Neil was;[15] but she did not recall that the patient had a problem with his airway.[16]   Obviously, if Col. O'Neil was hearing bilateral breath sounds throughout the Code and he arrived prior to Major Burkett, Major Burkett is wrong about the inadequate airway control.  This was also true if the patient was showing signs of breathing on his own as testified by Major Webster.

Another criticism by Major Burkett of Major Webster was that Major Webster failed to defibrillate the patient in a timely manner and needed prompting from him even after he intubated the patient.  Unfortunately, the Board was not given the opportunity to read the Code Sheet for if they had, there would have been raised serious questions regarding Major Burkett's criticisms.  Major Burkett testified that he was advised of the Code while he was at home, and that it takes him four to five minutes to get from his home to the ward.[17]  Major Burkett states in Exhibit 17 to the Credential's Hearing Transcript that when he arrived, Dr. Webster was in the process of trying to intubate the patient.  He went on to state that Major Webster was so intent on intubating the patient that she had forgotten about the need to defibrillate the patient.  The records of the Code showed that the arrest began at 21:30, and that the patient was defibrillated the first time at 21:33.  The patient was again defibrillated at 21:35 and 21:42, and the patient was not intubated until 21:47.  Thereafter, no further defibrillations were accomplished until the Code was terminated at 21:59.[18]  This record simply did not

---

[15] Page 163 of the Credential's Hearing Transcript
[16] Page 295, Credential's Hearing Transcript
[17] Page 58, Credential's Hearing Transcript
[18] Exhibit B, Appeal of Final Privileging Decision Regarding Wilma P. Webster, Major, USAF, MC, dated April 6, 1999

square with the testimony of Major Burkett or his Memorandum for Record; but Major Webster and her counsel and the Board were denied this record.

The testimony of Col. O'Neil further verified that Major Burkett's testimony and Memorandum for Record were in error. First, Col. O'Neil's time line was different from Major Burkett's.[19]  Further, it is apparent that when you compare his account to the Code Record, Col. O'Neil must have arrived latter than he remembered, and Major Burkett arrived after him. Finally Col. O'Neil testified that after the patient was intubated, the Code went smoothly.[20]  Clearly, if Major Burkett had to remind Major Webster to shock the patient, then the Code was not going smoothly after the patient was intubated, and Col. O'Neil would have obviously noted it.

The last area of criticism was the stopping of CPR after it was initiated. Dr. Matthews, a Credential's Hearing Board Member and the only physician on the Board who was Board Certified in Emergency Medicine, implied by his question at page 295 of the Credential's Hearing Transcript that it was appropriate to stop CPR at least to check the patient's real rhythm.

If the Board had been provided the Code Record, it is clear that the testimony of Major Burkett would have had to be questioned and, under cross-examination, the credibility of Major Burkett would clearly have been challenged. Further, the introduction of the x-rays ordered by Major Webster showing that Major Burkett possibly did not intubate the patient properly may have been given more credence by the Credential's Hearing Board and served as an explanation of why Major Burkett might have had some animosity against Major Webster as a result of this Code.

---

[19] Page 143 & 144, Credential's Hearing Transcript
[20] Page 162, Credential's Hearing Transcript

During the Hearing, clearly, there was no evidence introduced to the Credential's Hearing Board regarding the medication administered during the Code, but the Board found Major Webster was even deficient in this area. The Code Records should have clearly changed this opinion.

The Credential's Hearing Board chose to accept Major Burkett's testimony, which was contradicted by both Col. O'Neil and Major Webster. The only reasonable explanation for this was that the Board Chairperson was biased in favor of Major Burkett. This bias was shown when Major Webster's attorney challenged whether Major Burkett properly intubated the patient based upon the fact that post mortem x-rays taken prior to the patient being moved following the Code showed that the endotracheal tube was not inserted properly.[21]  Specifically at page 81 of the Credential's Hearing Transcript, the Committee Chairperson, Major Richard Steffen stated:

> "Is there any point pertaining to her because he is not on trial for intubating the code.  **We know that situation so I am sure Edwin intubated her just fine.  Is there anything pertaining** --"

At that point, the attorney for Major Webster immediately challenged the Chairperson for cause but the challenge was denied by the Legal Advisor. It is Major Webster's position that this challenge should have been sustained and the failure to do so is one of the reasons the Credential's Hearing Board accepted Major Burkett's testimony without even questioning it.  Further, contrary to the finding of the Credential Hearings Board, it is Major Webster's position that the record shows that she conducted the Code properly.  Her failure to be able to intubate the patient is not really criticized as every witness who was asked, acknowledged that she did the right thing by

---

[21] Exhibit 19 to the Credential's Hearing Transcript

asking someone else to intubate the patent when she was unable to.[22]  Finally, instead of this Code being used to show Major Webster cannot operate under stress, the full record, which the Board was never provided, shows just the opposite.

Further, another violation of Air Force Regulations that was permitted regards Exhibit 42 to the Credential's Hearing Transcript which was introduced as part of the file originally provided to Major Webster prior to this Credential's Hearing.  Exhibit 42 implied that the Code in question was reviewed by 1 MDOS/CC, Langley AFB, Virginia.  Major Matthews questioned this document and wanted to investigate it further.  The Legal Advisor warned the Credential's Hearing Board Members that they should not review anything which was not in the record and not try and investigate any matter outside the confines of the Board.  After Major Webster's attorney gave his closing argument relying on Exhibit 42, Major Matthews advised Major Webster's attorney that he had called Langley and determined that the Code in question had not actually been reviewed and that Exhibit 42, which was provided by the Government, could not be relied upon for determining the appropriateness of the Code. What other investigation was conducted by Major Matthews without the knowledge of Major Webster, her counsel, and the Legal Advisor is unknown, but one thing is clear – Major Matthews chose to disregard the instructions of the Legal Advisor and by doing so; Major Webster was subjected to secret evidence, a clear violation of her right to due process.

c.    <u>Cat Bite</u>:  Ms. Linda Thomas alleged that Major Webster gave her the wrong antibiotic and Major Webster contended that she decided to change the medication without any prompting from Ms. Thomas.  Ms. Thomas claimed that

---

[22] Page 70, Credential's Hearing Transcript

Major Webster had to be reminded that Ms. Thomas needed a tetanus shot and then forgot the conversation a short time later and asked her when she had her last tetanus shot. Major Webster denies this.[23] What is not included in Ms. Thomas' testimony or Major Webster's or in Exhibit 34 to the Credential's Hearing Transcript was that Major Webster prescribed the wrong dosage for the rabies immunoglobin. While the Board was free to accept either party's testimony as more creditable on the first two issues, they were not free to falsely assume that Major Webster prescribed the wrong dosage of the rabies immunoglobin. The Board was required to make their decisions based upon the evidence in the record and only that evidence. It is Major Webster's contention that this finding is only a further example of the bias of the Board against her.

I. **Allegations of Forgetfulness/Disorganization:** The Board found that Major Webster was forgetful and disorganized. Under this category the Credential's Hearing Transcript revealed only "relatively vague complaints" against Major Webster "to be true" and further finds that these relatively vague complaints are proof of a pattern of forgetfulness and disorganization.[24] To see how far the Board was willing to stretch to make this finding, the Court needs only to examine the testimony of Major Webster and the Exhibits referenced in footnote 24, and then compare them to the testimony of Major Webster's co-workers who appeared and testified at the Hearing, some at great risk to their career.

Contrary to the Board's assertion that Major Webster did not deny that she was forgetful, Page 281 of the Credential's Hearing Transcript where in response to her

---

[23] Pages 138-140; 281-283, Credential's Hearing Transcript
[24] They cite as support for these findings the failure of Major Webster to deny that she is forgetful and Exhibits 23, 34, 46, 47, 48 and the Benadryl/Tylenol mix-up, Exhibit 22, to the Credential's Hearing Transcript.

attorney's question:  "Are you forgetful in the Emergency Room?", Major Webster stated:  "No, not really."

Further as noted herein above, the incident involving the giving of Benadryl instead of Tylenol was clearly not an example of Major Webster's forgetfulness and disorganization, but rather a similar labeling problem that numerous other Physicians throughout the Hospital had also failed to distinguish in their care of their patients.  This finding is even documented in the Credential's Hearing Board's Findings and Recommendations and thus they reach contradictory findings on this error.

J.    **Specific Written Complaints:**  Exhibit 23 to the Credential's Hearing Transcript contains eight complaints.  Only two of these complaints, one dated November 11 and the other dated November 12, 1997, allege Major Webster was forgetful without any specific examples of why the patients had that opinion.  Exhibit 34 to the Credential's Hearing Transcript concerns the cat bite incident more fully discussed herein above.  If Ms. Thomas' testimony were to be believed over the testimony of Dr. Webster, then the Credential's Hearing Board may be able to use this as an example of forgetfulness.  However, if you believe Ms. Thomas, Major Webster's forgetfulness must not have been too bad as she recognized the need for the change in the medication she had prescribed immediately upon Ms. Thomas asking her about it, and she was sure that Ms. Thomas got her tetanus shot and was told to go to Public Health.

K.    **Memorandums of Captain Shercliffe:**

1.    Exhibits 46 and 47 to the Credential's Hearing Transcript concerned the written memorandums of Captain Shercliffe who wrote them after the Squadron Commander advised him to keep a close watch on Major Webster and

document anything he felt was of concern and after Captain Shercliffe was advised to tell his staff the same thing.  It is significant that despite this intensive scrutiny, all that Captain Shercliffe and his staff could document is what is contained in these memorandums. Additionally, Captain Shercliffe could not remember how long before his first memorandum it was that he was told to keep an eye on Major Webster and report any items of concern.[25]  With that background, the memorandum documents a total of five incidents.  The first incident concerns Major Webster's refusal to write up a dog bite report on a patient who had been seen earlier by another provider.[26]  Whether this decision was right or wrong is not at issue; however it is clearly not an example of forgetfulness or disorganization.

2.    The second item of concern relates to an ambulance run where Major Webster requested a strip on the patient.  She apparently was unaware that they did not have that capability but when finally informed that they could not provide a strip, gave appropriate orders.[27]    How could this be used as an example of forgetfulness or disorganization?

3.    The third item of concern regarded a full-term; pregnant patient who came into the Emergency Room after her water had broken.  Major Webster requested that the husband take her to the hospital downtown for delivery and he refused. Ultimately, they decided to take her downtown via a commercial taxi.[28]  Captain Shercliffe testified that it was in Major Webster's medical discretion how the patient should be transported downtown.  The Credential's Hearing Board felt that Major

---

[25] Pages 186-188, Credential's Hearing Transcripts
[26] Page 177, Credential's Hearing Transcript
[27] Page 178, Credential's Hearing Transcript
[28] Page 178, Credential's Hearing Transcript

Webster's decision breached the standard of care. Whether their opinion is correct or not, however, is not the issue in this instance. Clearly, there is nothing in this incident to show that Major Webster was forgetful or disorganized. The only issue is whether she made the correct decision in transporting the patient via commercial taxi.

Regarding the Credential's Hearings Board's opinion regarding Major Webster's decision to have the patient transported via public taxi to the downtown hospital, they had no records on the patient and asked no questions of Major Webster concerning this incident. None of the Board Members were specialists in OB/GYN. However, the record of the patient in question and the review by Gustavo A. Herrera, M.D., FACOG, OB/GYN Clinic, Howard AFB, Panama, documented that Major Webster consulted with Dr. Olmos, OB/GYN, who concurred in Major Webster's decision to send the patient via POV. Dr. Herrera further wrote that in his opinion, Major Webster's decision was not a breach of the standard of care.[29]  Regarding Major Webster's ability to respond to this alleged incident, it should be noted that nowhere in the notification letter to Major Webster was she advised that this case was considered to be an example of improper patient care. It should also be noted that Major Webster was denied the right to obtain actual copies of the medical records on the patient in question, and thus was forced to write what was in the medical records. Exhibit "C" to the Appeal of Final Privileging Decision Regarding Wilma P. Webster, Major, USAF, MC, dated August 27, 2006 is the typed version of what Major Webster recorded from the medical records of the patient in question.

---

[29] Exhibit "C", Appeal of Final Privileging Decision Regarding Wilma P. Webster, Major, USAF, MC, dated April 6, 1999

4.    The fourth item of concern is that Major Webster did not leave the Emergency Room until 1300 hours when she had to be back to work by 1800 hours the same day.[30]  No one suggests that Major Webster simply forgot that her shift ended earlier or that she failed to take off earlier due to lack of organization.  The truth is that her dedication to her patients attested to below by her co-workers is probably what kept her late.

5.    The fifth item concerns Major Webster seeing two pediatric patients before other scheduled patients.[31]  This may be a result of disorganization, but Captain Shercliffe did not ever suggest that it was a result of forgetfulness.  In fact in his entire testimony (while he did complain that comparatively Major Webster was not as organized as the other doctors or as predictable), he never once complained of any incidents of forgetfulness.  What was even more interesting, however, was his evaluation of Major Webster as an Emergency Room Provider.  He explained that her approach was one like other Emergency Room Doctors who were trained in Internal Medicine, that is, slow and methodical.  He also noted that her skills as a physician were comparable to the other Emergency Room Physicians, and he had confidence in her as a physician when working with her.[32]

6.    The final example of forgetfulness is Exhibit 47 to the Credential's Hearing Transcript which is a Memorandum for Record dated May 20, 1998 and written by Major James E. McCrary, Chief, Emergency Services.  This Memorandum includes the patient complaints already discussed above and the observations of Captain Shercliffe contained in his Memorandums discussed above.  It also listed a 12 November 1997

---

[30] Page 178, Credential's Hearing Transcript
[31] Pages 178-179, Credential's Hearing Transcript
[32] Pages 182-184, Credential's Hearing Transcript

Memorandum from Lt. Col. Robbins noting a one time non-compliance with standard documentation on downtown consults. It should be noted that Exhibit 53 to the Credential's Hearing Transcript contains a letter from Lt. Col. Robbins stating that after that one incident, Major Webster complied with the standard documentation on downtown consults. Hence, this clearly is not an example of forgetfulness or disorganization and could be construed as an example of the exact opposite.

Another item listed was Major McCrary's 30 November 1997 verbal counseling session. Significantly, Major McCrary testified that after that counseling, Major Webster improved.[33]

7. The final documented items in Major McCrary's Memorandum concerned "Leaving without Being Seen Statistics" (LWOBS). Exhibits 26 and 27 to the Credential's Hearing Transcript were compiled by Major Webster from the Emergency Room Patient Records and showed that contrary to what was written in the Memorandum, Major Webster was not consistently the provider with the highest LWOBS statistics. In fact, Major McCrary acknowledged that the numbers on Exhibit 26 and 27 were approximately the same numbers he used to come up with a different result.[34] Major McCrary also noted that these statistics may or may not be significant,[35] and Dr. Theodoro Mendez, Major McCrary's supervisor, testified that LWOBS statistics cannot be used in the Emergency Room because you don't know if they occurred on a slow day or if they were the result of treating an Emergency.[36]

---

[33] Pages 202 & 213, Credential's Hearing Transcript
[34] Page 197, Credential's Hearing Transcript
[35] Page 194, Credential's Hearing Transcript
[36] Page 108 &109, Credential's Hearing Transcript

Despite this, the Air Force produced new statistics on LWOBS, over the objection of Major Webster's counsel.[37]    AFI 44-119, paragraph 4.20, specifically prohibited the introduction of additional information not used in the original credentials function deliberations unless the provider was informed of the additional information prior to the hearing and was given reasonable time to review the information as well as access to the records upon which the additional information is based so that he/she can prepare to refute it.    Consequently, this constituted another example of where Major Webster was denied her rights to due process and the Air Force violated its own regulations.

In any event, these statistics did not denote forgetfulness.    They might have denoted a lack of organization, but there was simply not enough evidence to validate these statistics as being an example of Major Webster's disorganization.

L.    **Evidence Not Cited by the Credential's Hearing Board:**  At this point, however, it is necessary to review the evidence not cited by the Board in their Findings and Recommendations.    The first thing that needs to be pointed out is that **Major McCrary acknowledged that he never observed Major Webster's clinical practice and had no criticism of her medical practice despite reviewing her patient charts**.[38] Further, the only time he felt it was necessary to counsel her on her performance in the Emergency Room was on 30 November 1997.[39] Major McCrary **had no criticism of her medical practice and based upon seeing patients who were previously seen by Major Webster and reviewing their charts, found no discrepancies in her treatment of the**

---

[37] Pages 198-199, & Exhibits 49-52 to Credential's Hearing Transcript
[38] Pages 191, 203 & 204, Credential's Hearing Transcript
[39] Page 192, Credential's Hearing Transcript

24

**patients**.[40]   In fact, he volunteered that from what he had seen of Major Webster's medical practice, **he thought it was good**.[41]   He also contradicted Dr. Mendez' testimony that Major Webster got 50% of the patient complaints in the Emergency Room.[42] Additionally, he admitted that **his Emergency Room was disorganized**.[43] Clearly, this disorganization could have been part of what others perceived was Major Webster's problem instead of an Emergency Room wide problem.   Major McCrary did not state that Major Webster was forgetful. And finally, Major McCrary refused to voice any opinion on whether Major Webster should have her privileges removed, but did voice his opinion that he did not think it was right to go from a verbal counseling to a hearing to remove one's privileges.[44]   His bottom line was that while Major Webster's "care of patients is appropriate," she "just takes too long."

It is also necessary to point out that every one of the Air Force's witnesses from Col. O'Neil down could not produce one patient chart that documented Major Webster rendering poor care.[45]   In fact, **every one of the Air Force witnesses acknowledged that as far as they knew, her medical skills were good**.

M.    **Testimony of Plaintiff's Co-Workers and Patients:**  The testimony of Major Webster's co-workers and patients was even more glowing and are briefly summarized below:

1.    Major Michael B. Angeloro, Nurse Anesthetist:[46]  Major Angeloro testified that he tested Major Webster's skills in intubating a patient, that she successfully

---

[40] Page 203, Credential's Hearing Transcript
[41] Pages 203 & 204, Credential's Hearing Transcript
[42] Pages 206, 210 & 211, Credential's Hearing Transcript
[43] Page 210, Credential's Hearing Transcript
[44] Pages 207 & 208, Credential's Hearing Transcript
[45] Pages 79, 80,107, 159 & 160, Credential's Hearing Transcript
[46] Pages 215-218, Credentials Hearing Transcript

intubated two patients without any problems, and that **he saw nothing that would cause him concern in her skills in intubating a patient**. Remarkably, the Board used this as an example that Major Webster could operate in a non-stressful environment, but implied based upon her handling of the Code in question, that the results would be different in a stressful situation. This was remarkable because the evidence was uncontradicted that all physicians from time to time have difficulty intubating patients, and in this particular case, the evidence is uncontradicted that her failure to intubate the patient was due to a physical limitation (Carpal Tunnel Syndrome) which was treated successfully.

      2.    <u>Major David Copp, General Surgeon</u>:[47] Major Copp worked with Major Webster in the Emergency Room when he was called by her for a surgical consult. **He stated that from working with her in the Emergency Room and from seeing patients in his clinic who were seen by Dr. Webster in the Emergency Room, he found her skills comparable to the skills of the other Emergency Room Doctors and saw nothing that would give him any concern about her competency to practice medicine**.

      3.    <u>Captain Mark P. Westrick, Director Clinical Laboratory</u>:[48] Captain Westrick **regularly reviewed Major Webster's orders for test and laboratory work and found them to be appropriate for the patients**. He saw nothing in her laboratory work which caused him concern about her competency to practice medicine and felt that this was a good indicator to judge a physician's competency. He also knew Major Webster socially and noted that she had never made any inappropriate comments to him.

---

[47] Pages 218-220, Credential's Hearing Transcript
[48] Pages 220-223, Credential's Hearing Transcript

4.    <u>Doctor Byron Efthimiadis, Health Promoter Coordinator</u>:[49]  Dr. Efthimiadis is a pediatrician who had at least one experience with Major Webster in treating an Emergency Room Patient and who is Major Webster's supervisor in her current assignment at the Health and Wellness Center.  Concerning the shared patient, he related that Major Webster called him from the Emergency Room for a consult on an infant she suspected had diabetes.  **When he arrived at the Emergency Room, the patient had been properly worked up by Major Webster.  He found her diagnosis to be correct and found that in working with her, she was very competent.**  He also testified that Major Webster was performing excellently in her current job and that he wanted her back if the Board did not pull her credentials.  He noted that Major Webster had not made any inappropriate remarks while she worked for him.  **He knew of nothing which would cause him to question Major Webster's competency to practice medicine.**

5.    <u>Captain Randall Langston, Commander of Public Health</u>:[50] Captain Langston reviewed the complaint of Ms. Thomas and **found nothing distressing about it with regards to Major Webster's handling of the cat bite**.  He also testified that he has worked with Major Webster since she was transferred to the Health and Wellness Center.  He stated that Major Webster had never said anything inappropriate to him and that **he would have no hesitancy in allowing Major Webster to treat either himself or his family**.

6.    <u>Captain Steven G. Cusack, Chief of Pharmacy</u>:[51]  Captain Cusack regularly reviewed the prescriptions of Major Webster and **was most impressed with**

---

[49] Pages 223-227, Credential's Hearing Transcript
[50] Pages 227-232, Credential's Hearing Transcript
[51] Pages 232-239, Credential's Hearing Transcript

**her knowledge of pharmacology, her ability to stay current in the use of drugs, and her performance on his committee**. He found her thorough. **He was a patient of Major Webster and was impressed with her thoroughness and the concern she showed about him. He saw nothing in his observations to given him concern about her competency to practice medicine and would allow her to treat himself and his family.** He further felt that a physician's prescription use was one of the better ways to evaluate a physician's competency.

       7.    <u>Captain Ann Li, Primary Care Physician</u>:[52] Captain Li **worked with Major Webster for eight months in the Emergency Room**. Prior to her becoming licensed, Dr. Webster was supervising her. **Captain Li found Major Webster to be an excellent physician who was very thorough and meticulous in her treatment of patients.** In her opinion, Major Webster's rate of seeing patients was about the same rate as Captain Li's. **She never had any concerns about her judgment and sought her advice on consults. She also sought treatment from Major Webster. She knew of nothing that would justify pulling Major Webster's credentials in the Emergency Room or anywhere else and voiced the opinion that she was a very good doctor**.

       Captain Li also testified that she **felt threatened by Major Burkett. She had a conversation with him in which it was her distinct impression that if she testified out of the norm in the Hearing, her application for Flight Medicine would be disapproved**.

---

[52] Pages 239-245, Credential's Hearing Transcript

8.    <u>TSgt Thomas Sonderegger, NCOIC Patient Administration</u>:[53] TSgt Sonderegger submitted a written statement in support of Major Webster as well as testifying before the Board.  He found Major Webster a very honest and thorough person who gave him everything he needed to process her recent PEB.  **He further noted that in her practice of medicine, she frequently came to his section to follow up on laboratory and other test results and x-rays on patients.  He also noted how she would call her patients to advise of the results.**  Major Webster never said anything inappropriate to him, and he never observed anything which caused him to question her competency in practicing medicine.  **He would allow Major Webster to treat him and his family.**

9.    <u>Captain Michael Tall, Emergency Room Physician</u>:[54] Captain Tall **worked with Major Webster in the Emergency Room** but did not recall having treated a patient with her.  He has however **seen patients previously seen by Major Webster and their records always reflected a proper diagnostic work up and proper care**.  **He believes that she is competent to practice medicine in the Emergency Room and would have no objection to her being reinstated as an Emergency Room Physician at Howard AFB.**  If she was sent to a busier Emergency Room, again he would not have a problem with her medical skills, but he felt that because of her thoroughness, you might get more patient complaints because the waiting times might go up.  **Captain Tall was particularly appreciative that Major Webster would stay after her shift to see patients who she began treating on her shift rather than passing them on to the next**

---

[53] Pages 245-248 & Exhibit 30 to Credential's Hearing Transcript
[54] Pages 249-254, Credential's Hearing Transcript

shift.  **Captain Tall stated that he would have no problem in having Major Webster treat him or a member of his family.**

10.    Major Joan Marine, Physician Assistant:[55]  Major Marine **has seen over 70 patients seen previously by Major Webster.  She has also called Major Webster for consults.  She trusts Major Webster's medical judgment and has never seen anything which caused her to question Major Webster's competency.  Captain Marine would allow Major Webster to treat both her and her family.**  Major Webster never said anything inappropriate to her.

11.    Captain Mark A. Luff, Family Practice Physician:[56] Captain Luff **worked with Major Webster in the Emergency Room**.  He was unable to be present for the hearing but he submitted a letter supporting her.  He noted that **she had a caring patient attitude and unlike other providers, always stayed after her shift to finish up her patients**.

12.    SrA Stacey L. Lindgren, Emergency Room Technician:[57]  SrA Lindgren submitted a letter in support of Major Webster whom she had **worked with in the Emergency Room.  She voiced the opinion that Major Webster was an "exceptional doctor" who inspired her to strive a little harder and become knowledgeable**.  She further noted that Major Webster was dedicated to her patients.

13.    Captain Phyllis F. Jones, Nurse Manager:[58] Captain Jones **worked with Major Webster for two months in the Emergency Room**.  She was very laudatory of Major Webster both with regards to her patient care and her interactions with

---

[55] Pages 284-286, Credential's Hearing Transcript
[56] Exhibit 28 to the Credential's Hearing Transcript
[57] Exhibit 29 to Credential's Hearing Transcript
[58] Exhibit 61 to Credential's Hearing Transcript

the staff.  She concluded her letter by stating "**As a registered nurse, I never felt a need to question or doubt her management, treatment or care she administered to her patients.**"

14.    <u>Lt.Col. Santa Ngo, Pediatrician</u>:[59]  Lt. Col. Ngo was a **member of the original Credentials Committee who voted to revoke Major Webster's privileges.  However, she submitted a letter of support for Major Webster**.  Lt. Col. Ngo noted that she **worked with Major Webster in the Emergency Room when called for consultations.  She noted that Major Webster had genuine concern for her patients and provided good medical care**.  She also commented that Major Webster stays current on her medical journals and accepts recommendations on current pediatric care.

15.    <u>SrA Jodi L. McMasters, Medical Service Journeyman</u>:[60]  SrA McMasters is a patient of Major Webster and noted that she was very caring and willing to listen to her concerns.

16.    <u>Mr. John S. Best, SFC, USA (Retired)</u>:[61]  Mr. Best is a patient of Major Webster.  His letter thanks Major Webster for the prompt, courteous and professional medical care that Major Webster provided his family and himself.

N.    **Inappropriate Behavior/Impulse Control**:  There was no doubt that the statements referenced in this section of the Credential's Hearing Board's Findings and Recommendations were inappropriate.  Major Webster admitted to each of the incidents cited but did quarrel with what she said about the aerovac plane blowing up.  She recalled stating that "I don't care if the plane blows-up" or words to that effect; not that "I am

---

[59] Exhibit 62 to Credential's Hearing Transcript
[60] Exhibit 63 to Credential's Hearing Transcript
[61] Exhibit 64 to Credential's Hearing Transcript

going to blow up the plane" or words to that effect.  SrA Goode recalled the event differently, and the flight nurse recorded what SrA Goode said differently.  However, Major Webster did not deny that whatever the words, it was inappropriate to speak them.  The Credential's Hearing Board concluded that these outbursts were secondary to stress and contended that, therefore, Major Webster should be removed from a position of stress in the Emergency Room.

What the Board did not mention, although it was clearly in evidence, was what caused this stress.[62]  The first incident occurred on Major Webster's first day of working in the Primary Care Clinic after she had just been removed from the Emergency Room due to her Carpal Tunnel Syndrome and the impact this medical condition had on her ability to intubate patients.  Essentially, she told Major Burkett that she was going to lunch in a louder than normal voice.  Major Burkett said she was not, and she returned to the Clinic without taking lunch.  While Major Burkett may not have liked her response to his orders for her not to go to lunch, clearly her response was appropriate but for her raising her voice.  Further, while she disagreed with Major Burkett's directive to return to the Primary Care Clinic without going to lunch, she nevertheless followed his directive to do so.

During the time that the other incidents occurred, there were several events which threatened Major Webster's career not only in the Air Force but also her profession as a physician:

1.    The Emergency Room Supervisor was directed by the Squadron Commander to write memorandums on anything he felt was inappropriate action by Major Webster in the Emergency Room and was further directed to advise the

---

[62] Exhibits 12 & 13 to the Credential's Hearing Transcript

Emergency Room Staff to advise him of anything they observed with regards to Major Webster's treatment of her patients;

2.    Major Webster was removed from her position as an Emergency Room Physician due to her Commander's loss of confidence in her;

3.    Major Webster was given a Command Directed Mental Health Evaluation;

4.    Major Webster was given a Referral OPR;

5.    Major Webster was evaluated by Major LaMacchia as having cognitive deficits and possibly Multiple Sclerosis which made her unfit to practice as an Emergency Room Provider;

6.    Major Webster was directed to go to Wilford Hall USAF Medical Center for further evaluation and for possible MEB action;

7.    Major Webster had all her privileges at Howard AFB revoked;

8.    Major Webster suffered Gullian-Barre Syndrome and was returned to Wilford Hall USAF Medical Center;

9.    Major Webster was referred to PEB; and

10.    Major Webster was presented with a package of documents, many of which she had never seen, which were being used to justify the revocation of all of her privileges and further advised that this was an adverse credentialing action which, if accepted, would be reported to her state medical licensing boards.

O.    **Psychologist's Testimony:**  Captain Gregory Fey, a psychologist, in his testimony admitted that Major Webster was "stressed out" from all these events.  He also testified that Major Webster felt that she was being railroaded by the Air Force and had

no effective advocate for herself. **He also stated that her rationale was logical and that she was never psychotic**. And as noted in the Board's Findings and Recommendations, Captain Fey noted that **she was never suicidal or homicidal**. Finally, while he felt that her actions could not simply be explained by stress, **he admitted that he had not treated many physicians in a similar situation and had never been in this situation himself**. Further, **he was unwilling or unable to advise the Board that Major Webster was unfit to practice medicine because he had never observed her medical practices** and that was not his function in seeing her.

It was and is Major Webster's contention that placed under the enormous stress of all the above, she reacted badly, but these reactions were caused by her deep convictions that none of the actions were justified. It is also her position that all of these events, **except for the event with Sgt. John D. Silbaugh on 7 February 1998, never occurred while she was treating patients. In fact, this one event occurred in the Primary Care Clinic, not in the Emergency Room. It is further significant to note that even after she was returned to the Emergency Room in mid-April 1998, she was never reported as making inappropriate comments to patients. Additionally, she made no such comments while performing her duties in the Health and Wellness Clinic.** In other words, **there is no showing that despite her tremendous frustration with the Air Force and how she was being treated, she ever voiced these concerns to her patients she was treating, other than the 7 February 1998 incident, or that they impacted in any way on the quality of care she provided. Again, the only evidence from her co-workers is that she is a quality physician who cared for her patients and rendered care well within the standard of care of an Emergency Room Physician.**

Her actions at the time may have been a basis for administrative (letter or reprimand) or non-judicial punishment (Article 15), but should never have been the basis to revoked her credentialing.

P.    **Neuropsychological Disorder:**    The Board, in their Findings and Recommendations, found that Major Webster had "some form of cognitive deficit" and further concluded that "this deficit impaired her ability to make effective and rapid decisions, which are essential for an ER setting."  The problem with this conclusion is that there is no evidence as detailed above in the Credential's Hearing Transcript or its Exhibits that show that Major Webster's "cognitive deficit" ever impaired her ability to make effective and rapid decisions in the ER. The testimony and statements of her co-workers and even the Government's Witness were that she was a fine physician who rendered good care to her patients.  Not one medical record was introduced by the Government to show inadequate care by Major Webster to any of her patients.  Dr. Tall, Dr. Li, Dr. Copp, Dr. Efthimiadis, Dr. Luff, Dr. Ngo, Dr. McCrary, PA Marine, and Captain Shercliffe all either worked with Major Webster in the Emergency Room or reviewed charts of patients seen by Major Webster, and **not one** had any criticisms of her medical care of patients.

Major Burkett in his testimony admitted that no decredentialing action of any kind was taken against Major Webster when she was removed from the ER and placed in the Health and Wellness Center in late May 1998.[63]  Hence, apparently at that point, the Hospital Commander and Major Webster's Supervisors had concluded that all the evidence used against her now in this hearing from October 1997 to May 1998 did not justify the conclusion that Major Webster was unfit to be a credentialed provider in any

---

[63] Beginning at Page 255 of the Credential's Hearing Transcript

area of the hospital.  This evidence only became a justification for decredentialing Major Webster after she was found to possibly have Multiple Sclerosis and to have "cognitive deficit."  Major Burkett as much as admitted this when during an exchange between Major Matthews, Major Steffens and himself, he testified that the decredentialing was done because Major Webster had a health problem which was hindering her cognitive abilities.[64]

Turning to Major Webster's cognitive deficit, it is important to appreciate that psychiatry and psychology are not exact scientific fields.  Much of their conclusions are based on subjective analysis of testing and speaking with the patient.  Their findings and conclusions must always be substantiated by concrete examples of the patient's actual behavior and performance.  With this in mind, it is important to realize that none of the psychologists that examined Major Webster ever observed her practice of medicine in any setting, much less the Emergency Room.  They were not privileged to hear the testimony of Major Webster's co-workers and others, who based on their observation of her treatment of her patients, the records of her treatment of her patients, the laboratory work she ordered on her patients, the prescriptions she ordered for her patients and the favorable results she obtained for her patients.  If they had, the "relative cognitive deficit" described by Dr. O'Connor and the "cognitive deficit" found by the Government's psychologists may well have been found to be of no significance in her practice of medicine in any setting.

Further, each of the Government Examiners to an extent were predisposed to find something wrong with Major Webster as Major Webster was referred to them as a result of a Command Directed Mental Evaluation.  Each Government Psychologist was

---

[64] Pages 262-263, Credential's Hearing Transcript

also provided with letters from her commander which made wide sweeping allegations against her. However, when such allegations were put to the test under cross-examination in the Credential's Hearing, the overwhelming weight of the evidence proved that Major Webster's practice of medicine was equal to her other providers in the Emergency Room with the exception that she was a little slower seeing patients due to her approach, i.e., her training as an internist.

Additionally, at the time of the Hearing, the FPEB had already met and found that Major Webster had no medical problems and was fit for worldwide duty. Because of this, it was the position of Major Webster throughout the hearing that the Board was not permitted to reexamine the medical narratives on Major Webster to, in effect, reopen the PEB. It was her legal position that the findings of the PEB were "res judicata" on the Board with regards to her medical and psychological fitness to practice medicine, and the Board's inquiry was limited to determining if Major Webster's medical practice was deficient as shown by the treatment she rendered to her patients. By taking the position that the Board could reexamine Major Webster's mental and physical competency to practice medicine, they again violated Major Webster's right to due process. In fact, their Findings and Recommendations are not based upon examples of Major Webster's poor medical practice, but rather are based on her cognitive deficit.

Because of these beliefs and legal positions, Major Webster was not prepared to defend herself further on these issues. However, since the Hearing, Major Webster has consulted with Gustavo A. Herrera, M.D., Gynecologist, Howard AFB, Panama, on the possible effects on her cognitive abilities of not taking hormonal replacement therapy. It was his opinion that the cognitive deficits noted by the

psychologists who examined Major Webster were probably related to her estrogen deficiency.[65]  Therefore, even if the Board was correct in finding that Major Webster had "cognitive deficits", a problem which did not result in improper care to Major Webster's patients, this problem apparently is easily resolved with the hormone replacement therapy, a treatment option not even considered by the psychologist who examined Major Webster or by the members of the Board.

Q.    **Conclusions of Credential's Hearing Board:**  On February 18, 1999, the Credential's Hearing Board unanimously concluded that (1) Major Webster did not adequately manage task-saturated events; (2) Major Webster's family practice, primary care and aerospace medicine privileges should be allowed, with the caveat that Major Webster should be monitored 100 percent chart review for no less that 3 months; and (3) at the conclusion of the three month period, Major Webster's privileges should be reevaluated.  AR 45-46.  Although these conclusions were accepted by the Commander of the 24th Medical Group, he never allowed Major Webster to return to the clinic to practice medicine, thus effectively denying her any privileges.

R.    **Appeal to Air Force Surgeon General:**  On April 6, 1999, Major Webster, through her attorney, appealed to the Air Force Surgeon General ("AF/SG") the Credential Functioning Committee's decision, In the opening paragraph Major Webster's attorney stated the following:

> "It is further Major Webster's position **that her rights to due process under the law and in accordance with AFI 44-119 were violated as** (1) the Air Force failed to produce at the hearing crucial medical records concerning the Code Blue which was one of the matters which the Credentials Board based part of their opinion upon; (2) introduced records not provided to Major Webster prior to the Credentials

---

[65] Exhibit "D", Appeal of Final Privileging Decision Regarding Wilma P. Webster, Major, USAF, MC, dated April 6, 1999

Hearing; (3) exerted command influence upon at least one of the witnesses; (4) failed to assure the impartiality of the Hearing Committee and (5) went outside the hearing record to investigate the Code Blue without advising Major Webster of same." (Emphasis added.) AR 52

The Air Force Medical Practice Review Board ("MPRB") reviewed Major Webster's appeal and found that action taken by the Credential's Functioning Committee at Howard AFB to be appropriate.  AR 84.  After reviewing all of the facts of Major Webster's case, and the items Major Webster raised in her appeal, AF/SG concurred with the position of the MPRB and informed Major Webster that he intended to report the results of the hearing to the National Practitioner's Data Bank ("NPDB").  AR 84.

S.    **Evaluation at Kessler AFB:**  In December 1999, Major Webster was sent to Keesler AFB in Mississippi for reevaluation.  AR 97.  At this time, **Major Webster had not practiced any clinical medicine with patients for a period of approximately 18 months through no fault of her own.**  During December 1999 and January 2000, six physicians provided direct evaluation of Major Webster's emergency room practice.  None took in consideration that Major Webster had not practice medicine in a clinical setting for 18 months or that she had never practice emergency medicine in a state of the art, major medical center emergency room.  These physicians recommended that it would not be prudent to leave Major Webster alone in charge of an emergency department, and that Major Webster was not a competent emergency physician.  Most of these physicians also believed that Major Webster could perform at a satisfactory manner in a controlled, slower clinical setting. AR 97; 102-123.  The evaluating physicians concluded that Major Webster possesses good clinical knowledge in most settings, but all agreed that she could not handle the multi-tasking needed in the emergency medical specialty.  AR 97;102-123.

T.  **Second Disability Process:**  On July 12, 2000, a second MEB was convened to consider Major Webster's fitness for continued service.  AR 139-140.  Once again, the MEB referred Major Webster's case to an IPEB,  AR 139,  The IPEB again concluded that Major Webster was unfit for continued service because she possessed MS, associated with secondary cognitive deficit, and recommended that Major Webster be permanently retired with a compensable percentage of 30 percent.  AR 139-140.  Major Webster initially disagreed with the IPEB's findings and requested a FPEB.  AR 141. Finally, given the fact that she was facing separation from the Air Force due to the end of her contract and given the fact that her ability to practice medicine had been lost due to the actions of the AF/SG in reporting its findings to the NPDB, she finally gave up and accepted the IPEB's findings and disability rating on September 20, 2000.  AR 41.  On October 17, 2000, the Office of the Secretary of the Air Force directed that Major Webster be retired in grade of major with a compensable rating of 30 percent.  Major Webster was retired effective December 1, 2000.

U.  **AFBCMR:**  On May 1, 2000, Major Webster filed an application for correction of military records with the AFBCMR.  AR 15.  Major Webster alleged that Air Force officials acted in an arbitrary and capricious manner and in violation of existing law and regulations by limiting Major Webster's medical credentials, by removing her from any practice in the emergency room medical care, and in limiting her clinical care credentials by requiring 100 percent monitoring of her clinical practice.  AR 15.  Major Webster also alleged that the Air Force act in an arbitrary and capricious manner, contrary to law and regulation, when it limited her practice of medicine to Family

Practice, Primary Care and Aerospace Medicine Clinics.  AR 15-16.  Finally, Major Webster alleged that the Air Force erred when it failed to pay her ASP "in late 1998 or early 1999." AR 31.

The AFBCMR concluded that insufficient relevant evidence had been presented to demonstrate the existence of error or injustice that would warrant full relief of Major Webster's requests.  AR 10.  The AFBCMR noted that the Credential's Hearing Committee, after deliberating upon all the facts of her case, recommended that Major Webster should not practice in an emergency room setting, but that Major Webster should be allowed clinical privileges and another evaluation after a period of time.  AR 10.  Major Webster's commander concurred with the recommendation.  AR 48.

The AFBCMR found that the actions taken to affect revocation of her emergency room privileges and restrict her to clinical practices were appropriately taken and done in accordance with established directives.  AR 10-11.  The Board specifically found that evidence had not been presented to show that Major Webster's commander abused his discretionary authority or that the actions he took against Major Webster were taken for anything other than her own performance.  AR 11.  The AFBMCR also addressed Major Webster's application and the information provided regarding the reevaluation of her emergency medicine practice that was accomplished at Keesler AFB and found that it was further confirmation that Major Webster should be limited to performing duties in a clinical setting.  AR 11.  Finally, the AFBCMR carefully reviewed the data contained in the Adverse Action Report  provided to the NPDB and was not persuaded that the data was factually incorrect or that the report was improperly submitted.  AR 11.  The AFBCMR agreed with the Air Force Office of Primary

Responsibility ("OPR") and adopted OPR's rationale as a basis for the Board's conclusion that Major Webster had not been a victim of an error or injustice warranting correction. AR 11.

Notwithstanding these findings, the Board found that Major Webster present sufficient relevant evidence warranting approval of Major Webster's request to receive Additional Special Pay for July 1998 to July 2000. AR 11. The Board found that Major Webster's pay records reflected that Major Webster remained eligible for ASP for certain periods that it was denied her. AR 11. While the AFBCMR believed that Major Webster's commander possessed discretion to relegate her to other duties, it found that, based upon the findings of the MPRB, Major Webster could have practiced in a clinical setting and therefore was entitled to the ASP. AR 11. Thus, the AFBCMR recommended that Major Webster's military records be corrected to show that:

a.    On July 27, 1998, Major Webster had executed and competent authority approved, a one-year Additional Special Pay Contract effective July 28, 1998 (AR 12); and

b.    On July 27, 1999, Major Webster had executed and competent authority approved, a one-year Additional Special Pay Contract effective July 28, 1999. AR 12.

On August 19, 2004, Major Webster asked the AFBCMR to reconsider its decision of February 4, 2003. AR 1475-1500. Major Webster's reconsideration request also asked the AFBCMR to clarify its previous decision to reflect that the Board's initial decision removed all such restriction the Air Force placed upon Major Webster's ability to practice in a medical clinical setting and in the emergency room. AR 1476. The

AFBCMR, voting 2 to 1, did not adopt Major Webster's interpretation of its initial decision, and on December 28, 2004, the majority of the Board rejected Major Webster's request for reconsideration and restated that the Board had partially granted Major Webster's ASP request.  AR 1503-1505.

V.    **Filing of Complaint:**  On December 20, 2005, Major Webster filed suit in this Court, alleging that the MPRB and AFBCMR decisions were arbitrary and capricious and violated Major Webster's right to due process and specified numerous reasons for this position.

## ARGUMENT

## I.    This Court Has Jurisdiction under Plaintiff's Causes of Action:

Citing from the Defendant's Argument:  *The United States Court of Federal Claims has been authorized by Congress to render judgment upon any claim against the United States founded either **upon the Constitution**, or any Act of Congress or **any regulation of an executive department**, or upon any express or implied contact with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."28 U.S.C. §1491(a)(1).*  (Emphasis added.)   Again citing from the Defendant's Argument, footnote 9:  *28 U.S.C. §1491(a)(2) provides:*

> ***To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue** orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and **such other orders may issued to any appropriate official of the United States.***

While the Plaintiff agrees with the Defendant that Plaintiff is not entitled to any further ASP based on the appropriately cited regulations and case law, Plaintiff did plead

thorough out her pleadings numerous violations by the Defendant of its regulations and the deprivation of her valuable property right resulting there from, that is, the right to practice medicine, without due process of law.  Although the Defendant's violation of the 7th Amendment to the United States Constitution is not specifically pled under **JURISDICTION** in Plaintiff's complaint, the substance of same is alleged throughout paragraph 13 a through o of her complaint as well as in the documents and the record quoted to the Court under **II.  Statement of Facts,** set forth herein above.  Hence the Defendant cannot claim unfair surprise that Plaintiff is alleging this basis to sustain the Court's jurisdiction over this case.

In the Defendant's **_ARGUMENT_**, the Defendant in citing United States v. Mitchell, 445 U.S. 535, 538 (1980), writes the following:

> "…the United States Supreme Court held that the Tucker Act does not create any substantive right for monetary damages.  Therefore, Major Webster must identify and plead an independent contractual relationship, constitutional provision, Federal statute, and/or executive agency regulation that provides (sic) a substantive right to money damages in order for the Court to possess jurisdiction.  See Todd v. United States, 386 F. 3d 1091, 1094 (Fed. Cir. 2004)  ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); see also Fisher v. United States, 402 F. 3d 1167, 1173-74 (Fed. Cir. 2005) (en banc)."

Using these same authorities, the Plaintiff has pled a violation of a constitutional provision, the 7th Amendment to the United States Constitution, that provides a substantive right to money damages and thus the Court possesses jurisdiction.  The United States Air Force violated its own regulations guaranteeing the Plaintiff due process of law.  Specifically, AFI 44-119, paragraph 4.18, states: "Privileges review is a function of professional peers.  Personnel participating in the review **must be able to**

**impartially review the case**." AFI 44-119, paragraph 4.20 states: "Additional information, not used in the original credentials function deliberations on the case, may be presented at the hearing. **However, the provider must be informed of additional information prior to the hearing and must be afforded reasonable time to review the information as well as access records upon which the additional information is based so that he/she may prepare to refute it**."

The Air Force violated both of these provisions in the Hearing afforded Major Webster. The Air Force allowed, over the objection of Major Webster's counsel, the new Leaving Without Being Seen Statistics, and Major Matthews, contrary to the direction of the Board's Legal Advisor, conducted his own investigation of the Code Review without such information being provided to Major Webster. The Air Force also failed to provide Major Webster with an impartial hearing as the Chairperson was biased in favor of Major Burkett, the Government's chief accuser.

Besides the above, the Board itself was tainted by unlawful command influence upon witnesses and possibly potential witnesses in favor of Major Webster (Dr. Li). Further, the Hospital Commander, the boss of everyone on the Credential's Hearing Board testified that he could not accept a recommendation for the Board that returned Major Webster to practice in the Emergency Room.

In addition, the Government withheld key records on the Code in question and, in fact, represented to the Board that such records were not available and could not be found when, in fact, **such records were locked in the Command Section**.

The above actions of the Government tainted the proceedings and violated Major Webster's constitutionally guaranteed right to due process prior to the taking of a

valuable property right, her right to practice medicine.  The impact of the above cited violation on the Board's Findings and Recommendations is obvious when measured against the evidence that was produced at the Credential's Hearing.

What the evidence did show in this case, without any contrary evidence from the Government, was that Major Webster was a competent Emergency Room Physician.  The evidence further showed that if she had cognitive deficit, Major Webster's cognitive deficit did not affect, in any way, the proper treatment of her patients.

The Board, itself, found that with regards to "patient complaints", the only theme in the few which were attributed to Major Webster was "to waiting times."  With regards to medication errors, one of which Major Webster contends was not an error, the Board found that two medication errors was "an acceptable medication error rate."  Further, the Board found that Major Webster's knowledge of pharmacology was impressive.  Finally the Board admitted that Major Webster had "the requisite knowledge to be a physician" and had superior traits as a physician, i.e., thoroughness, dedication to patients, medical knowledge, etc."

However, despite these findings and the evidence produced at the Credential's Hearing, the Board still revoked Major Webster's credentials to practice Emergency Room Medicine and limited her privileges to practice in Family Practice/Primary Care/Aerospace Medicine Clinic.  These findings and recommendations were based:  (1) upon her alleged forgetfulness and disorganization which is not documented in the evidence and is, in fact, contradicted by the evidence in this case; (2) her "cognitive deficit" without any examples of how this "cognitive deficit" ever manifested itself in the treatment of Major Webster's patients; (3) upon analysis of the Code Case, Pregnancy

Case  and the Cat Bite Case which were flawed and contradicted by not only the evidence presented at the Hearing but by the records of the Code and the Pregnancy Case; and (4) upon her inappropriate statements made under the stress of the threat of having her privileges revoked and having her professional career destroyed.  The Board's decision was arbitrary and capricious, and their flawed reasoning showed that Major Webster was denied due process of law resulting in the loss of her medical licenses proximately caused by the erroneous report filed by the AF/SG with the NPDB.

This process was further flawed when the AFBCMR, by a 2 to 1 majority, refused to grant Plaintiff's request that her records be corrected to reinstate all her medical privileges and require the Air Force to rescind its letter to the NPDB.  This decision ignored the evidence produced at the Credential's Hearing and failed to recognize the unfairness of Major Webster's subsequent reevaluation of her emergency room skills after 18 months of not practicing medicine in any clinical setting.  For that reason, the majority of the AFBCMR merely served to compound the injustice that occurred to Major Webster by using the subsequent reevaluation of Major Webster as a basis to justify the past actions of the Credential's Hearing Board and the Commander of the 24th Medical Group.  For that reason, their actions were arbitrary and capricious and further violated Plaintiff's right to due process under the 7th Amendment to the Constitution.

## II.      Leave to Amend Pleadings:

Included with this Response is a Motion for Leave of Court for Plaintiff to file her Amended Complaint.  This is necessary so that Plaintiff can properly plead the basis for the Court's jurisdiction as set forth herein and its damages proximately caused by the

Defendant's violation of her 7th Amendment rights guaranteed by the United States Constitution. In considering this request, the Plaintiff would cite the Court to Rule 15 (a), F.R.C.P., wherein it states:

> "…Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires…"

A copy of Plaintiff's proposed Amended Complaint is attached hereto as Exhibit "A" and incorporated by reference the same as if fully copied herein verbatim. By amending her complaint and based upon the authorities cited by the Defendant under **_ARGUMENT,_** section **_I.,_** entitled ***This Court's Standard Of Review for Motions to Dismiss For Lack Of Jurisdiction And Failure To State A Claim,*** this Court will have jurisdiction to hear this case.

## CONCLUSION

For the reasons stated above, the Plaintiff, Major Wilma P. Webster, USAF, MC, Retired, respectfully requests that she be granted Leave to Amend her Complaint and that Defendant's Motion to Dismiss be denied.

Respectfully submitted,


_____ s/Terrence J. Martin, Sr.
**TERRENCE J. MARTIN, SR.**
Law Offices of
TERRENCE J. MARTIN, SR.
THE PARK ON MEDICAL
4115 Medical Drive, Suite 401
San Antonio, TX 78229
Tel: (210) 697-3400
Fax: (210) 697-6386

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on this 28th day of August 2006, a copy of the foregoing "PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND MOTION FOR LEAVE OF COURT TO AMEND PLAINTIFF'S COMPLAINT," was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

s/Terrence J. Martin, Sr.

**TERRENCE J. MARTIN, SR.**

**EXHIBIT "A"**
**TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND**
**MOTION FOR LEAVE OF COURT TO AMEND PLAINTIFF'S COMPLAINT**

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **MAJOR WILMA P. WEBSTER, MC,** | § | |
| **USAF RETIRED,** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| **vs.** | § | **No. 05-1333C** |
| | § | **(Judge Christine O. C. Miller)** |
| **UNITED STATES,** | § | |
| | § | |
| *Defendant*. | § | |

**PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT**

COMES NOW Major Wilma P. Webster, MC, USAF Retired, Plaintiff, and first with obtaining leave of Court, files her First Amended Original Complaint against USAF Board for Correction of Military Record and the United States, Defendants, and as grounds for same would show the Court:

**PARTIES**

1.      Plaintiff is a resident of Los Angeles, California.

2.      Defendant is an agency of the United States Government who has already been served and answered in this cause.

**ADMINISTRATIVE HISTORY**

3.      Plaintiff was medically retired from the USAF on December 1, 2000.  On or about April 25, 2002, less than 3 years following her medical retirement from the USAF, Plaintiff filed her Application for Correction of Military Records with Plaintiff seeking the following:

        a.      Void a finding and recommendation of a Medical Practice Review Board ("MPRB") convened by the 24th Medical Group at Howard AFB, Panama, on 17-18 February 1999 which restricted Plaintiff from practicing Emergency Room Medicine;

b. Void a determination by the Commander, 24th Medical Group, Howard AFB, Panama on March 24, 1999, which restricted Plaintiff from practicing Emergency Room Medicine and which further restricted Plaintiff from practicing medicine in Family Practice/Primary Care/Aerospace Medicine clinics without 100 per cent supervision for six months;

c. Direct the Office of the Surgeon General of the Air Force to rescind or correct its correspondence to the National Practitioner Data Bank to reverse the adverse information previously furnished by them to the National Practitioner Data Bank;

d. Direct Air Force Officials to remove and/or correct information from Plaintiff's official Air Force personnel files and records to comply with the decision of the AFBCMR on this application.

e. Direct Air Force Officials to remove and/or correct information from Plaintiff's official Air Force personnel files and records to comply with the decision of the AFBCMR on this application.

4. Defendant docketed this case as Docket Number: 02-01487, styled "In the Matter of Wilma P. Webster, ███████.

5. On or about August 16, 2002 and September 25, 2002, Defendant forwarded to Plaintiff the Air Force Advisory Opinions for review and response and on November 7, 2002, Plaintiff filed her Responses to the Advisory Opinions of the Air Force.

6. On or about February 4, 2003, Defendant Board issued its findings in this case as follows:

a. The applicant (Plaintiff) has exhausted all remedies provided by existing law or regulations.

b. The application was timely filed.

c. Insufficient relevant evidence has been presented to demonstrate the existence of error or injustice that would warrant full relief of the Applicant's (Plaintiff's) requests. We note that the credentials hearing committee, after deliberation on all the facts of her case, recommended that she should not practice in an ER setting and that she should be allowed clinical privileges with 100 percent chart review and reevaluation after a period of time. Her commander concurred with that recommendation. The

51

MPRB reviewed the facts of her case and made their recommendation to the AF/SG. After review of all the facts of her case and consideration of her appeal, the AF/SG subsequently concurred with the recommendation of the MPRB. The Applicant (Plaintiff) contends that the actions taken to revoke her ER privileges and limit her to clinical privileges were arbitrary, capricious, and were in violation of laws and policy; and requests that those findings and determinations be removed from her records. After a thorough review of the evidence of record, it is our opinion that the actions taken to affect revocation of her ER privileges and restrict her to clinical practice were taken appropriately and in accordance with established directives. Evidence has not been presented which would lead us to believe that her commander abused his discretionary authority in this matter or that the actions taken against the Applicant (Plaintiff) were based on anything other than her own performance. Upon her application for ER clinical privileges, she was reevaluated in an ER setting and it was in an ER department and it was recommended that she should be limited to duties in a clinical setting. We note the Applicant's (Plaintiff's) request that the adverse correspondence provided to the National Practitioner Data Bank (NPDB) be rescinded, or in the alternative amended. However, we carefully reviewed the data contained in the Adverse Action Report provided to the NPDB and are not persuaded that the data therein is factually incorrect or that the report was improperly submitted. Therefore, we agree with the Air Force officers of primary responsibility regarding these matters, and adopt their rationale as basis for our conclusion that she has not been the victim of error or injustice.

        d.      Sufficient relevant evidence has been presented warranting approval of Applicant's (Plaintiff's) request to receive Additional Special Pay ("ASP") for the years 1998 and 1999. A review of her pay records reflects that she remained eligible for, and continued to receive payments on her Incentive Special Pay, Multi-year Special Pay, Board Certification Pay, and Variable Special Pay contracts. Based on our review of the evidence of record, it is our opinion that although her ER privileges were revoked, the MPRB had determined that she was qualified to perform in a clinical setting. While we believe that it was at her commander's discretion to relegate her to other duties, we note that based on the findings of the MPRB, the applicant could have practiced in a clinical setting and therefore was entitled to the Additional Special Pay. Accordingly, we recommend that her records be corrected to the extent indicated below; and

e.    The applicant's case is adequately documented and it has not been shown that a personal appearance with or without counsel will materially add to our understanding of the issues involved.  Therefore, the request for a hearing is not favorably considered.

7.    The Defendant, despite the above findings, rejected Plaintiff's other requests.  See Defendant's decision attached hereto as Exhibit "A" and incorporated by reference the same as if fully copied herein verbatim.

8.    On or about August 19, 2004 Plaintiff submitted a Request to Reconsider Decision issued on February 4, 2003 by the AFBCMR and for clarification.  Specifically, Plaintiff requested:

a.    The findings and recommendation of a Medical Practice Review Board (MRPB) restricting Plaintiff from practicing Emergency Room (ER) medicine be removed from records. COMMENT: AFBCMR did not grant this request.

b.    The determination of the 24th Medical Group commander restricting Plaintiff from practicing medicine in the Family Practice/Primary Care/Aerospace Medicine clinics with 100 percent supervision for 6 months should be removed from her records.  COMMENT: It appears the AFBCMR granted this relief but Major Webster requests clarification of the Board's decision in this regard to assure that her privileges regarding Family Practice/Primary Care/Aerospace Medicine are totally unrestricted.

c.    The adverse correspondence provided to the National Practitioner Data Bank (NPDP) by the Office of the Surgeon General of the Air Force (AF/SG) should be rescinded, or in the alternative, the restriction should be reduced to supervised practice in the ER only.  COMMENT: It appears the Board granted this request as to clinical settings but did not grant this request regarding ER practice. Major Webster requests clarification of the Board's decision to assure her clinical privileges are totally unrestricted.

d.    Plaintiff should be granted physician's incentive pay and other benefits from January 1, 1999 through December 1, 2000.  COMMENT: the Board granted this request approving Additional Special Pay, effective July 28, 1998, for one year, and effective July 28, 1999, for one year.

9.    The Plaintiff also asked for the following clarifications:

a.    Clarify specifically that it was the Board's decision that Dr. Webster's medical clinical privileges either were never restricted in any way, or if they had been restricted, the Board's decision clearly removed all such restrictions on her ability to practice in a medical clinical setting.

b.    Remove all restrictions preventing her from practicing Emergency Room (ER) medicine.  In support of this request, attached hereto for your consideration are three statements from civilian emergency room physicians …supporting the restoration of emergency room (ER) privilege. Please see the letter of James L. Stanton, Counsel for the Applicant at the time, dated August 19, 2004 and the attachments thereto which is attached hereto as Exhibit "B" and incorporated by reference the same as if fully copied herein verbatim.

10.    On or about December 28, 2004, two of the three members of the AFBCMR rejected the Plaintiff's request for reconsideration of their earlier ruling and merely restated the one area, specialty pay, which they granted in part.  The other member wrote a minority report justifying why she would have granted Plaintiff's requests.  See Defendant's decision attached hereto as Exhibit "C" and incorporated by reference the same as if fully copied herein verbatim.

## JURISDICTION

11.    Plaintiff has now exhausted all his administrative remedies and Defendant Board has made a final ruling.  This Court has jurisdiction of this claim pursuant to 5 U.S.C. 704 and pursuant to the 7th Amendment to the United States Constitution.

## ITEMS NOT APPEALED

12.    Plaintiff does not wish to appeal the portion of the AFBCMR initial decision approving Additional Special Pay, effective July 28, 1998, for one year, and effective July 28, 1999, for one year.

## CONTENTIONS OF PLAINTIFF

13.    Plaintiff contends that:

a.    The findings of the MPRB upon which the AFBCMR's decision was based is against the great weight and preponderance of the evidence produced at the MPRB and thus the MPRB's

decision as well as the AFBCMR's decision are arbitrary and capricious with no basis in fact or law and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

       b.      The Board Chairman was biased in favor of Major Burke and this bias denied Plaintiff the right to a fair and impartial hearing as guaranteed by AFI 44-119 and thus the MPRB decision and the AFBCMR's decision is arbitrary and capricious and against the great weight and preponderance of the evidence produced at the MPRB Hearing and at the AFBCMR, and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

       c.      The decision of the USAF FORMAL PEB composed of the proper agency for making such decisions found that Plaintiff was not suffering from MS and was fit for duty. The decision of the MPRB contradicts this finding and violated USAF Regulations. Hence their decision and that of the AFBCMR's decision based upon the MPRB's decision was arbitrary and capricious and against the great weight and preponderance of the evidence produced at the MPRB Hearing, and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

       d.      The decision of the MPRB was based on evidence produced at the hearing and not given to Major Webster prior the hearing in contradiction of AFI 44-119. Hence the decision of the MPRB violated USAF regulations and thus is arbitrary and capricious and violative of the USAF's own regulations and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

       e.      A key part of the MPRB's decision was based upon Major Webster's alleged performance during a "Code Blue." The decision was based upon the testimony and memorandum of Dr. Burke and the testimony of Col. O'Neal, the Hospital Commander. It was not based upon the record of the "Code Blue" as it was represented to the MPRB that the record had been lost. In truth and in fact, the record of the "Code Blue," was locked in the Command Section. This record contradicts both the testimony of Col. O'Neal and Dr. Burke. The failure to produce this evidence or to reconvene the Board once it was

"found" produced a decision that was arbitrary and capricious, and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine. Col. O'Neal, who in acting upon the recommendations of the MPRB, had the "Code Blue" record and chose to disregard it and thus his decision and that of the MPRB was arbitrary and capricious and the failure to produce this evidence violated USAF Regulations and Major Webster's right to effectively confront her accusers, and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

       f.     At least one of the witnesses was subject to "Command Influence" not to testify in favor of Major Webster. While this witness did ultimately testify in Major Webster's favor, other witnesses were reluctant and refused to testify. The use of command influence violated USAF Regulations and tainted the entire process. The AFBCMR disregarded this evidence or found that as the witness ultimately testified for Major Webster, there was no harm. This finding fails to recognize that the exercise of such "Command Influence" tainted the entire impartiality of the hearing and thus their decision was arbitrary and capricious, and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

       g.     One of the MPRB members, against the advice of the Legal Adviser to the MPRB, conducted an investigation of the validity of one document in evidence as he doubted its credibility. The AFBCMR dismissed this conduct because the Board Member found out nothing. However, the hearing transcript contradicts this finding as the member specifically stated that the document that stated that the "Code Blue" had been reviewed and found nothing wrong was wrong and that the "Code Blue," contrary to the evidence produced by the Government, was not reviewed. Hence the AFBCMR finding was incorrect and further was arbitrary and capricious as it ignored the evidence in the transcript of the hearing, and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

       h.     The unbiased medical evidence produced in this case established that Major Webster did not suffer from MS, was not forgetful and was not disorganized. As such the contrary finding by the

MPRB and the AFBCMR was arbitrary and capricious and against the great weight of the evidence adjudged at the MPRB hearing, and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

        i.      The MPRB and the USAF advisory opinions to the AFBCMR counseled that the AFBCMR should disregard the favorable testimony of the witnesses for Major Webster as none of these witnesses were her peers in the Emergency. However, the clear and uncontradicted evidence shows that several of Major Webster's witnesses were her peers in the Emergency Room. Hence a decision based upon the opposite conclusion is arbitrary and capricious and against the great weight and preponderance of the evidence, and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

        j.      Major Webster was denied the right to investigate the patient complaints used at the MPRB due to the vast amount of documents produced and given the time between the MPRB and the actual complaints. However, two of the complaints which the MPRB and the AFBCMR relied upon were contradicted in the evidence produced during the MPRB hearing and by subsequent evidence produced to the AFBCMR. Hence, the great weight and preponderance of the evidence show that she acted in accordance with standard practice of medicine. The decision of the MPRB and subsequent decision of the AFBCMR based upon the MPRB's decision was against the great weight and preponderance of the evidence and hence was arbitrary and capricious, and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

        k.      The finding of the MPRB that Major Webster was forgetful and disorganized was unsupported by any of the evidence produced at the MPRB and the decision of the AFBCMR supporting this decision was without basis in law or fact and thus was arbitrary and capricious, and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

        l.      The finding of the MPRB that Major Webster had cognitive difficulties was not supported by the great weight and preponderance of the evidence. There was no evidence that showed that Major Webster displayed any cognitive difficulties in treating her patients, but rather the evidence was

totally to the contrary.  Hence the decision of the MPRB and the subsequent decision of the AFBCMR based upon the MPRB's findings were arbitrary and capricious, and violated Plaintiff's constitutionally protected right to due process prior to the taking of her property, that is, her licenses and rights to practice medicine.

        m.    Plaintiff, as a result of the information filed with the NPDB, has been denied of her livelihood as a practicing physician.  This taking of a valuable property was accomplished without Plaintiff being granted due process of law as is required by the 7th Amendment to the United States Constitution. Consequently the decision of the AFBCMR was arbitrary and capricious and should be rescinded.

14.    As a direct and proximate result of the Defendant violating its own regulations, Defendant was denied due process of law as guaranteed under the 7th Amendment to the United States Constitution.  As a direct and proximate result of Defendant's denial of Plaintiff's right to due process, the AF/SG sent an unfavorable report to the NPDB which resulted in the Plaintiff having all her licenses revoked in every state in which she practiced law.

15.    Plaintiff would show the Court that she is a Board Certified in the Specialty of Internal Medicine and that as a result of her constitutional protected right to due process, she was lost her licenses to practice medicine in all the states that she was licensed to practice.  Plaintiff would further show the Court that the median income for a Board Certified Specialist in the states that she was licensed and in the United States in general were as follows:

| State and Nation | State and National Median Yearly Income for Calendar Year 2004* |
|---|---|
| United States | $145,600.00 |
| Michigan | 144,300.00 |
| Wisconsin | 145,600.00 |
| Pennsylvania | 129,300.00 |
| California | 144,700.00 |
| **Average Median Income in States:** | **$140,975.00** |

* Source: AMERICA'S CAREERINFONTET, Informed Career Decisions, A Component of CareOneStop.

16.     Based upon the above, Plaintiff hereby pleads for damages for the Defendant's unconstitutional taking of her licenses to practice medicine as a direct and proximate result of her Defendant's to provide her with due process under the 7th Amendment to the United States Constitution in the amount of $810,606.20 through August 2006 for past damages, and future damages at the rate of $11,747.92 per month through the date of trial and thereafter until the Defendant rescinds it unfavorable information letter to the NPDB and Plaintiff's medical licenses are reinstated, and all the costs of reinstating Plaintiff state medical licenses in the states of California, Michigan, Pennsylvania and Wisconsin.

WHEREFORE PREMISES CONSIDERED, Plaintiff requests that that upon final hearing the Court order:

1.     The findings and recommendations of a Medical Practice Review Board restricting Plaintiff from practicing Emergency Medicine should be removed from Plaintiff's records.

2.     The determination of the 24th Medical Group commander restricting Plaintiff from practicing medicine in the Family Practice/Primary Care/Aerospace Medicine clinics without 100 percent supervision for six months should be removed from Plaintiff's records.

3.     The adverse correspondence provided to the National Practitioner Data Bank by the Office of the Surgeon General (AF/SG) shall be rescinded, or in the alternative, shall be limited to only a restriction that the Plaintiff shall be limited to practicing Emergency Medicine under the supervision of another physician;

4.      Plaintiff should be granted damages in the amount of at least $810,606.20 for lost wages in the past and the future, and costs of reinstating Plaintiff's medical licenses in the states of California, Michigan, Pennsylvania and Wisconsin.

Respectfully submitted,

_s/Terrence J. Martin_

**TERRENCE J. MARTIN, SR.**
Law Offices of
TERRENCE J. MARTIN, SR.
THE PARK ON MEDICAL
4115 Medical Drive, Suite 401
San Antonio, Texas 78229
Tel.:  (210) 697-3400
Fax:  (210) 697-6386
Attorney for Plaintiff

### CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this __ day of _____2006, a copy of the foregoing "PLAINTIFF'S FIRST AMENDED ORIGINAL COMPLAINT," was filed electronically.  I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_s/Terrence J. Martin, Sr._

**TERRENCE J. MARTIN, SR.**